UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
          Plaintiff,               )  Civil Action
                                   )  No. 1:07-12065-JLT
          vs.                      )  September 11, 2009
                                   )  @10:20 a.m.
WESLEY GRAHAM,                     )  Non-Jury Trial
          Defendant.               )  Day Three



     BEFORE:  THE HONORABLE JOSEPH L. TAURO
              UNITED STATES DISTRICT JUDGE


     APPEARANCES:

     United States Attorney's Office
     (By:  Mark J. Grady, Attorney at Law &
           Donald J. Savery, Attorney at Law)
     1 Courthouse Way, Suite 9200
     Boston, Massachusetts  02210
     (617) 748-3100

          On Behalf of the Plaintiff.


     Federal Defender's Office
     (By:  Stylianus Sinnis, Attorney at Law &
           Ian Gold, Attorney at Law)
     51 Sleeper Street, 5th Floor
     Boston, Massachusetts 02210

          On Behalf of the Defendant.


          John Joseph Moakley United States Courthouse
                    Courtroom No. 21
                    1 Courthouse Way
                    Boston, MA  02210


               Helana E. Kline, RMR, CRR
          John Joseph Moakley United States Courthouse
               1 Courthouse Way, Room 3209
                    Boston, MA 02210

I N D E X

Witnesses called on behalf of the Plaintiff:


Testimony of:

                        Direct   Cross   Redirect   Recross

Floyd Young, Jr.

By Mr. Sinnis          6


Ivan D. Young

By Mr. Sinnis          15


Witnesses called on Behalf of the Defendant:


Joseph J. Plaud, Ph.D.

By Mr. Gold            24

By Mr. Grady                            104



E X H I B I T S


Marked into Evidence:

No.    Description                              Page

31     Introductory sections of the DSM admitted   5
       by stipulation.

32     Notes of Dr. Joseph Plaud.                   5

```
1              P R O C E E D I N G S
2          THE COURT:  We're going right into the jury-waived
3     trial.  Where are we, the doctor left?
4          MR. SINNIS:  Yes.  The doctor left, your Honor.
5          MR. GOLD:  Yes, she left.
6          THE COURT:  Did she make her plane?
7          MR. SINNIS:  I believe she did.  There was a cab
8     downstairs waiting for her so I think that was not a problem.
9          THE COURT:  Okay, good.
10         MR. GRADY:  Your Honor, just one housekeeping matter
11    before we rest.  We've got two exhibits that we want to --
12         THE COURT:  I thought you wanted to put her on some
13    more?
14         MR. GOLD:  No.
15         MR. SINNIS:  We may decide to recall her, your Honor,
16    but she needed to go back to Wisconsin to deal with some
17    personal matters ... so if we recall her, it would not be
18    today.  We're going to move into -- I don't know if the
19    government's officially going to rest or how the
20    government's handling it?
21         MR. GRADY:  Well --
22         THE COURT:  Well, you wanted some more testimony
23    from her too or no?
24         MR. GRADY:  We're comfortable with where things
25    stand.  I mean, if they're willing to conclude their cross
```

1    where we were yesterday, we're happy to let things stand as

2    they are.

3          THE COURT:  Well, I have to know that now.  You know,

4    that's --

5          MR. SINNIS:  Well, I may have misunderstood your

6    Honor's comments yesterday, so let's clarify that:  you gave

7    us an opportunity to recall her if we wanted, correct?

8          THE COURT:  Well, the question is:  does the

9    plaintiff rest?  The plaintiff is not going to rest until

10   the cross-examination is closed because then the plaintiff

11   can figure out whether they want to have redirect or not.

12      Now, as I take it, plaintiff's counsel is satisfied to

13   rest if you people rest; and, you know, when I say "rest,"

14   we're not going to have any further evidence from this

15   witness who I guess is your only -- the plaintiff's only

16   witness, is that it?

17         MR. SINNIS:  I think my answer to that would be to

18   allow, your Honor, to give us some time to think about that,

19   to call these next two witnesses out of order, to give

20   Mr. Gold and I a chance to talk about that, and then get

21   back to you.

22      The government has agreed to call these two witnesses

23   out of order anyway.

24         THE COURT:  So it doesn't matter whether you're

25   resting or not?

1        MR. GRADY:  That's fine, your Honor.  Could I mention

2   just one housekeeping matter, and, that is, we're going to

3   be putting in Exhibit 31 by stipulation.

4      I need to get a better copy, but it's going to be

5   introductory sections of the DSM that we discussed on

6   redirect yesterday.  It's by agreement of the parties.

7        THE COURT:  Okay.

8        MR. GOLD:  And also, your Honor, we're going to be

9   offering the notes of Dr. Plaud as well who's the next

10  witness here.

11        MR. GRADY:  If they're agreed, they weren't agreed

12  as of --

13        MR. SINNIS:  They can come in?

14        MR. GRADY:  We have no objection, your Honor.

15        THE COURT:  So it's exhibit what?

16        MR. GRADY:  They're marked as Exhibit F in the binder

17  the court already has.  We can remark it as Government

18  Exhibit 32, is that correct?

19        THE CLERK:  Correct.

20        THE COURT:  Okay.  We're going right along very

21  nicely here, see....

22        MR. SINNIS:  Should I knock on the door?

23        THE COURT:  Knock on the door, see if he's in

24  there ... can you hear him?  We're all set for you.

25  Thank you.  How are you this morning?

1          THE WITNESS:  I'm fine, sir.  How are you?

2          THE COURT:  Good.

3          MR. SINNIS:  Will your Honor give Mr. Gold and I

4    about ten minutes after these two witnesses to make that

5    decision of whether or not we're going to recall Ms. Salter?

6          THE COURT:  Of course.

7          MR. SINNIS:  Okay.  Thank you, your Honor.  At this

8    time the respondent would call Floyd Young to the stand....

9          THE COURT:  What is this, the 11th?

10         MR. SINNIS:  Yes, your Honor ... you have to be

11   sworn in.

12         THE COURT:  Yes, just a minute.  Raise your right

13   hand.

14              (Floyd Young, Jr., duly sworn.)

15         THE COURT:  Okay.  You may be seated.

16         THE WITNESS:  Thank you, sir.

17         DIRECT EXAMINATION BY MR. SINNIS:

18   Q.   Mr. Young, can you please state your full name,

19   spelling your last name for the record?

20   A.   Floyd Young, Y-o-u-n-g, Jr.

21   Q.   Floyd Young, Jr.?

22   A.   Yes, sir.

23   Q.   And, Mr. Young, do you know Wesley Graham?

24   A.   Yes, sir.  He's my uncle.

25   Q.   Okay.  How long have you known Mr. Graham?

1    A.   Say ever since I probably was around about three, four.

2    Q.   Okay.   When's the last time -- well, strike that.   Were

3    you in the courtroom yesterday?

4    A.   Yes, sir.

5    Q.   Is that the first time you'd seen your uncle in some

6    years?

7    A.   Yeah, about five years --

8    Q.   Okay.

9    A.   -- or something.

10   Q.   And why is it that you hadn't seen your uncle in the

11   last five years?

12   A.   Well, the last time I think was when I came up to

13   Jessup; he had moved so far away to here.

14   Q.   When you say the last time you seen him was when he was

15   at Jessup, is that what you said?

16   A.   Yes, sir.

17   Q.   And is that a prison facility?

18   A.   Yes, sir.

19   Q.   Closer to where you live?

20   A.   Yes, sir.

21   Q.   So since he's been moved up to Massachusetts, you

22   haven't had an opportunity to see him?

23   A.   Until yesterday.

24   Q.   Okay.   And going back a little bit, you said that

25   you're his nephew, who is your mother?

1    A.   Lizzy Mae Young.

2    Q.   Okay, and was that Mr. Graham's sister?

3    A.   Yes, sir.

4    Q.   Okay, and did Mr. Graham have any other sisters or

5    brothers?

6    A.   No, sir.

7    Q.   And is your mother still alive?

8    A.   No, she just passed June of this year.

9    Q.   And in your knowledge was she close to her brother

10   Wesley?

11   A.   Yes, sir, she was.

12   Q.   And when she was alive and he was down in Jessup, would

13   they visit?

14   A.   Yes, sir.

15   Q.   And would you visit as well?

16   A.   Yes, sir.

17   Q.   How often do you think you visited Mr. Graham during

18   the course of his stay in prisons that were closer to where

19   you live?

20   A.   It was something like a month, maybe two months; maybe

21   a month, something like that, whenever my mom feel like she

22   wanted to go up and see him.

23   Q.   And where do you live now, sir?

24   A.   65 --

25   Q.   You don't have to give us the full address, just give

1    us the city and state.

2    A.   I live in Maryland, District Heights, Maryland.

3    Q.   And have you lived there for awhile?

4    A.   Yeah.  Approximately about four, five years, something

5    like that.

6    Q.   Where did you grow up?

7    A.   I grew up in DC.

8    Q.   And do you have any siblings?

9    A.   I have kids.

10   Q.   Okay.  Do you have any brothers and sisters?

11   A.   Yeah, I have about three brothers and two half brothers

12   and a stepsister.

13   Q.   And you also have children you said?

14   A.   Yes.

15   Q.   How many children do you have?

16   A.   I have three.

17   Q.   And do they live with you?

18   A.   No, Michael does; my other son doesn't and my daughter

19   doesn't.

20   Q.   Okay, and do you live with -- do you have a partner or

21   are you married?

22   A.   I'm married, going through a divorce.  I have a fiance

23   and two step kids.

24   Q.   And do they live with you?

25   A.   The two step kids does, yes, and my fiancee does.

Q.   And if Mr. Graham is released, would you be willing to
have him live with you?

A.   Yes, sir, not a doubt.

Q.   Do you have room in your house to have Mr. Graham live
with you?

A.   Yes, I do.

Q.   And you would take him in under your roof?

A.   Yes, sir, I will.

Q.   Do you work?

A.   Yes, sir.

Q.   What do you do?

A.   I do transportation.  I transport kids to school.

Q.   And do you know anything about Mr. Graham's work
history?

A.   Well, we worked together a few times.  We did some
construction work together.  He got me that job; and after
that ended up -- I ended up working at a car dealership, and
I called my uncle up and asked him if he would like to come
work up here with me, so I got him a job up here with me.

     And he worked in one section, I worked in another
section, and we held on, and, unfortunately, he had an issue
with a ride so he couldn't get to work and my job was in a
different direction so we just couldn't keep up with the time
to keep him going.

Q.   So you're saying at some point he got terminated from

1    that job because he couldn't get there?

2    A.   Yes, sir.

3    Q.   And you mentioned that he had gotten you a construction

4    job at one point?

5    A.   Yes, sir.

6    Q.   And you both worked construction together?

7    A.   Yes, sir.

8    Q.   Do you know a woman named Mary, Mary Phargood?

9    A.   Yes, sir.

10   Q.   And did that person have a relationship with your uncle?

11   A.   Yes, sir.

12   Q.   And can you describe for the Court what you know about

13   that relationship?

14   A.   Well, since I was small Ms. Mary had been around us for

15   many years.  I never seen no problems with them arguing or

16   nothing like that.  We always came over my uncle's, visit my

17   mom.  I'd go over to his house, walk through the little park,

18   with her little grandson who used to walk with me and my

19   uncle.

20   Q.   So fair to say that Mary was involved and integrated

21   into your sister's family and Mr. Graham's family?

22   A.   Yeah, we was good friends.

23   Q.   Do you still have contact with Mary?

24   A.   Yeah, she was calling infrequently to talk to my mother,

25   my uncle, and we was talking about her, and you know, just

1  chatting.

2  Q.   Okay.  Do you know whether or not her and Mr. Graham

3  still speak?

4  A.   Well, I know they was -- she was talking to him on the

5  phone on a call.  You know, she accepted the phone call and

6  stuff like that.

7       MR. GRADY:  Objection, your Honor.  Move to strike

8  for lack of foundation.

9       THE COURT:  I'll sustain it.

10 Q.   Did you ever speak to Miss Phargood or your uncle about

11 whether or not they were still in communication with each

12 other?

13 A.   Yeah, she told me she talked to him on the phone.

14      MR. GRADY:  Objection.  Move to strike the portion

15 she told him.

16      THE COURT:  I'll let it stand.

17 Q.   And when's the last time you saw Miss Phargood,

18 "Ms. Mary" as you called her?

19 A.   Mary, I think she had moved because she had a little

20 store down there on Alabama Avenue, and I think her brother

21 took sick or something like that.  And she was there for

22 awhile and then she moved, but she stayed in contact with my

23 mother.

24 Q.   Where did your mother grow up?

25 A.   I think in, I think in Hornsborough; I don't know.  I

```
 1   know she moved to DC, and that's where I was raised since I
 2   was one years old in Stanton, New Jersey.
 3   Q.   Okay.  And so your mother had you when -- you were born
 4   in DC?
 5   A.   Yeah.
 6   Q.   So since at least you've been alive your mother's lived
 7   in DC?
 8   A.   Yes, sir.
 9   Q.   And do you know anybody who used to live next-door to
10   where your mother and Mr. Graham grew up, do you know the
11   family that used to live next-door or their children?
12   A.   Well, it was like a few people.  I know Darnel, Nell,
13   Cynthia.  I think her mother's name was Gray; it was Gray or
14   something like that.
15   Q.   So next-door to where your uncle grew up and your mother
16   grew up there was a family with children named Cynthia,
17   Darnel, and Nell, and you think the mother was Mrs. Gray?
18   A.   Mrs. Gray, yeah.  I think her name was Mrs. Gray if I'm
19   not mistaken.
20   Q.   If your uncle should be released at the end of this
21   case, you indicated that he'd be welcome to stay in your
22   home, correct?
23   A.   Yes, sir.
24   Q.   Would you be of assistance to him in trying to help him
25   gain employment?
```

1    A.   Yes, sir.

2    Q.   Would you help support him in the interim until he could

3    gain employment?

4    A.   Yes, sir.

5    Q.   And he'd be free to stay at your house for any number of

6    months or however long it takes for him to get on his feet?

7    A.   As long as he needs.

8         THE COURT:  What did you say?

9         THE WITNESS:  As long as he needs, sir, as long as

10   he wanted to stay.

11        THE COURT:  As long as he needs?

12        THE WITNESS:  Yes, sir.

13   Q.   You said you hadn't seen him since he left Jessup.  Have

14   you talked to him since he left Jessup?

15   A.   Yes, sir.

16   Q.   How often do you talk to your uncle?

17   A.   Whenever he calls.

18   Q.   When do you think that is?

19   A.   Well, he calls -- frankly, you know, talks, says hi to

20   everybody.  You know, see how I'm doing and, you know, how is

21   everybody holding up and everything like that.

22        MR. SINNIS:  One moment, your Honor ... nothing

23   further, your Honor.

24        THE COURT:  All right.

25        MR. GRADY:  No questions, your Honor.

1           THE COURT:  Okay.  You're excused, sir.

2           MR. SINNIS:  Your Honor, we would call Ivan Young to

3    the stand....

4           THE COURT:  Right up here, sir.  Raise your right

5    hand.

6                    (Ivan D. Young duly sworn.)

7           THE COURT:  You may be seated.

8      DIRECT EXAMINATION BY MR. SINNIS:

9    Q.  Mr. Young, could you please state your full name for

10   the Court and spell your last name?

11   A.  Ivan Young.

12   Q.  Can you speak into the microphone?

13   A.  Sorry.  My full name is Ivan Young, Ivan Darien Young,

14   last name is Y-o-u-n-g.

15   Q.  Can you spell your middle name for the court reporter?

16   A.  D-a-r-i-e-n.

17   Q.  And where do you live, sir?

18   A.  I live in Bryans Road, Maryland, in Charles County.

19   Q.  And how long have you lived in Maryland?

20   A.  I've lived in Maryland for about three years, a little

21   over three years.

22   Q.  And do you recognize Mr. Graham?

23   A.  Yes, he's my uncle.

24   Q.  How long have you known your uncle?

25   A.  Now, 42 years.

1    Q.    Is that how old you are?

2    A.    Yes, sir.

3    Q.    Can you briefly for the Court describe your relationship

4    with your uncle as you were growing up?

5    A.    Yes.  We -- basically, I mean, when I was growing up,

6    we used to go fishing together.  We used to go over his house

7    because he lived at Oxen Hill, and we used to, you know, get

8    together, go fishing.  We went and got our license together

9    as well.

10   Q.    I'm just going to take a moment and move this microphone

11   a little closer and ask you to just speak into it, sir.

12   A.    Okay.

13   Q.    You said you went fishing on occasion with your uncle?

14   A.    Yes.

15   Q.    And you said, where did your uncle live at that time?

16   A.    I think it was Oxen Hill right off Lincoln Road.

17   Q.    And do you know who he lived with?

18   A.    Yes, Mary.

19   Q.    And did he live with Mary for some time?

20   A.    Yes.

21   Q.    And did you have occasion to observe him interact with

22   Mary?

23   A.    Yes.

24   Q.    And can you just tell the court what you perceived in

25   terms of what you saw in terms of their relationship?

```
 1    A.   He used to come over the house, visit me and my mother

 2    and my grandfather.  We used to go outside.  We used to play

 3    outside and have fun, play volleyball, kickball, and stuff

 4    like that.  I used to go over his house with him and Mary

 5    and sit down at the table, eat, talk, laugh, have fun

 6    together, you know.

 7    Q.   Did you ever see any violence between the two of them?

 8    A.   No.  No, it's always been like he's fun.  You know, he's

 9    always laughing and enjoying himself.

10    Q.   And just so the Court's aware of what time frame we're

11    talking, are we talking roughly in the kind of early to mid

12    '80s, that time frame in there; is that what you're speaking

13    about?

14    A.   Yes.

15    Q.   Do you speak to your uncle now?

16    A.   Yes.

17    Q.   How often do you speak to your uncle?

18    A.   I think it's maybe, maybe three weeks or something like

19    that, almost a month, something like that.  Once every three

20    -- or once a month, something like that.

21    Q.   And he calls you obviously, right; you can't call him?

22    A.   Yes.

23    Q.   And what kinds of things do you guys talk about?

24    A.   Well, basically, we talk now.  One time he called me

25    asked me -- like I figure if he need something he'd call me
```

1    or if he needed to talk, we'd sit down and talk about, you

2    know, how things is going.  And he asked how the family's

3    doing and everything.  I'd say, you know, everybody's doing

4    fine.

5        You know, I talked to him about what's going on here

6    about the case here, you know, where the case is at.  I was

7    more questioning him, you know, why are things going the way

8    they're going ... because I was kind of puzzled how they're

9    putting him on the new law instead of the old law.

10   Q.   You're talking about you don't quite understand why

11   your uncle hasn't come home yet, is that what you're saying?

12   A.   Yes.

13   Q.   And you say that because you had anticipated, the

14   family had anticipated, him coming home at the end of his

15   prison sentence or why do you say that?

16   A.   Yes, that's why I said that.  I figure he should be at

17   home by now.  He actually served his time so....

18   Q.   How did your uncle learn that his sister had passed

19   away?

20   A.   I had to call him on the phone, and he ran over to the

21   chaplain, and the chaplain called him in, and the chaplain

22   told him my mother passed away.

23   Q.   And that was in June of this year?

24   A.   Yeah.  I think it was June, yes.

25   Q.   Do you have any sense of when the last time was he might

1    have seen his sister before that?

2    A.   The last time was probably up in Jessup.  I'm not sure

3    what year it was, but I think it was like a couple months

4    before he got transferred to Boston.

5    Q.   Did you ever speak to your uncle about the passing of

6    his sister?

7    A.   When she passed I basically talked to him about it and,

8    you know, just telling him, you know, how things was and how

9    peaceful she was and everything.

10   Q.   How did he take it?

11   A.   I mean, death you don't take well no matter who it is:

12   a family member, a friend, you don't take well at all, but

13   a mother, you know, it's kind of hard when you lose your

14   mother --

15   Q.   And how did your uncle --

16   A.   -- and sister.

17   Q.   How did your uncle take it?

18   A.   Well, I was just saying it was kind of hard.  He

19   basically lost his father and then he lost his sister, so,

20   you know, it's kind of hard.  The only thing he have left is

21   me and my brother, now that my mother's gone.  When you lose

22   a family member, it's kind of hard.

23   Q.   So you're the family he has left?

24   A.   Yes.

25   Q.   And as that family he has left, are you willing to help

```
1    him if he should be released?
2    A.   Yes.
3    Q.   What types of things would you be willing to do?
4    A.   Anything I possibly can.  If he needs, you know, a place
5    to stay or if he needs some money or go out and help him,
6    you know, if it's a job something, you know, whatever he
7    needs me to help him, I will help him.
8         MR. SINNIS:  Thank you very much.
9         THE COURT:  Any cross?
10        MR. GRADY:  No, your Honor.  Thank you.
11        THE COURT:  All right, you're excused.
12        THE WITNESS:  Thank you.
13        MR. GRADY:  Can we have that 10 minutes I asked you
14   about now, your Honor; I know it's short, or maybe just 5
15   minutes to speak to Mr. Gold about the decision with regard
16   to recalling Dr. Salter?
17        THE COURT:  Then what are we going to do?
18        MR. GOLD:  Then we have -- in the event that we say
19   we're not and the government rests, we have a case to put on.
20   We have a witness waiting outside to start the defense -- to
21   continue the defense case.
22        MR. SINNIS:  Dr. Joseph Plaud will be our first
23   witness, your Honor.  Our second witness is Dr. Barry Mills
24   who we agreed to start fresh with on Monday, but we have
25   Dr. Plaud ready to go.  We just need like two minutes.
```

1          THE COURT:  Well, you're getting faster and faster.

2     First, it was 10; then, it was 5; now, it's down to 2, and

3     you haven't even started yet, so why don't you try 5 and see.

4     We'll take a five-minute break.

5          MR. SINNIS:  Thank you, your Honor....

6          (Whereupon, a brief recess convened.)

7          THE CLERK:  All rise for the Honorable Court....

8          THE COURT:  Good morning again, everybody.

9          MR. GRADY:  Good morning, your Honor.

10         MR. SINNIS:  Your Honor, we do not wish to recall

11    Dr. Salter.

12         THE COURT:  Okay.

13         MR. GRADY:  The government rests.

14         THE COURT:  The government rests.

15         MR. SINNIS:  Your Honor, at this time we would

16    actually make a motion, an oral motion, under civil Rule 52C

17    for a finding against the government at this point based upon

18    the insufficiency of the evidence presented.

19       The government has presented one witness, Dr. Anna

20    Salter, and that doctor has testified that based upon the

21    diagnosis of paraphilia NOS(nonconsent), Mr. Graham, who

22    actually probably should be here but --

23         THE COURT:  Yes.

24         MR. SINNIS:  -- I'll await his presence.

25         THE COURT:  Why don't we do that.

1          MR. SINNIS:  I'm sorry.  I just noticed myself.

2          THE COURT:  Please, if it weren't for you, we would

3     have done the morning without him; I forgot all about him.

4     I'm so used to being taken care of....

5          MR. SINNIS:  We all are by Ms. Lovett and all the

6     other clerks....

7          THE COURT:  Go ahead.

8          MR. SINNIS:  Just so the record reflects, Mr. Graham

9     is now present in the courtroom.

10         THE COURT:  Go ahead.

11         MR. SINNIS:  Your Honor, I was saying we would move

12    pursuant to civil rule 52C for a finding that the government

13    has not met their burden by clear and convincing evidence.

14        The one witness that they've presented, Dr. Anna Salter,

15    has testified that the paraphilia NOS (nonconsent),

16    otherwise known paraphilic rapism, paraphilia, paraphilia

17    coercive disorder, that Mr. Graham suffers from it; and as a

18    cause of that, he's going to be -- it is likely that he

19    would reoffend.

20         Before I get to that, I just want to say that in terms

21    of antisocial personality disorder, the government is going

22    to respond on cross-examination Dr. Salter said that the

23    antisocial personality disorder does not drive the sexual

24    offending, so I think they're out of the box on that right

25    there.  That was a direct quote from what she said during

```
1    her testimony.
2         MR. GRADY:  Your Honor, I don't wish to interrupt my
3    brother, but the government would not advance the argument
4    that his antisocial personality alone would be sufficient
5    to support commitment on the facts of this case.
6         THE COURT:  Okay.
7         MR. SINNIS:  So as I hear that, the government is
8    relying pretty much exclusively on paraphilia NOS
9    (nonconsent) or somehow it's a combination with antisocial
10   personality disorder, so is paraphilia NOS (nonconsent) a
11   valid diagnosis, a mental disorder, or illness, or
12   abnormality under the DSM?  I think that's the question for
13   your Honor to answer.
14        THE COURT:  Well, I think it is, but why don't we
15   finish the evidence.
16        MR. SINNIS:  Okay.  Well, then, I would make that
17   motion on the ground that your Honor is obviously
18   anticipating us to reserve that until the end of the case?
19        THE COURT:  I'll reserve.
20        MR. SINNIS:  Thank you.
21        THE COURT:  Okay.
22        MR. GOLD:  Your Honor, at this time the respondent
23   would call --
24        THE COURT:  I mean, it's essentially the same issue
25   that I had in a different context, the last case I had.
```

```
1          MR. SINNIS:  Absolutely, your Honor.

2          MR. GRADY:  Your Honor, if the court is reserving

3   decision, I will reserve argument, but the government would

4   not agree that it's specifically the same issue.

5          THE COURT:  I didn't say specifically.

6          MR. GRADY:  Okay.

7          THE COURT:  It's sort of the kissing cousin, third

8   cousin ... I'm trying to get you to nod.

9          MR. GRADY:  I would not deny either of the Court's

10  observations.

11         THE COURT:  Let the record reflect that it was all

12  done in good humor, everybody smiled.

13         MR. GOLD:  Your Honor, at this time the respondent

14  would call Dr. Joseph Plaud to the stand....

15         THE COURT:  Okay.  Doctor, raise your right hand

16  please.

17              (Joseph J. Plaud, Ph.D., duly sworn.)

18         THE COURT:  You may be seated.

19         THE WITNESS:  Thank you.

20     DIRECT EXAMINATION BY MR. GOLD:

21  Q.  Good morning, Dr. Plaud.

22  A.  Good morning.

23  Q.  Could you please state your name and spell your last

24  name for the record?

25  A.  Yes, it's Joseph J. Plaud, P-l-a-u-d.
```

1    Q.   And, Dr. Plaud, what is your profession?

2    A.   I'm a licensed psychologist.

3    Q.   Do you have a specialty in psychology?

4    A.   Yes.

5    Q.   And what is that?

6    A.   The specialty focus of my work as a psychologist from

7    the outset of my clinical training for about the last 22

8    years has been in evaluating and treating sexual offenders.

9    Q.   Dr. Plaud, I have placed on the ELMO here what has

10   previously been marked and entered into evidence as

11   Exhibit 28.  Do you recognize this document?

12   A.   Yes.

13   Q.   What is it?

14   A.   It's a cover page of my curriculum vitae.

15   Q.   And so the record shows it appears to be your complete

16   CV?

17   A.   Yes.

18   Q.   And I've placed what's been previously entered into

19   evidence as Exhibit 27.  Do you recognize that document?

20   A.   I do.

21   Q.   And what is it?

22   A.   That is a copy of my psychological psychosexual

23   evaluation report on Mr. Graham dated May 27, 2009.

