```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2
     * * * * * * * * * * * * * *
 3   UNITED STATES OF AMERICA      *
                                   *
 4            vs.                  *      CIVIL ACTION
                                   *      No. 07-12065-JLT
 5   WESLEY GRAHAM                 *
                                   *
 6   * * * * * * * * * * * * * *

 7             BEFORE THE HONORABLE JOSEPH L. TAURO
                   UNITED STATES DISTRICT JUDGE
 8                         DAY ONE
                       NONJURY TRIAL
 9
     A P P E A R A N C E S
10
                 OFFICE OF THE UNITED STATES ATTORNEY
11               1 Courthouse Way, Suite 9200
                 Boston, Massachusetts 02210
12               for the United States
                 By:  Donald J. Savery, AUSA
13                    Mark J. Grady, AUSA

14
                 FEDERAL DEFENDER OFFICE
15               51 Sleeper Street, Fifth Floor
                 Boston, Massachusetts 02210
16               for the defendant
                 By:  Ian Gold, Esq.
17                    Stylianus Sinnis, Esq.

18
                                   Courtroom No. 22
19                                 John J. Moakley Courthouse
                                   1 Courthouse Way
20                                 Boston, Massachusetts 02210
                                   September 9, 2009
21                                 10:10 a.m.

22

23
                     CAROL LYNN SCOTT, CSR, RMR
24                     Official Court Reporter
                   One Courthouse Way, Suite 7204
25                   Boston, Massachusetts 02210
                         (617) 330-1377
```

1

<u>**I N D E X**</u>

2

<u>**WITNESS**</u>:          <u>**DIRECT**</u>   <u>**CROSS**</u>   <u>**REDIRECT**</u>   <u>**RECROSS**</u>

3

4       OPENING STATEMENT BY MR. SAVERY.............PAGE  4

5       OPENING STATEMENT BY MR. SINNIS.............PAGE 22

6                         * * * * * * * * * *

7       ANNA CAROL SALTER

8         By Mr. Savery    41

9

10

11

12                         <u>**E X H I B I T S**</u>

13

14      <u>**EXHIBIT**</u>:                              <u>**IN EVD.**</u>

15

16          Nos. 1-28 As reflected on Exhibit List     41

17          No. 29  Certificate from D.C. Superior   5656
                    Court with respect to 1974
18                  rape charges

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

1

2          **THE CLERK:**  All rise for the Honorable Court.

3          **THE COURT:**  Good morning, everybody.

4          **COUNSEL:**  Good morning, Your Honor.

5          **THE CLERK:**  This is civil action No. 07-12065,

6   United States of America versus Wesley Graham.

7          Counsel please identify themselves for the record.

8          **MR. SAVERY:**  Don Savery, Your Honor, for the United

9   States.

10          **MR. GRADY:**  Your Honor, Mark Grady as well on

11   behalf of the United States.

12          **THE COURT:**  Okay.

13          **MR. SINNIS:**  Good morning, Your Honor.  Stellio

14   Sinnis on behalf of Mr. Graham.

15          **MR. GOLD:**  Ian Gold on behalf of Mr. Graham.

16          **THE COURT:**  Okay.  And Mr. Graham is here in court.

17          **THE CLERK:**  Yes, Judge.

18          **THE COURT:**  Are we ready to go?

19          **MR. SAVERY:**  We are, Your Honor.

20          **THE COURT:**  Okay.  Please, everybody, be seated.

21          Do you want to make an opening statement?

22          **MR. SAVERY:**  I would like to, Your Honor.

23          **THE COURT:**  Go ahead.

24          Excuse me before you start.

25          **MR. SAVERY:**  Yes.

```
1              (Whereupon, the Court and the Deputy Courtroom

2         Clerk conferred.)

3         THE COURT:  Go ahead.

4              OPENING STATEMENT BY MR. SAVERY

5         MR. SAVERY:  Thank you, Your Honor.

6              The evidence in this case, Your Honor, will show

7    that Wesley Graham is a sexually dangerous person.  He is

8    what's known as a sexual specialist.  He's a three-time

9    convicted sex offender.  And he is a repeated rapist whose

10   mental disorders drive him to reoffend.

11              Since he first committed a rape in 1974, his

12   conduct has followed a predictable pattern.  And that

13   pattern has involved committing a sexual offense, going to

14   prison for it, showing no remorse, accepting no sex offender

15   treatment or no psychotherapy of any sort, ultimately being

16   released on parole, and while out of confinement on parole

17   committing yet another sexual offense starting the cycle

18   over again.

19              And it's a predictable pattern of recidivism that

20   has shown itself over and over again in the life of Wesley

21   Graham.

22              And what is more concerning is that the sexual

23   offenses over time become more brutal and more aggressive.

24   They started 35 years ago with the rape of a known victim.

25   They progressed to assaults on strangers.  And they
```

1    progressed ultimately in his latest offenses to brutality,

2    to beatings and strangulation of his victims.

3              The evidence will show Your Honor clearly and

4    convincingly that Mr. Graham should be civilly committed

5    under the Adam Walsh Act.

6              And there are three questions for the Court in this

7    case.  The first is has Mr. Graham engaged in sexually

8    violent conduct in the past?

9              The second is does Mr. Graham suffer from a serious

10   mental illness, abnormality or disorder?

11             And the third is as a result of that mental

12   illness, abnormality or disorder would Mr. Graham have

13   serious difficulty refraining from sexually violent conduct

14   if he were released?

15             On the first issue, Your Honor, Mr. Graham has

16   clearly engaged in sexually violent conduct.

17             Mr. Graham was born in 1950.  As a juvenile he was

18   incarcerated for a period of time.  And as he progressed

19   into his adult years, Your Honor, he began abusing heroin

20   and marijuana.  His criminal record reflects a number of

21   arrests and convictions going into his adulthood.

22             In his early 20s, Your Honor, Mr. Graham's criminal

23   focus turned to sex.  His first sexual offense took place in

24   1974 and it was a rape.  It occurred late on a January

25   night.  Mr. Graham was in a Chinese restaurant in

1   Washington, D.C.  His victim was there as well.  There is

2   evidence that Mr. Graham knew his victim before that night.

3   But in all events, by two o'clock in the morning Mr. Graham

4   offered the victim a ride home.  And when he drove her home,

5   at some point they drove off the road.  He parked the car

6   and he told his victim, turned to her and told her, I'm not

7   a teenager anymore and I'm going to show you.

8        And then he instructed her to take her clothes off.

9   And when she refused to take her clothes off, Mr. Graham

10   attacked her.  He literally tore her clothes off and then he

11   raped her.  And in the course of the rape he ejaculated

12   inside and on the victim.  It was only after he completed

13   the act that he let her out of the car.

14        She contacted the police.  She reported to the

15   hospital.  And later that same day Mr. Graham was arrested

16   for rape.

17        He was convicted by a jury in June of 1974 and he

18   was sentenced to 6 to 18 months incarceration.  While he was

19   incarcerated he showed no remorse for his conduct.  He

20   didn't accept responsibility for his conduct.  While he was

21   incarcerated he received no sex offender --

22        **THE COURT:**  What was the sentence again?

23        **MR. SAVERY:**  6 to 18 months.  He received no

24   treatment of any sort, sex offender or therapy of any sort.

25        He was let out on parole in January of 1975, so

1    approximately six months after the sentencing.

2         In January of 1975 Wesley Graham, an untreated sex

3    offender, was back on the street.  And while he was out on

4    parole that didn't stop him from reoffending.  His pattern

5    continued and it continued in July of 1975, approximately

6    six months after he was released.  This offense took place

7    in a public park on a summer day.  And it was a park near a

8    boathouse on the a Potomac River.

9         The victim in this instance was eight months

10   pregnant.  And she was walking along one of the trails in

11   the park and she was approached by the offender who attacked

12   her.  He assaulted her with the intent to rape her but for

13   some reason he didn't achieve the rape and he left the

14   scene.

15        She reported to the police, she gave them a

16   detailed description of the offender.  And Mr. Graham was

17   apprehended a short while later in the area entering his

18   car, fitting the description, his clothes fitting the

19   description given by the victim.  And the victim later

20   identified him in person.

21        So the pattern of recidivism is now in full

22   operation and the aggressiveness of the conduct is now

23   increasing.  Whereas with the first rape it was a known

24   victim, now this offense is with a complete stranger.

25   Whereas the first event, the first rape took place at night,

1    this one now took place in broad daylight.  Whereas the

2    first rape took place in the privacy of a car, this one now

3    takes place in a public park.  And whereas with the first

4    rape the victim was an ordinary woman, in this instance

5    she's an eight-month pregnant woman.

6         Mr. Graham pleaded guilty in March of 1976 in the

7    District of Columbia to assault with intent to commit rape

8    and he was sentenced to 4 to 12 years.  While he was

9    incarcerated he refused sex offender treatment.  He refused

10   to participate in any psychotherapy.  He didn't participate

11   in any substance abuse treatment.  He showed no remorse for

12   his conduct.

13        Nonetheless, Mr. Graham after serving seven years

14   of that sentence was released on parole.  So in October of

15   1982 now Wesley Graham, still an untreated sex offender, was

16   once again back on the street.  And while he was released on

17   parole, that didn't stop him from reoffending.

18        The pattern continued.  In 1985, Your Honor, Wesley

19   Graham -- sorry -- it was late 1984 when he was arrested for

20   OUI and he was convicted in 1985.  In 1985 there was also an

21   arrest for a series of batteries.  Approximately three

22   charges of batteries were brought against Mr. Graham.  They

23   were all associated with brutal violence and one of the

24   charges was associated with a sexual offense.

25        The charges sprang from three separate incidents

1   over a period of months.  All of them relate to his live-in

2   girlfriend Mary P.  Mary P. had two adult daughters.  And

3   the first event arose when Mr. Graham attempted to hit Mary

4   P. one day.  One of the adult daughters intervened.

5   Mr. Graham turned his aggression to the adult daughter.  He

6   grabbed her by the throat.  He choked her, dragged her into

7   another room in the apartment, had her pinned down on the

8   ground choking her and eventually she was able to break

9   free.

10        The second two events, Your Honor, take place after

11  Mary P. had invasive surgery.  In May of 1985 she had a

12  hysterectomy.  And after she was released from the hospital

13  she returned home to recuperate.  The very next day after

14  her return home Mr. Graham arrived home and he began abusing

15  her.  He was first verbally abusive.  Then he pushed her

16  around.  Then he locked her in a bedroom.

17        Well, one of Mary P.'s adult daughters, actually

18  the other adult daughter was home at the time, she contacted

19  police.  The police arrived in his home, spoke to Mr. Graham

20  and then they left.

21        Mr. Graham then turned his aggression on the adult

22  daughter.  He told her to leave the apartment.  She refused.

23  He threatened to kill her if she didn't leave.  She refused.

24  He threw her up against the door and told her that if she

25  didn't leave he was going to knock all of her teeth down

1    here throat.  And that's when she finally left.

2            The third incident in this chronology, Your Honor,

3    took place several weeks later.  Mary P. is now a few weeks

4    away from her hysterectomy but she is still recuperating.

5    And she was on doctor's orders to abstain from sexual

6    intercourse for several months.

7            The allegations are that Mr. Graham took her car

8    without permission.  And then he reported the car stolen and

9    Mary P. didn't believe the car was actually stolen.  Well,

10   the police contacted her in around this time.  Mr. Graham

11   was home.  And when Mary P. spoke to the police, he ran over

12   to her, struck her in the face and he hung up the phone.

13   And then he contacted the police again and explained that

14   the phone had been disconnected.

15           Well, the violence continued the next morning.  And

16   the next morning Mr. Graham again abused her, threw her down

17   on the bed, slapped her, and then he demanded that they have

18   sex.  And she refused because she was still recuperating

19   from this surgery.  Nonetheless he demanded that they have

20   sex.  He threatened her.  He abused her again physically and

21   then she gave in.

22           Mr. Graham ultimately pleaded guilty to the second

23   of those three battery charges regarding one of the

24   daughters.  The other two charges were nolle prossed.  But

25   they're all relevant to the issue of his dangerousness in

1    this case.  And once again we see the brutality of the

2    sexual offenses increasing in some respects.  While again in

3    this instance the victim was known to Mr. Graham, this time

4    he repeatedly struck her.  This time he forced sex on her

5    even though she was recuperating from surgery.

6         So the conviction in this case on that second

7    battery resulted in probation for Mr. Graham.  He didn't do

8    any time.  So after these charges and that conviction

9    Mr. Graham was still an untreated sex offender.  He was

10   still out on the street.  And even though he was out on

11   parole, that didn't stop him from continuing to reoffend.

12   The pattern continued.

13        In 1986, Your Honor, he tested positive for

14   marijuana on two occasions and PCP on one occasion.  And

15   then in May of 1987 he committed his next sexual offense and

16   this was his most brutal sexual offense as far as we know.

17        The victim was an employee of the Department of

18   Defense.  And she was at home on a spring day gardening in

19   her backyard.  And the evidence is that she was residing in

20   a location near Mr. Graham in the same or adjacent apartment

21   complex.  While she was out gardening, Mr. Graham came by

22   and started a conversation.  He ended the conversation and

23   he left.  He came back presenting her with a plant which he

24   held in his hand which looked like it had been pulled from

25   the ground.  She accepted the plant.  Mr. Graham went away.

1          The victim then went in her house.  And all of a

2     sudden she looked up to see Mr. Graham standing on her patio

3     with his hand against the door.  She tried to get him to go

4     away but he forced his way into the apartment.  And once he

5     got in the apartment, he approached the victim, put his

6     hands on her throat, and he strangled her into

7     unconsciousness.  She lost control of her bladder on the

8     floor.  And when she came to, she was in another location in

9     the apartment.  When she came to, Mr. Graham put his hands

10    on her throat again and he strangled her into

11    unconsciousness again.

12          When she came to after that event, she woke up in

13    yet another location in the apartment.  Mr. Graham repeated

14    his conduct:  Put his hands on her throat, choked her into

15    unconsciousness.

16          She finally woke up the third time.  Now, in the

17    course of these chokings she at one point tried to resist

18    and he threatened to kill her if she resisted.  And that's

19    when she stopped resisting.

20          Well, after she came to the third time, that's when

21    the rapes began.  And they began on the floor.  Mr. Graham

22    raped her on the floor.  And after he finished a short while

23    later he raped her in her own bed.  He asked her for her

24    telephone number and she was smart enough to give him her

25    work number and he left.

1          He called her a few days later at her employment at

2     the Department of Defense.  She had already contacted the

3     authorities and they were prepared to trace the call, which

4     they did.  And they tracked down Mr. Graham and placed him

5     under arrest.

6          So once again we see a continuation of Mr. Graham's

7     pattern of recidivism.  And once again the level of

8     brutality increases even more.  This time it's with a

9     stranger.  This time again it's in broad daylight.  This

10    time again he threatens his victim but this time instead of

11    merely beating his victim, he now strangles her into

12    unconsciousness repeatedly.

13         Mr. Graham was convicted of rape in March of 1988,

14    received a sentence of 25 years and was imprisoned in

15    Maryland.  Once again he showed no remorse.  In fact, he

16    threatened to sue his victim for damages associated with his

17    incarceration.

18         Once again he doesn't participate in sex offender

19    treatment or any psychotherapy.  He serves fifteen years of

20    that sentence which was essentially a completion of his

21    sentence in Maryland.  By the time he is released from

22    Maryland, his parole on the earlier violation was revoked

23    and he was released into federal custody where he remains

24    today.  So he has served out the remainder of his sentence

25    on the assault with intent to commit rape.

1          Mr. Graham's sentence expired in March of 2007.

2     He's an untreated sex offender.  He was set to be released

3     without any conditions, Your Honor.  And the Board of

4     Prisons, the Bureau of Prisons --

5          **THE COURT:**  How does he become a federal prisoner

6     again?  What was the choreography there?

7          **MR. SAVERY:**  Yes.  That second conviction for a

8     second offense when he did time, that was in a federal

9     institution.  He was released on parole.

10         **THE COURT:**  Why was it a federal case?

11         **MR. SAVERY:**  It was in the District of Columbia.

12         **THE COURT:**  I see.  Okay.

13         **MR. SAVERY:**  So once he was released from Maryland,

14    he went back into federal custody, completed his prison

15    sentence on that second conviction and that's where we stand

16    today.

17         **THE COURT:**  Okay.

18         **MR. SAVERY:**  In March of 2007 he was set to be

19    released and the Bureau of Prisons certified him as sexually

20    dangerous and that was the start of our proceedings here.

21         The testimony in this case, Your Honor, will by and

22    large come from expert witnesses and a major part of that

23    testimony is going to be focused on the second and third

24    issues under the Adam Walsh Act.

25         Regarding the second issue Mr. Graham does suffer

1    from a serious mental illness, abnormality or disorder.  In

2    fact, he suffers from two mental disorders, serious mental

3    disorders.

4            The first one is Antisocial Personality Disorder.

5    And the government's expert witness Anna Salter and the

6    court-appointed examiner in this case Dr. Mills are in

7    agreement that he suffers from that disorder.

8            **THE COURT:**  Now, is that a disorder that is

9    included in DSM-IV?

10           **MR. SAVERY:**  It is.

11           **THE COURT:**  Okay.

12           **MR. SAVERY:**  And that diagnosis is clear given his

13   long history of violence, his antisocial conduct and his

14   lack of remorse and so forth.

15           The second is paraphilia.  Specifically Paraphilia

16   NOS (Nonconsent).

17           **THE COURT:**  Now, is that listed in DSM?

18           **MR. SAVERY:**  Paraphilia NOS is listed in DSM.  And

19   that is the general category to cover paraphilias that

20   aren't separately identified in that section.

21           **THE COURT:**  By "paraphilia," you are saying what?

22   Define that.

23           **MR. SAVERY:**  Sure.  The Paraphilia NOS is a

24   category called Paraphilia Not Otherwise Specified.

25           The DSM --

1          **THE COURT:**  And "paraphilia" means what to me as

2     you are going to argue it?

3          **MR. SAVERY:**  Sure.  It is an aberrant urge for --

4     sorry -- it's crime motivated by sexual urges.  In this

5     instance what the urge in this case is Paraphilia NOS

6     (Nonconsent) and what that means is that he has a recurring

7     intense urge involving nonconsenting persons.  And he

8     carries out that urge by committing rapes.  Okay.

9          Dr. Salter will explain that, again, this specific

10    type of paraphilia falls within this Paraphilia NOS

11    category.  It is supported by scientific studies, scientific

12    research and it's been acknowledged for a long time in the

13    field.  In fact, this specific type of paraphilia is

14    referenced in the *DSM-IV Casebook*.  And this is a book that

15    essentially takes a variety of the DSM diagnoses and gives

16    examples of them.

17         And one of the examples that is given concerns a

18    repeated rapist such as Mr. Graham.  And it explains that

19    this type of paraphilia falls within this category of

20    Paraphilia NOS.

21         And I should note that the authors of this *Casebook*

22    were also involved in the Editorial Board for the DSM-IV.

23    It's the same people who prepared the DSM-IV.  In fact, one

24    of the authors of the *Casebook* was the editor in chief of

25    the DSM-IV.

1          It is also worth noting, Your Honor, that, although

2     the respondent argues that Paraphilia NOS (Nonconsent) is

3     not a legitimate diagnosis, every expert who has had any

4     involvement with Mr. Graham in this case has acknowledged

5     that it does exist, starting with the Bureau of Prisons

6     psychologist who examined Mr. Graham in connection with the

7     certification in this case.  She filed her report.  It's an

8     exhibit in this case.  She acknowledged that Paraphilia NOS

9     exists.

10         The Court appointed Dr. Mills as an independent

11    examiner in this case.  His report is replete with

12    references to Paraphilia NOS and where it's colloquially

13    called Paraphilic Rapism.

14         Respondent's own expert Dr. Plaud recently

15    testified in his deposition -- we expect his testimony will

16    be consistent in this case -- that he does acknowledge the

17    existence of Paraphilia NOS (Nonconsent).

18         And, finally, Dr. Salter, the government's witness,

19    will explain that, indeed, it does exist and, indeed,

20    Mr. Graham should be diagnosed with Paraphilia NOS

21    (Nonconsent).

22         Mr. Graham's conduct also has signs of another

23    paraphilia, Sexual Sadism.  And the repeated strangulation

24    of his last victim is a prime example.  His sadistic traits

25    are also relevant to his diagnosis and risk assessment

1    in this case.  Your Honor, may I grab my water?

2              **THE COURT:**  Sure.

3              (Pause in proceedings.)

4              **MR. SAVERY:**  Thank you.

5              Regarding the third issue under the statute, Your

6    Honor, Mr. Graham remains an untreated sex offender.  And if

7    he is released, he will have serious difficulty refraining

8    from future sexually violent conduct.

9              On this issue one of the key components of the

10   experts' assessments are actuarial instruments or actuarial

11   tools.  And these are tools that take the universe of sexual

12   offenders and then try to designate them or divide them up

13   by their risk of reoffending.  And essentially they try to

14   separate the high risk sexual offenders, those who are at

15   high risk for reoffending, from those who are of moderate

16   risk from those who are of the lowest risk.

17             And the most widely used tool in this regard is

18   called the Static-99.  Dr. Salter and Dr. Mills, the

19   court-appointed examiner, both scored Mr. Graham on the

20   Static-99 and they both determined that his score falls

21   within the range that represents the highest risk of

22   recidivism on the Static-99.

23             Now, apart from actuarial tools, sex offender

24   assessment also takes into account a number of other

25   factors.  One, for instance, is the individual's health and

1   his physical condition.  And the evidence will be that

2   Mr. Graham is a fit and healthy individual for a man his

3   age.

4          Another factor is treatment.  And that's a critical

5   factor in this case, because, as I have noted, Mr. Graham

6   has historically refused treatment.  He's historically

7   refused sex offender treatment.  He's refused to participate

8   in psychotherapy.  In fact, he was so adamant in his

9   opposition to participating in therapy that he decided to

10  forego an earlier release on appeal on his second conviction

11  because it would have required him to participate in therapy

12  and he had no interest in it.

13         This history of behavior while on release is also a

14  relevant factor and the evidence will be it's abysmal.  Each

15  time he's released into the public he commits a more serious

16  sexual offense than the last.

17         Now, we expect you will hear a lot of discussion on

18  the issue of aging and what impact does aging have on a risk

19  assessment.  Mr. Graham is 59 years old.  Now, as the Court

20  observed in its recent United States versus Hunt decision,

21  the research on aging is not comprehensive and it's not

22  necessarily uniform.  But at least one thing is clear and

23  that is that aging affects sex offenders, different types of

24  sex offenders, differently.

25         And there is one line of research that is

1  particularly important here and that concerns sexual

2  specialists.  These are individuals like Mr. Graham who have

3  been convicted of a sex offense on at least three occasions.

4  And the research shows that whereas the general population

5  of criminals, their risk of recidivism goes down generally

6  over time, for sexual specialists it actually increases as

7  their age increases.

8       Through his pattern of recidivism, Your Honor,

9  Mr. Graham has proven over and over again that he is unable

10  to refrain from sexually violent conduct when he is released

11  into society.  And his prior releases were all on parole,

12  Your Honor, with conditions.

13       He is now set to be released into society, not on

14  parole, with no conditions and with no expectation that he's

15  going to treat the underlying cause of his conduct.  If he

16  were released now, he would have serious difficulty

17  refraining from violent conduct.

18       In closing, Your Honor, the government's confident

19  that at the conclusion of this proceeding the Court will

20  find by clear and convincing evidence that Mr. Graham is a

21  sexual specialist, that he is a repeated rapist, a violent

22  rapist, that he suffers from Antisocial Personality Disorder

23  and Paraphilia, and that he would have serious difficulty

24  refraining from reoffending if he were released into

25  society.

1          And finally, Your Honor, that he should be

2     committed under the Adam Walsh Act.

3          **THE COURT:**  Okay.

4          (Whereupon, the Court and the Court Reporter

5          conferred.)

6          **THE COURT:**  You decided not to have daily copy

7     here?

8          **MR. GRADY:**  From the government's perspective, Your

9     Honor, yes, just as a -- but in, if I recall back to Hunt,

10    what we had done was a one-week requested expedited at the

11    conclusion of the proceedings.  I had expected --

12         **MR. SINNIS:**  Your Honor, I think we'll order daily

13    transcripts if that would be of aid to the Court.

14         **THE COURT:**  Well, I am just thinking of everybody.

15    In other words, the sooner we get the transcripts, the

16    sooner we get the proposed findings of fact and the sooner

17    you get a decision.

18         **MR. GRADY:**  Absolutely.

19         **MR. SINNIS:**  Barring --

20         **THE COURT:**  I am not telling you what to do.  I was

21    inquiring from Carol whether you had done anything.

22         **MR. SINNIS:**  Barring being reprimanded by

23    Ms. Conrad, we will order daily transcripts.

24         **THE COURT:**  You know the old saying:  It is easier

25    to ask forgiveness than to get permission.

1          (Laughter.)

2          **MR. SINNIS:**  Then we will order daily transcripts

3     and beg for forgiveness.

4          (Whereupon, the Court and the Court Reporter

5          conferred.)

6          **THE COURT:**  She will do it expedited for you.  She

7     doesn't have help to give you daily.  Is that all right?

8          **MR. SINNIS:**  Of course.

9          **MR. GRADY:**  Just with the caveat the government

10    does need to request for approval, but I will let her know

11    as fast as I know.

12         **THE COURT:**  Okay.  All right.  And I am not

13    ordering anybody to do anything.  If you don't think it is a

14    good tactic, then don't do it.

15         All right.  Go ahead now with your opening.

16              <u>**OPENING STATEMENT BY MR. SINNIS**</u>

17         **MR. SINNIS:**  Thank you, Your Honor.

18         Your Honor, first the facts and then the science.

19         In terms of the facts, what we have here with

20    Mr. Graham are, notwithstanding what Mr. Savery just said,

21    three instances, well, four instances and let's take them

22    one by one.

