1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2
     * * * * * * * * * * * * * * *
3    UNITED STATES OF AMERICA        *
                                     *
4              vs.                   *      CIVIL ACTION
                                     *      No. 07-12065-JLT
5    WESLEY GRAHAM                   *
                                     *
6    * * * * * * * * * * * * * * *

7              BEFORE THE HONORABLE JOSEPH L. TAURO
                  UNITED STATES DISTRICT JUDGE
8                          **DAY TWO**
                        **NONJURY TRIAL**
9
     A P P E A R A N C E S
10
               OFFICE OF THE UNITED STATES ATTORNEY
11             1 Courthouse Way, Suite 9200
               Boston, Massachusetts 02210
12             for the United States
               By:  Donald J. Savery, AUSA
13                  Mark J. Grady, AUSA

14
               FEDERAL DEFENDER OFFICE
15             51 Sleeper Street, Fifth Floor
               Boston, Massachusetts 02210
16             for the defendant
               By:  Ian Gold, Esq.
17                  Stylianus Sinnis, Esq.

18
                                    Courtroom No. 22
19                                  John J. Moakley Courthouse
                                    1 Courthouse Way
20                                  Boston, Massachusetts 02210
                                    September 10, 2009
21                                  10:05 a.m.

22

23
                    CAROL LYNN SCOTT, CSR, RMR
24                    Official Court Reporter
                 One Courthouse Way, Suite 7204
25                 Boston, Massachusetts 02210
                        (617) 330-1377

1                          **I N D E X**

2

3   **WITNESS:**              **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**

4   ANNA CAROL SALTER, Resumed

5    By Mr. Gold                        3                        188

6      By Mr. Savery                             161

7

8

9                      * * * * * * * * * *

10

11                       **E X H I B I T S**

12   **EXHIBIT:**                                   **IN EVD.**

13        No. 30   Emails ........................161

14

15

16

17

18

19

20

21

22

23

24

25

1                        **P R O C E E D I N G S**

2              **THE CLERK:**  All rise for the Honorable Court.

3              **THE COURT:**  Good morning, everybody.

4              **COUNSEL:**  Good morning, Your Honor.

5              **THE COURT:**  Okay.  We are all set for cross now,

6       are we?

7              **MR. GOLD:**  Yes, Your Honor.

8              **THE COURT:**  Okay.  Go ahead.

9              **THE CLERK:**  And just to advise you, ma'am, you are

10      still under oath.

11             **THE WITNESS:**  Yes.

12             **THE CLERK:**  Thank you.

13                     **ANNA CAROL SALTER, Resumed**

14                        **CROSS-EXAMINATION**

15      **Q.**  Good morning, Dr. Salter.

16      **A.**  Good morning.

17      **Q.**  I have a book up on the display here.  Do you recognize

18      that?

19      **A.**  Yes.

20      **Q.**  And what is that book?

21      **A.**  That's the book I wrote.

22      **Q.**  And what is the title of that book?

23      **A.**  *Predators, Pedophiles, Rapists and other Sex Offenders,*

24      *Who They Are, How They Operate and How We Can Protect*

25      *Ourselves and Our Children.*

1  **Q.**  Now, I'm going to turn to page 54 of that book.  There

2  is a passage there which is indicated in pencil right here

3  (indicating).  Can you see that there?

4  **A.**  Yes.

5  **Q.**  Could you read the sentence that is circled there?

6  **A.**  "A basic tenet of science is that if the facts don't

7  support the theory, the theory should give way.  It simply

8  does not happen.  Sometimes the facts are twisted to fit the

9  theory.  If that fails, they are simply ignored."

10  **Q.**  Now, that's a statement of a basic principle.  You wrote

11  that, you endorse that principle; right?

12  **A.**  Very much so.

13  **Q.**  Now, Dr. Salter, we spent a good portion of yesterday's

14  testimony talking about, or you did with Mr. Savery, about

15  the Paraphilia NOS (Nonconsent) diagnosis.

16        Now, it is your testimony that that diagnosis is a

17  valid diagnosis for forensic purposes?

18  **A.**  Yes.

19  **Q.**  Now, that diagnosis is different from other NOS

20  diagnoses in that it was specifically considered and

21  rejected by the American Psychiatric Association?

22  **A.**  As a separate entity, yes.

23  **Q.**  Now, it is your testimony that the American Psychiatric

24  Association rejected that diagnosis but intended that the

25  diagnosis still be made by professionals such as yourself

1    through the NOS category?

2    **A.**   Based on the statements of the last three editors of the

3    DSM series, DSM-III, DSM-IV and DSM-IV-TR, all of whom have

4    said that diagnosis covers paraphilic rapism.

5    **Q.**   Well, the DSM is published by the American Psychiatric

6    Association; right?

7    **A.**   Yes.

8    **Q.**   And the way it works is there are committees who talk

9    about what the diagnoses should be; right?

10   **A.**   Yes.

11   **Q.**   They consider diagnoses and either accept or reject

12   them?

13   **A.**   Yes.

14   **Q.**   They argue about what is a good diagnosis and what

15   isn't?

16   **A.**   Yes.

17           **THE COURT:**   Committees of what?

18           **MR. GOLD:**   Committees are brought together to

19   discuss --

20           **THE COURT:**   No, ask her, committees of what.

21   BY MR. GOLD

22   **Q.**   Committees of what?

23   **A.**   Typically psychiatrists who are chosen --

24           **THE COURT:**   Some particular association?

25           **THE WITNESS:**   Well, they're typically chosen I

1   believe by the editor because of their expertise in a

2   particular area.  And the editor convenes Work Groups which

3   determine the actual criteria for the specific category.

4   Diagnosis.

5   BY MR. GOLD

6   **Q.**  The DSM is an official publication of the American

7   Psychiatric Association; right?

8   **A.**  Yes.

9   **Q.**  And you've stated that it is the bible of diagnoses in

10  this country?

11  **A.**  Yes.

12  **Q.**  You also stated in a deposition in this matter that when

13  deciding to diagnose or not diagnose Sexual Sadism you

14  followed the letter of the law by not diagnosing Sexual

15  Sadism in this case; correct?

16  **A.**  When it was contradicted by one of the criteria because

17  he had not met six months.

18  **Q.**  Now, you agree that Paraphilic Coercive Disorder was

19  rejected by the APA when they were considering DSM-III;

20  right?

21  **A.**  As a separate diagnosis based according to the editor on

22  a political --

23          **THE COURT:**  Try to just answer the question, will

24  you?

25          **THE WITNESS:**  Okay.  It was rejected and I said

1    that as a separate diagnosis.

2    BY MR. GOLD

3    **Q.**  Well, you keep saying "as a separate diagnosis."  But

4    the Paraphilic Coercive Disorder was considered and then

5    rejected; right?

6    **A.**  Only as a separate diagnosis.  The editor of the DSM-III

7    in which that occurred subsequently published a casebook

8    which made it, in which he used Paraphilic Coercive Disorder

9    as an example of a disorder that would fall under Paraphilia

10   NOS.  So this is not something that I am saying.  This is

11   something that Robert Spitzer who is the editor said, who

12   was the editor at the time.  It's also, that position has

13   been endorsed by the following two editors --

14        **THE COURT:**  This will go a lot faster for you and

15   for everybody if you just answer the question.  It is

16   cross-examination.  You have done this before.

17        **THE WITNESS:**  Okay.

18        **THE COURT:**  He is entitled to a yes or no answer,

19   not to have you give an explanation.

20        If you can't answer the question yes or no, tell

21   him "I can't answer it yes or no" and he will give you a

22   different question.  Okay?

23        **THE WITNESS:**  Okay.

24        **THE COURT:**  Try it again.

25   BY MR. GOLD

1    **Q.**  Dr. Salter, you recall on direct examination yesterday

2    that you referenced two people who were previously involved

3    with the DSM, Allen Frances and Michael First.  Do you

4    recall that?

5    **A.**  Yes.

6    **Q.**  Now, Michael First was an editor of the DSM; right?

7    **A.**  Yes.

8    **Q.**  Now, and Allen Frances was also a very important person

9    with respect to the DSM; right?

10   **A.**  Chairperson.

11   **Q.**  And those two articles you recognized as authority or

12   authors you recognized as authorities in the field of

13   psychiatric diagnosis; right?

14   **A.**  Yes.

15   **Q.**  And you cite them both for support of your

16   interpretation that the current DSM allows for the diagnosis

17   of a paraphilia involving rape under the NOS category?

18   **A.**  Yes.

19   **Q.**  Now, part of your interpretation involves reference to a

20   document called the *Casebook*; right?

21   **A.**  Yes.

22   **Q.**  And the *Casebook* is not a publication of the American

23   Psychiatric Association; isn't that right?

24   **A.**  Yes.

25   **Q.**  Now, in the *Casebook* there is a reference to a disorder

1    having to do with rape being diagnosed under the Paraphilia

2    NOS category; right?

3    **A.**   Yes.

4    **Q.**   And you used that as support for your interpretation of

5    the DSM-IV-TR that it permits diagnosis of a rape paraphilia

6    under the NOS category; right?

7    **A.**   Yes.

8    **Q.**   Now, I have just put up on the display an article which

9    was referenced yesterday.  And the title of that article is,

10   "Defining Mental Disorder When it Really Counts, DSM-IV-TR

11   and SVP/SDP Statutes."  And there are three authors listed,

12   Allen Frances, M.D., Shoba Sreenivasan and Linda Weinberger.

13         Is that the article that was referenced in your

14   testimony yesterday?

15   **A.**   Yes.

16   **Q.**   And Allen Frances is -- I have just for the record put

17   the DMS itself opened up to page Roman Numeral XI.  It shows

18   the staff here of the American Psychiatric Association put

19   together to do the DSM.  And Allen Frances's name is up at

20   the top; right?

21   **A.**   Yes.

22   **Q.**   He is listed as the chairperson?

23   **A.**   Yes.

24   **Q.**   Now, the authors in this article are talking about the

25   issue that is before this Court right now, right, which is

1    defining mental disorder in SVP cases; right?

2    **A.**  Yes.

3    **Q.**  There is a section of the article, and for the record it

4    is on page 380.  This is the *Journal of the American Academy*

5    *of Psychiatry and the Law*.  And that is a peer-reviewed

6    journal; right?

7    **A.**  Yes.

8    **Q.**  And peer reviewed in the context of the social sciences

9    means that an article is submitted for publication and

10   typically sent out to anonymous reviewers who will then

11   review the content, make any comments and send it back;

12   right?

13   **A.**  Yes.

14   **Q.**  So the comments might be incorporated by the author, or

15   not, and then the article is submitted for publication;

16   right?

17   **A.**  Well, accepted or not.

18   **Q.**  If it is accepted; right?

19   **A.**  If it is accepted.

20   **Q.**  And so the peer-review process we consider to be one

21   assurance of a certain level of reliability in science;

22   right?

23   **A.**  Yes.

24   **Q.**  That's the purpose of it; right?

25   **A.**  Yes --

1  **Q.**  If you would read the -- in this article you, it is not

2  only the type of material you typically rely on but you have

3  read this article; right?

4  **A.**  Yes.

5  **Q.**  And it is now part of the corpus of information on which

6  you rely when you do these assessments; right?

7  **A.**  Yes.

8  **Q.**  Could you read the yellow highlighted sentence.

9  **A.**  "The use of Paraphilia NOS to describe repetitive rape

10  cannot be justified on the basis of the term or behaviors

11  alone."

12  **Q.**  And could I ask you to continue reading.

13  **A.**  "This distinction does not mean that Paraphilia NOS

14  cannot or should not be used to describe some individuals

15  who commit coercive sexual acts."

16  **Q.**  Now, if I could step you there for a moment.

17       So am I correct when I interpret that sentence to

18  say that Dr. Frances is, interprets the manual of which he

19  was the chairperson of the Task Force that put it together,

20  to permit in certain circumstances a diagnosis of a rape

21  related paraphilia?

22  **A.**  As Paraphilia NOS, yes.

23  **Q.**  Please keep reading.

24  **A.**  "However, such diagnosis would require considerable

25  evidence documenting that the rapes reflected paraphilic

1    urges and fantasies linking the coercion to arousal.  One

2    acceptable standard for using it may be to demonstrate clear

3    substantiation of urges and fantasies, either as inferred by

4    the acts perpetrated on the victim or by interview

5    information so as to distinguish it from criminal behavior

6    that is not rooted in sexual psychopathology."

7    **Q.**  If I could stop you there.

8           And so that is a central task of what the Court is

9    required to do in any SVP case; is that a fair statement?

10   **A.**  Well, in any SVP case that involves this issue.

11   **Q.**  But a principal concern of the Court's and professionals

12   such as yourself in these types of cases is distinguishing

13   from behavior that we would classify as criminal and that

14   type of behavior that we could classify as the product of

15   some sort of mental disorder?

16   **A.**  Yes.

17   **Q.**  If I could ask you to keep reading.

18   **A.**  "The term 'rape' does appear within the DSM-IV-TR in the

19   context of Sexual Sadism.  It is possible that the

20   repetitive expression of sadistic behaviors, for example,

21   domination, strangulation, beatings in a particular case of

22   the serial rapist may well warrant the diagnosis of

23   Paraphilia NOS with sadistic traits when there is

24   insufficient evidence to support the criteria for Sexual

25   Sadism."

```
 1              Do you want me to keep going?
 2   Q.  Continue, please.
 3   A.  "The DSM-IV-TR Casebook --"
 4   Q.  Let me stop you there.
 5              This is the Casebook on which you rely partly for
 6   your interpretation that it is appropriate to diagnose a
 7   rape-related paraphilia under the NOS category in this book;
 8   right?
 9   A.  Yes.
10   Q.  Keep reading, please.
11   A.  "The DSM-IV-TR Casebook provides an illustration of
12   Paraphilia NOS for a serial rapist (Jim) without antisocial
13   traits.  The narrative in the Casebook states during the
14   development of DSM-III-R the term 'Paraphilic Coercive
15   Disorder' was suggested for this particular kind of
16   paraphilia but the category has never been officially
17   recognized.  Therefore, Jim's disorder would be coded as
18   Paraphilia Not Otherwise Specified, DSM-IV-TR, page 579,
19   reference 13, page 173."
20   Q.  I stop you there.  So that is a quotation from the
21   Casebook itself; right?
22   A.  Yes.
23   Q.  And you were shown the Casebook yesterday; right?
24   A.  Yes.
25   Q.  The Casebook itself recognizes that the diagnosis was
```

1    never officially recognized; right?

2    **A.**   Yes.   Well, the separate diagnosis was not recognized,

3    yes.

4    **Q.**   That's right.   And then the authors of the *Casebook* who

5    are not the American Psychiatric Association; correct?

6    **A.**   Well, the authors are in the American Psychiatric

7    Association and all of them were involved in the DSM-III

8    which put it forward.   So I don't exactly know what your

9    question means.   But the authors were from the DSM-IV --

10   DSM-III Work Groups that established the diagnoses.

11   **Q.**   Well, are they all the authors who participated in the

12   decision as to whether to include the diagnosis or not?

13   **A.**   They're not all, not all of the authors were there, no.

14   **Q.**   And this product here is intended to be a representation

15   of the considered view of the American Psychiatric

16   Association as a whole; correct?

17   **A.**   Intended to be.   It's produced by the work, the specific

18   Work Groups.

19   **Q.**   Let's continue on with Dr. Frances with the word

20   "however."

21   **A.**   "However, reliance on the *Casebook* to buttress an

22   argument for using Paraphilia NOS to signify Paraphilic

23   Coercive Disorder may be a weak avenue, particularly in a

24   forensic context.   The *Casebook*, unlike the DSM-IV, does not

25   reflect the work or endorsement of the DSM-IV Task Force.

1    Therefore, it is not authoritative."

2    **Q.**  So Dr. Frances at least believes that the *Casebook* is

3    not a good interpretive guide as to the intent of the

4    authors of the DSM; is that fair to say?

5    **A.**  Dr. Frances has some issue with the *Casebook*, that is

6    fair to say.

7              (Pause in proceedings.)

8    **Q.**  Dr. Salter, I just switched the display on the screen.

9    Do you recognize this page from your report?

10   **A.**  Yes.

11   **Q.**  And the report, this is an image of the report which is

12   exhibit I believe one in this matter.

13              Now, here on the screen is your section on

14   Paraphilia Not Otherwise Specified.  Do you recognize that?

15   **A.**  Yes.

16   **Q.**  And I actually have highlighted here the same passage

17   which we just read in Dr. Frances's article; right?

18   **A.**  Yes.

19   **Q.**  And there you state your interpretation that paraphilic

20   rapism is intended to be covered by Paraphilia NOS as

21   indicated by the *DSM-IV-TR Casebook*.  In discussing a case

22   where an offender was specifically sexually aroused by

23   coercion, it states that, and then the quote that we just

24   read from Dr. Frances's article comes; correct?

25   **A.**  Yes.

1   **Q.**  Now, you then spend some time talking about the

2   essential feature of Paraphilia NOS which is that the

3   individual is sexually aroused by the victim's lack of

4   consent.  And then you state, "While not representing a

5   specific category in DSM-IV-TR, paraphilic rapism has long

6   been accepted as a clinical entity;" right?

7   **A.**  Yes.

8   **Q.**  And this passage here, we discussed this at your

9   deposition, is actually copied from another book; right?

10  **A.**  No, it isn't copied from another book.  I had read

11  Dennis Doren's statement on this and I didn't quite realize

12  that I had put them in the same order but it is not actually

13  copied.

14  **Q.**  Well, you cite three sources here.  John Money's 1986

15  book *LoveMaps* -- well, more than three.  Gene Able and

16  colleagues?

17  **A.**  Yes.

18  **Q.**  Marshall and Barbaree, Richard Laws?

19  **A.**  Yes.

20  **Q.**  And then Fred Berlin and Park Dietz; right?

21  **A.**  And John Money.

22  **Q.**  And John Money who we mentioned first.

23          Now, in support of your use of this particular

24  diagnosis you are citing court testimony; right?

25  **A.**  Yes.

1   **Q.**  Now, Dr. Doren we discussed yesterday his book on

2   *Evaluating Sex Offenders* which I am holding up right here

3   (indicating); right?

4   **A.**  Yes.

5   **Q.**  Now, Dr. Doren you said was a personal friend of yours;

6   right?

7   **A.**  Yes.

8   **Q.**  And he is an evaluator who does this sort of thing in

9   Wisconsin; right?

10  **A.**  He has since retired by he was head of the unit that did

11  civil commitment evaluations in Wisconsin.

12  **Q.**  So he worked for the Department of Health and Human

13  Services?

14  **A.**  Yes.

15  **Q.**  In Wisconsin.

16        And he was involved in sexually violent person

17  cases there; right?

18  **A.**  And around the country.

19  **Q.**  And around the country.

20        Now, he wrote this book and it was published in

21  2002; right?

22  **A.**  Yes.

23  **Q.**  This book would you agree with me is very influential in

24  the world of sexually violent person evaluations?

25  **A.**  Very.

1   **Q.**  Now -- and for the record, I have Chapter 3 of the book

2   *Evaluating Sex Offenders*, 2002, which is entitled,

3   "Diagnostic Issues Within Sex Offender Civil Commitment

4   Assessments;" do you see that?

5   **A.**  Yes.

6   **Q.**  Now, this is a chapter on which you relied to arrive at

7   your diagnosis in this case; is that fair to say?

8   **A.**  In part.

9   **Q.**  In part.

10          Now, I always found it interesting, and I think it

11  gives a sense of the terrain here, but this chapter actually

12  begins with a sample cross-examination on the very subject

13  of Paraphilia NOS related to rapism; is that right?

14  **A.**  Yes.

15  **Q.**  It begins, "Doctor, you diagnosed my client as having a

16  paraphilia related to raping; correct?"  And the witness

17  says, "Yes."

18          "And you supposedly used the DSM-IV to make that

19  diagnosis?"  And the witness says, "Yes."  And so on.

20          And an interesting feature of this diagnosis is,

21  the witness says the diagnosis was based only on overt

22  behavior; right?

23  **A.**  Yes.

24  **Q.**  And when with we read Dr. Frances --

25          **THE COURT:**  Where are you in this thing?

1              **MR. GOLD:**  Down three lines or three witnesses from

2     the top.

3              **THE COURT:**  I see it.  Okay.

4     BY MR. GOLD

5     **Q.**  And that is distinct from what Dr. Frances said about a

6     diagnosis of Paraphilia NOS (Nonconsent).  He said that it

7     can never be based simply on behavior; correct?

8     **A.**  Well, that is not how I understand it.  He is saying

9     that you have to be able to infer the construct and an

10    example he used of using behavior to refer to the construct

11    was sadism and that is a behavior.  What I understand him to

12    be saying is you can't just say he raped four people and,

13    therefore, he has Paraphilia NOS.  I think he did reference

14    behaviors.

15    **Q.**  Well, what he says in the highlighted passage is the use

16    of Paraphilia NOS to describe repetitive rape cannot be

17    justified on the basis of the term or behaviors alone;

18    right?

19    **A.**  Yes, and he qualifies that below, either as inferred by

20    the acts perpetrated.

21    **Q.**  Well, but Dr. Doren doesn't take that position; does he?

22    **A.**  Well, he does take that position that you have to infer

23    the construct from the acts and he says very, very clearly

24    that you cannot simply diagnose it based on the fact that he

25    has raped several people.

1    **Q.**  Well, Dr. Doren states that a diagnosis is permissible

2    or allowed by the manual simply based on behavior occurring

3    over a six-month period.  And he states that that's not

4    something he would do but he states that the diagnosis can

5    be made on the basis of behaviors?

6    **A.**  Technically -- actually you have to show me what he says

7    in that regard for me to be accurate.

8          (Pause in proceedings.)

9    **Q.**  Dr. Salter, I am making a note to myself to return to

10   that point as I was getting a little off track and I don't

11   have the cite that I wanted to show you right in front of

12   me.

13         But what we were talking about before was the

14   citations that you list in support of your diagnosis or in

15   this passage in which you state, "While not representing a

16   specific category in the DSM paraphilic rapism has long been

17   accepted as a clinical entity."

18         Now, you stated that you did not copy the passage

19   from Dr. Doren's book; right?

20   **A.**  No.

21   **Q.**  But, in fact, the sources you cite are pretty much

22   identical; right?

23   **A.**  I cited, I cited some of the same sources and I cited

24   additional sources.  I don't know if very many of the

25   annotated bibliography are in the book.

Certainly we both cited Able.  We both cited
Marshall and Barbaree.  And I was actually in the trial, at
the Turner trial in Wisconsin in which Park Dietz and Fred
Berlin testified and I cited that.

**Q.**  Well, let's look -- now, is it customary in support of a
diagnosis to cite to unpublished trial testimony?  Is that
something that happens commonly in your field?

**A.**  Yes.

**Q.**  It is?

**A.**  Yes.

**Q.**  To support a diagnosis with reference to the transcript
of a trial in which a psychiatrist has testified?

**A.**  Yes.

**Q.**  In what other contexts have you done that?

**A.**  I don't remember the examples specifically.  For
example, if the question, as it is in this case, is what was
the intent of the people in the Work Group, it would be
extremely relevant to hear the words of someone who was
there at the time.  And that's exactly -- Fred Berlin and
Park Dietz were both on the committee and knew better than
anyone what that committee intended.  And they talked about
that in the trial so it was appropriate to cite it.

**Q.**  Well, I am not asking how appropriate it is but how
common it is, Dr. Salter.  How common is it to cite
unpublished trial transcript in support of a particular

1    psychiatric diagnosis?

2    **A.**  Well, in my experience it is common.  You can see that

3    Dennis Doren did it.  I believe Zander did it.  I believe

4    First did it, although I'm not entirely sure about First.  I

5    believe that it is common.

6    **Q.**  Outside of the area of Paraphilia NOS, how commonly

7    would you cite unpublished trial transcripts in support of a

8    particular interpretation of the DSM?

9    **A.**  Well, whenever it is relevant.  I can't remember, I

10   don't remember the last time that occurred.

11   **Q.**  Now, for the record, look at the last two sentences of

12   this book.  It says, "Richard Laws has testified that,

13   quote, in the field of treating sex offenders, rape is

14   recognized as a paraphilia by most...practitioners."

15   **A.**  Yes.

16   **Q.**  (Deposition given June 11, 1999 concerning In Re:

17   Commitment of R.S., King County, Washington).

18         Now, we actually asked you during the deposition in

19   this matter if you could track down that transcript so we

20   could have a look at it.  Do you recall that?

21   **A.**  Yes.

22   **Q.**  And you weren't able to track it down; right?

23   **A.**  No, I had notes on it because I remember that case from

24   before but I couldn't find the transcript.

25   **Q.**  And then the sentence goes on, "Fred Berlin and Park

1    Dietz have testified to the same effect (In Re: Commitment

2    of G.T., Dane County, Wisconsin, 1997);" right?

3    **A.**   Yes.

4    **Q.**   Now, if we turn to your report, you end a passage, there

5    is a citation to Marshall and Barbaree in 1995, a published

6    source that you state supports your contention.  And then it

7    says, "Richard Laws has testified that, in the field of

8    treating sex offenders rape is recognized as a paraphilia by

9    most...practitioners." (Deposition given June 11, 1999,

10   concerning In Re: Commitment of R.S., King County,

11   Washington)."

12          If I'm not mistaken, Dr. Salter, those two

13   sentences are identical; correct?

14   **A.**   Well, yes.  It's a quote.

15   **Q.**   Well, the sentence including the internal quote is

16   identical to the sentence we just read from Dr. Doren's

17   manual; correct?

18   **A.**   Yes, there are five words introducing the quote and they

19   are identical.

20   **Q.**   And they are a citation to an obscure trial transcript

21   which you could not produce for us so that we could take a

22   look at it; right?

23   **A.**   I don't think it's so obscure.  It was well known at the

24   time because the defense withdrew Richard Laws after that.

25   He was actually testifying for the defense.

1    **Q.**  But it's not published in the book; is it?

2    **A.**  Well, that doesn't mean the trial is obscure.

3    **Q.**  You couldn't find the transcript for us when we asked

4    for it; right?

5    **A.**  That's true, I couldn't find the transcript.

6    **Q.**  And then it continues to, the passage goes on, "Both

7    Fred Berlin and Park Dietz have agreed (In Re: Commitment of

8    G.T., Dane County, Wisconsin, 1987)."

9          Now, despite the fact that this is you say 1987 and

10   Dr. Doren says 1997, those sentences are identical as well;

11   correct?

12   **A.**  Yes.

13   **Q.**  So you copied those sentences from Dr. Doren's manual

14   into your report for this case?

15   **A.**  That's not true, sir.  I read Doren's material and I

16   read other people's material.  I remembered those cases.  I

17   was involved in that case and I wrote my report.  If they're

18   in the same order or they sound familiar, it was

19   unintentional.  But the data that they're based on is sound.

20   That's exactly what they said.

21   **Q.**  Well, for the record, you cite the same sources, not

22   just these two but the other two in slightly different

23   language and then this description of the trial testimony we

24   have just discovered except for the 1987, 1997 issue as

25   identical; right?