24   Q.   Now, Dr. Plaud, could you please describe for the Court

25   your educational background starting with your Bachelor's?

1   A.   Yes.  I received my bachelor's degree in psychology in

2   1987 from Clark University in Worcester, Massachusetts, and

3   a Ph.D. in clinical psychology from the University of Maine,

4   yes, the University of Maine in Orono, completing my clinical

5   internship at the University of Mississippi Medical Center

6   in Jackson, Mississippi.

7   Q.   Now, during your Ph.D. studies did you have any

8   particular focus?

9   A.   Yes.  Beginning in my first year of graduate school, my

10  focus of training clinically was in evaluating and treating

11  sexual offenders.

12      My first major professor, whose name was William

13  O'Donahue, that was his area of clinical concentration, and

14  I began working with him in this area at a clinic that he

15  set up at the university providing evaluations of sex

16  offenders, setting up a physiological evaluation lab on

17  campus through a contract with the Maine Department of

18  Probation & Parole.

19  Q.   Could you describe what a physiological lab is?

20  A.   Yes, Dr. O'Donoghue's focus of his research with sex

21  offenders was and continues to be:  physiological analysis,

22  assessment of patterns of sexual arousal in males; and I

23  was tasked, since he didn't know too much about computers,

24  computers weren't back in the 1980s what they are now, but,

25  still, we were moving from solid state equipment to

1    computer-based equipment so my indoctrination into the

2    research lab was to basically to set up the entire lab, to

3    get all the computers working and to come up with the

4    protocols for the PPG, the penile plethysmograph, which is

5    a physiological assessment tool for use with males that

6    measured relative patterns of sexual arousal.

7    Q.  Can you describe for the Court your career steps after

8    your Ph.D. was complete?

9    A.  Yes.  After completing my degree, my first professional

10   position, matriculation, was to join the clinical psychology

11   faculty at the University of North Dakota at Grand Forks

12   where we had a Ph.D. program that was accredited by the

13   American Psychological Association in clinical psychology ...

14   so I could sit sort of on the other side of the desk and work

15   with students, graduate students, undergraduate students.

16   We set up our own clinic devoted to evaluating and treating

17   sexual offenders who were referrals from community-based

18   placement services in North Dakota.

19       As well as conducting research, excuse me, I also did

20   coordinate with local human service agencies on evaluative

21   services they were doing with sex offenders in the area.  I

22   was approached by the State of North Dakota to develop their

23   state-wide treatment program for sexual offenders who also

24   have a history of developmental disabilities.

25       It's a program I did develop and implement at the North

1    Dakota Developmental Center called the STOP Program, the

2    Specialized Treatment Offenders Program, which continues to

3    this day.  I consulted with that program and worked as a

4    consultant, as a clinical faculty member, faculty advisor,

5    for Ph.D.'s dissertations from 1993 until the very end of

6    1997.

7        I moved back to Massachusetts in December of 1997 after

8    I would say the great Grand Forks flood made me decide to

9    come back to this area, and I did do so.  I received several

10   faculty appointments in this area to teach courses which I

11   did actively for a few years and took a position as the

12   Director of Research for the Cambridge Center for Behavioral

13   Studies and then started my own private practice called:

14   Applied Behavioral Consultants, designed to evaluate and

15   treat sexual offenders, coordinating services with other

16   experts in the area, in the Greater Boston area, and I've

17   continued that work to the present day.

18   Q.   And you're a licensed psychologist?

19   A.   Yes, I'm licensed as a psychologist in the Commonwealth

20   of Massachusetts as well as in the State of New York.

21   Q.   There's a section in your curriculum vitae which

22   details your research grants.  Could you please describe

23   your research grant activities as they're relevant to your

24   expertise in this case to the Court?

25   A.   Yes.  While on faculty at the University of North

1    Dakota, I did apply for and receive several grants from the

2    federal government; most of which dealt with my empirical

3    inquiries into the measurement of sexual arousal, the

4    relationship between sexual arousal and sexual behavior.

5    Most of my grant activities were funded through the

6    National Science Foundation.

7    Q.   Now, have you performed research in the area of sex

8    offender research during the course of your career?

9    A.   Yes.

10   Q.   Do you have -- have you published in peer-reviewed

11   journals?

12   A.   Yes.

13   Q.   Approximately how many publications do you have to

14   your credit?

15   A.   In total, I mean, I can count them up on the CV there,

16   but a number of publications.  I would say over a hundred

17   publications in toto.

18   Q.   And could you please describe your research interests

19   and publications as they are most relevant to this case?

20   A.   Yes.  Well, I've had a number of publications that

21   focus on not only the definition and understanding of what

22   sexual arousal is as a physiological response system in the

23   human male, but the relationship of sexual arousal and

24   disorders of sexual arousal to essentially offending

25   behavior.

1        I've published in the parameters of understanding how

2    male sexual arousal, the course of it, in other words, the

3    conditioning parameters that underlie the expression of male

4    sexuality through arousal.  I've published articles dealing

5    with different strategies used to evaluate sex offenders as

6    well as to treat sex offenders ... so I would say that my

7    research over the years in this area has started with an

8    understanding with and definition of what male sexual

9    arousal is, the relationship between arousal and behavior,

10   and the function of assessment and treatment modalities in

11   addressing deviant sexual arousal.

12   Q.   For the record, I've placed Page 12 of your curriculum

13   vitae on the ELMO.  Could you please describe for the Court

14   the publication listed from 1997 with you as the principal

15   author entitled:  External Validity of Behavorial and

16   Psychophysiological Sexual Arousal Research?

17   A.   Yes.  That article, the research that was the basis for

18   that article, was an investigation as to the applicability

19   of analog research to clinical populations.  In other words,

20   most of the research that's conducted, including with issues

21   relating to or having potential application to sex offenders,

22   a lot of the basic behavioral physiological research is

23   conducted with college students, analog samples.

24       My research was no different, and what I found in the

25   laboratory had -- in writing up, presenting my data, and

1    discussing the data, and the implications for my findings,

2    where what I found with college students, what applicability

3    does that have to understanding sexual criminal behavior,

4    deviant sexual behavior, deviant sexual arousal, and that

5    article was addressed to the generalizability of

6    college-based analog samples to actual clinical populations.

7    Q.   Now, have you yourself in the laboratory performed

8    experiments regarding arousal with actual human subjects?

9    A.   I have.

10   Q.   And could you describe in some detail how those

11   experiments work?

12   A.   Yes.

13   Q.   Well, I've conducted a number of studies, but I would

14   say most of the studies were designed to evaluate how the

15   introduction of different types of sexual stimuli influence

16   males and their sexual response pattern, the parameters

17   under which males experience sexual arousal, whether or not

18   sexual arousal can be changed experimentally in the

19   laboratory by the introduction of certain types of

20   consequences, whether or not novel or nonsexual stimuli can

21   be conditioned to become sexual in a laboratory setting such

22   that it's a model, it's a behavioral model, that underlie

23   behavioral strategies to change aberrant behavior -- excuse

24   me, to change aberrant sexual arousal ... so what I would do,

25   for example, was to look at the respondent or classbook

1    conditioning of human sexual arousal.

2        And in one study I took college students and did some

3    preliminary testing by penile plethysmography, PPG, and

4    determined what their sexual preferences were directly; also

5    of their self-report of their sexual preferences.

6        I then took relevant stimuli associated with that,

7    compared it with novel stimuli that were not sexual in

8    nature; for example, slides of a penny jar.

9            THE COURT:  Slides of any jar?

10           THE WITNESS:  A penny jar, yes, Judge, a nonsexual

11   stimulus.

12           THE COURT:  All right.

13           THE WITNESS:  And through an experimental condition,

14   I introduced that as a conditioned stimulus, and found --

15   which resulted in a publication in the Journal of

16   Behavioral Modification 10 or 11 years ago, the respondent

17   conditioning of male sexual arousal; that I could induce

18   sexual response to previously neutral sexual stimuli

19   through specific types of pairing that neutral stimulus

20   with priority-defined sexually exciting stimuli to the

21   person being evaluated.  This was all measured by a PPG

22   physiologically in a laboratory.

23       I also studied habituation, both in the short term and

24   in the long term, as a model for understanding sexual

25   promiscuity and sexual compulsions.  In other words, I would

1   take, again, an understanding for individual subjects what

2   their sexual preferences were.  They would be measured on

3   those sexual preferences, and then repeated stimulus

4   presentations of those types of sexual stimuli would occur

5   over different spaced intervals of time, and decrements in

6   response to sexual arousal were measured.

7       They were reintroduced to see if there was a recovery

8   of the response, and essentially what I found, and some of

9   this research actually did win an award in the Journal of

10  Behavioral Therapy and Experimental Psychiatry in, I believe,

11  1993 or '94; that I found essentially that I -- I shouldn't

12  say "I," Dr. O'Donahue and I, we worked together on this

13  research ... we found that repeated stimulus presentations,

14  even for highly sexual excited stimuli initially, if they

15  were repeated with a certain type of manner, experimentally

16  we could essentially get them to go down very significantly

17  not only in the short term within the session but over weeks

18  and months so that they would show far less sexual

19  excitement to that stimuli.

20      And the implication of that was trying to understand how

21  people can stray from committed relationships, for example;

22  this is one implication of it, based on a sexual arousal

23  decrement, so we defined the parameters of both short and

24  long term habituation of sexual arousal in the laboratory.

25  Q.   Dr. Plaud, have you done any research of the kind that

```
1    you're describing now, specifically involving sexually

2    coercive stimuli?

3    A.   Yes.

4    Q.   Could you describe that research?

5    A.   Yes, we conducted a number of studies --

6              THE COURT:  Sexually coercive?

7              MR. GOLD:  Sexually coercive stimuli.

8              MR. GRADY:  Your Honor, I'm going to object to this

9    just for the record that Dr. Plaud has no mention in his

10   report relying upon his research in making the diagnosis in

11   this case.

12       To the extent it is merely for background and to show

13   his experience, certainly it is fair game; but to the

14   extent this is an attempt to lay a foundation for testimony

15   regarding an opinion in this case, based upon his testimony,

16   it was not disclosed in his report, it was not disclosed at

17   the time of deposition; therefore, it would be improper.

18             MR. GOLD:  Your Honor, I'm not sure -- this is part

19   of his expertise that makes him qualified to testify in the

20   case.  I don't think I'm heading where the government thinks,

21   but he researches in the area.

22             THE COURT:  Well, go ahead.  I mean, we'll take it

23   as part of his background; that's all.

24             MR. GRADY:  And I no objection to that, your Honor.

25             THE COURT:  Go ahead.
```

1    Q.   Please describe the research that you've conducted

2    which involved sexually coercive stimuli?

3    A.   Yes.   I did a number of studies that looked at again

4    analog college samples, first of all, whether or not males

5    could distinguish or differentiate in scenarios where

6    consent to sexual behavior verbally is not given.   In other

7    words, for example, the use of the word "no," and the sexual

8    arousal component.   In other words, did that verbally-based

9    statement of "no," did that cause people, college students,

10   who were not diagnosed in any way to decrease their levels

11   of sexual arousal compared to conditions when the consent

12   was given ... and I found -- we found essentially no

13   differences between those two issues; that sexual arousal

14   is not influenced or decreased, decremented, by the

15   introduction of a verbal stimuli such as "no" ... implying

16   that consent or stating directly that consent was not given.

17       This formed the basis for a series of other studies

18   where I tried to yet fine-tune an understanding of whether

19   I could tease out any other factors in students, in the

20   subjects, that could perhaps more reliably focus on whether

21   the coercive -- that certain types of people were more

22   likely to engage in coercive sexual behavior than others,

23   and so I looked at, for example, person's -- each subject's

24   desire for social acceptance or what we call social

25   desirability.   I looked at their sexual fantasies, whether

```
1    it involved any type of coercive, nonconsensual type of

2    sexual activity; and, again, essentially found that, I mean,

3    there were some differences, but on the whole, it was very

4    difficult to disentangle from the normal population of

5    college students a special subgroup where there was a focus

6    on that coercive -- the coercive nature of sexual

7    interaction with another.

8    Q.   And you mentioned before research talking about the

9    applicability of these types of samples to other situations?

10   A.   Yes.

11   Q.   So does that research have any -- can we draw inferences

12   from it that are more general?

13             MR. GRADY:  Objection, your Honor.

14             THE COURT:  Overruled.  I'll let him testify, go

15   ahead.

16   A.   Well, yes, you can, in my judgment, and that's why we

17   did the research:  to understand, to try to have an

18   understanding of factors related to when men are told no,

19   for example, by a partner, does that -- that may influence

20   their behavior?

21      Hopefully, it does influence their behavior on an overt

22   level such that they won't engage in coercive sexual

23   behavior; but, deeper than that:  is it influencing their

24   sexual arousal.  If a person says no to them, does that port

25   hold water on their arousal level?
```

1        We essentially found that it didn't, which is troubling,

2   because if you want to apply it up the scale from analog

3   samples to real-world situations, it might mean that one

4   reason, one explanatory reason why rape or coercive sexual

5   behavior is so prevalent in our society and in other

6   societies is because physiological arousal is still very

7   strong, regardless of the acceptable socially-based feedback,

8   including verbal feedback, withdrawing consent to sexual

9   interaction.

10        MR. GRADY:  Your Honor, the government objects and

11  would move to strike on the ground that counsel is

12  attempting to back-door in information which was not

13  disclosed in the report.

14        THE COURT:  I'm going to overrule the objection.

15  Go ahead.

16  Q.  Thank you.  Dr. Plaud, about what time were you

17  conducting this research?

18  A.  I would say '95, '96, '97; those three years was when I

19  was doing most of that research.

20  Q.  Are you currently doing any type of research or do you

21  have any publications that you're working on currently?

22  A.  Yes, I am currently working on several manuscripts; and

23  during the 1990s I was publishing with great ferocity, but

24  that is -- I've slacked off tremendously in the past five

25  years and don't think well of myself, so I've been

1    endeavoring to get back on track; and the focus of my

2    research now is more on aging and recidivism issues relating

3    to both statistical analysis of risk to reoffend based on

4    our understanding of base rates and other factors that are

5    associated with aging.  It comes out of some of the earlier

6    research I had done on chronic medical illness and sexual

7    functioning.

8    Q.   And do you have any research articles that are

9    currently in press or forthcoming?

10   A.   Well, I hope to have soon; I have some on submission

11   right now.

12   Q.   Dr. Plaud, you testify frequently as an expert witness

13   in cases of this kind, right?

14   A.   Yes.

15   Q.   And you testify typically for the defense?

16   A.   Yes.

17   Q.   Now, Dr. Plaud, are you a member of professional

18   associations in your field?

19   A.   Yes.

20   Q.   And what are those or those that are most relevant to

21   the issues here?

22   A.    Well, I mean, I'm a member -- I'm a fellow of the

23   American Psychological Association.  That's the association

24   I'm most active in; specifically, Division 41 of the American

25   Psychological Association, which is the American Psychology &

1    Law Society.  I run its lists, serve on the internet; that's
2    the most relevant.
3        I'm a member of other organizations as well that focus
4    on, for example, behavior therapy, behavior analysis,
5    applied behavior analysis and modification; those are the
6    organizations.
7    Q.   Now, have you ever failed to be qualified as an expert
8    in a case in which you testified?
9    A.   No.
10   Q.   Dr. Plaud, how did you come to be involved in the case
11   of Mr. Young?
12   A.   I think I became involved in this case because I was
13   contacted by you directly and asked if I would be willing to
14   do an evaluation of Mr. Graham, which I agreed to do, and
15   began my investigation and analysis shortly thereafter, I
16   believe, in late April or early May.
17   Q.   And I informed you -- were you appointed by the Court
18   in this case?
19   A.   Well, I'm not quite sure how that works in these
20   federal cases ... I believe I was court-appointed, yes.
21   Q.   Now, did you arrive at an opinion as to whether
22   Mr. Graham meets the criteria for a sexually dangerous person
23   under 18 U.S.C. 4247?
24   A.   Yes.
25   Q.   And what is that opinion?

A.   It's my professional opinion that he does not meet the
criteria.  He's not a sexually dangerous person.

Q.   And did you arrive at an opinion as to whether
Mr. Graham currently suffers from a serious mental illness,
disorder, or abnormality?

A.   I did make a conclusion in that area, yes.

Q.   And what is that?

A.   That he does not suffer from a serious mental illness,
abnormality, or disorder.

Q.   And did you arrive at an opinion as to whether
Mr. Graham will have serious difficulty in refraining from
sexual defiant conduct if he is released?

A.   Yes.

Q.   What is that opinion?

A.   I do not believe he will -- well, too, let me just say
that as a result of the way it's worded, since I don't
believe he has it.  I think that's pretty self-explanatory,
but I will say that I think he has requisite control over
his sexual impulses at this time.

Q.   Did you arrive at those conclusions to a reasonable
degree of professional certainty?

A.   I did.

Q.   Can you explain for the Court what you mean when you say
that?

          THE COURT:  Say what?

1          MR. GOLD:  Reasonable degree of professional

2     certainty.

3          THE COURT:  Okay.

4     A.   Yes.  Well, when I say that, I mean, based on my

5     training, my experience, my work with sexual offenders over

6     the past 22 plus years, my knowledge of relevant literature,

7     research in the area, and my training as a clinical

8     psychologist, that in my judgment based upon all of those

9     sources that I have an opinion professionally about

10    Mr. Graham at this time that he does not meet the criteria

11    for being sexually dangerous.

12    Q.   Can you describe what you did in your evaluation of

13    Mr. Graham?

14    A.   Yes.  The first step was I received records, documents,

15    that pertained to Mr. Graham's background; they were Bates

16    stamped, a number of records, concerning his history of the

17    reports, his criminal history, his sexual offense history,

18    his institutional history.

19         These were labeled, Bates stamped GR01 to GR939.  I

20    reviewed that material.  I organized it.  I made a number of

21    notes on it.  That was the basis then to travel to Devens

22    and conduct a complete clinical interview of Mr. Graham.

23         I obtained information from the records, supplemented

24    by my clinical interview, and I made, first of all, some

25    diagnostic impressions about Mr. Graham.  I looked at some

1    statistical risk issues and ultimately concluded that he

2    does not have any condition generally acquired at the time

3    of the evaluation that would lead him to have serious

4    difficulty in refraining from sexually violent behavior.

5    Q.   Dr. Plaud, why is a clinical interview important?

6    A.   Well, a clinical interview is important in keeping

7    with ethical principles and best practices because we're

8    evaluating individuals, people, and there are sources of

9    information that we rely on, records we rely on that may be

10   contradictory, especially when you have 939 pieces of paper.

11      They provide different conclusions, may not provide

12   enough ... so a clinical interview is used most importantly

13   in long diagnostic lines to discuss an individual's

14   background, to discuss their interpretation of certain life

15   events, maybe to put a little more definition in certain

16   areas of the record.

17      They're not really used for risk assessment per se.

18   It's more in the line of making diagnostic impressions of a

19   person, which not only involves making or clarifying issues

20   in the record, but, also, having direct one-on-one contact

21   with the individual engaging in certain behavioral issues

22   during the interview.

23   Q.   Now, Dr. Plaud, can you summarize for the Court your

24   impression of Mr. Graham's background?

25   A.   Yes, I do summarize this in my report.  He was born in

1    March of 1950 in South Carolina.  He had a sister Lizzy,

2    who's ten years older than he was.  She passed away recently.

3    She had four sons, so Mr. Graham does have four nephews,

4    which he indicated he has contact with.  His parents worked.

5    He was physically disciplined at home; and at the age of

6    approximately 16, he started living with his sister in

7    Washington, D.C.  His parents are deceased.

8       He -- educationally, he went to school to the 7th grade.

9    After which, he left.  However, during his term of

10   incarceration he has or made attempts to take some courses

11   to obtain his GED, his general equivalency diploma.

12      With regard to substance use, he did take alcohol on

13   weekends.  He did use marijuana from approximately the age

14   of 14 years to the mid 1980s.  He also started to inject

15   heroin at the age of 15 to approximately the age of 21 years.

16      I did not find any major medical conditions; and

17   according to Mr. Graham at the time of the interview, he

18   did not take any medications.

19      He worked growing up with his father in roofing.  He

20   worked in carpentry.  He's had a number of other jobs as a

21   clerk at a number of establishments as well as a security

22   guard.

23   Q.   Dr. Plaud, let me stop you there.  What are you looking

24   for when you're collecting this background information as it

25   applied to this assessment?

1    A.   What I'm looking for is to have an understanding of the

2    individual whom I'm evaluating, to have an understanding of

3    disciplinary issues, school issues, behavioral issues,

4    starting when they were young, substance abuse issues, but

5    I make or potentially can make diagnoses of them as an adult.

6        Some of those diagnoses are based on an understanding of

7    their childhood, their adolescence, they're socioeconomic

8    issues, they're criminal history, et cetera ... so this

9    information informs or assists my judgment in making

10   diagnostic conclusions about adult disorders, personality

11   disorders, sexual disorders, or any other type of mental

12   disorder.

13   Q.   Now, did you consider Mr. Graham's criminal history in

14   your assessment?

15   A.   Yes.

16   Q.   How does the -- well, what is your understanding of

17   Mr. Graham's criminal history?

18   A.   Well, he has a criminal history.  It started as a

19   juvenile, to which I also give some specific notation to in

20   my report beginning on Page 4.

21       When he was 13 years of age, he was arrested, charged

22   with petty larceny; again, arrested at age 15 for simple

23   assault, and several other encounters with the law going up

24   to his adulthood including:  substance abuse, motor vehicle

25   and disorderly convictions going up to 1985, separate from

1   his sexual convictions.

2   Q.   And moving onto his sexual convictions, Dr. Plaud,

3   which are at center stage here, can you describe your

4   understanding of Mr. Graham's sexually -- his sexual

5   convictions?

6   A.   Yes.  His sexual offense history includes, going back to

7   when he was in his early '20s; he was 23 years old in 1974.

8         MR. GRADY:  Your Honor, just for the record the

9   witness is reading from his report; I'd just wish the record

10  to reflect that.

11        THE COURT:  Well, I take it, we can do that or have

12  him refresh his recollection.

13        MR. GRADY:  No objection to the testimony, your

14  Honor, just for the purposes of the record.

15        THE COURT:  All right, go ahead.

16  A.   Thank you, Judge ... he had a 25-year-old victim and he

17  sexually assaulted her.  Do you want me to go into detail?

18  Q.   Well, why don't we -- if you would, Dr. Plaud, I guess

19  what I'm open to elicit is simply your clinical assessment of

20  the sexual offenses as they relate to the case.

21  A.   Okay.

22  Q.   Well, what happened, Dr. Plaud?

23  A.   On this first instance, again going back to 1974, he's

24  23 years old.  It was a woman he knew, 25 years old.

25  Apparently, he had known her for a number of years.

1        According to the official version, he picked her up,

2    drove her to a parking lot in Washington, D.C., had told her

3    to remove her clothing.  She did not.  She refused to do so.

4    He grabbed her, ripped her clothes in her crotch area,

5    removed her pants and panties and then raped her.

6        He then let her out of the car.  He offered to give her

7    a ride to her boyfriend's home.  She refused.  When she did

8    arrive there later on, she called the police.

9        She was examined and released at DC General Hospital,

10   and then Mr. Graham was arrested shortly thereafter, charged

11   with rape, for which he received a sentence of 6 to 18

12   months.  That's the official version.

13       I did elicit from Mr. Graham, his version.

14   Q.   And what is Mr. Graham's version?

15   A.   During the interview Mr. Graham stated to me that he

16   denied raping the victim.  He stated that he knew the

17   victim for a number of years when she was -- since she was

18   approximately 13 years old.

19       He began a sexual relationship with her when they were

20   both teenagers.  She had lived next-door.  When I asked him

21   therefore why was he accused of raping her?  His statement

22   to me essentially was that he was accused because he

23   believes that the victim was upset.  He was in a steady

24   relationship with another woman, and she was, the victim, he

25   said was in a series of troubled relationships, had some

1    drinking intoxication issues, and that he would with great

2    frequency pick the victim up at bars after she became

3    intoxicated and drop her off at her mother's house.

4        He did not deny having sexual relations with her but

5    stated that it was consensual in the past, but during the

6    time that he was accused of raping her he did not have

7    sexual relations with her.

8    Q.   Now, Dr. Plaud, what did you do with that conflict of

9    versions in your forensic assessment of this case?

10   A.   What I do with that information is what I did with my

11   report.  I put the official version; I put what he said, and

12   I proceed along the lines of the official version because of

13   the adjudication.

14       He was found guilty and had been given a criminal

15   sentence for it.  I wasn't there at the time.  I don't know

16   what happened.  I don't have super powers, so I just take,

17   given the legal consequence; I take the official version as

18   what happened.

19   Q.   So the police report that you read when you did the

20   assessment is the version of the facts that you regard as

21   the facts?

22   A.   Correct.

23   Q.   Is that right?

24   A.   That's correct.

25   Q.   Can you move on to the second sexual offense in

1    Mr. Graham's record?

2    A.   Yes.  In July of 1975, according to the official

3    version, there's an assault of a female in the middle of the

4    afternoon.  Mr. Graham was located, arrested, and ultimately

5    charged with assault with intent to rape where he was found

6    guilty in June of 1976.

7        After his plea he was given a sentence of

8    four-and-a-half to 12 years.

9    Q.   Dr. Plaud, if you could just wait one moment for the

10   court reporter....

11   A.   Again, I asked Mr. Graham during the interview about

12   this assault with intent to which he plead and received a

13   criminal sentence.  His statement to me during the interview

14   was that he did not commit this offense.  He didn't know who

15   the victim was, didn't know the victim's name, and I asked

16   him then why he pleaded guilty.

17       He stated he pleaded guilty because he was advised to do

18   so by his attorney.  He was told at the time -- he said that

19   the victim was pregnant, and he would probably get a very

20   lengthy sentence if he went to trial and so he pleaded.

21   Q.   So the same question, Dr. Plaud:  in this situation of

22   the conflict, what do you consider to be the facts with

23   respect to the second sexual offense?

24   A.   I would give you the same response insofar as that the

25   official version is the official version; that he did plead

1    guilty to that fact back in 1976.

2    Q.   What you do with the -- in a situation such as this when

3    there is not much factual information about a particular

4    offense?

5    A.   Well, what I do is I take what information I can get

6    from what is available.  I don't want to make inferences

7    unnecessarily or incorrectly.  I just take the information;

8    and in this case, I have information from the official

9    version that Mr. Graham was charged with assault with intent,

10   and that the victim was an adult female.

11       I think those are the two most important sources of

12   information, and there isn't a lot of other data in this

13   particular case to make other types of conclusions other

14   than what I just said.

15   Q.   Dr. Plaud, the third sexual offense?

16   A.   The index governing of the instant offense was from

17   1987.  According again to the official version, Mr. Graham

18   forced his way into the residence of an adult female.  He

19   had choked her on several occasions to -- basically to

20   unconsciousness, removed her clothing, and raped her.

21       He was arrested and charged with rape in the first in

22   Maryland, and he was convicted in 1988 on the charge of rape.

23   He received a sentence of 25 years.  His parole previously

24   was also revoked I believe for the 1987 charge.