23         In 1974 Mr. Graham lives next door to a woman named

24    Cynthia Foreman.  On a particular night he drives

25    Ms. Foreman home and he has sex with her and she makes an

1    allegation that it was rape.  She is known to him.  They've

2    known each other for some time.

3          He is found guilty of that charge.  And as Your

4    Honor very astutely noticed, he was sentenced to 6 to 18

5    months.  I think that type of sentence sends a signal as to

6    what that particular trial judge felt about that particular

7    case.  The only thing we know about that case, and this is

8    extremely important with all of these allegations that are

9    being made by the government, is, except as to the very last

10   one, there is a paltry amount of documents as to what

11   actually took place.

12         So for the rape of Cynthia Foreman, notwithstanding

13   this case went to trial, you have in total a one-paragraph

14   police report description of what happened.  That is it.

15   And it says, as Mr. Savery said, she said that he tore her

16   clothes off, forced her to have sex.  He then goes to trial

17   and he is found guilty and does 6 to 18 months.

18         In 1975 the second assault with intent to rape,

19   again, very important, not a rape, assault with intent to

20   rape.  The only -- you will learn nothing, after three days

21   of trial, four days of trial, you will learn nothing about

22   what Mr. Graham did in that event because there is not a

23   single piece of paper, not a single piece of evidence that

24   tells us what Mr. Graham did.

25         In that one we have even less than what we had in

1    the case of Cynthia Foreman.  All we know about that case is

2    the woman was pregnant and she was on a path in Washington,

3    D.C., on a towpath down by a river.  And her original

4    allegation to the police was that she had been assaulted.

5    That is what the report says, that she had been assaulted.

6    She didn't say she had been assaulted with intent to commit

7    rape.  She said she had been assaulted.  We don't know what

8    that assault was.  We don't know whether he chased after

9    her.  We don't know whether he grabbed her.  We don't know

10   whether he didn't even touch her but just scared her.

11          We know not a single fact now and you will not know

12   a single fact at the end of this trial as to what Mr. Graham

13   did on that day.  And yet the government and its expert want

14   you to make leaps of faith and assumptions like their expert

15   does as to what he did.  But the simple fact is we don't

16   know what he did.

17          He was found guilty of that charge.  He pled guilty

18   to that charge and he served time in prison.  He gets out of

19   prison.  And Mr. Savery spent a long time speaking about a

20   series of battery charges regarding Mary Phargood who is the

21   lifelong partner of Wesley Graham.  You will hear from

22   Wesley Graham's nephews in this case.  They will tell you

23   that Mr. Graham still speaks to Mary Phargood on a weekly,

24   every couple weeks basis.  They're still friendly.  They

25   still keep in touch.  She's been a very strong sense of

1    support to him while he's been in prison.  And you will hear

2    that through the nephews.

3           And Mr. Savery spent a lot of time about that

4    allegation.  Here's what we know about that.  We know that

5    ten months after it is alleged that Mr. Graham assaulted two

6    of Mary Phargood's daughters and assaulted her, that was the

7    first time that allegation ever came to light.  They didn't

8    make the allegation on the night of the alleged incident.

9    They didn't make it the next day.  They didn't make it the

10   next day.  They didn't make it the next month.  They made it

11   ten months later.

12          And the only records we have about that of someone

13   who is actually there and is a neutral party was his

14   probation officer.  And his probation officer, who I submit,

15   Your Honor, would agree, he's probably not looking to cut

16   Mr. Graham a break, investigated those allegations.  And the

17   allegations were as Mr. Savery said.  There is allegations

18   that he physically harmed the two daughters.  Not in a

19   sexual way but physically harmed them, dragging them out of

20   the house, dragging them out of a particular room.

21          And then there is an allegation that he forced

22   Ms. Phargood to have sex with him after she had undergone a

23   hysterectomy against medical orders.  But, again, not

24   alleged until ten months later.

25          And what you will hear, that the parole officer

1    Joseph Murray who actually investigated it for the Parole

2    Commission, he says, "It should be noted the alleged

3    incident took place approximately ten months ago.  It would

4    appear she," referring to Mary Phargood, "is reacting to the

5    loss of her automobile and is distressed over his," meaning

6    Mr. Graham's, "admitted involvement with another woman."

7           The parole officer didn't believe it.  The Court

8    didn't believe it.  The charge was nolle prossed.  It's of

9    zero value.  And the fact that their expert wants to rely on

10   it to put him in jail for the rest of his life or civilly

11   commit him for the rest of his life I think gives you a

12   sense and an idea of what their expert is willing to do in

13   terms of bending facts, assuming facts and ignoring facts in

14   order to get to an endgame.

15          Now, I will talk about that more when we talk about

16   the science.  So I think those are red herrings.

17          Ten months after the event, that's when they're

18   first alleged, the parole officer investigates, says I don't

19   believe it.  The court says we don't believe it, nolle

20   prossed, done.

21          Continuing to try to get as candid as I can with

22   Your Honor, there is a third charge here, the rape, the

23   index offense for lack of a better word.  That is a violent

24   offense.  Brutal.  He chokes his victim.  He repeatedly

25   rapes her.  He drags her around her own home.  No excuse.

1    Heinous act.  He's been in prison for 22 years.  That seems

2    like a sufficient sentence.

3           Because he raped someone 22 years ago does not mean

4    he currently suffers from a mental disease or disorder that

5    requires his confinement.  He has done a substantial period

6    of prison time.  He's 60 years old.  There is not going to

7    be sufficient evidence on the facts of the case to commit

8    him at the end of this case.

9           So those are the facts to try to lay it a little

10   more clearly.

11          Now, in terms of the science, Your Honor, I want to

12   quote -- the government is going to call Anna Salter.  And

13   Anna Salter wrote, "A basic tenant of science is that if the

14   facts don't support the theory, the theory should give way.

15   It often simply does not happen.  Sometimes the facts are

16   twisted to fit the theory or if that fails, they're simply

17   ignored."

18          Ironically she wrote that.  She wrote that in a

19   book called, *Predators, Pedophiles, Rapists and Other Sex*

20   *Offenders, Who They Are, How They Operate and How We Can*

21   *Protect Ourselves and our Children.*

22          I say ironically because at every turn of this case

23   Anna Salter does exactly what she excoriates people not to

24   do.  She ignores the science when needed.  She ignores facts

25   or she assumes facts such as what Mr. Graham might have done

1    in that assault with intent to commit rape in order to fit

2    her diagnosis.

3              She writes fiction books.  And frankly the title of

4    the back I just quoted you and of her fiction books, it

5    becomes very clear that at the end of the day she is finding

6    ways to fit science and fit facts to commit people civilly.

7              There are three discrete issues in this case, Your

8    Honor, as we see them.  One --

9         **THE COURT:**  When you talk about her writing

10   fiction, are you being facetious or --

11        **MR. SINNIS:**  No.  No, I am not being facetious,

12   Your Honor.

13        **THE COURT:**  All right.  No, that is okay.

14        **MR. SINNIS:**  We have them here.  You will see them

15   when Mr. Gold cross-examines her.

16        **THE COURT:**  Okay.

17        **MR. SINNIS:**  She has written probably this high

18   (indicating), a foot and a half high of fiction novels about

19   sexual predators and sex offenders.

20             We think there are three discrete areas of issue

21   for Your Honor to decide in this case.  One is does

22   Paraphilia Not Otherwise Specified (Nonconsent) exist as a

23   valid scientific diagnosis; and if it does, is it applicable

24   in this case?

25             Two, is Antisocial Personality Disorder standing

1    alone sufficient for civil commitment under the Adam Walsh

2    Act?  A question that Chief Judge Wolf recently answered in

3    the negative in the case of U.S. v. Wilkinson.

4         And, thirdly, does the fact that Mr. Graham is 59

5    and a half years old reduce his risk of recidivism of

6    reoffending?

7         On each and every one of those questions the

8    evidence will show that the government's only witness Anna

9    Salter ignores the science but not only ignores it, she

10   rejects it.  She rejects it.

11        The authors of the DSM, Your Honor asked

12   Mr. Savery is it in the DSM?  Paraphilia NOS (Nonconsent) is

13   not in the DSM.  And Mr. Savery very artfully somewhat

14   dodged that question and then said, well, it's in the

15   Casebook.  It's not in the DSM.

16        Not only is it not in the DSM, it was specifically

17   considered and rejected by the authors of the DSM for

18   inclusion.  And let me give Your Honor a little bit of

19   background on that.

20        Between 1983 and 1986 there was strenuous debate

21   about whether or not the DSM should include a specific

22   diagnosis for adult stranger rape with nonsadistic aspects

23   to it.  Prior to this time there was never anywhere in the

24   DSM a mental disorder, disease or condition that would apply

25   to -- and I don't mean this in any type of condescending

1    way -- but your garden variety rapist.  There was nothing in

2    the DSM that would apply to that.

3         And so certain people said we need something, we

4    need something in the DSM that discusses why people commit

5    the crime of rape.  So the authors of the DSM after much

6    consideration and debate took the issue up.  They took it up

7    and they answered the question.  And they said no,

8    Paraphilia NOS (Nonconsent) does not belong in the DSM

9    because it is not scientifically substantiated.

10        And just so Your Honor is clear as the trial is

11   going on, Paraphilia NOS (Nonconsent) is also referred to by

12   some different names:  Paraphilic Rapism or Paraphilic

13   Coercive Disorder, PCD.  They all mean the same thing.  They

14   were rejected from inclusion in the DSM.

15        The American Psychiatric Association said it

16   shouldn't be in there.  The National Association of Women

17   said it shouldn't be in there.  And quite interestingly the

18   Department of Justice said it shouldn't be in there.  And

19   they all said it shouldn't be in there because the science

20   was clear, rape is not about sex.  It is about power.  It is

21   about aggression.  It is not about sexual arousal.  It's not

22   a mental disorder.  It is not caused by a mental disorder.

23   Keep it out of the DSM, and they did.

24        But the government's only witness in this case says

25   it doesn't matter if it is in the DSM or not.  It's in this

1    *Casebook*, a *Casebook* that is not part of the DSM.  It is not

2    referenced by the DSM.  And, in fact, the *Casebook* portion

3    that Mr. Savery mentioned has been revised in a new edition.

4    And you know what, lo and behold, Paraphilia NOS, not in

5    there, not in there.  So it's not even in the most recent

6    version of the *Casebook* and it's not in the DSM itself.

7    But, again, Ms. Salter doesn't care about that because this

8    is her diagnosis of Wesley Graham and this is her way to get

9    Mr. Graham civilly committed.

10            So notwithstanding the fact that the American

11    Psychiatric Association and the authors of the DSM say it

12    doesn't get included, Anna Salter says I think it's a valid

13    diagnosis.  I think it should be in the DSM.  And she turns

14    to a friend of hers, a personal friend of hers, Dennis

15    Doren, who is a fellow psychologist in Wisconsin, and

16    Dennis, and she says to Dennis Doren what do we do about

17    these people.  What do we do about adult rapists, adult

18    stranger victims.

19            And Dennis Doren created Paraphilia NOS

20    (Nonconsent.)  And he is unabashed about it.  He's testified

21    under oath, and you will hear evidence, he's testified under

22    oath --

23            **THE COURT:**  He is a what?

24            **MR. SINNIS:**  He's not a witness in this case.  He

25    is a friend of Dr. Salter's --

1          THE COURT:  Who does what?

2          MR. SINNIS:  Who created the Paraphilia NOS

3    (Nonconsent) diagnosis.

4          THE COURT:  What does he do for a living?

5          MR. SINNIS:  He used to work for the Wisconsin

6    Department of Probation.

7          MR. GOLD:  Wisconsin Department of Public Health.

8    He does this work.  This is what he does.  He wrote a book

9    called *Evaluating Sex Offenders* which is about seven years

10   old but is popular.

11         THE COURT:  And his credentials are what?

12         MR. SINNIS:  He's a psychologist.

13         THE COURT:  A psychologist.

14         MR. SINNIS:  He's a psychologist.  And a colleague

15   and friend of Anna Salter's.

16         THE COURT:  Okay.

17         MR. SINNIS:  And so in a trial he testified under

18   oath that the psychiatric community did not recognize this

19   disorder and that he created it himself because he perceived

20   a gap in the DSM.  He perceived a gap in the DSM.

21             There wasn't any gap in the DSM.  Rather there was

22   a deliberative process and a reasoned scientific conclusion

23   was reached that paraphilic rapism was not a scientifically

24   valid diagnosis worthy of placement in the DSM.  That's not

25   a gap.  That's a decision, a decision Anna Salter doesn't

1      like, a decision that her colleague Dennis Doren didn't

2      like, but it was a decision made by psychiatrists who are

3      more expertise in the field than psychologists who played a

4      circuit of coming in and testifying in civil commitment

5      proceedings.

6             But apparently Dennis Doren and Anna Salter believe

7      they know better than the American Psychiatric Association.

8      They know better than the authors of the DSM.

9             Simply put the evidence in this trial will show

10     that the overwhelming position in the scientific community

11     is that such a diagnosis is not worthy of inclusion in that

12     book, the DSM, and not worthy of diagnosing people with.

13            And let me say one more thing before I forget.

14     Mr. Savery said in his opening that the Bureau of Prisons in

15     their certification of Mr. Graham, which was performed by a

16     Ph.D Monica Ferraro, diagnosed him with Paraphilia NOS

17     (Nonconsent).

18            **MR. SAVERY:**  Your Honor, I'm objecting.  I didn't

19     represent that he was diagnosed with it.  I merely

20     represented that they acknowledged the diagnosis.

21            **MR. SINNIS:**  Well --

22            **THE COURT:**  Well, we will hear what the evidence

23     is.

24            **MR. SINNIS:**  What she specifically said is, Rule it

25     out.  I don't have enough information.

1          The whole point of Paraphilia NOS (Nonconsent) is

2     based upon the fact that the person committing the rape is

3     aroused by the nonconsent of the victim.  That's it.  That's

4     as clear as I can put it.  If a rapist is aroused by the

5     nonconsent of the victim, then people like Anna Salter will

6     get on the stand and say they suffer from Paraphilia NOS

7     (Nonconsent).

8          Well, interestingly, Dr. Ferraro, the Bureau of

9     Prisons Ph.D who evaluated Mr. Graham, says in her report,

10    "While records indicate that Mr. Graham choked his victim

11    while committing the rape in 1987, there is no indication

12    that Mr. Graham derived sexual pleasure from the pain of his

13    rape victim.  Rather, it appears as though the aggression

14    associated with Mr. Graham's offense conduct was to subdue

15    his victim so that he could rape her."

16         She rejects the only criteria that Anna Salter says

17    is necessary to diagnose someone with this illness.  She

18    rejects it.  The Bureau of Prisons expert rejects it.

19         Now, even if, even if Paraphilia NOS (Nonconsent)

20    is a valid diagnosis, it has no place in this case.  There

21    are absolutely no facts, as I just indicated, that, Ph.D

22    Ferraro also indicates, there are no facts in this case to

23    justify its application to Mr. Graham.

24         Now, there are people, and Mr. Savery alluded to,

25    in the scientific community who accept this diagnosis,

1    Paraphilia NOS (Nonconsent).  They're in the minority but
2    there are those who accept it.  But interestingly even the
3    people who accept it vehemently disagree with Anna Salter
4    and Dennis Doren's indiscriminate application of this
5    diagnosis to any and all adult stranger rapists.  Those
6    individuals specifically say, and you will hear testimony to
7    this effect, that if you are going to apply this diagnosis,
8    it should be applied to rapists with "extreme caution" and
9    only applied, "when there is considerable evidence that the
10   rapist is motivated by his victim's nonconsent."

11        There is nothing in this record whatsoever to
12   indicate that Mr. Graham was motivated by his victims'
13   nonconsent.

14        So not only is the position espoused by Anna Salter
15   an outlier within the scientific community as a whole, it's
16   also an outlier even among those people in that community
17   who accept this diagnosis.  And if, quite simply, the
18   extremity of the view would stand for the proposition that
19   if accepted by this Court that any adult stranger rapist
20   suffers from a mental illness and is justified to be
21   committed under the Adam Walsh Act, the science doesn't
22   condone that nor should the law.

23        The second issue which I mentioned is whether
24   Antisocial Personality Disorder standing alone is sufficient
25   to justify the commitment of Mr. Graham under the Adam Walsh

1    Act.  As I indicated, that exact issue was presented in the

2    Wilkinson case in this district and was answered in the

3    negative, that it was not sufficient.

4         Now, Mr. Graham has been diagnosed with Antisocial

5    Personality Disorder.  As Your Honor knows, probably 50, 60

6    percent of prisoners have Antisocial Personality Disorder.

7         So Dr. Salter says he has Antisocial Personality

8    Disorder.  Dr. Mills who is the court-appointed expert says

9    he has Antisocial Personality Disorder.  Where they differ

10   from is what is the endgame about that.  What does that give

11   us.  What does that mean to us to say.

12        Dr. Mills who testified in Wilkinson takes the

13   position as a psychiatrist that Antisocial Personality

14   Disorder standing alone is not sufficient basis to civilly

15   commit someone under the Adam Walsh Act.  It is not a

16   serious mental illness, disorder or condition.  It's on the

17   Axis II, not Axis I, and the disorders are just

18   substantively and qualitatively different than those that

19   you find, for example, say pedophilia or any of the other

20   paraphilias.  They're just different and they're not serious

21   mental illnesses or conditions or disorders.  And,

22   therefore, they don't justify the commitment of Mr. Graham.

23        And as I said, he testified in the Wilkinson case.

24   And in response, in his decision Chief Judge Wolf said, "The

25   government had not proven that ASPD alone ever, ever causes

1    a person to have serious difficulty in controlling his

2    conduct."

3          **MR. SAVERY:**  Your Honor, I'm going to object to

4    this line.  We're now commenting on another judge's

5    determination based on the evidence presented to that judge

6    in another case.  I am not sure how it relates to this case.

7          **THE COURT:**  Well, I think it is of interest.  I

8    want to know what my colleagues did on the issue.  Thank

9    you.

10         **MR. SINNIS:**  Yet again Anna Salter, in the face of

11   the majority of the scientific community and against legal

12   decisions on point, will opine that there is absolutely no

13   reason why Antisocial Personality Disorder can't justify the

14   civil commitment of Mr. Graham or any other.  The Court

15   should reject this position.

16         But, again, even if the Court were to accept that

17   ASPD standing alone is sufficient in some circumstances to

18   civilly commit someone under the Adam Walsh Act, as applied

19   in this case, again, the facts don't rise to the level of

20   Mr. Graham's ASPD indicating that he has serious difficulty

21   from refraining from future illegal conduct or sexual

22   offending.  And I say that because, for two reasons.

23         One, Mr. Graham is 59 and a half years old.  And,

24   two, he has an almost unblemished prison record for the last

25   22 years that he has been incarcerated.  A couple isolated

1    disciplinary incidents but other than that he has worked.

2    He's abided by the rules of the institution.  He has minded

3    his own business and hasn't bothered anybody.

4          The literature and science unequivocally states

5    that ASPD actually diminished over the lifespan of an

6    individual.  This is such a commonly known fact that the

7    psychiatrists in the field have given it a name:  Burnout.

8    Basically meaning the older you get, the less these traits

9    come to the fore and the less these traits have any ability

10   to cause you some desire to do some illegal conduct.

11         But, again, Dr. Salter refuses to concede that.

12   She says age has nothing to do with his ASPD.  She says, oh,

13   the fact that he spent 22 years in prison and didn't do

14   anything wrong, that doesn't count either.

15         So, again, she's twisting the facts or ignoring the

16   facts or ignoring the science in order to get to her endgame

17   which is that he needs to be civilly committed.

18         And finally we come to age.  And I think this one,

19   you know, there is a lot of science on this and I know Your

20   Honor heard a lot of it in the Hunt case.  I come at this

21   from more of a common sense standpoint.  I think there --

22   Your Honor has been a federal court judge since 1972.  I

23   have been a criminal defense attorney for 18 years.  60-year

24   old men are rare to be seen in a courtroom.  And I think

25   science tells us that.  I think if you look at the prison

1    population across this country you will see that.  That

2    offenders at the age of offense are younger, not older.

3         If you look at the FBI, which we will submit to

4    Your Honor, the FBI 2007 Uniformed Crime Reports, there were

5    17,136 arrests for forcible rape in 2007.  1.7 percent of

6    those are people over 60.

7         Clients and defendants come in all shapes, types

8    and sizes but they rarely come in the form of a 60-year old

9    person.  I think that is just common sense, that as we get

10   older or as people age, they commit less offenses, less

11   criminal conduct.

12        Dr. Salter won't accept that.  She says age has

13   nothing to do with whether someone will reoffend.  She says

14   Wesley Graham is likely today at 59 and a half to go out and

15   commit a rape as he was at 29, 30, 35.  That flies in the

16   face of science.  It flies in the face of common sense but

17   that is what she's going to tell Your Honor.

18        And I'd like to just end with one final point.  We

19   talked about how she's reached her conclusions and opinions.

20   But quite surprisingly the night before her deposition, the

21   night before her deposition in this case she emails a friend

22   of hers, David Thornton.  She gives him a nine-line

23   inaccurate factual description of Mr. Graham's history, nine

24   lines on a computer.  Condensed his life to nine lines and

25   sent it to her friend David Thornton who is also a

1    psychologist in Wisconsin and said to him what do I do?  She

2    asked him, How much would you weigh his age, quote/unquote?

3    What do you think of a six on a Static given the new norms,

4    quote/unquote?

5           The government asked her to formulate a scientific

6    opinion of Mr. Graham but rather than do that, to apply fine

7    science and research, she emails a friend the night before

8    and says, What do you think?  That's the government's

9    expert.  That's the government's case.

10          And that is how she twisted the facts and theories

11   in order to reach the conclusion that Mr. Graham is a

12   sexually dangerous person.  We submit that's not science and

13   that's certainly not proof beyond -- proof by clear and

14   convincing evidence.

15          Thank you, Your Honor.

16          **THE COURT:**  Okay.

17          **MR. SAVERY:**  Your Honor, the government calls Anna

18   Salter.

19          **THE COURT:**  Go ahead.

20          **MR. SAVERY:**  And, Your Honor, I have a set of

21   exhibits which the parties have agreed to with stipulated

22   numbers 1 through 28.  I'd offer those.

23          **THE COURT:**  Okay.  Any objection?

24          **MR. SINNIS:**  No, Your Honor.

25          **THE COURT:**  Okay.

1              (Whereupon, Exhibits No. 1 to 28 were received in

2       evidence with the descriptions being found on the Trial

3       Exhibit List.)

4              (Whereupon, counsel conferred.)

5              **MR. SAVERY:**  I'd like to give a set to the Court.

6              **THE COURT:**  Okay.  Give them to Suzie here.

7              **MR. SAVERY:**  I will put a set on the witness stand

8       as well.

9              Your Honor, I will note that the --

10             **THE COURT:**  Just give me one minute.  I am working

11      on something that has nothing to do with this case.

12             **MR. SAVERY:**  Sure.

13             (Pause in proceedings.)

14             **THE CLERK:**  Would you raise your right hand,

15      please.

16                     <u>**ANNA CAROL SALTER, Sworn**</u>

17             **THE CLERK:**  Thank you.  You may be seated.

18                       <u>**DIRECT EXAMINATION**</u>

19      BY MR. SAVERY

20      **Q.**  Good morning.

21      **A.**  Good morning.

22      **Q.**  Would you please state your full name.

23      **A.**  Anna Carol Salter.

24      **Q.**  And what is your occupation, Dr. Salter?

25      **A.**  I am a psychologist.

1    **Q.**  And have you been retained by the government in this

2    case to provide your opinions concerning the sexual

3    dangerousness of the respondent Wesley Graham?

4    **A.**  Yes.

5    **Q.**  There are two binders of exhibits to your right.  If you

6    could take binder one, please.  Turn to Exhibit 1.

7        Is that a copy of your report that you prepared in

8    this case?

9    **A.**  Yes.

10   **Q.**  Okay.  And if you would turn to Exhibit 2 in that same

11   binder.

12   **A.**  Right.

13   **Q.**  And what is that?

14   **A.**  That is an addendum to the report which I wrote after

15   some of the norms for the Static, one of the instruments

16   that I used, was changed, were changed.

17   **Q.**  Okay.  Have you reached an opinion in this case to a

18   reasonable degree of professional certainty as to whether

19   Wesley Graham meets criteria for a civil commitment under 18

20   U.S.C. Sections 4247 and 4248?

21   **A.**  Yes.

22   **Q.**  Could you please identify for us what those criteria

23   are?

24   **A.**  The criteria for a sexually dangerous person are that

25   the person has engaged or attempted to engage in sexually

1    violent conduct and that they have -- and they are sexually

2    dangerous to others.  "Sexually dangerous to others" has

3    been further defined as the person suffers from a serious

4    mental illness, abnormality or disorder as a result of which

5    he would have serious difficulty in refraining from sexually

6    violent conduct or child molestation.

7    **Q.**  Okay.  Thank you.

8         Before we get to the substance of your opinions,

9    I'd like to focus for a few minutes on your background.

10        Can you just quickly walk us through your

11   educational history.

12   **A.**  I have a BA from the University of North Carolina in

13   philosophy and English.  I have a master's degree from Tufts

14   University in child study.  And I have a Ph.D from Harvard

15   University in clinical psychology and public practice.

16   **Q.**  If you could turn to Exhibit 3 in that binder, please.

17        Is this a copy of your CV?

18   **A.**  Yes.

19   **Q.**  Okay.  Are you a licensed psychologist?

20   **A.**  I am.

21   **Q.**  And when did you first become licensed?

22   **A.**  I believe it was in the late '70s in New Hampshire.

23   **Q.**  And where are you currently licensed?

24   **A.**  Wisconsin.

25   **Q.**  For how long have you been licensed in Wisconsin?

1    **A.**  Since 1996.

2    **Q.**  Have you been continuously licensed as a psychologist

3    since the time you were first licensed in New Hampshire?