1   **A.**   That section is.  I don't think he had Money's, I don't

2   think Money's is in his or some of the other things.  But

3   that section he does cite the same sources.

4   **Q.**   Even Dr. Doren recognizes that there is controversy

5   about this issue; right?

6   **A.**   Yes.

7   **Q.**   And he says right here, "In 2002 this category probably

8   represents the most controversial among the commonly

9   diagnosed conditions within the civil commitment realm;"

10  right?

11  **A.**   Yes.

12  **Q.**   Or sex offender civil commitment realm.

13          Now, what Dr. Doren does here is he first of all

14  supports his interpretation that the current -- that it is

15  appropriate to diagnose Paraphilia NOS or a rape related

16  to -- sexual disorder related to rape with the Paraphilia

17  NOS label; right?

18  **A.**   Yes.

19  **Q.**   And Dr. Doren notes that it was considered and rejected

20  by the APA; right?

21  **A.**   As a separate entity, yes.

22  **Q.**   Well --

23          **THE COURT:**   You keep saying that.  What are you

24  trying to tell me when you say it is a separate entity?

25          **THE WITNESS:**   Well, because I don't believe the

1    condition was rejected because the editors have since said

2    that you can use paraphilia NOS for the same condition.

3    BY MR. GOLD

4    **Q.**  Well, but what we're talking about here, Dr. Salter, is

5    interpretation of this book; right?

6    **A.**  Yes.

7    **Q.**  And you interpret the book by reference to external

8    sources to support your diagnosis.  Now, those are --

9    correct?

10   **A.**  Yes.

11   **Q.**  And those sources you state are influential; right?

12   **A.**  Yes.

13   **Q.**  Because they were involved in the development of this

14   manual; right?

15   **A.**  Well, that one and the previous two.

16   **Q.**  The previous two.

17   **A.**  It actually came in on the DSM-III.

18   **Q.**  But it's typical to understand the diagnosis with

19   reference to the past manuals; right?

20   **A.**  Well, if it came in in the past manual, the past manual

21   is relevant.

22   **Q.**  Now, you're familiar with Tom Zander; right?

23   **A.**  His work, yes.

24   **Q.**  And Tom Zander -- well, Dr. Doren states his view that

25   the diagnosis was rejected for political reasons; right?

1    **A.**   Well, his view among other people's, yes.

2    **Q.**   And that's the view he puts forward in this book; right?

3    **A.**   Yes.

4         (Pause in proceedings.)

5    **Q.**   And for the record I have put on the screen an article

6    entitled, "Commentary:  Inventing Diagnosis for Civil

7    Commitment of Rapists."

8         Are you familiar with this article?

9    **A.**   Yes.

10   **Q.**   When did you first read this article?

11   **A.**   I have no idea.  I don't remember when I first read this

12   article.

13   **Q.**   Well, did you read it in connection with your

14   preparation for this case?

15   **A.**   I reread it.  I don't remember when I first read this

16   article.

17   **Q.**   How many articles have you read by Dr. Zander?

18   **A.**   I think two articles by Dr. Zander.

19   **Q.**   And one was written recently; correct?

20   **A.**   Yes.

21   **Q.**   And one was written a few years ago; right?

22   **A.**   Yes.

23   **Q.**   Now, you don't reference this article in your

24   bibliography with your report?

25   **A.**   No, I referenced his other article I believe.  Or I

1    referenced it in the annotated bibliography.

2    **Q.**  Well, but you submitted a bibliography with your report

3    in this matter; right?

4    **A.**  Yes.

5    **Q.**  And one of the things you cite in your bibliography is

6    this article that we were discussing by First and Halon --

7    **A.**  Yes.

8    **Q.**  -- yesterday; right?

9    **A.**  Yes.

10   **Q.**  Now, that article was published in 2008; right?

11   **A.**  Yes.

12   **Q.**  But that article you cite in an in-press version; right?

13   **A.**  I believe so.

14   **Q.**  Well, let's just lock that in.

15         **THE COURT:**  Did you say in press?

16         **MR. GOLD:**   In press, yes.

17         **THE COURT:**   That is a new one on me.

18   BY MR. GOLD

19   **Q.**  "In press" is a term that signifies that an article has

20   been accepted for publication but the publication hasn't

21   formally come out; right?

22   **A.**  Yes.

23         **THE COURT:**   Thank you.

24   BY MR. GOLD

25   **Q.**  Now, here I have page 14 of your report.  And just very

1    briefly you make a citation to the First and Halon article

2    that we were talking about in published form yesterday but

3    at the time you wrote your report you were citing it in

4    press; right?

5    **A.**   Yes.

6    **Q.**   And when we asked you for a copy of it, you didn't give

7    us the published version, you gave us a copy of this

8    manuscript; right?

9    **A.**   Yes.

10   **Q.**   Now, the First and Halon article appeared in 2008 in

11   this journal; right?

12   **A.**   Yes.

13   **Q.**   The *Journal of the American Academy of Psychiatry and*

14   *the Law*; right?

15   **A.**   Yes.

16   **Q.**   And, in fact, if you know, it appeared in the same

17   number of the journal that this article does; right?

18   **A.**   I don't remember that but I will accept your statement.

19   **Q.**   For the record, briefly, the article that we discussed

20   yesterday was, "The Use of DSM Paraphilia Diagnoses in

21   Sexually Violent Predator Commitment Cases," by Michael

22   First and Robert Halon; right?

23   **A.**   Yes.

24   **Q.**   And that is in the *Journal of the American Academy of*

25   *Psychiatry and Law*, volume 36, pages 443 through 54 from

1    2008; right?

2    **A.**   Yes.

3    **Q.**   And Dr. Zander's article is the same number, right,

4    volume 36?

5    **A.**   Yes.

6    **Q.**   Now, Dr. Zander in this article with which you're

7    familiar takes a different view of the interpretation of

8    this document; right?

9    **A.**   Yes.

10   **Q.**   Now, have you heard of Presidential Signing Statements?

11   **A.**   Yes.

12   **Q.**   And those are when the President, they're a

13   controversial legislative device where the President makes a

14   comment about some legislation that he is signing into law;

15   right?

16   **A.**   Yes.

17   **Q.**   And if you're a news reader, you would know that part of

18   the controversy is what is the interpretive value of what

19   the President is saying when he makes these Presidential

20   Signing Statements; right?

21   **A.**   Yes.

22   **Q.**   Now, just because Michael First or Dr. Frances say what

23   the DSM means, that doesn't necessarily mean the DSM means

24   that; right?

25   **A.**   They're pretty good authorities since they were editors.

1  And if you are looking what, for what the DSM means, you

2  would certainly turn first to the working group and second

3  to the editors because they are the people who know, who

4  were actually involved in the making of the DSM.  So they

5  are very good authorities for what the DSM means.

6  **Q.**  Well, what the DSM, the way it works is there are

7  committees that make proposals and then there are votes;

8  right?

9  **A.**  Yes.

10  **Q.**  And once the proposals are voted on, they're either

11  accepted or rejected; right?

12  **A.**  Yes.

13  **Q.**  And then they became part of the manual; right?

14  **A.**  Yes.

15  **Q.**  And that is something that happened with Paraphilic

16  Coercive Disorder.  And Dr. Zander talks about that in this

17  article; right?

18  **A.**  Yes.

19  **Q.**  Now, when you mentioned Dr. Zander briefly yesterday, my

20  recollection of your testimony, and correct me if I'm wrong,

21  you stated that he was opposed to the civil commitment of

22  sexual predators; was that your testimony?

23  **A.**  I don't remember exactly what I said but he is opposed

24  to the use of pedophilia.  He doesn't consider a mental

25  disorder.  He is opposed to Paraphilia NOS.  He has serious

1    issues, put it that way, with -- appears to have very

2    serious reservations about the civil commitment process.

3    **Q.**   Now, where do you get that?

4    **A.**   From his, from the article that I cited yesterday.

5    **Q.**   And when you state he is opposed to pedophilia, what do

6    you mean?

7    **A.**   He says in the article that he questions whether it is a

8    mental abnormality and based on the fact that other cultures

9    have accepted it.

10   **Q.**   That's your interpretation of what he says in the 2005

11   article?

12   **A.**   Well, I don't have the article with me; but I can show

13   you where he says that if you would like to provide it.

14   **Q.**   I am going to turn your attention to the section of the

15   article which is circled in pen.  And I'm going to read it

16   and ask you if I'm reading it correctly.

17        "The application of PNOS as a diagnosis of rapists

18   was popularized by Dennis Doren, a state hospital

19   psychologist from Wisconsin whose 2002 book *Evaluating Sex*

20   *Offenders:  A Manual for Civil Commitments and Beyond*, has

21   become the bible for many forensic evaluators in civil

22   commitment cases, especially those who testify primarily for

23   the prosecution."

24        **MR. SAVERY:**  Your Honor, just for clarification,

25   could we get a reference to which article is up now?

1          **MR. GOLD:**  For the record, yes, I am referring to

2     the *Journal of American Academy, Psychiatry and Law*, volume

3     36 pages 459 through 69, 2008.  Page 460.

4          **MR. SAVERY:**  By whom?

5     BY MR. GOLD

6     **Q.**  Did I read that correctly?

7     **A.**  Yes.

8          **MR. SAVERY:**  Whose article is it is the question?

9          **MR. GOLD:**  This is the Zander article.

10         **MR. SAVERY:**  Thank you.

11    BY MR. GOLD

12    **Q.**  Now, do you agree with that statement?

13    **A.**  I agree that Dennis Doren supports that.  I don't know

14    what he means by "popularized."  Dennis certainly isn't the

15    only person that supports that.

16         I do agree that Dennis's book has become the

17    leading book in the field on evaluation of sex offenders for

18    civil commitment purposes.

19    **Q.**  Well, the book is very popular in this field; right?

20    **A.**  Very popular.

21    **Q.**  And Dr. Doren does trainings; right?

22    **A.**  Did training.

23    **Q.**  And he did trainings with you; right?

24    **A.**  Rarely, but, yes, we have trained together on occasion.

25    **Q.**  Well, in fact, you trained together when the Bureau of

1    Prisons was putting together their apparatus for the Adam

2    Walsh Act commitments.  You trained Bureau of Prisons

3    people; correct?

4    **A.**   Yes.

5    **Q.**   You and Dr. Doren together; right?

6    **A.**   Yes.

7    **Q.**   Now, you published three books in the field which are

8    not mystery novels; right?

9    **A.**   Yes.

10   **Q.**   Two of them you refer to as academic books; right?

11   **A.**   Yes.

12   **Q.**   And those were both published by Sage Publications;

13   right?

14   **A.**   Yes.

15   **Q.**   And Sage Publications is an entity in the social

16   sciences, they publish professional trade books; right?

17   **A.**   Yes.

18   **Q.**   So when you call your books academic books, you are not

19   saying that they're published by an academic press; right?

20   **A.**   That's right.

21   **Q.**   And you are not an academic yourself in the sense of

22   someone who has a tenured position and is with, associated

23   with an institution of higher learning; right?

24   **A.**   I do not have a tenure position with an institution of

25   higher learning.

1    **Q.**  And, in fact, one of the points of tenure is to insulate

2    people from political pressures; is that a fair statement?

3    **A.**  Yes.

4    **Q.**  Now, you had a relationship with Sage Publications and

5    actually recruited Dr. Doren to write this book; right?

6    **A.**  Yes.

7    **Q.**  And Dr. Doren when he wrote his chapter on the issue

8    that we are talking about today among the sources that he

9    cites are personal communications; right?

10   **A.**  Yes.

11   **Q.**  And that's not uncommon in the area of psychology;

12   right?

13   **A.**  That's right.

14   **Q.**  And among the personal communications that he cites are

15   personal communications with you; right?

16   **A.**  Yes.

17   **Q.**  Now, this book is influential in the world of sex

18   offender commitments; right?

19   **A.**  Yes.

20   **Q.**  It's widely distributed?

21   **A.**  Yes.

22   **Q.**  There is no other book like it; right?

23   **A.**  Not to my knowledge.

24   **Q.**  And it is now about seven years old; right?

25   **A.**  Yes.

1  **Q.**  Now, one of the things that Dr. Zander does in support,

2  because he has an interpretation of the manual, right?  He

3  says that basically the history, opposite to what you're

4  saying, the history of the rejection of Paraphilic Coercive

5  Disorder means that we should not interpret it to allow the

6  same diagnosis under the NOS category.  That's his

7  interpretation; right?

8  **A.**  That's his interpretation.

9  **Q.**  And in this article he goes about making that argument

10  and supporting his argument with references to sources;

11  right?

12  **A.**  Yes.

13  **Q.**  And he does the same thing that you do, right?  He cites

14  sources that are not contained within the covers of this

15  book; right?

16  **A.**  That's right.

17  **Q.**  Now, there is a passage highlighted on the screen.

18  **A.**  Which one?

19  **Q.**  From 1983 to 1986.  I was trying to poke it but it is

20  not working.

21       Could you read that passage, please.

22  **A.**  "From 1983 to 1986 attempts were made to insert a

23  proposed diagnosis called Paraphilic Coercive Disorder (PCD)

24  into DSM-III-R with the following diagnostic criteria."

25       Do you want me to continue?

1    **Q.**  Please read the criteria.

2    **A.**  "Over a period of at least six months preoccupation with

3    recurrent and intense sexual urges and sexually arousing

4    fantasies involving the act of forcing sexual contact, for

5    example, oral, vaginal or anal penetration, grabbing a

6    woman's breast on a nonconsenting person.

7           "B, it is the course of nature of the sexual act

8    that is sexually exciting and not signs of psychological or

9    physical suffering of the victim as in Sexual Sadism.

10          "C, the individual repeatedly acts on these urges

11   and is markedly distressed by them."

12   **Q.**  And could you continue reading, please.

13   **A.**  "The proposed diagnosis of PCD was made along with

14   proposals for two other diagnoses, Masochistic Personality

15   Disorder and Premenstrual Dysphoric Disorder.  The three

16   proposed diagnoses generated what the *New York Times*

17   reported as vigorous opposition, reference 25, page C1."

18   **Q.**  And there he is making reference to a news report of

19   this vigorous opposition.  Presumably he's quoting from that

20   source; right?

21   **A.**  Yes.

22   **Q.**  Now, and just to repeat, one thing we can at least hope

23   about this article is that as it appears in a peer-reviewed

24   journal, it has been peer reviewed; right?

25   **A.**  We can hope it's been peer reviewed, yes.

1   **Q.**  And that it has gone through this process that allows us

2   to give it a measure of credibility when we read it; right?

3   **A.**  It --

4   **Q.**  This process that we just discussed, it's been through

5   that process?

6   **A.**  It's been through that process.

7   **Q.**  Please continue.

8   **A.**  "The American Psychological Association, the American

9   Psychiatric Association, the National Association of Social

10  Workers and the National Organization for Woman mounted

11  strong opposition to the proposed diagnosis.  Even the U.S.

12  Department of Justice, which rarely takes public policy

13  positions on matters relating to mental health, argued that

14  the proposed diagnosis of PCD would be used by criminal

15  defendants to avoid legal responsibility in criminal

16  prosecution for rape."

17  **Q.**  Continue, please.

18  **A.**  "After opposition to the three proposed diagnoses was

19  expressed at a meeting of the Work Group to revise DSM-III,

20  the group's chairman Robert Spitzer admitted we didn't

21  anticipate the strong objections of many, both in psychiatry

22  and psychology, to this proposal.  The discussion was very

23  heated."

24  **Q.**  So that is a discussion of this deliberative process

25  that ultimately led to the DSM-III with respect to this

1    diagnosis; right?

2    **A.**   Yes.

3    **Q.**   And there was opposition that Robert Spitzer, that's a

4    name that we haven't discussed in a little while, but who is

5    very influential in the creation of this book, didn't

6    expect; right?

7    **A.**   Yes, that's the author -- the editor of the DSM-III and

8    the editor of the *Casebook*.

9    **Q.**   Now, Dr. Doren cites some of this in his chapter as

10   reasons why the diagnosis was rejected; is that right?

11   **A.**   Yes.

12   **Q.**   And, in fact, he implies, would you agree with me -- and

13   for the record, I am turning to his book.  And I am just

14   going to read a passage from page 63.  It states, it cites

15   the same sources we were talking about when we were talking

16   about your report in the paragraph above where I am about to

17   read.

18         And then he states a conclusion basically, "If

19   there is no meaningful argument about whether or not there

20   are some rapists who experience a paraphilic condition

21   specifically related to their sexual assaultiveness, why

22   then is there no separately listed paraphilia of this type

23   in the current diagnostic manual?"

24         Dr. Doren poses that question; right?

25   **A.**   Yes.

1    **Q.**  And then on the next page, on 64, he says, "At least

2    four reasons present themselves."  And he lists them out.

3         "It was not believed that such a condition really

4    exists.

5         "Two, there was fear that such an official

6    diagnostic category would lead to widespread use of that

7    diagnosis by rapists in attempts to be found not guilty by

8    reason of insanity for their crimes.

9         "Three, there was strong opposition by those

10   espousing the feminist theory, quote/unquote, concerning

11   rape, such that the idea was unacceptable that rape might be

12   associated with a pathological condition.  (Versus seen as

13   an outgrowth of differential power relationships).

14        "Four, there was a desire to avoid naming a

15   condition for some rapists which might have then implied

16   their having psychiatric, psychological treatment needs that

17   would add competition for limited insurance dollars with

18   existing types of preferred clientele".

19        And then he goes on, he says, "Reportedly the

20   writers of the manual did not seriously debate whether or

21   not the condition exists, Fred Berlin and Park Dietz

22   separately in court testimony cited above."

23        So he cites the court testimony; right?

24   **A.**  Yes.

25   **Q.**  Now, this is his interpretation of why the diagnostic

1    category is absent; right?

2    **A.**  Yes.

3    **Q.**  Now, Dr. Zander is talking about the same period, right?

4    When we were talking about this period from 1983 to 1986.

5         He goes on to say, "The opposition to the proposal

6    for PCD should have been expected given that by the mid

7    1980s according," to Dr. Zander, "it was widely accepted

8    that rape is a violent assault motivated by the rapist's

9    desire for power and dominance rather than by sexual

10   arousal, a concept advanced in popular culture by Susan

11   Brownmiller's 19675 bestselling book *Against Our Will:  Men,*

12   *Women and Rape* and in the research literature by a body of

13   empirical studies of the time."

14        And I stop there, Dr. Salter, to ask you if you

15   recall about this article that Dr. Zander's argument is not

16   just that the diagnosis was rejected because of political

17   reasons, as suggested by Dr. Doren, but because there were

18   legitimate problems with the reliability and validity of the

19   diagnosis as a diagnosis.  That's Dr. Zander's argument;

20   right?

21   **A.**  Yes, that is Dr. Zander's argument.

22   **Q.**  And that is an argument that you are not persuaded by;

23   is that fair to say?

24   **A.**  That's correct.

25   **Q.**  Now, Dr. Zander continues on.  He says, "Within

1    professional psychiatry there was considerable opposition to

2    the proposed diagnoses.  Psychiatrist Judith Herman said of

3    the proposed diagnosis of PCD, the diagnosis is not

4    sufficiently based on behavioral criteria.  The diagnosis of

5    Paraphilic Coercive Disorder does not belong in the

6    DSM-III."

7            And there is a citation to a reference there.

8            Now, this is a citation in support of Dr. Zander's

9    argument that among the reasons it was rejected was because

10   of concerns not about the political implications of

11   accepting it but about its reliability as a diagnosis,

12   something that can tell us something about mental disorder;

13   right?

14   **A.**   That's Dr. Zander's stance, yes.

15   **Q.**   And then if we go down to the -- well, I'll continue

16   reading from where I was.

17           "The then president of the American Academy of

18   Psychiatry and Law wrote, Indeed it is the consensus that

19   such categories may well be embarrassing to psychiatry as a

20   whole, Reference 31."  It is not clear why he is saying

21   that.

22           But then, "At a meeting of two APA committees

23   primarily responsible for revising DSM-III forensic Loren

24   Roth expressed reservation about PCD which included concerns

25   about its reliability, the lack of information about its

1    prevalence and epidemiology among rapists, problems with

2    differential diagnosis and possible forensic implications;"

3    right?

4    **A.**  Yes.

5    **Q.**  And there is a reference there to reference 32; right?

6    **A.**  Yes.

7    **Q.**  And if we go to the back, we see -- of this article on

8    page 468, we see reference 32 (indicating).  It's a memo to

9    the Advisory Committee on paraphilia.  And it's apparently

10   an unpublished primary source document held at the American

11   Psychiatric Association Library July 2, 1986 by Robert

12   Spitzer; right?

13   **A.**  Yes.

14   **Q.**  Now, for the record I have on the screen here a document

15   which is on American Psychiatric Association letterhead,

16   Work Group to Revise DSM-III, and it's dated July 2nd, 1986.

17   It's a memo to the Advisory Committee on paraphilias from

18   Robert Spitzer about Paraphilic Coercive Disorder.  Does

19   that appear to be the source of Dr. Zander's references?

20   **A.**  Yes.

21   **Q.**  And this memo reads, "This is to let you know that the

22   results of the June 24 meeting at which the issue of

23   Paraphilic Coercive Disorder was discussed with the Work

24   Group and with the Ad Hoc Committee of the board and the

25   assembly to revise DSM-III."

1          And then it says, "Dr. Fred Berlin," one of the

2     sources that you cited, "made a very strong defense of the

3     category that included the presentation of a videotape of an

4     interview of a patient with the disorder.  Dr. Loren Roth

5     then discussed many of the reservations that he had

6     regarding the category.  This included concerns about its

7     reliability, the lack of information about its prevalence,

8     and epidemiology among rapists, problems with differential

9     diagnosis, lack of treatment facilities and possible

10    forensic implications.  It became quite clear," Dr. Spitzer

11    goes on, "that the concerns that he and others raise would

12    not result in the inclusion of this category by the Board of

13    Trustees.  Therefore, the Work Group withdrew the proposal

14    making it clear that it believed that the advisory committee

15    had made a strong case for the validity of the category

16    itself but that the Work Group could not be unmindful of

17    serious questions about the credibility, acceptability of

18    the category, both within psychiatry and within the larger

19    society."

20          MR. SAVERY:  I object, Your Honor, to the extent

21    that was a question.  We are now seeing this for the first

22    time --

23          THE COURT:  He is just asking to have it read.

24          MR. SAVERY:  Okay.

25          THE COURT:  For the record and he did read it.  Is

1    it an exhibit?

2           **MR. GOLD:**  No.

3           **MR. SAVERY:**  It is not an exhibit, no.  You know,

4    we're seeing it for the first time.  It's a document that

5    hadn't been authenticated here.  I'm not sure the witness

6    has ever seen it.

7           **THE COURT:**  Well, there is a reference to, what,

8    paragraph 32 of the notes.  And that has been in evidence;

9    right?

10          **MR. SAVERY:**  The article that references this

11   document is not in evidence.  The article itself isn't an

12   exhibit in evidence.  It was read to the witness and she

13   responded to questions.

14          **MR. GOLD:**  Your Honor, she authenticated the

15   exhibit by stating, I would argue, that she recognizes it to

16   be a document corresponding to what Dr. Zander has cited.

17          **THE COURT:**  Well, but Dr. Zander's article is in

18   evidence; isn't it?

19          **MR. GOLD:**  It was submitted to the Court in the

20   pretrial brief but we have not submitted any scholarly

21   literature as evidence outside of the DSM.  And that, my

22   understanding with the government is that's more of a,

23   almost a demonstrative was the idea of submitting that.

24          But it was our understanding that we were not

25   submitting these articles as evidence.

1          **THE COURT:**  Well, I just assumed that you were in

2     agreement that this information could come to my attention.

3          **MR. SINNIS:**  I believe we were, Your Honor.  We had

4     an agreement that we would reference articles but we

5     wouldn't actually put the physical articles into evidence.

6          **MR. SAVERY:**  Right.  And this isn't an article.

7     This is some sort of a memo from the American Psychiatric

8     Association that was apparently referenced in the footnote

9     to an article.  We haven't seen this.  We haven't discussed

10    it and it is hearsay.  It's not authenticated.

11         **MR. GOLD:**  Well, Your Honor, the article references

12    these sources.  Dr. Salter has testified that she is not

13    persuaded by the argument.  And the argument here is why did

14    this DSM or the meaning of the DSM people rejecting this

15    diagnosis in the first place come about.  Was it just for

16    political reasons and, therefore, it's fine to diagnose it

17    under NOS or was it because of scientific reasons?

18         Now, Dr. Zander point for point citing the same

19    type of unpublished source that Dr. Salter in this courtroom

20    is relying on for her diagnosis, that is, courtroom

21    testimony in random cases where she says that people

22    involved with the DSM made certain statements.

23         These are, in fact, the documents referred to in

24    this peer-reviewed journal to support Dr. Zander's argument.

25    They also give the Court frankly a first person view of the

1    process of diagnosis creation which I think in this case is

2    very important to our argument as to the validity of the

3    diagnosis.

4            And I'm just asking --

5            **THE COURT:**  Do you have a -- I say this, I don't

6    mean to be dismissive when I say it.  Do you have a serious

7    authentication argument here?  What else could this be?

8    This is Dr. Zander's letter; right?

9            **MR. SAVERY:**  This is a letter from, apparently from

10   Spitzer to --

11           **THE COURT:**  Explaining what happened.

12           **MR. SAVERY:**  Right.  You know, that's what it

13   purports to be.

14           I think the larger objection is that it's hearsay.

15   That we haven't been in the practice in this trial of

16   reading in documents apart from learned treatises and

17   articles.  And that was our agreement going into this case.

18           We're now far beyond that.  And Mr. Gold references

19   trial testimony that the witness has relied upon.  We

20   haven't been attempting to read in trial testimony.  We are

21   now getting far beyond the primary articles, the authorities

22   in the field, which I think is an appropriate item for

23   examination of a witness on.

24           But we're now dealing with the parent sources for

25   some of these articles referenced in footnotes.  I just

1    think we are far beyond where we should be in terms of using

2    learned treatises as appropriate evidence in the case.

3         **MR. GOLD:**  Your Honor, in response I would state

4    what we have here is an expert report which justifies using

5    this diagnosis by reference, among other things, to

6    statements of these doctors in trial testimony.  It's

7    necessary to do that because the manual doesn't, in fact,

8    support the diagnosis.

9         Now, everyone knows that the diagnosis was

10   rejected.  But Dr. Salter and her colleague believe that it

11   was rejected for political reasons, and, therefore, it's

12   appropriate to diagnose it anyway under the Not Otherwise

13   Specified category.

14        Now, what Dr. Zander has done, and this is simply

15   impeachment evidence, Your Honor, simply because Dr. Salter

16   has said she's read and has consumed this article that we're

17   looking at right now, she has digested Dr. Zander's article

18   and is not persuaded, not persuaded by his arguments.