25       It again involved rape of an adult female.  During the

1    interview Mr. Graham admitted to committing this sexual

2    offense, told me that what happened was at the time he was

3    sitting at a table, a picnic table, in a common area of a

4    condominium development area, and the victim was in that

5    area.  She was gardening.  They began to talk.  They began a

6    conversation.  He admitted that he forced himself on her.

7        He told me that at the time of committing this governing

8    offense he was angry, upset about his parole being violated,

9    returned to drinking alcohol.  He was intoxicated at the

10   time of the sexual assault, and that's his version, and the

11   official version.

12   Q.   Now, Dr. Plaud, in the course of reviewing the records

13   pertaining to this offense, did you review the decision of a

14   Maryland Court of Appeals?

15   A.   I did.

16   Q.   And for the record, I've put on the screen Page 513 of

17   the Bates-stamped discovery which is the fact section of the

18   Court of Appeals decision.

19       Do you recognize that, and is that part of the material

20   which you reviewed in arriving at your conclusions in this

21   case?

22   A.   Yes.

23   Q.   Dr. Plaud, if you don't mind, I will ask you to read

24   the factual section?

25   A.   Yes.  "The victim testified that on May 24, 1987, at

1    8 a.m. she had been working in her garden adjacent to her

2    residence for over an hour when appellant approached her

3    from the sidewalk.  Appellant stepped onto the victim's

4    patio and engaged her in a brief 'neighborly-type'

5    conversation.  The victim brought the conversation to a

6    close, went inside her residence" --

7    Q.   Just one moment, Dr. Plaud.  If I might, does that look

8    like:  "Closed the screen door"?

9    A.   Yes, it does.  "Closed the screen door, which could not

10   be locked."

11   Q.   "The victim saw"?

12   A.   "The victim saw the appellant had left the patio and

13   had returned to the picnic area nearby.  While the victim

14   was listening to the audio of a videotape, appellant again

15   appeared at the screen door and presented her with a plant.

16   She thanked him and again said that she had to go inside.

17       At approximately 11 a.m. the victim saw the appellant

18   again standing at her screen door with his right hand gloved,

19   and his left hand pressed against the glass.  It was then

20   that she became apprehensive.

21       Despite the victim's protests, appellant pushed his way

22   into her condominium, asserting that he wanted to see the

23   plant he had given to her.  When the victim screamed,

24   appellant placed his gloved hand over her throat and

25   dragged her into the living room.

1    Although, the victim initially struggled to free

2  herself, she stopped when appellant threatened to kill her.

3  Appellant then choked the victim until she passed out telling

4  her:  'I just got to put you out for awhile.'

5    When the victim regained consciousness and attempted to

6  stand" --

7  Q.  "Appellant"?

8  A.  -- "appellant choked her again.  The victim twisted her

9  body so that she could kick the door.  She stopped when

10  appellant again threatened to kill her.  For the second time

11  the appellant choked the victim into unconsciousness.

12    Before the appellant initiated sexual intercourse with

13  her, the victim requested that he be gentle because she had

14  not had intercourse for about four months.

15    After the act was completed, the appellant warned the

16  victim that no one would believe her if she reported" -- I

17  really cannot make it out.

18  Q.  I'm going to -- "if she reported this because there was

19  no sign of forced entry," is that what that looks like?

20  A.  Yes.  "The victim requested a glass of tea.  Appellant

21  helped her up because she was too weak to stand.  At

22  approximately 11:30 a.m. appellant outstretched his hand to

23  guide the victim into her bedroom stating that he 'wanted to

24  make love to her in her bed.'

25    The second act of intercourse occurred in the bedroom.

1    Afterward there was some conversation during which appellant

2    requested the victim's telephone number, which she gave to

3    him.  The victim thanked him for not killing her."

4    Q.   And if you recall, Dr. Plaud, and we'll stop reading

5    here, how Mr. Graham came to be apprehended in this case?

6    A.   Yes.  You don't want me to continue reading or you do?

7    Q.   Sure.  Why don't you.

8    A.   Okay.  "The victim immediately telephoned a friend.

9    The friend transported her to Andrews Air Force base and

10   later to Prince George's County Hospital where she received

11   -- excuse me, a complete medical examination which revealed

12   trauma to her neck and to her genital area -- genitals,

13   internal bleeding, and the presence of semen.

14       A Prince George's County Police Officer at the hospital

15   notified Detective Roger Irving who interviewed the victim

16   and began gathering other evidence.  Through officer Irving

17   and two other witnesses, there was testimony that the victim

18   had red abrasions on her neck.

19       During the last of three telephone calls from appellant

20   to the victim at the Pentagon where she worked,

21   Officer Irving and Air Force Agent Andy Martinez were

22   successful in getting a trace on the telephone.  It was by

23   appellant.  As a result, appellant was taken into custody."

24   Q.   Thank you.  Now, Dr. Plaud, does this document form

25   part of what you call the official version when you look for

```
1    facts on which to base your conclusions?
2    A.   Yes.
3    Q.   Dr. Plaud, did you diagnose the respondent with any
4    mental condition?
5    A.   No.
6    Q.   How do you go about doing the diagnosis?
7    A.   The manner by which I diagnose mental disorders --
8              THE COURT:  Wait a minute.  Maybe I don't understand,
9    are you asking whether he came up with the diagnosis?
10             MR. GOLD:  I did.
11             THE COURT:  And he said no?
12             MR. GOLD:  Yes, and then I'm asking him how does one
13   or how does he go about making or not.
14             THE COURT:  Well, first of all, we don't really care
15   unless he's going to tell us that he came up with one in
16   this case, right?
17             MR. GOLD:  Well, Dr. Plaud details in his report
18   considered certain diagnoses and then did not make them for
19   certain reasons.
20             THE COURT:  Well, that's different.
21             MR. GOLD:  So that's what I was trying to elicit
22   with this.
23             THE COURT:  All right.
24             MR. GOLD:  Question.
25   Q.   Dr. Plaud, did you consider any diagnoses as possible
```

```
1    diagnoses flowing from the facts that we've just laid out?
2    A.   Yes.
3    Q.   And how do you go about or what were those diagnoses?
4    A.   The focus of my clinical examination was in whether or
5    not Mr. Graham suffered from any sexually-based mental
6    disorder.
7    Q.   And what conditions did you determine Mr. Graham --
8    what conditions did these facts suggest may be present in
9    Mr. Graham?
10   A.   The facts of the sexual offenses that I had just
11   detailed do not, in and of themselves, support any diagnosis
12   for any sexually-based disorder, any paraphilic disorder as
13   contained and defined in the Diagnostic & Statistical Manual
14   of Mental Disorders, 4th edition, Text Revision.
15        Mr. Graham does not suffer -- does not meet the
16   diagnostic criteria for any sexual disorder in the
17   Diagnostic & Statistical Manual.
18   Q.   Now, Dr. Plaud, is it required of a psychologist to use
19   the Diagnostic & Statistical Manual?
20   A.   That's a very interesting question.  Is it required?
21   I would say it is to the extent that that in the western
22   hemisphere is the tone, the classification system, that is
23   utilized in the diagnoses that are generally accepted in the
24   professional community of mental disorders.
25        There is another diagnostic system called the
```

1    International Classification of Diseases, ICD, which does

2    have use in Europe; but in the United States and Canada, the

3    DSM is the major pretty much sole use of the diagnostic

4    system in the definition and diagnoses of mental disorders.

5    Q.   Now, Dr. Plaud, are you familiar with the term:

6    paraphilia.

7    A.   Yes.

8    Q.   And does that term appear in the DSM?

9    A.   It does.

10   Q.   What is paraphilia, Dr. Plaud?

11   A.   A paraphilia essentially refers to intense arousing,

12   exciting, sexually gratifying thoughts, fantasies, or

13   behaviors that focus on sexual interactions/behaviors that

14   go beyond the bounds of normal human experiences that are

15   not within the realm of what are considered and defined as

16   normal or appropriate sexual behavior.

17   Q.   Are there any particular paraphilias that you

18   considered as applicable to this case?

19   A.   Well, the DSM, the Diagnostic & Statistical Manual,

20   discusses by name and by classification a number of

21   paraphilias that range from sexual attraction to prepubescent

22   children, which is a primary paraphilia called pedophilia,

23   to sexual gratification or sexual desires surrounding

24   displaying one genitals in a public venue, to becoming

25   sexually gratified from watching others in a state of

1    undress, to rubbing up against others, one's genitals

2    against others in public settings.

3        There are a number of paraphilias that have been

4    defined, and specific types of diagnoses or criteria have

5    been developed in the definition of those paraphilic

6    behaviors.

7    Q.   Are there any particular paraphilias that you

8    considered for this case?

9    A.   Yes.  There is one, given the background and the

10   history, the sexual offense history, that I believe did

11   merit the focus of my clinical attention, and that was

12   whether or not Mr. Graham suffered from a sexual sadism,

13   which essentially was the diagnostic label.

14       Sexual sadism meaning that a person has sexual arousal,

15   excitement, interest, and I did list it in my report as you

16   put up here, for a period of time and has fantasies,

17   interests, behaviors, urges, in which psychological or

18   physical harm, suffering, humiliation is -- the focus is

19   what really drives their sexual interest.

20       The person has acted on these urges; or if the person

21   has not acted on these urges, the fact that those urges are

22   there are clinically distressing to the person or interfere

23   with that person's occupational or social functioning.

24   Q.   And did you determine that Mr. Graham met the criteria

25   for this paraphilia?

1  A.   He does not meet the criteria.  No, he's not a sexual

2  sadist.

3  Q.   And what's the basis, the factual basis, for your

4  conclusion in that regard?

5  A.   Well, again, I detailed his sexual offense history.

6  There are two rapes and an attempted, or an assault with

7  intent, and then I have information about his more general

8  sexual history, and there is no substantiation in that data,

9  including an understanding of his offense history, sexual

10 offense history, that a basis for Mr. Graham's sexual

11 arousal has ever been the focus on the infliction of pain

12 or suffering or humiliation on victim or victims.

13      There's only one instance where even the specter of that

14 emerges in this particular case, and that has to do with the

15 governing or index offense, and the choking of the victim ...

16 because that type of behavior could be associated more

17 generally with an accurate valid diagnosis of sexual sadism,

18 but I'd have to have a number of things in evidence to

19 substantiate that, not just a description that he has a

20 sexual offense where choking was involved ... because pretty

21 much ever rape contains elements of restraint, coercion,

22 physical assault, as well as sexual assault, to subdue the

23 victim, to make the victim compliant, the use of weapons, et

24 cetera.

25      Sexual sadists are not using those techniques to get

1    victims to comply; they're using those techniques to satisfy

2    their sexual urges, such that if they don't have those, they

3    will not be aroused sexually to the victim; and for some

4    sexual sadists, it's not necessarily illegal, some of the

5    activity they do, if they have consenting partners, but

6    that's another issue ...

7             So I looked at the choking episode and I would say

8    three things about it.  No. 1, it's the only instance I have

9    in his entire history including his sexual offense history of

10   the use of that technique ... so it certainly doesn't mean --

11           THE COURT:  The use of what technique?

12           THE WITNESS:  The choking.

13           THE COURT:  Did you have a word before the word

14   "technique"?

15           THE WITNESS:  The use of that technique.

16           THE COURT:  Oh, that technique.

17           THE WITNESS:  In the commission of his sexual

18   offense, the governing offense, in this case.  The DSM and

19   the diagnostic criteria sets a period, as it does with all

20   paraphilias, a period of time of at least six months of

21   duration so that's not satisfied on the surface; and that's

22   in there for a very important reason, because there has to

23   be consistency across time for the demonstration of that

24   pattern of arousal or sexual interests to emerge, and that's

25   not met.

1    No. 2, I don't see any other indication of it, even in

2    the commission of his -- the first rape, or there was no

3    information on the assault with intent that would indicate

4    any pain, suffering, humiliation of the victims.

5    No. 3, and I think this is important, it relates to what

6    I just read out loud, and that is this:  my interpretation,

7    given the way, the words I just read, was that the choking,

8    even though it was a very significant and severe act of

9    violence, was used again to gain compliance by the victim.

10   Even a "I'm going to have to knock you out for awhile,"

11   meaning so that I can have sex with you, that's again

12   compliance; and that when she came to, she was trying to --

13   obviously, to flee from him; and then afterwards, all that

14   stopped and even though he was certainly coercive, he was

15   there, and they had second intercourse, there was none of

16   that involved ... so it does not fit in my experience

17   diagnostically or clinically the sexual sadists that I've

18   treated over the years as even close to a valid diagnosis

19   of what goes into a sexual sadist.

20   Q.   And are you aware of any other expert in this case

21   who's diagnosed sexual sadism?

22   A.   No, I'm not.

23   Q.   Now, Dr. Plaud, did you consider a not otherwise

24   specified paraphilia diagnosis?

25   A.   Yes.

1    Q.    Now, are you aware of the term paraphilia, not

2    otherwise specified (nonconsent)?

3    A.    I'm aware of that term, yes.

4    Q.    Now, is that a valid diagnosis under the DSM in your

5    opinion?

6    A.    No.

7    Q.    Why not?

8    A.    Well, that term, it's not in the DSM.  There is no such

9    term as paraphilia not otherwise specified or NOS/

10   nonconsent.

11        That term, as I just stated it, does not exist in the

12   DSM.  That term was a term that was essentially invented by

13   one person and published in a book that's about seven years

14   ago, and that person's name was Dennis Doren -- is Dennis

15   Doren, D-o-r-e-n.  That's his term that he used in advance

16   to be used.

17        It's not been adopted, accepted by the general

18   professional community; and it's, as I said, not in the DSM,

19   so that term is a term that was published in a book by one

20   individual who has his own theories but that does not

21   represent a valid consensus of professionals in this field

22   who deal with adult rapists.

23   Q.    Well, Dr. Plaud, we heard testimony over the course of

24   the past two days that paraphilia NOS is a commonly

25   diagnosed, the implication was nonconsenting NOS, commonly

1   diagnosed in sexually dangerous persons cases; is that your

2   understanding?

3   A.   That's my understanding and it's my experience, having

4   worked in this area for the better part of the last decade.

5   Yes, I would agree with that.

6   Q.   And does that indicate general acceptance in the

7   psychological community?

8   A.   No.

9   Q.   Why not?

10  A.   Because every disorder in the DSM, every diagnostic

11  area of classification, including the sexual disorders,

12  contains a catch-all area called NOS, not otherwise

13  specified, which essentially means and really was developed

14  as an investigative, hypothesis-testing diagnosis, a place

15  holder, if you will, such that there may be elements of

16  agreed-upon diagnostic areas, but that the person in

17  question does not satisfy all the diagnostic criteria ... so

18  rather than just jettison it overboard in toto, it's used to

19  basically suggest that there might be something going on

20  with the individual, but that it does not rise to the level

21  of a bona fide diagnosis under the accepted terms that are

22  in the DSM, and so it is a way to communicate that further

23  investigation may be required, but the information we have

24  thus far is insufficient to support any one diagnosis in the

25  DSM.

1    All diagnoses:  anxiety disorders, mood disorders, as

2    well as sexual disorders, have that catch-all phrase; so, as

3    such, if you are licensed, as I am, and have this great power

4    to make diagnoses that supposably carry weight, I could

5    diagnose anyone with a not otherwise specified based on any

6    type of information.

7    It's the easiest thing in the world to do because there

8    really are no set criteria; that's the whole point.  It's

9    not otherwise specified, and it has a great, great, great

10   potential to be misused ... because you can say anything is

11   not otherwise specified, and then when you do that it goes

12   away from its hypothesis-testing or communicative function

13   that more investigation is needed, a function which it may

14   serve a valid point, and for which it is included in the

15   DSM, to this:  well, I don't need these diagnostic criteria.

16   He's not a sexual sadist.  Okay.  I can't say he is, so I'll

17   just say he's NOS, and then I'll just use a term some guy

18   wrote in a book in 2002.  That's not right.  Unless you --

19   you have to have substantiation, you have to have data to

20   support that in a paraphilia there is an underlying intense,

21   sexually-arousing orientation in that person that focuses on

22   an area that is definable, that is shown consistency over

23   time, over environment, and drives that -- ultimately can

24   serve as a motivational behavior to drive that person's

25   sexual behavior, whether he acts on it or doesn't act on it

1    ... so I really think it's very, very problematic to use an

2    NOS diagnosis, no matter what other term you want to use

3    with it:  nonconsent, interested in tables, you know,

4    whatever you want to put with it ... because anybody can do

5    it; it's the easiest thing in the world, and it abandons the

6    standard of accountability because it's so diffuse.

7    Q.   Is hebephilia often diagnosed in the same way in this

8    type of case?

9    A.   It is, exactly.  That's a very good analogy, and I'll

10   tell you why:  it's because I investigated this myself in

11   the lab.

12        MR. GRADY:  I'm just going to object to the relevance

13   grounds of this testimony.

14        THE COURT:  Tell me about the hebephilia, what is

15   that?

16        THE WITNESS:  Hebephilia, Judge.

17        THE COURT:  Oh, hebe?

18        THE WITNESS:  H-e-b-e.

19        THE COURT:  B-e, right.

20        MR. GOLD:  No, hebe's the issue we had in the other

21   hearing.

22        THE COURT:  I remember that.  Yes, of course.

23   A.   Hebephilia as a term is generated among clinicians and

24   social scientists who are interested in whether or not we

25   can identify specific sexual orientation and interests into

1    young persons who are post -- or pubescent or post-pubescent.

2        Essentially, as I said earlier, pedophilia is sexual

3    attraction to prepubescents, children who have not yet

4    evidenced the development in their maturation, their sexual

5    maturation of sexual secondary characteristics ... so, for

6    example, in women:  breast development, pubic hair

7    development, hip development.

8        This pedophile, especially if they're exclusive, once

9    those types of secondary sexual characteristics emerge become

10   less or not sexually interested.

11       Well, hebephilia was a term of art that was used as a

12   shorthand notation to address:  well, is there a

13   classification of individuals who are not pedophiles or not

14   exclusively pedophiles, but yet are not really interested

15   in adults as well?

16       This middle ground where you have the development of

17   secondary sexual characteristics but they're not 17 or 18;

18   they're not age of legal consent, clearly not defined in any

19   socially relevant or meaningful way as adults ... people, in

20   other words, interested in young boys or girls who are

21   pubescent or post-pubescent, that is hebephilia; and it got

22   even more defined as being generally in the areas of 13, 14,

23   years of age, maybe 15; but then as you get to 15, 16, maybe

24   even 17, there's another term called ephebophilia, e-p-h, so

25   it's the same mechanism but just may be development of more

1   maturation but still under the age of consent, still clearly

2   not adults in the way that we use it, and this was good in

3   the sense of generating the question:  can we identify it?

4   And the bottom line is when it's -- in the DSM it's not

5   diagnosis so for the very same reason or similar reasons why

6   paraphilic types of rape or basophilia, you know, are not in

7   there ... because there's no consensus among the professional

8   community that says this is an identifiable disorder.

9       In my own work I look at hebephilia and sexual arousal

10  patterns.  I recently published on this particular issue in

11  the Archives of Sexual Behavior; in that, it's almost

12  impossible when you have someone who's sexually interested

13  in adults to not find some level of sexual interest in

14  pose-pubescents of that same gender ... so to make it a

15  disorder is to take it to a level that's not supported by

16  behavioral and physiological data.

17      Well, it's the same thing here with paraphilia NOS/

18  nonconsent, whatever term you want to use, the data are not

19  there to support that for most men, the vast majority of men

20  who rape women, that the reason they're doing it is based on

21  some disorder, pattern of sexual arousal or interest that

22  is paraphilic in nature ... because their sexual arousal

23  patterns are very similar to normal men, and it has led to

24  the conclusion professionally and a consensus professionally

25  of not adopting it for the DSM.

1       It's not in there, and, No. 2, and very importantly, to

2   make the indication that most rapists, rape is a crime of

3   violence against women where sex is the weapon in that case

4   ... but it's not the causative, motivational thing that

5   makes them do what they do.  There are other issues:  anger,

6   negative attitudes towards women, other issues relating to

7   violence, and not a sexual disorder that is inherent in a

8   paraphilia diagnosis, and that's the issue.

9   Q.   Dr. Plaud, we heard very detailed testimony about the

10  criteria in general for diagnosing a paraphilia?

11  A.   Yes.

12  Q.   And for the record I have Page 566 of the DSM, which is

13  the introductory parts of the paraphilia section of the

14  manual, and there is a paragraph entitled:  Diagnostic

15  Features.  Could you read the first sentence, the

16  Criterion A?

17  A.   Yes.  "The essential features of paraphilia are" --

18          THE COURT:  Can you sharpen that a bit?

19          MR. GOLD:  I don't know that.  I wish Zita was here.

20          THE COURT:  Well, all right; I can read it.  I'll

21  listen while --

22  A.   "The essential features of a paraphilia are recurrent,

23  intense, sexually-arousing fantasies, sexual urges or

24  behaviors generally involving:  one, non-human objects; two,

25  the suffering or humiliation of one's self or one's partner;

1    or, three, children or other nonconsenting persons that occur

2    over a period of at least six months (Criterion A)."

3    Q.   Now, Dr. Plaud, does Criterion A allow a diagnosis of

4    NOS (nonconsent) in your opinion?

5    A.   I would say in -- on the whole, no.  Well, no, that's

6    not a valid diagnosis, to use that term, paraphilia NOS

7    (nonconsent), no.

8    Q.   Well, there's a reference here to, I believe, to

9    nonconsenting persons?

10   A.   Yes.

11   Q.   Does that validate a paraphilia NOS (nonconsent)

12   diagnosis?

13   A.   No.

14   Q.   What does nonconsenting persons refer to?

15   A.   Nonconsenting persons refers to children, No. 1, and

16   most importantly; No. 2, it refers to classes of individuals

17   who are associated with mostly noncontact offenders; for

18   example, exhibitionists being the most prominent, victims of

19   frotteurism, those types of disorders.

20       If you look at the deliberations of the DSM group, the

21   sexual disorders group, when they were discussing nonconsent,

22   it was used mostly in discussion of pedophilia, meaning

23   children are nonconsenting by definition, and exhibitionism.

24       If you're in a park and a person flashes 70 people in the

25   park, all those people are nonconsenting to being flashed;

```
 1   they're victims of a, of an exhibitionist; that's the way
 2   nonconsenting is being -- is defined in that context.
 3   Q.   Dr. Plaud, we referred extensively in testimony over the
 4   past two days to two articles, one by Alan Francis --
 5   A.   Oh, yes.
 6   Q.   -- and other authors called Defining A Mental Disorder
 7   When It Really Counts?
 8   A.   Yes.
 9   Q.   And another by a Michael First and Robert Allen, both
10   of which appear in the Journal of the American Academy of
11   Psychiatry And The Law, No. 36.  Are you familiar with this
12   article?
13   A.   I am.
14   Q.   And now Dr. Francis is who?
15   A.   Pretty much all of them are DSM people; these are the
16   people who are associated with the development and adoption
17   of the DSM.
18   Q.   And could you read the first highlighted sentence on the
19   screen, please?
20   A.   Yes.  "The term nonconsenting person was meant to apply
21   only to exhibitionism, voyeurism and sadism.  It was not
22   meant to signify rapists specifically.  Rape was not
23   included as a coded diagnosis, nor as an example of NOS.
24        While there may be cases where the diagnosis is
25   justified purely on the basis of rape behavior, it was
```

1  never intended to convey that these acts alone would be

2  paraphilic.

3      Some rapes may be triggered by opportunity, others may

4  occur in the context of intoxication related to

5  disinhibition, and some may reflect character disorder or

6  other nonparaphilic pathology."

7  Q.  Dr. Plaud, is Dr. Francis' opinion -- is your opinion

8  consistent with his?

9  A.  Yes.  I mean, before this article came out, I mean, I

10 was under the -- I'm very familiar with the use of that term

11 and the deliberations that went into the diagnostic criteria,

12 and that is an accurate reflection, and that's exactly what

13 I just said in my testimony.

14 Q.  Well, Dr. Plaud, are you familiar with the history of

15 paraphilic coercive disorder as it was considered by the

16 DSM --

17 A.  Yes.

18 Q.  -- committees?  And what is that history in your

19 understanding briefly?

20 A.  Well, briefly, the history is that it has been --

21      MR. GRADY:  Objection, your Honor; it's beyond the

22 scope of his report and beyond the scope of his direct

23 testimony.

24      MR. GOLD:  Well, it's certainly the subject of

25 testimony in this case.  It's a part of his expertise in

1    which he bases his opinion on this interpretation I believe.

2            THE COURT:  I'm going to let him testify.  Go ahead.

3    A.   There are several terms that have been used, paraphilic

4    coercive disorder as a potential diagnosis or paraphilia --

5    paraphilic rapism, and other terms that are -- the common

6    denominator is that there's an identification in individuals

7    that the basis for their paraphilia concerns subduing victims

8    to having nonconsensual sexual intercourse with victims.

9        That is the key feature in the consideration over the

10   years under various terms of that type of disorder, and it

11   has been rejected each and every time as being a valid

12   diagnosis because, specifically, there is -- for the 90 --

13   I mean, almost 100% of those who are adult rapists there's

14   no ability to pick out a difference in their sexual

15   attraction, their sexual arousal pattern, or the

16   demonstration that these specific elements of nonconsent

17   cause them to conduct and commit a sexual offense against

18   adult woman.  There's no evidence for it.

19           THE COURT:  Well, what about here where we have the

20   two choking episodes?

21           THE WITNESS:  Yes, Judge, in this case we have the

22   two choking episodes.

23           MR. GOLD:  Your Honor is referring to the two

24   chokings and the one episode?

25           THE COURT:  Yeah.  Well the two separate chokings

```
 1    anyway.  If you want to call it one episode, you know what
 2    I'm talking about?
 3            THE WITNESS:  Yes.
 4            THE COURT:  The occasion where he choked this lady
 5    twice?
 6            THE WITNESS:  Yes.
 7            THE COURT:  While he was there?
 8            THE WITNESS:  Yes, Judge, and here's my response to
 9    that, because I did consider that.
10        I've worked with a number of rapists, you know, over
11    the last two decades.  In men who rape woman the most common
12    denominator is that there are elements of violence, severe
13    violence, including:  choking, attempted strangulation,
14    binding, threats of force, use of weapons, et cetera.  The
15    question is why, why are they doing that?  The bottom line is
16    why?  What's the answer to the question?
17        And for these men the answer to the why is to get the
18    victim to comply with them, to subdue the victim in order to
19    engage in sexual intercourse with the victim ultimately;
20    that's why, to restrain the victim, to make the victim more
21    pliable.  That's why they threaten them.  That's why they
22    tie them up.  That's why they choke them.  That's why.
23            THE COURT:  So the choking is not the end; it's the
24    means to an end?
25            THE WITNESS:  Exactly.  It is the -- very good, it's
```

1    the means to the end.  It's the mechanism in this case

2    whereby he gained sexual access to the victim, and what I

3    was reading earlier from the record, he subdued the victim.

4    He threatened the victim.  She was trying to escape.  He

5    choked her.  He even said it was a quote, I'm going to put

6    you out for awhile, to have sex with her.

7        She regains consciousness, tries to get away, and only

8    then did he try to choke her again, again, to get compliance;

9    that's the "why," the means to an end, exactly.