4    **A.**  Yes, I was licensed in New Hampshire.  And then because

5    I was also working in Vermont, I obtained a Vermont license

6    and held both of those licenses until I moved to Wisconsin

7    in 1996.

8            **THE COURT:**  That is fresh water there.

9            **THE WITNESS:**  Thank you.

10           **THE COURT:**  And the cups are clean I think.

11           (Laughter.)

12           **THE COURT:**  Right?

13           **THE LAW CLERK:**  Yes.

14           (Pause in proceedings while the witness drank some

15           water.)

16   BY MR. SAVERY

17   **Q.**  Have you had any clinical experience relating to sex

18   offenders and victims?

19   **A.**  Yes.

20   **Q.**  Okay.  Can you briefly describe your relevant experience

21   for us?

22   **A.**  I first began assessing and treating sex offenders and

23   victims when I began clinical practice which was in the late

24   '70s.  I began by treating victims and then offenders began

25   to come into the facility where I was working.  And I

1    subsequently obtained a grant and studied offender programs

2    in different places in the country to determine the best

3    treatment for offenders.

4         I began to treat offenders and I continued to treat

5    victims and offenders until I moved to Wisconsin in 1996.

6    Since that time -- and I continued to see clients for the

7    first couple of years.  But since around 1998 I have focused

8    particularly on assessment of sex offenders and I do other

9    professional activities but clinically I focus on the

10   assessment of sex offenders.

11   **Q.**  Okay.  And what type of work are you doing in that

12   regard?

13   **A.**  Well, first of all, I consult half time to the

14   Department of Corrections in Wisconsin.  And as part of that

15   job I, on a weekly basis I assess sex offenders in one

16   facility and then violent offenders in a second facility.  I

17   also do other jobs for the Department of Corrections.

18        Second, I have an ongoing contract with the State

19   of Iowa to do civil commitment evaluations of sex offenders.

20   And on occasion I have done them in Wisconsin.  It's

21   typically not my responsibility in Wisconsin; but when they

22   have overflow or they need a second opinion, I have done

23   some evaluations in Wisconsin and some in other states as

24   well.

25   **Q.**  Okay.  Now, have you had any teaching experience that

1    concerns sex offenders?

2    **A.**   That concerns sex offenders?

3    **Q.**   And victims.

4    **A.**   And victims.  I train -- well, first of all, I was a

5    teaching fellow at both of my graduate schools but neither

6    of them had any courses in the sexual piece (ph.) so I did

7    not train or teach on sex offenders or victims at either

8    Harvard or Tufts.

9         However, after moving into clinical practice I,

10   within a few years I joined the faculty of Dartmouth Medical

11   School and I was on the faculty of psychiatry and maternal

12   and child health as a joint appointment.  And during that

13   time I was director of psychosexual education for the

14   pediatric residency training program.  In that capacity I

15   trained pediatric residents on a variety of subjects and one

16   of them was sexual abuse.

17        I was also at that time assistant director of the

18   Children at Risk Program which was Dartmouth's child sexual

19   abuse program.  And I was also involved in teaching and

20   training activities through that.

21        In addition I also trained in different parts of

22   the country and abroad on sex offenders and victims.

23   **Q.**   Okay.  Are you able to estimate how many sex offenders

24   you've clinically treated?

25   **A.**   I never kept a list.  I saw them pretty continually for

1   roughly twenty years but I never kept a list of my clients.

2   **Q.**   How about victims of sex offenses?

3   **A.**   The same thing, I have never kept a list.

4   **Q.**   How many individuals have you evaluated in civil

5   commitment cases over the course of your career?

6   **A.**   I did keep a list of that.  I have I believe 65 cases

7   that I have done civil commitment evaluations in.

8   **Q.**   Are those cases prescreened by the time they come to

9   you?

10   **A.**   They are prescreened.  Only the very small percentage of

11   sex offenders are referred for evaluation.  No state that I

12   am aware of civilly commits more than ten percent of sex

13   offenders.  And typically they're between 10 and 20 percent

14   of the highest risk sex offenders are referred for

15   evaluation.  The rest are not.

16   **Q.**   Okay.  So you see only the highest risk sex offenders?

17   **A.**   Yes.

18   **Q.**   Okay.  And roughly what percentage of those have you

19   found to be qualifying as sex offenders?

20   **A.**   About half, 51 percent.

21   **Q.**   Have you testified as an expert in sex offender

22   commitment proceedings?

23   **A.**   Yes.

24   **Q.**   And how many?

25   **A.**   23 times, 23 cases.

1    **Q.**  In how many states or jurisdictions?

2    **A.**  Well, several.  Iowa, Wisconsin, one, two, four states.

3    **Q.**  Okay.  Have you ever failed to qualify as an expert

4    witness?

5    **A.**  No.

6    **Q.**  You mentioned some trainings that you have done apart

7    from your work within academic posts.  Can you just tell us

8    briefly what areas you have conducted trainings in that are

9    relevant to this case and who your audiences were?

10   **A.**  Well, the audiences typically are a variety of

11   professionals who deal with sexual abuse.  They often

12   include mental health personnel.  They include correctional

13   personnel, probation and parole, police, attorneys, judges,

14   child protection education, roughly anyone or any

15   professionals who deal with sexual abuse come to these

16   trainings.

17   **Q.**  Okay.  And have you received any grants in the field of

18   sexual abuse or concerning sex offenders?

19   **A.**  I have received a series of grants.  When I was at

20   Dartmouth Medical School along with a pediatrician named

21   Steve Kerry (ph.) we essentially financed the child,

22   Children at Risk Program through grants over a number of

23   years.

24   **Q.**  Okay.  And have you published any books or articles in

25   the field of sexual abuse or concerning sex offenders?

1    **A.**   I published three books on sex offenders.  Two are

2    academic books and the third I wrote for a more general

3    audience.

4         I published *Treating Child Sex Offenders and*

5    *Victims, A Practical Guide* in 1988.  That was a nuts and

6    bolts guide to assessing and treating sex offenders.

7         I also published a book called *Transforming Trauma*

8    in the mid '90s on.  And that was a book for adult

9    survivors -- not for adult survivors -- for professionals

10   about how to understand and treat adult survivors.  But in

11   that book a good section, a very large section was devoted

12   to the dynamics of sex offenders because it was my belief

13   that many treatment providers for victims did not understand

14   sex offenders and the dynamics of molestation and rape and

15   that that hindered their ability to treat a surviver.  So

16   the book actually had quite a lot to do with sex offenders.

17        And then I published a book called *Predators,*

18   *Pedophiles, Rapists and Other Sex Offenders*.  And that book

19   was designed for the general public but I have been

20   surprised by how many professionals use it as well.

21   **Q.**   Okay.  And you've published other writings in the area

22   of sex offense and sex offender treatment; is that right?

23   **A.**   Yes, but I primarily collect my work and publish it in

24   books.

25   **Q.**   Okay.  In all events, are your writings listed in your

1  CV?

2  **A.**  My writings are listed in the CV except for the book

3  that I am currently starting working on on treatment.

4  **Q.**  Okay.  And are you also a novelist?

5  **A.**  Yes.  I have published five mysteries.

6  **Q.**  Now, have you produced any educational films in the area

7  of sex offenders?

8  **A.**  I have.  I have produced several.  The two that I have

9  out now are *Truth, Lies and Sex Offenders*.  And this is a

10  film in which both -- all my films are films of sex

11  offenders talking about certain issues, the issues on the

12  film.

13          *Truth, Lies and Sex offenders* is about how sex

14  offenders fool people, how they fool clinicians, how they

15  fool community members, how they fool victims.  And it is a

16  series of sex offenders describing the techniques that they

17  use.

18          I also have a film out now on *Sadistic and*

19  *Nonsadistic Offenders, How They Think and How They Operate*,

20  which includes a sadist describing his thinking process and

21  his behavior.

22          And I have a new one coming out as well on *The*

23  *Dynamics of Sexual Molestation*.

24  **Q.**  Are you a member of any professional associations

25  relating to sex offenses specifically?

1   **A.**   Yes, the Association for the Treatment of Sexual

2   Abusers.

3   **Q.**   Have you received any awards for your work in the area

4   of sex offenses?

5   **A.**   In the area of sex offenses I received a significant

6   achievement award from the Association for the Treatment of

7   Sexual Abusers which they gave to one person each year.

8   **Q.**   And when did you receive that award?

9   **A.**   1997.

10  **Q.**   I'd like to turn your attention now to this case against

11  Wesley Graham.  What was your assignment in this case?

12  **A.**   My assignment was to evaluate from the records

13  Mr. Graham and to determine if he met the specified criteria

14  and I was asked to critique the report of Dr. Mills in the

15  light of this case.

16  **Q.**   Okay.  How did you go about handling that assignment?

17  **A.**   Well, I asked to see all the records.  And then the

18  process is that I set aside records that are not

19  specifically related to the sexual offender and the

20  evaluation.  I then developed a notebook in which I put

21  each, information about each offense in one section, his

22  reports, et cetera, in another.  And I get all the material

23  organized.

24          Then I look for diagnoses.  I look for whether or

25  not this person does or does not have a diagnoses that would

1    lend itself to sexual offending.  Many sex offenders

2    actually do not have that diagnosis that lend them to future

3    sex offending.

4          I also looked at the actuarial instruments to

5    determine their risk of offense in the future.  I then look

6    at whether there are any issues that would cause me to

7    adjust the actuarial assessment.  You might have an

8    offender, for example, with a high risk of offending but

9    he's in extremely poor health, permanently in poor health

10   and thus the risk assessment should be adjusted.

11         And finally I look at the evidence of treatment and

12   the impact of treatment.  And I also look at the issue of

13   volitional impairment.  Is the person, does the person have

14   anything that affects their volition and makes it difficult

15   for them to control their impulses.

16   **Q.**  And in connection with your work in this case did you

17   also review the reports submitted by Doctors Mills and

18   Plaud?

19   **A.**  I did.

20   **Q.**  Were you permitted to interview Mr. Graham?

21   **A.**  I was not.

22   **Q.**  How did that affect your ability to reach opinions in

23   this case?

24   **A.**  It limits it in some ways.  A missing piece in this case

25   in my opinion is that no one has done a psychopathy

checklist on Mr. Graham.  The concept of psychopathy is

important to sexual offending, and important in this case in

a couple of ways.  There is a lot of research to suggest

that sexual deviance combined with psychopathy results in

very fast and very high levels of recidivism.

       And, secondly, aging tends to affect psychopaths

differently.  They tend to decrease their nonviolent

offenses as they age but not their violent offenses, not

necessarily.

**Q.**  Okay.  Now, before we get to the opinions you formed in

this case, did you consider Mr. Graham's background?

**A.**  Yes.

**Q.**  Can you tell us about his youth and any early criminal

history?

**A.**  He says that he had a normal background in terms of his

family.  At age 13 he began -- he was arrested for

shoplifting.  I believe he has said that he was sent

somewhere for a couple of months based on that.  At age 15

he has a conviction for assault as well.

**Q.**  Okay.  And can you tell us what you know about his drug

use?

**A.**  He began drug use at an early age.  He admitted to using

marijuana from the age of 14.  He was using heroin from the

age of 15.

       **THE COURT:**  Where did you get this history?

1          **THE WITNESS:**  This history is in the reports.  He

2    reported to the presentence evaluator that he consumed all

3    of this --

4          **THE COURT:**  No, I mean, this entire history -- you

5    didn't interview him.

6          **THE WITNESS:**  I did not interview him.  This was

7    all based on records.

8          **THE COURT:**  Okay.

9    BY MR. SAVERY

10   **Q.**  And was Mr. Graham convicted of any sexual offenses?

11   **A.**  Yes.

12   **Q.**  When did the first offense occur?

13   **A.**  The first offense occurred in 1974, in January.

14   **Q.**  Okay.  Did you rely on any records relating to this

15   offense?

16   **A.**  Yes.

17   **Q.**  If you'd turn to Exhibit 13, please.  And specifically

18   to pages 408 and 409.

19   **A.**  Yes.

20   **Q.**  Do those concern this first offense?

21   **A.**  Yes, it does.

22   **Q.**  Okay.  And focusing on 409 which I have put up here on

23   the camera (indicating), are you able to read the

24   description of the event from this page?

25   **A.**  Yes.  "Black female reports that at about 0215 hours,

1    1/24/74, she accepted a ride home from the Chung-King

2    Restaurant at 709 H Street, N.E.  A man known to her as

3    'Wesley' drove her to the 5100 block of C Street, S.E. and

4    parked in a parking lot.  He told her that he wasn't a

5    teenager and he was going to show her that he wasn't.  He

6    told her to remove her clothes and she told him no.  He

7    grabbed her pants and the seam tore in the crotch.  He

8    removed her pants and her panties and had sexual intercourse

9    with her, reaching a climax and ejaculating on her and in

10   her.  He let her out of the car and told her that he would

11   give her a ride to her boyfriend's.  She told him to go to

12   hell.  She went to her boyfriend's home and called her

13   cousin and then called the police.  The complainant was

14   later examined at D.C. General Hospital and released."

15   **Q.**  Okay.  And can you continue with that last line, please.

16   **A.**  "The defendant denies having intercourse with the

17   complainant."

18   **Q.**  Do you know whether he still denies this offense?

19   **A.**  Yes, I believe that he has maintained his stance that

20   this is a vindictive ex-girlfriend who reported him for rape

21   when he told her that he was marrying someone else.

22   **Q.**  Okay.  And was Mr. Graham convicted of this offense?

23   **A.**  He was.

24   **Q.**  I'd like you to turn to -- actually you don't even have

25   to turn.  I'll put it up here on the ELMO.

1      **MR. SAVERY:**  This is marked in the binder, this is

2      Exhibit D for identification but my understanding is that

3      it's now a stipulated exhibit and I'll offer it, Your Honor.

4           **THE COURT:**  Any objection?

5           **MR. GOLD:**  I'm sorry, Your Honor.  That's correct.

6           **THE COURT:**  Okay.  I will let it in.

7           **MR. SAVERY:**  So this will be Exhibit 29.

8           **(Government's Exhibit No. 29 received in evidence.)**

9      BY MR. SAVERY

10     **Q.**  And what is this document, Dr. Salter?

11     **A.**  This document is a certificate that states that he was

12     convicted of rape and sentenced to 6 to 18 months.  It was

13     the second charge that was nolle prosequi.

14     **Q.**  Okay.  But the second charge was listed on this

15     document, case No. 19572 A 74 that shows a rape charge and a

16     disposition of 6 to 18 months?

17     **A.**  Yes.

18     **Q.**  And do you know, he was incarcerated; is that right?

19     **A.**  He was incarcerated.

20     **Q.**  And when was he released?

21     **A.**  He was released on parole in January of 1976.  After

22     five and a half months of the sentence.

23     **Q.**  Following his release when did his next sexual offense

24     occur?

25     **A.**  There is something wrong with this because it says that

1    it occurred in July 1975.  It says he was released on parole

2    in January of 1976 so let me go back to my report for that.

3    **Q.**  Sure.

4    **A.**  And the second one, the date --

5              **MR. GOLD:**  Your Honor, it's not clear to us at

6    least what the witness is looking at.  If she could identify

7    that.

8              **THE WITNESS:**  I have a --

9              **THE COURT:**  I thought the question dealt with a

10   record.

11             **MR. SAVERY:**  Initially, Your Honor, the question

12   dealt with the prior record.  I'm asking now when he was

13   released from this first incarceration.

14             **THE COURT:**  And she is referring to records to give

15   us an answer; right?

16             **MR. SAVERY:**  Yes.  Yes, she is.  Well, she is

17   now --

18             **THE COURT:**  She seems to have trouble with the

19   record, the accuracy of the record.

20             **THE WITNESS:**  I have an offense that appears that I

21   have a question about.  I am going back to my report which

22   specifies that he was released after five and a half months

23   and put on parole.

24             His next offense was June, let's see, his next

25   offense was July 2nd, 1975, so a few months after, I think

1    about six months after he was released.

2         **MR. SAVERY:**  And if I could clarify this, Your

3    Honor.

4    BY MR. SAVERY

5    **Q.**  Were you referring to a chronology when you noted that

6    there is an inconsistency in dates?

7    **A.**  Yes.

8         **MR. SAVERY:**  And, Your Honor, I'll represent to the

9    Court that this is a chronology that the government has

10   prepared and that is going in by stipulation, although the

11   defense wants an opportunity to review it again.  We've

12   communicated back and forth on this over the last few days.

13   But it does appear that there is an incorrect date in his

14   chronology.  And I'm happy to replace it with an accurate

15   chronology, you know, if that's the appropriate course.

16        In all events the defense --

17        **THE COURT:**  Well, why don't you see if you can

18   agree on a course of action.  If you can't, then bring it to

19   my attention and I will try to solve the problem.  Okay.

20        **MR. SAVERY:**  Okay.  Thank you, Your Honor.

21   BY MR. SAVERY

22   **Q.**  So, Dr. Salter, can you reiterate for us when it was

23   that he was released from prison for his first, on his first

24   offense?

25   **A.**  I believe he was released in January of '75 and

1   reoffended in July of '75.

2   **Q.**  Okay.  And he was released on parole?

3   **A.**  Yes.

4   **Q.**  Okay.  And how long after that release then was he next

5   arrested for a sexual offense?

6   **A.**  July.

7   **Q.**  Six months?

8   **A.**  Yes.

9   **Q.**  Okay.

10  **A.**  July 2nd of '75 he committed his second offense.

11  **Q.**  And was he still on parole at that time?

12  **A.**  He was.

13  **Q.**  And what was the second offense?

14  **A.**  A pregnant woman was walking on a towpath near a place

15  called Fletcher's Boathouse.  She was a stranger and was

16  assaulted by Mr. Graham.  I cannot find any records that

17  give the details of this offense so all we know is that she

18  called the police and reported being assaulted and described

19  his clothes in great detail.  And he was arrested on,

20  essentially near that place and convicted of assault with

21  intent to commit rape.

22  **Q.**  Okay.  If you could quickly turn to Exhibit 13.

23  Specifically to page 410 of that exhibit.

24  **A.**  Okay.

25  **Q.**  Going into 411.

1    **A.**   Yes.

2    **Q.**   Is that a United States Park Police Report?

3    **A.**   Yes.

4    **Q.**   And does that concern this offense?

5    **A.**   Yes.

6    **Q.**   Did you rely on that report?

7    **A.**   Yes.

8    **Q.**   If you would turn to the next exhibit, please, Exhibit

9    14, are those documents that relate to this offense as well?

10   **A.**   Yes.

11   **Q.**   Okay.  And did you rely on them?

12   **A.**   Yes.

13   **Q.**   And if you would now turn to Exhibit 17 which

14   unfortunately is in your second binder.

15           If you'd turn to page 807.

16   **A.**   Yes.

17   **Q.**   What's that document?

18   **A.**   A Presentence Report.

19   **Q.**   Okay.  Could you turn to page 808, please.  I'm going to

20   put an image of this up on the overhead.

21   **A.**   Okay.

22   **Q.**   If you could read the first two sentences in this page.

23   **A.**   "The defendant Wesley Graham was originally charged in a

24   grand jury indictment with assault with intent to rape."

25   **Q.**   Could you read the next sentence, please.

1    **A.**   "On March 23, 1976 the defendant entered a plea of

2    guilty to assault with intent to rape."

3    **Q.**   And finally could you read the paragraph beginning with

4    "according to."

5    **A.**   "According to the statement of facts submitted by the

6    Metropolitan Police Department, at approximately 1534 hours,

7    a police officer was informed by the dispatcher of an

8    assault that had occurred on the C&O Canal towpath,

9    one-quarter mile east of Fletcher's Boat House.  A

10   description was issued as follows:  'A negro/male, five ten

11   to five eleven, 180 pounds, white T shirt worn about the

12   head, bluejeans with light-colored stitches down the sides

13   of his pants and black criss-cross sandals.'  At

14   approximately 1613 hours a search was made of the M and

15   Grace Streets area where an individual fitting the

16   description was observed.  The individual was approached as

17   he was attempting to enter a Lincoln with D.C. registration

18   316-764 in the vicinity of Potomac and Gray Street, N.W."

19   **Q.**   Okay.  Thank you.

20           Could you flip forward three pages, please, to page

21   811.

22   **A.**   Okay.

23   **Q.**   And down the bottom do you see an "Evaluative Summary"?

24   **A.**   Yes.

25   **Q.**   Could you read the second paragraph of that, please.

1   **A.**   "The complainant, an eight-months pregnant woman, has

2   presented this writer with a detailed description of the

3   alleged attack on her by the defendant.  As noted before,

4   this statement is attached to this report."

5   **Q.**   Okay.  Now, have you ever seen this victim statement?

6   **A.**   No, I could not find it in any other records.

7   **Q.**   Thank you.

8           Now, was Mr. Graham convicted of assault with

9   intent to rape?

10  **A.**   He was.

11  **Q.**   Could you turn quickly to Exhibit 14, please, page 415.

12          And is that a copy of the judgment and commitment

13  order for that charge of assault with intent to commit rape?

14  **A.**   Yes.

15  **Q.**   Okay.  And what was his sentence?

16  **A.**   His sentence at the time was 4 to 12 years

17  incarceration.

18  **Q.**   Okay.  Now, during this incarceration was psychotherapy

19  recommended for Mr. Graham?

20  **A.**   Yes.

21  **Q.**   And did that include to your knowledge some sort of sex

22  offender treatment?

23  **A.**   I don't think there are any details about what it

24  included.  I am not sure there was sex offender treatment at

25  that time.

1    **Q.**   Okay.  Did Mr. Graham attend psychotherapy?

2    **A.**   I believe he attended for a period of time but did not

3    make progress and eventually he and the program agreed to

4    terminate.

5    **Q.**   Okay.  And how much of his 4- to 12-year sentence did

6    Mr. Graham serve?

7    **A.**   He was released in 1982 which was six years later.

8    **Q.**   And what was the nature of his release at that time?

9    **A.**   He was placed on parole.

10   **Q.**   Now, following his release was Mr. Graham convicted of

11   any crimes?

12   **A.**   Yes.

13   **Q.**   Can you explain that?

14   **A.**   In May of 1985 he was found guilty of operating under

15   the influence and on December 5th of 1985 he was convicted

16   of one count of battery arising out of a June '85 incident

17   with his then girlfriend and her two daughters.

18   **Q.**   Okay.  Now --

19   **A.**   There was actually several incidents involved in that,

20   however.

21   **Q.**   Okay.  Have you seen arrest records associated with that

22   series of incidents?

23   **A.**   Yes.

24   **Q.**   That is, the battery charge for which he was ultimately

25   convicted in late 1985?

1    **A.**   Yes.

2    **Q.**   And did you rely on information from those records in

3    reaching your opinions in this case?

4    **A.**   Yes.

5    **Q.**   And are they the type of records and do they contain the

6    type of information which an expert psychologist would use

7    in rendering a diagnosis and in reaching an opinion as to

8    sexual dangerousness?

9    **A.**   Yes.

10   **Q.**   If you could turn to Exhibit A for identification.

11           That is at the end of the second binder.

12           And if you could flip through that exhibit.   Are

13   these the documents you were referring to?

14   **A.**   Yes.

15   **Q.**   Okay.   I'd like to turn your attention to page 892.

16           **THE COURT:**   Excuse me just one second.

17           **MR. SAVERY:**   Sure.

18           (Pause in proceedings.)

19           **THE COURT:**   Go ahead.

20           **MR. GOLD:**   Your Honor, we are going to object to

21   the introduction of these records.   These records were the

22   subject of a motion we filed in limine.   The police reports

23   pertained to offenses which did not --

24           **THE COURT:**   Did I rule on the motion in limine?   I

25   don't remember.

1          **MR. GOLD:**  As far as I am aware you have not.

2          **MR. SINNIS:**  You without prejudice denied it.

3          **MR. GOLD:**  Oh, denied without prejudice to us

4    renewing it at this moment.

5          **THE COURT:**  At this moment, okay.  And your

6    objection is what?

7          **MR. GOLD:**  That the police reports here are

8    unreliable hearsay essentially.  They are not validated by

9    conviction or any other indicia that would lend them any

10   reliability.

11         **THE COURT:**  What do you say?

12         **MR. SAVERY:**  Well, I say with respect to one of the

13   reports, Your Honor, there was a conviction that resulted.

14         With respect to the other, to the extent the expert

15   relied on these, you know, they can come in.  We don't have

16   a jury here so Rule 703 wouldn't prevent them from being

17   disclosed to the court.

18         Frankly, Your Honor is in a position to determine

19   how much weight to give any of the evidence that comes in in

20   this proceeding.

21         **THE COURT:**  I am going to sustain the objection

22   though.  Let's have the record clear.  So I will sustain the

23   objection.  I will allow the motion in limine.

24         **MR. GOLD:**  Thank you, Your Honor.

25         **MR. SAVERY:**  Your Honor, to the extent she's

1    relying on this, may she testify --

2              **THE COURT:**  Oh, yes.

3         **MR. SAVERY:**  -- without the records coming in?

4         **THE COURT:**  She can rely on all kinds of material

5    that is not evidence in the case.  As long as she testifies

6    that it is the type of information that experts reasonably

7    rely on.

8         **MR. SAVERY:**  Okay.  Just so I'm clear, the

9    objection has been sustained as to these documents coming in

10   as evidence?

11             **THE COURT:**  As evidence.  She can use them as part

12   of her opinion.  If I let them come in as evidence, whatever

13   they say is then evidence in the case for all purposes and

14   that is not what I want.

15        **MR. SAVERY:**  Okay.

16        **THE COURT:**  Why don't you go ahead and just ask

17   questions and let's see if you make it where you want to

18   get.

19        **MR. SAVERY:**  Okay.  Sounds good.

20   BY MR. SAVERY

21   **Q.**  If you'd turn, please, to page 893 rather than 892.

22             **MR. GOLD:**  Your Honor, our objection -- the witness

23   may testify as to her opinion and records that she reviewed;

24   but we would object to the display of this information that

25   is not coming into evidence to the witness in this fashion.