19        She has testified that it's quite common to have

20   personal communications, especially on issues of high

21   importance in this area, about things related to diagnoses

22   and the ethical obligations of an expert in these types of

23   cases.  She had every opportunity to have personal

24   communications with Dr. Zander if she was not persuaded by

25   his use of sources and his argumentation here when he

1     argues, and crucially the point is that the diagnosis was

2     rejected because it's not scientifically valid.  That's what

3     the sources are going to demonstrate.  And it's somewhat

4     ironic that what we are making reference to and actually

5     showing to Dr. Salter so that she can evaluate Dr. Zander's

6     argument right here are the primary sources on which he

7     relies from the archives of the American Psychiatric

8     Association which are simply obtainable by communicating

9     with Dr. Zander.

10         **THE COURT:**  I am going to let the testimony stand.

11    It dawns on me that this isn't hearsay anyway because it is

12    not being offered for the truth.  It is being offered to

13    contradict.  It is impeachment testimony.

14         **MR. SAVERY:**  It is impeachment testimony --

15         **THE COURT:**  And as I understand that, that is

16    never, you know, that is -- I shouldn't say "never" because

17    I will find out from the Court of Appeals that this is --

18         (Laughter.)

19         **THE COURT:**  -- that one time.  But impeachment

20    testimony is usually not considered to be hearsay.  It is

21    not being offered for the truth, just to contradict.

22         **MR. SAVERY:**  Okay.  I still stand by my hearsay

23    objection.  It is only worthwhile as impeachment testimony,

24    Your Honor, if what it contains is truthful.  If it's

25    representing the reasons of --

1          **THE COURT:**  That is always an argument in

2     impeachment testimony.

3          Why don't we take a deep breath and take a recess

4     until about 11:30 and then we will come back.  Okay.

5          But, understand, what you want to do is to make

6     sure I get all the information I possibly can so I can make

7     a correct decision.  This isn't a question of who got to the

8     intersection first.  You want to make sure that I get as

9     much information as I possibly can so that when I make my

10    call, it is informed.  You may disagree with it but at least

11    you will know that I considered everything that you think

12    might have been helpful to us.

13          **MR. SAVERY:**  I understand.

14          **THE COURT:**  All right.  We will see you in ten

15    minutes.

16          **THE CLERK:**  All rise for the Honorable Court.

17          (Recess.)

18          **THE CLERK:**  All rise for the Honorable Court.

19          **THE COURT:**  Okay.  Sit down, everybody.

20          Is everybody back?

21          Okay.  Go ahead.

22                    **ANNA CAROL SALTER, Resumed**

23                    **CROSS-EXAMINATION, (Cont'd.)**

24    BY MR. GOLD

25    **Q.**  So, again, Zander's arguments is that the diagnosis was

1    rejected by the DSM, the American Psychiatric Association

2    for political reasons in part and for reasons having to do

3    with the validity of the diagnosis in part; correct?

4    **A.**  Yes.

5    **Q.**  Now, in this passage, continuing on page 462 of the

6    article Dr. Zander writes, "Based on the strong opposition

7    and the concerns raised as to the validity of the proposed

8    diagnosis of PCD, the APA Board of Trustees rejected it by a

9    vote of 10 to 4 on June 28, 1986."

10             And two sources are cited there --

11             **THE COURT:**  This is the article?

12             **MR. GOLD:**  This is the article that we're looking

13    at now.

14             **THE COURT:**  Not the letter in support of or Figure

15    32 or anything like that?

16             **MR. GOLD:**  Right.

17             **THE COURT:**  We are right in the article now.

18             **MR. GOLD:**  And now I'm going to do the same

19    procedure of going to the footnote and then go to the

20    source.

21             **THE COURT:**  All right.  Okay.

22    BY MR. GOLD

23    **Q.**  And there are two citations there, 24 and 35.  Do you

24    see that?

25    **A.**  Yes.

1    **Q.**  Now, 24 we've already seen.  It's a citation -- I'm

2    sorry.  It's not.  I thought it was a citation to the *New*

3    *York Times* article but it's a citation to a book by Kutchins

4    and Kirk called *Making Us Crazy, DSM, the Psychiatric Bible*

5    *and The Creation of Mental Disorder*s from 1997.

6         But the other source there, No. 35, is minutes of a

7    meeting of the American Psychiatric Association, Board of

8    Trustees, Washington D.C.  It's a document, a primary source

9    document which Dr. Zander says he got at the American

10   Psychiatric Association Library.  And it's dated June 27 to

11   28, 1986.

12        Now, up on the screen now is a document which

13   purports to be the document referred to.  It says minutes of

14   the Board of Trustees, 6/27 to 28, 1986, Washington, D.C.

15   and it's at page 34.  Do you see that?

16   **A.**  Yes.

17   **Q.**  And there is a highlighted section there that states,

18   "The Ad Hoc Committee and the Work Group recommended the

19   following:  That the proposed category Paraphilic Coercive

20   Disorder be excluded from the DSM-III-IV classification."

21        That's what the Ad Hoc committee and the Work Group

22   recommended at the end of this process; right?

23        **MR. SAVERY:**  Your Honor --

24   **Q.**  According to this document?

25        **MR. SAVERY:**  I'd like to note my objection.  The

1    same objection as before regarding --

2          THE COURT:  Okay.  Your objection is noted.  I am

3    going to let it in.  Go ahead.

4    BY MR. GOLD

5    Q.  Then it continues.  And the highlighted section I will

6    read states, "While recognizing that there are political

7    pressures affecting consideration of inclusion of these

8    categories in DSM III-R, the AHC, the Ad Hoc Committee, and

9    the Work Group stressed that any changes must be based on

10   scientific issues involved.  Discussion by members of the

11   board raised questions as to the scientific foundation for

12   the three categories recommended for the inclusion in

13   DSM-III-IV because there were two other diagnoses which were

14   being debated at the same time."

15         Are you aware of that?

16   A.  Yes.

17   Q.  I'll continue reading.

18         "It was suggested by a number of members that

19   further research was needed to validate the status of these

20   categories as diagnostic classifications."

21         The next paragraph begins, "A major issue discussed

22   was the appropriateness of including one or more of the

23   categories in an appendix rather than in the text of the

24   manual."  Because presumably that would have a different

25   implication; is that a fair statement, whether it's in the

1    appendix or not included at all?

2              **MR. SAVERY:**  Objection.

3              **THE COURT:**  Overruled.

4    **A.**  I really don't know.  I haven't seen anything like this

5    included in an appendix.  But I think it was a novel

6    suggestion.  I don't really know what the implications would

7    be.

8    **Q.**  This passage continues, "Dr. Spitzer responded that

9    placement in an appendix posed problems, including the

10   implication that all other diagnoses in the text are fully

11   tested and proven.  However, several members of the board

12   continued to believe that placement of some categories in an

13   appendix would be useful to aid further research and that

14   this placement would highlight the need for further

15   scientific study."

16             Did I read that correctly?

17   **A.**  Yes.

18   **Q.**  So, again, this is another document which supports

19   Dr. Zander's argument that the -- would you agree with me

20   that the American Psychiatric Association rejected this

21   diagnosis in part because it concerns having to do with its

22   scientific validity?

23   **A.**  I would agree with you that this document supports his

24   contention.  I don't agree with you that the previous

25   document that you showed me when read in its entirety

1    supports his contention.

2    **Q.**  And for the record the previous document you were

3    referring to is footnote 32, the Spitzer memo?

4    **A.**  Yes, the memo that you had up a few minutes ago.

5    **Q.**  And for the record I have the July 2nd, 1986 Spitzer

6    memo.

7    **A.**  Yes.

8    **Q.**  And the passage we read said two things.  It said

9    Dr. Fred Berlin made a strong defense and that Dr. Roth

10   raised reservations that he had regarding the category.  And

11   that he cites reasons; right?  It is your testimony that

12   this document does not support his interpretation; right?

13          **MR. SAVERY:**  Your Honor, I object.

14          **THE COURT:**  Your objection is noted.  You have a

15   continuing objection to this, all right.

16          **MR. SAVERY:**  Thank you, Your Honor.

17   **A.**  If you read the whole document, that's my testimony.

18          **THE COURT:**  I can't hear you.

19          **THE WITNESS:**  If you read the entire document,

20   that's my testimony.

21          (Pause in proceedings.)

22   BY MR. GOLD

23   **Q.**  How, Dr. Salter?

24   **A.**  Can you move it up so I can see it.

25          What this document --

1            **THE COURT:**  What was the question, how what?

2    BY MR. GOLD

3    **Q.**  How does this fail to support Dr. Zander's contentions

4    that part of the reason that the diagnosis was rejected is

5    concerns about scientific validity?

6    **A.**  Raise it up just a little bit further, if you could.

7            What this says is that, "The Advisory Group was

8    unanimous in believing into this should be added.  That the

9    Work Group believed the Advisory Committee made a strong

10   case for the validity of the category but was concerned

11   about acceptability, credibility and that they thought it

12   should be brought up again but in the meantime there was a

13   need to educate the profession and society at large about

14   the category."

15           Now, what that says to me is they were less

16   concerned about the validity for which they believed they

17   had made a strong case than public acceptance of this

18   category.  They didn't call for additional research.  They

19   called for education of the public so that it would be more

20   acceptable.

21           To me that says that they were concerned not so

22   much about the validity.  Yes, it's true, there was one

23   member of the committee who was very concerned about

24   validity; but overall if you read this whole memo, that

25   appears to me to be what it says.

1    Q.  Well, what it shows is one member of the committee --

2    A.  Yes.

3    Q.  -- who expresses very strong reservations with

4    Dr. Spitzer, a proponent of the diagnosis; correct?

5    A.  As far as I know.  I don't know Spitzer's stand on the

6    diagnosis.  I only know that --

7    Q.  You don't.

8    A.  -- he believed the condition existed.

9    Q.  But Dr. Loren Roth is part of the group that creates the

10   DSM; correct?

11   A.  That's true.

12   Q.  He expresses reservations; correct?

13   A.  Yes, one member expressed reservations.

14   Q.  And then the author of this memo states his view.  And

15   what we know is the diagnosis is not accepted; correct?

16   A.  That's right.

17          (Whereupon, counsel conferred.)

18   Q.  And just to focus in on the second highlighted passage,

19   Dr. Salter, "It became clear," Dr. Spitzer writes, "that the

20   concerns that he," that refers to Dr. Roth; right?

21   A.  Yes.

22   Q.  "And others," that refers to others, right?

23   A.  Yes.

24   Q.  "Raised would not result in the inclusion of this

25   category by the Board of Trustees."

1          And the Board of Trustees apparently is the

2     authoritative body that makes the yes or no decisions;

3     right?

4     **A.**  Yes.

5     **Q.**  And, in fact, we've looked at the Board of Trustees memo

6     previously where they, you agreed with me, expressed

7     concerns in that document about the validity and reliability

8     of this diagnosis as a diagnosis; right?

9     **A.**  Yes, that document does.

10    **Q.**  Now, Dr. Zander continues his argument because what

11    we're talking about now is when this diagnosis was rejected,

12    which is back in 1986; right?

13    **A.**  Yes.

14    **Q.**  And he states that if you interpret things right, in his

15    view, the manual properly interpreted does not allow for the

16    diagnosis of this rejected condition through the NOS

17    category.  That's his position; right?

18    **A.**  That's his position.

19    **Q.**  Now, Dr. Zander continues in this article, "The history

20    and text of DSM following the APA's rejection of PCD does

21    not suggest any intent that the diagnostic concept that it

22    embodied be used even within the PNOS," that's Paraphilia

23    Not Otherwise Specified, "miscellaneous category as the

24    following evidence demonstrates. Now, first, after rejecting

25    PCD the APA board approved DSM-III-R which defines PNOS as

1    describing paraphilias that are less commonly encountered.

2    A definition that remains, essentially remains in DSM-IV-TR

3    as less frequently encountered."

4           Now, that's a reference to this book, page 567.

5    And, in fact, he is correct about that, right, that the DSM

6    has a paraphilia section.  And there is a comment here in

7    the introduction, "A residual category Paraphilia Not

8    Otherwise Specified includes other paraphilias that are less

9    frequently encountered;" right?

10   **A.**  Well, it does say that.

11   **Q.**  It does say that?

12   **A.**  But it actually doesn't hold up.

13   **Q.**  Well, it does say that; correct?

14   **A.**  It does say that.

15   **Q.**  Now, this rape diagnosis that you're making in this

16   case, suffice it to say, it's much more common than Sexual

17   Sadism which isn't being diagnosed; right?

18   **A.**  Yes, but so are others in that category such as obscene

19   phone calls.

20   **Q.**  Dr. Zander actually makes the point that I just made,

21   "It is unlikely that the rape behavior postulated by the

22   proponents of PCD would be less commonly encountered than

23   the more extreme behavior diagnosed as Sexual Sadism;"

24   right?  That's what Dr. Zander says?

25   **A.**  Yes, that's true.

1   **Q.**  And that's probably why I had the argument in my head I

2   imagine.

3          Now, Dr. Salter, this is an argument that

4   Dr. Zander is making based on the text of the manual; is

5   that fair to say?

6   **A.**  Yes.

7   **Q.**  "Second," he continues in this article, "whereas the APA

8   Board rejected PCD outright and placed the two others

9   simultaneously proposed and equally controversial," he says

10  talking about this history that he's discussed, "diagnoses

11  in the DSM-III-R appendix, thereby allowing their

12  application under an NOS category.  Had the APA board

13  intended that PCD also be diagnosed via PNOS, he argues it

14  would have placed PCD wording in the PNOS category or at

15  least in the appendix."

16         That's what Dr. Zander argues; right?

17  **A.**  He argues that but I really can't comment on that

18  because I really don't know how the DSM appendix is used.

19  **Q.**  But that's what it is, it's an argument; right?

20  **A.**  It is an argument.

21  **Q.**  And it's based on the fact that in this subsequent

22  edition of the manual they put these -- and three

23  controversial diagnoses were proposed at the same time;

24  right?

25  **A.**  Yes.

1    **Q.**  You recall that and you agree with that; right?

2    **A.**  Yes.

3    **Q.**  And Dr. Zander says he knows that two of them were

4    placed in an appendix and that the Not Otherwise Specified

5    category specifically included diagnoses in the appendices.

6    That is what Dr. Zander says; right?

7    **A.**  Yes.  I have never heard that claim made before so I

8    can't comment on it.

9    **Q.**  And then he says that the fact that the PCD diagnosis

10   was not included in it as an appendix like the other two is

11   significant when we're trying to determine what the

12   intention of the APA is; right?

13   **A.**  He does say that but I have never heard of the other two

14   being diagnosed as Paraphilia NOS.

15   **Q.**  Now, that is an argument, you'd agree with me, based on

16   the textual history of the DSM; is that fair to say?

17   **A.**  Well, this appendix argument, I don't know where he is

18   getting that from.

19   **Q.**  Well, do you dispute that the other two diagnoses were

20   contained in an appendix?

21   **A.**  I would have to look at the appendix.  I haven't

22   followed what happened to those other two diagnoses.  But I

23   never heard of anyone diagnosing Paraphilia NOS for the

24   other ones.

25   **Q.**  So you do not dispute that the two other diagnoses were

1    in the appendix, you just don't remember?

2    **A.**   I don't have a comment on it because I have not read the

3    appendix recently and I really don't remember what happened

4    to those categories.

5    **Q.**   You don't know?

6    **A.**   I don't know.

7    **Q.**   Dr. Zander continues, he says, "In fact, documentary

8    evidence that is contemporaneous with the APA's rejection of

9    PCD confirms the intent of the APA board not to include the

10   failed diagnosis in the PNOS category.  After the board's

11   rejection of PCD Fred Berlin," and this is the doctor whose

12   testimony in the G.T. case you cite; right?

13   **A.**   Yes.

14   **Q.**   "One of the original proponents of PCD criticized the

15   board-approved draft of DSM-III-R as a conscious effort to

16   leave out the fact that some men rape as a consequence of

17   being turned on by the coercive rather than the sadistic

18   elements of rape;" right?

19   **A.**   Yes.

20   **Q.**   And it appears to me that Dr. Berlin agrees with you

21   that the Paraphilic Coercive Disorder is an entity which

22   exists; right?

23   **A.**   Well, he introduced it to DSM-III.

24   **Q.**   "Referring again to the board's conscious effort not to

25   include the PCD concept in the PNOS category," he added,

1    "again it troubles me a great deal that no mention of those

2    individuals who are preoccupied with thoughts and urges that

3    center around issues of coercion are not at least

4    mentioned;" right?

5    **A.**  Well, that's what Zander says.  I haven't seen the

6    underlying documents that show that Berlin's comment was

7    based on any effort not to include it in the PNOS category.

8           (Pause in proceedings.)

9    **Q.**  I have put up on the screen a document that -- a letter

10   which carries the letterhead of the Johns Hopkins University

11   School of Medicine, the Johns Hopkins Hospital, November 11,

12   1986.  It's a letter directed to Dr. Spitzer, chairperson of

13   the group to revise DSM-III, and it's signed by Fred Berlin

14   on the fifth page.

15   **A.**  Yes.

16   **Q.**  Do you see that?

17   **A.**  Yes.

18   **Q.**  Does that appear to be the source which Dr. Zander

19   cites --

20   **A.**  Yes.

21   **Q.**  -- in quotes from in his article?

22          And this is a long document dealing with various

23   issues that the Work Group was dealing with; right?  Or it

24   appears to be; correct?

25   **A.**  Yes.

1   **Q.**  And it's commenting on another document.  And it says,

2   "On page 15 there is a discussion of the differential

3   diagnosis of Sexual Sadism and the topic of rape is

4   discussed.  I find the discussion under differential

5   diagnosis somewhat confusing and I suspect that it so

6   because of a conscious effort to leave out the fact that

7   some men rape as a consequence of being turned on by the

8   coercive rather than the sadistic elements of rape.  I find

9   it very unfortunate that all mention of this fact, a fact

10  that was agreed to by every single expert on the

11  subcommittee of the paraphilias has been excluded from the

12  discussion here.

13          "Again, under the Paraphilias Not Otherwise

14  Specified it troubles me a great deal that no mention of

15  those individuals who are preoccupied with thoughts and

16  urges that center around issues of coercion are not at least

17  mentioned;" right?

18  **A.**  Right.  He wanted it mentioned as an example.

19          **THE COURT:**  Yes.

20          **MR. SAVERY:**  Yes, Your Honor, I have got a

21  continuing objection.  Now we're referencing documents which

22  contain references to yet other sets of documents.

23          **THE COURT:**  I think it is getting kind of remote.

24          **MR. GOLD:**  Well, the reason this is on the screen,

25  Your Honor, is simply because this is an authority that this

1    witness has credited whose expert DSM views are important in

2    interpreting the document.  And what this passage I asked

3    the witness seems to indicate is that Dr. Berlin was

4    overruled.  And it is important that there is no rape in

5    this NOS category.

6         **THE COURT:**  So you want to ask her what?  She can't

7    read his mind.

8         **MR. GOLD:**  No, she can't.  But she can certainly

9    note that he was concerned, it appears that Dr. Berlin was

10   concerned --

11        **THE COURT:**  Well, you may ask her if she interprets

12   the letter that way, that he was at least concerned, but

13   then I would go on to something else.

14   BY MR. GOLD

15   **Q.**  Dr. Zander interprets this to be Dr. Berlin worried that

16   the condition was not mentioned and he thinks it should have

17   been; right?  In the NOS category.

18   **A.**  You have to go back to Zander for me to see exactly what

19   Zander said.  But what I take from this is that he wanted it

20   used as an example.  He did -- I don't see anything here

21   which says that POS -- Paraphilia NOS cannot include this

22   category but given the political flack they were not going

23   to list it as an example.  And Fred Berlin is extremely

24   upset about this.  I agree with that.

25        See, what Zander says is different.  He doesn't say

1   listed as an example or mention it specifically.  He says

2   not to include the PCD concept in the PNOS category.  From

3   Zander's statement you would infer that they had made some

4   kind of statement that you could not diagnose this category

5   under that, under paraphilia NOS, a statement which the

6   editor completely denied by putting it in the *Casebook*.  So

7   I think Zander twisted that memo to some extent.

8           I agree with what that memo says, is Fred Berlin

9   wanted it used as an example and they wouldn't go that far

10  to use it as an example.

11  **Q.**  The *Casebook* which we discussed this morning that

12  Dr. Frances said is not an authoritative source for

13  interpreting the DSM itself; right?

14  **A.**  Yes, although Frances agrees with the main point because

15  Frances has said you can use this disorder for that category

16  too.  So I don't really understand what Frances's objection

17  is since Frances actually agrees with Spitzer on the main

18  point.

19  **Q.**  Well, Frances acknowledges that he is making an argument

20  just like anybody else; right?

21  **A.**  That who is making an argument?

22  **Q.**  Dr. Frances argues that it is appropriate to diagnose a

23  rape-related disorder under Paraphilia NOS despite the

24  history of rejection of the category; right?

25  **A.**  Yes, Frances does argue that, which is essentially what

1    Spitzer recognized by putting the example in the *Casebook*.

2    So I really don't know what Frances has against the *Casebook*

3    in this context since they actually both agree that a

4    paraphilic disorder can be and should be, when it's

5    appropriate, diagnosed under Paraphilia NOS.

6    **Q.**  Well, he is talking about how to interpret this

7    document, right?  When Dr. Frances says you can't use the

8    *Casebook* because it's not official, that's his view of the

9    use of the *Casebook* which you used to justify your

10   interpretation; right?

11   **A.**  Well, that's his view of the *Casebook* but I don't --

12   **Q.**  But he is someone that you recommend -- we'll get to

13   that in a minute.

14   **A.**  Okay.

15   **Q.**  But he is someone that you recommend as an authority, an

16   overall authority in this field; right?

17          **MR. SAVERY:**  Objection, Your Honor.  We've been

18   over this at least once already.

19          **THE COURT:**  I think so.  I am going to sustain the

20   objection.

21   BY MR. GOLD

22   **Q.**  Dr. Zander continues.  He says, "Third, following the

23   controversy over PCD, the APA never reconsidered it."

24          That's what Dr. Zander says.  Do you dispute that?

25   **A.**  No.  As far as I know, that is accurate.  It was not

1    reintroduced.

2    **Q.**  But starting in DSM-IV and continuing in DSM-IV-TR new V

3    codes were inserted to cover a perpetration of sexual

4    coercion and rape; right?

5    **A.**  Yes.

6    **Q.**  And so the V codes -- now, again, this manual, its

7    typical use in the broader field of psychiatry and

8    psychology is for insurance billing purposes; is that a fair

9    statement?

10   **A.**  Well, that's one use.  I wouldn't argue that is the

11   most, that is the only use or the most frequent use.

12   **Q.**  Well, it's certainly frequently done that mental health

13   professionals have to bill insurance companies; right?

14   **A.**  Yes, that's true.

15   **Q.**  And all the codes that we see here are the codes that go

16   to insurance companies; right?

17   **A.**  Yes.

18   **Q.**  Now the V codes are codes for nonmental disorders that

19   may nevertheless bring someone into somebody's office for

20   treatment; right?

21   **A.**  That's correct.

22   **Q.**  And so on page 738 of the manual we see some of these,

23   problems related to abuse or neglect; right?

24   **A.**  Yes.

25   **Q.**  Physical abuse of child, neglect of child, sexual abuse

1    of child, sexual abuse of adult?

2    **A.**  Yes.

3    **Q.**  And there are several different types.  If focus of

4    clinical attention is on the perpetrator and abuse is by

5    partner, that's one code.

6         If focus of clinical attention is on the

7    perpetrator and abuse is by person other than partner,

8    that's another; right?

9    **A.**  Yes.

10   **Q.**  And so people have -- now, what Zander does with that is

11   he says that -- Dr. Zander interprets that to be a

12   recognition by the APA that sexually assaultive behavior

13   which may be something that will come to clinical attention

14   is not a mental disorder; right?  That's his interpretation?

15   **A.**  That's his interpretation.

16   **Q.**  Or that's an aid to our interpretation of why this

17   diagnosis is missing; right?

18   **A.**  No, I don't agree with that.  No one has ever argued

19   that all rapists are paraphilic.  So you would need that

20   code for those rapists who are not paraphilic even if you

21   had a category.

22   **Q.**  Well, no, what Dr. Zander is saying is that the

23   introduction of the codes after this history of rejection of

24   the diagnosis is an aid to our interpretation of the manual;

25   right?

1    **A.**   That's what Zander is saying, yes.

2    **Q.**   That's what Zander is saying.  That's his interpretation

3    as we follow his argument; right?

4    **A.**   (Witness nodded.)

5    **Q.**   Now, this development of Michael First and Allen Frances

6    writing these two articles in the same number of the journal

7    that Dr. Zander's article appears in, that's a relatively

8    recent development; right?

9    **A.**   The articles are recent, yes.

10   **Q.**   They date from 2008?

11   **A.**   Yes.

12   **Q.**   Right?

13          Now, all of those articles are concerned with the

14   over diagnosis of this condition in these types of cases;

15   right?

16   **A.**   That's true.  Well, I think Zander's is concerned with

17   whether the condition exists or not but the other two are

18   concerned about the other diagnosis.

19   **Q.**   Now, it's your testimony or is it your testimony that

20   your diagnosis in this case is consistent with the diagnoses

21   proposed by Michael First or Allen Frances?

22   **A.**   In general, yes, I believe that I share some of the same

23   concerns they do.  And I believe that I did not diagnose him

24   as a paraphilic rapist based simply on the number of rapes

25   but on an analysis of the patterns.

1    **Q.**  Well, now, Dr. Salter, you told us when you were

2    discussing Antisocial Personality Disorder yesterday that

3    the DSM, one of the things it does that is good is it gives

4    us defined criteria sets; right?

5    **A.**  In some places, yes.

6    **Q.**  In some places, right?

7          And, in fact, with Antisocial Personality Disorder

8    it's actually quite structured; right?  You noted that there

9    are seven different categories; right?

10   **A.**  Yes.

11   **Q.**  And if you get any three of those categories, you

12   qualify; right?

13   **A.**  That's right.

14   **Q.**  If you don't get three, you don't qualify; right?

15   **A.**  That's right.

16   **Q.**  And that is something that is designed to enhance

17   agreement among clinicians, right, something called

18   interater reliability; right?

19   **A.**  Yes.

20   **Q.**  The development of criteria so that clinicians aren't

21   using ad hoc, ad hoc criteria when they make a diagnosis;

22   right?

23   **A.**  Yes.

24   **Q.**  Now, the interesting thing about using an NOS

25   category -- and, now, Dr. Zander goes on to argue in this

1    article that it is questionable whether using an NOS

2    diagnosis is ever appropriate in the forensic context.

3              Do you recall reading that?

4    **A.**  Yes.

5    **Q.**  And part of the reason is that NOS diagnoses, there is

6    no criteria for them; right?

7    **A.**  It's poorly delineated, I would agree with that.

8    **Q.**  Well, it's not delineated at all because it's not really

9    in there; right?  The general criteria for a paraphilia;

10   right?

11   **A.**  No, I would disagree.  To some extent it talks

12   specifically about urges, fantasies or behaviors and so

13   forth.  So it has, it mentions criteria A and criteria B but

14   I don't think they're very well delineated.  It doesn't give

15   us much.

16   **Q.**  Nothing on Antisocial Personality Disorder; right?

17   **A.**  Right.  It doesn't give us much guidance in how to

18   distinguish it, the paraphilic from the nonparaphilic

19   rapists.