10       Now, in a smaller group of rapists who are sexual

11   sadists there is, and you will see time and time again that

12   they do engage in a variety of violent, assaultive, demeaning

13   humiliation-based strategies, even verbal humiliation, never

14   mind physical violence, with victims as a prerequisite to

15   getting sexually excited, and then engaging in sexual

16   behavior with the person, but that is a different animal

17   altogether from what I see in this case.

18   Q.   Dr. Plaud, assuming for the moment that there was

19   evidence as you said suggestive of a paraphilia diagnosis --

20   A.   Yes.

21   Q.   -- would that be sufficient in your opinion to justify

22   a diagnosis based on the totality of the circumstances?

23   A.   No.

24   Q.   Why not?

25   A.   Because as I said earlier, in the diagnosis of

1   paraphilia is the requirement, standard requirement, of

2   evidence of this type of sexually-arousing thought, fantasy,

3   behavior for at least six months duration; it's at least six

4   months duration, and this is the only -- this happened one

5   time.  One victim, one time; that's all I know.

6       In his sexual history with others, with his long-term

7   girlfriend, there's no evidence that he engaged in this

8   behavior; there's no evidence anywhere of that six-month

9   period being satisfied.

10  Q.   Well, but, Dr. Plaud, you do have the two prior sexual

11  offenses, don't you?

12  A.   Yes.

13  Q.   And don't those support an inference that there's a

14  pattern of behavior?

15  A.   It's certainly not an inference.  There was a pattern

16  of behavior with three episodes:  two rapes and one assault

17  with intent, where he engaged in violent and illegal

18  behavior, sexually coercive in nature, with an adult female,

19  but the issue has to do with not illegal behavior on the

20  surface of it, but what was motivating him to engage in that

21  behavior.

22      And is there any evidence that it was motivated speaks

23  to the heart and sole of the significant criteria definition

24  of mental abnormalities, et cetera, is:  was it motivated

25  by a paraphilic sexual interest that at this time would make

1    him have serious difficulty controlling his sexual conduct

2    if he were released from a secure facility, and that's the

3    issue; that the vast, vast majority of rapists do not rape

4    women because of an underlying sexual deviance.  That's not

5    what's motivating, empowering the illegal and violent

6    behavior.  It's something else, or a combination of factors

7    so you can't just use the rape itself as the explanation.

8    Q.   Dr. Plaud, is it ever permissible to diagnose sexual

9    arousal to rape under an NOS classification?

10   A.   I believe it is possible, yes.

11   Q.   What is the difference between that position and your

12   criticism of the not otherwise specified nonconsent

13   diagnosis?

14   A.   There's a very straight-forward answer to that.  There

15   has to be evidence that the person is sexually excited by

16   the act in and of itself by engaging in nonconsensual sexual

17   behavior.  What level of violence or not is secondary.

18        The bottom line is you have to have objective data over

19   a period of time that the person is acting on an underlying

20   sexual arousal pattern, interest pattern, to the act itself

21   of engaging in nonconsensual behavior with others.  That has

22   to be in evidence.  That has to be clear.

23        And over the years and over the many, many hundreds and

24   hundreds of sex offenders, rapists, that I have dealt with,

25   evaluated, treated, I can tell you that it's almost -- I can

1    -- I think I've used the term on one hand, and that's even

2    being -- giving it a very easy definition.  I could count

3    the number of people who are rapists who probably could have

4    begun to be considered in that category, so it's a very

5    small minority of rapists, and there has to be exceptional

6    data which I generally do not find either in records or any

7    other sources of information that men are most -- the vast

8    majority of men are raping women for reasons that have

9    nothing to do with their sexual arousal.

10        They're doing it for reasons of anger or violence.  As I

11   said, rape is an act of violence where sex is used as an

12   expression of that violence ... like when other people are

13   acting on violence, they use weapons on other people and no

14   sexual behavior or whatever.  It's not the motivator; it's

15   the tool that they express something else going on.

16   Q.   Well, Dr. Plaud, is it ever in your view appropriate to

17   offer an NOS diagnosis in a forensic environment like this?

18   A.   I would myself be hard-pressed to do that because I

19   think, you know, to put it simply, as Cole Porter wrote many

20   years ago:  anything goes.

21        You can justify or say anything.  You can put anything

22   in an NOS classification.  It's a self-threshold diagnosis;

23   it's not otherwise specified.  It's exploratory.  It's

24   hypothesis-testing.

25        It isn't some magic diagnosis that sets the stage for an

1      understanding of that person whether it's their sexual

2      interest pattern or any other type of NOS diagnosis among

3      other disorders.  It's just not sufficient as a diagnostic

4      category in my judgment for implications that -- and the

5      definitions we have like in recivil commitment laws.

6      Q.  And is there a difference in your opinion from making a

7      diagnosis in a forensic situation to making a diagnosis in a

8      clinical situation?

9      A.  Absolutely.

10     Q.  And what is the difference?

11     A.  Well, in a clinical situation if I'm making an NOS

12     diagnosis, what I'm communicating either to myself, if I'm

13     the treating clinician or doing further evaluations, or to

14     other professionals who may be reading what I'm -- my report

15     or my recommendation might be exactly what I said earlier,

16     that I think there may be something going on here; I don't

17     have enough data.  The person does not meet established

18     standard criteria as defined in any of the diagnostic

19     categories in the sexual disorders under the DSM, but I

20     think we need to have some more investigation.  I think we

21     need to do a little more finding out of information if

22     possible, but there's just not enough to go on.

23     Q.  Dr. Plaud, are you familiar with who Dr. Fred Berlin is?

24     A.  Yes, I know Fred.

25     Q.  And could you briefly describe who he is in the field

1   of sex offender research?

2   A.   Yes.   Fred Berlin is at Johns Hopkins University in

3   Baltimore.   He's a very well-renowned expert in the field of

4   sexual disorders work, working with sex offenders; he's a

5   psychiatrist.

6   Q.   Now, we heard testimony yesterday that Fred Berlin has

7   testified that he supports making a paraphilic rapism or

8   coercive disorder under the NOS category.

9        The first question I have for you is, is it customary --

10  did you read Dr. Salter's report?

11  A.   I did.

12  Q.   Is it customary when discussing a diagnosis that you're

13  putting forward to cite to other professionals' work or

14  testimony?

15  A.   No.

16  Q.   Now, we heard testimony that Dr. Berlin supports doing

17  that, in that Dr. Berlin is on the DSM --

18           THE COURT:   Doing that meaning what?

19           MR. GOLD:   Oh, diagnosing a rape-related disorder

20  under the NOS category....

21  Q.   Now, in that Dr. Berlin was associated with the

22  development of the DSM-IV, why doesn't that mean you can do

23  it?

24  A.   Well, because -- very simply, because what's in the DSM

25  is what's in the DSM.   It's a public version and it's the

1    product of deliberations in a group of professionals and

2    decisions made by a group of professionals.

3        Now, in that group or in the advisors to that group, if

4    they're not central, there may be some differences of opinion

5    professionally; but at the end of the day, it's what's in

6    there that counts, not what the myriad of individual

7    opinions might be in terms of making diagnoses ... so I'm

8    certainly not fully aware of what you just said about

9    Dr. Berlin's testimony to that effect, so I can't comment

10   directly on it, but I can say that even if it's -- even if

11   he did make some comment like that, that carries no weight

12   because the DSM is what it is.  It's a public version and

13   what's in the diagnostic criteria are the latest

14   understanding of accepted diagnostic categories by the

15   group that compose the sexual disorders task force.

16   Q.   Are you familiar with the criteria that Dr. Doren

17   proposed for his not otherwise specified diagnosis?

18   A.   Yes.  I mean, I've read it many times.  I don't have it

19   right here in front of me, but, yes.

20   Q.   Well, what is your -- doesn't Dr. Doren resolve the

21   problem of the lack of criteria in the manual?

22   A.   Well, he may think he does by saying or putting forth

23   criteria he thinks may be worthwhile or valid or that may

24   distinguish rapists as a specific class of paraphilia; but

25   if he thinks this is the case, then he needs to propose

1    criteria to the diagnostic working group and see what

2    happens.

3         That's, that's where the rubber meets the road.  I mean,

4    I can sit here, give me five minutes, I'll come up with 16

5    other diagnoses.  I could sound very philosophic about, use

6    very technical terms, but who cares?  It's whether I'm doing

7    it seriously or whether I'm just doing it as a thought

8    exercise; it's my opinion.

9         It's my opinion and my opinion in this sense is

10   overweighed by the DSM; that is the agreed-upon diagnostic

11   classification.

12        I have some issues with the DSM.  I haven't met a

13   clinician who doesn't, but I'm not here to say:  well, you

14   know, I don't think pedophilia should be in here.  I don't

15   think exhibitionism should be in there.  You know, these are

16   agreed-upon diagnostic categories, and they're there for a

17   reason.

18   Q.   Well, now, we heard testimony yesterday that the NOS

19   category lists examples?

20   A.   Yes.

21   Q.   And it says that those examples, it's not an exhaustive

22   list?

23   A.   Correct.

24   Q.   Doesn't that allow for what was done in this case?

25   A.   No.

1    Q.   Why not?

2    A.   Because here's the key to that question, there are any

3    number of labels you could come up with that define what the

4    object or area of sexual interest might be ... and an NOS

5    diagnosis, because you can't capture everything in the

6    classifications that are in the DSM under the sexual

7    disorders ... so, for example, there's a nice sounding term

8    telephone scatologia.

9         Probably you heard about it as obscene telephone calls

10   or crank calls growing up ... now, that in and of itself,

11   there's no separate diagnostic criteria for that.  It's just

12   a paraphilia when the diagnostic criteria for paraphilias

13   are satisfied, but relates to demonstrable evidence that

14   the person gains sexual interest, excitement from making

15   sexually suggestive telephone calls.

16        That would be a paraphilia not otherwise specified, but

17   the diagnostic criteria for paraphilia in general are

18   specified and are there; it's just that the term otherwise

19   isn't in the DSM under its own separate heading.

20        You could go on for, you know, 200 pages.  The same thing

21   with zoophilia or what's known as bestiality, which is also

22   an example or specific -- you know, coprophilia or urophilia,

23   different types of sexual attraction to different, I should

24   say, less tasteful aspects perhaps of sexual encounters with

25   other people.

1          That's a totally different way to understand it, but

2     the bottom line is:  in all of those cases you have a

3     demonstration that the person has specific sexual arousal,

4     interest, urges over a period of at least six months to

5     engaging in this behavior or acting on those urges.

6          There's no evidence that nonconsent per se is an

7     initiator of a paraphilic sexual type of behavior; that's

8     the difference.  That is the difference.

9     Q.   Could you explain to us, Dr. Plaud, how these five

10    clinical cases that you saw in the past where you would

11    consider a paraphilia NOS diagnosis, first, were those in

12    clinical or forensic context?

13    A.   Clinical.

14    Q.   And why is that important, if it is?

15    A.   Well, the diagnosis was used insofar as, again,

16    communicating information about their sexual interest

17    patterns in the context of treatment rather than any type

18    of legal designation they may fall in as a result of it,

19    and I would add in all of those cases I would suspect

20    sexual sadism but didn't have enough information.

21    Q.   Now, we heard extensive testimony about laboratory

22    research, citing numbers of peer-reviewed articles about

23    differences between rapists and nonrapists in the lab?

24    A.   Yes.

25    Q.   Are you familiar with that research?

1              MR. GRADY:  Your Honor, I'm going to object.

2    Again, there's been no notice that this witness was going

3    to provide expert testimony on this subject in either his

4    report or his deposition.

5         Indeed, this expert's report was prepared after

6    Dr. Salter's; and if they wished this expert to address

7    Dr. Salter's opinions, I would believe it would be incumbent

8    upon them under Rule 26 to disclose the nature of those

9    opinions, the basis upon which he is opining on Dr. Salter's

10   opinions, or the validity thereof, and that that should be

11   disclosed in a report prior to trial.

12             MR. GOLD:  With respect to the timeliness, Judge, we

13   got the bibliography that the government cited very recently,

14   but I think the bigger point is that this is the body of

15   research that any expert who's competent to testify in this

16   field should have in their mind to be qualified to testify

17   about as it informs their opinion.

18        I think to the extent that it's not anything that

19   Dr. Plaud will say about the testimony, it should be part of

20   the common fund of knowledge that lies behind what he's

21   saying and is implicit in the reports that we have, and is

22   part -- in fact, Dr. Plaud conducts part of this research;

23   this is part of why he was called as a witness in this case

24   because he's knowledgeable about it.

25             THE COURT:  I'm going to let him testify.  Go ahead.

1    Q.   What is your understanding with regard to the research

2    regarding laboratory findings of rapists compared to

3    nonrapists?

4    A.   Well, I will tell you that the most important statement

5    I can make is:  overall, if you look at the data in the

6    laboratory over the last several decades in the aggregate,

7    it's very difficult, if not impossible, to differentiate

8    rapists along the lines of deviant sexual arousal.

9        In other words, it's hard to pick them out based upon

10   physiological data on deviant arousal to sexual violence for

11   two reasons:  No. 1, they don't show differences within the

12   clinical sample itself ... so if you just segregate rapists,

13   you'll see that there's a lot of homogeneity in their arousal

14   pattern; but, more importantly, if you compare that group to

15   normals analoged, you don't see differences.  That's why

16   that's -- that's the most important reason why it's been

17   rejected diagnostically over the decades is because it's so

18   difficult, if not impossible, to differentiate the two; that

19   most rapists are not acting on deviant sexual arousal,

20   that's why the diagnosis per se isn't in there.  That's why

21   paraphilic rape has been jettisoned.

22       Now, let me also say, and some of my research is in this

23   second area, is:  if you take a group of rapists and you try

24   to tease out some differences, whether among psychological

25   dimensions or even physiological dimensions, on arousal, and

1    try to fit those in with typologies, for example, that have

2    been developed to classify different types of offenders ...

3    there are some studies that have indicated that there might

4    be a way to parse out some rapists and put them in a more

5    sexualized versus less sexualized group.

6        It's not so much about the deviant arousal as is the

7    level of sexual arousal that they have, rather than being

8    qualitatively different on the deviant side; but a lot of

9    that is based on very small numbers, there's not a lot of it

10   to support it in general; it's more exploratory.

11       I would say even three or four decades later when some

12   of this first research comes out, it's still all very

13   exploratory.  Most of it that even does point to any

14   differences are based on very small numbers, and large

15   numbers of rapists are always excluded from the studies,

16   which is mind-boggling ... because what does that do?  There

17   could be -- if you're excluding a bunch of rapists from the

18   study, what validity, what external generalized ability does

19   your study have?

20       That's one reason I chose to analog subjects in toto to

21   do this research, so I could look at a more normative group

22   and see if there was something going on there I could

23   understand ... so that's the character of the research;

24   there's really nobody's research, I'm here to tell you,

25   that demonstrates this qualitative difference either within

1    rapists or between rapists and nonrapists sexually, sexual

2    deviance, paraphilia wise; it's just not there with any

3    degree of precision.

4    Q.   Assuming -- moving on to a related topic, Dr. Plaud,

5    assuming for the moment that you did have a valid paraphilia

6    diagnosis in the past, is it of any relevance at all that it

7    would be in this case 22 years old?

8         THE COURT:  Say that again?  I don't quite

9    understand.

10   Q.   Assuming for the sake of argument that you had a valid

11   paraphilia diagnosis of some kind, does the age of the

12   diagnosis have any relevance at all?

13        THE COURT:  In other words, adding nothing to the

14   facts, just --

15        MR. GOLD:  Adding nothing to the facts?

16        THE COURT:  Does it have a shelf life?

17   Q.   Just the passage of time, does it have a shelf life?

18   A.   The short answer would be:  yes, it does have a short

19   shelf life, and the further back the data go, the more

20   dubious the diagnosis.

21      Now, there are paraphilias and the DSM speaks -- uses

22   the term oftentimes considered to be chronic, which means

23   they have power over time.  They last, but it depends which

24   paraphilia you're talking about.

25      Some seem to have more power over time than others; for

1    example, pedophilia, especially what the term is, fixated

2    pedophilia, meaning exclusively pedophilia in diagnostic

3    terms, does tend to have more consistency over time.

4        However, there are even a number of caveats to that, and

5    let me put that aside, just to use it as an illustration.

6        For rapists, no, there's no evidence that a paraphilia

7    diagnosis in and of itself over decades just propels itself

8    that the motivational basis stays in tact, or that it will

9    impact a person later in life as it may have -- I mean, I'm

10   speaking to your hypothetical question, so if it was there

11   in some degree earlier that it would last.

12       People, and I get this information, for example, for

13   exhibitionism as a paraphilia; exhibitionism can be very

14   changeable over time and have change as a function of

15   absolutely no intervention at all ... because in

16   exhibitionism, to a large extent, many exhibitionists are

17   not deviant in the sense that they're trying to flash

18   children; some are, but they act on anxiety or depression,

19   which, if remediated, in and of itself, makes the

20   exhibitionistic behavior go away as well ... so in a case

21   of any kind of NOS paraphilia, there's no assumption that

22   it will last over the decades, none.  It needs to have some

23   more recent data to back it up.

24   Q.   And continuing with the hypothetical but going on the

25   facts in this case, are there any facts since his conviction

1    which would be consistent with a paraphilia diagnosis?

2    A.   None.

3    Q.   Now, there's no disciplinary record?

4    A.   No.

5    Q.   Are you aware of any record of sexual misconduct?

6    A.   No, meaning, in an institutionalized setting since the

7    governing offense?

8    Q.   Yes.

9    A.   No.

10   Q.   Are you aware of any disciplinary reports in the records

11   for Mr. Graham for the past 22 years?

12   A.   I am not aware of any as I sit here, no.

13   Q.   And assuming the validity of the diagnosis, would that

14   be a factor that you would consider?

15   A.   Yes, of course.

16   Q.   Why?

17   A.   Because the decision in these cases is it's a decision

18   about Mr. Graham today.  Now, that decision is informed

19   obviously by Mr. Graham yesterday and the day before

20   yesterday and ten years ago and 20 years ago and 30 years

21   ago, but the farther out you go in time, the more tenuous

22   his current status, especially if we're talking about

23   disorders, mental status, the more tenuous it's going to be.

24       You need to have some data, and, preferably, more recent

25   in time, to substantiate ongoing difficulties ... because any

1   diagnosis in the DSM, as is stated repeatedly in the book,

2   does not carry with it any implication about a person's

3   current capacity to control that behavior, to act on that

4   behavior, or to be influenced by whatever it is that is

5   underlying historically that behavior, and that's where you

6   need to have more current data ... so if a person is

7   continuing to act out sexually, making threats against staff,

8   sexual threats, engaging in rape behaviors in prison, et

9   cetera ... well, that would certainly be a strong indication

10  of something continuing to go on that would be problematic

11  and support perhaps an earlier diagnosis or diagnoses based

12  on behavior 22 and more years ago.

13      The absence of that however is the absence of it, so it

14  makes whatever you wanted to decide 22 or more years ago more

15  tenuous on the surface.

16  Q.   Now, just to clarify, the DSM speaks to the issue of

17  whether a diagnosis in itself indicates that there's

18  volitional impairment?

19  A.   It does not.  It does speak to the issue in the sense

20  that it says that it does not carry with it any statement

21  about a person's current volitional capacity to control

22  themselves.

23  Q.   So as you as the forensic psychologist doing this work,

24  if you found a valid paraphilic diagnosis, would you attempt

25  to make an additional finding as to volitional impairment or

1    what would you do?

2    A.   Well, I think that in this context I think it's a

3    critical issue; it's a central issue.  I mean on Page 10 of

4    my report I provide a quotation from the DSM that speaks to

5    the issue of volitional cast capacity to control and what

6    the DSM itself says about it in the sense that on Page 23

7    of the Roman Numeral section in the preface, "in the

8    DSM-IV, it is precisely because impairments, abilities, and

9    disabilities vary widely within each diagnostic category

10   that assignment of a particular diagnosis does not imply a

11   specific level of impairment or disability."

12       So that is always an issue that should be considered:

13   a diagnosis alone is not sufficient; it's a necessary but

14   not sufficient statement, so it's really an analysis, so if

15   you're labeling someone with a paraphilia, that's step one;

16   in this case, I'm not, so I don't need to go to step two,

17   but if I did go to step one, and I diagnosed Mr. Graham

18   with a paraphilia not otherwise specified, I wouldn't put

19   nonconsent in there.

20       I'd just put paraphilia not otherwise specified, and

21   then I'd give a verbal description.  I would then as a

22   clinician tasked with the responsibility professionally of

23   relating to the best of my ability, making conclusions about

24   his current level of volitional control over that area of

25   diagnosis.

1    Q.   Did you consider a diagnosis of antisocial personality

2    disorder in this case?

3    A.   I did.

4    Q.   What conclusion did you arrive at with respect to that

5    decision?

6    A.   My conclusion specifically was that -- I mean:  look,

7    it's not out of the realm of possibility that Mr. Graham,

8    given his criminal history beginning as a juvenile, the

9    diagnosis by record could be made; but, if you factor out

10   his sexual offense history as an adult, his criminal history,

11   as well as his institutional history, lack of disciplinary

12   reports, demonstration over decades of an ongoing ability to

13   comport behavior to social norms, rules, regulations within

14   the institution, coupled with the fact that he's 59 years

15   old and burnout is a big factor in the diagnosis of ASP.

16   Q.   Let me stop you there, Dr. Plaud.

17   A.   Yeah.

18   Q.   Could you talk about, does the DSM say anything about

19   this concept of burnout?

20   A.   Yes.

21   Q.   What does it say?

22   A.   That aging does impact the diagnosis or chronicity or

23   the applicability of the diagnosis of ASP, antisocial

24   personality disorder, beginning in the third decade of

25   life; of which Mr. Graham is now well over ... so it's not

1   impossible to make the diagnosis, certainly, but, again, I

2   look at it more functionally:  Does he now, as a 59 year old

3   man, with evidence of his behavior in the last, you know,

4   two decades, is there an indication that he meets the

5   diagnostic criteria as specified?  Not really, No. 1.

6       No. 2, in and of itself even if you had the diagnosis,

7   so what?  Who cares?  That is not enough to make any

8   statements regarding propensity to engage in sexually

9   violent behavior.  It's not in and of itself enough ... so

10  even if you want to grant that he has it, in and of itself,

11  it's a footnote.

12  Q.   Now, Dr. Plaud, you arrived at the opinion that -- well,

13  let me ask you, what is your opinion with respect to the

14  third prong of the statute, serious difficulty refraining

15  from sexually violent crime?

16  A.   Well, I really think again it's important to point out

17  that its prefaced, the third prong, as a result of, words to

18  that effect, if I may refresh my memory; but as a result of

19  his serious mental illness abnormality or disorder, that is,

20  that's the first part of the third tier.

21      If he doesn't have that disorder, then by definition you

22  don't have to waste too much brain activity going further.

23  The answer would be no because he does not suffer from the

24  condition; but if I wanted to take a diagnostically neutral

25  stance and just look at this empirically, statistically

1    risk-wise, I would still say no.

2    Q.   And why is that?

3    A.   Because Mr. Graham apart from --

4         MR. GRADY:  Your Honor, I'm just going to object

5    for purposes of relevance.  If the witness himself has

6    acknowledged my testimony is this is not going to answer the

7    question presented by the statute, it doesn't seem to be

8    informing the Court's opinion.

9         THE COURT:  I'll let him have it.  Go ahead.

10   A.   As I said a moment ago, Mr. Graham is now 59 years old.

11   He is now millimeters away from an age cohort which is

12   associated with extremely low rates of sexual recidivism,

13   Reoffending in a sexual manner ... so if you want to just

14   look at this from a statistical perspective, taking out the

15   issues of mental disorders, serious mental illnesses,

16   disease, whatever term you want to use, and just look at

17   this from what we know about men with criminal sexual

18   histories who are rapists, and their recidivism rates at

19   his current age what you find is he's in a statistically or

20   will be or he already is but very shortly will be even more

21   in a grouping of men who are in the lowest possible group to

22   reoffend ... especially absent any underlying condition that

23   would motivate him potentially to reoffend such as a true

24   paraphilia.

25   Q.   Now, Dr. Plaud, I want to back up a little bit and ask

1    you:  when you are presented with the referral question as a

2    result of a mental illness, abnormality, or disorder, serious

3    difficulty refraining from sexually violent conduct, what is

4    the statute in your mind asking you to do?

5    A.   In my mind what the statute is asking me to do, No. 1,

6    is:  given adequate sources of information, records, and

7    any other source of information that's sufficient to make

8    professional conclusions, the first step importantly is to

9    be able to make a diagnosis, to provide a step, an

10   understanding, defining specifically that the person suffers

11   from a disorder pattern of sexual interest, a paraphilic

12   sexual interest, and/or a personality disorder.

13       And then if the answer to that is yes, that you can

14   diagnose them credibly, validly, with a paraphilic disorder

15   or a personality disorder, then, to go to the next stage to

16   say:  well, does the presence of this condition make it

17   likely that they would reoffend, cause them serious

18   difficulty controlling their behavior if they were not

19   confined; that that motivational basis underlies their

20   behavior such that if they didn't have the constraints of an

21   institutional setting they would be at risk to reoffend.

22   Q.   Now, how do you -- do you use a particular method in

23   going about answering the risk to reoffend question?

24   A.   The best answer I can give is:  it's more of an

25   open-ended issue at the present time.  I'm having very

1    significant difficulty -- I can't answer that yes or no.

2    Q.   Well, Dr. Plaud, give us and the court, if you will, a

3    bit of background to explain your present difficulty?

4    A.   Okay.

5    Q.   Are there different methodologies to conduct a risk

6    assessment?

7    A.   Yes.

8    Q.   And what are those?

9    A.   Well, there are certain terms of art that are used

10   generally to describe different methodologies ranging from

11   a clinical type of methodology, which essentially refers to

12   the clinician in question basing professional judgments about

13   risk to reoffend on their training and experience working in

14   a particular area or a particular group of individuals.

15       On the other end is a statistical or actuarial

16   methodology, which refers to the computation of one or more

17   actuarial tools that have preselected items that on the

18   surface can be measured, can be scored, can be weighted,

19   and then the scores can be compared to preselected groups

20   reference groups who score the same or similar to that

21   person and were followed over a period of time and their

22   reoffense rates over 5, 10, 15, 20, years, noted.

23       And in between there's techniques that have been

24   referred to, for example, as adjusted actuarial, starting

25   with actuarial as a risk assessment, and then adjusting that

1    based on other factors that are not in the actuarial tool or

2    empirically, structured clinical approach, which involves at

3    least the clinician in question saying they're basing their

4    judgment on the relevant scientific literature, whatever

5    that literature might be.

6    Q.   Now, Dr. Plaud, is there a -- were there concerns about

7    clinical judgment?  Would you like a minute, Dr. Plaud?

8    A.   Oh, no, I'm fine.  Thank you.

9    Q.   Were there concerns about clinical judgment that led

10   to the development of these actuarial instruments?

11   A.   Yes.

12   Q.   Could you briefly describe that history to the Court?

13   A.   Yes.  Clinical judgments of risk to reoffend, I'm

14   talking -- I want to be specific to sexual offenders to

15   making risk predictors of future probabilities to reoffend

16   in a sexual manner ... when those decisions are left to

17   clinicians, even ones who at least on the surface had proper

18   training, who worked with relevant clinical populations

19   over time were pretty bad.  Basically, chance levels;

20   flipping the coin, if you will.