1    She could --

2         **THE COURT:**  I mean, she has already looked at this

3    material I take it and it is part of her opinion.  I don't

4    understand what you are saying.

5         **MR. GOLD:**  Well, that it's -- my concern I suppose

6    is coming from the concern that this is material that is not

7    going to be in front of the trier of fact and here it is

8    being displayed to the trier of fact during the course of

9    the witness's testimony.

10        **THE COURT:**  Well, in a jury-waived trial, you know,

11   no matter what happens, the trier of fact has to see the

12   document if for no other reason than to agree with you that

13   it should be sustained.  But the trier of fact always sees

14   the document unless you can figure out a way that I can do

15   it without seeing it.

16        **MR. GOLD:**  Well, I am going to sit down.

17        (Laughter.)

18        **THE COURT:**  Okay.

19   BY MR. SAVERY

20   **Q.**  Dr. Salter, does this first document concern a charge

21   No. 610063E6?

22   **A.**  Yes.

23   **Q.**  Okay.  And do the following two pages concern that same

24   charge number?

25   **A.**  Yes.

1    **Q.**  And can you tell us briefly what this charge concerned?

2    **A.**  This is a description or a charge of assault by the

3    daughter of the woman that Mr. Graham was living with.  She

4    describes being at the residence of her mother when

5    Mr. Graham tried to hit her mother.  She got in between them

6    to prevent her mother from being assaulted.  He grabbed the

7    daughter and started choking her.  And he dragged her from

8    the kitchen into the living room, pinned her down and began

9    to choke her again.  Her four-year old was witnessing this

10   assault and she managed to free herself and leave the

11   apartment.

12   **Q.**  And is this a description of events that you relied on

13   in your analysis of this case?

14   **A.**  Yes, arrest records are commonly relied on by experts.

15   **Q.**  Thank you.  I'd like you to turn to, flip forward three

16   more pages.

17        And does this next report concern a charge numbered

18   610064EO?

19   **A.**  Yes.

20   **Q.**  And, again, if you'd flip through the next few pages, do

21   those documents as well concern that same charge?

22   **A.**  Yes.

23   **Q.**  Can you tell us what this charge concerned?

24   **A.**  This is another assault on a daughter.  She describes

25   that she was home taking care of her mother who had recently

1    had a hysterectomy and was confined to bed.

2           **THE COURT:**  Different charges, different day, a

3    different event?

4           **THE WITNESS:**  Yes, that's correct.

5           **THE COURT:**  Okay.

6           **THE WITNESS:**  Different event.

7           Okay.  She -- Mr. Graham came in from work and

8    started shouting at her mother and pushing her, cursing her

9    mother and pushing her.  It's really hard to read the next

10   word, conservatively I think it says, he locked her in the

11   bedroom.  She went nextdoor and called the police twice but

12   each time Mr. Graham was able to give the appearance that

13   nothing was wrong and nothing was happening so the police

14   did not remove him.  Immediately after the police left he

15   was very angry because she had called the police.  He

16   started cursing her mother, pushing her and pushing her.  He

17   started calling the daughter a bitch, mother fucker and

18   various other profane words.  He told me if I didn't leave

19   the house, he would kill me.  And then he punched her

20   against the door.  He then said that he would knock all my

21   teeth down my throat if I didn't leave.

22          So she became very fearful and left.

23   **Q.**  Okay.  If you flip forward two pages, Dr. Salter, page

24   900, is that an arrest warrant?

25   **A.**  Yes.

1    **Q.**  And what is the date on that arrest warrant as best you

2    can tell?

3    **A.**  The arrest warrant is 6/19/85, that is, June of '85.

4    **Q.**  Okay.  So it was June of '85 that he was arrested on

5    this charge?

6    **A.**  Yes.

7    **Q.**  Now, was he arrested on all three of the charges on that

8    same date?

9    **A.**  I believe he was arrested on that date but it didn't all

10   occur on that date.

11   **Q.**  Okay.  So let's step back for just a minute.  The charge

12   that you just discussed which is addressed on pages 897, 898

13   and 899, when was that conduct allegedly carried out?

14   **A.**  May 17th, about a month earlier.

15   **Q.**  Of 1985?

16   **A.**  Of 1985.

17   **Q.**  Okay.  And if you can flip back for just a minute to the

18   first charge you addressed, did this first charge involve

19   the choking of one of the adult daughters according to the

20   documents?

21   **A.**  Yes.

22   **Q.**  Okay.  And when did that occur according to these

23   documents?

24   **A.**  I remember it as being August but I am looking for the

25   exact date here.

1    **Q.**  If you look at page 894.

2    **A.**  Right.  August, that's right.

3    **Q.**  And that's August of 1984?

4    **A.**  That's right.

5    **Q.**  Okay.  So that's ten months before the charge was

6    actually brought; right?

7    **A.**  That's right.

8    **Q.**  Okay.  So the first one we've got now alleged conduct

9    ten months before the charge is brought; right?

10   **A.**  Right.

11   **Q.**  The second one we've got the conduct occurring in May of

12   '85 which is a few weeks before his arrest?

13   **A.**  Yes.

14   **Q.**  Now, let's turn to the third one.  And if you'd turn to

15   page 902.  Does page 902 concern a charge No. 610062E5?

16   **A.**  Yes.

17   **Q.**  Okay.  And do the next several pages relate to that

18   charge as well?

19   **A.**  Yes.

20   **Q.**  Now, when did this event allegedly take place, or the

21   events that these documents concern, when did they take

22   place?  According to the document?

23   **A.**  I remember it was in June, 6/14, 6/14/85.

24   **Q.**  So June 14 of 1985; right?

25   **A.**  Yes.

1    **Q.**  And when was the arrest warrant issued?  Did you say it

2    was June 19th?

3    **A.**  I believe it was the 18th or the 19th.  Let's see

4    exactly.

5    **Q.**  It looks like 18 on page 905.

6    **A.**  It says 18, 19.  I don't know what that means.

7    **Q.**  Okay.  In any event, somewhere three or four days prior

8    to the arrest is when this alleged incident took place; is

9    that right?

10   **A.**  Yes.

11   **Q.**  Okay.  Can you tell us briefly what this incident

12   involved?

13   **A.**  This incident has to do with his taking his, first of

14   all, taking his girlfriend's car and then telling her that

15   it was stolen.  There was a dispute about the car.  And then

16   he assaulted the girlfriend.  And specifically what she says

17   was, He took the vehicle without authority, therefore

18   leaving the owner without transportation.  She called him at

19   work.  Let's see.

20        On Friday the defendant reported the victim's

21   vehicle stolen to the District Police.  However, all the

22   information given was incorrect.  She thought someone else

23   stole it.  The owner told the police that the defendant had

24   stolen her car but the defendant fabricated another story.

25   After the owner and defendant were back at the owner's

1   address, the police were called to verify information

2   concerning his name and address.  And while the owner was

3   speaking, the defendant slapped her and hung up the phone.

4   He then called the police back and said the phone went dead.

5   On Saturday morning the defendant assaulted her again,

6   slapping and kicking her on the bed and forced her to have

7   sexual relations even though she had been given instructions

8   due to medical surgery by her doctor not to have relations

9   for two to three months.  She told him this.  However, he

10  told her that if she did not comply, she would be sorry.  He

11  pushed her again.

12  **Q.**  Okay.  Thank you.

13          Now, if you'd turn to page 889, have you seen this

14  document before?

15  **A.**  Yes.

16  **Q.**  And is this a memorandum issued in the Department of

17  Corrections?

18  **A.**  Yes.

19  **Q.**  Does this concern the three battery charges?

20  **A.**  Yes.

21  **Q.**  And I'd like to turn your attention to the second page,

22  that's page 890.  And specifically to the paragraph down at

23  the bottom that begins, "Immediately upon his release."

24  **A.**  Yes.

25  **Q.**  Okay.  Can you read that for us?

1    **A.**  "Immediately upon his release, he reported to this

2    writer, he states there have been times when he and Mrs. P.

3    have argued but denies the severity of her allegations

4    against him.  It should be noted that the alleged incident

5    took place approximately ten months ago.  It would appear

6    she is reacting to the loss of her automobile and is

7    distressed over his admitted involvement with other women."

8    **Q.**  Okay.  When was the loss of the automobile in proximity

9    to the date of arrest?

10   **A.**  The loss of the automobile I believe was in, it was a

11   few days earlier in June.

12   **Q.**  A few days prior?

13   **A.**  Yes.

14   **Q.**  So when this refers to an incident taking place ten

15   months ago --

16   **A.**  Right.

17   **Q.**  -- is this correct insofar as it refers to the

18   battery --

19           **MR. GOLD:**  Objection, Your Honor.

20   **A.**  -- on Mary P.?

21           **MR. GOLD:**  The documents --

22           **THE COURT:**  Yes, I will sustain the objection.

23           **MR. SAVERY:**  Okay.

24   BY MR. SAVERY

25   **Q.**  In any event, the first battery that you addressed

1    occurred ten months prior; is that right?

2    **A.**   Yes.

3    **Q.**   The second battery occurred three, four weeks prior?

4    **A.**   Yes.

5         **MR. GOLD:**   Objection, Your Honor.

6         **THE COURT:**   I will let him do it.   Go ahead.

7    BY MR. SAVERY

8    **Q.**   And the battery involving Mrs. P. and the force of sex,

9    that occurred several days before the arrest?

10   **A.**   It occurred several days before the arrest, yes.

11   **Q.**   Thank you.

12        Now, was Mr. Graham convicted of any of these three

13   battery charges?

14   **A.**   He was convicted of one of these assaults.

15   **Q.**   Okay.   I'd like you to turn to Exhibit 18, please.

16        And do you recognize these as documents you

17   reviewed in the course of your work in this case?

18   **A.**   Yes.

19   **Q.**   Are they certified records of the District Court of

20   Maryland?

21   **A.**   Yes.

22   **Q.**   Do they concern the three battery charges that we've

23   discussed?

24   **A.**   Yes.

25   **Q.**   And what did they tell us regarding the disposition of

1    those battery charges?

2          You can start with page 941.

3    **A.**  On 941 it says is that one battery was NP, nolle

4    prossed.

5    **Q.**  Okay.  And is that referring to case No. 610062E5?

6    **A.**  Yes.

7    **Q.**  Okay.  If you'd turn to page 944.  Does that concern

8    case No. 610036E6?

9    **A.**  Yes.

10   **Q.**  And what was the disposition in that case?

11   **A.**  Nolle prossed.

12   **Q.**  Finally, page 946, does that concern charge

13   No. 610064E0?

14   **A.**  Yes.

15   **Q.**  And what is the disposition noted?

16   **A.**  Guilty.

17   **Q.**  And is it your understanding that -- well, strike that.

18          Which charge do you understand the guilty

19   disposition to relate to?

20   **A.**  I believe it was the choking.

21   **Q.**  Of one of the children?

22   **A.**  The choking.

23   **Q.**  The choking?

24   **A.**  That's what I believe.

25   **Q.**  Now, are you aware of any drug testing conducted of

1    Mr. Graham while he was out on parole?

2    **A.**  Yes, he was drug tested.  He flunked at least I believe

3    two.

4    **Q.**  And what were those two drug tests positive for?

5    **A.**  Marijuana and PCP on two different occasions.

6    **Q.**  Okay.  Now, how old was Mr. Graham at this point?

7    **A.**  Let my amend my answer.  He apparently had flunked three

8    times, one on 1/17/86 and one on 3/7/86.  Both of those were

9    for marijuana and one in April for PCP.

10   **Q.**  Okay.  And all these occurred in early 1986?

11   **A.**  Yes.

12   **Q.**  Okay.  And how old was Mr. Graham at the time?

13   **A.**  36.

14            **THE COURT:**  Okay.  Let's take a five-minute break.

15   Okay.

16            **MR. SAVERY:**  Sure, Your Honor.  Thank you.

17            (Recess.)

18            **THE CLERK:**  All rise for the Honorable Court.

19            (Pause in proceedings.)

20            **THE COURT:**  Take your time.  No rush.

21            **MR. SINNIS:**  Sorry, Your Honor.

22            **THE COURT:**  That is all right.

23            Everybody back?

24            **MR. SAVERY:**  I believe so.

25            **THE COURT:**  Okay.  We will employ the buddy system,

1    the person -- remember when you were in camp?

2            (Laughter.)

3            **THE COURT:**  All right.  Sit down, everybody.

4            Go ahead.

5            **MR. SAVERY:**  Thank you, Your Honor.

6                    <u>**ANNA CAROL SALTER, Resumed**</u>

7                    <u>**DIRECT EXAMINATION, (Cont'd.)**</u>

8    BY MR. SAVERY

9    **Q.**  Now, after Mr. Graham tested positive for marijuana and

10   PCP, at some point did he stop reporting to his probation

11   officer?

12   **A.**  Yes, he did.

13           **THE COURT:**  Did he stop or start?

14           **MR. SAVERY:**  Stop.

15           **THE COURT:**  Stop.

16   **A.**  He stopped.

17   **Q.**  Okay.  Can you tell us about that?

18   **A.**  He quit contacting his probation officer.

19   **Q.**  Okay.  And do you recall when that was?

20   **A.**  I don't have it in front of me.  I believe it's --

21   **Q.**  Okay.

22           **MR. SINNIS:**  Can I just ask the witness to keep her

23   voice up.  I'm having a little difficulty --

24           **THE WITNESS:**  I'm sorry.

25           **THE COURT:**  You know, I was going to ask her too.

1    Just try to speak a little louder, please.

2              **THE WITNESS:**  Yes.

3    BY MR. SAVERY

4    **Q.**  Would you turn to Exhibit 17, page 818.

5              I'm going to put this up on the screen.  So if

6    you'd turn now to page 819.  In fact, you can look up on the

7    screen for it.

8              First off, do you recognize this document as one

9    that you reviewed?

10   **A.**  Yes, I do.

11   **Q.**  And does this contain a recommendation of a case

12   analyst?

13   **A.**  Yes.

14   **Q.**  And if you refer down to the bottom of the page, do you

15   see a paragraph beginning, "Subject failed to maintain"?

16   **A.**  Yes.

17   **Q.**  Can you read that, please?

18   **A.**  "Subject failed to maintain contact with his supervision

19   officer shortly after being advised that the parole

20   violation warrant had been issued by the D.C. Parole Board.

21   Subject's last contact with his officer was on 6/2/86.

22   There was no additional contact made between 6/2/86 and his

23   arrest on 5/27/87."

24   **Q.**  Okay.

25             **THE COURT:**  This is the Parole Board document; is

1     that what it is?

2              **MR. SAVERY:**  It is, Your Honor.

3              **THE COURT:**  Okay.

4     BY MR. SAVERY

5     **Q.**  Now, at some point did Mr. Graham commit another sexual

6     offense?

7     **A.**  He did.

8     **Q.**  And when did that occur?

9     **A.**  It occurred in 1987 on 5/24.

10    **Q.**  Okay.  I'll ask you to turn to Exhibit 16 at page 512.

11             Is this a court record that you relied on?

12    **A.**  Yes.

13    **Q.**  If you'd turn to the next page, I'm going to put this up

14    on the projector but it's difficult to read.

15             I'll ask you to do your best and read through the

16    fact section.

17    **A.**  "The victim testified that on May 24, 1987 at eight a.m.

18    she had been working in her garden adjacent to her residence

19    for over an hour when appellant approached her from the

20    sidewalk.  Appellant stepped onto the victim's patio and

21    engaged her in a brief neighborly type conversation.  The

22    victim brought the conversation to a close and went inside

23    her residence and closed the screen door.  It could not be

24    locked.  The victim saw that appellant had left the patio

25    and had returned to the picnic area nearby.  While the

 1    victim was listening to the audio of a videotape, appellant

 2    again appeared at the screen door and presented her with a

 3    plant.  She thanked him and again said that she had to go

 4    inside.  At approximately 11 a.m. the victim saw the

 5    appellant again standing at her screen door with his right

 6    hand gloved and his left hand pressed against the glass.  It

 7    was then that she became apprehensive.  Despite the victim's

 8    protest, appellant pushed his way into her condominium,

 9    asserting that he wanted to see the plant he had given her.

10    When the victim screamed, appellant placed his gloved hand

11    over her throat and grabbed her into the living room.

12    Although the victim initially struggled to free herself, she

13    stopped when appellant threatened to kill her.  Appellant

14    then choked the victim until she passed out telling her, 'I

15    have just got to put you out for a while.'  When the victim

16    regained consciousness and attempted to stand, appellant

17    choked her again.  The victim twisted her body so that she

18    could kick the door.  She stopped when appellant again

19    threatened to kill her.  For the second time the appellant

20    choked the victim into unconsciousness.  Before the

21    appellant initiated sexual intercourse with her, the victim

22    requested that he be gentle because she had not had

23    intercourse for about four months.  After the act was

24    completed, the appellant warned the victim that no one would

25    believe her if she reported because --" I'm sorry.

1  **Q.**  Okay.  Does it appear, "There was no sign of forced

2  entry"?

3  **A.**  Yes, "Because there was no sign of forced entry.  Then

4  victim requested a glass of tea and appellant helped her up

5  because she was too weak to stand.

6  "At approximately 11:30 a.m. appellant outstretched

7  his hand to guide the victim to a bedroom, stated that he

8  wanted to make love to her in her bed.  The second act of

9  intercourse occurred in the bedroom.  Afterwards there was

10  some conversation wherein the appellant requested the

11  victim's telephone number which she gave to him.  The victim

12  thanked him for not killing her.

13  **Q.**  Okay.  Thank you.

14  And just for purposes of the record here, at page

15  512, I am showing you now what's been numbered page 512.

16  And that was the first page of this document; is that right?

17  **A.**  Yes, it was.

18  **Q.**  And is that an Unreported Decision of the Special

19  Appeals of Maryland?

20  **A.**  Yes.

21  **Q.**  Thank you.

22  Now, if you'd turn to Exhibit 17.  I'm sorry we're

23  jumping around a little bit here.  At page 793.

24  Could you tell us what that document is?

25  **A.**  That document is a Presentence Investigation.

1   **Q.**  Okay.  Does that contain at page 793 a description of

2   the events relating to this offense?

3   **A.**  Yes.

4   **Q.**  And did you -- the prior description of events, is that

5   something you relied on in this case?

6   **A.**  Yes.

7   **Q.**  The one that you read into the record?

8   **A.**  Yes.

9   **Q.**  Is this as well?

10   **A.**  Yes.

11   **Q.**  Okay.  And if you'd turn to the same exhibit, page 800.

12   Does that likewise contain additional information concerning

13   the events here?

14   **A.**  Yes.

15   **Q.**  And did you rely on that as well?

16   **A.**  Yes.

17   **Q.**  How many times does it say she was strangled in this

18   description?

19   **A.**  Three times.

20   **Q.**  And, again, if you'd turn to Page 869 to 870, is this

21   yet another document on which you relied that relates some

22   of the facts associated with this incident?

23   **A.**  Yes.

24   **Q.**  Now, at the time of this offense how old was Mr. Graham?

25   **A.**  Mr. Graham was 37.

1  **Q.**  And was Mr. Graham on parole?

2  **A.**  I believe he was, yes.

3  **Q.**  Was he on parole at the time?

4  **A.**  Yes.

5  **Q.**  And was Mr. Graham prosecuted for this offense?

6  **A.**  Yes, he was.

7  **Q.**  If you'd turn to Exhibit 16.  Actually I'll put this up

8  on the overhead.  This is at Page 577 of Exhibit 16.

9        And is this one of the court records that you

10  reviewed in connection with your work in this case?

11  **A.**  Yes.

12  **Q.**  Is it one of the records you relied on?

13  **A.**  Yes.

14  **Q.**  And does this address the verdict --

15  **A.**  Yes.

16  **Q.**  -- and the prosecution?

17        And was he found guilty?

18  **A.**  He was found guilty.

19  **Q.**  And what was the sentence that was imposed?

20  **A.**  He was sentenced to 25 years on one count, I believe 25

21  years on another concurrent and 5 years but that was merged

22  with one of the other counts.

23  **Q.**  Okay.  And was Mr. Graham thereafter incarcerated?

24  **A.**  He was.

25  **Q.**  And how much of his 25-year sentence did he serve out?

1   **A.**  Let's see, I think it was 2003 so it was from 1986 to

2   2003, so that would be fifteen.

3   **Q.**  Is that 16, 17 years, that range?

4   **A.**  17 years actually.

5   **Q.**  And what happened then?

6   **A.**  Well, he was detained by the Federal Parole Commission

7   because he, his parole had been revoked for the previous

8   sexual assault.

9   **Q.**  Okay.  And I am referring now to page 825 of Exhibit 17.

10  Is this a document that you reviewed?

11  **A.**  Yes.

12  **Q.**  Is it a Parole Commission Notice of Action?

13  **A.**  Yes.

14  **Q.**  Dated May 6, 2004?

15  **A.**  Yes.

16  **Q.**  Can you read for us the findings of fact.

17  **A.**  "The Commission finds as a fact that you violated

18  conditions of release as charged as indicated below:  Charge

19  No. one, law violation, rape.  Basis for the above stated

20  findings:  Your admission and your conviction in Maryland in

21  1987."

22  **Q.**  Okay.  And if we go down to the "Reasons" section on

23  this report.  Could you read to us the text beginning,

24  "After review --"

25  **A.**  "After review of all relevant factors and information, a

1    decision above the guidelines is warranted because you are a

2    more serious risk than indicated by your salient factor

3    score in that the current parole violation includes a

4    conviction for rape.  This is the third time you have been

5    convicted of rape or attempted rape and two of these

6    occurred while under supervision.  You remain a serious risk

7    to commit further sex offenses once released again to the

8    community."

9    **Q.**   Okay.  Has Mr. Graham participated in sex offender

10   treatment since being incarcerated for his last offense?

11   **A.**   Not to my knowledge, no.

12   **Q.**   I'd like you to turn to Exhibit 7, please.  Is that a

13   document that you reviewed in this case?

14   **A.**   Yes.

15   **Q.**   And you considered it in connection with your assessment

16   in this case?

17   **A.**   Yes.

18   **Q.**   Can you describe this document?

19   **A.**   This is a Federal Bureau of Prisons Psychology Data

20   System.

21   **Q.**   Is this dated 6/13/06?

22   **A.**   Yes, it is.

23   **Q.**   Can you read the body of the document beginning with, "I

24   have reviewed this inmate's."

25   **A.**   "I have reviewed this inmate's psychology file and

1    SENTRY files.  He was recommended for both drug treatment

2    and sex offender treatment but has declined participation in

3    both.  He has a history of heroin and cannabis dependence,

4    and tested positive for PCP in the year he was convicted of

5    his third rape.  The likelihood of reoffense without a

6    willingness to rehab on his part is very high.  I am

7    recommending that the unit team meet with him and recommend

8    him for the drug education program and NA," Narcotics

9    Anonymous I would assume, "on Fridays.  If he successfully

10   completes drug education, I would recommend him for a

11   shorter period of CCC (one month) provided he agrees to

12   attend substance treatment while in CCC."

13   **Q.**  Okay.

14          **THE COURT:**  What is CCC?

15          **THE WITNESS:**  I don't know.

16   BY MR. SAVERY

17   **Q.**  Are you aware whether Mr. Graham participated in

18   any drug program?

19   **A.**  I did not.

20          **THE COURT:**  Did you read the report before you

21   testified today?

22          **THE WITNESS:**  Yes, sir.

23          **THE COURT:**  And when you came across CCC, reading

24   it, did it --

25          **THE WITNESS:**  Well, the important thing about the

1     report to me --

2             **THE COURT:**  No, you can listen to my question.

3             **THE WITNESS:**  I'm sorry.

4             **THE COURT:**  Did you consider it important to know

5     what CCC meant?

6             **THE WITNESS:**  No, sir.

7             **THE COURT:**  Okay.

8     BY MR. SAVERY

9     **Q.**  Are you familiar with community correction programs?

10    **A.**  Yes.

11    **Q.**  And what are those?

12    **A.**  Well, those are typically some kind of aftercare program

13    and they differ from place to place but they have the same

14    general structure.  The important point was he was offered a

15    chance to have a shorter aftercare period in exchange for

16    treatment and he declined.

17    **Q.**  Now, is it your understanding that Mr. Graham was due to

18    be released at the time these proceedings began --

19    **A.**  Yes.

20    **Q.**  -- in this case?

21            Would there have been any conditions on his release

22    to your knowledge?

23    **A.**  To my knowledge, no.

24    **Q.**  Prior to his release date was he evaluated by a staff

25    psychologist with the Bureau of Prisons?

1    **A.**  He was.

2    **Q.**  And who was that?

3    **A.**  I'd have to look at the name, Monica.

4    **Q.**  Okay.  If you can turn to Exhibit 5.

5    **A.**  The certification was done by Monica Ferraro.

6    **Q.**  And is it your understanding that Dr. Ferraro

7    interviewed Mr. Graham?

8    **A.**  Yes.

9    **Q.**  And did she record his comments and conclusions in her

10   report?

11   **A.**  Yes.

12   **Q.**  And did you rely on the contents of this report in

13   connection with your work in this case?

14   **A.**  Yes.

15   **Q.**  And what does Dr. Ferraro conclude in terms of

16   Mr. Graham's risk of reoffense?

17   **A.**  She concluded high risk.

18   **Q.**  Okay.  I'd like to turn now, Dr. Salter, to your own

19   opinions.  And based on your education and experience and

20   your review of the materials provided to you, have you

21   reached an opinion to a reasonable degree of professional

22   certainty as to whether Mr. Graham engaged or attempted to

23   engage in sexually violent conduct?

24   **A.**  Yes.

25   **Q.**  What is your opinion?

1    **A.**   The record is clear that he's been convicted of three

2    rapes or two rapes and assault with the intent to commit

3    rape.

4    **Q.**   Okay.  And have you reached an opinion to a reasonable

5    degree of professional certainty that Mr. Graham suffers

6    form a serious mental illness, abnormality or disorder?

7    **A.**   Yes.

8    **Q.**   And what is your opinion?

9    **A.**   He does.