20   **Q.**  Now, one of the things that Dr. Doren did in this book

21   was he developed some; right?

22   **A.**  Yes, he did.

23   **Q.**  He developed some criteria for the diagnosis because

24   there are none in the manual; right?

25   **A.**  There are not sufficient criteria in the manual, yes.

1    **Q.**  And when you diagnosed the condition, you used some of

2    these criteria; right?

3    **A.**  I looked at those criteria and I also looked at other

4    things.  But I did look at those criteria, yes, and see how

5    they applied.

6    **Q.**  Now, you mentioned a lot of research yesterday talking

7    about laboratory experiments having to do with convicted

8    rapists; do you recall that?

9    **A.**  Yes.

10   **Q.**  Now, it's undeniable that some studies show that rapists

11   are different than nonrapists; is that a fair statement?

12   Sexually I mean.

13   **A.**  I believe so.  I believe that is incontestable.

14   **Q.**  Now, because there are some studies of these laboratory

15   studies where they put this thing called a PPG on convicted

16   rapists and run scripts for them to figure out whether

17   they're differentially aroused to coercive stimuli; right?

18   **A.**  That's correct.

19   **Q.**  Now, you testified that this research as a whole

20   supports your diagnostic conclusion in this case; right?

21   **A.**  Well, it supports the notion that there --

22   **Q.**  That there is such a paraphilia; right?

23   **A.**  That there is such a paraphilia --

24          **MR. SAVERY:**  Could he let the witness answer,

25   please.

1          **THE COURT:**  I think he has been reasonable.

2          Go ahead.

3   BY MR. GOLD

4   **Q.**  So -- but -- correct me if I am wrong, but there is a

5   sort of chicken and egg issue with this research, this body

6   of research to which you refer, which is that the

7   researchers state that it is not entirely clear why rapists

8   are aroused more to the coercive stimuli in some studies.

9   And what they say is is that it's not clear whether they,

10  these rapists are aroused to the nonconsensual stimuli or

11  because they are antisocial guys who have raped somebody,

12  they're simply -- their arousal is not deterred when they

13  hear this stuff and that they are aroused to the sexual

14  stimuli alone.

15         Is that a fair characterization of this research?

16  **A.**  Well, it's a little more complicated in that when you

17  say they as though all researchers agree.  Barbaree has

18  proposed that, that it actually is not a deviant arousal

19  pattern, that they're just attracted to rape and they don't

20  have the same inhibitory mechanisms towards nonconsent.

21  **Q.**  Barbaree is a researcher in --

22  **A.**  Barbaree is one of the --

23  **Q.**  -- sexology; correct?

24  **A.**  Yes, he is.  However, Barbaree's own research found a

25  difference in the antisocial or in non -- in those rapists

1    who are classified as having a deviant arousal pattern and

2    in those who aren't.  So if Barbaree's thesis is right,

3    there shouldn't have been a difference.  Any antisocial

4    rapist should have had the same pattern.

5    **Q.**  So let me stop you there just so we're clear,

6    Dr. Salter.  So you're characterizing Barbaree's position as

7    being that the difference that he obtained in the laboratory

8    experiments that he did does not implicate deviant sexual

9    arousal but rather antisocial characteristics of these guys;

10   is that --

11   **A.**  What I am saying --

12   **Q.**  -- your sense of his position?

13   **A.**  My sense of his position prior to this recent research

14   that came out -- and I don't know if he has made any

15   statements since then -- but my sense of his position was

16   that, yes, there are differences in rapists and nonrapists,

17   in terms of not so much their arousal to consenting sex but

18   their arousal to forced sex.  But how do we know that

19   they're really attracted to forced sex.  Maybe they're just

20   attracted to sex and they have some kind of mechanism

21   whereby they don't care about the suffering.

22         Now, there are two things about that.  One is he

23   now has some research which divided into subgroups and he

24   didn't find that they had the same arousal across the

25   different subgroups.  So if his theory was right, the

1    antisocial person should have been just as aroused as the

2    group categorized as having a deviant arousal pattern but

3    they were not.  There was a difference.

4          So I don't know what he would say at this point.

5    Not everybody agrees.

6          (Whereupon, Mr. Gold and the witness were talking

7    simultaneously.)

8    **Q.**  Dr. Barbaree conducted --

9    **A.**  -- yes.

10   **Q.**  So just so we're clear, Dr. Barbaree is a noted expert

11   in this field?

12   **A.**  He is.

13   **Q.**  Has done research in a number of different areas;

14   correct?

15   **A.**  Yes.

16   **Q.**  And one of the areas that he has researched is this area

17   that we are discussing now; right?

18   **A.**  Yes.

19   **Q.**  And one of the decisions that he's derived from his own

20   research is that his results are not the result or he cannot

21   conclude that they're the result of deviant arousal because

22   they may be simply the product of the antisociality of the

23   people listening to them, their arousal is not deterred; is

24   that fair?

25   **A.**  Almost fair.  He didn't base it just on the research.

1    That was Barbaree's, as I understand it, that was Barbaree's

2    theory for the general finding in the field.  The finding

3    wasn't just found in Barbaree's research.  It was very

4    common.  And he had a theory to explain.  He's now got some

5    results that strike me as contradicting that theory and I

6    don't know what he says at present.

7         Other researchers would not agree with him.

8    Q.  Where are those results from?

9    A.  The latest Barbaree results?

10   Q.  What you are referring to right now.  The recent

11   research that is --

12   A.  I'm sorry --

13   Q.  -- to change his mind.  Well --

14   A.  I don't know if he has changed his mind.  I am just

15   telling you he's got some recent research.  I'm not sure, I

16   don't think he's consistent with that theory.

17        It's in my case if you would like me to get it.

18        **MR. GOLD:**  May we, Your Honor?

19        **THE COURT:**  Sure, go ahead.

20        (Whereupon, the witness stepped down to get papers

21        from her briefcase.)

22   A.  The research is, "Comparisons between sexual and

23   nonsexual rapists subtypes, sexual arousal to rape, offense

24   precursors and offense characteristics" published in

25   *Criminal Justice and Behavior*.  Actually this is

1    interesting, I thought this was recent but it isn't.  1994.

2    It's interesting.

3           And what he said in this was he divided it into

4    subtypes based on Knight and Prentky's typology --

5    **Q.**  Just to stop you there before you go on.

6           So this position that you have associated with

7    Dr. Barbaree, this, what I call the chicken and egg problem,

8    so Dr. Barbaree maintained this position after this research

9    or do you know?

10   **A.**  I don't know.  I don't know.  I just know that this

11   research showed that --

12   **Q.**  It is quite old now; right?

13              **MR. SAVERY:**  Your Honor --

14              **THE COURT:**  Let her --

15              **MR. GOLD:**  I'm sorry, Your Honor.

16              **THE COURT:**  Let her answer.  Go ahead.

17   **A.**  That the relative sexual arousal to rape descriptions

18   was greater among the sexual subtypes than among the

19   nonsexual subtypes.

20           So if, you know, if it's just the question that

21   they're antisocial, the antisocial subtypes should have had

22   as high an arousal as the rapists, as the sexual subtypes,

23   but in this they did not.  There was specifically what I

24   would call deviant arousal among a subtype called the

25   sexualized subtype that wasn't found in the antisocials.

1    **Q.**  Can I, just to be clear about one thing that you're

2    referring to now, you're talking about a typology by a

3    researcher named Robert Prentky and another researcher named

4    Raymond Knight; is that right?

5    **A.**  That's right.

6    **Q.**  And they did a typology of rapists; right?

7    **A.**  They did.

8    **Q.**  Based on their research just over here in Massachusetts

9    at the Bridgewater Massachusetts Treatment Center; right?

10   **A.**  That's right.

11   **Q.**  Now, these typologies, these different types of rapists,

12   those aren't diagnoses; right?

13   **A.**  No.

14   **Q.**  Those are kind of constructs but they're kind of like

15   diagnoses; would you agree with that?

16   **A.**  In what sense?

17   **Q.**  They are descriptions that apply to someone that tell us

18   something about the person; right?

19   **A.**  In that sense, yes.

20   **Q.**  Now, but, for example, these sexual rapists that the

21   researchers were dealing with, those were based on this

22   typology by Dr. Prentky; right?

23   **A.**  Yes.

24   **Q.**  So that they used those ideas to kind of conduct their

25   research in the lab; right?

1    **A.**   They divide -- to make comparisons among the groups.

2    **Q.**   But they did not, for example, take the people who were

3    diagnosed with Paraphilia NOS in the 1990s and compare those

4    to people who were not; right?

5    **A.**   This is not about Paraphilia NOS.

6    **Q.**   Well, that would have been a good way to conduct

7    research about sexual and nonsexual rapists; wouldn't it

8    have been?  To separate out the antisocials from the people

9    who are diagnosed with Paraphilia Not Otherwise Specified

10   (Nonconsent)?

11   **A.**   I think that would be a very nice study for someone to

12   do.

13   **Q.**   But the researchers didn't do that; right?

14   **A.**   No.  This is not a study on the SDP process in any

15   sense.

16   **Q.**   Well, in the early 1990s this condition is not being

17   diagnosed; right?

18   **A.**   Right.

19   **Q.**   All right.  Now, are you familiar with the book that I

20   put up on the screen, *The Causes Of Rape*?

21   **A.**   Actually I haven't read that book.

22   **Q.**   You have not?

23   **A.**   Nope.

24   **Q.**   But the authors here are familiar to you; are they not?

25   **A.**   Yes, they are.

1    **Q.**  In fact, the authors here are, again, some of the

2    leading lights in this field, they've published the most,

3    they do the most research; right?

4    **A.**  That's very true.

5    **Q.**  And their names are Martin Lalumiere, Grant Harris,

6    Vernon Quinsey and Marnie Rice; right?

7    **A.**  That's right.

8    **Q.**  Now, this book is entitled, *The Causes of Rape,*

9    *Understanding Individual Differences in Male Propensity for*

10   *Sexual Aggression*; right?

11   **A.**  That's right.

12        Can you tell me when that was published?

13   **Q.**  I will.

14        I have turned to the title page.  It's published by

15   the American Psychological Association.  And it's copyright

16   2005.

17        Now, this book purports to be a synthesis of the

18   research on the subject that we're discussing, rape behavior

19   by men?

20   **A.**  Yes.

21   **Q.**  Would you agree with that?

22        Now, I have turned to chapter five of this book.

23   And it's entitled, "Sexual Interest In Rape."  Do you see

24   that?

25   **A.**  Yes.

1    **Q.**   And the first page of this chapter reads," One of the

2    most controversial topics in the study of rape over the past

3    two decades has been the idea that some form of sexual

4    disorder might underlie men's propensity to rape."

5           That's what the book is about; right?  They're

6    studying the propensity in some men to rape; right?

7    **A.**   Yes.

8    **Q.**   "To some the idea is somewhat disturbing because it

9    appears to excuse rapists by allowing that their

10   reprehensible conduct is due to a disorder perhaps beyond

11   their control.  The very idea of rape as a sexual act is

12   often viewed as anathema.  Indeed, many commentators have

13   speculated that rape is simply an act of male aggression

14   against women, essentially a nonsexual act whose function is

15   to keep women in general subjugated to men in general;"

16   right?

17   **A.**   Right.

18   **Q.**   And then they cite to a source in a footnote; right?

19   **A.**   Yes.

20   **Q.**   Now, these researchers who have authored this book

21   authored many of the studies which you cited yesterday or

22   had listed in your bibliography which support the idea that

23   rape should be diagnosed as a sexual disorder; right?

24   **A.**   These men have done studies which show, as they put it,

25   it's incontestable that rapists differ from nonrapists in

1    their arousal pattern.

2    **Q.**  And so these folks are the researchers who are doing

3    that research on which you rely; right?

4    **A.**  Some of them.  These folks have certainly done research

5    demonstrating that rapists differ from nonrapists in their

6    arousal pattern.

7    **Q.**  And this chapter is talking about why that is; right?

8    **A.**  I don't know.  I haven't read it yet.

9    **Q.**  I am going to read you the conclusion of this chapter,

10   understanding that you haven't read it.  I just want to talk

11   about the section headings very quickly to give a sense of

12   where the chapter goes.  But it essentially is a synthesis

13   of the literature in the field.  That's what you would

14   expect from people who do the research writing a book called

15   *The Causes of Rape*; is that a fair statement?

16   **A.**  That would be the expectation.

17   **Q.**  And so given that expectation we have a chapter heading

18   here, *Sexual Arousal To Rape as a Sexual Disorder*.  And then

19   without getting into it, they discuss that subject; right?

20         **THE COURT:**  Well, she hasn't read the book.

21         **MR. GOLD:**  Well --

22   **A.**  I haven't read the book.

23   **Q.**  I guess you could fairly infer --

24         **MR. GOLD:**  I'm leading up to a quote which I'm

25   going to read to her.

1      **THE COURT:**  Why don't you get to the quote.

2    BY MR. GOLD

3    **Q.**  And so in the conclusion they state, "Rapists are

4    characterized by high mating effort and antisociality.  Are

5    individual differences in propensity to rape also related to

6    a paraphilic or other sexual disorder.  There is strong

7    phallometric evidence --

8      **THE COURT:**  Can you clear this up?  Can you make it

9    a little bigger?

10      **MR. GOLD:**  Oh, sorry, Your Honor.  Yes.

11      (Pause in proceedings.)

12      **THE COURT:**  That is better.  Thank you.

13    BY MR. GOLD

14    **Q.**  "There is strong phallometric evidence that many rapists

15    are sexually different from men who do not commit rape.  The

16    meaning of this difference is as yet unclear.  In this

17    chapter we discuss the possibility that rapist's unique

18    sexual arousal may represent sadism and thus a typology.

19    The evidence for this is meager.  And the very notion of

20    sadism may need to be reexamined.  We also discussed the

21    possibilities that a rapist's sexual arousal to rape is not

22    pathological but rather a byproduct of their general

23    antisocial tendencies or even a fundamental component design

24    feature of the different antisocial strategies discussed in

25    chapter 4.  There seems to be a relationship between arousal

1    to rape and measures of antisociality among rapists but much

2    more work remains to be done to further test these

3    possibilities."

4            That's what these folks concluded; right?

5    **A.**   That's what that said.

6    **Q.**   Well, and what they're concluding is that the research

7    in 2005 doesn't resolve the chicken and egg problem that I

8    put forward; right?

9    **A.**   Well, I haven't read the chapter so it is very hard for

10   me to put this in context.

11           What I get from that is that they say yes, there is

12   strong phallometric evidence that rapists differ from others

13   sexually in their arousal patterns.  And beyond that it

14   seems to me they have not decided what else they want to say

15   about that or what interpretation they want to give on that.

16           But the basic fact remains they do have a different

17   arousal pattern than nonrapists.

18   **Q.**   But that's a very important difference for our purposes,

19   would you agree, Dr. Salter?

20   **A.**   I am not sure how.  The important thing is do rapists

21   show a disordered arousal pattern.  Is there a subgroup of

22   rapists for whom the rape is driven by a sexual component.

23           Now, whether that is because of a failure of

24   inhibitory mechanisms that exist in other men or whether

25   it's because of a positive attraction, it is nonetheless a

1    sexual disorder.  It's a disorder of an arousal pattern,

2    either because it isn't inhibited when it should be or

3    because it is too deviant stimuli itself.  But it's going to

4    result, whatever your theory is, in identifying the same

5    group.

6    Q.  Well, it's different, you were talking yesterday about

7    the engine and the brakes.

8    A.  That's right.

9    Q.  And Antisocial Personality Disorder, no brakes, engine,

10   sexual deviance; right?

11   A.  Right.

12   Q.  And you said that a paraphilia is supported by this

13   research that you cited; right?

14   A.  Yes, and I still believe that.

15   Q.  But these researchers are saying their own research

16   doesn't support either conclusion; right?

17   A.  I wouldn't go that far.  They're saying their research

18   does support the conclusion that there is a sexually

19   different pattern about these men.

20   Q.  But the --

21   A.  They are saying that.

22   Q.  -- difference is unclear, Dr. Salter, that's what they

23   say; right?

24   A.  Well, for -- again, I really have to read the whole

25   chapter to see what they're discussing.  So I'm not sure

1    exactly what they mean beyond that.  But they are certainly

2    affirming that this is a different arousal pattern.  And how

3    they, they haven't quite decided how they, what

4    interpretation they want to make.

5         But for our purposes what is important, or at least

6    for the research I was citing and the point I was making,

7    which is that you can identify a subgroup of rapists by a

8    disordered arousal pattern and they're different from other

9    rapists who don't have it.  I don't see anything in their

10   conclusions that disputes that.

11   Q.  Perhaps you'll have a chance to look at the chapter over

12   the break.  It appears to me that there is a, the difference

13   is -- and correct me if I'm wrong, Dr. Salter -- that if

14   antisociality is the cause of the difference in these

15   results that they get from their devices, that's because the

16   people are simply aroused to sex but that the coercive

17   elements of the stimuli, the things that they're listening

18   to, don't make them lose their erection while --

19        **MR. SAVERY:**  Your Honor -- I'm sorry.

20   Q.  -- the other argument --

21        **THE COURT:**  I think you -- why don't you start

22   again.  You are going down two or three paths there.

23        **MR. GOLD:**  Okay.

24   BY MR. GOLD

25   Q.  Correct me if I'm wrong, Dr. Salter, but it strikes me

1    that the difference, when the researchers here say the

2    meaning of these results is not clear, what they're saying

3    is they do not know whether their laboratory results from

4    measuring men who are listening to these coercive scenarios

5    is the result of a disordered arousal pattern to the

6    nonconsensual aspect of the stimuli or an arousal to the

7    sexual aspect but they are not impeded in their arousal by

8    the violence.  Is that -- is my understanding of what

9    they're saying correct?

10         **THE COURT:**  Ask her if she understands the

11   question.

12   BY MR. GOLD

13   **Q.**  Do you understand the question, Dr. Salter?

14   **A.**  More or less.

15         **MR. SAVERY:**  I'm objecting nonetheless, Your Honor.

16   This -- she's now being examined on a chapter of a book that

17   she hasn't read.

18         **THE COURT:**  No --

19         **MR. SAVERY:**  Even if she had read it --

20         **THE COURT:**  -- I think he is just using that as the

21   crux for the question.  I don't think he is --

22         **MR. SAVERY:**  But I thought his question focused on

23   what were they trying to say when they said what they said

24   in this book based on this research.

25         **THE COURT:**  I think he got off that.  I think he

1   just asked, he is asking just in broad strokes whether or

2   not that can be a phenomenon.

3          **MR. GOLD:**  Right.  That's what I'm calling this

4   chicken and egg, yes.

5          **THE COURT:**  All right.  Go ahead.

6   **A.**  Well, the problem with the way you're formulating it for

7   me is if that, if your formulation were correct, then you

8   shouldn't get differences between antisocial and sexualized

9   subgroups of rapists.  That's the problem.  So I assume that

10  these guys are asking a more sophisticated question.  But I

11  can't really assess it without reading the chapter.

12  **Q.**  And just so we are clear, you mentioned several pieces

13  of research by these folks in your testimony yesterday or

14  perhaps in the bibliography that you were talking about; is

15  that right?

16  **A.**  Yes.

17  **Q.**  But you were not familiar -- were you aware of the

18  existence of this book?

19  **A.**  No, I don't remember that book.  I know for sure, I

20  don't know if I have seen it in bibs, but I have not read

21  it.

22  **Q.**  Are you familiar with this book that I'm putting up on

23  the screen?

24  **A.**  Yes.

25  **Q.**  And for the record this book is called *Sexual Deviance,*

*Theory, Assessment and Treatment*, edited by D. Richard Laws and William T. O'Donohue; right?

**A.** Yes.

**Q.** Now, did we hear about Laws before?

**A.** Laws testified in a case in which he stated that he believed paraphilic rapism existed and that most practitioners believe it existed --

**THE COURT:** You know, could you say that again? I couldn't hear you.

**THE WITNESS:** Laws, his name came up in connection with a deposition he did in Washington State in which he testified that it was, paraphilic rapism was accepted among practitioners in the field.

BY MR. GOLD

**Q.** And this was the testimony that we referred to before that you cited similarly to Doren but that you weren't able to provide us with a copy of it?

**A.** Yes, I can't find my copy of that transcript.

**Q.** Now, would you agree with me *Sexual Deviance* is a standard reference in the field?

**A.** Yes, it's a standard book in the field.

**Q.** And this is the second edition which came out relatively recently, 2008?

**A.** Yes.

**Q.** Do you own this book?

1   **A.**   I think so.  I own one of the editions.  I think it is

2   this one.

3   **Q.**   Well, one came out in 1997?

4   **A.**   Yes.  I own that for sure but I think I have this one.

5   **Q.**   Have you read it?

6   **A.**   Yes.  Or I don't know if I've read all the chapters.

7   I've certainly read some of them.

8   **Q.**   Now, the way this book is structured, there is an

9   introduction.  "An integrated theory of sexual offending" is

10  the second chapter.  And then there are different subjects,

11  "Sexual deviance over the lifespan" by Howard Barbaree and

12  Dr. Blanchard is chapter No. three.  And then different

13  diagnoses; right?

14  **A.**   Yes.

15  **Q.**   And so there is exhibitionism, psychopathology and

16  theory, exhibitionism, assessment and treatment; right?

17  **A.**   Yes.

18  **Q.**   And there is pedophilia, chapter 10, psychopathology and

19  theory, pedophilia, assessment and treatment.

20          Sexual sadism, psychopathology and theory, sexual

21  sadism, assessment and treatment.  And then chapter 20 is a

22  chapter on rape?

23  **A.**   Yes.

24  **Q.**   Psychopathology and theory.  Rape, assessment and

25  treatment.

1          Now, were you familiar with that chapter in

2    particular?

3    **A.**   Yes, I have read that chapter.

4    **Q.**   Now, would you agree with me that this chapter is

5    intended for professionals in the field to give them as of

6    2008 the most current relevant information when they want to

7    know about the psychopathology and theory of rape?

8    **A.**   Yes.

9    **Q.**   And that Theresa Gannon and Tony Ward are psychologists

10   who work in the field of sex offender assessment?

11   **A.**   I assume so.  I don't know Theresa Gannon's work.  I

12   know, I am very familiar with Tony Ward's.

13   **Q.**   Could you read the, if you can read it, let me try to --

14   I will read it and ask you if I'm reading it right.

15          There is a section called "Description."  It says,

16   "We commence our description of rape with reference to the

17   current standard classification system for mental disorders,

18   the DSM.  Notably rape is omitted from DSM-IV-TR with no

19   apparent plans to introduce it in the DSM-V planned for

20   release in 2011."

21          And that actually gives us information that the

22   DSM-V is currently being developed; right?

23   **A.**   Yes, it is.

24   **Q.**   And so when we have the DSM-V supposedly or a process

25   similar to what we're doing now is under way, similar to

1    what we were looking at in the 1980s is under way right now,

2    debating and discussing what the diagnoses should be and how

3    they should be set up; right?

4    **A.**   Yes.

5    **Q.**   According to these authors there is no plan right now to

6    introduce it in DSM-V; right?

7    **A.**   That's right.

8    **Q.**   "Within the latest DSM version a diagnosis of any

9    paraphilia is dependent upon recurrent intense sexual urges,

10   fantasies or behaviors that involve unusual objects,

11   activities or situations lasting for a period of at least

12   six months and causing significant distress to the

13   individual or impairment in functioning.  Although

14   professionals in the field of sexual offending have argued

15   that many sexual abusive men such as pedophiles and

16   exhibitionists are unlikely to meet such criteria."  And

17   they cite two sources.

18        "Rapists appear equally unlikely to meet

19   DSM-IV-TR's criteria, making rape's absence from DSM-IV-TR

20   perplexing."

21        So they're dealing with the same DSM that we are in

22   commenting on the absence of rape as perplexing; right?

23   **A.**   Right.

24   **Q.**   "Rape is cited as a behavior occurring under the

25   diagnosis of Sexual Sadism constituting a mere five to ten

1    percent of men who rape," and citing a source.  And that is

2    true, in fact, right?  Sexual Sadism has examples listed

3    under it in the DSM and among those examples of sexual

4    sadistic behavior rape is listed; right?

5    **A.**  Yes.

6    **Q.**  "But this is the only fleeting glimpse of rape in

7    DSM-IV-TR."

8          Well, in fact, we discussed earlier there is

9    another fleeting glimpse under the V code, right, but that's

10   called sexual abuse of an adult; right?

11   **A.**  Well, yes.

12   **Q.**  "Because rape is largely absent from DSM-IV-TR Marshall

13   argues that professionals required to provide clinical

14   diagnoses often place rapists into the Paraphilia Not

15   Otherwise Specified, NOS, category.  They state clearly such

16   overuse of the NOS category does little to inform clinical

17   assessment or treatment for rapists."

18         They cite the same source, Marshall 2007.

19         "Similarly the latest tenth revision of the

20   *International Classification of Diseases*, ICD 10, by the

21   World Health Organization, 1992, used widely outside North

22   America to diagnose a range of sexual disorders including

23   pedophilia, voyeurism and exhibitionism, does not specify

24   rape under behavioral disorders."

25         That is what the authors say; right?

1   **A.**  Yes.

2   **Q.**  And, in fact, since you're familiar with this chapter,

3   you'll agree with me that they don't discuss paraphilia any

4   more in this chapter about rape; right?

5   **A.**  I don't, I really don't remember their argument in this

6   chapter.  I have read it but I don't -- I would have to look

7   at it again to remember their argument.

8          **MR. GOLD:**  One moment, Your Honor.

9          (Pause in proceedings.)

10         **MR. GOLD:**  Your Honor, may I approach the witness?

11         **THE COURT:**  Yes.

12  BY MR. GOLD

13  **Q.**  For the record, Dr. Salter, I have handed you the

14  chapter.  I am going to ask you to spend a moment looking

15  through it and see if that refreshes your memory as to

16  whether there is any other discussion beyond that reference

17  that we just discussed of the Paraphilia NOS concept.

18         **MR. SAVERY:**  Your Honor, I am going to object to

19  this.  To the extent we're drilling down now on this one

20  specific chapter in this book that is titled *Rape*.  There

21  are other relevant chapters in this book --

22         **THE COURT:**  Well, there may be and you will have

23  the opportunity to inquire about it later.

24         (Witness read document.)

25  **A.**  Well, I am only scanning it but it does appear, it

1    appears the chapter isn't on diagnosis or DSM-IV or

2    anything.  The chapter is on characteristics of rapists.

3    It's also on sociobiological, social cognitive theories on

4    etiology and rehabilitation theories.  It doesn't appear to

5    be a chapter about -- and some work on risk assessment.

6    **Q.**  Well, that's right, Dr. Salter.  It's a chapter about

7    rape, correct, and theorizing about rape?

8    **A.**  Some aspects of rape.  As I said, I don't see anything

9    on diagnosis of rape.  I see a rape attachment styles, that

10   sort of thing, Ward and Hudson's pathways model of how rapes

11   occur, that sort of thing.