21       And the reason for that is very straight-forward and

22   led to the development of actuarial tools, and that is this:

23   despite what the media reports, including last week on a

24   couple of shows, news shows, I was watching, unfortunately,

25   the reoffense rates for sex offenders over 5- to 20-year

1    periods, but definitely within 10-year period, is low enough

2    that the assumptions that go into making risk predictions

3    are essentially violated.

4    Q.   Can you unpack that a little bit, Dr. Plaud?

5    A.   Yes.  The base rate of sexual offense recidivism is in

6    an area that is well below 50%.  When the base rate of any

7    phenomenon, whether it's sex offending or hitting a baseball,

8    is below 50%, precipitously below 50% depending on how in

9    volume you're measuring it out, then affirmative predictions,

10   meaning someone will do this, become very dicey ... because

11   those assumptions are based on, essentially, that the

12   likelihood, not knowing anything, but just letting a person

13   out, for example, a sex offender out, that there's a good

14   probability that the person's going to reoffend anyway.

15   Q.   Dr. Plaud, this base rate concept --

16            THE COURT:  Are you just about threw with him or

17   what?

18            MR. GOLD:  I've got another 30 minutes, your Honor.

19            THE COURT:  Okay, let's recess.  We'll see you at

20   2:15....

21            (After a lunch recess commenced at 1:00 p.m.,

22             the proceedings reconvened at 2:15 p.m.)

23            THE CLERK:  All rise for this Honorable Court ...

24            THE COURT:  Good afternoon, everybody.  Sit down,

25   please.  All set to roll?

1        MR. GRADY:  One housekeeping issue, your Honor, on

2   the Hunt trial we did not have closings; we went straight to

3   proposed findings with briefs.  We would propose, the

4   parties want to undertake the same course of action here:

5   no closings, go straight to briefs and proposed findings.

6        THE COURT:  Yes, I think so.  I think so.  If you

7   want me to rethink it, let me know.

8        MR. GRADY:  That's what we would ask the Court.

9        THE COURT:  Yes, I think it's helpful that way.  Go

10  ahead.

11       MR. GOLD:  Thank you, your Honor...

12  Q.  Dr. Plaud, are you familiar with an instrument called

13  the Static-99?

14  A.  I am.

15  Q.  And did you employ it when you did your risk analysis

16  in this case?

17  A.  No.

18  Q.  Did you used to use the Static-99?

19  A.  Yes.

20  Q.  Why didn't you use it in this case?

21  A.  Well, in this particular case I would cite two reasons,

22  at least, why I didn't use the Static-99:  first, I haven't

23  routinely used the Static-99 since 2005 due to some concerns

24  I developed beginning then with some of the data; but

25  putting that aside, as I said earlier, Mr. Graham is now

1    59 years old.

2         Given the base rate data on men who are above age 55,

3    and the assumptions that go into the calculations on the

4    conditional probabilities and expectancy tables for

5    Static-99, which are based on an average age of 34.2 years,

6    and the noted recidivism decreases between 34 years and

7    essentially age 60 ... it violates the assumptions of the

8    Static-99.  It totally pulls the rug out from under the

9    bayesian underpinnings of the Static-99 that result

10   ultimately in expectancy tables, so I think it would be in

11   this case, even if the Static-99 data were better than they

12   are, and since October of 2008, there's a lot more concerns

13   and questions about the Static-99, which underscore some of

14   the issues I had done three years earlier when I was having

15   some issues with it; but putting that aside, his age, for

16   a person who's 59 years old, there's currently no actuarial

17   tool that is sufficient for use in making valid

18   extrapolations.

19   Q.   Well, Dr. Plaud, then, what do you do when you

20   communicate risk information to the Court in a case like

21   this?

22   A.   Well, if a person is in an age range such as Mr. Graham,

23   if there is the presence of an underlying sexual disorder,

24   paraphilia, then I would look for evidence that the person

25   has an ongoing inability to control or has serious difficulty

1    controlling his impulses; I would look at the specific

2    issues relating to risk factors identified in the research

3    that are more acute, that may be predictive of some ongoing

4    difficulties controlling one's sexual behavior, and point

5    to those in my analysis.

6    Q.   Well, can someone who is in the 59, 60-year range ever

7    be considered dangerous in your opinion?

8    A.   Yes.

9    Q.   And what type of evidence or were you just describing

10   the type of evidence that would --

11   A.   Exactly.  You would have to have evidence of acute

12   risk factors present, and those can range from, for example,

13   obviously, the easiest one is statements of intent made to

14   either me as the clinician, this has happened, or collateral

15   information that the person has communicated and that I

16   judge has some validity to it; that he is experiencing

17   difficulties or issues in the control of his sexual

18   behavior or intends to engage in certain types of behavior

19   that are high risk ... certainly, that would be a simple

20   straight-forward example of an acute dynamic factor that

21   would override expectations statistically given the age of

22   59/60 years old, collateral information of behavior, whether

23   the person's incarcerated or not depending on the situation

24   that indicates ongoing difficulties controlling his sexual

25   behaviors; sexually related disciplinary reports, for

1    example, that would be another example of acute behavioral

2    data.

3    Q.   And, Dr. Plaud, is it true that what we're talking

4    about now is the type of evidence that would counterweight

5    the evidence on age?

6    A.   Right, it would, it would -- it would provide

7    information that would override or tend to override the best

8    information we have on the relationship between age and

9    recidivism.

10   Q.   What is, if you can say briefly, the research on age

11   telling us?

12   A.   Well, the research in the last decade has shown rather

13   conclusively and continues to do so:  as one ages, as one

14   gets older, the likelihood that the probability statistically

15   to reoffend in a sexual manner goes down.  It's an inverse

16   function of age ... so the older you get, the less likely,

17   all other things being equal, you are to reoffend.

18        Now, there are certain age cohorts where that effect is

19   seen more prominently.  Certainly, in the 50s the effects

20   become -- the slopes of the recidivism curves go down more

21   significantly; after age 60 they're within a 5% --

22   essentially, within a 5% recidivism ban, so it's very low

23   risk estimate.

24   Q.   Now, we heard testimony that there was conflicting

25   research on the age issue out there; is that correct?

1    A.   That's nonsense.

2    Q.   How is that nonsense?

3    A.   Because there isn't conflicting data.  There are a

4    variety of studies from several prominent researchers that

5    show rather conclusively statistically, not arguing any

6    theories or anything, just statistically that age inverse

7    relationship to recidivism.

8        Now, there have been two studies that have pointed to or

9    asked questions about what type of aging at what time with

10   what -- what age/ages have the more pronounced effect or is

11   age an offense -- this is the only exception I can think

12   of -- is age at the offense more predictive of recidivism

13   than age at release?

14       However, that's one study that within a year or so was

15   answered in another study to show that there were some

16   statistical errors made in that original study; and when

17   those errors are corrected, the age and offense really isn't

18   a factor.

19       All the other research from the people who developed the,

20   the actuarial tools, such as Dr. Hanson on down, have shown

21   rather conclusively, and, I mean, without exception, that

22   age matters in the prediction of sexual offense recidivism.

23   Q.   Are you familiar with a study by David Thornton that

24   showed a less marked decline with people with two prior

25   convictions?

1    A.   Yes.

2    Q.   How does that study figure into your opinion?

3    A.   Well, the question is the magnitude of the decline.

4    The decline is still there.  The question is magnitude,

5    No. 1; and No. 2, it has to do also with the type of offense.

6         What you're gonna -- what you find here in this case is,

7    you know, Mr. Graham is not a child molester; and much of

8    that data, research, to the extent that there's equivocation

9    whatsoever focuses more on child molesters than it does on

10   rapists.

11        And that goes for that study you talked about as well as,

12   for example, the Prentky & Lee study that found two different

13   functions of recidivism as a function of age for rapists

14   versus child molesters, where the child molester variability

15   went out longer and was not a linear function versus rapists,

16   which was essentially a five-year linear function ... so I

17   would say that you need to not have apples-and-oranges

18   comparisons here, just as diagnostically you don't want to

19   have apples and oranges with paraphilias to try to make a

20   rapist a paraphilia, like pedophilia is for child molesters,

21   to look statistically and say:  well, this study has mostly

22   child molesters, and we're going to apply it to rapists when

23   there's not data to show that.

24        MR. GOLD:  I have no further questions of the

25   witness.

1          THE COURT:  Okay.  Mr. Grady....

2          MR. GRADY:  Just a moment, your Honor.  I need to

3    set up.  I apologize, your Honor; I'm having one of those

4    nightmares where I left my cross-examination upstairs.

5          THE COURT:  You're giving me a nightmare ... do you

6    know that I've been on the bench 37 years, and I've never had

7    a judge dream, never dreamed that I was a Judge.

8          MR. GRADY:  Lucky you....

9          THE COURT:  No.  I always dream that I'm still trying

10   cases, and it's 2:00 and the doctor still hasn't shown up

11   yet, and I got this bastard of a judge who's, you know,

12   going to eat me alive, and I tell him my doctor isn't here

13   to testify, so I sympathize and empathize with you.

14         MR. GRADY:  Who sleeps in that situation, all right.

15         CROSS-EXAMINATION BY MR. GRADY:

16   Q.   Jim Healy, a 35-year-old social science researcher, has

17   just received multiple sentences of life imprisonment after

18   his third conviction for a series of rapes.

19       Are you familiar with that sentence, Doctor?

20   A.   Yes.

21   Q.   That is a sentence from a larger factual example in the

22   DSM-IV casebook, right?

23   A.   First edition, correct.

24   Q.   We'll come back to that in a moment, but I want to read

25   a little bit more about this factual discussion --

1    A.   Okay.

2    Q.   -- and then discuss it with you?

3    A.   Correct.

4    Q.   "Jim was reared in a chaotic family.  His father was

5    physically abusive towards his mother and toward women in

6    general.  Both parents were sexually promiscuous, sometimes

7    in his presence.  On at least one occasion as a child he was

8    sodomized by his father.  Growing up, feeling alone and

9    unloved, he began fantasizing about the perfect relationship

10   with an ideal woman who he could sweep off her feet.

11       As time passed such fantasies and urges began to assume

12   an eroticized, obsessional quality.  Initially, he would

13   imagine himself coercing unwilling women into sexual

14   activities that she would then come to enjoy.

15       He would then fantasize a continuing caring relationship.

16   Often, he would masturbate while having these fantasies.

17   Though Jim understood that the scenario in his fantasies

18   was unlikely, he nevertheless began to be preoccupied with

19   sexually exciting urges to act upon those fantasies.

20       When he was 16" --

21       MR. GOLD:  Your Honor, could I --

22       THE COURT:  Wait.  Excuse me.

23       MR. GOLD:  I'd like to object to the reading of this.

24   Just maybe we could have the witness look at it; or if

25   there's a question to be made, it sounds a little like, I

```
1    mean, we've talked about this a great deal --
2         THE COURT:  Well, I'll leave him alone.  It's
3    cross-examination; I'll let him do it his way, but we want
4    to get as much of the time left as we possibly can.  Go
5    ahead.
6         MR. GRADY:  Thank you.  We will.
7    Q.  "When he was 16" -- sorry, I'm going to start back at
8    the top of that paragraph:  "Though Jim understood the
9    scenario in his fantasies was unlikely, he nevertheless
10   began to be preoccupied with sexually exciting urges to act
11   upon those fantasies.
12        When Jim was 16, he committed his first rape.  After each
13   rape he would promise himself never again; but in time, as
14   his preoccupations and urges were rekindled, he would repeat
15   the cycle.
16        Although he would often threaten women with a knife to
17   obtain their compliance, he never physically hurt them, and
18   he used the minimal amount of force necessary.  Any obvious
19   signs of suffering or anguish would diminish rather than
20   enhance his sexual arousal -- excuse me, allotted arousal;
21   and during the course of each rape, he would invariably throw
22   away his weapon and assure the woman that he did not intend
23   to injure her or cause her harm.
24        While reading magazines or watching movies depicting
25   females in positions of subjugation or bonding, he would
```

1    become erotically aroused, fantasizing that they were

2    enjoying the experience, but he would not become thus

3    aroused if the women seemed to be suffering or in genuine

4    distress.

5        When tested in prison with a penile plethysmograph, Jim

6    developed an erection when presented with stimuli depicting

7    females in positions of subjugation, but his arousal was

8    diminished if they seemed to be suffering.  Laboratory

9    testing of his blood revealed an elevated level of serum

10   testosterone.

11       Apart from his convictions for rape, Jim has never been

12   convicted or even accused of any other type of criminal

13   activity.  He has no history of out-patient/inpatient

14   psychiatric treatment.  He has a stable work history.

15   He has never abused alcohol or other drugs."

16       Have I read that correctly?

17   A.   You have, yes.

18   Q.   Now, we had an opportunity, you and I, to discuss that

19   factual pattern, correct, at your deposition?

20   A.   Correct.

21   Q.   And, in fact, I posited to you that this was an example

22   of an individual whom the authors of the DSM casebook had

23   recognized is properly diagnosed as suffering from

24   paraphilia not otherwise specified, correct?

25   A.   Yes.

1    Q.   And you, in fact, added on, given what I read:  Yes, and

2    I probably would too; is that correct?

3    A.   Yes.

4    Q.   Now, I want to see if we can assist the Court in

5    understanding how we get to that diagnosis from these facts.

6    A.   Okay.

7    Q.   And I think there are two questions at issue:  the first

8    is whether the diagnosis of paraphilia NOS can ever exist,

9    correct?

10   A.   Right.

11   Q.   And there's a separate question, is there not, about

12   whether it would apply to Mr. Graham?

13   A.   Well, I think the first one is a given, but the second

14   one definitely is a question.

15   Q.   Okay.  Well, when you say "it's a given," the diagnosis

16   certainly exists, correct?

17   A.   Exactly.  It doesn't matter what I think.  There is a

18   diagnosis called paraphilia not otherwise specified.

19   Q.   Okay, and there are unquestionably --

20        THE COURT:  Which is not in the DSM?

21        THE WITNESS:  Which is in the DSM.

22        THE COURT:  Which is in the DSM?

23        THE WITNESS:  It doesn't refer to any particular

24   type of paraphilia; it's just not -- what I was describing,

25   Judge, earlier in the sense that you can put anything in

```
 1    there.
 2              THE COURT:  Okay, I remember.
 3    Q.   Now, I just want to talk a little bit for the record
 4    purposes about the book we were reading from?
 5    A.   Yes.
 6    Q.   I'm going to show you the book we've previously had in
 7    evidence -- well, actually, we previously discussed; none of
 8    this is new.
 9       Can you tell me what this book that I read from is
10    entitled?
11    A.   Yes.  That's the first edition of the casebook for the
12    DSM-IV-TR, and you can see the other verbiage:  it's a
13    learning companion.
14    Q.   Okay, and who are the editors of this book?
15    A.   The same editors essentially and advisors that
16    contributed to the DSM-IV themselves.
17    Q.   Just for clarity purposes, Robert Spitzer was the
18    editor-in-chief of the DSM-III and DSM-III-R, correct?
19    A.   Yes.
20    Q.   And Miriam Gibbons contributed to the writing, I
21    believe, of the global assessment and functioning that is
22    located in the DSM-IV?
23    A.   Right, she was an advisor.
24    Q.   And Andrew Skodol was a member of one of the working
25    groups that contributed diagnosis to the DSM-IV, is that
```

1    correct?

2    A.   Correct.

3    Q.   And Janet Williams was a member of the DSM-IV Task

4    Force?

5    A.   Right.

6    Q.   And Michael First was, as to the DSM-IV, the editor of

7    the text?

8    A.   Correct.

9    Q.   And as to the DSM-IV-TR, he was the editor-in-chief and

10   cochair, correct?

11   A.   Correct.

12   Q.   Okay.  Now, you mentioned this was the first edition;

13   are you aware of another edition?

14   A.   I'm aware of a second edition, yes.

15   Q.   Okay.  What is your understanding of that edition with

16   respect to the example of Jim?

17   A.   It is my understanding that that was not concluded.

18   Jim's case was not included in the second edition.

19   Q.   And why was that, do you know?

20   A.   I wasn't privy to the discussions so I don't know

21   exactly why, no.

22   Q.   Okay.  I'm just going to show you very quickly another

23   book; do you recognize that?

24   A.   Thank you.  Yes, the treatment companion, I have seen

25   it.

1    Q.   Okay.  The treatment companion of the DSM-IV-TR

2    casebook?

3    A.   Right.

4    Q.   And that is written by, hopefully, we can read it, the

5    same people?

6    A.   Correct.

7    Q.   Robert Spitzer, Michael First, Marian Gibbons, and Janet

8    Williams, correct?

9    A.   Yes.

10   Q.   And just with respect to the claim that the case of Jim

11   is not in the treatment companion book -- let me back up for

12   a minute.  This is entitled The Treatment Companion to the

13   DSM-IV casebook, correct?

14   A.   Right.

15   Q.   It's meant to be a companion to it, not a superseding

16   edition, correct?

17   A.   Oh, absolutely.  It's not the DSM-IV-TR.

18   Q.   Well, I'm talking about the casebook.

19   A.   Okay.

20   Q.   This is not a superseding edition of the casebook,

21   correct?

22   A.   No.

23   Q.   And it is directed, unlike the original casebook, to

24   treatment rather than diagnosis, correct?

25   A.   Correct.

1    Q.   Okay.  Now, you actually have a copy of the casebook,

2    the original DSM-IV-TR casebook?

3    A.   I do.

4    Q.   And you yourself use it for the purpose of checking up

5    on diagnosis, correct?

6    A.   Well, not really.  I mean, I have used it more for

7    educational, working with students is really the main reason,

8    but, I mean, I have referred to it, sure.

9    Q.   Well, let me see if you agree with this description; it

10   was from perhaps an authority you would consider very good.

11   "The authors of the casebook have taken real-life examples

12   and facts, and they have applied the diagnostic criteria of

13   the DSM-IV text revision to provide correct diagnoses, and

14   they have given an analysis of the background facts that you

15   do not get from the DSM-IV-TR itself."

16        Would you agree with that description?

17   A.   Sure.

18   Q.   Okay.  And that's exactly the description you gave in

19   your deposition, correct?

20   A.   That's a good one.

21   Q.   Okay.  And it is, in fact, used to compare case

22   examples in the book with real-life diagnostic situations?

23   A.   Right.

24   Q.   And, in fact, you have used it yourself for that

25   purpose?

1   A.   Yes.

2   Q.   Just taking a moment, your Honor, I'm skipping questions

3   ... now, you would agree that Jim is properly diagnosed with

4   paraphilia NOS, correct?

5   A.   I would agree that that is -- yes, that that diagnosis

6   could be made because of the wealth of information

7   specifically contained in the narrative that you read

8   earlier.  Although, I would have a question about sexual

9   sadism, but the words are really tailored so I would agree.

10  Q.   Okay.  At your deposition you were asked:  "And the

11  authors of the DSM casebook recognized that it's that

12  example, Jim, as properly diagnosed as paraphilia not

13  otherwise specified, have they not?"  And your answer was:

14  "Given what I have read, yes, and I probably would too if I

15  had those issues demonstrated"?

16  A.   Exactly.  In other words, they're saying that the person

17  experienced x, y, and z.  There's an eroticized urge and

18  fantasy about coercing a woman sexually.  It's laid out in

19  great detail in the text that you read.

20  Q.   So with respect to that factual situation, we have an

21  individual who experiences deviant sexual arousal to coercive

22  sex, correct?

23  A.   Right.

24  Q.   That is properly diagnosed under the DSM, under the

25  category of paraphilia NOS, correct?

1    A.   I would agree.

2    Q.   Now, I indicated that I wanted to see to assist the

3    Court in figuring out how we get to that diagnosis ... so

4    can you tell me what would be used to reach a diagnosis of

5    paraphilia NOS?

6    A.   You would look in the DSM-IV-TR that you're holding in

7    your hand.

8    Q.   Excellent.  And, now, on direct you mentioned that you

9    would have a different diagnosis based on whether something

10   was done in treatment or in a forensic setting, correct?

11   A.   No, I don't think that's what I said.

12   Q.   You indicated that there could be -- you would offer a

13   diagnosis in treatment regarding the NOS category?

14   A.   Right.

15   Q.   But you might not offer the same diagnosis in a forensic

16   setting, correct?

17   A.   Correct.  If the strength of the diagnostic criteria

18   were not there, that's correct.

19   Q.   Which version of the DSM am I holding?  Am I holding

20   the courtroom version or the treatment version?

21   A.   You're holding the one and only version.

22   Q.   Okay, so there's no different DSM for treatment; there's

23   no different DSM for forensic settings, correct?

24   A.   No.  Although, there are cautionary statements in that

25   book about the use of it in forensic settings.

1    Q.   I'm sorry, I must have mis-asked the question.   There

2    is no DSM specifically for treatment sessions:   yes or no?

3    A.   Correct.

4    Q.   And there is no DSM specifically for courtroom settings:

5    yes or no?

6    A.   Correct.

7    Q.   Okay.   Now, if an individual with Jim's symptoms came

8    to you, you would not look at Jim, and say:   You're fine, go

9    home; nothing we can do for you, correct?

10   A.   I would agree with that.

11   Q.   Jim has a problem?

12   A.   Yes.

13   Q.   Okay.   And the question is how do we determine whether

14   Jim's condition meets the diagnostic criteria under the DSM,

15   correct?

16   A.   In part, yes.

17   Q.   Okay.   That's where we'd go to see if he meets the

18   definition of the disorder?

19   A.   Yes.

20   Q.   Okay.   Now, Jim's problem appears to be based upon

21   deviant sexual arousal, correct?

22   A.   It would appear given the description that that would be

23   correct, yes.

24   Q.   Is there a section of the DSM or a series of disorders

25   that applies to individuals with deviant sexual arousal?

```
1    A.   Yes.

2    Q.   What is or what are those called?

3    A.   Sexual disorders.

4    Q.   Okay.  Is there, within the category of sexual

5    disorders, disorders that are specifically characterized by

6    deviant sexual arousal?

7    A.   Yes.

8    Q.   Okay, and what are those?

9    A.   The paraphilias.

10   Q.   Paraphilias ... just would you agree with this:  the

11   core diagnostic construct that forms the basis of the

12   paraphilia category is that the person becomes sexually

13   aroused in response to stimuli considered to be abnormal,

14   correct?

15   A.   That's essentially correct.

16   Q.   And Jim's erotic arousal to nonconsenting sex is

17   abnormal, correct?

18   A.   Both abnormal and illegal, yes.

19   Q.   But it is abnormal, correct?

20   A.   Yes.

21   Q.   Now, so it seems to me, and let me know if you would

22   agree:  if we wanted to know whether Jim had a diagnostic

23   criteria in the DSM, we would want to look in the paraphilia

24   section, correct?

25   A.   Yes.
```

1    Q.    And where is that located, if you know?

2    A.    On what page?

3    Q.    If you could look at Government Exhibit 21.

4    A.    Yes.

5    Q.    Take a look through that and let me know whether you

6    recognize what is within Government Exhibit 21 in evidence?

7    A.    It does have a copy of the paraphilia section, beginning

8    at Page 566 of the DSM.

9    Q.    Okay.  Now, how many paraphilias are there?

10   A.    How many are there?

11   Q.    Yes.

12   A.    Well, there are a number of predefined ones, ones that

13   are most salient, most encountered; but as I indicated in my

14   direct testimony, the universe of potential paraphilias can

15   be great.

16   Q.    Okay.

17   A.    A person, if it's demonstrated whether by their

18   physiological arousal, their self-report, collateral data,

19   can and are aroused to many different things that aren't

20   defined specifically in the DSM.

21   Q.    Okay.  The universe of deviant sexual arousals that

22   might give rise to a paraphilia diagnosis are virtually

23   limitless, correct?

24   A.    I would say so, yes.

25   Q.    And among those deviant sexual arousals that can give

1   rise to a diagnosis of paraphilia under one of these

2   categories would include deviant sexual arousal to coercive

3   sex?

4   A.   It's possible.  How likely it is is another question,

5   but it's certainly, as I said, possible.

6   Q.   Within the universe of paraphilias that can give rise

7   to a diagnosis of paraphilia within the DSM, within that

8   universe is deviant sexual arousal to coercive sex, correct?

9   A.   It's possible.

10   Q.   Is it within the universe:  yes, or is it not within

11   the universe:  no?

12   A.   Well, I think it's somewhat south of Alpha Centauri,

13   but it's in the universe somewhere.

14   Q.   Yes?

15   A.   Yes.

16   Q.   It was a long time to get to that, yes.

17        MR. GOLD:  Objection, your Honor.

18        THE COURT:  We'll let it stand.  I don't have to rule

19   on that....

20        MR. GRADY:  Withdrawn, your Honor.  I apologize....

21   Q.   Now, you mentioned there are specifically named

22   paraphilias, correct?

23   A.   Correct.

24   Q.   Pedophilia, which is what?

25   A.   That's a disorder pattern of sexual interest in

1    prepubescent children.

2    Q.   Okay.  We would look at that in Jim's case, and we

3    would conclude Jim does not qualify for pedophilia, correct?

4    A.   Well, I mean, from the limited -- from the description

5    I would say I agree with you, but it's certainly not -- it's

6    certainly possible if I had more information, but just

7    relying on the four paragraphs, I would agree.

8    Q.   Okay.  Relying upon the factual information relayed in

9    the casebook example, we would conclude that pedophilia is

10   not an appropriate diagnosis, correct?

11   A.   Correct.

12   Q.   Another potential paraphilia diagnosis would be sadism?

13   A.   Correct.

14   Q.   Frotteurism?

15   A.   Correct.

16   Q.   Fetishism?

17   A.   Correct.

18   Q.   Masochism, transvestic fetishism?

19   A.   Yes.

20   Q.   Voyeurism and exhibitionism, correct?

21   A.   Yes.

22   Q.   That's every listed paraphilia, correct?

23   A.   Correct.

24   Q.   And Jim's example based on the information you have

25   does not fit within any of them, correct?

1    A.   With the information, it does not, with the caveat of

2    more -- I would want more exploration on sexual sadism; but

3    having said that, it does not neatly fall into any of those

4    other defined paraphilias.

5    Q.   Let me digress completely one moment from my preplanned

6    questions.  When you say, "I would like more information on

7    sexual sadism," does that mean you'd ask questions about it

8    in a clinical interview or something like that?

9    A.   Correct.

10   Q.   So you'd make specific questions about sadistic urges/

11   behaviors that might be sadistic, correct?

12   A.   Correct.

13   Q.   Okay.  Backing up, Jim's example does not fall within

14   any of the eight specified paraphilias in this section of

15   the DSM, correct?

16   A.   Correct.

17   Q.   What are we to do with Jim?  Where do we go next?

18   A.   Well, diagnostically, you'd get as much information

19   about what specifically the urges are, as the casebook

20   illustration goes into in some detail, and the chronicity of

21   it; in other words, how long has it gone on for, and that's

22   where a paraphilia not otherwise specified would come into

23   the analysis.

24   Q.   Uh-huh.  A paraphilia not otherwise specified, where is

25   that in Exhibit 21?

1    A.   It is on page -- beginning on Page 576.

2    Q.   I'm just going to read from the DSM Page 576; Code

3    302.9, what's that?

4    A.   That's a diagnostic code for coding purposes.

5    Q.   For billing?

6    A.   Well, among other things, yes.  It is a billing code as

7    well.