10   **Q.**   And which mental illness, abnormality or disorder is he

11   suffering from?

12   **A.**   Paraphilia NOS and Antisocial Personality Disorder.

13   **Q.**   Could you please turn to Exhibit 20.

14        What does Exhibit 20 contain?

15   **A.**   It's the *Diagnostic and Statistical*, a section from the

16   *Diagnostic and Statistical Manual of Mental Disorders*,

17   *Fourth Edition, Text Revision, DSM-IV-TR.*

18   **Q.**   And what is the DSM-IV-TR?

19   **A.**   The DSM-IV-TR4 is the latest edition of the *Diagnostic*

20   *and Statistical Manual* published by the American Psychiatric

21   Association.  It is the only classification system that is

22   used to assess diagnoses in this country.  And it's accepted

23   everywhere in terms of hospitals, court systems, mental

24   health facilities and insurance agencies.  To my knowledge

25   there is no other system that is currently in use in this

1    country.

2    **Q.**   Okay.  Let's turn to Antisocial Personality Disorder.

3    What is Antisocial Personality Disorder?

4    **A.**   It's a pervasive pattern for and violation of the rights

5    of others.  It also has personality features associated with

6    it.

7    **Q.**   Okay.  And did you apply criteria from the DSM for

8    Antisocial Personality Disorder?

9    **A.**   I did.  The way diagnoses works is that for many of them

10   they list specific criteria and they even list how many of

11   these criteria that you have to have to make the diagnosis.

12   **Q.**   Okay.  And are those criteria identified on page 706 of

13   Exhibit 20?

14   **A.**   They are.

15   **Q.**   Okay.  And I have an image of that up on the screen.

16          Can you explain with reference to these criteria

17   why you determined that Mr. Graham should be diagnosed with

18   Antisocial Personality Disorder?

19   **A.**   I went down the criteria one by one and I looked at his

20   history and answered the question of whether or not he had

21   each of these criteria.  For example, in Section A you would

22   have to have, to meet this diagnosis you need to have three

23   or more of the following.

24          The first one is, "Failure to conform to social

25   norms with respect to lawful behaviors as indicated by

1    repeatedly performing acts that are grounds for arrest."

2        I don't think there is any question about whether

3    Mr. Graham has repeatedly been arrested.  He has three

4    rapes, two rapes and one attempt, assault with attempt to

5    commit rape, three OUIs and a battery among others on his

6    record.  So he clearly meets that criteria.

7        Criteria two is deceitfulness as evidenced by

8    repeated lying, use of aliases or conning others for

9    personal profit or pleasure.

10       Now, we don't have records, at least I don't, about

11   much of his personal life.  What we do have are the official

12   records of his offenses.  And we see that deceit was very

13   much a part of his offenses.  He offered one young woman a

14   ride home but instead of taking her home, he took her to a

15   remote location and raped her.

16       He chatted up with a stranger victim.  Then brought

17   her a plant and attempted entry into her house claiming that

18   he wanted to see the plant.

19       He has consistently and continues to deny and lie

20   about his sexual offenses.  Throughout his records he

21   maintained that the first offense was a vindictive report by

22   an ex-girlfriend when he said that he was getting married,

23   even though the medical evidence showed that she was full of

24   semen at the time.  It does not sound like anyone was -- and

25   he was convicted of the offense.

He has consistently said that he thought the last offense occurred because of a misinterpretation of signals even though it involved strangling her unconscious three times and threatening to kill her.

So he continues to deny these offenses.  He has continued to say that he did not commit the assault with intent to commit rape even though the victim was a stranger who certainly had no reason to make up anything about him. She described his clothes down to the last detail.

He denied to Dr. Mills that he ever injected heroin even though the records indicates otherwise.  He has claimed that he only raised a fist at a teacher when actually he was adjudicated for assault.  So I think there is a consistent pattern of deceit and deception on the record.

No. three, impulsivity or failure to plan ahead.  I did not score him either way on this item because I don't have information from the records.  Since he's denying offenses I don't have information about the extent to which he planned the offenses and I don't have sufficient information about his personal life outside the offenses.

Irritability and aggressiveness as indicated by repeated fights or assaults.  He has I believe four charges of battery as an adult, an assault adjudication as an adolescent.  His last rape was extremely violent.  And when you read the details of the domestic violence assaults for

1    one of which he was convicted of, you see a pattern of

2    aggressiveness and assaultive behavior that occurred over a

3    period of a number of months with several different victims

4    involved.

5            So I think the record is clear that he has a

6    history of assaultiveness in his past.

7            No. five -- at this point he's already met criteria

8    but he goes beyond meeting the minimum criteria -- reckless

9    disregard for safety or self or others.  If you strangle

10   someone unconscious three times, you certainly are

11   disregarding their safety.

12           His sexual assault against an eight-month pregnant

13   woman show a disregard for her safety and for the safety of

14   the fetus.

15           And his use of heroin and drugs show a disregard

16   for his own safety.

17           So the multiple assaults, I think it's hard to say

18   that he has not shown a disregard for the safety of other

19   people.

20           "Consistent irresponsibility as indicated by

21   repeated failure to sustain consistent work behavior or

22   honor financial obligations."  He certainly failed to --

23   what we know is that he failed to honor his parole

24   obligations by committing new sexual assaults on two

25   occasions and by failing his urine screen on three

1  occasions.

2         It's difficult to track his work history but he did

3  tell the presentence investigator that one job lasted for

4  three months.  And they were not able to actually find the

5  company.  He was fired from at least two jobs, one of which

6  he self-reported to Dr. Mills after he got into an argument

7  with the foreman.  There are records that he was fired from

8  a second job after being late to work.

9         Lack of remorse is indicated by being indifferent

10 or rationalizing having hurt, mistreated or stolen from

11 another.  I looked carefully in his records.  I have no

12 indication of any remorse anywhere in the history, the

13 17-year history of incarceration I see no expressions of

14 remorse for the behavior.

15        In fact, he continues to deny the behavior and he

16 can't express remorse for something that he said didn't

17 happen.

18 **Q.**  Now, in addition to Section A there, are there other

19 criteria that have to be satisfied?

20 **A.**  Yes.  He has to be 18 years old and he is.  There has to

21 be evidence of conduct disorder under the age of 15 and

22 there is.  He was arrested at 13 for truancy and

23 shoplifting.  And he said he went through a receiving home

24 for a couple of months for shoplifting.  And that really

25 doesn't occur if it's a first offense.

1           And, finally, that it has to, you can't make the

2       diagnosis if the person is acting out because he is

3       schizophrenic or psychotic in some way.  But he -- there is

4       no evidence and never has been that he has any major mental

5       illness or major psychotic illness such as schizophrenia.

6       **Q.**  Okay.  Thank you.

7           Is Antisocial Personality Disorder an Axis II

8       disorder in the DSM?

9       **A.**  It is an Axis II disorder.

10      **Q.**  Can you explain the concept of axes in the DSM?

11      **A.**  They divide the DSM into different axes.  Axis I is

12      referred to as the major mental illnesses.  Axis II are --

13      and they can be episodic.  Axis II consist of personality

14      disorders and the personality disorders are considered to be

15      pervasive traits, an enduring pattern of maladaptive

16      functioning that interferes with their ability to get along

17      with others and function in the world.

18      **Q.**  Okay.  What importance in your analysis in this case do

19      you place on the fact that Antisocial Personality Disorder

20      is an Axis II rather than an Axis I disorder?

21      **A.**  There is no real importance in a case like this.  It

22      just states that I am familiar with both axes.  So far as I

23      know all the states that have civil commitment, both Axis I

24      and Axis II diagnoses can be accepted because the

25      requirement is not typically related to which axis does this

1    fall into but does this lead to sexual offending.  Is there

2    a nexus between the diagnosis and sexual offending.

3        And they require typically that it be a mental

4    abnormality or disorder and Axis II disorders are fully

5    listed in DSM-IV as mental disorders.

6    **Q.**  Now, in your opinion is Antisocial Personality Disorder

7    as diagnosed in this case a serious mental disorder?

8    **A.**  Well, in this case it's serious.  As DSM-IV states

9    clearly, you don't assess seriousness by the category.  You

10   don't say this category is serious and that category is not

11   serious.  And I have a quote in my report that came straight

12   from the DSM-IV about that.

13       That across the categories people can be serious or

14   not serious within the same category.  Now, if someone's

15   Antisocial Personality Disorder is involved in and leads to

16   strangulation of someone for serious assault, then it is

17   going to fall into the serious end of the continuum.  And we

18   know that that's documented within DSM-IV because they have

19   a severity scale.  And the severity scale specifically lists

20   recurrent violence to others as the most severe part of the

21   scale.

22       They have a scale, a global functioning scale from

23   zero to a hundred.  And zero is the most serious, one

24   hundred is the least.  And if you look at zero to one, and I

25   have it in here if you want, zero to one what it says,

1    repeated violence to others is listed as extremely serious.

2    **Q.** Did you score Mr. Graham on that scale?

3    **A.** Yes.

4    **Q.** Okay.  And can you explain that?

5    **A.** Well, you look at the scale -- let me get this.

6          All right.  I looked at the scale.  One hundred

7    denotes superior functioning in a wide range of activities

8    and no symptoms.  The lowest function on the scale, which is

9    one to ten, is so severe that it includes, quote, persistent

10   inability to maintain personal hygiene or serious suicidal

11   act with clear expectation of death.  This lowest level also

12   includes, quote, persistent danger of severely hurting

13   himself or others (e.g., recurrent violence).

14         And that certainly applies to Mr. Graham.

15   **Q.** Are you aware whether Dr. Mills, the court-appointed

16   examiner in this case, also attempted to score Mr. Graham on

17   this scale?

18   **A.** I did.

19   **Q.** And --

20   **A.** I am aware.

21   **Q.** What was his score and what are your thoughts on that?

22   **A.** Well, he scored him at a 65.  But if you look at the

23   description of a 65, you see that a 65, the description,

24   quote, some mild symptoms, e.g, depressed mood or mild

25   insomnia or some difficulty in social, occupational or

1   school functioning (e.g. occasional truancy) or theft within

2   the household but generally functioning pretty well, has

3   some meaningful relationships.

4        That, I do not -- it is my opinion that I do not

5   see how multiple rapes which includes violence, sadistic

6   elements and strangling someone unconscious can be equated

7   to occasional truancy or theft within the household.

8   **Q.**   Okay.  What, if any, correlation is there between

9   Antisocial Personality Disorder and violence?

10  **A.**   It is one of the two diagnoses in DSM-IV that is most

11  linked to violence.  The other being sexual sadism.

12  **Q.**   And what is your understanding on how age affects the

13  typical person who is diagnosed with Antisocial Personality

14  Disorder, say, in their mid 30s?

15  **A.**   Well, if somebody is not psychopathic because

16  psychopaths follows a different age pattern, if they are

17  antisocial without psychopathy, then they should be slowing

18  down their antisocial behavior about half, reduce it between

19  35 and 40.

20  **Q.**   And have you examined Mr. Graham's conduct during that

21  same period of time?

22  **A.**   Yes.

23  **Q.**   And what does that suggest to you regarding whether

24  things are slowing down for him?

25  **A.**   Well, between 1974 and 1986 he showed escalating

1    violence.  The violence -- he started with an acquaintance

2    rape which did not have sadistic elements.  The next rape

3    was more severe because he attacked a stranger where there

4    was no possibility of his interpretation of signals of an

5    acquaintance or a date or anything like that.  He showed a

6    greater disregard for safety because the woman was eight

7    months pregnant.

8         **MR. GOLD:**  Your Honor, just, I would object here.

9    The witness, it is my understanding from her testimony, is

10   characterizing the assault with intent to rape as a rape but

11   I would like the record to reflect that that's not the

12   charge or conviction.

13        **THE WITNESS:**  I apologize.

14        With assault, he assaulted a pregnant woman.  And

15   that had a different, some different characteristics because

16   that was a stranger which is a more severe form, as I said.

17   It also occurred in a public place and it occurred at three

18   o'clock in the afternoon.  So it was more reckless and there

19   was a much greater chance of getting caught.

20        The third and last rape occurred as a result of a

21   home invasion of a stranger who he had not met previously

22   even though she was apparently a neighbor.  That it had,

23   barely had sadistic elements as she was under his control

24   and had stopped persisting before he strangled her for the

25   third time -- the first time.  So there was no reason for

1    the strangulation in terms of control.

2           So if Antisocial Personality Disorder were all and

3    he was not psychopathic and he was not paraphilic, he should

4    be slowing down.  Instead he is 37, 38 years old and we see

5    his most violent rape yet.  The violence is increasing, not

6    diminishing.

7    **Q.**  Okay.  Let's now turn to your diagnosis of paraphilia in

8    this case.

9           What is paraphilia generally?

10   **A.**  Paraphilia has to do with urges, sexual urges, fantasies

11   or behaviors that involve various nonconsenting categories,

12   either nonhuman subjects or nonconsenting subjects or

13   children.

14   **Q.**  Okay.  Could you turn to Exhibit 21, please.

15          **THE COURT:**  Now, what you have up there, is that

16   from the DSM-IV?

17          **MR. SAVERY:**  It is, Your Honor.

18          **THE COURT:**  This is a page from there?

19          **MR. SAVERY:**  Correct.

20          **THE COURT:**  Okay.

21   BY MR. SAVERY

22   **Q.**  Could you tell us what is in Exhibit 21?

23   **A.**  Well, Exhibit 21 has the diagnostic DSM-IV-TR section on

24   paraphilias.

25   **Q.**  Okay.  And I have put on the screen now page 566.  Is

1   this a page from Exhibit 21?

2   **A.**   Yes.

3   **Q.**   And can you tell us what this section of the DSM

4   discusses?

5   **A.**   It is a description and sets criteria for the

6   Paraphilias.

7   **Q.**   Okay.  Now, in using what has been put on the screen,

8   can you explain to us what the criteria are for general

9   paraphilias?

10   **A.**   "Intense sexually arousing fantasies, sexual urges or

11   behaviors generally involving nonhuman objects, the

12   suffering or humiliation of oneself or one's partner, or,

13   three, children or other nonconsenting persons that occur

14   over a period of at least six months (Criterion A)."

15   **Q.**   And is there a Criterion B?

16   **A.**   Yes.

17   **Q.**   And does that begin down near the bottom, "For the

18   remaining Paraphilias"?

19   **A.**   "For the remaining Paraphilias, the diagnosis is made if

20   the behavior, sexual urges, or fantasies cause clinically

21   significant distress or impairment in social, occupational,

22   or other important areas of functioning."

23   **Q.**   Okay.  Now, does this section of the DSM go on to

24   identify specific types of paraphilias?

25   **A.**   Some, yes.

1   **Q.**  Can you tell us which ones are identified in this

2   section?

3   **A.**  It identifies pedophilia, exhibitionism, voyeurism,

4   sexual sadism and I believe there are a few more.

5   **Q.**  Okay.

6   **A.**  Fetishism, Frotteurism, Sexual Masochism and Transvestic

7   Fetishism.

8   **Q.**  And what else?  Is there another?

9   **A.**  Paraphilia NOS.

10  **Q.**  What is Paraphilia NOS?

11  **A.**  Well, it's for coding paraphilias that do not meet

12  criteria for any of the specific categories.  And then they

13  give some examples that say that it is not limited to those

14  examples.

15  **Q.**  Okay.  And is this the section of the DSM that addresses

16  Paraphilia NOS?

17  **A.**  Yes.

18  **Q.**  And is NOS short for Not Otherwise Specified?

19  **A.**  It is.

20  **Q.**  Is Paraphilia NOS generally accepted in the psychiatric

21  and psychological community as a legitimate diagnosis of a

22  mental disorder?

23  **A.**  Yes.  DSM-IV is the bible of what is accepted and what

24  is not in terms of mental health.

25  **Q.**  Now, what is your specific diagnosis of Mr. Graham?

1   **A.**   Paraphilia NOS based on nonconsent.

2   **Q.**   Now, is that a specific type of paraphilia that's

3   separately listed in the DSM?

4   **A.**   It is not separately listed but it's encompassed in this

5   category.

6         **THE COURT:**   It is what?

7         **THE WITNESS:**   Encompassed in this category.

8         **THE COURT:**   Does it say so?

9         **THE WITNESS:**   Well, it gives the example in the

10   *Casebook* written by the people who wrote --

11         **THE COURT:**   Forget the *Casebook*.   The *Casebook* is

12   another issue.   What about the manual itself?

13         **THE WITNESS:**   The manual says nonconsent, based on

14   nonconsent.

15         **THE COURT:**   Where is that?   Show me that.

16         **THE WITNESS:**   "The essential features of a

17   paraphilia --"

18         **THE COURT:**   Give him an opportunity to put it up on

19   the screen.

20         **MR. SAVERY:**   And it is the page, Your Honor, that

21   we already addressed.   Let me find a copy of it.

22         (Pause in proceedings.)

23         **MR. SAVERY:**   I seem to have lost track of it here.

24         I am putting it up on the screen.

25         **THE WITNESS:**   "The essential diagnostic features,

1    the essential features of a paraphilia are recurrent intense

2    sexually arousing fantasies, sexual urges or behaviors

3    generally involving nonhuman subjects, the suffering or

4    humiliation of oneself or one's partner, and, three,

5    children or other nonconsenting persons that occur over a

6    period of at least six months."

7    BY MR. SAVERY

8    **Q.**  Now, you say that Paraphilia NOS (Nonconsent) is not

9    separately identified as a category of paraphilia in the

10   DSM; is that right?

11   **A.**  Yes.

12   **Q.**  How can you diagnose it if it is not separately

13   identified?

14   **A.**  Well, it's very clear that they intended it to be

15   diagnosed.  For one thing Frances who edited DSM-IV and who

16   has been generally critical of the way people are diagnosing

17   it nonetheless said this distinction, the distinction he had

18   made does not mean that Paraphilia NOS cannot or should not

19   be used to describe some individuals who commit coercive

20   sexual acts --

21           **THE COURT:**  Wait.  We are getting on to something

22   different.  I am asking a very simple question.

23           Underline for me so I see the words you are relying

24   on the diagnostic feature that would cover this case.

25           **THE WITNESS:**  "No. three, children or other

 1  nonconsenting persons."

 2          **THE COURT:**  That is it?

 3          **THE WITNESS:**  Well, that's the only place that they

 4  specify.

 5          **THE COURT:**  Okay.

 6          **MR. GOLD:**  Your Honor, the witness was just reading

 7  the statement of the editor of the DSM Task Force but did

 8  not identify what she was reading from.

 9          **THE COURT:**  I didn't hear her do that.

10          **MR. SAVERY:**  She did, Your Honor.

11  BY MR. SAVERY

12  **Q.**  Could you identify, Dr. Salter, what you read from?

13  **A.**  The editor of DSM-IV Alan Frances in an article

14  defining, called, "Defining mental disorder when it really

15  counts, DSM-IV-TR and SVP/SDP statutes," that's the article

16  I started to mention which in my opinion helped clarify

17  somewhat the intentions of the committee since this was the

18  editor.

19          **THE COURT:**  Okay.

20  BY MR. SAVERY

21  **Q.**  Dr. Salter, have you heard the term "paraphilic rapism"?

22  **A.**  Yes, of course.

23  **Q.**  Can you explain what that is?

24  **A.**  Well, it is done by many different terms, the latest

25  beings Paraphilia NOS; but it is the notion that there are a

1    group, a subgroup of rapists who have sexual, who are

2    sexually aroused by forcing somebody to have sex.  It is not

3    true of every rapist.  It is just a subgroup.

4    **Q.**  And did you prepare a bibliography of resources that

5    address this issue of Paraphilia NOS (Nonconsent)?

6    **A.**  I did.

7    **Q.**  And if you'd turn to Exhibit E for identification.

8         Can you tell us what this document is?

9    **A.**  That was the unannotated version of the bibliography.

10   **Q.**  Okay.  And what are these resources that you list in

11   this bibliography?

12   **A.**  They are resources that either discuss the condition,

13   Paraphilia NOS refers to one or it has been called at times

14   for the DSM series Paraphilia, Paraphilic Rapism Disorder or

15   specifically discuss Paraphilia NOS in the DSM.

16   **Q.**  Okay.  Is it a comprehensive list?

17   **A.**  Oh, no.  There are many, many articles in the research

18   that discuss this.  These are just some of them.

19   **Q.**  Now, were any of the authorities that are listed in

20   Exhibit E prepared by individuals who were involved in

21   generating the DSM-IV or the DSM-IV-TR?

22   **A.**  Yes.

23   **Q.**  Let's start with the *Casebook*.  Can you tell us what the

24   *Casebook* is?

25   **A.**  The *Casebook* was intended to accompany the DSM-IV

1   series.  It was edited by the person who initially more than

2   anybody else was the force behind the DSM book, Robert

3   Spitzer.  All of the people who prepared the *Casebook*, the

4   authors, were on the DSM-IV committee.

5   **Q.**  Okay.  And what does the *Casebook*, what is it intended

6   to be used for?

7   **A.**  The intent of the *Casebook*, as the authors say in their

8   introduction, is to help people with differential diagnoses.

9   You have this nice manual that tells you what the diagnoses

10  are and what the criteria are but it doesn't apply them to

11  real world cases.  So this was a differential diagnosis is

12  the point of the *Casebook*.

13  **Q.**  Okay.  And just before we jump into it, who is Robert

14  Spitzer?

15  **A.**  Robert Spitzer is probably one of the, is one of the

16  leading psychiatrists in this country.  And he was the

17  person who edited DSM-III when Paraphilia NOS was added to

18  DSM-III.  And he really has been the driving force behind

19  the DSM series.

20  **Q.**  Okay.  And who is the last doctor listed here, Michael

21  First?

22  **A.**  Michael First was involved and the person -- he was the

23  overall editor I believe of the DSM-IV and involved in the

24  *Personality Disorder Workbook*.

25  **Q.**  In what ways has the *Casebook* acknowledged Paraphilia

1    NOS (Nonconsent)?

2    **A.**  Well, quite specifically it gives a case and says a

3    course of paraphilic rapism.  It's the case of someone who

4    had fantasies of rape and who was driven to rape by his

5    urges to have sex with someone against their will.  And it

6    specifically says that they should be diagnosed as

7    Paraphilia NOS.  I can show it to you if you would like.

8    **Q.**  Sure.  Well, I have got something up on the screen now.

9    And this is -- do you recognize this as coming from the

10   *Casebook*?

11   **A.**  Yes.  And it was called -- they gave names to all the

12   cases.  It was called, "The Perfect Relationship."

13   **Q.**  Okay.  And so this is the section of the DSM that

14   addresses the scenario that you just discussed?

15   **A.**  Yes.  It refers also to his plethysmograph findings,

16   that he showed erection to stimuli depicting females in

17   position of subjugation and it's a discussion of this case

18   with a little bit of case history and characteristics.

19   **Q.**  Okay.  Now, following the laying out of the facts here,

20   is there a section, "Discussion of Perfect Relationship"?

21   **A.**  Yes.

22   **Q.**  And what generally is this discussion section?  What is

23   that intended to do?

24   **A.**  Well, it's to discuss the case material that was just

25   presented.

**Q.**   Okay.  If we turn to the next page here which is page

173 -- I apologize for the handwriting on this.  Can you

read from that first paragraph on this page beginning with,

"Most rapes" right there (indicating).

**A.**   "Most rapes are probably committed by men whose quite

ordinary nonparaphilic sexual preferences, many of whom

would meet the criteria for Antisocial Personality Disorder,

more rare than rape committed by men with mental

retardation, a psychotic disorder or drug intoxication or

dissociative identity disorder.  However, some rapists,

particularly serial rapists, have an aberrant sexual drive

of paraphilia, a disorder in which there are intense sexual

urges and sexually arousing fantasies involving either

nonhuman objects or the suffering or humiliation of oneself,

one's partner, children or other nonconsenting persons."

**Q.**   All right.  Now, if we move down toward the bottom of

this section here, the paragraph beginning, "Jim experienced

recurring eroticized urges."  If you start with the word,

"however," can you read the remainder of that paragraph.

**A.**   "However, his rape behavior can best be understood as a

manifestation of a specific paraphilia because his erotic

arousal depended on having a nonconsenting partner.  During

the development of DSM-III-R the term 'paraphilic Coercive

Disorder' was suggested for this particular kind of

paraphilia.  The category has never been officially

1    recognized.  Therefore, Jim's disorder would be coded as

2    Paraphilia Not Otherwise Specified, DSM-IV-TR, page 576."

3    **Q.**  Now, is there a new edition of the *Casebook*?

4    **A.**  No.

5         **MR. SAVERY:**  May I approach the witness, Your

6    Honor?

7         **THE COURT:**  Yes.

8    BY MR. SAVERY

9    **Q.**  I am handing you now a book.  Can you tell us what the

10   title is of that book?

11   **A.**  *Treatment, Companion to the DSM-IV-TR Casebook*.

12   **Q.**  Okay.  And what does that involve?

13   **A.**  Well, they say quite specifically that their first book

14   was on differential diagnoses.  And the second casebook is

15   on treatment.  And they mention specifically that -- okay.

16        Although some of the cases in the *DSM-IV-TR*

17   *Casebook* mention treatment, the discussions were focused,

18   that the patient received, the discussions were focused

19   exclusively on diagnostic issues.  In this book we have

20   taken the next step for 34 cases, all but three from the

21   *DSM-IV-TR Casebook.*  We have invited experts, many world

22   renowned, to discuss their approach to the treatment of a

23   case in a specialized area.

24        So they published two books.  One was on

25   differential diagnoses and one was on treatment.  And they

1  tried to provide continuity between them but, by having some

2  overlap in the cases.

3  **Q.**  So the treatment book that you're holding, you don't

4  understand that to be intended to replace the *Casebook*;

5  right?

6  **A.**  No.  I think if you read this, it makes it very clear

7  that it's in addition to the *Casebook* and that the *Casebook*

8  is on differential diagnosis and this book is on treatment.

9  The *Casebook* only mentions treatment.  It does not address

10  it.