12   **Q.**  And there is not a single reference in there, for

13   example, to Dr. Doren's criteria for the diagnosis of

14   Paraphilia Not Otherwise Specified (Nonconsent); right?

15   **A.**  That's not a diagnosis so there wouldn't be.

16   **Q.**  Well, it's on the phenomenon of rape; right?

17   **A.**  Well, there are many aspects of rape.  And this one is

18   not on, as far as I can tell, it is not on how to diagnose

19   rape.  It's on theories of attachment, theories of how

20   people become rapists in the first place.  It's on a

21   description of epidemiology of rapists.  It's on

22   rehabilitation efforts and risk assessment just on the

23   different topics.  As far as I can tell.

24        **MR. GOLD:**  May I approach and get it back, Your

25   Honor?

1        **THE COURT:**  Yes.

2             (Pause in proceedings.)

3    BY MR. GOLD

4    **Q.**  Now, the passage we read simply stated that Paraphilia

5    NOS, in their view they cite a source, does little or such

6    overuse of the NOS category does little to inform clinical

7    assessment or offer treatment for rapists; right?

8    **A.**  Well, they say that but I'm not sure I understand it.

9    **Q.**  Well, but they say that.  They are the authors of the

10   chapter on rape in the standard reference work *Sexual*

11   *Deviance*; right?  That's who they are; right?

12   **A.**  That's who they are, yes.

13   **Q.**  And then throughout the rest of the chapter when they're

14   discussing the subject that they say is called "rape," they

15   don't discuss this issue that we have been discussing in

16   this case; right?

17   **A.**  Well, they don't --

18        **THE COURT:**  What issue?

19        **MR. GOLD:**  The Paraphilia NOS rape disorder.

20   **A.**  No, they don't discuss diagnosis at all in any sense.

21   **Q.**  So what you're implying is that they are leaving that

22   it's an omission of some kind; right?

23   **A.**  No, you write chapters on different things.  Maybe I

24   missed something, and you certainly pointed out, but it

25   seems to me that this chapter is not on how to diagnose

1    rape.  There is nothing diagnostic in this chapter.  It is

2    on epidemiological factors, things like that.

3         If there is any place that I missed where they are

4    discussing diagnoses in any sense, then I would be happy to

5    look at it.

6    **Q.**  Dr. Salter, just -- I will move on in a moment, but just

7    so I have your testimony correct in my mind, it is your

8    testimony that this chapter, "Rape, Psychopathology and

9    Theory" does not -- "Rape, Psychopathology and Theory"

10   leaves out the psychopathology part?

11   **A.**  No, that is not my -- well, my confusion.  My confusion

12   is, if I am understanding your question, you seem to be

13   implying that it means something about Paraphilia NOS that

14   this chapter isn't on diagnosis.  It would mean something if

15   this chapter were really on diagnosis or even had a section

16   on it which discussed diagnosis and left that out.

17        But since they don't get into how to diagnose rape

18   by any system or in any methodology, it seem to me this

19   chapter is just on other facets of rape.

20   **Q.**  Okay.  But your testimony is that the chapter which

21   purports to be on -- that it is not significant in giving a

22   sense of the field of sex offender research that the chapter

23   on "Rape, Psychopathology and Theory" makes only one passing

24   negative reference to the NOS diagnosis and then discusses

25   its subject without another reference to the arousal that

1    you're talking about but that's insignificant?

2    **A.**   I don't fault the chapter.  It seems to me that they

3    chose a certain number of topics to cover in this chapter.

4    It doesn't look like from my brief scanning that they

5    covered any of the plethysmograph research or any of the

6    studies on arousal.  And that's fine, you're not required to

7    cover every topic in every chapter.

8            I wouldn't interpret anything from the fact that

9    they didn't discuss that research literature.

10   **Q.**   Doren came up with criteria; right?

11   **A.**   Yes.

12   **Q.**   Now, we talked a little bit about that book that he

13   wrote.  Now, you recruited him to write it.  Did you have

14   any involvement with him while he was writing it?

15   **A.**   Yes, I read drafts of some of the chapters and

16   commented on them, particularly the actuarials.

17   **Q.**   And we stated or we talked earlier about how it is not

18   uncommon in this field to cite personal communications back

19   and forth among professionals; right?

20   **A.**   Yes.

21   **Q.**   And, in fact, part of what Dr. Doren does is he cites

22   personal communications from you in the NOS (Nonconsent)

23   chapter; right?

24   **A.**   Yes.

25   **Q.**   Now, I want to talk a little bit about --

1          **THE COURT:**  Are you going to start a new topic?

2          **MR. GOLD:**  I was just going to mention to Your

3     Honor, I think --

4          **THE COURT:**  A good time to break?

5          **MR. GOLD:**  If we're going to break, it is a good

6     time.

7          **THE COURT:**  All right, 2:15.  Thank you, everybody.

8          **COUNSEL:**  Thank you, Your Honor.

9          **THE CLERK:**  Court is in recess.

10          (Luncheon recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **AFTERNOON PROCEEDINGS**

2          **THE CLERK:**  All rise for the Honorable Court.

3          (Whereupon, the Court and the Clerk conferred.)

4          **THE COURT:**  Okay.  You have this afternoon and also

5      tomorrow all day.

6          **MR. SINNIS:**  Right.  And then with Dr. Mills, we've

7      agreed on a schedule, if the Court would approve.  We will

8      do Dr. Plaud tomorrow which we anticipate will take almost

9      the entire whole day.  And instead of making Dr. Mills come

10     either very late in the day tomorrow or wait around, we just

11     thought we'd start fresh with him on Monday, finish him on

12     Monday and be done.

13         **THE COURT:**  Okay.  That is fine with me.  Is that

14     convenient for everybody?

15         **MR. SAVERY:**  Yes, You Honor.

16         **MR. GRADY:**  Absolutely.

17         **THE COURT:**  Let me ask you a question.  I just want

18     to make sure that I understand what everybody's definition

19     of "paraphilia" is.  Does somebody want to just tell me what

20     that is?  I think I know.  We hear it bandied around.

21         **MR. GRADY:**  Yes.  Very quickly, Your Honor, the

22     government's position, it would be the government's

23     definition that Paraphilia NOS is the general paraphilia

24     descriptor.  The reason -- and there are two --

25         **THE COURT:**  What about the part, NOS, that is where

1    we get the argument, the NOS.

2            **MR. GRADY:**  We start with NOS, that essentially --

3            **THE COURT:**  Not Otherwise Specified.

4            **MR. GRADY:**  Right.  And the core element of

5    paraphilia is a deviant sexual arousal involving, and I'll

6    skip to the relevant definition, nonconsenting persons.  It

7    is the first general definition of paraphilia.  The second

8    criteria being that it interferes with social or other

9    functioning.  Your going to jail would certainly qualify

10   criteria B.  So I don't think there is much issue of there

11   has been an impairment.

12           I think what is at issue is whether first there

13   is -- well, actually I think that at least the testimony

14   you've heard is that there is no dispute that there can be a

15   paraphilia in an individual who has a deviant sexual arousal

16   to noncoercive sex.  You haven't heard any witness testify

17   otherwise.

18           The question that has been raised via

19   cross-examination is whether that is properly --

20           **THE COURT:**  It is in the book.

21           **MR. GRADY:**  -- recognizable within the NOS

22   category.

23           **THE COURT:**  Yes.

24           **MR. GRADY:**  So the government's definition --

25   sorry.

1          **THE COURT:**  Whether it is in -- you can find it in

2     the DSM.

3          **MR. GRADY:**  I think that's part of the question but

4     not entirely all of it, Your Honor.  I think there is a

5     medical concept of what is the disorder of Paraphilia NOS.

6     I think there is a separate question of what is legally the

7     concept of a mental illness, abnormality or disorder under

8     the Adam Walsh Act.

9          I just want to make clear that my answer to the

10    first question is the criteria for diagnosing Paraphilia

11    NOS, what we would describe as nonconsent or paraphilia

12    focused on aberrant arousal to coercive sex, the criteria

13    for diagnosis of the general criteria for paraphilia listed

14    in the DSM and in the government's exhibit at Exhibit 20.

15         The question then arises so, I think a separate

16    issue arises is what is the extent to which the legal

17    definition in the Adam Walsh Act of mental illness,

18    abnormality or disorder meshes up with the DSM diagnosis.

19         And my suggestion to the Court is is that, in fact,

20    the two are very different.  And that, in fact, Congress

21    intended for the definition of "mental illness, abnormality

22    or disorder" as it's described in the Adam Walsh Act to be

23    substantially more broad.  And the reason I would suggest

24    that, I will give you the reason, the first -- the Adam

25    Walsh Act doesn't define "serious mental illness,

1    abnormality or disorder," Your Honor.  I will certainly

2    recognize that.

3          But the legislative history indicates that Congress

4    intended that the courts employ a definition similar to that

5    used by Kansas and approved by the Supreme Court in <u>Kansas</u>

6    <u>versus Hendricks</u>.  And I apologize, I'm reading it, but I

7    want to make sure I get this correctly, Your Honor.  Which

8    was obviously 521 U.S. 346 and also in <u>Kansas versus Crane</u>

9    534 U.S. 407.  And I would refer to the House Report No.

10   109-218, part one, at page --

11         **THE COURT:**  You are going at do this at the end of

12   the case.

13         **MR. GRADY:**  Well, right.  And I'm sorry, Your

14   Honor, I didn't know if we were arguing the issue or not.

15         **THE COURT:**  No, no.  I just asked you a little

16   question.

17         (Laughter.)

18         **MR. GRADY:**  Well, like most lawyers I can't give a

19   short answer.

20         **THE COURT:**  Last time I am going to ask you

21   anything.

22         (Laughter.)

23         **MR. GRADY:**  The fact is, Your Honor, that I would

24   shortly say in abbreviated fashion that what Congress

25   intended when it enacted the Adam Walsh Act was to cover --

1    Congress perceived a gap in 4246 which covered traditional

2    mental illnesses.  And it drafted the Adam Walsh Act because

3    it perceived that that statute which covered traditional

4    mental illnesses didn't cover disorders, illnesses and

5    abnormalities which Congress considered to be dangerous that

6    were not covered by 4246 that would cause individuals to go

7    out and commit sex offenses.

8          And what I take from that and what I take from the

9    statement of Congress that they intended to include the

10   definition that was recognized by the Supreme Court in the

11   two Kansas cases, Hendricks and Crane, is that they intended

12   the definition of "mental illness, abnormality or disorder"

13   that was broader than that recognized in the DSM.

14         So I think there were two components to the

15   government's definition and, therefore, two parts to the

16   answer.  And I'll rest on that to be somewhat short as the

17   Court asked.

18         **THE COURT:**  Thank you.

19         **MR. GOLD:**  Your Honor, I would just, very

20   succinctly, I think we take a contrary position to the

21   government there.

22         The Supreme Court has stated that a lot of the

23   constitutionality of this whole kind of regime depends on

24   this medical justification.  We would argue, and I think we

25   can back it up pretty well, that a DSM diagnosis is a

1   necessary but not sufficient condition to get you through

2   the door.

3          Then there is this other thing which they, the

4   witnesses talk about called volitional impairment.  The

5   witness's own sources that we've been talking about say that

6   the paraphilia diagnosis, it's disordered pattern in

7   arousal, right.  You are attracted to something that is

8   unusual, exhibitionism or showing your privates, things like

9   that.  That's a paraphilia.

10          But applying that diagnosis does not necessarily

11   mean that you are volitionally impaired.  Also I don't

12   think, we've always maintained that being volitionally

13   impaired at one time doesn't necessarily mean that you're

14   volitionally impaired at present.

15          So that's our position on that.

16          **THE COURT:**  All right.  Thank you very much,

17   everybody.

18          Let's move on now with the testimony.

19                  **ANNA CAROL SALTER, Resumed**

20                  **CROSS-EXAMINATION, (Cont'd.)**

21   BY MR. GOLD

22   **Q.**   Dr. Salter, good afternoon.

23   **A.**   Good afternoon.

24   **Q.**   So assuming that the Paraphilia NOS can be or, well,

25   that a disordered pattern of arousal to nonconsent can be

1  diagnosed through Paraphilia NOS through the book, there

2  are, as you agreed with me before, an absence of specific

3  criteria; right?

4  **A.**  Yes.

5  **Q.**  And, in fact, different authors have proposed different

6  ways of going about it and two of those articles that we

7  discussed gave us some criteria or at least advice about how

8  to diagnose a paraphilia; right?

9  **A.**  Yes.

10 **Q.**  And these two authors are authors that were involved in

11 the creation of the DSM and are important authorities on

12 which you rely to state that Paraphilia NOS as a diagnosis

13 for a rapist is okay.  Michael First is one, Allen Frances

14 is the other; right?

15 **A.**  Yes.

16 **Q.**  And so they are authorities whose opinions you respect;

17 correct?

18 **A.**  Yes.  I don't agree with them on everything but they are

19 certainly authorities.  And I certainly respect their

20 opinions.

21 **Q.**  And so I have up on the screen an image of the article,

22 "Defining Mental Disorder When it Really Counts."

23      Can you see that there?

24 **A.**  Yes.

25 **Q.**  Now, this is where Allen Frances of the DSM-IV Task

1    Force states that -- and we've read this sentence before --

2    "The use of Paraphilia NOS to describe repetitive rape

3    cannot be justified on the basis of the term or behaviors

4    alone."

5            Then he states, "This distinction does not mean

6    that Paraphilia NOS cannot or should not be used to describe

7    some individuals who commit coercive sexual acts.  However,

8    such diagnosis would require considerable evidence

9    documenting that the rapes reflected paraphilic urges and

10   fantasies linking the coercion to arousal.  One acceptable

11   standard for using it may be to demonstrate clear

12   substantiation of urges and fantasies, either as inferred by

13   the acts perpetrated on the victim or by the interview

14   information so as to distinguish it from criminal behavior

15   that is not rooted in sexual psychopathology;" right?

16   **A.**   Yes.

17   **Q.**   I read that correctly; right?

18   **A.**   Yes.

19   **Q.**   And that word "psychopathology" is the same word that

20   they used in the rape chapter that we were discussing a

21   little earlier; right?

22   **A.**   Yes.

23   **Q.**   That's the same word.

24           The term "rape" does appear -- well, I'll stop

25   there.

1          So what they want or what Dr. Frances wants is

2     considerable evidence documenting that the rapes reflected

3     paraphilic urges and fantasies linking the coercion to

4     arousal.

5          Now I've turned to the Michael First article from

6     the same number of the journal of the *American Academy of*

7     *Psychiatry and the Law*.  It states, "As emphasized in this

8     article," or the authors state, "the fact that the person

9     has a history of sexual offenses cannot by itself be

10    considered sufficient evidence that the offenses were the

11    product of paraphilic sexual fantasies and urges.  The

12    evaluator must delve deeper and examine the specific details

13    of the sexual offenses to establish that the behaviors are

14    being driven by paraphilic urges.  For example, if the

15    offender's rape behavior appears to be following a script as

16    evidenced by multiple rape victims who describe the rapist

17    as engaging in the same sequence of physical behaviors and

18    verbalizations, it may be reasonable to infer that the rapes

19    are motivated by a paraphilia.  Furthermore, since any

20    behavior can have other possible causal explanations,

21    alternative explanations for the criminal sexual behavior

22    must also be considered."

23         I read that correctly; right?

24    **A.**  Yes.

25    **Q.**  Now, you stated before I believe that your diagnosis in

1    this case was consistent in your view with the prescriptions

2    of both Dr. Frances and Dr. First; is that right?

3    **A.**   Yes.

4    **Q.**   Now, when you wrote your report in this case there were

5    three sex offenses that you were looking at; right?

6    **A.**   Yes.

7    **Q.**   There was the first rape in 1974; correct?

8    **A.**   Yes.

9    **Q.**   Now, that was an incident which involved an

10   acquaintance.  You'll agree with that?

11   **A.**   I don't know.  By definition it may well have been a

12   stranger in the sense that a stranger is generally defined

13   as somebody he doesn't know within -- has not known for 24

14   hours.  And this was somebody who just recognized him --

15   **Q.**   Well, this is someone --

16         **MR. SAVERY:**   Your Honor --

17         **THE COURT:**   Let her finish.

18   **Q.**   Go ahead.

19   **A.**   This is someone who only knew his first name so it

20   wasn't clear to me whether he just picked her up in the bar

21   so to speak.  So I don't know if he was an acquaintance

22   prior to that, she was an acquaintance prior to that

23   incident.

24   **Q.**   Okay.  So you don't know; correct?

25   **A.**   No.  The evidence suggests not because she knew nothing

1    except his first name.

2    **Q.**  Well, she knew his first name; right?

3    **A.**  She knew his first name.

4    **Q.**  That's the evidence that you have?

5    **A.**  That's the evidence we have.

6    **Q.**  Now, what you have in that rape is the witness's

7    description of what happened; right?

8    **A.**  Yes.

9    **Q.**  Now, there is a second incident and that is the assault

10   with intent to rape on the towpath; right?

11   **A.**  Yes.

12   **Q.**  And about that incident there is a paucity of

13   information; right?

14   **A.**  Only of characteristics.  We don't know -- meaning the

15   victim characteristics, time of day, et cetera.  We don't

16   have a description by the victim of the offenses.

17   **Q.**  Right.  So you have evidence that there is a conviction

18   for assault with intent to rape; correct?

19   **A.**  Yes.

20   **Q.**  You have evidence that you have an eight-month pregnant

21   woman; right?

22   **A.**  Yes.

23   **Q.**  You have evidence that it happened at three in the

24   afternoon?

25   **A.**  Yes.

1    **Q.**  And you have evidence that it happened in a park; right?

2    **A.**  A public park and that it was a stranger.

3    **Q.**  Now, you have no evidence of what actually happened;

4    correct?

5    **A.**  No direct evidence.  We do have one report that says it

6    was very similar to his previous rape but that is all.

7              **THE COURT:**  To his what?

8              **THE WITNESS:**  Previous rape.

9    BY MR. GOLD

10   **Q.**  What report is that, Dr. Salter?

11   **A.**  Well, let's hope I have it here.

12             I'm sorry, I don't know where this is.  I don't

13   appear to have it in here.

14             (Pause in proceedings.)

15             I don't have that with me.

16             (Whereupon, counsel conferred.)

17   **Q.**  I have put on the screen an excerpt from page 812 of the

18   Bates stamped series of pages.  Is this the page --

19   **A.**  Yes.

20   **Q.**  -- that you were referring to?

21   **A.**  Yes.

22   **Q.**  And this is by a parole officer?

23   **A.**  Yes.

24   **Q.**  And it says, "The defendant's involvement in the instant

25   offense as alleged by the complainant is of a very serious

1    nature.  This is his second conviction for a similar offense

2    within two years."

3    **A.**   Yes.

4    **Q.**   "By virtue of these convictions this writer views the

5    defendant as a potential threat to the community"?

6    **A.**   Yes.  And the similar offense was the completed rape.

7    **Q.**   And so that is the data that you were referring to?

8    **A.**   That's all we have.

9    **Q.**   Now, the third incident is the incident with the

10   strangling; right?

11   **A.**   Yes.

12   **Q.**   And that is an incident which we have some information

13   about; right?

14   **A.**   Well, yes.  We have the victim's report which is also

15   actually what we had in the first one as well.

16   **Q.**   Well, we have the victim's report, she wrote a victim

17   impact statement; right?

18   **A.**   We have that, yes.

19   **Q.**   And then we also have an appellate court's description

20   of the testimony which occurred at the trial in that case;

21   right?

22   **A.**   Yes.

23   **Q.**   And you read from some of that yesterday?

24   **A.**   Yes.

25   **Q.**   Right?

1          Now, it's my understanding of your diagnostic

2    process that you make two diagnoses in this case; right?

3    **A.**  Yes.

4    **Q.**  You make a diagnosis of Antisocial Personality Disorder

5    and you make a diagnosis of this other thing, the Paraphilia

6    NOS (Nonconsenting); right?

7    **A.**  Yes.

8    **Q.**  Now, the Paraphilia NOS (Nonconsenting) is based or when

9    you made it is based on the three rapes?

10   **A.**  Yes.

11   **Q.**  I'm sorry, the two rapes and the assault with intent to

12   rape; right?

13   **A.**  That's correct.

14   **Q.**  Now, you stated that the, in your report that the

15   incident with the strangling is clearly sadistic; right?

16   **A.**  Yes.

17          **THE COURT:**  Is clearly what?

18          **MR. GOLD:**  Sadistic.

19   BY MR. GOLD

20   **Q.**  And so in your view it was evidence that he may be a

21   sexual sadist; right?

22   **A.**  It's a possibility.

23   **Q.**  And that was also the evidence which made the other two

24   rapes qualify for a diagnosis of NOS (Nonconsent); right?

25   **A.**  It is the totality of the three together and the

1   analysis that I did.

2   **Q.**   The two together gets you no diagnosis; right?

3   **A.**   I don't know.  I didn't really do an analysis based on

4   the two.  I put all the evidence together and looked at the

5   pattern.

6   **Q.**   Well, what --

7            **THE COURT:**   When you say "the two, which two are

8   you talking about?  The two rapes as opposed to --

9            **MR. GOLD:**   No, the first rape and the assault with

10   intent to rape.

11           **THE COURT:**   You are talking about the first two

12   episodes?

13           **MR. GOLD:**   The first two episodes.

14   **A.**   Pardon?

15   **Q.**   You get no diagnosis; right?

16   **A.**   I don't know.  I didn't do an analysis based on the

17   first two.  I did an analysis of all three together so I

18   haven't looked at that separately.  And I wouldn't do it on

19   the fly.

20   **Q.**   Can you do an analysis for us right now, Dr. Salter, as

21   to whether it qualifies for Paraphilia NOS on the basis of

22   those two rapes?

23   **A.**   No, I would really have to think that through.  I can't

24   do that on the fly on the stand.

25   **Q.**   Well, but you have no information, correct, about what

1    was said at the assault with intent to rape on the towpath;

2    right?

3    **A.**  No, but we have important information.

4    **Q.**  Yes or no, Doctor?

5    **A.**  No, I don't know what was said.

6    **Q.**  You don't know, in fact, whether Mr. Graham touched her

7    with two hands or one hand; right?

8    **A.**  That's correct.

9    **Q.**  Or touched her at all; correct?

10   **A.**  Well, I do believe he must have touched her to get

11   charged and a conviction of assault with intent to commit

12   rape but I don't know how he touched her.

13   **Q.**  But you don't know because there is no description of

14   what actually happened in the record?

15   **A.**  Right.  I don't know how he touched her.

16   **Q.**  Now, the way you do your diagnosis, does it work that

17   you have evidence for sexual sadism in the strangling;

18   right?  That's --

19   **A.**  Yes.

20   **Q.**  And that makes a diagnosis for another condition valid?

21   **A.**  Well, Frances certainly suggested that sadistic elements

22   in the course of a rape were one factor to consider.  So,

23   yes, it is an element but it is certainly not -- I did a

24   whole analysis of this and the strangling was not the only

25   part of the analysis.

1    **Q.**  Well, let's talk about the strangling for a moment,

2    Dr. Salter.  In your report, if I could turn your attention

3    to page 13 of your report.

4         You say here in your report in the highlighted line

5    in blue, "There is simply no other explanation for the

6    strangling except sadism."  Is that your view?

7    **A.**  That's my view.

8    **Q.**  And would another clinician taking a different view be

9    unreasonable to you?

10   **A.**  Well, I'd like to hear their reasons; but it would

11   surprise me since I could not -- and I think actually Mills

12   agreed with me -- I cannot think of any other reason for

13   strangling someone in this way in the context in which it

14   was done after she had submitted.

15   **Q.**  And you reviewed all the records in the case?

16   **A.**  Yes.

17   **Q.**  And after a review of the records you came to that

18   conclusion?

19   **A.**  Yes.

20   **Q.**  Now, I have up on the screen a document numbered Bates

21   stamp page 91.  It is the Precertification Evaluation Report

22   done in this case?

23   **A.**  Yes.

24   **Q.**  You reviewed that document; right?

25   **A.**  Yes.

1   **Q.**  And that's by a Ph.D psychologist Monica Ferraro; right?

2   **A.**  Yes.

3   **Q.**  And so she did an assessment as to whether Mr. Graham

4   would be referred for this process or not; right?

5   **A.**  Yes.

6   **Q.**  And she found that he should be; right?

7   **A.**  Yes.

8   **Q.**  And she reviewed the same documents that you did;

9   correct?

10  **A.**  Well, I assume so.  I don't know what documents she saw.

11  **Q.**  Well, she's done a several page report here

12  (indicating)?

13  **A.**  That's correct, but I have no firsthand knowledge of

14  what documents she had.

15  **Q.**  Well, do you recall from reading the report whether she

16  had reviewed the same documents?

17  **A.**  She didn't list all of the documents so I couldn't tell

18  you what she reviewed.

19  **Q.**  Well, she arrived at different diagnostic impressions

20  than you did; didn't she?

21  **A.**  Yes, she did.

22  **Q.**  For the Axis I she found the diagnosis we were talking

23  about earlier, sexual abuse of adult; right?

24  **A.**  Well, that's not a diagnosis.  That's a V code.

25  **Q.**  Well, she put in a V code there; right?

1   **A.**   She did put in a V code.

2   **Q.**   And she also put, "Rule out Paraphilia Not Otherwise

3   Specified (Nonconsent);" right?

4   **A.**   That's right.  She didn't take a stand on it.

5   **Q.**   And, well, "rule out" means it could be there --

6   **A.**   Yes.

7   **Q.**   -- I'm not sure.

8   **A.**   That's right.

9   **Q.**   Right?

10          Because she didn't feel there was enough evidence;

11   right?

12   **A.**   Evidently she didn't feel there was.

13   **Q.**   She also --

14   **A.**   She didn't know.

15   **Q.**   -- lists opioid dependence, in a controlled environment;

16   right?

17   **A.**   Yes.

18   **Q.**   Now, she is a Bureau of Prisons' psychologist; correct?

19   **A.**   Correct.

20   **Q.**   She lists on page 6 an Axis II Antisocial Personality

21   Disorder.  That's the same diagnosis you get; right?

22   **A.**   Yes.

23   **Q.**   Now, she writes here, "Mr. Graham was convicted of

24   raping or attempting to rape three adult women.  While

25   records indicate that Mr. Graham choked his victim while

1    committing the rape in 1987, there is no indication that

2    Mr. Graham derived sexual pleasure from the pain of his rape

3    victim.   Rather, it appears as though the aggression

4    associated with Mr. Graham's offense conduct was to subdue

5    his victim so that he could rape her.   As a result, a

6    diagnosis of Sexual Sadism is not being made at this time.

7    However, a rule out diagnosis of Paraphilia Not Otherwise

8    Specified (Nonconsent) is being given as Mr. Graham has been

9    convicted of forcing or attempting to force women to engage

10   in nonconsensual sex on three separate occasions.   It is

11   considered possible that he finds the nonconsent of his

12   victim to be arousing;" right?

13   **A.**   Right.

14   **Q.**   Now, it is Dr. Ferraro's interpretation that there is no

15   indication that Mr. Graham derived sexual pleasure from the

16   rape of his victim or the pain of his rape victim?

17   **A.**   That's correct, that is her interpretation.