8    Q.   The title is paraphilia not otherwise specified,

9    correct?

10   A.   Correct.

11   Q.   And under that it reads:  "This category is included

12   for coding paraphilias that do not meet the criteria for any

13   other specific categories."

14       Have I read that correctly?

15   A.   You have.

16   Q.   Okay.  And with respect to the example we've provided

17   of Jim, Jim does not meet the criteria for any of the

18   specified categories, correct?

19   A.   Correct.

20   Q.   Okay.  So the first essential criteria for putting

21   something into the paraphilia NOS category is that it not

22   be specified elsewhere in the paraphilia category, correct?

23   A.   Right.

24   Q.   So the first thing something needs to have to qualify

25   for this diagnosis is that it not be in the DSM anywhere

1    else, correct?

2    A.   Well, not --

3    Q.   Not be in the paraphilia section?

4    A.   Okay, not being in the paraphilia section; however, it

5    can -- some of the diagnostic criteria can be in there, but

6    they don't meet all of them, and I think I spoke to that on

7    great extent in my direct examination.

8    Q.   We'll come -- sorry, I didn't mean to interrupt you.

9    A.   No.   I'm just saying if the person, for example, meets

10   a number of the criteria of one of those other paraphilias

11   that you named, but not all of them, that's a potential

12   paraphilia not otherwise specified as well.

13   Q.   Well, but, certainly, this diagnosis would include

14   paraphilias that are not mentioned in the specified

15   categories?

16   A.   True.

17   Q.   I'm going to read on under the paraphilia NOS in the

18   DSM-IV, Page 576:   "Examples include but are not limited to

19   telephone scatologia (obscene phone calls), necrophilia

20   (corpses), partialism (exclusive focus on parts of the body),

21   zoophilia (animals), coprophilia (feces), klismaphilia

22   (enemas) and urophilia (urine)."

23        Have I read that correctly?

24   A.   You have.

25   Q.   Okay, and what we have here is a list of examples, that

1    is, by the words of the DSM, not exclusive, correct?

2    A.   I'm sorry?

3    Q.   You have a list of examples --

4    A.   Oh.

5    Q.   -- but it is not an exclusive list, correct?

6    A.   Yes.

7    Q.   Okay.  Now, there is an NOS category for virtually

8    every class of disorders; is that correct?

9    A.   That's right.

10   Q.   I'll come back to the paraphilia not otherwise specified

11   in a moment ... I'm going to show you Page 939 of the DSM.

12   Typically -- I apparently left my highlighter at home --

13   that is the listing for --

14        THE COURT:  Do you want to borrow one?  Do we have

15   one here?

16   Q.   I'm just going to direct your attention to the

17   highlighted listing in the bibliography -- well, strike that.

18   Do you recognize what I've shown you on the screen as the

19   bibliography of the DSM-IV Text Revision?

20   A.   It looks like the index.

21   Q.   Well, we'll start with the book.

22   A.   Yes.

23   Q.   We'll start with the book.  Go to the back.  I'm in

24   another one of those dream modes ... all right.  In the back,

25   beginning at Page 933, there is a title; what is it?

1    A.   "Index."

2    Q.   Okay.  I'm going to show you a Page 939.  Showing you

3    Page 939 of the DSM, does that appear to be a portion of the

4    DSM-IV Text Revision Index?

5    A.   Yes.

6    Q.   What is the highlighted entry?

7    A.   "Not otherwise specified."

8    Q.   And approximately how many other "not otherwise

9    specified" categories are there in the DSM besides that for

10   paraphilias?

11   A.   Many.

12   Q.   Over 40?

13   A.   That would be right.

14   Q.   Now, I'm just going to come back to the beginning of

15   the DSM.  Sorry, I apologize to the Court.  I'm going to go

16   back to the beginning of the DSM.

17   A.   Okay.

18   Q.   Page 1, what's the title of the section beginning on

19   Page 1?

20   A.   "Use of the manual."

21   Q.   Okay, and we'll go to Page 4.  Now, you would agree

22   the section beginning at Page 4 of the DSM-IV Text Revision

23   is a general description by the authors and the writers of

24   the DSM-IV Text Revision on how to use the DSM-IV Text

25   Revision, correct?

1     A.   Correct.

2     Q.   And --

3          MR. SINNIS:  May I give him a copy so he can follow

4     along, if Mr. Grady is going to go from page to page?

5          THE COURT:  That would be helpful.  Don't you think

6     so?

7          MR. GRADY:  Sure, I can give him a copy.

8          MR. SINNIS:  No, I'll give him a copy.

9          MR. GRADY:  That's fine.

10    Q.   Directing your attention to Page 4, is Page 4 a portion

11    of the beginning of the DSM-IV Text Revision that describes

12    how to use the DSM-IV diagnostic categories?

13    A.   Yes.

14    Q.   Okay.  And within that on Page 4 is a section entitled:

15    "The use of the not otherwise specified categories," correct?

16    A.   Correct.

17    Q.   And it begins:  "Because of the diversity of clinical

18    presentations, it is impossible for the diagnostic

19    nomenclature to cover every possible situation."

20         Is that correct; have I read that correctly?

21    A.   You have.

22    Q.   And do you agree with that?

23    A.   I do.

24    Q.   Okay.  "For this reason, each diagnostic class has at

25    least one not otherwise specified category, and some classes

1    have several NOS categories," correct?

2    A.   Correct.

3    Q.   Now, I've read that correctly?

4    A.   You have.

5    Q.   And you agree with that, correct?

6    A.   I do.

7    Q.   All right.  "There are four situations," it goes on,

8    "in which an NOS diagnosis might be appropriate," correct?

9    A.   Right.

10   Q.   The first diagnosis, there's four bullet points there?

11   A.   Yes.

12   Q.   In deference to my brother, why don't you read the first

13   bullet point for us?

14   A.   Yes.  "The presentation conforms to the general

15   guidelines for mental disorder in the diagnostic class, but

16   the symptomatic picture does not meet the criteria for any

17   of the specific disorders.

18       This would occur either when the symptoms are below the

19   diagnostic threshold for one of the specific disorders or

20   when there is an atypical or mixed presentation."  That's

21   what I was talking about earlier.

22   Q.   Now, with respect to this first bullet point, when we

23   refer to Jim, are we -- strike that.

24       Are we following that bullet point of these instructions

25   when we place Jim into the paraphilia NOS category?

1    A.   No.

2    Q.   Okay.  Can you read onto the next --

3    A.   "The presentation conforms to a symptom pattern that

4    has not been included in the DSM-IV classification, but that

5    causes clinically significant distress or impairment.

6    Research criteria for some of these symptom patterns have

7    been included in Appendix B.  Criteria sets and axis provided

8    for further study; in which case, a page reference to the

9    suggested research criteria set in Appendix B is provided."

10   Q.   And with respect to placing Jim within the paraphilia

11   NOS category, is this instruction that you've just read the

12   manner in which we're using the NOS category?

13   A.   No.

14   Q.   All right.  Can you continue?

15   A.   "There is uncertainty about etiology; that is, whether

16   the disorder is due to a general medical condition, is

17   substance induced or is primary."

18   Q.   Okay.  Is that the bullet point that you would follow

19   in placing Jim within the paraphilia NOS category?

20   A.   No.

21   Q.   Okay, and read the fourth?

22   A.   There is insufficient opportunity for complete data

23   collection; for example, an emergency situation or

24   inconsistent or contradictory information, but there is

25   enough information to place it within a particular

1   diagnostic class.  For example:  the clinician determines

2   that the individual has psychotic symptoms but does not

3   have enough information to diagnose a specific psychotic

4   disorder."

5   Q.   Okay.  And is that the class in which you would testify

6   that we would be placing Jim in, the paraphilia NOS category?

7   A.   Not really.

8   Q.   Okay.  There is additionally a section of that

9   introduction that indicates that the paraphilia NOS category

10  may be used to indicate diagnostic uncertainty?

11  A.   Right.

12  Q.   Is that where you would place Jim in the category of

13  paraphilia NOS?

14  A.   No.

15  Q.   Okay.  Let's come back to the paraphilia NOS diagnosis

16  for a moment; we'll put Jim aside for a minute and come back

17  to 576 of the DSM-IV Text Revision ... one of the ways, you

18  would agree, that the authors of the DSM-IV Text Revision

19  had indicated the not otherwise specified category can be

20  used is where presentation conforms to the general

21  guidelines for the mental disorder in the diagnostic class,

22  but the symptomatic picture does not meet criteria for any

23  of the specific disorders, correct?

24  A.   Yes.

25  Q.   Now, paraphilias, as we've discussed, concern deviant

1    sexual arousal, correct?

2    A.   That's essentially correct.

3    Q.   Now, just coming back to the paraphilia NOS, there are

4    examples in that category, correct?

5    A.   Yes.

6    Q.   We'll take, for example, obscene phone calls, telephone

7    scatologia?

8    A.   One of my favorites.

9    Q.   Where in the DSM am I to find the criteria for

10   diagnosing that?

11   A.   There are no specific criteria for the diagnosing of

12   telephone scatologia.  You rely on the general criteria

13   beginning on Page 566 in the description of paraphilias.

14   Q.   So that nowhere in the DSM does it tell me how many

15   phone calls I have to make to qualify for the diagnosis,

16   correct?

17   A.   Right.

18   Q.   Nowhere in the DSM does it tell me how frequently I'd

19   have to make those phone calls week to week, month to month,

20   year to year; it does not tell me that, correct?

21   A.   No, it doesn't, with the understanding that the

22   six-month period that I discussed earlier is a general

23   criteria for any of the paraphilias.

24   Q.   Whatever frequency with which I engage in telephone

25   scatologia would have to meet the six-month criteria you

1    just identified?

2    A.   Correct.

3    Q.   But it doesn't tell me if it's within that six months

4    specifically how frequently you would have to engage in the

5    behavior?

6    A.   Correct.

7    Q.   It doesn't tell me how many calls a day, correct?

8    A.   It does not.

9    Q.   Okay.  With respect to klismaphilia, it's somewhat

10   disturbing, it doesn't tell you how many enemas on a given

11   day an individual would have to have, correct?

12   A.   True.

13   Q.   It doesn't tell you how frequently they would have to

14   do it, correct?

15   A.   True.

16   Q.   Now, should we infer from that, the absence of these

17   criteria in the DSM, that these are not properly diagnosed

18   under the category of paraphilia NOS?

19   A.   I don't understand the question.

20   Q.   Sure.  There has been argument made that there are no

21   set criteria for some paraphilia NOS diagnoses; do you

22   understand that to be the case?  Do you understand to have

23   testified that there are no criteria for the diagnosis of

24   paraphilia NOS as it applies to coercive sex?

25   A.   That's true, there isn't.

1    Q.   All right, and you have endorsed the notion that that

2    cannot be a proper paraphilia NOS diagnosis because the DSM

3    does not provide specific criteria for that, correct?

4    A.   The diagnosis paraphilia NOS (nonconsent) that I was

5    referring to, correct.

6    Q.   But you believe that paraphilia or among many reasons,

7    you believe paraphilia NOS (nonconsent) cannot be a diagnosis

8    because there are no specific criteria in the DSM, correct?

9    A.   I can't answer that yes or no.  I --

10   Q.   That's fine.

11   A.   Referring to the diagnosis itself, in the use of the

12   term --

13   Q.   I'm sorry, Doctor, did I ask you to explain?

14   A.   Okay.

15        MR. GOLD:   I would object to the argument, your

16   Honor.

17        THE COURT:   No, he's trying to confine the witness;

18   he's entitled to that.

19   Q.   Now, with respect to -- well, let's come back to this

20   coprophilia, how would one have to manipulate the feces

21   according to the DSM to qualify of coprophilia under the

22   category of paraphilia NOS; where are the criteria in the

23   DSM?

24   A.   Page 566 under the diagnostic features of paraphilias.

25   Q.   Okay.  So in order to help the Court, if we were going

1    to look to diagnose someone with paraphilia NOS, we would go

2    back to the generalized criteria for paraphilia listed on

3    Page 566, correct?

4    A.   Yes.

5    Q.   And we would look to those criteria and let me see if I

6    can identify it, okay?  I'm going to read some portions of

7    that, and you can tell me if those are the criteria?  I'm

8    going to start with the "diagnostic features."

9         "The essential features of paraphilia are recurrent,

10   intense, sexually-arousing fantasies, sexual urges, or

11   behaviors generally involving," and they give three things:

12   "one, nonhuman objects; two, the suffering or humiliation of

13   one's self or one's partner; or, three, children or other

14   nonconsenting persons that occur over a period of six months,

15   Criterion A."

16        Have I read that correctly?

17   A.   Correct.

18   Q.   And that is essentially the first criteria of making

19   paraphilia NOS diagnosis, correct?

20   A.   Correct.

21   Q.   Okay.  Now, previously you testified nonconsent

22   paraphilia -- well, strike that.

23        In the context of critiquing the diagnosis of paraphilia

24   NOS (nonconsent), you've indicated or you testified, if you

25   recall, that nonconsent is not in the DSM?

1    A.   That diagnosis is not in the DSM, correct.

2    Q.   Your exact testimony, I believe, was nonconsent is not

3    in the DSM?

4    A.   No, the term is in the DSM; it's used differently than

5    the Doren term is.

6    Q.   The term is in the DSM, correct?

7    A.   Yes.

8    Q.   The term nonconsenting is right there in Criterion A

9    that you've identified as being the first criteria we would

10   use to diagnose paraphilia NOS, correct?

11   A.   Correct.

12   Q.   Now, you also mentioned that nonconsenting doesn't mean

13   nonconsenting?  It has a limited meaning; it's only meant to

14   apply to certain of the paraphilias, correct?

15   A.   Well, I mean, I can't answer correct, and I disagree

16   with the way you've phrased your question.

17   Q.   You've testified previously -- I'll rephrase it.

18   A.   Thank you.

19   Q.   -- that the nonconsent that is used in that sentence

20   doesn't mean nonconsent generally?

21   A.   It has a specific meaning that I think is different

22   from the Doren meaning in this book, correct.

23   Q.   It only means nonconsent for sadism and what other --

24   A.   No, children are nonconsenting.

25   Q.   It says "children"?

1    A.    Children or other nonconsenting.

2    Q.    So children are within the --

3    A.    So that is sadistic behavior, exhibitionistic behavior,

4    voyeuristic behavior, behavior which involves sexual arousal

5    and aberrant sexual behavior where there are nonconsenting

6    victims, and I described it in some detail, for example, at

7    a park with an exhibitionist.

8    Q.    Okay, but it's not meant to apply to nonconsenting rape

9    victims?

10   A.    Well, it's not the reason it's there; I'll say that.

11   Q.    Okay.  Well, where in the DSM can I read that

12   nonconsenting as it exists in Criterion A does not apply to

13   rape victims?

14   A.    It doesn't say.

15   Q.    It doesn't say that in the DSM, correct?

16   A.    It's silent on that issue.

17   Q.    Well, let's be clear:  the DSM in its text does not

18   say, as you testified earlier, that the term nonconsenting

19   applies only to certain paraphilias as it is used in

20   Criterion A?

21   A.    No, that's the discussion that went around the use of

22   that term, as that article pointed out, but I will agree

23   that it's silent on exactly the attribution of the term, yes.

24   Q.    Well, again, remember -- you would agree that the DSM

25   does not say anywhere in its text that the term nonconsent,

```
1     as it is used in Criterion A on Page 566, nowhere in the DSM
2     does it say that does not apply to rape victims?  That's
3     correct, is it not?
4     A.   It does not mention the word "rape."
5     Q.   So, yes, that is correct?
6     A.   Yes, that is correct.
7     Q.   I'm just going to direct your attention to a little bit
8     further down.  The second half of that paragraph is dedicated
9     to a little paragraph entitled:  Criterion B, correct?
10    A.   Yes.
11    Q.   And, generally speaking, the remainder of those
12    sentences are the second criteria for making a diagnosis of
13    paraphilia NOS, correct?
14    A.   Correct.
15    Q.   Okay.  And the particular sentence that would apply to
16    paraphilia NOS begins:  "For the remaining paraphilias,"
17    correct?
18    A.   Yes.
19    Q.   Okay.  So for the second criteria we would look to, to
20    make a diagnosis of paraphilia NOS, we would look at:  "For
21    the remaining paraphilias, the diagnosis is made if the
22    behavior, sexual urges, or fantasies cause clinically
23    significant distress or impairment in social, occupational,
24    or other important areas of function."  Correct?
25    A.   That's what it says, correct.
```

1           MR. GRADY:  If I could just have a moment, your

2    Honor....

3    Q.   Now, having discussed all of that, I'm going to come

4    back to Mr. Healy, Jim Healy, in the casebook ... and just

5    going to -- now, in this casebook the authors have provided

6    a description of how they have applied the DSM Text Revision

7    diagnostic criteria to the factual situation, correct?

8    A.   Yes, to looking at an example, yes.

9    Q.   They've given their opinion, correct?  It's not the

10   American Psychiatric Association, this is not the DSM,

11   correct?

12   A.   No, this is whoever the author was particularly of this

13   section.

14   Q.   Okay.  And that author indicates Jim, and I'm just going

15   to quote from it:  "Jim experienced recurrent eroticized

16   urges and fantasies about coercing women sexually."

17       Have I read that correctly?

18   A.   You have.

19   Q.   And would you agree that based upon that fact pattern,

20   Jim experienced recurrent eroticized urges and fantasies

21   about coercing women sexually --

22   A.   That's what it says.

23   Q.   -- you would agree?  Would you agree with that

24   statement:  "Jim experienced," based on the facts you read,

25   "recurrent eroticized urges and fantasies about coercing

1    women sexually"?

2    A.   That's what it says, yes.

3    Q.   "Such fantasies and urges have been present for many

4    years, and he had been" -- excuse me, "and he had repeatedly

5    acted on them."

6        I've read that correctly, have I not?

7    A.   Yeah.

8    Q.   And you would agree that of the fact pattern you

9    described, this is an actual description of, correct?

10   A.   I'm sorry, I don't quite understand.  That's what it

11   says.

12   Q.   Sure.

13   A.   That's an example.  It's a case vignette.  You're

14   reading it accurately, correct.

15   Q.   Okay, and what I'm tempting to discern is if you agree

16   with the statements being made by the author about the case

17   vignette, so when I say the author states that such

18   fantasies and urges have been present for many years, and he

19   had repeatedly acted upon them, I ask you:  has the author

20   accurately summarized the fact pattern?

21   A.   I have no idea.  This is a hypothetical case that

22   they're inventing.  I don't agree or disagree with it.  I'm

23   saying you read it the way it is in the text.

24   Q.   Okay.  But we can all read the facts, correct?

25   A.   Yes.

1    Q.   But not all of us are psychologists like you, correct?

2    A.   True.

3    Q.   And when you read a certain fact pattern, you bring a

4    certain expertise to bear, correct?

5    A.   True.

6    Q.   Now, I can read the facts and I can read what the author

7    says, but I can't know from that whether you, bringing your

8    expertise to bear, agree with the author of this document;

9    that's what I'm attempting to discern?

10   A.   Well, and you're going over this expert's head because

11   it's not in my power to agree or disagree; it is what it is.

12   It's being --

13        THE COURT:  I think what he's asking you:  does it

14   add up to something?  Is that what you're basically asking?

15        MR. GRADY:  Well, I wanted to know to the extent

16   that the author offers his discussion and opinion on this

17   case, your Honor, the extent to which Dr. Plaud agrees with

18   it, and I was going through it sentence by sentence, but I

19   can certainly try to wrap it up if Dr. Plaud is having

20   difficulty understanding the concept; it's not a problem.

21        THE COURT:  Move onto something else then....

22   Q.   Dr. Plaud, the author of this vignette has concluded

23   that Jim's disorder would be coded as paraphilia not

24   otherwise specified under the DSM-IV Text Revision,

25   Page 576, correct?

```
1    A.   Yes.

2    Q.   And you've previously testified you agree that it

3    would be so coded or so diagnosed?

4    A.   Assuming the facts as they are presented that would be

5    the most appropriate diagnostic criteria, that category,

6    yes, for Jim.

7    Q.   Now, is there any confusion that the author of the

8    casebook was unaware that paraphilic coercive disorder was

9    declined or was rejected as a separate paraphilia diagnosis?

10   A.   I have no idea.

11   Q.   Okay.  Well, let's just move up one sentence.

12        "During the development" -- I'll ask you if I've read

13   this correctly:  "During the development of DSM-III-R the

14   term paraphilic coercive disorder was suggested for this

15   particular kind of paraphilia, but the category has never

16   been officially recognized."

17        Have I read that correctly?

18   A.   You have.

19   Q.   And does that inform you about whether the author of

20   this vignette who concluded that paraphilia NOS is an

21   appropriate diagnosis, does that inform you as to whether

22   he is aware whether paraphilic coercive disorder was

23   rejected?

24   A.   Correct.

25   Q.   He is aware, correct?
```

1    A.   He would appear to be, yes.

2    Q.   And notwithstanding that he is aware that paraphilic

3    coercive disorder was previously rejected in the DSM-III

4    Revision, he nonetheless concludes that the appropriate

5    diagnosis here is paraphilia NOS, correct?

6    A.   Correct.

7    Q.   Now, you would agree that in an individual who has a

8    paraphilic sexual attraction to nonconsenting partners, it

9    is possible to make a diagnosis of paraphilia NOS, correct?

10   A.   It is.

11   Q.   And, in fact, the case illustration is an example of

12   such an individual?

13   A.   It is, because it specifies the essential features of

14   paraphilia letter by letter.

15   Q.   Okay, and just so there is no possibility for confusion:

16   there is a diagnosis for paraphilia NOS that can be properly

17   made where the paraphilia in question is a sexual interest

18   in engaging in sexual acts with nonconsenting partners:

19   yes or no?

20   A.   It's possible.  Not probable, but possible, yes.

21   Q.   Thank you.  And, in fact, you indicated in your

22   testimony, both today and in deposition, that you have been

23   prepared on four or five occasions to make such a diagnosis

24   based upon paraphilic interest in nonconsenting sex, correct?

25   A.   Yes, I certainly have encountered it, not with this

1    amount of detail, but, yes, I would agree, as I've

2    testified to, but it's such a small number, and that's the

3    most critical issue.  It's so rare.

4    Q.   I mentioned there were two questions.

5    A.   Okay.

6    Q.   And it seems to me that the first question is whether a

7    diagnostic model or a disorder exists, correct?

8    A.   Yes.

9    Q.   And the second question is whether it applies to

10   Mr. Graham, correct?  And we're going over right now whether

11   the disorder exists, correct?

12   A.   Yes.

13   Q.   And, in fact, it is your testimony and you agree that

14   that disorder exists as we've just discussed?

15   A.   Yes.

16   Q.   Now, as you pointed out, there remains in this case the

17   question about how that diagnosis does or does not apply to

18   Mr. Graham, correct?

19   A.   Yes.

20   Q.   Just a couple more questions on this issue, Dr. Plaud

21   ... you discuss the issue of paraphilia NOS nonconsent in

22   your report, correct?

23   A.   That's correct.

24   Q.   Okay.  And you indicate in rather unequivocal language

25   that the diagnosis of paraphilia NOS nonconsent does not

```
1    exist, correct?
2    A.   That's right.  It's made up.
3    Q.   You have indicated that, in fact, with no less equivocal
4    language that it is a made-up diagnosis, correct?
5    A.   Exactly, it is.
6    Q.   But there is, nonetheless, a paraphilia NOS diagnosis
7    that can be properly made based upon a deviant sexual arousal
8    to nonconsenting sex, correct?
9    A.   I agree with you and that's the key, based on....
10             THE COURT:  Based on what?
11             THE WITNESS:  Based on evidence of the underlying
12   arousal that is focused on nonconsenting aspects to sexual
13   arousal.
14       You can label any behavior with a nonconsent validly.
15   I'm not disputing to any degree that NOS should or shouldn't
16   be there.  I think it should be in the DSM.
17        The question is:  there's another pseudodiagnosis,
18   Judge, called paraphilia NOS (nonconsent) with criteria
19   that's not in the DSM that we've just been discussing,
20   developed by one person named Dennis Doren, and published
21   in a book in 2002; and that's what's being used by some
22   clinicians to make diagnoses and give them some credibility,
23   in the absence of the demonstration of the underlying sexual
24   arousal disorder.  That is the key issue.
25        What we've been discussing here is the example by a
```

1    hypothetical man named Jim where they can see in the text

2    every issue, forget about the nonconsent -- or sex with

3    nonconsenting persons, they're just going down in a bullet-

4    like fashion saying that it's recurrent and intense sexual

5    fantasies, urges, and behaviors towards this type of sexual

6    behavior ... that's a paraphilia NOS.

7    Q.   Well, Dr. Plaud, to be clear, the diagnosis of

8    paraphilia NOS may be made based upon a deviant sexual

9    arousal to non -- excuse me, to coercive sex, right?

10   A.   Sure.

11   Q.   And what you take issue with is the label:  paraphilia

12   NOS with the parenthesis (nonconsent) inside the parenthesis,

13   correct?

14   A.   Well, I do, but that's just the beginning ... because

15   there is a separate set of criteria designed and developed

16   by one individual that tries to go around the issue of the

17   deviant arousal and specified other factors that you can use

18   to make such a diagnosis; that's the phony part.

19   Q.   Great, thank you.  Where -- in your report I see a

20   page-and-a-half dedicated to -- it's Exhibit 27, if you want

21   to look; I see a page-and-a-half dedicated to paraphilia NOS

22   (nonconsent) does not exist.

23        Would you agree with that?

24   A.   I have one -- two paragraphs dedicated to that specific

25   issue on Page 9.

Q.   Okay.  Two full paragraphs dedicated to the assertion

that paraphilia NOS (nonconsent) does not exist, correct?

A.   Yes.

Q.   Where -- well, strike that.  Nowhere in your report

does it mention that paraphilia NOS may be properly

diagnosed based upon a deviant sexual arousal to

nonconsenting sex, correct?

A.   I don't have that and I wouldn't put that in there;

there's no reason for it, but, yeah, true.

Q.   Nowhere in your report is that acknowledgment, correct?

A.   No, I talk about the V code issue and how to come to

terms with it.

Q.   Well, let's be clear:  nowhere in your report does it

say that even though paraphilia NOS (nonconsent) which I've

dedicated two paragraphs to does not exist, there is

certainly a diagnosis of paraphilia NOS that is properly

applied when the deviant sexual arousal issue is to

noncoercive sex?

A.   That's true, with the caveat that I do discuss

paraphilia NOS specifically.

Q.   Okay, but you never acknowledge that there is a proper

paraphilia NOS diagnosis that can be applied to individuals

who experience deviant sexual arousal to nonconsenting sex;

it's nowhere in your report, correct?

A.   That's correct.  I don't discuss any of the -- any

1    specifics, because as you said, there is a universe of

2    potential issues.  I don't discuss potential sexual interest

3    in tables or chairs or, you know, bedroom furniture, or, you

4    know, there's a universe of possibilities.

5         Why would I even want to put that into the report?

6    Q.   So you wouldn't -- that's fine, I understand.

7         In your view the potential diagnosis of paraphilia NOS

8    that applies to individuals who derive sexual pleasure from

9    noncoercive sex, from rape, doesn't belong in your report?