11  **Q.**  Okay.  Could you turn to page 319 of the diagnosis book.

12          And what appears on page 319?

13  **A.**  It's an index by DSM-IV-TR, diagnosis of the -- of the

14  cases that are presented in the treatment book.

15  **Q.**  Okay.  So it lists the types of diagnoses from the

16  DSM-IV that are addressed in that treatment manual?

17  **A.**  Yes.

18  **Q.**  Okay.  Now, approximately how many items are listed

19  there?

20  **A.**  I have to count them.

21          32, I count 32.

22  **Q.**  32, okay.

23          **THE COURT:**  Could we go back to the other, the

24  first one that you put up?

25          **MR. SAVERY:**  Sure.

1      **THE COURT:**  And there was a phrase, a line that you

2   mentioned.  We didn't seem to concentrate on it.  I may be

3   misremembering.  It said children and nonconsensual --

4      **THE WITNESS:**  Other nonconsenting persons.

5      **THE COURT:**  Now, is that enough to get you over the

6   line?  Are you relying on that sentence?

7      **MR. SAVERY:**  Yes, Your Honor.  That is enough to

8   fall within the general category of paraphilia.  And in

9   terms of where this specific --

10      **THE COURT:**  No, I mean is that enough to qualify it

11   as part of the brethren of DSM-IV?  In other words, to be

12   included, to be authenticated by the DSM-IV?

13      **MR. SAVERY:**  Is it enough simply to satisfy the

14   definition in that?

15      **THE COURT:**  Yes.

16      **MR. SAVERY:**  I am not sure.  I can ask the witness

17   if --

18      **THE COURT:**  What are you relying on?  I mean, is

19   that what you are going to argue to me?

20      **MR. SAVERY:**  No, I think what we will argue to you

21   is that this conduct falls within and it's generally

22   accepted in the psychological community to fall within --

23      **THE COURT:**  But you are not relying on that

24   language?  You are not seizing on the fact that it says no

25   consent?

1          **MR. SAVERY:**  We are, Your Honor, because that is

2     required for any paraphilia.  In other words, those initial

3     criteria that are laid out at the beginning of that section

4     should be satisfied for any paraphilia.  Here it's satisfied

5     because one of the criteria says nonconsent.  But at the

6     same time we argue that this specific paraphilia that is

7     diagnosed in this case falls within the subcategory of

8     Paraphilia NOS.

9          And Dr. Salter has --

10         **THE COURT:**  But it is not specifically identified

11    in the manual.

12         **MR. SAVERY:**  It is not specifically named as an

13    example of Paraphilia NOS diagnoses.

14         **THE COURT:**  You are saying it is accepted by way of

15    practice by people who deal in this area of the profession?

16         **MR. SAVERY:**  I want to be cautious.  Yes, we are

17    saying that; but at the same time we are saying that it does

18    satisfy the criteria for paraphilia generally and it does

19    fit within the NOS category.  It doesn't have to be

20    separately listed for it to fit within the NOS category.

21    That's I guess the short answer.

22         And so what we do beyond that is we rely on what

23    are the authorities out there, what do they say on this

24    issue and Dr. Salter's own experience.

25         **THE COURT:**  Okay.

1    BY MR. SAVERY

2    **Q.**  Just going back to the treatment manual, Dr. Salter, you

3    mentioned that it identifies or that it addresses 32

4    different diagnoses from the DSM-IV; is that right?

5    **A.**  Yes.

6    **Q.**  Okay.  Does that suggest to you that all of the other

7    DSM diagnoses are now no longer valid?

8    **A.**  No, it does not, no.

9    **Q.**  All right.

10   **A.**  These are only some of the diagnoses.  They didn't try

11   to produce an exhaustive treatment manual which covered

12   every diagnosis in the DSM-IV.

13   **Q.**  Okay.  And do they address in that manual Paraphilia NOS

14   (Nonconsent)?

15   **A.**  No, I don't think they have it in the treatment book.

16   **Q.**  Okay.  Now, referring back to Exhibit E, there is an

17   article here that is listed on page two authored by a First

18   and Halon, H-A-L-O-N?

19   **A.**  Yes.

20   **Q.**  Again, who is First?

21   **A.**  He was the editor of DSM-IV.

22   **Q.**  Okay.  And can you explain in what way this article

23   supports the existence of Paraphilia NOS (Nonconsent)?

24   **A.**  Well, First is generally critical of the way it's been

25   diagnosed.  And his argument is that there are people out

1    there who are simply diagnosing it every time you have a

2    repeat rapist without concern for the underlying condition.

3           And the underlying idea behind paraphilia is that

4    the person is sexually aroused and attracted to whatever it

5    is, dead bodies, nonconsent, whatever the object of that

6    attraction is, and that people should try in their

7    differential diagnosis to make sure that they are honoring

8    that, that they are not simply diagnosing someone as a

9    rapist because he's committed -- a paraphilic rapist because

10   he's committed a lot of rapes.  Because there are people who

11   commit rapes for other reasons.

12          But he specifically says, he specifically says that

13   it exists and can be diagnosed.

14   Q.  Okay.  And do you agree with his position insofar as

15   you've described it?

16   A.  Well, generally I do agree.  I have run into situations

17   where people said -- and I have had evaluators say to me if

18   he has multiple rapes he must be paraphiliac.  I don't think

19   that's true.

20          We have typologies of sex offenders going back 30

21   years.  We have plethysmograph studies.  What they all show

22   is that some rapists are motivated by anger.  Some rapists

23   are antisocial only and simply want sex and they don't care

24   if the other person wants it or not.

25          And we have clear case studies and research

1    evidence to tell us there is another category of rapists.

2    And that is the category of rapists who are sexually aroused

3    by rape, by forcing sex on someone.

4         So generally I agree with that basic point that

5    First makes, that you have to make this diagnosis based on

6    whether or not you can infer from the evidence that he's

7    sexually attracted to rape.  He also says -- and I can't

8    seem to come up with it -- but he also says that rapists

9    don't always tell you the truth so you can't just go by what

10   they say.

11        **MR. GOLD:**  Your Honor, I'd like to enter an

12   objection or a request at this time.  It's not entirely

13   timely but the witness mentioned this bibliography was

14   authored by her but that she had given to the government an

15   annotated version of the bibliography which I imagine the

16   government has taken out the annotations.

17        We would ask that the annotated version be produced

18   to us since it seems that her analysis of these sources

19   forms some of the basis of her opinion.

20        **MR. SAVERY:**  We have no objection, Your Honor.

21        **THE COURT:**  Okay.  You turn it over.  This is a

22   good time, maybe you can do it during the recess.

23        We can break now till 2:15; is that convenient?

24        **MR. SAVERY:**  That's fine.

25        **THE COURT:**  Okay.

1           **THE CLERK:**  All rise for the Honorable Court.

2       Court is in recess.

3

4       (Luncheon recess.)

1                          **AFTERNOON PROCEEDINGS**

2              **THE CLERK:**  All rise for the Honorable Court.

3              **THE COURT:**  Good afternoon, everybody.

4              **COUNSEL:**  Good afternoon, Your Honor.

5              **THE COURT:**  Be seated, please.

6              You know, I am going to have to leave at about four

7       o'clock, maybe five past four.  I have a physical therapy

8       appointment in Marblehead and it takes me that long to get

9       there in traffic.

10             Okay.  Sit down.

11             Go ahead.  There was some concern about an exhibit.

12      Did you work that out?

13             **MR. SINNIS:**  Oh, yes.  In terms of the annotated

14      bibliography, Your Honor?

15             **THE COURT:**  Yes.

16             **MR. GOLD:**  Yes, we did work that out.

17             **THE COURT:**  Okay.  So we are all set to continue.

18      Go ahead.

19             **MR. SAVERY:**  Thank you, Your Honor.

20                      **ANNA CAROL SALTER, Resumed**

21                      **DIRECT EXAMINATION, (Cont'd.)**

22      BY MR. SAVERY

23      **Q.**  Dr. Salter, before the break you were addressing an

24      article offered by Doctors First and Halon; is that right?

25      **A.**  Yes.

1   **Q.**   Okay.  Now, does Dr. First offer some criticism in that

2   article regarding the use of Paraphilia NOS (Nonconsent)?

3   **A.**   Yes, he does.

4   **Q.**   Can you explain that for us?

5   **A.**   He is concerned that many people or at least some people

6   are diagnosing it on every rapist that has more than one

7   rape.  So they are saying that the evidence for Paraphilia

8   NOS is that simply if they have more than one rape, they

9   must have Paraphilia NOS.

10   **Q.**   Okay.  Does he question that the diagnosis is real in

11   that article?

12   **A.**   No, he doesn't question that the diagnosis is real nor

13   does he question that you can use Paraphilia NOS for it.  He

14   says that there are some people who diagnose it for every

15   rapist with multiple rapes and there are some people who

16   think you can't use it at all.

17          And what he says is our inclination is to come down

18   somewhere in the middle on the appropriateness of using the

19   Paraphilia NOS category as the basis for the claim that the

20   individual's sexual offenses are driven by mental disorder.

21          There are certainly some dangerous sexual offenders

22   in our society whose offenses are clearly driven by a

23   paraphilic sexual arousal pattern involving fantasies and

24   urges to commit rape and it may be appropriate to apply a

25   diagnosis --

1     **THE COURT:**  This is not an exhibit; right?

2     **MR. SAVERY:**  Correct.

3     **THE COURT:**  That she is reading from.

4     **MR. SAVERY:**  That's right.

5     **THE WITNESS:**  -- of Paraphilia NOS to such

6     individual.

7     **THE COURT:**  You are relying on that in your

8     opinion?

9     **THE WITNESS:**  In my opinion.

10    **THE COURT:**  Okay.

11    **MR. GOLD:**  And for the record, Your Honor, I'd like

12    to have it made clear that she was reading and also what

13    source she was reading from.

14    **THE COURT:**  Okay.  That is fair.

15    **MR. SAVERY:**  Sure.

16    BY MR. SAVERY

17    **Q.**  Doctor, could you just particularize where you are

18    reading from and on what page?

19    **A.**  That is a quote from page 452 that starts with, "Our

20    inclination" and ends, my quote does, "With such

21    individuals."  It is from, *The Use of DSM Paraphilia*

22    *Diagnoses in Sexually Violent Predator Commitment Cases* by

23    Michael B. First and Robert Halon.  And it is from the

24    Journal of the Academy -- American Academy of Psychiatry and

25    Law.

1   **Q.**   Okay.   Is that a peer-reviewed journal?

2   **A.**   Yes.

3   **Q.**   Okay.   One of the other items that is listed in the

4   bibliography is an article by a DeClue?

5   **A.**   Yes.

6   **Q.**   Can you tell us what that article is?

7   **A.**   Well, the argument by DeClue --

8   **Q.**   Sorry.   Before you get to the argument, can you just

9   tell us what the article is?

10   **A.**   The article is by G. DeClue.   It is called "Paraphilia

11   NOS, (Nonconsenting) and Antisocial Personality Disorder,"

12   *Journal of Psychiatry and Law*, 2006 by --

13           **THE COURT:**   Hold it.

14           (Pause in proceedings while the Court took a phone

15           call.)

16           **THE COURT:**   Go ahead.   Thank you.

17   BY MR. SAVERY

18   **Q.**   Have you considered this article to be reliable

19   authority in your professional field?

20   **A.**   Yes.

21   **Q.**   Can you explain in what way this article supports the

22   existence of Paraphilia NOS (Nonconsent) as a diagnosis?

23   **A.**   Well, he is answering people that he believes are

24   critics of using the diagnosis Paraphilia NOS for paraphilic

25   rapism.   And what he says is that one of the arguments that

1   is presented is that the plethysmograph studies show that

2   rapists typically respond to rape and they also respond to

3   consenting sex.  And what he says is that is no reason not

4   to diagnose him as Paraphilia NOS.

5           If you, for example, are an necrophiliac, if you

6   have sex with dead bodies and you also have sex with live

7   bodies, it doesn't mean you are not a necrophiliac.

8           If you have sex with animals, you still have

9   bestiality if you are attracted, sexually attracted to

10  animals.  And it's irrelevant whether or not you also have

11  sex with people.  And that the argument that you can't use

12  this for rapists because rapists also enjoy consenting sex

13  is invalid.

14  **Q.**  Okay.  You mentioned something called a plethysmograph?

15  **A.**  Yes.

16  **Q.**  Can you explain what that is?

17  **A.**  The plethysmograph is a small gauge.  It fits on the

18  offender's penis.  He's in a room alone.  There are wires

19  that go from the gauge to a computer in another room.  He

20  typically has on headphones and he is listening to stories

21  of different types of sex.  Typically sex with children of

22  different ages and consenting sex and rape and sadistic sex.

23  There are no children involved in this.  These are stories

24  that are read by adults.

25          The machine measures what he gets sexually aroused

1    to.  It directly measures the size of the erection.  And

2    these studies are typically used in research and sometimes

3    in treatment in order to sort out what a person is sexually

4    aroused by.

5    **Q.**  Okay.  Thank you.

6         I am now turning to page 508 of the DeClue article.

7    And if you could read for me, it's up on the screen now, the

8    paragraph beginning with, "What about patterns."

9    **A.**  I was asked to bring this with me (indicating) when I

10   read.

11   **Q.**  Okay.

12   **A.**  "What about patterns of sex acts that would be

13   normatively popular with consenting persons but are

14   inflicted on nonconsenting persons?  There appears to be

15   general acceptance among most psychiatrists, psychologists

16   and sexologists that a person can have a paraphilia

17   involving rape.

18        For example, Money in *Lovemaps* in 1989, page 48,

19   writes about the clinical syndrome named raptophilia, the

20   Latin derivative, or biastophilia, the Greek derivative.

21   And the syndrome of raptophilia, raptophilia genital arousal

22   and eventually the orgasm are contingent upon having a

23   partner who as a captive is forced to yield sexually under

24   condition of threat, assault or injury."

25   **Q.**  Okay.  Now, I'm going to turn to Page 511 of that same

1    article.  And if you could read the bottom paragraph,

2    please.

3    **A.**  "The DSM-IV-TR does not provide diagnostic criteria for

4    any of the paraphilias coded under Paraphilia NOS, including

5    the list of paraphilias such as telephone scatologia,

6    necrophilia or zoophilia or the unlisted paraphilias such as

7    Paraphilia NOS (Nonconsenting).  My reading of DSM-IV-TR

8    suggests that Paraphilia NOS (Nonconsenting) should be

9    diagnosed if the following criteria are satisfied.  Over a

10   period of at least six months recurrent, intense sexually

11   arousing fantasies, sexual urges or behaviors involving

12   sexual activity with a nonconsenting person and, B, the

13   person has acted on these urges or the sexual urges or

14   fantasies caused distress or interpersonal difficulty.  In

15   the absence of reliable data about a person's sexual

16   fantasies, urges, or in spite of a person's claims that he

17   has no sexual fantasies or urges to engage in sexual

18   behavior with nonconsenting persons, the presence of

19   Paraphilia NOS (Nonconsenting) is evident if the person

20   repeatedly engages in sexual behavior with nonconsenting

21   persons over a period of at least six months."

22   **Q.**  All right.  Now, can you tell us what your views are on

23   that paragraph and his explanation?

24   **A.**  I don't agree with him.  I think it's overly inclusive.

25   I think if you simply -- I agree with First on this.  I

1   think if you simply diagnose everybody that had multiple

2   rapes as a paraphilia, you would also include people who

3   raped repeatedly for other reasons, because they are

4   antisocial, because they are what we call opportunistic

5   rapists who rape in the course of a burglary for example,

6   because they are angry rapists who are taking out their

7   anger on women.  I don't -- I think that's too liberal.

8          I agree more that we have to carefully analyze

9   every case for indications of whether or not there are other

10  explanations other than a paraphilic rapism which accounts

11  for them all.

12  Q.   Okay.  And is that view in line with what you understand

13  First to be saying?

14  A.   That's in line with First and Doren and I believe the

15  majority of the people.

16  Q.   Okay.  Lastly if you could just read in this sentence

17  here (indicating) beginning with, "In my opinion."

18  A.   "In my opinion a repetitive pattern of sexual behavior

19  with nonconsenting persons is sufficient for the diagnosis

20  of Paraphilia NOS (Nonconsenting) which a mental abnormality

21  that in some cases could provide a diagnosis for meeting the

22  criteria for civil commitment as a SVP."

23  Q.   Okay.  And so you agree with this to the extent that it

24  recognizes Paraphilia NOS (Nonconsenting) as a diagnosis; is

25  that fair to say?

1   **A.**   Yes, I agree with that.  I think that's clear.  There

2   are studies of what states who use civil commitment laws and

3   what they show is that this is a very common diagnosis.

4   **Q.**   Okay.  And I don't want to go through each of articles

5   in the bibliography but I do want to focus on at least one

6   more.  And this is the book written by Doren.

7            Can you tell us who Dennis Doren is?

8   **A.**   Dennis Doren is now retired but he was head of

9   evaluation for the government, mental health.  Essentially

10  he did the, was in charge of the unit that did the civil

11  commitment evaluations for the State of Wisconsin.

12           He also wrote what I think is generally considered

13  the lead book in the field, *Evaluation of Sex Offenders:*

14  *Civil Commitment and Beyond*.  And he wrote a whole series of

15  articles particularly on diagnosis and on the actuarial

16  instruments which have been very influential in the field.

17  **Q.**   Okay.  Is the *Evaluating Sex Offender* book, is that

18  listed in your bibliography?

19  **A.**   Yes.

20  **Q.**   Okay.  Can you describe what, if any, relationship you

21  have with Dr. Doren?

22  **A.**   He's a colleague and a personal friend.

23  **Q.**   Okay.  Now, is his book *Evaluation of Sex Offenders*

24  relied on as an authoritative source by those in your

25  profession?

**A.** Well, it certainly is.  Even Zander who has really
attacked him on many issues wrote extensively in one of his
articles on the influence that Dennis Doren's book has had.
And he mentioned that it was on the reading list for the
American -- let me get this right -- Forensic -- one of the
diplomat boards, the American Board of Forensic Psychology
as a recommended reading for their exam for diplomate
status.

**Q.** Okay.  And can you briefly describe for us what it is
that Doren's book tells us on Paraphilia NOS (Nonconsent) as
a legitimate diagnosis?

**A.** Well, Doren accepts, as do many others, the notion that
Paraphilia NOS is the appropriate designation for people who
have sexual urges to rape.  His position is also that not
every rapist has Paraphilia NOS, that there are other
reasons for raping.

What he attempted to do in this book that many
people found useful is to delineate some criteria for
distinguishing between when you should use it and when you
shouldn't use it.  And it was an advance because the
category is poorly delineated in the DSM-IV-TR.

**Q.** Okay.  And I'm going to turn to, I'm going to put this
up on the screen, page 67.  And do you recognize this as
being from Dr. Doren's book?

**A.** Yes.

1  **Q.**  And, again, that book is *Evaluating Sex Offenders:   A*

2  *Manual For Civil Commitments and Beyond*?

3  **A.**  Yes.

4  **Q.**  Could you please read into the record the first full

5  paragraph on that page beginning with, "Despite the

6  potential arguments."

7  **A.**  "Despite the potential arguments to be made about the

8  limits to what we know and the edges or thresholds for where

9  a rape-related paraphilia begins, there does not appear to

10  be a meaningful argument against the idea that at least some

11  rapists clearly meet the DSM-IV criteria for a paraphilia.

12  If the offender has repetitively and knowingly enacted

13  sexual contact with nonconsenting persons over a period of

14  at least six months specifically for sexual arousal to

15  nonconsenting interaction, and that behavior has caused him

16  significant impairment in social, occupational or other

17  areas of functioning, then criteria for paraphilia are met."

18  **Q.**  Okay.  Now, is this a set of criterion or discussion of

19  criteria that you applied in this case?

20  **A.**  Well, in the section he has nine different criteria that

21  he suggests looking at.  It's not all in that paragraph.

22  **Q.**  Okay.  Are you able to tell us what those criteria are?

23  **A.**  Yes.  He says that these are things to consider in

24  making this distinction.

25        First of all, is there evidence that he was

1    sexually aroused to something that he clearly knew was not

2    consensual.  And what he's trying to eliminate here are the

3    I know she's -- the date rape situations, she's saying no

4    but she really means yes.  Where the person, there is some

5    kind of distorted perception of the victim's reaction.  So

6    is it in a situation where it is absolutely clear that the

7    sexual contact is forced and is there evidence that he was

8    sexually aroused and did not lose his arousal when it became

9    clear that the contact was forced.  So, for example,

10   ejaculation would be a sign that he continued his sexual

11   arousal.

12          The second one was repetitive patterns.  There are

13   repetitive patterns within the rape.  There is some kind of

14   sexual script that you can identify as common from one rape

15   particularly to another.

16          The third one is are virtually all of his crimes

17   sexual.  In other words, if you have an antisocial person

18   who is raping because he just generally takes what he wants,

19   and it may be money, it may be sex, you typically see many,

20   many other nonsexual crimes as well.  So one percentage of

21   these crimes are sexual.

22          Fourth, if the person is willing to have consensual

23   sex, and there are cases like this, does he rape them

24   anyway?  This sometimes does occur in relationships or even

25   in, even in one-night stands where the person was willing to

1   have sex and he beats them up and raped them anyway.

2           Fifth, high frequency rapes.  And if they're out

3   free, are they raping within a particular period of time or

4   are they raping as soon as they get out of prison?  You

5   can't easily rape a woman in prison so he mentioned when

6   they get out of prison do they rape pretty, very quickly and

7   particularly if they're still under supervision.

8           Six, do they rape in situations where there is a

9   high likelihood of getting caught?  In his opinion that

10  suggests that the pressure to rape, that the desire to rape

11  is so strong that it's overweighing other factors.

12          Seven, do they have concomitant access to

13  consenting sex partners?  Are they living with someone?  Do

14  they have access to regular sex?

15          Eight, do they have various type of victims?  There

16  are some paraphilic rapists that will use -- that want to

17  rape somebody and they don't actually care who.  They may

18  not actually know who is home when they enter a house.

19          And, nine, is there evidence of a rape kit.

20  **Q.**  Okay.  Now, did you apply those criteria here?

21  **A.**  I did.  This isn't all I applied but I did look at

22  Dennis Doren's work.

23  **Q.**  Okay.  Can you explain to us then how you went about

24  concluding that Mr. Graham has Paraphilia NOS (Nonconsent)?

25  **A.**  Well, in general the first thing I did was look for

1   other reasons for the rape.  Rapes where I believe that

2   Knight and Prentky's typology of rapists is the most

3   empirically backed so one of their types is opportunistic

4   rapist.  So I looked at the record to see if, for example,

5   he went into a burglary and then accidently found a woman

6   alone and raped her, any pattern there, any pattern like

7   that, so you have to rule that out.

8          I also looked, this is another category, is

9   basically an angry rapist who just doesn't like women and he

10  is using that as one woman somewhere back in his past,

11  decides that all women are deceitful bitches and typically

12  does a blitz attack where he attacks a woman, beats them

13  really badly, often rapes them and then goes on.  What you

14  see in those cases is a frenzied attack.  And what we had

15  here was not a frenzied attack.  It was a period of time,

16  let's say the last one, and then we have a very considered

17  strangulation and, "I'm just going to have to put you out

18  for a while."

19          This is -- I have seen and dealt with cases of

20  frenzied attacks where women were actually even killed.  And

21  the characteristics of those attacks is the extreme anger

22  and violence that occurs.  But this was not, there was no

23  evidence of anger in this assault.

24          So I then, so I looked at that.  So I looked at

25  other alternatives.  Do we have any other ways to explain

1    these rapes other than the paraphiliac interest in rape.

2    And there really wasn't.

3          I also looked at Doren's criteria.  Was it

4    absolutely clear to Mr. Graham that this woman was not

5    consenting.  Well, yes, he threatened to kill her in order

6    to subdue her and then he strangled her on three different

7    occasions.

8    **Q.**  You're referring specifically to the last incident; is

9    that right?

10   **A.**  I was referring specifically because that's the latest.

11   **Q.**  How about the prior incidents?

12   **A.**  Well, the, he could -- one could argue -- I'm not

13   arguing -- but you could argue that in the car with the

14   woman that he picked up, he had some reason --

15          **MR. GOLD:**  Objection if she is not making the

16   argument.

17          **THE COURT:**  Well, she is giving an opinion.

18          **MR. SINNIS:**  She is saying it is not her opinion.

19          **THE COURT:**  I think that is her opinion.

20          **MR. SAVERY:**  She's going to explain what her

21   opinion is if we give her a chance.

22          **THE WITNESS:**  It is my opinion that it is possible

23   to ask the question about whether he resorted to first rape.

24   Beyond that point it isn't because he attacked a stranger on

25   a path and attacking a stranger, an eight-month pregnant

1   woman in a public place in the middle of the afternoon on a

2   path is not consistent with thinking that the rape was

3   consensual, that was sex was consensual.  That he clearly

4   knew that that was nonconsensual interaction by its very

5   nature.  Going in -- pushing his way in a woman's house who

6   is screaming and trying to fight him off, there is clear

7   evidence that he understood the rape was not consensual.

8           And he, at least in the -- and he continued with

9   the rape anyway.  He was able to successfully rape the

10  woman.  So the knowledge that she was not consenting and had

11  to be threatened with her life in order to consent and that

12  she was screaming and frightened, this did not stop the

13  attack and it did not diminish his arousal.  So that was one

14  of Dr. Doren's categories.

15          We don't have a repetitive pattern across the rapes

16  because the rapes continued to escalate in violence.  And we

17  have a repetitive pattern within the last rape but there is

18  no explanation for the strangulation on three occasions

19  except the sexual script.  She was already subdued.  So what

20  other reason is there for strangling someone who has already

21  agreed to have sex except that you find the strangulation

22  sexually exciting.  If he wanted to kill her, he would have

23  just kept strangling her.  So he wasn't trying to kill her.

24  He let her come back to consciousness and then he moved her

25  and he strangled her again.