18   **Q.**   Now, part of the --

19           **THE COURT:**   Well, who wrote this paragraph that you

20   have got --

21           **MR. GOLD:**   This is a BOP prison psychologist.

22           **THE COURT:**   Not Ms. Ferraro?

23           **MR. GOLD:**   It is Ms. Ferraro, yes.

24           **THE COURT:**   Well, maybe I am misreading it.

25           (Pause in proceedings.)

1          THE COURT:  "However, a rule out diagnosis"?

2          MR. GOLD:  That's right.  And we were discussing

3     the rule out diagnosis is when you think there may be

4     something --

5          THE COURT:  I understand that but does it say that?

6          MR. GOLD:  "However, a rule out diagnosis of

7     Paraphilia Not Otherwise Specified (Nonconsent) is being

8     given."

9          THE COURT:  Oh, okay.  I missed the "being given."

10    I got it.  Thank you.

11    BY MR. GOLD

12    **Q.**  But, again, what that indicates in clinical language is

13    it's a communication to other clinicians that this diagnosis

14    may be present or maybe not; right?

15    **A.**  Yes.

16    **Q.**  Now, part of the records that we reviewed -- and I have

17    up on the screen Bates No. 512 which is an unreported

18    appellate opinion on Mr. Graham's appeal in this criminal

19    case after his conviction by jury; right?

20    **A.**  Yes.

21    **Q.**  And this is among the documents that you reviewed;

22    right?

23    **A.**  Yes.

24    **Q.**  And there is a fact section there based on the testimony

25    at trial; right?

1   **A.**   Yes --

2   **Q.**   It says, "The victim," and it leaves out her name,

3   "testified that on May 24, 1987 at 8 a.m. she had been

4   working in her garden adjacent to her residence for over an

5   hour when appellant approached her from the sidewalk.

6   Appellant stepped onto the victim's patio and engaged her in

7   a brief 'neighborly type' conversation.   The victim brought

8   the conversation to a close; went inside her residence

9   and --"

10   **A.**   I believe it says, "closed the door."

11   **Q.**   "Closed the door which could not be locked.   The victim

12   saw that appellant had left the patio and had returned to

13   the picnic area nearby.   While the victim was listening to

14   the audio of a videotape, appellant again appeared at the

15   screen door and presented her with a plant.   She thanked him

16   and again said that she had to go inside.   At approximately

17   11 a.m. the victim saw the appellant again standing at her

18   screen door with his right hand gloved and his left hand

19   pressed against the glass.   It was then that she became

20   apprehensive.   Despite the victim's protests, appellant

21   pushed his way into her condominium asserting that he wanted

22   to see the plant he had given to her.   When the victim

23   screamed, appellant placed his gloved hand over her throat

24   and dragged her into the living room.   Although the victim

25   initially struggled to free herself, she stopped when

1    appellant threatened to kill her.  Appellant then choked the

2    victim until she passed out telling her, 'I've just got to

3    put you out for a while.'  When the victim regained

4    consciousness and attempted to stand, appellant choked her

5    again.  The victim twisted her body so that she could kick

6    the door.  She stopped when appellant again threatened to

7    kill her.  For the second time the appellant choked the

8    victim into unconsciousness.  Before the appellant initiated

9    sexual intercourse with her, the victim requested that he be

10   gentle, because she had not had intercourse for about four

11   months.  After the act was completed, the appellant warned

12   the victim that no one would believe her if she reported it

13   because there was no sign of forced entry.  The victim

14   requested a glass of tea and appellant helped her up because

15   she was too weak to stand.  At approximately 11:30 a.m.

16   appellant outstretched his hand to guide the victim into her

17   bedroom stating that he wanted to make love to her in her

18   bed.  A second act of intercourse occurred in the bedroom.

19   Afterwards there was some conversation during which

20   appellant requested the victim's telephone number which she

21   gave him.  The victim thanked him for not killing her."

22         And then Mr. Graham called her three days later;

23   right?

24   **A.**  Yes.

25   **Q.**  And that's how he came to be arrested; right?

1    **A.**  Yes.

2    **Q.**  Now, sometimes when you do a diagnosis you defer doing a

3    diagnosis because you don't have sufficient information;

4    right?

5    **A.**  Yes.

6    **Q.**  And, in fact, in this very case, when you were rating

7    Mr. Graham on the Antisocial Personality Disorder criteria,

8    there is an example of this process.  One of the criteria is

9    impulsivity or failure to plan ahead.

10          "There is insufficient information in the records

11   to evaluate this criteria.  It is unknown whether

12   Mr. Graham's offenses were impulsive or planned;" right?

13   **A.**  Yes.

14   **Q.**  So that is certainly something that you can do as a

15   clinician in one of these cases; right?

16   **A.**  Certainly.

17   **Q.**  Now, in the offenses we just had it described to us --

18   well, Sexual Sadism requires evidence of arousal to the pain

19   of the victim; right?

20   **A.**  Yes.

21   **Q.**  And it's your testimony that it is impossible to view

22   these facts that I just read reasonably as Mr. Graham

23   attempting to subdue the victim prior to raping her; right?

24   **A.**  Yes.  Dr. Ferraro's facts were inaccurate.  He did not

25   subdue her.  He did not strangle her to subdue her but --

1    **Q.**  Dr. Salter, it's your testimony that it is impossible to

2    view the facts we just read as an attempt to subdue the

3    victim; right?  In your view?

4    **A.**  She --

5    **Q.**  Yes or no?

6    **A.**  She said --

7    **Q.**  Yes or no, please.

8    **A.**  Yes.

9    **Q.**  It is impossible to view them that way; right?

10   **A.**  Yes.

11   **Q.**  That there is no, according to your report there is no

12   other explanation of the choking but sexual sadism; right?

13   **A.**  Let me be clear.  I do not see any other possibility in

14   that description other than the choking was sadistic.

15   **Q.**  You don't have evidence that Mr. Graham had an erection

16   during that; right?

17   **A.**  Yes, we do.  Mr. Graham's arousal was not inhibited.  He

18   raped her immediately after choking her, either for --

19   **Q.**  Well, the immediately --

20   **A.**  -- for the second or third time.

21   **Q.**  How long was the period, Dr. Salter?

22          **THE COURT:**  Let her finish her answer.  Go ahead.

23   **A.**  All of the chokings occurred prior to the first

24   penetration and the penetration was successful so we do have

25   evidence that the choking did not inhibit and in context it

1    looks like the choking was foreplay because there is no

2    other reason for it.

3    Q.   Well, it is your testimony that there is no other reason

4    for it; right?

5    A.   Exactly.  It's my opinion, which is what I'm testifying

6    to, that there is no other reasonable explanation since she

7    had ceased resisting.

8    Q.   Well, between the first and second choking she's kicking

9    the door; right?

10   A.   Well, if you read that again, you will see that she

11   stopped resisting before he choked her in each case.

12   Q.   Well, but what you are doing is saying that Doctor --

13   that Mr. Graham was not subduing her, that was not the

14   purpose of the choking; correct?

15   A.   I am not saying that.  The victim said that.  She said

16   when he threatened to kill her, she stopped struggling and

17   then he said "I have got to put you out for a little while"

18   and choked her.  That's the victim's testimony.

19   Q.   You have a moment where, before the appellant initiated

20   sexual intercourse with her, the victim requested that he be

21   gentle because she had not had intercourse for four months;

22   right?

23   A.   Yes, that's after the choking.

24   Q.   Okay.  But that's during the sexual encounter; right?

25   A.   Yes.

1   **Q.**  And this sadist that's supposed to be deriving sexual

2   pleasure from the pain he is inflicting, right, not

3   necessarily even a sexual encounter; right?  Sexual arousal

4   to pain, that's what the diagnostic criteria are for sadism;

5   correct?

6        **MR. SAVERY:**  Objection.  There is at least three

7   questions there.

8        **THE COURT:**  No, I think -- I think he landed on his

9   feet.  Do you understand the question?

10        **THE WITNESS:**  Not exactly.  I thought it was

11   multiple as well.

12        **THE COURT:**  All right.  Try it again.

13   BY MR. GOLD

14   **Q.**  Well, a diagnosis of Sexual Sadism is sexual arousal to

15   pain, the suffering of the victim; correct?  That's the

16   definition?

17   **A.**  Pain, suffering, terror or humiliation.

18   **Q.**  Terror or humiliation; right?

19   **A.**  Yes.

20   **Q.**  Now, after she requested that he be gentle, right, there

21   is no record that he is more forceful; correct?

22   **A.**  That's correct.  There is no record of what happened --

23   **Q.**  Yes or no, please, Dr. Salter.  No record?

24   **A.**  There is no record of anything after that except for he

25   completed the act.

1    **Q.**  Well, this is an appellant description --

2              (Whereupon, Mr. Savery stood.)

3              **MR. GOLD:**  Well, Your Honor, I am --

4              **THE COURT:**  She is not being responsive so he has

5    got a right to cut her off.  Go ahead.

6    BY MR. GOLD

7    **Q.**  This is an appellant description of a summary of the

8    trial testimony; right?

9    **A.**  Yes.

10   **Q.**  And this is about as close as you are going to get about

11   how this woman testified at trial; right?

12   **A.**  Yes.

13   **Q.**  And there is nothing after that she asked him to be

14   gentle that he did anything more violent or anything

15   indicative of sexual sadism at that point; right?

16   **A.**  That's correct.

17   **Q.**  Now, you testified in a deposition in this matter;

18   right?

19   **A.**  Yes.

20   **Q.**  And I asked you about this strange fact that he calls

21   her up three days later; right?

22   **A.**  Right.

23   **Q.**  And you said that was atypical in a situation like that

24   in your view; right?

25   **A.**  I said I was surprised by it.

1  **Q.**  You were surprised by it.  In fact --

2  **A.**  Or it was interesting.  I forget my exact words.

3  **Q.**  Because you stated that that's something that antisocial

4  rapists do, they call up to brag about what they did or ask

5  for a date or something; right?

6  **A.**  I think I gave you a couple of alternative possibilities

7  and said I didn't have any information about the

8  conversation so I couldn't make any comments.

9  **Q.**  Now, this phone call happens after, there is this

10  statement that Mr. Graham says, "I want to make love to you

11  in the bedroom;" right?

12  **A.**  Yes.

13  **Q.**  Now, it's your testimony that this interchange is

14  evidence of nothing other than sexual sadism; right?

15  **A.**  No, my testimony was that the choking was sadistic.  It

16  was -- that was all I testified to, is that he choked her

17  three times.  She stopped resisting so the choking was not

18  to subdue her by the victim's report and that I had no

19  alternative explanation for the choking.  I didn't testify

20  that any other part of the attack was sadistic.

21  **Q.**  Now, he said -- is stating that you want to make love to

22  the person evidence of arousal to nonconsent?

23  **A.**  No.

24  **Q.**  But isn't what we're looking for if we're going to

25  diagnose this condition evidence that the person is aroused

```
1    specifically to the nonconsent of the individual?
2    A.  Yes, of course.
3    Q.  And in this instance we have him leading her by the hand
4    to a bedroom and saying "I want to make love to you" and
5    then calling her three days later; correct?
6    A.  Right.
7    Q.  And so it is certainly possible based on those facts
8    that he's got some delusional idea, which is not uncommon
9    with rapists, if you'll agree with me?
10   A.  No, I wouldn't, I would not agree with you.
11   Q.  She is liking him or something like that?
12   A.  I wouldn't agree with you.  In an interaction in which
13   you're in a car with someone or on a date with someone, you
14   might interpret signals.
15           When you strangle them unconscious three times, I
16   believe if you are not psychotic, then you are aware that
17   they, that that was not consenting.
18   Q.  Well, let's go back.  Now, these criteria that you have
19   to diagnose this condition, because there is no explicit
20   criteria in the manual, a lot of them you get from Dennis
21   Doren; right?
22   A.  Some of them.  You saw my analysis.
23   Q.  In fact, you don't list the ones from Dennis Doren that
24   don't apply to this case; right?
25   A.  Right.
```

1  **Q.**  So there is like six that he has that don't apply to

2  this case that you don't bother to list because they're not

3  relevant; right?

4  **A.**  No, they weren't relevant.

5  **Q.**  Well, there are certainly criteria that he lists that

6  don't apply to Mr. Graham; right?

7  **A.**  Well, I think one of them was forcing intercourse when

8  the person has already agreed to have intercourse.  And that

9  didn't apply to this case.

10  **Q.**  Well, there is no evidence that he ever did that; right?

11  **A.**  Well, there is no evidence she agreed so it wasn't

12  relevant.

13  **Q.**  Well, Dr. Doren is trying to give clinicians like

14  yourself advice as to how to diagnose the condition and he

15  sets out nine criteria, not the two that you list; right?

16  **A.**  Yes.  He doesn't say that they all apply and have to be

17  met in every case.

18  **Q.**  No, these are criteria that may apply and that you may

19  use to diagnose the condition; right?

20  **A.**  Exactly.

21  **Q.**  And the first one that he lists is that the offender is

22  aware -- that there is evidence that an offender ejaculated

23  or was aroused and was aware that the interaction was not

24  consensual; right?

25  **A.**  Yes.

1    **Q.**  That's evidence of arousal to nonconsent; right?

2    **A.**  Yes, if there is no possibility.

3    **Q.**  That's just a description of rape; right?

4    **A.**  No, there are many situations in which -- date rape is,

5    for example, she said no but she meant yes.

6    **Q.**  But, Dr. Salter, Doren in defining the criteria that you

7    would diagnose this condition with or clinicians who've made

8    this a very commonly diagnosed condition has essentially

9    defined it in such a way, and you'll agree with me, will you

10   not, that it was supposed to be a rare condition; right?  Do

11   you agree with that or not?

12   **A.**  That paraphilic rapism is rare?

13   **Q.**  Correct.

14   **A.**  Among the general population or among rapists?

15   **Q.**  Among rapists.

16   **A.**  Well, the latest research by Michaud showed that 60

17   percent of rapists had a disordered arousal pattern.  That's

18   consistent with Quinsey's findings.

19   **Q.**  Is your testimony that it is a, not supposed to be a

20   rare condition?

21   **A.**  I don't think we know the exact percentage amongst

22   rapists.  We do know there are a percentage of rapists.  And

23   probably the best data we have comes from the plethysmograph

24   studies.

25   **Q.**  Dr. Salter, Robert Spitzer thought it was going to be a

1    rare condition; right?  And he's an authority that you've

2    cited here.  So do you disagree with Dr. Spitzer?

3    **A.**  I don't know specifically what -- I don't remember

4    specifically whether Spitzer gave -- what Spitzer said about

5    the rarity of it.

6    **Q.**  Now, you cited Robert Prentky.  He's a big researcher in

7    this area; right?

8    **A.**  Yes.

9    **Q.**  And Robert Prentky's *Psychology of Rapists* is something

10   that you discussed; right?

11   **A.**  Yes.

12   **Q.**  Now, Robert Prentky wrote an article which I'm sure

13   you're familiar called, "Science on Trial, Sexually Violent

14   Predators in the Courtroom, Science on Trial," with other

15   authors.  Are you familiar with that article?

16   **A.**  Yes.

17   **Q.**  And that is a peer-reviewed article as we discussed in

18   *Psychology, Public Policy and Law*, 2006; right?

19   **A.**  Certainly.

20   **Q.**  Now, he discusses this controversial area as well;

21   right?

22   **A.**  Yes.

23   **Q.**  And this is a researcher whose research is among the

24   work that you are calling upon to justify your diagnosis of

25   the condition in this case; right?

1  **A.**  Yes.

2  **Q.**  And he goes on to say, "Because the DSM-IV-TR offers

3  little explicit diagnostic guidance with respect to rapists,

4  it has become a common practice among some examiners to

5  apply a newly coined diagnosis, Paraphilia NOS

6  (Nonconsent)."

7         So he's talking about this controversy that we were

8  just talking about; right?

9  **A.**  Yes.

10  **Q.**  Now, he discusses it and he cites a personal

11  communication with Robert Spitzer.  At the end he says,

12  "According to Spitzer," if you see down there, personal

13  communication January 23, 2004, "It was the subcommittee's

14  understanding that this proposed paraphilia applied to only

15  a small subgroup of sex offenders.  And most important that

16  their diagnosis required evidence that the coercive element

17  of the sexual assault was sexually arousing and that sexual

18  sadism was ruled out as a preferable diagnosis."

19  **A.**  Yes.

20  **Q.**  That's what it says here; right?

21  **A.**  Yes.

22  **Q.**  But the way you're defining it or you and Dr. Doren is

23  in such a way that it excludes only date rapists who are

24  legitimately confused about whether someone consented or

25  not?

1   **A.**   That's entirely inaccurate.   I would not agree with that

2   statement whatsoever.

3   **Q.**   Well, when I just asked you whether arousal and

4   awareness of nonconsent was a feature of rape, you stated as

5   an example that there were date rapists who were not

6   aroused; right?

7   **A.**   I simply gave an example.   I do not believe that all --

8   I believe many rapists have distorted cognitions about rape.

9   And I do not believe that it is true that only date rapists

10   are antisocial.   There is an entire category of antisocial

11   rapists who do not have a paraphilic disorder who do not,

12   are not necessarily date rapists.

13   **Q.**   Well, but we're talking about the criteria that

14   Dr. Doren has given us so that we can diagnose the

15   condition.   And this is a criteria that you used where you

16   say that Mr. Graham qualifies for this diagnosis because

17   there is evidence that he was aware that these victims were

18   nonconsenting and there is evidence that he ejaculated or

19   was aroused and that is something that qualifies him for

20   this rare diagnosis?

21   **A.**   No, that is a simplification of what I said.   That's

22   only one element in my analysis.   I did an entire section of

23   the report analyzing the patterns of rape and came to the --

24   **Q.**   Part of --

25          **THE COURT:**   Let her finish.

1   **A.**   That that was only one element in the analysis.   It

2   wasn't by any means the beginning and end of the analysis.

3   **Q.**   Well, it was -- it is a criteria.   One of the things

4   about Antisocial Personality Disorder is that it gives us

5   criteria that we can use.   And Dr. Doren has done that and

6   you used two of them; right?   Two of his criteria; right?

7   **A.**   Yes.

8   **Q.**   Now, you referenced Michael First as an authority on

9   this area; right?

10   **A.**   Yes.

11   **Q.**   And he talked about evidence from the behaviors, right,

12   like repetitive patterns of the behavior across offenses;

13   right?

14   **A.**   Yes.

15   **Q.**   So, for example, you would have someone who choked

16   people on multiple rapes; right?   That would be evidence of

17   a repetitive pattern; right?

18   **A.**   That would be a repetitive pattern.

19   **Q.**   You would have evidence of people thriving on the

20   nonconsensual aspect of the interaction.   For example,

21   trying to get the person to say I don't want you to do it;

22   right?   That's another criteria; right?

23   **A.**   Yes.

24   **Q.**   And you have none of that in this case; right?

25   **A.**   You do have, you have a pattern within one rape but

1    primarily you have a pattern of escalating violence across

2    rapes --

3    **Q.**  So, Dr. Salter, I'm sorry to interrupt you but so you're

4    saying that you can diagnose a pattern of behavior from

5    within one of the incidents; is that right?

6    **A.**  No.  If you would like, I would be happy to go through

7    my analysis of this case in terms of what elements that I

8    found relevant to diagnosing paraphilia --

9    **Q.**  Well, right now we are talking about the elements that I

10   find relevant.  And then with the government you will have

11   the opportunity to talk about any that you or the government

12   find relevant.

13        Now, with respect to this criteria, Michael First

14   has said that the criteria of arousal and awareness of

15   nonconsent is completely bogus; right?

16   **A.**  Well, you have to show me exactly what he said if you

17   want me to comment.

18   **Q.**  Well, do you recall that from reading the article?

19   **A.**  Completely bogus, no.

20   **Q.**  Well, no, not that characterization, of course, but

21   where they discuss this.

22        Now, this section --

23        (Pause in proceedings.)

24        **THE COURT:**  Are you waiting for the witness?

25        **THE WITNESS:**  To my knowledge there is no question.

1          **THE COURT:**  Oh, okay.  Go ahead.

2    BY MR. GOLD

3    **Q.**  Now, for the record, I have put up, "The Use of DSM

4    Paraphilia Diagnoses in SVP Commitment Cases."

5          It says, "However, not infrequently evaluators have

6    asserted the presence of a paraphilia based solely on the

7    history of sexual offenses which is the logical fallacy of

8    affirming the consequence, that is, assuming that the sex

9    offenses were necessarily a consequence of a paraphilia,

10   i.e., the antecedent.  For example, the expert in a

11   California SVP evaluation report claimed that," and then

12   there is a description of a report that they're taking issue

13   with or an excerpt.

14         "The respondent clearly meets the diagnostic

15   criteria for a paraphilia for nonconsenting sexual

16   aggression because he has committed four rapes over a

17   seven-year period.  The respondent began raping at age 17

18   and sexually reoffends almost immediately upon release from

19   custody."

20         I want to stop there.

21   **A.**  I don't know where you are.  Do you have it on the

22   screen?

23   **Q.**  It is on the screen.

24   **A.**  Okay.

25   **Q.**  Now, reoffend immediately on release from custody,

1    that's a criteria that you discussed yesterday; right?

2    **A.**   Yes, but I don't remember in what context.

3    **Q.**   Well, in this context it's one of the things that make

4    him qualify for this diagnosis; right?

5    **A.**   I don't think I had that in the analysis.

6    **Q.**   Well, you discussed it yesterday with the Court when

7    you -- do you recall testifying on direct that Mr. Graham

8    reoffended immediately upon release and, therefore,that's --

9    **A.**   Yes, yes, that's right.  As part of an overall analysis

10   I was discussing the strength of the drive.

11   **Q.**   The strength of the drive?

12   **A.**   Yes.

13   **Q.**   And he reoffended immediately on release how many times?

14   **A.**   Well, he reoffended once, let's see, it was several

15   months after he was released.

16   **Q.**   And then the second time?

17   **A.**   I think the second offense was sometime later.

18   **Q.**   Approximately four years; right?

19   **A.**   Yes.  Yes.

20   **Q.**   So that's not immediate; right?

21   **A.**   No, four years wouldn't be.

22   **Q.**   Now, it goes on to say, "He seems incapable of

23   controlling his sexual, aggressive sexual impulses.  The

24   respondent is obviously aroused by aggression since he

25   achieves erections and ejaculates during the rape."

1            And it states here, the authors go on to say,

2       "Concluding that an individual's behaviors are driven by

3       paraphilic rapism based entirely on a history of committing

4       repeated rapes within a circumscribed period of time is

5       never justified.  Recidivism among rapists is, as is the

6       case with other types of violent criminals, is not uncommon.

7       Rapists may repeatedly rape for a variety of reasons such as

8       aggressive impulses and a complete disregard for others."

9            And this is where I was going with this.

10           "The fact that the offender can function sexually

11      while committing a rape provides no specific information

12      about what is going on in his mind vis-a-vis the focus of

13      his sexual arousal pattern during the act.  Furthermore,

14      given that the legal definition of rape entails penetration,

15      the rapist is required to function adequately at least in

16      that way while raping.  Therefore, that fact cannot suffice

17      as evidence that there is a mental abnormality driving the

18      rape behavior."

19           Did I read that correctly?

20  **A.**  Yes.

21  **Q.**  And that is essentially a rejection of Doren's first

22      criteria --

23  **A.**  That is.

24  **Q.**  -- correct?

25  **A.**  Well, as the only criteria, yes.  And I would agree with

1    that, that you cannot use that fact alone to determine

2    paraphilia.

3    **Q.**  Well, there is nothing there about talking about that

4    fact alone; is there, Doctor?  There is simply the

5    recognition that the legal definition of rape entails

6    penetration.  A rapist is required to function adequately at

7    least in that way while raping, therefore, that fact cannot

8    suffice as evidence that there was a mental abnormality

9    driving the rape behavior; right?

10   **A.**  Well, in the section you read to me he was describing a

11   case in which the only evidence was repeated rapes and they

12   did no further analysis.  And that was in the section that

13   you read to me.  And based simply on the fact that he

14   completed a number of rapes, apparently that evaluator

15   decided he had a paraphilic disorder.

16           First disagrees with that and I disagree with that,

17   which is why I did an entire analysis of the rapes to

18   determine -- to make that diagnosis.

19   **Q.**  So it is your testimony that is a valid criteria on your

20   way to ruling in someone for a diagnosis of a sexual

21   paraphilia, a rape paraphilia, that they were aware that it

22   was a rape and that they were aroused, that that is part --

23   a step along the road?

24   **A.**  It is my testimony that it is reasonable to consider to

25   what extent they knew that the rape was nonconsenting and to

1    what extent their arousal was or wasn't inhibited by a

2    brutality or violence but that it is only one element.  And

3    it would not suffice by itself to make a paraphilic

4    diagnosis.

5              (Pause in proceedings.)

6              (Whereupon, counsel conferred.)

7    BY MR. GOLD

8    **Q.**  Dr. Salter, you were -- you did a risk analysis in this

9    case?

10   **A.**  Yes.

11   **Q.**  And that's part of what you do when you do these

12   evaluations, you do a risk analysis; right?

13   **A.**  Yes.

14   **Q.**  And one of the things that happened in this case was you

15   relied on this instrument called the Static-99; right?

16   **A.**  Yes.

17   **Q.**  And you testified yesterday that there has been a big

18   change in that instrument in the last 12 months; right?

19   **A.**  Yes.

20   **Q.**  They published new norms; right?

21   **A.**  Yes.

22   **Q.**  Now, you testified that you are a consultant with the

23   Wisconsin Department of Correction; right?

24   **A.**  Yes.

25   **Q.**  Dr. Doren is a former employee of the Sand Ridge

1   Correctional Facility; right?

2   **A.**   Yes.

3   **Q.**   David Thornton is another employee of the Wisconsin

4   government; right?

5   **A.**   Yes, at Sand Ridge.

6   **Q.**   He's the director of treatment at Sand Ridge; right?

7   **A.**   Yes.

8   **Q.**   Now, you used to have or you had a dating relationship

9   with Dr. Thornton for a while; right?

10   **A.**   Briefly, yes.

11   **Q.**   And now you have a professional relationship with him;

12   right?

13   **A.**   Yes.

14   **Q.**   And one of the things that happened with this change in

15   the way these actuarials were handled is that they were

16   lowered, the norms were lower than they had been previously?

17   **A.**   The new norms are lower than the previous norms.

18   **Q.**   Now, so one of the features of your analysis in this

19   case was that Mr. Graham scores a six on the Static-99;

20   right?

21   **A.**   Yes.

22   **Q.**   And when you reported the risk estimate associated with

23   that, you reported a figure of 52 percent; right?

24   **A.**   Yes.

25   **Q.**   And you stated that that may be an underestimate for

1    Mr. Graham because there is a phenomenon called undetected

2    recidivism; right?

3    **A.**   Yes.

4    **Q.**   And so those rates underestimate what the recidivism

5    actually was; correct?

6    **A.**   I don't think there is any disagreement with that.

7    **Q.**   Yes or no, please?

8    **A.**   Yes.

9    **Q.**   Yes.   Okay.