10   A.   If it were in evidence in the case, it would be in my

11   report, but there is no evidence in this case of any of that

12   being here.

13   Q.   So your testimony is there is no need to have any

14   discussion about paraphilia NOS (nonconsent) -- strike that.

15   Excuse me.

16        There's no need to have any discussion in your report

17   about paraphilia NOS based upon deviant sexual arousal to

18   rape or nonconsenting sex?

19   A.   Absence of evidence, no, there isn't.  Other than the

20   description that I do give in my report in talking about

21   what paraphilia NOS is, talking about examples given in

22   the DSM, talking about rape-related paraphilias that may

23   have relevance such as sexual sadism, and then talking about

24   the Doren diagnosis, that's -- I'm trying to talk about,

25   dissect the important issues.

1    Q.   Well, in your book then, let's agree:  in your view it

2    was important to dedicate two paragraphs to the fact that

3    paraphilia NOS (nonconsent) does not exist, correct?  You

4    dedicated your time to the important issues?

5    A.   No, that actually is -- it's in two sentences.  I mean,

6    in most of the large paragraph I talk about the V codes.

7    I'm talking about the V codes in the DSM.

8    Q.   You're talking about V codes in the context of refuting

9    the diagnosis of paraphilia nonconsent, correct?

10   A.   No, I'm talking about that is the place where in the

11   DSM it's dealt with more traditionally than what your

12   suggestion is....

13   Q.   Well, so you indicated previously you only needed to

14   put in your report what was important, correct?

15   A.   True.

16   Q.   And you put in your report at least two paragraphs

17   about paraphilia NOS (nonconsent) not existing, correct?

18   A.   True.

19   Q.   And you put nothing in your report about acknowledging

20   that paraphilia NOS can be properly diagnosed where an

21   individual has a deviant sexual arousal to noncoercive sex,

22   correct?

23   A.   To noncoercive?

24   Q.   Excuse me, to coercive sex.

25   A.   I did not put that in, correct.

```
1    Q.   You mentioned other diagnoses that you thought might
2    apply but the criteria weren't met, correct?
3    A.   True.
4    Q.   You mentioned sadism?
5    A.   I did.
6    Q.   And you mentioned that sadism is a recognized
7    paraphilia; it would be a possible diagnosis, but it's not
8    met, correct?
9    A.   Correct.
10   Q.   But you do not undertake any such analysis with respect
11   to the paraphilia NOS diagnosis based upon deviant sexual
12   arousal to coercive sex, correct; it's not there?
13   A.   It's not there because it would -- on a case-by-case
14   basis, given its low frequency, I mean, as I said....
15   Q.   Now, Doctor, you included a bibliography to your report,
16   correct?
17   A.   I did, yeah.
18   Q.   And in your bibliography you cited to relevant works
19   that were important to your decision, correct?
20   A.   True.
21   Q.   And they're cited in the bibliography because they
22   were important to your decision, correct?
23   A.   Well, not only in this case.
24   Q.   Well, they played a role?
25   A.   Yes.  I mean, those are some of the salient research
```

1    papers in the last couple decades.

2    Q.   And were you familiar with the DSM casebook and the

3    example of Jim Healy when you drafted this report?

4    A.   I certainly had read it a number of years ago, so I

5    was aware of it.  Really, it's through the net; it's not

6    research, so --

7    Q.   Not mentioned in your bibliography?

8    A.   I was aware of it, and it's not in my bibliography

9    because I'm citing more authoritative, mostly research

10   articles in there.

11   Q.   Great.  Is there any of those more authoritative,

12   mostly research articles, that you cite in your bibliography

13   that have anything to do with the diagnosis of paraphilia

14   NOS?

15   A.   Well, I have some references to books that talk about

16   paraphilia NOS, sure, including some of my own publications

17   where I discuss that.

18   Q.   Do you recall in your deposition when I asked you

19   quote -- why don't I just show it to you -- "Are you aware --

20   well, are you aware of any peer-reviewed journals that

21   support the descriptor nonconsent within the context of a

22   paraphilia NOS diagnosis?"  Your answer was:  "No" --

23   A.   That's correct.

24   Q.   -- right?  I'm just going to show you an item and tell

25   me if you know what this is?

1    A.   Yes.

2    Q.   What is it?

3    A.   It's a review article written by Michael First and

4    Robert Halon, published in the Journal of the American

5    Academy of Psychiatry and the Law.

6    Q.   Is the Journal of American Academy of Psychiatry and

7    the Law a well-recognized journal?

8    A.   Very well-recognized.

9    Q.   Is it peer-reviewed?

10   A.   It is.

11   Q.   And are its articles routinely relied upon in the field?

12   A.   In the field and by me.

13   Q.   And were you aware of this article at the time you

14   drafted your report?

15   A.   Yes.

16   Q.   This article is dated November 4th, 2008?

17   A.   It is.

18   Q.   And your report was in May of 2009, correct?

19   A.   Correct.

20   Q.   And you were familiar with this article at the time

21   that you drafted your report, correct?

22   A.   Not only was I familiar with it, I had several

23   discussions with one of the coauthors about it.

24   Q.   Were you aware of this article last week when I asked

25   you if you were aware of any articles that supported the

1    notion of the use of the paraphilia NOS (nonconsent)

2    diagnosis?

3    A.   Yes.

4         THE COURT:  When you asked him last week?

5         MR. GRADY:  At his deposition.

6         THE COURT:  Oh....

7    A.   Yes.

8    Q.   Can you read for me -- I'll zoom in on it -- the

9    abstract that describes the general nature of this article?

10   A.   You want me to read the entire abstract?

11   Q.   Absolutely, please.

12   A.   Okay.  "There is legitimate concern in the psychiatric

13   community about the constitutionality of sexually violent

14   predator (SVP) commitment statutes.  Such constitutionality

15   depends on the requirement that a sexual offender has a

16   mental abnormality that may make him commit violent,

17   predatory sex offenses, and reflects almost exclusively a

18   concern for public safety with little regard for notions of

19   clinical sensibility or diagnostic accuracy.

20       However, given that mental health experts' diagnostic

21   opinions are, and will continue to be important, to be

22   important to the triers of fact in regard to the

23   application of the SVP statute, we describe a valid means

24   of making a DSM-IV-TR paraphilia diagnosis.

25       We also provide a three-step approach for the judicious

1    application of the diagnoses in a context of SVP commitment

2    evaluations that emphasizes the importance of not making a

3    paraphilia diagnosis based solely on the sexual offenses

4    themselves.  Finally, we discuss the appropriate use of the

5    paraphilia NOS diagnosis in SVP cases."

6    Q.   And the author of this article, Michael B. First is

7    the same Michael B. First that is a member of the DSM-IV

8    Task Force, correct?

9    A.   Correct.

10   Q.   But in the context of this article, Dr. First

11   specifically addresses the use of paraphilia NOS

12   (nonconsent), does he not?

13   A.   Paraphilia NOS, yes.

14   Q.   He does not address paraphilia NOS (nonconsent) at all?

15   A.   Yes, he does address the nonconsenting aspects of it.

16   Q.   Okay.

17   A.   But I think you're confusing some terms, that's why

18   I'm -- you asked me specifically earlier in the deposition

19   of paraphilia NOS/nonconsent, I want to be clear, and then

20   you're asking me -- it says here using paraphilia NOS and

21   so --

22   Q.   So at the deposition you were answering -- well --

23   A.   You're asking me two different questions.  You're

24   talking about the Doren term; you're using the Doren term,

25   and this is not using the Doren term.  This is using -- it's

1    highlighted, use of paraphilia NOS.  Where do you see slash

2    nonconsent?

3    Q.   Let's just go down to the bottom of Page 451 of the

4    article.  The last paragraph, the first column:  "In SVP

5    commitment cases, the version of paraphilia NOS that has been

6    most widely applied to offenders who have been convicted of

7    raping an adult is often called paraphilia NOS (nonconsent),"

8    did I read that correctly?

9    A.   Right, and then they underline it completely.

10   Q.   Well, let's come back to that.  Now, Dr. First goes on

11   to say, in the next highlighted section:  "The idea that

12   rape might be the focal point of a person's sexual urges and

13   fantasies is not novel."  He says that, correct?

14   A.   Yes.

15   Q.   And you would agree, the idea that rape might be the

16   focal point of a person's sexual urges and fantasies is not

17   novel?

18   A.   I would agree with that.

19   Q.   And, in fact, Dr. First goes onto say:  "In a similar

20   diagnostic construct, paraphilic rape, also known as

21   paraphilic coercive disorder, was considered by the DSM-III

22   advisory committee for possible inclusion in the DSM-III

23   Revision as a new type of paraphilia," correct?

24   A.   Right, I'm aware of that.

25   Q.   I've read that correctly?

1    A.   Yes.

2    Q.   "It was considered by the advisory committee to be

3    relatively uncommon among men who commit rape," correct?

4    A.   Exactly.

5    Q.   And "it was to be distinguished from sexual sadism,"

6    which may involve -- "which may also involve fantasies of

7    rape"?

8    A.   Right.

9    Q.   "By virtue of the fact that in sexual sadism the focus

10   of the sexual arousal is the humiliation and suffering of

11   the victim"?

12   A.   Right.

13   Q.   "In paraphilic coercive disorder, in contrast to sexual

14   sadism, it is specifically the coercive nature of the sex act

15   that is the source of the sexual arousal," correct?

16   A.   Correct.

17   Q.   And Dr. First goes on to specifically mention Mr. Jim

18   Healy.  He says:  "In the case of paraphilic coercive

19   disorder included in the DSM-III-R casebook, the individual

20   with the paraphilia fantasized about rape but was repulsed

21   if he felt the woman was in any way suffering."

22        Have I read that correctly?

23   A.   You have.

24   Q.   "The committee ultimately decided to recommend against

25   including this diagnosis in" DSM-IV" -- excuse me, "III-R

1    because of concerns raised that the category might be used

2    by rapists to reduce criminal responsibility.  Hence, the

3    proposed category did not even appear in the August 1st,

4    1986, second draft of the DSM-III-R diagnostic criteria,"

5    correct?

6    A.   Correct.

7    Q.   That's what Dr. First writes in any event?

8    A.   In the first edition, yes.

9    Q.   Certainly, Dr. First is aware that paraphilic coercive

10   disorder was rejected as a separate diagnosis, correct?

11   A.   Yes.

12   Q.   Dr. First goes on in the article looking at Page 452;

13   would you like a copy by the way or is it easy to read along?

14   A.   It's easy enough to read along; I have a copy in my bag.

15   I can read it fine.

16   Q.   "Conceptually," Dr. First goes on, "given the wide

17   variety of stimuli known to be the focus of paraphilias,

18   there is no reason to doubt the existence of a paraphilia

19   in which the aberrant focus of sexual arousal is precisely

20   the nonconsensual aspect of the interaction."

21       Have I read that correctly?

22   A.   You have and I agree with it.

23   Q.   "The problem, of course," and you'll probably agree

24   with this:  "The problem, of course, is that most rapists

25   are not known to be driven by paraphilic fantasies and urges,

1    and there are inherent difficulties in differentiating those

2    rapists who are driven to rape by such paraphilia, for most

3    rapists commit rapes for other reasons."

4        Have I read that correctly?

5    A.   Yes, that's exactly what I've been testifying to.

6    Q.   So for clarity's purposes there is no doubt that the

7    paraphilic NOS diagnosis may be applied, as Dr. First

8    suggests, to individuals in which the aberrant focus of

9    sexual arousal is precisely the nonconsensual aspect of the

10   interaction?

11   A.   Absolutely.  If you can find them, sure.

12   Q.   Okay.  And, of course, the problem is finding them?

13   A.   Exactly.

14   Q.   Okay.  But as a diagnosis, paraphilia NOS is correct

15   where appropriately applied?

16   A.   I would agree again, yes.

17   Q.   Now, Dr. First goes on to note -- I'll have to slide it

18   in; I think Ian broke it -- "The appropriateness of using

19   the paraphilia NOS category as any basis for SVP commitment

20   is hotly debated," correct?

21   A.   Correct.

22   Q.   "Some have argued that it should be used rather

23   liberally for any case in which an individual has repeatedly

24   engaged in sexual behavior with nonconsenting persons, even

25   in the absence of reliable data about the person's sexual

```
1    fantasies," correct?

2    A.   That's the Doren position.

3    Q.   Well, in your view, correct?

4    A.   It's in my view, that's true.  That's correct.

5    Q.   And on the opposite end are those who argue that there

6    are no circumstances in which it would be appropriate to use

7    this diagnosis because "it is contrary to the intent of the

8    drafters of the DSM and the consensus of scholarly opinion

9    regarding its appropriate use."

10        Have I read that correctly?

11   A.   You have.

12   Q.   Okay.  And you would fall into neither of those two

13   camps, right?

14   A.   I would not.  I would fall somewhere in the middle.

15   Q.   Okay.  Ultimately, Dr. First offers his opinion?

16   A.   Which I think is somewhere in the middle, yes.

17   Q.   Okay.  Can you read it for me?

18   A.   Oh ... "Our inclination is to come down somewhere in

19   the middle on the appropriateness of using the paraphilia

20   NOS category as the basis for the claim that the individual's

21   sexual offenses are driven by a mental disorder.  There are

22   certainly some dangerous sexual offenders in our society

23   whose offenses are clearly driven by a paraphilic sexual

24   arousal pattern involving fantasies and urges to commit rape,

25   and it may be appropriate to apply diagnosis of paraphilia
```

1    NOS to such individuals.

2        On the other hand, given the implications of a false

3    positive diagnosis; that is, indefinite, potentially

4    life-long civil commitment, and given all of the

5    complexities involved in determining whether rape is

6    motivated by a paraphilia as opposed to other causes as

7    discussed herein, we recommend that a diagnosis of

8    paraphilia NOS be used only with extreme caution for sexual

9    offenders incarcerated for raping adults, and that the

10   diagnostician stringently follow the three steps that we

11   have presented.

12       In such cases, it is especially important to go beyond

13   the facts of the sexual offenses themselves before asserting

14   the presence of paraphilia."

15   Q.   Thank you.  Do you agree with that, Dr. Plaud?

16   A.   I agree with that as thoroughly and as completely as I

17   could agree with any statement relating to this.

18   Q.   Excellent.  Thank you.  Now, in the quote you have read

19   we have heard about three steps for making the diagnosis,

20   correct?

21   A.   Yes.

22   Q.   The first step, according to the article, is to discern

23   whether there's a paraphilic sexual interest at work,

24   correct?

25   A.   Correct.

1    Q.   And, indeed, the article specifically cautions that one

2    should not discern the presence of paraphilia merely from

3    the fact of conviction, correct?

4    A.   Correct.

5    Q.   And Dr. First illustrates this by saying:  "If the

6    criminal sexual behavior itself were sufficient for making

7    the diagnosis of paraphilia, there would be no need for input

8    from mental health professionals," correct?

9    A.   Right.

10   Q.   You would agree with that?

11   A.   I would.

12   Q.   Now, I'll return to Page 445 of that article.  There is

13   a section entitled:  Step 1, Establishing the Presence of

14   Paraphilia," correct?

15   A.   Yes.

16   Q.   And the first thing we need to look for, Dr. First

17   starts with the statement:  "The core diagnostic construct

18   that forms the basis of the paraphilia category is that the

19   person becomes sexually aroused in response to stimuli

20   considered to be abnormal," correct?

21   A.   Yes.

22   Q.   And certainly becoming or having the focus on -- or

23   strike that.

24       If a person becomes sexually aroused in response to rape,

25   that's abnormal, correct?

A.   Yes, absolutely.  If that's the function of the arousal,
yes.

Q.   Sure.  Dr. First identifies potential sources of
information that are possibly useful, correct?  He goes on
on Page 447; can you read that for us?

A.   "Sources of information that are potentially useful,
although never definitive in the attempt to determine the
presence of paraphilia, include:  the diagnostic interview,
self-report questionnaire, and history of specific types of
sexual behavior.  The diagnostic interview should include
questions about the individual's sexual thoughts, fantasies,
urges, interests, and behavior specific to both paraphilic
and nonparaphilic targets.

     Self-report questionnaires, for example, Clark's Sexual
History Questionnaire Revised, can also be useful in
providing a comprehensive assessment of sexuality, and some
such instruments include normative data for male sex
offenders.

     Although the information gleaned from interviews and
questionnaires is potentially very useful, one must always
be sceptical about the veracity of methods that rely on
self-report because of the legal and social sanction s
offenders may face as a result of acknowledging their
paraphilic interests in past illegal acts."

Q.   Do you agree with that?

1    A.   Yes.

2    Q.   Dr. First indicates that evaluators have to be skeptical

3    of self-reports, correct?

4    A.   Yes.

5    Q.   And you would agree?

6    A.   Yes.

7    Q.   When you interviewed Mr. Graham, if he denied having

8    deviant sexual arousal to rape, he didn't get up and leave

9    and say:  Oh, we're all done, correct?

10   A.   True.

11   Q.   An individual subject to potential civil commitment is

12   unlikely to volunteer such deviant arousal, correct?

13   A.   I will say that it has happened, but it is a rare

14   phenomenon, yes.

15   Q.   Certainly.  Well, let's go on with Dr. First's

16   description of how we can go about finding the paraphilia ...

17   he goes on to say, perhaps you could read the next sentence?

18   A.   "A history of sexual offenses thematically related to

19   paraphilia; for example, arrests for indecent exposure in

20   someone with a possible exhibitionistic paraphilia, or

21   arrests for child molestation, someone with possibly

22   pedophilia is certainly relevant as a potential indicator

23   of an underlying paraphilic arousal pattern.

24        However, as emphasized in this article, the fact that

25   the person has a history of sexual offenses cannot by itself

1    be considered sufficient evidence that the offenses were the

2    product of paraphilic sexual fantasies and urges."

3    Q.   And do you agree with that?

4    A.   Completely.

5    Q.   Excellent.  So you would agree that essentially the

6    thematic, the theme here, two convictions for rape, one

7    conviction for assault with intent to rape, is relevant,

8    correct?

9    A.   It's relevant.

10   Q.   But it is not the "be-all, end-all" certainly, and we

11   cannot make a determination that that behavior is driven by

12   paraphilia merely from the existence of those convictions,

13   correct?

14   A.   Merely from the existence, true.

15   Q.   Now, because we know that individuals are unlikely

16   to volunteer that they exhibit deviant sexual arousal,

17   Dr. First suggests what with respect to the deviant

18   behaviors?

19   A.   "The evaluator must delve deeper and examine the

20   specific details of the sexual offenses to establish that

21   the behaviors are being driven by paraphilic urges."

22   Q.   That's what Dr. First writes, correct?

23   A.   Yes.

24   Q.   And you would agree with that?

25   A.   Yes.

1    Q.   Now, I take it, Mr. Graham did not volunteer to you

2    that he experienced deviant sexual arousal to raping women?

3    A.   No, he did volunteer other issues relating to anger at

4    the time, but not -- no, he did not divulge any paraphilic

5    sexual interests.

6    Q.   Okay, but you would agree that we can place little

7    value upon that?

8    A.   I wouldn't place the absence of that information as

9    indicative of anything.

10   Q.   So if the diagnosis in this case is going to be properly

11   made, we're going to have to delve into the details of the

12   offenses, correct?

13   A.   Well, I mean, yes, we're going to have to.  That may not

14   be the end of the analysis, but, yes, that would certainly

15   be part of it.

16   Q.   Mr. Graham has denied it; the only remaining source of

17   the potential information are the details of the offenses

18   themselves, correct?

19   A.   Correct.

20   Q.   Now, you indicated in the course of your clinical

21   interview you asked Mr. Graham about the 1974 incident,

22   correct?

23   A.   I did.

24   Q.   And he denied committing the rape, correct?

25   A.   Correct.

1    Q.   Difficult to ask follow-up questions about his

2    motivations concerning an event he denies, correct?

3    A.   I would agree.

4    Q.   Okay, and so you didn't really have a lot of follow-up

5    questions in the 1974 --

6    A.   Well, I asked him to explain in as much detail as he

7    could his version of what happened.  He denied the rape, but

8    he did not deny having had a longer term sexual relationship

9    with the victim beginning when they were teenagers, knowing

10   the victim, interacting with the victim ... so to that

11   extent, I got more information than just:  No, I didn't do

12   it.

13   Q.   Okay.  Do you credit those statements?

14   A.   No.  As I said earlier I got the information, and I

15   summarized it in my report.

16   Q.   Okay.  But I'm going to recall back to when we were

17   discussing Jim, you said:  I'd want to know more about

18   sexual sadism, correct?

19   A.   Right.

20   Q.   And you'd use the clinical interview to ask about

21   particular details in order to develop information on

22   sadism, correct?

23   A.   Right.

24   Q.   And that's the same type of investigation you'd want to

25   do in this case, correct?

1    A.   Correct.

2    Q.   You'd want to ask specific questions of Mr. Graham of

3    specific behaviors in order to sort of tease out some of the

4    details, correct?

5    A.   Sure.

6    Q.   Some of his motivations, correct?

7    A.   Sure.

8         THE COURT:  With this in light, someone coming to

9    your office for evaluation and treatment; here, we have an

10   adversary proceeding that's designed to determine whether

11   somebody's going to go to jail for a long time, if not

12   forever.

13        THE WITNESS:  Right.

14        THE COURT:  Doesn't that make a difference?

15        THE WITNESS:  It sure does.

16   Q.   Well, you were hired by or you were selected by

17   Mr. Graham's attorneys, correct?

18   A.   Yes, I was selected, but that doesn't change the way I

19   do my work.

20   Q.   Okay.  You'd ask the same questions, do the same

21   clinical interview, investigate in the same way?

22   A.   Well, but --

23        THE COURT:  I'm not talking so much about what he

24   does; if you were talking about my question --

25        MR. GRADY:  I'm sorry, your Honor; I think I had

1    moved on from it but --

2           THE COURT:  It's the --

3           MR. GRADY:  -- the Court has the floor so....

4           THE COURT:  No, no.  What I'm hearing makes me want

5    to point out what's on my mind; and, that is, that this is

6    very different from an academic evaluation for purposes of

7    treatment.  Here, not only are the stakes different, you

8    know, jail perhaps, but you have a relationship that's

9    different; you have an adversarial relationship.

10      When somebody goes to the doctor, nobody's trying to

11   punish them; they go to see if they can help them; here,

12   there's been a predetermination made.  I'm not saying that

13   it's wrong.  There's been a pre-determination made that

14   there's a likelihood that this man ought to be retained and

15   suffer, you know, perhaps a lifetime in jail.  It's already

16   been decided by somebody.  I have to listen to everybody,

17   and then decide whether that's the ultimate finding.

18          MR. GRADY:  That's certainly correct, your Honor.

19   I don't believe that my questions are directed towards

20   impugning that thought in any way.

21          THE COURT:  No, I don't think they were either.  I

22   guess I wanted to strike, you know, strike that note and get

23   a response to see whether everybody thought I was on the

24   right page, that's all.

25          MR. GRADY:  I unquestionably agree that the Court

1    must make first a determination of whether this diagnosis

2    even exists, and, second, the determination of whether it

3    applies to Mr. Graham.

4        I believe that following questions will illustrate to

5    the Court from the government's perspective why it is that

6    it would feel that Dr. Plaud might not have investigated in

7    the clinical interview as much as was possible.

8        In this particular case the government's expert was not

9    allowed to interview Mr. Graham, and they could not answer

10   these questions.  If the concern is Mr. Graham has no

11   obligation to provide information --

12           THE COURT:  And not that it's gospel, but in the

13   other two cases I've had we followed this same procedure.

14           MR. GRADY:  Absolutely.

15           THE COURT:  Okay.

16   Q.   I'm just going to come back to the 1975 offense.

17   Similar to the 1974 offense, Mr. Graham denied the event,

18   correct?

19   A.   Correct.

20   Q.   And you asked -- you presented the official version

21   which was fairly sparse?

22   A.   Correct.

23   Q.   Mr. Graham acknowledged that while he did not commit

24   the rape, he plead guilty -- excuse me, did not commit the

25   assault with intent to rape?

1    A.   Correct.

2    Q.   He plead guilty to that offense because he was advised

3    by his attorney that if he went to trial and lost, he would

4    go to jail for a very, very, very long time, correct?

5    A.   That's what my recollection is, yes.

6    Q.   Dr. Plaud, where in your report or your notes does it

7    reflect that you asked Mr. Graham, even presuming he denies

8    the event, what did they say you did?

9    A.   Would you ask me that again, please?

10   Q.   Sure.  There's a paucity of facts in the official

11   record, correct?

12   A.   That's correct.

13   Q.   And, certainly, we can infer from the fact that

14   Mr. Graham acknowledges to you that he plead guilty to this

15   offense, correct --

16   A.   Right.

17   Q.   -- that he was present when he plead guilty, correct?

18   A.   True.

19   Q.   Where in your report, where in your notes does it

20   indicate that you asked Mr. Graham:  What did they say that

21   you did?

22   A.   I did ask Mr. Graham that question, and I did report

23   what he said back to me.

24   Q.   Where is it reflected in your report that you asked

25   Mr. Graham what did they say that you did?

1    A.   Well, those are your words.  I don't think I asked --

2    used those particular words.  I asked him to tell me what he

3    knew about this offense that he pleaded guilty to.

4    Q.   Okay.

5    A.   And as I reflected in my report, he said to me he

6    didn't know exactly.  He denied that he had even attempted

7    to do anything.  He didn't even know what the victim's name

8    was, and then he proceeded to tell me why he pleaded guilty

9    so he had -- he really to my -- to communicating with me

10   during the interview, he didn't seem to know much about

11   anything about the details of it.

12   Q.   Dr. Plaud, you have been in this business for 22 years,

13   correct?

14   A.   Yes.

15   Q.   And you have become familiar as a result with the

16   operations of the criminal justice system of the United

17   States, correct, to some degree?

18   A.   I have.

19   Q.   And you are aware that when an individual pleads

20   guilty, there are facts to which he pleads guilty, correct?

21   A.   Correct.

22   Q.   And nowhere in your report does it say:  well,

23   Mr. Graham, even if you didn't do this rape, what were the

24   facts that they said you did; it's not in there?

25   A.   True.

1    Q.   And there's nothing in your notes, there's nothing in

2    your report, correct?

3    A.   Correct.

4    Q.   Let's look at the version of the 1987 offense that you

5    put in your report.  Now, I'm showing you a document.  What

6    is it?

7    A.   That appears to be, it looks like, Page 6 of my

8    report -- I'm sorry, Page 5.

9    Q.   Can you read for us the facts of the event that you

10   relate in your report concerning Mr. Graham's 1987 offense --

11   1986 offense that he was convicted for -- or, excuse me, his

12   1987 offense.  I apologize, go ahead.

13   A.   "On May 24, 1987, Mr. Graham forced his way into the

14   residence of a female.  He choked her to unconsciousness,

15   removed her clothing, and forced vaginal intercourse.  On

16   May 27th, 1987, he was arrested by the Prince George's

17   County Maryland Police.  He was charged with rape first

18   degree.  On March 4th, 1988 he was convicted in the Circuit

19   Court of Maryland, Prince George's County, on the charge of

20   rape.  He received a sentence of 25 years.

21        On May 6, 2004, his parole was revoked, and there was

22   a 1987 charge of rape.  During the clinical interview

23   Mr. Graham admitted to committing this governing sexual

24   offense.