1          So we have sadistic elements in the assault.  And

2     that is one of the things that Frances who criticizes many

3     things about the way this is diagnosed says that you can use

4     to determine if it's a paraphilic rapist.

5          So we're down to No. four, repetitive patterns.

6     No. three, virtually all of his criminal offending is

7     sexual.  He has what I consider a fairly minor nonsexual

8     criminal history, at least in cases of the offenders that I

9     see.  We have an assault at fifteen and another assault in

10    part of the domestic violence incident but he does not have

11    a big track record of other criminal offenses.

12         **THE COURT:**  Talking about the track record, what is

13    the timeline here from the first sexual encounter, I guess

14    that is in the car --

15         **THE WITNESS:**  1974 to 1987.

16         **THE COURT:**  And then the second one is on the canal

17    there in Washington; right?

18         **THE WITNESS:**  That's right.

19         **THE COURT:**  The pregnant woman.

20         **THE WITNESS:**  That's right.

21         **THE COURT:**  And the third one is when he invades

22    the house of the person he gave a plant to.

23         **THE WITNESS:**  Yes.  Although, yes, an alleged rape

24    in between.

25         **THE COURT:**  Well, what timeline is that?  That is

1    three episodes in what?

2         **THE WITNESS:**  1974 to 1986, '87.

3         **THE COURT:**  So does it strike you that that makes

4    someone a sexually dangerous person if they have three

5    episodes in fifteen years, whatever it is?

6         **THE WITNESS:**  What it says is that the paraphilic

7    arousal wasn't temporary, that he sustained it over more

8    than a decade and is continuing to through assault which

9    speaks to a --

10        **THE COURT:**  Does it argue the other way, the fact

11   that he didn't act on it more than three times, three

12   episodes in -- how many years is that?

13        **MR. SINNIS:**  12 to 13 years.

14        **MR. SAVERY:**  13 years.

15        **THE WITNESS:**  He was incarcerated for much of that

16   time.  He was incarcerated for one six-year stretch for --

17        **THE COURT:**  So take six years out of it.  Don't

18   give him credit for anything.

19        **THE WITNESS:**  Well, in fact, he raped within a few

20   months of being released on I think two occasions.  He

21   actually raped very quickly after release because he was

22   incarcerated first for the first one and then he, when he

23   was released he raped.

24        **THE COURT:**  Okay.  Go ahead.

25   BY MR. SAVERY

1   **Q.**  You can continue with your discussion of Doren's

2   criteria and how you applied it here.

3   **A.**  The raping when willing to have consensual sex doesn't

4   apply because the strangers were not willing to have

5   consensual sex.  The high frequency has to do with the fact

6   that he did rape very quickly when he was released and he

7   was on supervision, he was raping while he was still on

8   supervision in two instances.

9        The high likelihood of getting caught at three

10  o'clock in the afternoon on a public path.  There is a high

11  likelihood of getting caught going to your neighbor's house

12  who knows that you live across the way because you've

13  identified yourself as a neighbor.  It is a virtual

14  certainty of getting caught.

15       The consenting sex partner, I believe he told

16  Dr. Mills that he was living with someone at the time, that

17  he lived with her for several years so he had a partner in

18  the home.

19  **Q.**  I am sorry, can I stop you there.

20       Can you explain that a little further.  He had a

21  partner in the home at the time he offended?

22  **A.**  Yes, he had a partner in the home so he -- if you are

23  just looking for sex, you just want sex, he has someone at

24  home that he is having sex with and is able to have sex with

25  so why do you go out and rape.  One reason is consenting sex

1    isn't enough.

2         Various types of victims, he actually doesn't.  His

3    victims are pretty much adult females within a narrow range

4    and we don't see any evidence of a rape kit.  So certainly

5    he didn't fit all the criteria but he certainly fit --

6         **THE COURT:**  I am sorry, your voice dropped.  A rape

7    kit?

8         **THE WITNESS:**  Yes, he didn't have -- there are

9    rapists who carry masking tape -- duct tape and tools for

10   burglary and things like that just to get in the house.  So

11   he did not have a rape kit per se.  But then again, this was

12   his first home invasion so he didn't have a set modus

13   operandi.

14   BY MR. SAVERY

15   **Q.**  Now, apart from the authorities that recognized the

16   diagnosis which we just spent some time on, are you familiar

17   with the scientific research or analysis that supports

18   generally the existence of this category of paraphilia?

19   **A.**  Yes.

20   **Q.**  And can you tell us about that, please?

21   **A.**  Okay.  There are two types of studies and there are a

22   lot of each of them so I'm just going to mention a category

23   and a couple of examples.

24        First of all, there is a long history going back to

25   the '70s of plethysmograph studies.  And what those

1    plethysmograph studies show is that in general rapists

2    respond differently than non-rapists to audio descriptions

3    of rape.

4           Now, remember, most of these studies are of rapists

5    as a group and we know that all rapists don't respond

6    differently so for the mean to be higher, you have to have a

7    significant number of rapists who do respond differently.

8    For example, there is the most recent study -- well, first

9    of all, Quinsey and his group have done a series of studies

10   and they reviewed other people's studies as well.  And in

11   his 2003 article summarizing the research in this -- and

12   that is on the bib -- Quinsey said, "It is incontestable

13   that rapists differ from non-rapists in their responses to

14   sexual coercive stimuli relative to consensual stimuli in

15   the laboratory studies review."

16          He mentioned that he could, he had only one

17   negative finding in the literature on that.

18          There is also a brand-new 20009 study that just

19   came out.  And what --

20   **Q.**  I'm sorry.  Can you refer to the name of that study,

21   please?

22   **A.**  Michaud and Proulx.  I have never known how to pronounce

23   his name.  Do you want me to --

24   **Q.**  Is it P-R-O-U-L-X?

25   **A.**  It's M-I-C-H-A-U-D and P-R-O-U-L-X, 2009 *Penile-response*

1    *Profiles of Sexual Aggressors During Phallometric Testing*,

2    *Sexual Abuse:*  A *Journal of Research and Treatment*, Volume

3    21, pages 308 to 334.  And that's the *Journal of the*

4    *Association for the Treatment of Sexual Abusers*.

5         And what he says is there was two response groups.

6    61 percent of the sample of rapists had stronger responses,

7    particularly to heated sex, to rape, than did -- they had

8    stronger responses than they did to consenting, particularly

9    to a sexual assault of a female with humiliation and sexual

10   assault of a female with violence.  So they had 61 percent

11   of their rapists showed a deviant arousal pattern.  Not all

12   of them but a significant percentage of their rapists did.

13        Now, there is another very interesting study by

14   Barbaree and what he looked at was subgroups of rapists.

15   Most of them really haven't focused on subgroups.  And what

16   he found was that when you classify them according to

17   subgroups, the sexual subgroup was characterized by a

18   deviant arousal pattern on this plethysmograph, on the

19   plethysmograph.

20        So there is a whole series of studies, it could

21   take a long time to describe, but those are just a couple of

22   examples.

23        In general what they find is that rapists are often

24   aroused to both consenting and nonconsenting sex.  And as

25   the suffering gets greater, you actually get a better

differentiation of the normal group and the rapist group
because the normal group gets less and less aroused as the
suffering gets greater and the rapists do not.  That's one
series of studies we have to know that this is real, that
there really are people who have a disordered arousal
pattern around rape.

The second series or class of studies are the
typology studies.  And, again, this has been going on for 40
years also.

And Knight and Prentky have probably the best, most
empirically backed typology today.  And in 1991 they
reviewed the old typologies.  And they found in a number of
different older typologies that four dimensions were
typically seen by clinicians.  They include sexualization,
sexual fantasies and paraphilias, okay.  So they say that
rapes are, you can divide them by the amount of aggression,
the presence or absence of antisocial personalities, sadism
and sexualization.

Now, in their modern studies they find that there
are different kinds of rapists.  There are opportunistic
rapists.  There are pervasively angry rapists that beat up
women and rape women.  There are vindictive rapists that
don't beat up, they just don't like women very much.  And
there are rapists with a disordered arousal pattern, some of
whom are sadists and some of whom are just sexually

1    attracted to a struggling female who does not want to have

2    sex with them.

3           So if you go to the literature of how do we divide

4    rapists into subgroups, you don't find literature that

5    leaves out this category, that says that there are no

6    rapists that have a disordered arousal pattern.

7    **Q.**  Okay.  Thank you.

8           Now, are there articles of commentators or

9    professionals who argue that NOS (Nonconsent) is not a valid

10   diagnosis?

11   **A.**  Yes.  And I think the forerunner of those is probably

12   Zander or the one that is most well known.

13   **Q.**  Okay.  Now, can you tell us a little bit about Zander

14   and what his position is?

15   **A.**  Well, Zander's position, he is against the civil

16   commitment of nonpsychotic sex offenders.  He thinks that

17   only, as I understand it, only psychotic sex offenders

18   should be civilly committed.  He also questions pedophilia

19   saying that there is certain cultures who support it

20   historically and, therefore, it should not be a mental

21   disorder.

22          He also doesn't agree with Paraphilia NOS.  He also

23   claims --

24          **MR. GOLD:**  Your Honor, I'm going to object to this.

25   She seems to be just describing his views and not his work,

1    for example, this comment about pedophilia or --

2         **THE COURT:**  Well, we did cover that in my last case

3    so we don't have to hear about it again.

4         Why don't you go ahead.

5         **MR. SAVERY:**  Okay.

6    BY MR. SAVERY

7    **Q.**  Well, can you tell us, if you can cut to the chase on

8    Zander's view regarding NOS (Nonconsenting), can you tell us

9    a little bit about his position there and whether or not you

10   are convinced by him?

11   **A.**  I am not -- as I understand his position, his position

12   is that it should not be used in civil commitment cases.

13        **MR. GOLD:**  And, again, just on foundation, Your

14   Honor, how she knows about his position --

15        **THE COURT:**  Well, you can have a chance to ask all

16   the questions you want in a short time.

17        **MR. GOLD:**  Okay.

18        **THE COURT:**  She is fielding them one at a time.

19   **A.**  He has a section in his article --

20   **Q.**  Can you tell us which article that is?

21   **A.**  "Civil Commitment Without Psychosis, The Law's Reliance

22   On The Weakest Links In Psychodiagnosis."

23   **Q.**  Okay.

24   **A.**  From the *Journal of Sex Offender Civil Commitments,*

25   *Science and Law.*  He claims in this that Dennis Doren made

1    up the diagnosis.

2            **THE COURT:**  Who made it up?

3            **THE WITNESS:**  Dennis Doren.  And, of course, Dennis

4    Doren wasn't on the Work Committee for DSM-IV or DSM-III

5    which put this diagnosis in.  And Doren has since published

6    an article called, "Setting the Record Straight" in which he

7    made it clear that what he made up was some criteria to help

8    distinguish this from other conditions but that, of course,

9    this diagnosis preceded Dennis Doren by a long -- by many

10   years.

11   **Q.**  Okay.  And are you familiar with the work of Dr. Frances

12   on this issue of Paraphilia NOS (Nonconsent)?

13   **A.**  Yes.

14   **Q.**  Can you tell us a little bit about that?

15   **A.**  Frances was on, was the editor of DSM-IV I believe, not

16   DSM-IV-TR but DSM-IV.  And Frances is a pretty serious

17   critic of the way this is diagnosed and says a number of

18   negative things about the way that this is diagnosed.

19          But nonetheless this is from an article called,

20   "Defining Mental Disorder When It Really Counts, DSM-IV-TR

21   and SVP/SDP Statutes."  And that was in the *Journal of the*

22   *American Academy of Psychiatry and the Law* in 2008.

23          And, nonetheless, what he says is this diagnosis

24   Paraphilia NOS is given to distinguish the criminally

25   inclined individual who rapes as part of the broad

1    repertoire of illegal activities from the rapist driven by

2    deviant sexual urges, namely, arousal to coercion.

3            Let's see.

4            **THE COURT:**  Arousal to coercion you said?

5            **THE WITNESS:**  To coercion -- the diagnosis is given

6    to distinguish the two.

7            **THE COURT:**  Oh, I see.

8            **THE WITNESS:**  Okay.  And then it says what Frances

9    is opposed to again is diagnosing it just on the basis that

10   he's raped a lot of people so he must be a paraphilic.

11           "While there may be cases," this is a quote, "where

12   the diagnosis is justified, purely on the basis of rape

13   behavior, it was never intended to convey that the acts

14   alone would be paraphilic.  Some rapists may be triggered by

15   opportunity, others may occur in the context of

16   intoxication, related disinhibition and some may reflect

17   character disorder or nonparaphilic pathology."

18           And then he goes on to say, "This distinction does

19   not mean that Paraphilia NOS cannot or should not be used to

20   describe some individuals who commit coercive sexual acts.

21   However, such diagnosis would require considerable evidence

22   documenting that the rapes reflected paraphilic urges and

23   fantasies linking the coercion to the arousal."

24           And then a little later, "Either is inferred by the

25   acts perpetrated on the victim or by the interview

1    information."  And he goes on to say, "One type of evidence

2    to consider is whether there are sadistic acts present."

3              And he goes on to say, "It is possible that the

4    repetitive expression of sadistic behaviors, for example,

5    domination, strangulation, beatings and a particular case of

6    a serial rapist may well warrant the diagnosis of Paraphilia

7    NOS with sadistic traits when there is insufficient evidence

8    to support the criteria for sexual sadism."

9              And that's exactly the situation in this case.  So

10   Frances is considered a great critic.  But when you read

11   Frances, what you see is Frances is opposed to this

12   diagnosis based on acts alone but does not question whether

13   there is a real disorder or whether it can be diagnosed as

14   Paraphilia NOS.

15   **Q.**  Okay.  Thank you, Doctor.

16             Have you previously diagnosed anyone with

17   Paraphilia NOS (Nonconsent)?

18   **A.**  Yes.

19   **Q.**  In support of commitment?

20   **A.**  Yes.

21   **Q.**  And how many times would you say you have diagnosed

22   someone with that disorder?

23   **A.**  I don't know.  I didn't -- it's not a frequent

24   diagnosis.

25   **Q.**  Have courts accepted your opinion?

1    **A.**   Yes.  And not just mine.  This is a common diagnosis as

2    evidenced by the research.

3    **Q.**   Okay.  And has a court ever rejected the diagnosis that

4    you have rendered in a commitment case that the subject

5    should be diagnosed with Paraphilia NOS (Nonconsent)?

6    **A.**   Not yet.

7    **Q.**   And are you aware of other jurisdictions that have

8    accepted the diagnosis?

9    **A.**   Yes.  There are studies of Arizona and there are studies

10   in Washington State.  In Arizona Paraphilia NOS was

11   diagnosed in 56 percent of the cases of SDPs.

12        In Washington State it was diagnosed in --

13   paraphilia -- I'm sorry.  Yes, in Washington State it was

14   specifically Nonconsent Paraphilia, it was diagnosed in 42,

15   43, 42.6 percent of the cases.

16        **THE COURT:**  Of what?  What are you talking about?

17        **THE WITNESS:**  I am talking about two pieces of

18   research.  One is an article by Jackson, Rebecca Jackson and

19   Henry Richards called, "Diagnostic and Risk Profiles Among

20   Civilly Committed Sex Offenders in Washington State."  This

21   was the *International Journal of Offender Therapy and*

22   *Comparative Criminology*, 2007.  And they gave a diagnostic

23   summary in which they listed the different diagnoses that

24   they had found in their review of cases in Washington State.

25   And Nonconsent Paraphilia was diagnosed in essentially 43

1   percent of the cases.

2           The second article --

3           **MR. SINNIS:**  Excuse me.  Can the government provide

4   us a copy of what she is reviewing, because we have not seen

5   it?

6           **MR. SAVERY:**  Sure.

7           **THE COURT:**  Okay.

8   **A.**  The second article was by Judith Becker who consults to

9   their SVP program, Jill Stinson, Shannon Tromp, T-R-O-M-P,

10  and Gene Messar, M-E-S-S-E-R, called, "Characteristics of

11  Individuals Petitioned For Civil Commitment."  And that was

12  from the *International Journal of Offender Therapy and

13  Comparative Criminology*.  And that was a 2003 article.  And

14  in that 56 percent of the cases were diagnosed with

15  Paraphilia NOS.

16  **Q.**  Okay.

17  **A.**  Now, that doesn't say nonconsent.  Some of those might,

18  some rare ones might have been necrophilia or something

19  else.

20  **Q.**  Okay.  Now, have you ever assessed a repeated rapist as

21  not being diagnosed with Paraphilia NOS (Nonconsent)?

22  **A.**  Yes.

23  **Q.**  More than once?

24  **A.**  Yes.

25  **Q.**  And how would you distinguish those types of cases where

1   you have rendered that opinion from what we are dealing with

2   here?

3   **A.**  Well, in the ways that I just described.  I look at the

4   behavior and I look at all possible explanations for the

5   behavior that I can find.  And I try to see if there is an

6   alternative explanation other than Paraphilia NOS.

7          And I also look at any available literature about

8   how to make the distinction, Doren says the most thorough

9   one, so I look at the criteria he has set, look at the issue

10  of sexual sadism that Frances raised and try to make a

11  determination whether this behavior reflects some underlying

12  sexual attraction to rape or not.

13  **Q.**  Okay.  Is Paraphilia NOS (Nonconsent) a mental illness,

14  abnormality or disorder in your opinion?

15  **A.**  Yes, it's clearly a disorder because it's in the DSM-IV.

16  **Q.**  And in the case of Mr. Graham does this paraphilia

17  diagnosis represent a serious mental illness, abnormality or

18  disorder?

19  **A.**  Yes, it's definitely serious.  It's interfered with his

20  liberty for most of his life and so it has impaired his

21  occupational and social functioning extremely and certainly

22  had a devastating impact on the victim.

23  **Q.**  Now, are you familiar with Dr. Mills's views on the

24  issue of whether paraphilia can never qualify as a serious

25  mental illness, abnormality or disorder?

1    **A.**  Yes.

2    **Q.**  And what is his position on that?

3    **A.**  I think he finds that neither the personality disorders

4    nor the paraphilias can qualify.

5    **Q.**  Do you agree with that?

6    **A.**  No.

7    **Q.**  Why not?

8    **A.**  I don't know on what basis anyone can make that claim.

9    Something that impacts your own life the way this has

10   impacted Mr. Graham's, something that can cause such harm to

11   victims and cause a host of psychological disorders and in

12   some cases lead to death, sexual sadism isn't serious?

13         It's a paraphilia that causes someone to strangle a

14   woman unconscious three times isn't serious?  In what sense

15   does the word "serious" have any meaning if these things

16   aren't serious.

17   **Q.**  Now, did you also consider a possible diagnosis of

18   Paraphilic Sexual Sadism?

19   **A.**  I didn't --

20         **THE COURT:**  Let me ask you this.

21         But is it true that if it isn't in the DSM-IV

22   manual that the balance, the majority of professionals don't

23   regard it as a dangerous condition, a sexually dangerous

24   condition?

25         **THE WITNESS:**  No, it was excluded specifically, and

1    the people who were there say this, because they were afraid

2    of the political repercussions that rapists would use --

3         **THE COURT:**  Regardless of the motive, if it is not

4    in the book, it doesn't count as far as the majority of your

5    highly respected peers; isn't that right?

6         **THE WITNESS:**  No, that actually isn't right.

7    Psychopathy, for example, has not ever made it to DSM-IV

8    series and yet it is entirely accepted throughout the field

9    and has a phenomenal amount of research on it.

10        **THE COURT:**  Well, people may accept it but that

11   doesn't mean that they regard it officially as a sexually

12   dangerous condition?  Unless it has got that stamp, the

13   DSM-IV stamp?

14        **THE WITNESS:**  Well they typically stick with DSM-IV

15   or the DSM-IV-TR for the diagnosis of it.  So that's why the

16   head of DSM-IV has said clearly that you can use this

17   diagnosis for that condition.

18        So they stick with it for that but there are

19   conditions and syndromes that everybody recognizes and

20   utilizes in their work that they don't treat as a diagnosis

21   but that everybody knows they're real and has phenomenal

22   reliability for that.

23   BY MR. SAVERY

24   **Q.**  And would those be viewed as illnesses, abnormalities or

25   disorders?

1    **A.**  I haven't seen anybody try to use them as a basis of an

2    SVP diagnosis.  For example, psychopathy isn't in DSM-IV but

3    we use it in risk assessment all the time because it has the

4    highest correlation of violence than anything.

5              But for SVP work people tend to stay with the

6    DSM-IV and the diagnoses that are within DSM-IV, for the

7    diagnostic part.

8    **Q.**  And can you explain for us, please, which particular

9    diagnosis in DSM-IV applies to Mr. Graham's paraphilia?

10   **A.**  Well, Paraphilia NOS.  I don't think there is any real

11   doubt about that.  Even the people typically who criticize

12   it, First and Frances both acknowledge that it can and

13   should be used in certain circumstances for certain people

14   for exactly that request.

15   **Q.**  Now, did you consider a possible diagnosis of Paraphilic

16   Sexual Sadism?

17   **A.**  I did.

18   **Q.**  And what is that disorder?

19   **A.**  Sadism is sexual arousal to pain, suffering, terror or

20   humiliation.  It isn't just through a struggling female who

21   doesn't want to have sex with you.  It's specifically the

22   suffering.  In its more advanced forms it results in

23   torture.

24   **Q.**  And why did you consider it here?

25   **A.**  He strangled her three times and brought her back, let

1    her come back each time after he had subdued her.  What

2    other explanation is there except that it was part of his

3    sexual arousal.  He also raped her after the third

4    strangulation so the strangulations did not inhibit the

5    sexual arousal.  They were actually apparently some kind of

6    foreplay.

7    **Q.**  What did you conclude with respect to the potential

8    diagnosis of Sexual Sadism?

9    **A.**  That he was arrested right afterwards so there was no

10   ability to establish the six-month timeline which is part of

11   the criteria so I stuck with the -- even the DSM-IV says in

12   certain circumstances you can take liberties, I stuck with

13   the criteria.  I didn't give him a separate diagnosis of

14   Sexual Sadism because we only had one incident and I

15   couldn't see a pattern from one incident.  But I did, I do

16   believe that those acts were sadistic in that particular

17   rape.

18   **Q.**  And what implications does that add to your assessment

19   in this case?

20   **A.**  Well, the one thing, it is important in evaluating what

21   is pushing the rapes because sexual sadism is clearly a

22   disordered arousal pattern.  And if you are simply raping

23   for an antisocial reason, you would have no reason to

24   strangle her unconscious three times.

25           So it speaks to a disordered arousal pattern.  It

1   also speaks to the fact that I don't believe it is the

2   antisocial behavior that is driving the rapes because that

3   should have been dropping out.  Instead the strangulations

4   are clearly in escalation from previous behaviors.  It is

5   the most violent, the last one was the most violent assault

6   yet so he is getting older but the rapes aren't getting less

7   violent.  The rapes are getting more violent.

8   **Q.**  Okay.  And has Mr. Graham been diagnosed with any

9   substance abuse disorders?

10  **A.**  Yes.

11  **Q.**  Can you tell us about those, please?

12  **A.**  Well, he has heroin, he has used heroin in the past and

13  also marijuana and PCP and wanted to use them badly enough

14  to use them on, when he was under supervision and gave a

15  urine test would speak to they're a bad problem with them.

16  **Q.**  Okay.  And what implications do those diagnoses have for

17  your assessment in this case?

18  **A.**  I don't think they have a lot of implication because I

19  don't think the drugs are pushing this thing.  I think that

20  if he were not taking the drugs he would still be at risk.

21  There isn't a lot of evidence that he was incapacitated from

22  the drugs and drug offenses.

23  **Q.**  Now, the Adam Walsh Act uses the term "suffers from" in

24  regard to serious mental illness, abnormality or disorder.

25  **A.**  Right.

1   **Q.**  Are you familiar with that?

2   **A.**  Yes.

3   **Q.**  Okay.  Did you consider Dr. Mills' views on the term

4   "suffers from"?

5   **A.**  I considered it.

6   **Q.**  Okay.  Can you tell us your understanding of what his

7   views are and what your thoughts are?

8   **A.**  As I understand it, he appears to be saying that if the

9   individual doesn't suffer from the behavior himself, if he

10   enjoys raping people, for example, then he cannot be

11   diagnosed as -- he cannot be civilly committed because the

12   disorder doesn't cause him to suffer.

13          I can only say that that is completely out of line

14   with any ruling in any court that I am familiar with.  If

15   that were the case, then the Legislature, if that was their

16   intent, they wouldn't be saying that only those sex

17   offenders who could be civilly committed who felt remorse

18   and guilt but that sex offenders who didn't feel remorse and

19   guilt and were happy to continue their behavior could not be

20   civilly committed.

21          There is no court I have ever seen that has taken

22   that view.

23   **Q.**  And apart from any courts and what their views might be

24   on this, as a professional in your field, what do you

25   understand the term "suffers from" to mean?

**A.**   The term "suffered" is commonly used to mean has the

condition of.  So I think in my report I said, for example,

the saying "He suffers from being too proud" doesn't

indicate that he is suffering because he is proud.  It

indicates that he has the condition of being too proud.  If

you look it up in the dictionary, it says that, that one of

the definitions of "suffers" is to have the condition of

something.

**Q.**   Now, to move on to your next opinion here, have you

reached an opinion to a reasonable degree of professional

certainty that Mr. Graham as a result of a serious mental

illness, abnormality or disorder would have difficulty in

refraining from sexually violent conduct if he's released?

**A.**   Yes, I believe he would.

**Q.**   And can you describe for us how you went about reaching

your conclusion on that issue?

**A.**   Well, for regular normal people, what controls their

behavior is the fact that they usually do not have any

intense overwhelming urge to engage in behavior.  And that

if, for example, they would consider raping someone, they

also have brakes.  And those brakes are in the form of

empathy, compassion and taking other people's point of view.

And they are affective components.  Empathy is not just a

cognitive thing.  It is an affective reaction to other

people suffering.