10         Now, the other thing was the lifetime risk; right?

11   **A.**   I don't think I mentioned that in the report.   I think I

12   mentioned three lines on the addendum.

13   **Q.**   Well, that's right.   You did a calculation for lifetime

14   risk in the addendum but not in your report; right?

15   **A.**   Yes.

16   **Q.**   Now, these -- you work in a couple of jurisdictions

17   doing these types of cases; right?

18   **A.**   Yes.

19   **Q.**   And a lot of the states have slightly different

20   statutory standards for what gets someone committed;

21   correct?

22   **A.**   Yes.

23   **Q.**   And a lot of them are what I'll call 50 percent

24   jurisdictions; right?

25   **A.**   Yes.

1   **Q.**  And, in fact, more likely than not or 50 percent

2   jurisdictions, if you're an evaluator coming in recommending

3   commitment, you're well advised to come in with an actuarial

4   score that's above 50 percent; right?

5   **A.**  Well, typically, depending on the state and the ruling

6   but you end up saying no to cases that are significantly

7   below 50 percent.

8   **Q.**  Now, when you testified at a deposition in this matter,

9   you stated your view that the federal standard what the

10  level of risk is warranted is not known to you; right?

11  **A.**  That's correct.

12  **Q.**  Now, you -- prior to your deposition, two days prior to

13  your deposition, if I'm not mistaken, or three, on Sunday,

14  August 16th, or Saturday you wrote Dr. Thornton.  Do you

15  recall that?

16  **A.**  Yes.

17  **Q.**  And I have that email up on the screen.  And that's an

18  email from Saturday, August 15, 2009.  It says, "I remember

19  reading an article of yours about the impact of aging in

20  prison.  I can't find it, however, or even the citation.

21  Can you send me the cite?  Hope you and yours are well.

22  Thanks.  Anna."

23          That's what you wrote Dr. Thornton?

24  **A.**  Yes.

25  **Q.**  And Dr. Thornton refers you to a study and says, "I

1    believe the data analysis you are thinking of was reported

2    at the end of the Grant report that Ray and I put together.

3    We haven't published it separately except in a few

4    conference presentations.  I encourage you not to overweigh

5    the results of one study when you really need multiple

6    studies of the effect of aging in prison before firm

7    conclusions can be made."

8         That's what he said?

9    A.  Yes.

10   Q.  Now, another area, an entire topic of debate which we

11   did in the previous trial is the impact of aging on these

12   risk assessments; right?

13   A.  Right.

14   Q.  And it's a common finding in the field that the risk of

15   reoffense declines linearly for rapists but not in a linear

16   form for child molesters; is that right?

17   A.  No.

18   Q.  A common finding in the field?

19   A.  No, I wouldn't say so.  The latest analysis showed that

20   that only occurred, for example, in the Prentky work for the

21   first ten years.

22   Q.  Well, let's talk --

23   A.  And then there was no change.

24   Q.  -- about the latest analysis, Dr. Salter.  I just want

25   to get into the sources of some of these assertions that you

1    made.

2           Now, when you say the latest analysis, you're

3    referring to a paper by Dr. Doren; right?

4    **A.**  Right, Dennis wrote the paper.

5    **Q.**  Right.  Dr. Doren has a history of doing reanalyses, in

6    fact, that's basically what he does; right?

7    **A.**  I don't know if that's basically what he does but he has

8    done a number of analysis of data.

9    **Q.**  Dr. Thornton will you agree with me and Dr. Doren are

10   both researchers associated with the idea that recidivism

11   risk is not related to age at all; right?

12   **A.**  No --

13          **MR. SAVERY:**  Your Honor, I'd just ask the Court to

14   permit the witness to answer her question fully before --

15          **MR. GOLD:**  Your Honor, I apologize.  I am trying

16   to --

17          **THE COURT:**  I understand.  He is doing a good job,

18   you know, anyway but give the witness a chance to answer.

19   The trouble is that sometimes she doesn't just answer the

20   question.  She goes off so he has to protect himself that

21   way too.  But I think I am going to overrule the objection.

22          **THE WITNESS:**  I just need to say I need to leave at

23   four o'clock to catch a plane.  So I just want to make sure

24   everybody is aware of that.

25          **THE COURT:**  You know, I am not aware of it.  I

1    don't think -- is that something you told me about?

2            THE CLERK:  No, Judge.

3            THE COURT:  I thought we were going to do this this

4    afternoon.

5            (Whereupon, the Court and the Clerk conferred.)

6        MR. SAVERY:  Your Honor, we discussed it together.

7    Mr. Gold was going to be ending just about now.  I was going

8    to redirect for half an hour and try to get her out by four

9    o'clock.  And then we've got two fact witnesses, quick fact

10   witnesses that we're going to try to get on at four.

11           THE COURT:  I am at your service.  I will do

12   whatever you want.

13           MR. SINNIS:  I am not sure that's going to work

14   out.

15           MR. GOLD:  Your Honor, the best laid plans.  I just

16   have a little bit more to accomplish.  We had some fact

17   witnesses which I've just learned we don't need to call

18   today.  We could fit them in tomorrow and try to keep

19   Dr. Salter to the last possible moment that we can so that

20   she can --

21           THE COURT:  But, remember, he wants some redirect

22   so --

23           MR. GOLD:  Well, let me discuss it with him.

24           (Whereupon, counsel conferred.)

25           MR. SAVERY:  Your Honor, I discussed it with

1    Mr. Gold and Mr. Gold agreed that he'd go until 3:45,

2    another fifteen minutes or so on cross.  I'd go until 4:15.

3    We'll try to get her out the door by 4:15.

4           Her situation is she was on an earlier flight and

5    we put her back.  She has got a sick child at home who she

6    is trying to get home to tonight to Wisconsin.

7           **MR. GOLD:**  Well, Your Honor, I was just

8    discussing --

9           **THE COURT:**  You guys are going to use up the whole

10   time chatting with each other.  You have already wasted five

11   minutes.

12   BY MR. GOLD

13   **Q.**   So Dr. Doren has done a reanalysis of the age research;

14   right?

15   **A.**   Of the which research?

16   **Q.**   The age research.

17   **A.**   Well, which age research?  He has done -- the one I was

18   referring to was the Prentky research on rapists and child

19   molesters.

20   **Q.**   Well, that study was a study by Robert Prentky and a

21   statistician called Austin, named Austin Lee; right?

22   **A.**   Yes.

23   **Q.**   And they did a study of the risk of reoffense among the

24   Bridgewater Treatment Center, Massachusetts, sample that

25   they used for research; right?

1    **A.**   Right.

2    **Q.**   And they found in that study that the risk of reoffense

3    declined with the rapists with age; right?

4    **A.**   Yes.

5    **Q.**   And you disregard that result in your assessments.   And

6    correct me if I'm wrong, but because in part of a study by

7    your friend Dr. Doren; right?

8    **A.**   No, I didn't disregard it.   I presented to the Court all

9    the evidence, not just Doren's.   I presented Prentky's and I

10   presented evidence on all sides as far as I know.   I did

11   that in the deposition as well.

12   **Q.**   Well, Dr. Salter, to be clear, when you gave a risk

13   assessment to this Court about this 59-year old man, what

14   you did is you took a risk percentage associated with or a

15   risk percentage that would have been the same if he had

16   before scored on the instrument back in 1987, right?   Will

17   you grant me that point, that if he had been scored

18   immediately upon his entrance into prison --

19   **A.**   Yes.

20   **Q.**   -- he would have got the same score; right?

21   **A.**   Yes.

22   **Q.**   And now 22 years later you state that his risk of

23   reoffense, the risk that he poses based on these actuarial

24   instruments that you used is -- well, first of all, the six

25   now doesn't mean 52 percent over 15 years; right?   It means

1    36 percent over 10 years; right?

2    **A.**  Right.

3    **Q.**  And that is actually not the end of the story.  There is

4    a whole story here to what a six means on the Static-99 by

5    which I mean they had a big sample and now they've split it

6    up into two different samples; right?

7    **A.**  Yes.

8    **Q.**  They broke it out into, they had a large sample and then

9    they broke it out into what they called a low-risk or a low

10   base rate sample and a high-risk sample; right?

11   **A.**  Yes.

12   **Q.**  And when they first came out with these norms, you were

13   supposed to or the recommendation was to report a range;

14   right?  From low to high.

15   **A.**  Yes, that was the first recommendation.

16   **Q.**  Right.  And now the recommendation is just to report the

17   high; right?

18   **A.**  No, the recommendation is not just to support the high,

19   report the high.  The recommendation is to figure out which

20   of the two subsamples your offender is most like and to use

21   the appropriate subsample.

22   **Q.**  Correct.  And to display what criteria you used to

23   determine which sample the person is?

24   **A.**  Yes.

25   **Q.**  And to -- but you don't do that anymore with someone who

1    is referred for civil commitment; right?

2    **A.**   The recommendation specifically by Helmus is that if he

3    is preselected, gone through a screening process for civil

4    commitment, then we are instructed to use the high-risk

5    numbers --

6    **Q.**   But you are instructed, but you as a scientist are

7    supposed to present the data in the most accurate possible

8    way to the Court; right?

9    **A.**   I believe that is the most accurate way.

10   **Q.**   Do you agree with that statement, Dr. Salter?  As a

11   scientist, a person of science, you're supposed to

12   synthesize the data and give this Court a good idea of what

13   the risk of a 59-year old six on the Static actually poses;

14   right?

15   **A.**   I'm sorry.  Is your question about which sample to use

16   or --

17   **Q.**   You as a psychologist and a person of science, you are

18   supposed to synthesize the available data in such a way that

19   this Court has a good idea of what the risk actually posed

20   of reoffense by Mr. Graham is; right?

21   **A.**   Of course.

22   **Q.**   But what you do in this case is because Dr. Helmus told

23   you and, again, none of this information has been released

24   in a peer-reviewed journal; is that correct?

25   **A.**   No, they have not published it yet in a peer-reviewed

1    journal.

2    **Q.**  The only thing that has been, in fact, published in a

3    peer-reviewed journal is a critique which you said you were

4    familiar with by Brian Abbot; right?

5    **A.**  Yes.

6    **Q.**  And he critiques the very thing that we're talking

7    about, the whole criteria of low and high risk; right?

8    **A.**  Well, he critiques the new norms as a whole, not just

9    low and high risk.

10   **Q.**  Well, it's a, like you were saying about your report,

11   it's a complicated analysis; right?

12   **A.**  It is a complicated analysis.

13   **Q.**  One of the things he does though is he states that if

14   you are going to use these instruments with older people,

15   you should go back to the tables which have age adjustments

16   like what Hanson did in 2006; right?  That's his

17   recommendation; right?

18   **A.**  That would be the old norms though.  And I don't agree

19   with that.

20   **Q.**  Well, he published in a peer-reviewed journal a critique

21   of these new norms and stated that they're overestimating

22   risk for older people; right?

23   **A.**  That's Abbot's opinion.

24   **Q.**  Right.

25          Now, your opinion in contrast is that you take the

1   high-risk norms because Leslie Helmus told you to, because

2   he's been referred by Monica Ferraro who you probably

3   trained and adjust them upward, not down for age but upward

4   for lifetime risk; right?

5   **A.** No.

6   **Q.** It gets you right over that 50 percent mark so that you

7   ended up with 53 percent; right?

8   **A.** That is --

9       **MR. SAVERY:** I objection to form, Your Honor.

10  **A.** -- incorrect. When you asked me in the deposition about

11  the lifetime norms, I said that I had listed them but that

12  there was a question about whether you should use them

13  because of age. That's exactly what I said.

14      What we know for sure is the risk in the first ten

15  years and we know that that is relevant. And I flagged it

16  in the deposition that really with an offender of this age

17  you didn't, we didn't know how far to count it down the

18  line. So that is an incorrect statement.

19      Also the statement that --

20  **Q.** Doctor, I'm just going to cut you off, and I'm sorry,

21  because we have limited time.

22  **A.** Okay.

23  **Q.** Now, Doctor, another thing that I asked you was what

24  sense did it make -- well, let me withdraw that and ask you

25  this:

1          You said it was a diagnostically significant fact

2     if someone reoffended right away, right, for this paraphilia

3     diagnosis?

4     **A.**   That is one element.

5     **Q.**   Well, and I asked you what sense does it make to give a

6     10-year or a lifetime risk rate, because you didn't report

7     the 5-year rates in your report; did you?

8     **A.**   No.

9     **Q.**   And one of the things you say is that the percentage

10    that you got, which was about 36 percent, was in your view

11    in this case sufficient for you to recommend commitment;

12    right?

13    **A.**   Yes, I recommended commitment if that was the percentage

14    I got.

15    **Q.**   And that's high risk to you; right?

16    **A.**   Yes, that's a significant amount of risk.

17    **Q.**   Now, in your report you go through this history of risk

18    assessment, sort of what we're just talking about

19    tangentially here.  I have up on the screen page 18 of your

20    report where you've got a 6 with that 52 percent magic

21    number there and then you have a four on the RRASOR or

22    rather a three on the RRASOR; right?

23    **A.**   Yes.

24    **Q.**   And that is associated in your report here with a 36.9

25    percent --

1    **A.**  Yes.

2    **Q.**  -- reoffense rate?

3           Now, in the next paragraph you say, "Thus,

4    Mr. Graham scored in the high-risk range on two of the three

5    actuarial instruments.  It is significant --" well, I will

6    stop there.

7           Now, the two of the three are the Static-99 and the

8    MnSOST-R; right?

9    **A.**  Yes.

10   **Q.**  So in your view in this report an actuarial score which

11   corresponded with a 36 percent was not high risk?  Now, also

12   we should note that that's an overestimate because these

13   norms are probably lower too.  But in your view that was not

14   high risk but now a 36 percent approximately is high risk;

15   right?

16           **MR. SAVERY:**  I'm going to object, Your Honor.

17           **THE COURT:**  I am going to sustain the objection.

18   It is argumentative.

19   BY MR. GOLD

20   **Q.**  Well, it's your opinion that a three on the RRASOR is

21   not high risk; right?  That's what's reflected in the

22   report?

23   **A.**  Well, in the --

24           **THE COURT:**  Yes or no, that is the answer.  If you

25   can answer that way.

1    **A.**  On the RRASOR at that time, no.

2            (Whereupon, counsel conferred.)

3    BY MR. GOLD

4    **Q.**  Returning to the email, Dr. Salter.  After you got the

5    email with the report attached to it, you actually asked

6    Dr. Thornton for a consultation.  Do you remember that?

7    **A.**  Yes.

8    **Q.**  And it says, "Do you have time for a quick consultation?

9    If not, ignore this.  58-year old offender."  In fact, he

10   was 59 at the time; right?  "Since 1988 up for possible

11   federal civil commitment.  Four rapes over a 12-year period,

12   increasing violence.  One, offered a ride to a girl in a bar

13   who only knew him by his first name.  Two, attacked an

14   eight-month pregnant female stranger on a path.  Three,

15   raped his girlfriend after she got out of the hospital with

16   a hysterectomy after beating her adult daughters and

17   strangling one of them."

18           Now, that is the incident which was nolle prossed;

19   right?

20   **A.**  Yes.

21   **Q.**  "Four home invasions, strangled a stranger unconscious

22   three times, moving her to different rooms of the house each

23   time while she was unconscious.  He said for one I have got

24   to put you out for a little while.  No treatment, refused."

25           Now, that's significance because he's not a

1    treatment dropout; right?

2    **A.**  He's not a treatment dropout or a treatment completer.

3    **Q.**  Right.  Treatment completer is good.  Treatment dropout,

4    bad.  Treatment refusal is neutral in terms of risk; right?

5    **A.**  Yes.

6    **Q.**  "Static, six.  MnSOST-R, eleven, RRASOR, three.  How

7    much would you weigh his age?  What do you think of a six in

8    light of the new norms?  Anna."

9          And he sends you an email back.  He says, "This

10   will all get a little easier after the new round of data is

11   released at ATSA this year."

12         Now, what he is referring to now is last year they

13   put the new norms out.  This year they're going to give age

14   information; correct?

15   **A.**  No, I don't know that they're giving age information.

16   But they are updating the norms and I don't know what

17   they're doing with them.

18   **Q.**  You don't know, okay.

19         "I'm assuming that some degree of preselection has

20   taken place to get him to you;" right?

21   **A.**  Yes.

22   **Q.**  "My take is that after you make reasonable allowance for

23   undetected offending and extrapolation beyond ten years, the

24   Static-99 six is right on the level of risk needed for

25   commitment in Wisconsin with other factors, age, dynamic

1    risk, et cetera, properly pushing you either way.  I'm not

2    familiar with the threshold for federal civil commitment."

3          So Dr. Thornton is giving you his view based on his

4    experience that a six is right on the edge; right?

5    **A.**  Yes.

6    **Q.**  "Statistically I would see his age as putting him down

7    the equivalent of one Static-99 point.  The caution on that

8    would be that much of his aging has taken place in prison.

9    I agree that the Bridgewater study raises questions about

10    the effect of aging in prison so you might argue that it

11    should be more like half a point;" right?

12    **A.**  Yes.

13    **Q.**  Now, one of the things he's telling you there is,

14    previously he sent you a study which he did which is also

15    unpublished; right?

16    **A.**  Yes.

17    **Q.**  Not published in a peer-reviewed journal; right?

18    **A.**  Yes.

19    **Q.**  And he said that study suggests that aging in prison may

20    not have the same risk mitigating impact that aging in the

21    community does; right?

22    **A.**  That's right.

23    **Q.**  But he cautioned you that that's just one study; right?

24    **A.**  Of course.

25    **Q.**  And here he is saying you might argue it because the

1    Bridgewater study raises questions.  It's up to you; right?

2    **A.**  Well, he is saying you might want to reduce it half a

3    point.

4    **Q.**  But you did not do that in this case; right?

5    **A.**  No, I don't change the score.

6    **Q.**  Just yes or no, thank you.

7        (Whereupon, counsel conferred.)

8    BY MR. GOLD

9    **Q.**  Now, you relied on Dr. Thornton's advice --

10       **THE COURT:**  I think everybody thinks your deal was

11   you were going to stop at quarter of four.

12       **MR. GOLD:**  Yes.  And I'm just done, I'm just trying

13   to move this document into evidence.  This is a disputed

14   exhibit, Your Honor.

15       **THE COURT:**  All right.  Take 30 seconds.

16   BY MR. GOLD

17   **Q.**  You relied on Dr. Thornton's advice in this

18   communication in the development of your opinion?

19   **A.**  No, my opinion was already developed and written before

20   I had that communication.  I didn't change my opinion but I

21   didn't rely on that to make my opinion.

22       **MR. GOLD:**  Despite that testimony, Your Honor, I

23   would ask to put this into evidence in front of you.  I

24   think it's an important document in the consideration of her

25   opinion.

1        **THE COURT:**  I will let it in.

2        **MR. SAVERY:**  Note our objection, Your Honor.

3        **THE COURT:**  Your objection is noted.  Go ahead.

4        **THE CLERK:**  Does it have a number?

5        **MR. SINNIS:**  Yes, that was --

6        **MR. SAVERY:**  I think it's 30, Your Honor.

7        **THE CLERK:**  30?

8        (Whereupon, counsel conferred.)

9        **THE CLERK:**  No, 1 through 28 are already in.  This

10   is 30.

11        **(Defendant's Exhibit No. 30 received in evidence.)**

12        **MR. GOLD:**  I'm sorry, Your Honor.  There is just

13   one more point I need to make from this witness.

14        **THE COURT:**  No.  No.  He has given you five of his

15   minutes already.

16        **MR. GOLD:**  All right.

17                    <u>**REDIRECT EXAMINATION**</u>

18   BY MR. SAVERY

19   **Q.**  Dr. Salter, I'm going to put up on the screen here a

20   page from the DSM.  Now, you had some questions regarding

21   the NOS category of paraphilia; right?

22   **A.**  Yes.

23   **Q.**  Okay.  And does the DSM address generally the idea of

24   the Not Otherwise Specified categories?

25   **A.**  Yes.

1    **Q.**  I'm going to read the DSM at page Roman Numeral XVIII.

2            "No classification of mental disorders can have a

3    sufficient number of specific categories to encompass every

4    conceivable clinical presentation.  The Not Otherwise

5    Specified categories are provided to cover the not

6    infrequent presentations that are at the boundary of

7    specific categorical definitions."

8            Do you see that?

9    **A.**  Yes.

10   **Q.**  What do you understand that to mean?

11   **A.**  I understand that to mean that they have this category

12   to cover, to cover those they have not listed individually

13   and that they acknowledge they cannot possibly list all

14   clinical presentations separately.

15   **Q.**  Okay.  So now we're going to move forward a few pages in

16   the DSM.  We're now at page 4.  And the DSM instructs us,

17   right, on the use of Not Otherwise Specified categories?

18   **A.**  Yes.

19   **Q.**  Okay.  In fact, there is a section here and it reads,

20   "Because of the diversity of clinical presentations it is

21   impossible for the diagnostic nomenclature to cover every

22   possible situation.  For this reason each diagnostic class

23   has at least one Not Otherwise Specified category.  And some

24   classes have several NOS categories."

25           Do you see that?

1    **A.**   Yes.

2    **Q.**   "There are four situations in which an NOS diagnosis may

3    be appropriate;" right?

4    **A.**   Yes.

5    **Q.**   And can you read the first situation they recite there?

6    **A.**   "The presentation conforms to the general guidelines for

7    a mental disorder in the diagnostic class but the

8    symptomatic picture does not meet the criteria for any of

9    the specific disorders.  This would occur either when the

10   symptoms are below the diagnostic threshold for one of the

11   specific disorders or when there is an atypical or mixed

12   presentation."

13   **Q.**   Okay.  So what do you understand that to mean?  If you

14   could put that in the context of the paraphilia diagnosis?

15   **A.**   Put that back up so I'm sure that I'm responding to what

16   you are asking.

17   **Q.**   Sure.

18   **A.**   What that indicates is that it conforms to the general

19   guidelines, in this case what a paraphilia is, but it

20   doesn't meet the specific criteria for any of the listed

21   paraphilias.

22   **Q.**   Okay.  And does your diagnosis of paraphilia with

23   respect to Mr. Graham meet the general guidelines for a

24   mental disorder paraphilia?

25   **A.**   Yes.

1    **Q.**   Okay.  But it doesn't meet the criteria, am I right, for

2    any specific paraphilia that is separately listed out?

3    **A.**   That's correct.

4    **Q.**   Okay.  So what do you read, the provision that we just

5    went through, what do you read that as instructing you to

6    do, when you meet the general criteria for the category but

7    you don't meet any of the specific criteria for the listed

8    specific subgroups?

9    **A.**   To use Paraphilia NOS.

10   **Q.**   Let's turn to the paraphilia section now.

11            And do you recognize this as being from the

12   paraphilia section of the DSM?

13   **A.**   Yes.

14   **Q.**   Now, does this section of the DSM cover the general

15   guidelines in this diagnostic class?

16   **A.**   Yes.

17   **Q.**   Okay.  And what are those general guidelines?

18   **A.**   "The essential features of a paraphilia are recurrent

19   intense sexual arousing fantasies, sexual urges or behaviors

20   generally involving nonhuman objects, suffering or

21   humiliation of oneself or one's partner, or children or

22   other nonconsenting persons that occurred over a period of

23   at least six months."

24   **Q.**   Okay.  So that's the first criteria in these general

25   guidelines; is that right?

1    **A.**   Yes.

2    **Q.**   Now, how does Mr. Graham satisfy these criteria?  Can

3    you tell us using the words of the criteria?  What words

4    does his situation fit?

5    **A.**   Well, he, the object was a nonconsenting person and I

6    infer the existence of the arousing urges from the behavior

7    and the analysis that I did, not simply from the fact that

8    he raped a number of people.

9    **Q.**   Okay.  Now, is there another criterion here?

10   **A.**   The diagnosis is made if the behavior, sexual urges or

11   fantasies, cause clinically significant distress or

12   impairment in social, occupational or other important areas

13   of functioning.

14   **Q.**   And does Mr. Graham in your opinion satisfy that

15   criterion?

16   **A.**   Yes.

17   **Q.**   So is it your opinion, Dr. Salter, that Mr. Graham

18   satisfies the two criteria that represent the general

19   guidelines for a diagnosis of paraphilia?

20   **A.**   Yes.

21   **Q.**   Okay.  Now, following this first page in the Paraphilia

22   section of the DSM, does it include a number of specific

23   paraphilias that are listed out?

24   **A.**   Yes.

25   **Q.**   For instance, exhibitionism, is that one of them?

1    **A.**   Yes.

2    **Q.**   And fetishism, is that another?

3    **A.**   Yes.

4    **Q.**   Pedophilia is another one that is listed out; is that

5    right?

6    **A.**   Yes.

7    **Q.**   Now, in your testimony regarding the proposed change to

8    the DSM to insert a new paraphilia as a nonconsenting

9    paraphilia, you used the term "a separate entity," that it

10   was proposed as a separate entity?

11   **A.**   Yes.

12   **Q.**   Can you explain that to us?

13   **A.**   They proposed it as a specific diagnostic category such

14   as Pedophilia, Sexual Masochism or Sexual Sadism.

15   **Q.**   So the proposal was let's separate it out and give it

16   its own separate category such as Sexual Sadism?

17   **A.**   That was the proposal.

18   **Q.**   Okay.  Now, do you question whether a separate category

19   of paraphilia concerning nonconsent was rejected by the

20   panel that considered it?

21   **A.**   No.

22   **Q.**   All right.  But do you understand that the panel ruled

23   it out from the NOS category?

24   **A.**   They did not.

25   **Q.**   Have you seen any official statement of the APA to that

1    effect?

2    **A.**  Never.

3    **Q.**  Have you seen any statement from the panel as a whole to

4    that effect?

5    **A.**  Never.

6    **Q.**  And if you consider the DSM itself in isolation, is

7    there anything that tells you in this book that nonconsent

8    doesn't fit within the NOS category of paraphilia?

9          **MR. GOLD:**  Your Honor, I'm going to object to the

10   leading.

11         **THE COURT:**  I will let him do it.  Go ahead.

12   **A.**  On the contrary.  It says, it lists nonconsent as one of

13   the objects of a paraphilia.

14   **Q.**  Okay.  And is there anything in the book that tells you

15   you can't put that type of a paraphilia in the NOS category?

16   **A.**  No.

17   **Q.**  In fact, the book instructs you, right, that when it

18   meets the general guidelines and it doesn't fit the specific

19   type of diagnosis, you put it in the NOS category; right?

20         **MR. GOLD:**  Objection.

21         **THE COURT:**  Now that is leading.

22   BY MR. SAVERY

23   **Q.**  What does the book instruct you to do when you meet the

24   general guidelines but you don't fit the guideline score for

25   any specifically identified diagnoses?

1   **A.**   To put it into the NOS category.

2   **Q.**   And is that what you did in this case?

3   **A.**   Yes.

4   **Q.**   Now, Doctor --

5            **THE COURT:**  Where again does it say that precisely?

6            **MR. SAVERY:**  Sure.  It is at page 4, Your Honor, in

7   the instructions on how to use the otherwise, Not Otherwise

8   Specified categories.

9            **THE COURT:**  Okay.  You don't have to read it.