25        He stated that he was sitting at a picnic table in the

1    common area at the condominium development in which the

2    victim was gardening.  They had begun to talk and he did

3    force himself on the victim.

4        Mr. Graham further stated that at the time of the

5    commission of the governing offense he was angry and upset

6    about his parole being violated (federal) and that he had

7    returned to drinking alcohol and was intoxicated at the time.

8    He expressed remorse for committing the governing sexual

9    offense."

10        MR. GRADY:  I apologize.  May I have a moment, your

11   Honor?

12        THE COURT:  Uh-huh.

13   Q.   Thank you for reading that, Dr. Plaud.  Now, I'm just

14   going to note that within the records you were provided was

15   an appellant court decision from the Maryland Appeals Court,

16   correct?

17   A.   Correct, I believe I read it earlier.

18   Q.   And I'm not going to have you read it because I think

19   most of us could recite it at this point; I'm just going to

20   show you that report begins on Page 512, correct, of the

21   Bates-stamped materials, that decision of the appeals court?

22   A.   Yes.

23   Q.   Okay.  Just a little minor issue, there was a

24   certification of that record, correct?

25   A.   Yes.

1    Q.   Okay, and this is -- if we can look at it -- down on

2    there Page 511, one page before, correct?

3    A.   Correct.

4    Q.   And this record, according to the certification, was

5    generated on February 1st, 2008, correct?

6    A.   Correct.

7    Q.   It goes without saying that if you had prepared a

8    report in March of 2007, you would not have had access to

9    that document or that record, correct?

10   A.   I did not have access to it.

11   Q.   Well, no, no, no, no, if you had; your report is in

12   March of 2009?

13   A.   I'm sorry?

14   Q.   Sure.

15   A.   If I prepared my report?

16   Q.   There's been some suggestion that an earlier physician

17   ruled out certain things or -- strike that.

18       I'll just stand on the testimony; we'll strike what I

19   just testified to.

20       Suffice it to say that this particular appeals court

21   decision is a record that was generated in February of 2008,

22   correct?

23   A.   Right.

24   Q.   Okay.  Now, in the official version, which I will not

25   have you read yet again, the victim was raped on multiple

1  occasions, correct?

2  A.   Correct.

3  Q.   The victim is choked on multiple occasions, correct?

4  A.   Yes, twice according to that report.

5  Q.   And in your report you do not reflect the victim was

6  raped on multiple occasions, correct?

7  A.   I did not report each occasion, that's correct.

8  Q.   And you did not report that the victim was choked on

9  multiple occasions, correct?

10  A.   I referenced that she was choked, but you're correct;

11  I didn't put on two occasions.

12  Q.   But, nonetheless, we would, according to Dr. First's

13  rules, want to delve into the specific facts of the offenses,

14  correct?

15  A.   Sure.

16  Q.   Now, you actually noted that the choking was a

17  particularly significant diagnostic fact, correct?

18  A.   Potentially.

19  Q.   Potentially, correct?

20  A.   Yes.

21  Q.   But in your report you don't even accurately report the

22  number of times that it occurred, correct?

23  A.   I was well aware that it was there.  Look, that's

24  fine because I --

25  Q.   In your report it's not correct?

1    A.   Well, it's correct that he engaged in it.  I didn't put

2    two times, on two occasions during that, that's correct.

3    Q.   And you've indicated previously -- or strike that.

4    You would agree that Mr. Graham's choking of the victim in

5    this case is a possible indicator of both sadism and

6    paraphilic sexual interest in nonconsenting sex?

7    A.   More the former than the latter.  I would definitely

8    use it as an investigative -- more as a potential behavior

9    going into a diagnosis of sexual sadism.

10       Again, this -- your use of the term nonconsent is your

11   use of the term; there's no one way to conceive of that,

12   whether it's choking or not.

13       Generally, I would say not with the choking unless it

14   specifically had to do with sexual eroticizing around the

15   nonconsensual aspect, but I've never experienced that before.

16   Q.   It is something that is an indicator, albeit alone

17   insufficient, that could lead to a diagnosis of both sadism

18   and/or the paraphilia NOS regarding nonconsenting sex,

19   correct?

20   A.   I would concede the first, not the second, and I think

21   it's coercive and not noncoercive.

22   Q.   I'm just going to show you, do you recall being deposed

23   in this matter?

24   A.   Yes.

25   Q.   On Page 86 -- 186 of your deposition I asked:  "Are

1   there any aspects of his behavior, as reflected in these

2   records, that are some evidence of a paraphilic interest in

3   nonconsensual sex?"

4      Your answer:  "Well, my answer would be in the instant or

5   governing offense, we talked about the choking, and that's

6   clearly something that might be evidence of that; or even

7   more specifically, sexual sadism as a potential disorder"?

8   A.   Right, sexual sadism.  Correct, that's what I said.

9   Q.   Clearly, that's something that might be evidence for

10  that referring to a paraphilic interest in nonconsensual sex?

11  A.   Well --

12  Q.   This is what your testimony was?

13  A.   Yes, I understand.

14  Q.   I've read it correctly, have I not?

15  A.   You have read it correctly but --

16  Q.   Thank you.  Now, again, bearing in mind that we have to

17  undertake a detailed factual review in order to discern the

18  presence of a paraphilic interest, and given that you use

19  your clinical interviews to discern the motivations of

20  people with respect to potential diagnoses such as sadism;

21  both of those things are correct, are they not?

22  A.   Well, not really.

23  Q.   That's fine.  You would agree that we need to delve

24  into the details of the prior offenses in order to discern a

25  paraphilic deviant arousal pattern, correct?

1    A.   That's one source, yes.   The details of the sexual

2    offense history itself can provide important information,

3    yes.

4    Q.   And you've previously testified that you would use the

5    clinical interview to attempt to tease out facts, correct,

6    and you asked about an individual's motivations performing

7    certain acts because the answers to those questions might

8    assist you in making a diagnosis, correct?

9    A.   Yes.

10   Q.   There is no mention in your report, is there, that you

11   asked Mr. Graham why he choked her?

12   A.   Well, I did ask him --

13   Q.   There is no mention --

14   A.   -- why he committed the offense.

15   Q.   -- in your report that you asked Mr. Graham why he

16   choked the victim?

17   A.   True.

18   Q.   There is no mention in your notes --

19   A.   True.

20   Q.   -- correct?   Let's just look at the statement we're

21   all familiar with from having read the fact of that appeals

22   court so many times.

23        "I've just got to put you out for awhile," that was a

24   statement made by Mr. Graham according to the victim,

25   correct?

1    A.   Correct.

2    Q.   And nowhere in your report, nowhere in your notes does

3    it reflect that you asked Mr. Graham:  Why did you make that

4    statement, correct?

5    A.   True.

6    Q.   And nowhere does it reflect his answer?

7    A.   True, because I didn't ask him.

8    Q.   There is nothing in your report or your notes

9    reflecting that you asked Mr. Graham why he choked the

10   victim a second time, correct?

11   A.   True.

12   Q.   There's nothing about any answer he provided?

13   A.   True.

14   Q.   There is nothing in your report about a second rape,

15   correct?

16   A.   True.

17   Q.   And there is nothing about your asking Mr. Graham why he

18   committed a second rape, correct?

19   A.   True.

20   Q.   There is nothing in your report inquiring of Mr. Graham

21   why he called a woman he had repeatedly raped, correct?

22   A.   That's correct.

23   Q.   And there's nothing in your notes to that effect?

24   A.   That's right.

25   Q.   Yet, you would agree with Dr. First's statement that we

1    have to delve into the facts of the prior offenses, correct,
2    in order to find a paraphilic interest?
3    A.   Well, I think we're mixing up a few things, but, yes,
4    I would agree you have to delve into the facts.  I was aware
5    of all those issues going in.  I have to choose in every
6    case what I think is appropriate to ask and what gives me
7    information, and if I included those things you asked of --
8    Q.   I'm sorry, Dr. Plaud; there's no question in front of
9    you.
10         MR. SINNIS:  But there was a question and he cut him
11   off.
12         THE COURT:  Well, it's pretty hard to know.  I think
13   that his answer was going a little bit adrift, so we'll let
14   whatever he answered stand, and then we'll go onto the next
15   question....
16   Q.   Now, I'm going to direct your attention to Page 10, and
17   you mentioned this previously, that in your view Mr. Graham's
18   past sexual offending behavior had to do with ongoing anger,
19   power, and control issues exacerbated by his act of
20   substance abuse at the time, correct?
21   A.   Yes.
22   Q.   And I've read that portion of your report correctly?
23   A.   Yes.
24   Q.   And that has been your testimony today, correct?
25   A.   Yes.

Q.   Now, you've previously agreed however that since

Mr. Graham's denied committing the 1974 rape, you are unable

to provide us with what his motivation was for the act he

denies, correct?

A.   True.

Q.   And with respect to -- the same is true with respect to

the 1975 assault with intent to rape that he denies, correct?

A.   True.

Q.   And you cannot indicate that his motivation for that

crime was anger, power, or control issues exacerbated by

substance abuse, correct?

A.   That's true.

Q.   And you have agreed that when the report speaks to this

it is speaking solely to the 1987 offense that you discussed

with Mr. Graham, correct?

A.   Yes.

Q.   And what, if you could tell me, was the source for that

information that Mr. Graham was motivated by anger, was

motivated by power issues, was motivated by ongoing

substance abuse?

A.   I had a detailed discussion with him about the

commission of the governing offense, of which I reflected

in my report, at least some of it; and Mr. Graham himself

identified on the question of his motivation, asking him

why he did what he did, he was talking -- he then started

1    talking about at the time, that would be back in 1987, the

2    anger he was feeling, the fear that he had about violating

3    his probation, and the anger surrounding that.

4        He had discussed his act of substance abuse earlier, and

5    that type of response that you volunteered to me is certainly

6    consistent with the vast majority, in the sense of motivating

7    factors, for the rapists that I've dealt with over a number

8    of years, and for which the professional community certainly

9    considers to be motivating factors for rape; it matched up,

10   and that would be my conclusion.  There's no evidence of any

11   paraphilic underpinnings.

12   Q.   You can continue, but I asked you about what the source

13   was.  Are we getting a little away from that?

14   A.   No.  Okay.

15   Q.   The source was Mr. Graham?

16   A.   In part, as well as what his words matched with my own

17   experiences dealing with rapists over the past 20-plus years.

18   Q.   So the source of this is Mr. Graham's self-report,

19   correct, the source of this information?

20   A.   Partly, yes.

21   Q.   And that matched up with what you sort of went in with

22   as your assumptions about most rapists, correct?

23   A.   The data on most rapists, which clearly are my

24   assumptions, yes.

25   Q.   Okay.  Well, there's no reason to suspect going in

1    already, before we even get to your conclusions, that that

2    same data applies to Mr. Graham, correct?  You can't just

3    start out saying Mr. Graham is the same as this data for

4    most rapists, correct?

5    A.   No, I wouldn't do that; but if, to be honest with you,

6    if Ted Williams was batting for the Red Sox and I went to

7    Fenway Park, I would be expecting I'd see a hit at the ball

8    game.

9    Q.   So with respect to Mr. Graham, you'd be expecting to see

10   a dead body?

11   A.   You know, that's just the issue:  it's one of

12   probabilities.  Most rapists are not motivated by paraphilic

13   urges.

14   Q.   Great.  Thank you.  What I'm asking is:  so your source

15   for this information is Mr. Graham's self-report, correct,

16   and your previous knowledge about what most rapists do,

17   correct?

18   A.   That is true in the absence of any supporting, specific

19   data in the record that would be suggestive of a paraphilic

20   sexual disorder.

21   Q.   Thank you.  Now, you've previously indicated that you

22   agree with Dr. First's statement that we have to be somewhat

23   suspicious of self-reports, correct?

24   A.   Of course.

25   Q.   Especially when -- well, in the context of this case, a

1    self-report that could be credited as against penal interests

2    is:  I'm interested in rape, correct?

3    A.    True.

4    Q.    Whereas, I'm just a normal rapist; I'm motivated by

5    anger; I'm motivated by substance abuse; I'm motivated by

6    power issues really isn't, correct?  It doesn't hurt his

7    civil commitment case, correct?

8            THE COURT:  To do what?

9    Q.    To acknowledge or to tell you that he was motivated by

10   power and control issues or by anger, correct?

11   A.    Sure.  I guess I don't know what you mean.

12   Q.    Well, let me step back for a moment.  We would agree

13   that one must be skeptical of self-reports, correct?

14   A.    In these contexts I would agree in most cases, in most

15   contexts, that if it's not against penile interests, you

16   should be skeptical, yes.

17   Q.    So you confirm -- well, strike that.  You indicated,

18   both in your report and in your deposition, that Mr. Graham

19   reported to you that he committed this rape because he was

20   angry about the possibility his parole could be revoked,

21   correct?

22   A.    That's what he said.

23   Q.    And it was also -- he was also intoxicated at the time

24   of the offense, correct?

25   A.    Yes, he was.

1    Q.   And those were both based on self-reports, correct?

2    A.   True.

3    Q.   So because you could not immediately credit the

4    self-report, you looked for verification of this in the

5    records, correct?

6    A.   Yes.

7    Q.   You had records from the Federal Parole Commission,

8    correct?

9    A.   Yes.

10   Q.   And you had the records with respect to his 1987

11   offense, correct?

12   A.   I did.

13   Q.   And statements that he made about his intoxicated or

14   non-intoxicated condition?

15   A.   Right.

16   Q.   When did the 1987 rape occur?

17   A.   May 24, 1987.

18   Q.   I'm just going to show you a piece of paper from

19   Exhibit 17.  You can take a look at it on the monitor or

20   you can look at Exhibit 17 in the binder in front of you at

21   Page 883.  Do you see that down at the bottom of 883?

22   A.   Well -- yes.  Yes.

23   Q.   Okay.  Now, this is what?

24   A.   A warrant, it appears to be.

25   Q.   For a parole violation for whom?

1    A.   Mr. Graham.

2    Q.   Okay.

3         MR. SINNIS:   Just could you move that ... thank you.

4    Q.   When was the parole violation warrant issued?

5    A.   May 5th, 1986.

6    Q.   And Mr. Graham was angry about the possibility of his

7    parole being revoked for an entire year prior to committing

8    the rape, correct?

9    A.   Yes.

10   Q.   Where in the records, besides Mr. Graham's self-report,

11   is there evidence that Mr. Graham was intoxicated at the

12   time of the 1987 offense as you put in your report?

13   A.   I don't recall any specific report indicating an

14   independent --

15   Q.   Do you recall any specific report that contradicts

16   Mr. Graham's self-report concerning intoxication at the time

17   of the 1987 rape offense?

18   A.   I don't.

19   Q.   You've previously testified, however, that when

20   conflicted with the self-report, you would credit the

21   official record, correct?

22   A.   Sure.

23   Q.   I'm going to show you a document from Exhibit 17,

24   beginning on page Bates-stamped 792, and I'd ask you for a

25   moment to -- can you tell me if you know what that is or if

1    you're able to zoom in on it?

2    A.   Yes, it's a presentence investigation.

3    Q.   And it's with respect to what offense?

4    A.   I can't read that, I'm sorry ... the governing offense.

5    Q.   The 1987 rape?

6    A.   Yes.

7    Q.   I'm going to direct your attention to the middle of

8    Page 793.  There is a section of the report entitled:

9    "Statement of Defendant," correct?

10   A.   Yes.

11   Q.   And within that I have highlighted a portion, can you

12   read that for the Court?

13   A.   "He denied being under the influence of alcohol, drugs,

14   or medication during the perpetration of the instant offense

15   and at the time of his arrest."

16   Q.   Okay.  So when you indicate in your report that

17   Mr. Graham is motivated by anger and intoxication to commit

18   -- sorry.

19        When you indicated Mr. Graham has raped because of anger

20   and intoxication, you were first only speaking of the 1987

21   rape, correct?

22   A.   Yes.

23   Q.   And you were speaking in direct contravention as to

24   the intoxication issue to contemporaneous statements of

25   Mr. Graham, correct?

1    A.   Okay.

2    Q.   Is that right?

3    A.   Sure.

4    Q.   And you were speaking about anger over a parole

5    situation that had begun developing and had been resulted

6    in the issuance of a warrant more than a full year before

7    the rape, correct?

8    A.   But that he was still out so....

9    Q.   The situation that led to his being angry about his

10   parole had begun more than a year prior, correct?

11   A.   It appears to be from the documentation, but that

12   doesn't rule out the fact that he could have been angry at

13   the time or nervous, upset, just having a lot of lifestyle

14   destabilization; that doesn't rule any of that out.

15   Q.   In your report and in your deposition you testified he

16   was angry because of the parole warrant; you didn't testify

17   that he could have been angry about anything, did you?

18   A.   That's not what I'm saying now.

19   Q.   Now, you mentioned within your report when you're

20   discussing paraphilia and nonconsent, what you previously

21   alluded to as V codes, correct?

22   A.   Yes.

23   Q.   Now, I'm just going to try to do this quickly because

24   I'm hoping perhaps we can actually finish your testimony

25   today.

1        You would agree that the V code diagnosis exists for

2   individuals who do not have a mental disorder, correct?

3   A.   Correct.  There are problems, behavioral areas that

4   are attention of clinical focus.

5   Q.   Okay, and the mere fact that there is a V code for

6   sexual assault of an adult does not suggest that there is no

7   diagnosis of paraphilia NOS predicated upon a deviant sexual

8   arousal to coercive sex, correct?

9   A.   That's true, if you can show that there is, absolutely;

10  the same way there's a V code for abuse of a child and

11  there's also pedophilia as a sexual disorder.  There has to

12  be the demonstration of the sexual arousal disorder

13  component; that's the key issue.

14  Q.   Let's speak very briefly about antisocial personality

15  disorder.  The prevalence of antisocial personality disorder

16  in the general population is somewhere between 3 and 5%,

17  correct?

18  A.   Correct.

19  Q.   Certainly abnormal in the general population?

20  A.   Yes.

21  Q.   Okay, and you would agree -- let me just direct your

22  attention to Exhibit 20, Page 706, very quickly.

23  A.   Yes.

24  Q.   What are those?

25  A.   Those are the diagnostic criteria:  301.7, antisocial

1    personality disorder.

2    Q.   Excellent.  We don't have to worry about any -- oh, by

3    the way, is there a personality disorder NOS?

4    A.   Yes.

5    Q.   That is a valid diagnosis?

6    A.   Yes.

7    Q.   Okay.  You would agree that Mr. Graham, let me just

8    come back to this item, meets all of the criteria for an

9    antisocial personality disorder, correct?

10   A.   As I said earlier, by his record, he could, yes.

11   Q.   Well, not by his record he could; by his record, he

12   does meet the criteria?

13   A.   Yes.

14   Q.   But you do not diagnose him with antisocial personality

15   disorder today, correct?

16   A.   Correct.

17   Q.   And you've mentioned the concept of burnout, correct?

18   A.   Correct.

19   Q.   And that is a well-recognized concept that, generally

20   speaking, as individuals with antisocial personality

21   disorder age, they can become, as someone has said:  Older

22   and wiser, correct?

23   A.   True.

24   Q.   And that that leads to less criminal offending?

25   A.   It leads to less criminal offending.  It leads to less

```
 1    of the behaviors beyond criminal issues associated with an

 2    ability to comport one's behavior with social norms and

 3    acting in regard for the rights and safety of others.

 4    Q.   Okay.  It leads to an amelioration of all of the items?

 5    A.   That's correct.

 6    Q.   That's a general rule?

 7    A.   I agree.

 8    Q.   It doesn't apply to all individuals who may be

 9    antisocial, correct?

10    A.   It does not.

11    Q.   And one of the categories where it has been shown

12    empirically not to apply is to psychopaths, correct?

13    A.   Well, psychopath, that's something a little different.

14    Q.   Okay.  Well, we'll get to that, but, certainly, there

15    are individuals who do not experience burnout; is that

16    correct?

17    A.   Correct.  No, I agree with you.

18    Q.   In a typical case of burnout, you would see an

19    individual become more remorseful about their prior

20    criminal acts; you would agree?

21    A.   You could, sure.

22    Q.   You could see an individual acknowledge that they had

23    done horrible things and they would indicate:  But that was

24    the old me; I'm very sorry for those things?  There would be

25    behaviors to show remorse, correct; that would be one
```

1    manifestation of --

2    A.    True.

3    Q.    -- burnout?

4    A.    Yes.

5    Q.    Mr. Graham, by contrast to that just one example I've

6    given you, continues to deny that he committed a rape in

7    1974, correct?

8    A.    Correct.

9    Q.    And he continues to deny that he committed assault with

10   intent to rape in 1975, correct?

11   A.    Correct.

12   Q.    So at least in this regard, Mr. Graham is inconsistent

13   with the manifestations you were suggesting, correct?

14   A.    To an extent.

15   Q.    Now, it's not the only one?

16   A.    Right.

17   Q.    But one of the criteria is deceitfulness, correct?

18   A.    Yes.

19   Q.    And do you recall if I asked you whether you credited

20   Mr. Graham's denial of committing the 1974 rape?

21   A.    I do vaguely remember it, yes.

22   Q.    And do you recall saying that you credited the official

23   record?

24   A.    I do.

25   Q.    And as a result, I inquired, if Mr. Graham -- if the

1    official record is correct, if Mr. Graham committed the 1974

2    offense, he lied to your face in the interview, correct?

3    A.   That would be the inescapable conclusion.

4    Q.   And in fact --

5         MR. GOLD:  Objection to lied in your face.

6         THE COURT:  You know, it's just me here.

7         MR. GRADY:  I'm sorry, your Honor.  I'll withdraw

8    the question.

9    Q.   Mr. Graham lied in the interview?

10   A.   If what you say is true, that would be the conclusion.

11   Q.   And if he committed the 1975 assault with intent to

12   rape, he denied it to you in the interview; he lied about

13   that as well, correct?

14   A.   Yes.

15   Q.   And those are examples of ongoing, present

16   deceitfulness, correct?

17   A.   It would be.

18   Q.   And if he indicated to you that he was intoxicated at

19   the time of the 1987 rape and you credited the official

20   record of the contemporaneous statements where he denies

21   being intoxicated, he would be lying about that as well,

22   correct?

23   A.   That would be the implication.

24   Q.   That would be an example of ongoing deceitfulness; one

25   of the characteristics of antisocial personality disorder,

1    correct?

2    A.   True.

3    Q.   And if, in fact, Mr. Graham committed the 1974 rape,

4    the 1975 assault with intent to rape, and continues to deny

5    those offenses, he is showing no remorse, correct, for those

6    offenses?

7    A.   Yes.

8    Q.   And the lack of remorse is an additional antisocial

9    personality disorder characteristic, correct; and if that is

10   true, if what I have said is true, he has an ongoing issue

11   with that, correct?

12   A.   If what you say is true....

13   Q.   Any antisocial personality disorder, you would agree,

14   can make it more likely that a person with paraphilia would

15   act with paraphilic urges?

16   A.   Well, it's a bit more complicated than just what you

17   said, but it can, I believe, under certain circumstances.

18   Although, I think there's more attribution going on to some

19   discussion of that but --

20   Q.   Well, the two can operate comorbidly as it's described,

21   correct?

22   A.   It's possible.

23   Q.   In that, antisocial can contribute to the inability to

24   control paraphilic urges; it's certainly possible?

25   A.   If there are established paraphilic urges present, it's

1    possible.

2    Q.   Okay.  What is a comorbid condition?

3    A.   A comorbid condition means more than one condition

4    coexisting at the same time.

5    Q.   Do you recall -- or strike that.  I'll just finish here.

6    One other --

7         MR. GOLD:  Your Honor, if I might just interrupt, I

8    just wanted to alert the Court to our scheduling issues

9    with --

10        MR. GRADY:  You know what, Judge ... I'm sorry, I

11   tried; I don't know if I'm going to finish tonight.

12        THE COURT:  You're going to finish at 4:30.  What

13   you do next week is something else.

14        MR. GRADY:  Okay.  Well, I'm apologizing for not

15   finishing the entirety of Dr. Plaud's cross both to you and

16   Dr. Plaud, I tried to --

17        THE COURT:  Well, you do have redirect, don't you?

18        MR. GOLD:  Well --

19        MR. GRADY:  I still have more questions.

20        MR. GOLD:  We would have to take Dr. Plaud out of

21   order or I'd be willing, if the Court were interested, to

22   forego redirect.

23        THE COURT:  I don't care.  You keep including me; I

24   don't have a vote in what you do....

25        MR. GOLD:  Well, just if the Court was inclined to

1   go over 4:30.

2           THE COURT:  No, I'm not.  The Court is going to

3   leave here at 4:30 and my staff is tired; everybody else is

4   tired.  This poor court reporter's been whacking away with

5   almost no recesses.

6           MR. GOLD:  Okay.

7           MR. GRADY:  I think she's had to type that fast 80

8   times ... should I continue questioning or should we just

9   address the issue of when he's going to come back, your

10  Honor?

11          THE COURT:  Whatever you can do in the next 30

12  seconds, because that's what you have left on that point....

13          MR. GRADY:  Excellent.

14  Q.   Dr. Plaud, I'm going to show you an article -- or

15  strike that.  I'm going to show you a document, and tell me

16  what it is?

17  A.   Yes, it's another publication in the Journal of American

18  Academy of Psychiatry and the Law.

19  Q.   Okay.  A published, peer-reviewed journal, correct?

20  A.   It is.

21  Q.   Well-respected?

22  A.   Very.

23  Q.   Okay, and the article of this -- excuse me, the author,

24  Alan Francis, was the editor-in-chief of the DSM-IV, correct?

25  A.   Correct.

1     Q.   The book that we rely upon for finding diagnoses,

2     correct?

3     A.   Yes.

4     Q.   Okay.  And the other authors, tell us about them, if

5     you would, very briefly?

6     A.   They are psychologists who are experts in this area.

7     Q.   Okay.

8          THE COURT:  Okay.  Monday, what is it, 10:00?  Did

9     Zita tell you?

10         THE CLERK:  Yes, 10:00.

11         MR. GRADY:  Your Honor, there is just one caveat:

12    we will be starting with Dr. Mills and finishing Dr. Plaud.

13         THE COURT:  Whatever you agree to....

14         MR. GOLD:  We're agreed to it.

15         THE COURT:  You present me with an agreed-upon agenda

16    Monday, and we'll follow it.

17         MR. GRADY:  We're agreed.  Thank you, your Honor.

18         MR. GOLD:  Thank you.

19         THE COURT:  Thank you.  Have a nice weekend.

20         THE CLERK:  All rise....

21         (Whereupon, the proceedings concluded at 4:30 p.m.)

22

23

24

25

1                      C E R T I F I C A T E

2

3        I, Helana E. Kline, a Registered Merit Reporter,

4    Certified Realtime Reporter, and Federal Official Court

5    Reporter of the United States District Court, do hereby

6    certify that the foregoing transcript, from Page 1 to

7    Page 195, constitutes, to the best of my skill and ability,

8    a true and accurate transcription of my stenotype notes

9    taken in the matter of the United States of America v.

10   Wesley Graham.

11

12

13

14

15

16

17

18

19

20

21

22

23      /s/ Helana E. Kline              September 17, 2009

24      Helana E. Kline, RMR, CRR

25      Federal Official Court Reporter