1          Most people if they see someone being strangled,

2     for example, would be extremely upset and get a negative

3     visceral reaction to that.  This is where the Antisocial

4     Personality Disorder is important because it is not simply a

5     list of unlawful behaviors, it also describes a reckless

6     indifference to people's safety.  It describes a remorseless

7     personality who does not feel the normal empathy and

8     compassion that other people feel.

9          Now, Mr. Graham has Antisocial Personality

10    Disorder.  And quite specifically he meets those

11    characteristics.  There is no evidence in the record of his

12    having a negative reaction to a victim suffering.  In that

13    last and most advanced rape, we saw that he strangles her

14    and she came back.  She couldn't even stand up and he

15    strangles her again at some point.

16          So his personality characteristics do not have the

17    normal controls built in that would allow him to resist

18    impulses.  He also has a deviant arousal pattern in my

19    opinion that is pushing him to commit these acts.  So he has

20    both an accelerator that is going to make it hard for him to

21    control his behavior.  And he has an absence of brakes that

22    are going to make it hard for him to control his behavior.

23    Even if he wants to control his behavior, he has to deal

24    with urges that most people do not have to deal with in

25    their lives.  And he doesn't have the built-in mechanisms

1    that allows him to resist those urges.  So I think he is

2    going to have difficulty.

3    **Q.**  Okay.  Can you tell us what an actuarial instrument is?

4    **A.**  The actuarial instruments are methods of assessing risk

5    in sex offenders.  And prior to their invention, to assess

6    risk in a sex offender you sat down and interviewed the sex

7    offender and then came up with an opinion of how risky you

8    thought his were.

9         The research indicated that this actually was a

10   really poor way to assess risk.  That the people clinicians

11   thought would reoffend often didn't.  The people they didn't

12   think would reoffend often did.  There was just no good

13   correlation with reoffending.

14        In response to that they tried a different

15   approach.  The actuarial instruments are much like the

16   insurance tables that -- actuarial tables that insurance

17   companies use.  If you go in for insurance, they want to

18   know some information, male or female, how old are you, do

19   you have a history of heart disease, do you have a history

20   of -- how long did your parents live?

21        Now, the reason they ask these questions are

22   because these are items that they know are associated with

23   early death.  And as a result of all that, they're going to

24   put you in a box and it's going to say 30-year old male,

25   healthy, no previous history, or it may say 70-year old

1    female, bad heart condition.  And they're going to set your

2    rates accordingly.  Because they know that they're going to

3    be, different percentages of people are going to die in

4    those two categories.

5         The actuarial instruments all have this in common.

6    They have a series of variables that have been identified as

7    associated with risk.  You get scored based on how many of

8    those variables you have.  Then they have done research that

9    shows how many people with a score of zero reoffended.  And

10   then it is five years, ten years, fifteen years.  How many

11   with a score of one, how many with a score of two, all the

12   way up to the top of the scale.  And different instruments

13   have different numbers of potential points.

14        So I scored the three main actuarial instruments in

15   use today.

16   **Q.**  Can you tell us what those are?

17   **A.**  The most common actuarial instrument is Static-99.  And

18   in one of the surveys of civil commitment states, 95 percent

19   of the evaluators use it.

20   **Q.**  Okay.

21   **A.**  With it being required in some states.

22   **Q.**  Now, what can you tell us about cross-validation as that

23   concept relates to the Static-99?

24   **A.**  Well, the last time I reviewed it there were I think 63

25   studies but that has been a couple of years ago so it has

1    been extensively cross-validated, not just in this country

2    but in England and New Zealand and a host of other

3    countries.

4    **Q.**  Now, are you familiar with the term "confidence

5    interval" as it's used in regard to actuarial instruments?

6    **A.**  Yes.

7    **Q.**  Can you describe that concept to us and how it relates

8    to the Static-99?  And I'll refer you to Exhibit 19.

9    **A.**  If we could survey every sex offender in the world, then

10   we would know exactly what the recidivism rates were.  We

11   can't do that so we are going to take the samples.  But if

12   take a sample in Wisconsin and take a sample in

13   Massachusetts, we might not get the exact same rate.  But

14   what we are going to get if we take enough of those samples

15   is they're going to cluster in a bell-shaped curve.

16        Let's say the true rate of recidivism of all the

17   sex offenders in the world, which we don't have, know, the

18   more studies you take, the bigger your sample size is.

19   They should cluster in a bell-shaped curve around the true

20   rate.

21        The confidence interval is -- but we don't know for

22   any one study whether it's exactly the true rate or whether

23   it's on this side of it or that side of it.

24        The confidence interval tells you the spread

25   between, the 95 percent confidence true rate falls somewhere

1   between these two numbers.

2   **Q.**   Okay.  And can you tell us what is contained in Exhibit

3   19?

4   **A.**   Well, Exhibit 19 are the new -- the old norms and the

5   new norms for Static-99 --

6   **Q.**   I'm sorry.  Can you tell us what a norm is?

7   **A.**   When they do these studies, they take a large number of

8   offenders and they see how many, some of them get zero, some

9   get one, some get two, different scores on the test.  Then

10   they see how many of that group reoffend as measured by

11   reconviction within a set period of time.

12           So that for other people who use these norms, those

13   considered norms, I can look at that table and I can say

14   this gentleman had a four.  Of the people who had a four

15   this percentage reoffended over five years, ten years,

16   fifteen years, whatever the rate is.

17   **Q.**   You mentioned Exhibit 19 contains old norms and new

18   norms.  Were the norms recently updated?

19   **A.**   They were.  In the middle of this case the norms were

20   updated.  When I wrote my first report, we were still

21   working on the old norms.  Then in October last year the

22   makers of the Static-99 along with a new researcher Paul

23   Helmus presented new norms at the Association for the

24   Treatment of Sexual Abusers based on larger sample sizes.

25   So the field has largely converted to the new norms.

1    **Q.**   Okay.  Has the Static-99 gained acceptance in the

2    psychological and psychiatric community?

3    **A.**   Well, yes, to the point that the actuarial instruments

4    are now required by the Association of the Treatment of

5    Sexual Abusers in their standards of practice.  Because the

6    evidence is so strong, that they are better predictors than

7    clinical assessment is.

8    **Q.**   Okay.  And did you score Mr. Graham using the Static-99?

9    **A.**   Yes.

10   **Q.**   And I am putting up on the screen now the first page of

11   Exhibit 23.  Can you tell us what this is?

12   **A.**   That is my summary of my scoring for the Static-99 of

13   Mr. Graham.

14   **Q.**   Okay.  And can you explain how you went about scoring

15   him and what the score was that you gave him?

16   **A.**   There are ten different items on the Static-99.  And the

17   first is age.  Age is built in in that in their studies

18   offenders 25 or younger had or 24 up to 25 reoffended more

19   than offenders older than that.

20        So if you are young, you get a point.  If you are

21   over 25, you get a zero.

22        The second item is ever lived with a lover for two

23   years.  For reasons that we don't entirely understand, it

24   appears to be a protective factor.  Individuals who have

25   lived with someone for two years or longer are less likely

1    to reoffend.

2           My understanding is that Mr. Graham did live with

3    someone for at least seven years, possibly longer, so he got

4    a zero on that as well.

5           The third item is index not sexual violence.  And

6    that is was the person so violent in the recent and the last

7    assault that they got a point -- that they got a separate

8    charge or got a separate conviction for violence.  An

9    example might be kidnapping and sexual assault or murder and

10   sexual assault.

11          He was extremely violent but it does not show up on

12   the scoring because the scoring rules require that he be

13   charged with it and he was not given a separate charge so he

14   gets zero on that.

15          The fourth one is previous nonsexual violence, any

16   conviction.  And that is has he ever had an assault

17   conviction.  And he has.  He has had several assault

18   convictions so he gets a one on that.

19          The next item is prior sexual offenses.  And you

20   get up to three points on this particular item.  If he has

21   no prior sexual offenses, he gets a zero.  If he has had

22   either one to two charges or one conviction, he gets a one.

23   If he has had three to five charges or two convictions, he

24   gets a two.

25          And if he has six plus charges or four previous

1    convictions, he gets three.

2          And he has a two on this because he has two prior

3    convictions.  Assault with intent to commit rape is

4    considered a sexual -- is a sexual conviction because he

5    didn't have to succeed in order for it to count.  And, of

6    course, he had one prior to that.

7          Prior sentencing dates.  If you have three or less

8    of any kind, for anything, for theft, for sexual offenses,

9    for anything, you get a zero.  And if you have four or more,

10    you get a one.  And he's had four or more so he gets a one.

11          Any convictions for noncontact sex offenses.  That

12    refers to things like exhibitionism, for example.  You don't

13    touch a victim.  And he has not had that so he gets a zero.

14          Any unrelated victims, that is, victims outside of

15    his family.  Zero for none, one for, if he's had even one.

16    And all of his offenses, all of his victims have been out of

17    his family so he gets a one.

18          Any stranger victims, a zero for none and one if he

19    has had any.  And he has had two, probably three, depending

20    on how long the first victim knew him.  But certainly the

21    woman on the path didn't know him previously nor did the

22    victim of the last assault so he gets a one.

23          Any male victims, he gets a zero -- if he had any,

24    he would get a one because, especially men who molest

25    children, the ones who molest male victims reoffend more.

1           But this is an adult rapist and they rarely rape

2    males so he would get a zero.

3    **Q.**  And so what score did you ultimately give Mr. Graham?

4    **A.**  Six.

5    **Q.**  Now, before we get to the meaning of that, did Dr. Mills

6    also score Mr. Graham on the Static-99 using the Static-99?

7    **A.**  Yes.

8    **Q.**  And what score did he give Mr. Graham?

9    **A.**  I believe he got a six also.

10   **Q.**  Okay.  Can you tell us what the significance is of a

11   score of six?

12   **A.**  Well, in the old norms that was actually the top

13   category.  In the new norms, six and above they have

14   differentiated with all the way up to as high as you can go

15   because they had enough numbers to separate them out.  But

16   it is a score that is associated with a 37 percent

17   reconviction rate for new sexual offense within the first

18   ten years.  That's according to the new high-risk norms.

19   **Q.**  And did you also consider risk of recidivation between

20   that ten-year period?

21   **A.**  Well, I did.

22   **Q.**  Why did you do that?

23   **A.**  Well, you do it routinely because the norms -- every

24   actuarial instrument has a limited follow-up period but the

25   law does not ask the question of when he will reoffend in

1    the first five years or the first ten years.  The law

2    typically has to do with does he have the likelihood of ever

3    committing a new sexual offense.

4    **Q.**  Okay.  And what did you determine as you extended out

5    your analysis beyond ten years?

6    **A.**  Well, if you want to extend it, it is a fair question to

7    raise given his age, if you want to extend it, it looks like

8    the ten-year rates are about 70 percent of the long-term

9    rates.

10   **Q.**  Now, do the percentages associated with the various

11   scores in the Static-99, do they accurately estimate the

12   risk of reoffense versus rearrest or reconviction?

13   **A.**  Well, these norms are based on rearrest.  Some of the

14   samples have rearrest and some have reconviction.

15   **Q.**  And what does that tell us as compared with the concept

16   of reoffense?

17   **A.**  Well, it is generally accepted that offenders don't get

18   caught for everything they do.  In fact, based on his

19   research Able thought the chance of getting caught for

20   sexual offense was about three percent.  People argue over

21   that about how many more offenses occur than people get

22   caught for.  But there is no dispute that we don't catch

23   everybody for everything that they do.

24          So it is clear that this, these figures are floor

25   figures.  They're not ceiling figures.  They are the minimum

1    number of offenses.  And we know that there are undoubtedly

2    people in those norming groups who had offenses that they

3    didn't get caught for so it doesn't measure the offending,

4    it just measures rearrest and conviction.

5         **THE COURT:**  So help me out.  Without going into the

6    whole thing, what does this six represent?

7         **THE WITNESS:**  The six is the score he got and it's

8    the --

9         **THE COURT:**  No, I understand; but what is it?  How

10   do I translate that into what?  Danger?

11        **THE WITNESS:**  You translate that into a 37 percent

12   rearrest rate.  Of the people who had his score, 37 percent

13   were either rearrested or reconvicted for a new sexual

14   offense in the first ten years of release.  That's what it

15   means.

16        **THE COURT:**  Okay.

17   BY MR. SAVERY

18   **Q.**  Now, how do actuarials compare with purely clinical

19   assessments in terms of accuracy?

20   **A.**  They, on average they tend to meet that.  Some of the

21   studies of clinical assessment show that some people get it

22   right and they are -- some of the studies show clinical

23   assessment is almost as good as an actuarial but not better.

24   Some of the studies show that a clinical assessment is no

25   better than flipping a coin.  And there are studies that

 1    show that it is worse than flipping a coin, that they

 2    actually get the wrong people released.  It's called the

 3    "wrong people," it's high risk.

 4         So there is great variability in clinical

 5    assessment.  And there is no way to know how good your

 6    clinical assessment is because nobody follows the results of

 7    the clinical assessment.  We don't know how many of the

 8    people that are called high risk by clinical assessment

 9    reoffend or how many of the people that are called low risk

10    don't.

11    **Q.**  Okay.  Now, you mentioned two other actuarial

12    instruments you used to score Mr. Graham or to assess his

13    risk of recidivism.  And I'm showing you the first page of

14    Exhibit 24.

15         What actuarial tool does this relate to?

16    **A.**  That relates to the Minnesota instrument which was

17    developed for SDP purposes in Minnesota by Doug Epperson and

18    Stephen Huot.

19    **Q.**  And how is this different from the Static-99?  What does

20    it add to the equation?

21    **A.**  Well, it's a different instrument.  It has some similar

22    variables and it has some different variables but it's also

23    been shown to correlate with reoffending.

24    **Q.**  Okay.  And without going through every category on this,

25    can you tell us how you scored Mr. Graham?

**A.**   In much the same manner as the Static-99, I went through

each of the items.  I'll just give a couple of examples.

For example, number of sex, sex-related convictions,

including current.  That's how they do it.  Only one

conviction, his current conviction, would be a zero.  If the

offender has two or more, it would be a plus two.

This instrument is different from the Static-99 in

that the weights for this instrument were derived

empirically.  In other words, they looked at the percentage

of people who reoffended who had only one conviction and

then they looked at the percentage of people who reoffended

who had two or more.  And for every five percentage points

difference they gave one point.  So this means -- the fact

they had a plus two means that the ones who had two or more

convictions had a ten percent higher reoffense rate than the

ones who had no other, no other convictions.

**Q.**   Okay.  And what did you ultimately score him with on

this tool?

**A.**   Well, he scores a plus 11.  There is a little bit of

controversy in that he probably should be a plus 12 because

there is one item where I scored conservatively where

actually Epperson I think would have given him an additional

point.  But I changed it because it doesn't matter.  It's in

the same risk category with either 11 or a 12.

**Q.**   Okay.  What is the significance of a score of 11 on this

1   actuarial?

2   **A.**   Now, this has not been renormed and it may be at some

3   point.   In fact, it probably will be at some point.   But

4   according to the current norms, 57 percent of offenders with

5   this score were rearrested for a new sexual sentence within

6   the first six weeks.

7   **Q.**   And is the MnSOST-R a tool that is used or is it widely

8   accepted in your profession as a means for assessing risk?

9   **A.**   It is.   It's not as widely accepted as the Static-99

10  because it has fewer research studies to back it.   And many

11  clinicians do not use it alone.   They only use it in

12  conjunction with the Static-99.

13         And I need to say that the new norms are expected

14  to be somewhat lower because it looks like overall sexual

15  recidivism rates have dropped over time.   We don't know how

16  much lower those norms will be until they come out.

17  **Q.**   Okay.   Finally, turning to RRASOR, what is RRASOR?

18  **A.**   The RRASOR?

19  **Q.**   Yes.

20  **A.**   The RRASOR is Rapid Risk Assessment for Sex Offense

21  Recidivism.   And it was actually the first one that came

22  out.   It came out in 1996 by Karl Hanson.   And it had only

23  four items on it.

24  **Q.**   Did you score Mr. Graham using the RRASOR?

25  **A.**   I did.

1   **Q.**  What score did you give him?

2   **A.**  He scored a three.

3   **Q.**  And can you tell us what significance the score of three

4   has?

5   **A.**  A score of three, let me get it exactly.

6           A score of three.  It's associated with a 37

7   percent reoffense rate in the first ten years of release.

8   That has not been renormed either.

9   **Q.**  Okay.

10  **A.**  At this point.

11  **Q.**  Can you tell us what role these actuarials played in

12  your assessment of Mr. Graham's risk of reoffense?

13  **A.**  Well, I started the actuarial instruments and then you

14  look to see if there are any other factors which should be

15  considered.  For instance, poor health, for instance, age,

16  for instance, treatment, those are three that are routinely

17  looked at.

18  **Q.**  What did you consider with respect to the first of

19  those, his health?

20  **A.**  He appears to be in good health.

21  **Q.**  And how about the second item?

22  **A.**  The second item -- well, there are three items.

23  Treatment, he appeared not to have cooperated with

24  treatment.  That doesn't mean -- that I would not lower his

25  risk assessment based on successful completion of treatment

1   which we do sometimes because we know treatment will impact

2   recidivism.

3          And the third item is age.  And I looked at that

4   pretty extensively.

5   **Q.**  Okay.  Can you describe for us the status of the

6   research on age and its effect on predicting risk of

7   reoffense?

8   **A.**  The age research is almost entirely in my opinion

9   contradictory at this point in time.  You could separate

10  out, for any position you have on age you can find an

11  article which will support it.  But it would not be a fair

12  presentation to pick one article or the other.  The truth is

13  when you have articles such as Barbaree's, and I believe

14  Dr. Mills referred to that, which shows an almost straight

15  line of decreasing with age.  We also have research like

16  Thornton and Doren which showed that that disappears if you

17  divide them into high risk and low risk and that all the way

18  through age 59 the high-risk offenders did not drop, did not

19  decrease their offending.  That's as far as the study.

20         We also have research like that by Fazel (ph.) who

21  found that the highest recidivism rates were those who were

22  under 25, that those who were between 25 and 39 and the

23  group that was 55 plus were in between the group that was

24  under 25 and the group that was 40 to 54 and that the lowest

25  recidivism rates were the group that was 40 to 54.  In other

1    words, it went up and down.

2           We have research by Langton that shows a plateau

3    from 18 to 39 and then it dropped off that to 45.  We have

4    research by Knight and Thornton which showed that there was

5    no statistical relationship with age.

6           We have research, a reevaluation of some of

7    Prinzi's research which showed that for rapists that

8    decreased in age, with age for rapists disappeared after the

9    first ten years.  His claim is that Prentky didn't talk

10   about that but actually the dropping rapists rates are for

11   the first ten years and then they do not decrease again.

12          And we have Rice and we have Knight and Thornton

13   saying that there is a possibility that aging in prison

14   affects people differently than aging outside of prison.

15   And that much of the research is based on British and

16   England -- British and Canadian samples where the sentences

17   are very short.  And that the group of offenders who are

18   coming out of those prisons may have served two years or so

19   and that the reason that they're not showing a decrease with

20   aging and recidivism may be, may be because they have a

21   sample that served much longer prison sentences and that the

22   prison sentences are, that that affects age differently.

23          In other words, in this field in all honesty we

24   have people like Barbaree who are saying that age is

25   potentially the most important variable and that there is a

1    straight line decrease in age.

2          We have Doren saying that he does not think you

3    should consider age because in his research the older

4    samples reoffended less because they had lower actuarial

5    scores and that they're not comparing age.  They're

6    comparing higher actuarial scores with lower actuarial

7    scores.

8          We hear Harris and Rice saying that they do not

9    believe age, that you should consider age in offending.  We

10   have, I mean, the most honest thing I can do is just tell

11   you exactly what the research says, which is there is no

12   consensus on the impact of aging and offending.

13         **THE COURT:**  There is no what?

14         **THE WITNESS:**  There is no consensus, there is no

15   agreement on the impact of aging and offending.

16         Now, when I was preparing for this, I decided,

17   given all the conflicting research, I actually emailed David

18   Thornton because he is one of the instrument makers of the

19   Static-99 and he is the person who is involved, one of the

20   people in the research.

21         And I asked him a question about this.  And I asked

22   a question about in his opinion would a six still qualify

23   for civil commitment.  His answer was depending on the case,

24   what other factors would push it up and down.  And he also

25   said that he thought you could take off a half a point for

1    an offender's age.  I don't know what implication a half

2    point is.  But in all honesty there is no agreement at this

3    point on the impact of aging.  Anybody who tells you

4    otherwise is presenting one side of the research and not the

5    whole picture.

6    BY MR. SAVERY

7    **Q.**  Okay.  Now, you include a graph in your report at page

8    33 and I have put it up on the screen here.

9    **A.**  Yes.

10   **Q.**  Can you tell us what this is and what your source was

11   for this graph?

12   **A.**  This was a presentation that David Thornton and Dennis

13   Doren did at ATSA, the Association for the Treatment of

14   Sexual Abusers.  And it has since been written up in an

15   article by Thornton.

16           And what they were showing is that the two lines

17   that go down on the bottom, those are what we might consider

18   lower risk offenders.  They define risk by sentencing

19   occasions or sentencing appearances, SA.  So that they have

20   offenders who had one sentencing appearance, offenders who

21   had two and offenders who had three.  These are sexual

22   offenses.  So they're looking at this.  It's a rough measure

23   of risk level.

24           And what they discovered was that the pattern of

25   aging is different for the ones who have one and two

1   sentencing occasions, the lower risk offenders, than it is

2   for the high-risk offenders.  The high-risk offenders didn't

3   decrease their offending with age.  But I did not present

4   this to say that this was the last word.

5          Barbaree has some research in which he found a

6   different point, a new percentage to say that the research

7   that shows that they just dropped like a stone doesn't take

8   into account the risk level of the offenders.

9   Q.  Okay.  And what implications does this research have for

10  your analysis in this case?

11  A.  Well, I really don't think there is any agreement at

12  this point in terms of the impact of age on offenders.  I

13  really don't.  I don't think that we would know how to count

14  the impact of aging on offenders.

15         Hanson has said part of the problem may be that

16  what we really should be looking at is not aging, it's the

17  health and vitality of the offender.  What people may

18  consider aging effects may be the fact that many people are

19  not in that great of health and as they get more feeble,

20  they have impairments or health problems that they're not so

21  able to reoffend and maybe we should be looking at the

22  health of the offender.

23         I have not adjusted it in any way for age.  I just

24  presented all the data.

25  Q.  Okay.  Switching gears, what role, if any, does

1    Mr. Graham's history of substance abuse play in your risk

2    assessment?

3    **A.**  Well, I noted it and I wrote about it in the report.  I

4    don't think it is the main factor here in this case.  I

5    think that sober or not sober, he still presents a risk to

6    reoffend.

7    **Q.**  And regarding your finding in that Mr. Graham's conduct

8    displays traits of sexual sadism, what implications does

9    that have in your risk assessment?

10   **A.**  Well, that is more significant.  I think it is a factor.

11   It strengthens the case.  This is a disordered arousal

12   pattern because Sexual Sadism is by definition a disordered

13   arousal pattern.  Whether he meets the criteria for the full

14   diagnosis or not, at present he certainly did commit

15   sadistic acts and it supports the diagnosis of Paraphilia

16   NOS.

17   **Q.**  Now, you've diagnosed Mr. Graham with both Paraphilia

18   and Antisocial Personality Disorder.

19            What is the relationship between those two

20   disorders with respect to your risk assessment in this case?

21   **A.**  There are people who have a paraphilia but they are not

22   antisocial.  The paraphilia worries them.  In some cases it

23   frightens them.  They seek treatment.  They don't want to

24   hurt anyone.  They feel guilty if they do.  And they

25   actively try to control the behavior because of the degree

1   of remorse and guilt that they feel.

2          When you combine the two disorders, you end up with

3   someone who has a motor and no brakes.  You have someone who

4   is pushed to commit the offending but who doesn't have the

5   remorse, the guilt, the concern for other people, the desire

6   not to violate other people's rights that someone has who

7   doesn't have that disorder so it exacerbates the condition

8   and decreases volitional control.

9   **Q.**  Dr.  Salter, what is an executive function test?

10  **A.**  It's a test for brain damage.

11  **Q.**  Did you see in Dr. Mill's report that he uses that test?

12  **A.**  Yes.

13  **Q.**  In your experience is that a test that is used in

14  connection with sex offender evaluations?

15  **A.**  I have never seen that test used before because it

16  requires a brain damage.  And I have never been in any

17  situation for an assessment where brain damage was

18  considered part of an SDP evaluation.  The law doesn't

19  require brain damage so far as I know.

20          **MR. SAVERY:**  Your Honor, may I have one moment?

21          **THE COURT:**  Yes.

22          (Whereupon, counsel conferred.)

23          **MR. SAVERY:**  I have no further questions, Your

24  Honor.

25          **THE COURT:**  Okay.  Do you want to start now or do

1   you want to start tomorrow?

2          **MR. GOLD:**  If it's all right with the Court, we can

3   start fresh tomorrow.

4          **THE COURT:**  Okay.  You get a vote.  Would you like

5   to start tomorrow or continue?

6          **THE WITNESS:**  Tomorrow.

7          **THE COURT:**  Okay.

8          All right.  Is it tomorrow we are coming back?

9          **THE CLERK:**  Yes, we are.

10          **THE COURT:**  All right.  Ten o'clock?

11          **THE CLERK:**  Ten o'clock.

12          **THE COURT:**  All right.  We will see you at ten

13   o'clock tomorrow.  Okay.

14          **MR. SAVERY:**  Thank you, Your Honor.

15          **MR. GRADY:**  Thank you, Your Honor.

16          **MR. GOLD:**  Thank you, Your Honor.

17          **MR. SINNIS:**  Thank you, Your Honor.

18          **THE CLERK:**  All rise for the Honorable Court.

19          Court is in recess.

20

21          (WHEREUPON, the proceedings were recessed at 3:50

22          p.m.)

23

24

25

C E R T I F I C A T E

I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


/S/CAROL LYNN SCOTT


_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377


**DATE:**September 17, 2009