10           **MR. SAVERY:**  Okay.

11           **THE COURT:**  Thank you.

12  BY MR. SAVERY

13  **Q.**   Now, Dr. Frances cautions against placing too much

14  reliance on the *Casebook*; is that right?

15  **A.**   Yes.

16  **Q.**   All right.  And you received a few questions from

17  Mr. Gold on that issue; right?

18  **A.**   Yes.

19  **Q.**   Now, does that suggest to you that his view is that NOS,

20  the NOS category does not encompass a nonconsent diagnosis?

21  **A.**   No, he says specifically that it does.

22  **Q.**   His article says that?

23  **A.**   His article says that.  His article says the distinction

24  he's making does not mean the Paraphilia NOS cannot or

25  should not be used to describe some individuals who commit

1    coercive sexual acts.  And then he goes on to say that you

2    want to have evidence that the rapes reflect paraphilic

3    urges, et cetera.

4    **Q.**  Okay.

5    **A.**  And he specifically mentions that sadistic acts would be

6    some of the evidence and says it is possible repetitive

7    expression of sadistic behaviors, domination, strangulation,

8    beatings, and a particular case of a serial rapist might

9    well warrant the diagnosis of Paraphilia NOS with sadistic

10   traits when there is insufficient evidence to support the

11   criteria for Sexual Sadism.

12          And that I believe is exactly the situation that we

13   have here.  That is exactly what Frances endorsed.

14   **Q.**  Okay.  Thank you.

15          Now, you received some questions regarding

16   Mr. Zander's article, Dr. Zander's article; is that right?

17   **A.**  Yes.

18   **Q.**  Now, it says Dr. Zander is a Psy.D.  What does that

19   stand for?

20   **A.**  It is a, it's not a Ph.D, it's a different type of

21   doctorate, more clinically oriented.

22   **Q.**  Is he a psychiatrist?

23   **A.**  No, psychology.

24   **Q.**  Is it the equivalent of an M.D.?

25   **A.**  No.

1    **Q.**  Do you know what the difference is between Ph.D, M.D.

2    and this Psy.D?

3    **A.**  M.D. goes to medical school.  Ph.D does a research

4    oriented or a program that has a substantial amount of

5    research in it and does a thesis.  I'm not very familiar

6    with the Psy.D so I can't tell you much about it.  But it is

7    considered a less, I understand it be less academic degree

8    and I'm not sure that you have to do a thesis.

9    **Q.**  Okay.  Now, you were shown an email chain between, I

10   guess it is Mr. Zander at the time and Dr. Fred Berlin.  Do

11   you recall that email chain?  I'm putting it up on the

12   screen.

13   **A.**  Yes.

14   **Q.**  Okay.  And if we go down to the bottom of this first

15   page of the email, this is from Tom Zander to Dr. Berlin.

16   And let's just start at the end actually.  He raises several

17   questions and then he notes at the end, "These questions are

18   relevant to my clinical psychology doctoral research."

19        Do you see that?

20   **A.**  Yes.

21   **Q.**  Is the psychology doctoral degree, is that what is being

22   referred to here?

23   **A.**  I assume he's referring to that but I don't know very

24   much about the Psy.D degree.

25   **Q.**  Okay.  All right.  This email chain was in April of

1   2005; right?

2   **A.**   Yes.

3   **Q.**   So this at least suggests to us that he doesn't have his

4   doctoral -- his doctorate at this point in time when he is

5   raising these questions with Dr. Berlin; light?

6   **A.**   It sounds like it.

7   **Q.**   Okay.  And given that the date of his article here is

8   2008, it appears that he's had his Psy.D degree for, well,

9   at most, three years?

10  **A.**   Or less I gather.

11  **Q.**   Okay.  Now, this email he sent to Dr. Berlin, can you

12  just remind us who Dr. Berlin is in connection with the DSM?

13  **A.**   Dr. Berlin introduced the proposal that Coercive Rapism

14  be included in the DSM-III.

15  **Q.**   Okay.  And so he asks Dr. Berlin, "Thank you for

16  attempting to return my phone call to you on Monday.  I

17  tried unsuccessfully to reach you again today.  My call was

18  a follow-up to an email I sent you on April 18 regarding the

19  use of the diagnosis of Paraphilia NOS in cases where the

20  diagnosis of Paraphilic Coercive Disorder proposed in the

21  mid '80s but not included in the DSM would have been

22  useable.  As I understand it, this proposal was voted down

23  by the Board of Trustees of the APA.  Here are my

24  questions."

25         Okay.  "First question, was the diagnosis of

1    Paraphilic Coercive Disorder reconsidered by the APA for

2    DSM-IV?  If so, what was the outcome?  Any documentation you

3    can send me regarding this matter would be appreciated."

4         Up above we've got Dr. Berlin's response to item

5    No. one.  "The diagnosis of Paraphilic Coercive Disorder was

6    not considered for DSM-IV."

7         Is that consistent with your understanding?

8    **A.**  Yes.

9    **Q.**  Okay.  Let's go to No. two.

10        "Do you believe that it is appropriate to use the

11   diagnosis of Paraphilia NOS in cases where the proposed

12   diagnosis of Paraphilic Coercive Disorder would have been

13   appropriate had it been included in the DSM?"

14        And the response, "No. two.  However, it is

15   acceptable to diagnose the condition under the broader

16   category of Paraphilia NOS."

17        Do you see that?

18   **A.**  Yes.

19   **Q.**  Okay.  And then he goes on to note, "The concept of

20   Paraphilic Coercive Disorder is discussed in the *Casebook*."

21   That is a companion to the DSM: is that right?

22   **A.**  Yes.

23   **Q.**  And is that the same *Casebook* that you referred to

24   earlier in your testimony?

25   **A.**  I would assume so, yes.

1    **Q.**  Now, do you have a sense of Dr. Zander's reputation in

2    the community?  In your professional community?

3    **A.**  I don't.  My own opinion is that he is not generally

4    recognized as someone with a great deal of expertise in this

5    field.  That's my opinion.

6    **Q.**  Do you know whether he had any role in the DSM project?

7    **A.**  He had no role in the DSM project.

8         **THE COURT:**  Who are we talking about?

9         **MR. SAVERY:**  This is Dr. Zander whose article was a

10   focus of Mr. Gold's cross-examination.

11        **THE COURT:**  All right.

12   BY MR. SAVERY

13   **Q.**  Now, do you know whether Dr. Zander is a law professor?

14   **A.**  I don't know.

15   **Q.**  Okay.

16   **A.**  I had never heard of him before his article and his

17   attacks on Dennis Doren.

18   **Q.**  Okay.  Let's read this.  "Dr. Zander is a clinical and

19   forensic psychologist and adjunct professor of law at

20   Marquette University, Milwaukee, Wisconsin."

21        Do you see that?

22   **A.**  Yes.

23   **Q.**  And did you know he was a lawyer at least?

24   **A.**  Well, from the J.D., yes.

25   **Q.**  Do you know whether he was a lawyer before he became a

1    Psy.D?

2    **A.**   I don't know.

3    **Q.**   Now, Zander points out in his article that -- and just

4    give me a second to find it here.

5           One of the reasons he is critical of the use of the

6    NOS category to encompass the idea of nonconsent is that he

7    feels the diagnoses -- he points out that there is language

8    in the DSM that suggests they're for less frequently

9    encountered disorders.

10          Do you recall that, those questions?

11   **A.**   Yes, I do.

12   **Q.**   Okay.  In fact, down here at the bottom of page 462 of

13   this Zander article, "The APA Board approved DSM-III-R which

14   defines Paraphilia NOS as describing paraphilias that are

15   less commonly encountered;" right?

16   **A.**   Yes.

17   **Q.**   "It is unlikely that the rape behavior postulated by the

18   proponents of PCD," what is PCD?

19   **A.**   Paraphilic Coercive Disorder.

20   **Q.**   Okay.  And that's what we've been talking about here,

21   right, it's Paraphilia NOS (Nonconsent)?

22   **A.**   Yes.

23   **Q.**   "That PCD would be less commonly encountered in the more

24   extreme behavior diagnosed as Sexual Sadism;" do you see

25   that?

1   **A.**   Yes.

2   **Q.**   And I think you've testified that that concept doesn't

3   hold up?

4   **A.**   It doesn't hold up.

5   **Q.**   Can you explain that?

6   **A.**   It doesn't hold up entirely because they list things

7   like obscene phone calling and Paraphilia NOS.   And that is

8   much more common than sexual sadism.   So not all of the,

9   even the ones they use as examples in Paraphilia NOS are

10   that uncommon.

11   **Q.**   Okay.   Why don't we turn to the examples in NOS.

12        So, again, the idea is -- before we do that, let's

13   just point out the sentence that he is talking about.   This

14   is now in the DSM, the paraphilia section; right?

15   **A.**   Yes.

16   **Q.**   And it says here, "A residual category Paraphilia Not

17   Otherwise Specified includes other paraphilias that are less

18   frequently encountered;" right?

19   **A.**   Yes.

20   **Q.**   Does it say it only includes other paraphilias that are

21   less frequently encountered?

22   **A.**   No.

23   **Q.**   Okay.   Let's go to Paraphilia NOS, Not Otherwise

24   Specified.   Now, you mentioned a telephone scatologia?

25   **A.**   Right.

1  **Q.**  What is that?

2  **A.**  It is a compulsion to make obscene phone calls.  They

3  may make 50 to 100 a day.

4  **Q.**  Okay.  And is that more frequently encountered than,

5  say, sexual sadism?

6  **A.**  Yes.

7  **Q.**  In your experience?

8  **A.**  Yes.

9  **Q.**  And would you say it's also more frequently encountered

10  than Paraphilia NOS (Nonconsent)?

11  **A.**  Yes.

12  **Q.**  Another fact that Zander points to is that V codes are

13  now included in the DSM; right?

14  **A.**  Yes.

15  **Q.**  And can you remind us what are V codes?

16  **A.**  They are conditions that are, may need clinical

17  attention but don't need any full-blown diagnosis.

18  **Q.**  Okay.  And Zander suggested that the use of the V code

19  suggests that when something is identified as a V code, it's

20  not intended to fall within the other diagnoses in the DSM.

21  Is that what you understood the thrust of his argument to

22  be?

23  **A.**  Yes, but that's clearly incorrect.

24  **Q.**  Why do you say that's clearly incorrect?

25  **A.**  Well, they have sexual abuse of a child as a V code but

1   they also have pedophilia.  For example, the fact that they

2   have sexual abuse of the child as a V code doesn't stop them

3   from having pedophilia.

4         The point is you can molest a child and be a

5   pedophile or you can molest a child and not be a pedophile

6   and qualify for a V code.  So the same thing is true, they

7   would need a V code for sexual abuse of an adult whether or

8   not they had Coercive Paraphilic Disorder or Paraphilia NOS

9   because not all rapists are going to qualify for that.

10  **Q.**  Okay.

11        **THE COURT:**  What does V stand for?

12        **THE WITNESS:**  They just say V.

13        **THE COURT:**  They just picked a letter?

14        **THE WITNESS:**  I don't know how they picked that

15   letter to be honest.

16  BY MR. SAVERY

17  **Q.**  Now, another point that I think Mr. Gold was making in

18   his questioning concerned the lack of criteria for NOS

19   (Nonconsent) in the DSM itself.

20  **A.**  Yes.

21  **Q.**  Do you recall that questioning?

22  **A.**  Yes.

23  **Q.**  And the suggestion was because there aren't specific

24   criteria for NOS (Nonconsent) in the DSM itself, it can't be

25   a valid diagnosis in the DSM; right?

1    **A.**   Right.

2    **Q.**   Are there another diagnoses in the DSM that doesn't

3    include specific criteria recited in the DSM?

4    **A.**   Certainly.   There is an NOS category in most, if not

5    all, conditions.

6    **Q.**   Okay.   Let's put that up.

7         Here's the NOS category (indicating).   First of

8    all, "examples of this category include;" right?

9    **A.**   That's right.

10   **Q.**   Is it your understanding this was intended to be an

11   exclusive list?

12   **A.**   No, it says "but are not limited to."

13   **Q.**   Okay.   Telephone scatologia, do you know how to say that

14   word?

15   **A.**   I have always said scatologia but I don't know if it is

16   correct.

17   **Q.**   Okay.   You're more reliable than I am on that.

18         We don't have any criteria here listed for that; do

19   we?

20   **A.**   No.

21   **Q.**   But do you understand this to at least acknowledge that

22   that's a valid diagnosis?

23   **A.**   Yes.

24   **Q.**   Do we have any criteria listed for any of these?

25   **A.**   None of them.

1    **Q.**  So how would you go about diagnosing any of these?

2    **A.**  You would go back to the definition of a paraphilia as

3    it applies to those particular subjects.

4    **Q.**  Okay.  And that's the same thing you're doing, am I

5    right, with respect to Paraphilia NOS (Nonconsent)?

6    **A.**  Yes.

7              **THE COURT:**  But implicit in this is a specification

8    that the paraphilias involved do not meet the criteria for

9    any of the specific categories.

10             **MR. SAVERY:**  That's right, Your Honor.

11             **THE WITNESS:**  That's right.

12             **THE COURT:**  I was asking her.

13             **MR. SAVERY:**  I'm sorry.

14             **THE WITNESS:**  Yes, sir.

15             **THE COURT:**  Thank you for your help.

16             (Laughter.)

17   BY MR. SAVERY

18   **Q.**  And do any of those that are listed in the NOS category,

19   do they meet the criteria for the other specific NOS --

20   sorry -- paraphilia diagnoses that are listed out?

21   **A.**  No.

22   **Q.**  Okay.  Does sexual -- does NOS (Nonconsent) meet the

23   requirements for any of these other separately listed

24   paraphilias?

25   **A.**  No.

**Q.**  Did you find --

        **THE COURT:**  But in this case you have to convince

me by clear and convincing evidence that there is a disease,

for want of a better term, that affects the defendant, the

respondent in this case.

        **MR. SAVERY:**  Right.

        **THE COURT:**  It can't be, you know, pretty close.

It has got to be there; doesn't it?

        **MR. SAVERY:**  Absolutely, Your Honor.  And so I

think there is really two questions for you.  The first is

is it a legitimate diagnosis.  And subject to our arguments

that Mr. Grady made out before, is it a legitimate diagnosis

within the DSM?  That was one question the Court had at the

outset.  And I think we have been responding to that one.

        The second is does he fit that diagnosis?  And, you

know, we've covered that quite a bit in her direct

examination.

        **THE COURT:**  Okay.

BY MR. SAVERY

**Q.**  Just a couple more questions here and then we will let

you go, Doctor.

        You had some questions about the *Sexual Deviance*

book; right?

**A.**  Yes.

**Q.**  Okay.  And the questions were all focused on a single

1   chapter of that book; correct?

2   **A.**   Yes.

3   **Q.**   And which chapter did that concern?  I'm sorry, what

4   chapter of the book were you focused on, do you recall?

5   **A.**   I don't remember.

6   **Q.**   Did it concern rape?

7   **A.**   Yes, it was a chapter on rape.

8   **Q.**   Okay.  In fact, I think the title of the chapter was,

9   "Rape;" do you remember that?

10   **A.**   Something like that, yes.

11   **Q.**   Okay.  And I think the questions that were asked of you

12   focused on whether there was any reference in that chapter

13   regarding rape to the idea of Paraphilia Not Otherwise

14   Specified?

15   **A.**   Yes.

16   **Q.**   I'm showing you the Table of Contents to the book.

17   Okay?

18   **A.**   Yes.

19   **Q.**   We have a chapter on rape, chapter 20.  We have another

20   chapter on rape, chapter 21.  What's the next chapter

21   called?

22   **A.**   "Paraphilia Not Otherwise Specified, Psychopathology and

23   Theory."

24   **Q.**   And what's the next chapter called?

25   **A.**   "Paraphilia Not Otherwise Specified, Assessment and

1    Treatment."

2    **Q.**   Does it surprise you that there wouldn't be much

3    discussion in the rape chapters of this book given what

4    other chapter headings we have here?   Of Paraphilia Not

5    Otherwise Specified.

6    **A.**   Well, it didn't surprise me anyway because it wasn't the

7    focus of the article.

8    **Q.**   Here's a page from that section.   It states, "The

9    category of Paraphilia Not Otherwise Specified, Paraphilia

10   NOS, the current term for residual paraphilias initially

11   appeared in DSM-III-R and remains in use in DSM-IV-TR;"

12   right?

13   **A.**   Yes.

14   **Q.**   "Diagnostic criteria," this is two pages later.

15        "DSM-IV did not provide individual diagnostic

16   criteria for any of the Paraphilia NOS categories and the

17   same is true of its text revision DSM-IV-TR.   Although

18   DSM-IV and DSM-IV-TR indicate that the Paraphilia NOS

19   category is to be used for when an individual's behavior

20   does not meet criteria for any of the listed paraphilias.

21   The only definitional information regarding what can be

22   diagnosed as Paraphilia NOS is found in the general

23   guidelines used to define the essential features of any

24   paraphilia;" right?

25   **A.**   Yes.

1    **Q.**  And that's what we were discussing before, those general

2    guidelines, the two criteria at the outset of the paraphilia

3    section of the DSM; correct?

4    **A.**  Yes.

5    **Q.**  Now, this section goes on to discuss Paraphilia NOS

6    categories.  Do you see that?

7    **A.**  Yes.

8    **Q.**  The first one concerns nonhuman objects; right?

9    **A.**  Yes.

10   **Q.**  Zoophilia, do you see that?

11   **A.**  Yes.

12   **Q.**  Is that a diagnosis that is explicitly referenced in the

13   DSM-IV?

14   **A.**  I don't think so.

15   **Q.**  And let me see if I can refresh your recollection on

16   that.

17          I'm going to show you -- is it referenced in the

18   Paraphilia Not Otherwise Specified category?

19   **A.**  Oh, yes.  I thought you meant was it separated out as a

20   category.

21   **Q.**  Okay.  So here we have this authority referencing

22   zoophilia which is one of the listed NOS categories; right?

23   **A.**  Yes.

24   **Q.**  Then it goes on to discuss several other categories of

25   NOS.  "Suffering or humiliation of oneself or one's

1    partner;" do you see that?

2    **A.**   Yes.

3    **Q.**   And then it references biastophilia?

4    **A.**   Yes.

5    **Q.**   Do you know what biastophilia is?

6    **A.**   Yes, I think it was Money's designation for paraphilic

7    rapism.

8    **Q.**   Okay.  This is a reference, your understanding is, to

9    paraphilic rapism; right?

10   **A.**   Yes.  He says the sexual focus on the act of sexually

11   assaulting a nonconsenting and terrified person.

12   **Q.**   So do you understand this to be an affirmation of

13   Paraphilia NOS (Nonconsent) falling within the scope of the

14   Paraphilia NOS category?

15   **A.**   Yes.

16   **Q.**   And can you explain why?

17   **A.**   Well, because they're listing it under Paraphilia NOS as

18   part of their discussion of Paraphilia NOS and it explicitly

19   describes rape, paraphilic rape.

20   **Q.**   "Biastophilia is used to describe violent serial rape

21   and may overlap with lust murder.  In some cases if the

22   resistance of the victim lessens, the biastophile may become

23   less aroused or may increase the level of violence to

24   increase the fear."

25           And then he goes on to discuss the Money book;

1  right?

2  **A.**  Yes.

3  **Q.**  And the Money work is one of the authorities you listed

4  in the bibliography of authorities that are recognized, the

5  concept at least of a paraphilic rapist?

6  **A.**  Yes.

7      **MR. GOLD:**  Your Honor, I am going to need some time

8  for redirect (sic).

9      **THE COURT:**  Recross.

10      **MR. GOLD:**  Recross rather.

11      **THE COURT:**  I thought she was out of here at

12  quarter past four.

13      **THE WITNESS:**  I did too, I might add.

14      **MR. SAVERY:**  And with that, Your Honor, I am happy

15  to end now.

16      **MR. SINNIS:**  May I just make a comment?

17      **THE COURT:**  No.  You can -- it is not my fault.  I

18  am here.

19      **MR. SINNIS:**  We would like to question her some

20  more.

21      **THE COURT:**  Well --

22      **THE WITNESS:**  I have to catch a plane.

23      **THE COURT:**  She has to catch a plane.  Bring her

24  back --

25      **MR. SINNIS:**  Well, she's a government -- then we

1    will bring her back.  She is the government's only witness

2    in this case.  I feel as though we have been cut off by some

3    gentlemen's agreement, not Your Honor, by some gentlemen's

4    agreement --

5           **THE COURT:**  Be very careful because I get very

6    sensitive when I see some of these gratuitous comments.  I

7    don't get many so maybe that is why I am so sensitive.

8           **MR. SINNIS:**  I didn't mean that as a gratuitous

9    comment.

10          **THE COURT:**  No one can ever say that I cut them off

11   of anything unless they have been outrageous.

12          **MR. SINNIS:**  No, I said simply by a gentlemen's

13   agreement --

14          **MR. GOLD:**  A gentlemen's agreement among the

15   government --

16          **MR. SINNIS:**  Among us (indicating).

17          **THE COURT:**  But you did it to yourself.

18          **MR. GOLD:**  Well --

19          **MR. SINNIS:**  Well, now we'd like some time for

20   recross.

21          **THE COURT:**  That is up to you.  If you want to

22   bring her back, you work with Ms. Lovett and she will give

23   you a slot.  If you want to pay for her to come back, that

24   is up to you.

25          **MR. SINNIS:**  Okay.  Can we have ten minutes now,

1    Your Honor?  Her plane is not until six o'clock.

2              **THE WITNESS:**  I need to go find a cab somewhere to

3    get to the airport.

4              **THE COURT:**  You don't have a car waiting for her?

5              **THE WITNESS:**  No, I don't have a car waiting.

6              **THE COURT:**  Well, why don't you people call a car

7    for her.  Treat her with some respect.

8              **MR. GOLD:**  Well.

9              **MR. SINNIS:**  We can --

10             **THE COURT:**  You have got the whole United States

11   Government here.

12             **MR. SINNIS:**  We can do that, Your Honor.

13             **THE COURT:**  Yes, so do it.

14             Just get Boston Coach over here.  It will cost you

15   a few bucks but you will keep your witness happy.

16             **MR. SINNIS:**  Thank you.  We are going to do that,

17   Your Honor.

18             **THE COURT:**  Good.

19             If they put you on a trolley, let me know about it.

20             (Laughter.)

21             (Pause in proceedings.)

22             **THE COURT:**  Zita reminds me, she has got to be

23   there at least an hour before the flight leaves.

24             **MR. GRADY:**  The quicker you start asking

25   questions --

1          **MR. GOLD:**  I will.

2                          **RECROSS-EXAMINATION**

3     BY MR. GOLD

4      **Q.**  Dr. Salter, you were asked about this --

5          **THE COURT:**  If she is coming back anyway, why make

6     her miss the flight?

7          **MR. SINNIS:**  Well, I think if we get 15 minutes we

8     might not need her --

9          **MR. GOLD:**  We might not need to bring her back.

10         **THE COURT:**  She will never get to the airport.

11         **THE WITNESS:**  I will never make my flight.

12         If you have five minutes, I am happy to answer

13    quick but --

14         **MR. GOLD:**  I will do five, we'll try to do it.

15         **THE COURT:**  All right.

16    BY MR. GOLD

17     **Q.**  I have an email up on the screen that is dated April 28,

18    2005.  You were asked questions about it, the exchange

19    between Dr. Zander and Fred Berlin; right?

20     **A.**  Yes.

21     **Q.**  Mr. Savery didn't ask you about the fourth point that

22    Dr. Berlin makes.  I am just going to read that.

23         "I believe that the diagnosis of Paraphilia NOS is

24    being too broadly applied, especially in SVP hearings.  It

25    should only be utilized when there is clear evidence of

1    abnormality in a person's sexual makeup and not diagnosed

2    simply because a person has been a rapist."

3            That's what he said in the fourth point there?

4    **A.**  Yes.

5    **Q.**  Now, you stated that Paraphilic Coercive Disorder had

6    been rejected by the committee but that didn't mean that you

7    couldn't diagnose it under DSM anyway; right?

8    **A.**  That's under Paraphilia NOS.

9    **Q.**  Now, another diagnosis that was rejected and at one time

10   was included was homosexuality; right?

11   **A.**  Yes.

12   **Q.**  Now, that was rejected, in fact, the last rejection was

13   at the same time that Paraphilic Coercive Disorder was

14   rejected, ego-dystonic homosexuality; right?

15   **A.**  Yes.

16   **Q.**  Now, is it appropriate in your view to diagnose someone

17   who is a homosexual with Paraphilia NOS today?

18   **A.**  No.

19   **Q.**  Now, you stated you were not aware of any official

20   statement by the American Psychiatric Association regarding

21   the use of this diagnosis; right?

22   **A.**  I'm not aware of any statement that you could not use

23   Paraphilia NOS to cover this.

24            (Pause in proceedings.)

25   **Q.**  But, in fact, the American Psychiatric Association put

1    together a Task Force in 1999 to do a study of the Sexually

2    Violent Predator laws.  Are you familiar with this book,

3    *Dangerous Sex Offenders*?

4    **A.**  Yes.

5              (Pause in proceedings.)

6              **THE COURT:**  It better be good, this is your last

7    question.

8              **MR. GOLD:**  Yes.

9    BY MR. GOLD

10   **Q.**  Now, this book published in 1999 contains the following

11   statement, "Whether or not any rapist has a paraphilia

12   represents a controversial issue in the research literature.

13   DSM-IV has not classified paraphilic rapism as a mental

14   disorder.  Some researchers believe that a small group of

15   rapists have a diagnosis feature similar to those with other

16   paraphilias.  The ability to make the diagnosis with a

17   sufficient degree of validity and reliability remains

18   problematic.  In addition, other research has shown that

19   many rapes are not the product of primary sexual interest

20   but rather represent an exercise in power and control.  In a

21   study looking at a variety of demographic and criminal facts

22   in several samples of incarcerated offenders, the authors

23   concluded there is little difference between rapists and

24   either property or violent offenders, the offender group

25   with which rapists differed most, were the other sex

1    offenders."

2            And so did I read that passage from the American

3    Psychiatric Association's Task Force in 1999 correctly?

4    **A.**  Yes.

5            **THE COURT:**  Okay.  That is it.

6            **MR. GOLD:**  That's it.

7            **THE COURT:**  You can get her back.  Talk to

8    Ms. Lovett and she will --

9            **MR. SINNIS:**  We will talk to Ms. Lovett if we want

10   her back, yes, Your Honor.

11           **THE COURT:**  All right.  Good night everybody.  I

12   guess we will see you tomorrow.

13           **THE CLERK:**  Yes, Judge.

14           **COUNSEL:**  Good night, You Honor.

15

16           (WHEREUPON, the proceedings were recessed at 4:30

17           p.m.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


       /S/CAROL LYNN SCOTT


_____

           CAROL LYNN SCOTT
          Official Court Reporter
        John J. Moakley Courthouse
      1 Courthouse Way, Suite 7204
       Boston, Massachusetts 02210
          (617) 330-1377


**DATE:**September 17, 2009