UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                Plaintiff,         )  Civil Action
                                   )  No. 1:07-12065-JLT
                vs.                )  September 14, 2009
                                   )  @10:20 a.m.
WESLEY GRAHAM,                     )  Non-Jury Trial
                Defendant.         )  Day Four



        BEFORE:  THE HONORABLE JOSEPH L. TAURO
                 UNITED STATES DISTRICT JUDGE


        APPEARANCES:

        United States Attorney's Office
        (By:  Mark J. Grady, Attorney at Law &
              Donald J. Savery, Attorney at Law)
        1 Courthouse Way, Suite 9200
        Boston, Massachusetts  02210
        (617) 748-3100

              On Behalf of the Plaintiff.


        Federal Defender's Office
        (By:  Stylianus Sinnis, Attorney at Law &
              Ian Gold, Attorney at Law)
        51 Sleeper Street, 5th Floor
        Boston, Massachusetts 02210

              On Behalf of the Defendant.


            John Joseph Moakley United States Courthouse
                     Courtroom No. 21
                     1 Courthouse Way
                     Boston, MA  02210


                Helana E. Kline, RMR, CRR
        John Joseph Moakley United States Courthouse
                1 Courthouse Way, Room 3507
                     Boston, MA  02210

I N D E X

Witnesses called on behalf of the Defendant:

Testimony of:

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

Barry J. Mills, Ph.D.

By Mr. Sinnis          5                      163

By Mr. Savery                      78

E X H I B I T S

(No exhibits entered into evidence)

```
1                      P R O C E E D I N G S
2            THE CLERK:  All rise for the Honorable Court ...
3            THE COURT:  Good morning, everybody.
4            MR. GOLD:  Can we bring Mr. Graham out now?
5            THE COURT:  Yes.  What I wanted to suggest is that
6     you see how few questions you can ask.  You're very, very
7     thorough, the lawyers on both sides, and there's almost no
8     question that could have been asked so far that hasn't been
9     asked ... now see if we can resist the temptation to see how
10    many you can do today.  Today is it; I'm not having any
11    court tomorrow.  I'm not planning to, so plan to move a
12    little faster, okay?
13           MR. SINNIS:  I will endeavor to do that, your Honor.
14    Thank you.
15           THE COURT:  All right.  Thank you, and would the
16    marshal do me a favor?  Judge Lowell, our first judge, is
17    crooked back there; that was driving me whacky last week ...
18    I think that's okay.  Thank you.
19           MR. SINNIS:  May I proceed, your Honor?
20           THE COURT:  All set.  Go ahead.
21           MR. SINNIS:  The defense would call court-appointed
22    expert Dr. Barry Mills to the stand.
23           THE COURT:  Now, we're all through with the --
24           MR. SINNIS:  Here's where we are, your Honor, a
25    little housekeeping:  Dr. Plaud, as you know, Mr. Grady was
```

```
 1    not finished with his cross.  Dr. Plaud was unavailable
 2    based upon schedule today.  We heard what your Honor just
 3    said about tomorrow; we've been discussing whether or not
 4    Mr. Grady can live with what he's gotten, and we can live
 5    with no redirect.  We'll have an answer to your Honor, Mark,
 6    by lunch?
 7             MR. GRADY:  Certainly after lunch at the latest,
 8    your Honor.
 9             THE COURT:  Well, I mean, that's --
10             MR. SINNIS:  If Mr. Grady needed Dr. Plaud back,
11    then I guess we would have to ask whether he could come on a
12    day other than tomorrow that fits with your Honor's schedule.
13    That would only be about an hour's worth of testimony though.
14             THE COURT:  Well, I might be able to give you an hour
15    in the morning.
16             MR. GRADY:  I think that we'd be leaning towards
17    seeing if we can't, in keeping with the Court's intent, wrap
18    up the case today.
19             THE COURT:  Well, why don't you --
20             MR. GRADY:  But we'll see what we can do.
21             THE COURT:  Don't wait until, you know, 1:00; see if
22    you can let me know at 12?
23             MR. GRADY:  Sure.
24             THE COURT:  Okay.  Go ahead.
25             MR. SINNIS:  Thank you.
```

1          THE COURT:  Raise your right hand.

2                  (Barry J. Mills, Ph.D., duly sworn.)

3      DIRECT EXAMINATION BY MR. SINNIS:

4      Q.   Dr. Mills, can you state your full name, spelling your

5      last name for the record, please?

6      A.   Barry Joseph Mills, M-i-l-l-s.

7      Q.   Dr. Mills, you were appointed by the court in this case?

8      A.   Yes.

9      Q.   Have you read a report prepared by Dr. Anna Salter?

10     A.   Yes.

11     Q.   I'll show you on the screen Page 14 of that report.

12     Do you see the highlighted portion of that?

13     A.   Yes.

14     Q.   Can you read that?

15     A.   "The diagnostic task as it pertains to SVP civil

16     commitment cases is for the expert to consider what other

17     conditions besides a paraphilia are possible causal

18     conditions for the sexual offense, and to rule them out

19     before concluding that the sexual offense is a direct

20     consequence of the paraphilia."

21     Q.   And where does Dr. Salter get that quote from?

22     A.   It is a rough draft of an article by First & Halon.

23     Q.   In fact, on line two of that, where I'm pointing, can

24     you just read that she's saying:  First & Halon in press?

25     A.   Correct.

1    Q.   Now, have you --

2         THE COURT:  Could you put that back up?  I didn't

3    finish looking at it, please.

4         MR. SINNIS:  I apologize, your Honor....

5         THE COURT:  Okay.  Thank you.

6    Q.   Now, have you looked -- well, let me rephrase that.

7    I'm going to show you the in-press version, which, this is

8    the front page of the in-press version of the First & Halon

9    report; and as Dr. Salter indicates on Page 19, there's the

10   quote, correct?

11   A.   Yes.

12   Q.   Okay.  Have you read the actual version of the First &

13   Halon report that was peer reviewed and published in a

14   journal?

15   A.   Yes.

16   Q.   Does that quote appear --

17   A.   No.

18   Q.   -- in the published version?

19   A.   No.

20   Q.   Okay.  I'm going to show you the published version of

21   the First & Halon article and go to the step two, which is

22   where the quoted phrase was in Dr. Salter's report, and

23   you -- and I'd ask you if that quote is in, not only step

24   two, anywhere in the article based upon your review of that

25   article?

A.   I was not able to find it anywhere in the article.

Q.   Okay.  So to be clear for the Court, the first press portion of that article -- are you familiar with how articles become published articles in peer-reviewed journals?

A.   Yes.

Q.   Okay.  The first press article would have been something that went out to be peer reviewed, correct?

A.   Yes.

Q.   Okay.  And then based upon some comments in peer review, articles change over life span, correct?

A.   Correct.

Q.   Until they're actually published as this article is, correct?

A.   Correct.

Q.   When a particular quote or conclusion of an author is deleted during the peer-review process, in your experience as a medical profession, would it still be appropriate to quote from the in-press version when giving an opinion or a report?

A.   Well, it depends on when it was published.  I believe Dr. Salter's initial report came out before the article was actually published ... so in that sense, it may have been appropriate.

     However, since she wrote an addendum report afterwards, it probably would have been better for her to clarify the fact that in the addendum report that that quote was

1    mistaken.

2    Q.   Okay, fair enough.  That since she only had the in-press

3    version at the time she wrote her first report, it's not

4    inappropriate to quote it; but when you do an addendum and

5    it's no longer in the published version, you should probably

6    go back and get rid of it, correct?

7    A.   Yes.

8    Q.   And, in fact, did you reach any conclusions as to

9    whether or not the quoted phrase that appears on Page 14 of

10   her report, this phrase right here which you just read, is

11   that position still consistent with what First & Halon say

12   in the published version of the article in your opinion?

13   A.   No.

14   Q.   Can you elaborate on that for the Court?

15   A.   In fact, it's exactly the opposite.  It's kind of

16   important to understand how these diagnoses are made.  The

17   assumption of all medical diagnoses is what we call the

18   noel hypothesis; that is, a person does not have an illness

19   until there's evidence to support it, particularly if it's

20   a very severe illness ... so the First & Halon article is

21   essentially arguing this, that particularly in these

22   marginal, strange diagnoses that don't have a lot of

23   empirical evidence to support them, you actually have to be

24   almost more careful; whereas, what this report suggests is

25   that the task of an expert is to essentially assume that the

1   person has paraphilia merely because they're charged with a

2   crime and that to -- your job as the expert, according to

3   the report, is just to make sure that it isn't something

4   else; that the default position is that the person has

5   paraphilia, which is against the grain of almost everything

6   published on this subject; that the whole point of

7   paraphilia is to make sure, in fact, that you're not

8   equating them with merely a criminal charge or a criminal

9   conviction.

10  Q.   Okay, and we will come back to your opinion on it being

11  a Noel hypothesis and how you approach something when given

12  a scientific task at-hand later on in your direct, but I

13  want to pick up on the last thing you said about reliance on

14  criminal acts and criminal behavior and go to another portion

15  of Dr. Salter's report.

16      She writes, and can you read once this comes into focus,

17  can you read the highlighted portion from Page 12 her report?

18  A.   "It cannot be doubted that the DSM-IV-TR permits the

19  diagnosis of paraphilia NOS by behavior alone.  DSM-IV says

20  specifically that the criteria for paraphilia includes:

21  recurrent, intense sexually-arousing fantasies, sexual

22  urges, or behaviors (italics added) on behaviors."

23  Q.   Okay.  Now, are you familiar with Dr. Allen Francis?

24  A.   Yes.

25  Q.   And Dr. Allen Francis is actually the chair person of

1   the DSM Task Force that prepared the DSM-IV-TR, correct?

2   A.   Correct.

3   Q.   Okay.  Are you familiar with an article -- so before I

4   get to that, what Dr. Salter says is it cannot be doubted

5   that behaviors alone can be used to diagnose paraphilia,

6   correct?

7   A.   Correct.

8   Q.   Okay.  She bases that on a single use of the word

9   "behavior" in the DSM paraphilia section, correct?

10  A.   Correct.

11  Q.   Okay.  Are you familiar with this article by

12  Dr. Francis?

13  A.   Yes.

14  Q.   Now, just to go to the conclusion, Dr. Francis, on

15  Page 380, if you can read where I have my finger?  Can you

16  read what he says?

17  A.   "The use of paraphilia NOS to describe repetitive rape

18  cannot be justified on the basis of the term 'or behaviors

19  alone'."

20  Q.   Dr. Francis stated the exact opposite position, correct?

21  A.   Yes.

22  Q.   Okay.  Dr. Francis basically put together the DSM-TR-IV,

23  correct?

24  A.   He was one of the leaders on it, yes.

25  Q.   All right, and can we give the Court a little bit of

1  background as to why he reaches the conclusion that

2  behaviors alone are never acceptable as opposed to what

3  Dr. Salter says, which is, it cannot be doubted that you

4  can do it?

5          MR. SAVERY:  Objection.

6          THE COURT:  Wait, what's the --

7          MR. SAVERY:  His basis of knowledge for what

8  Dr. Francis thinks.

9          THE COURT:  I take it, he's asking his opinion of

10  that as a conclusion, is that it?

11          MR. SINNIS:  That's fair, your Honor.

12          THE COURT:  Did I get it right?  Go ahead.  I just

13  want to make sure I understand:  what part of the whole

14  picture does behavior play, and let me add to that a second

15  part to the question:  what fairer way to judge a person's

16  propensities could there be other than analyzing his

17  behavior, actually what he did?

18          THE WITNESS:  Absolutely.  That's a good question,

19  your Honor ... what DSM explains is that it was an

20  inadvertent placement in the language that behaviors was --

21  when they asserted that word, it was never intended to be

22  that one would diagnose only on behaviors; merely, that

23  behaviors are, as you said, kind of the better culmination

24  of the inner urges and fantasies, but probably if there's any

25  single thing that I teach medical students and residents on

1    Day 1 of a paraphilia seminar is the first -- if you don't

2    know -- if you don't learn anything else in my seminar, the

3    key thing to know is that paraphilia is distinct from a

4    sexual offense.

5         They may be related, very well much, but the whole

6    reason why psychiatry or psychology needs to be involved is

7    that it's not always merely behaviors; that there's some

8    small group of, a strange group of people have these bizarre

9    deviant fantasies and urges that may or may not lead to

10   behaviors, but that's different than someone than just acts

11   that way ... because there's many different reasons that

12   someone may act that way.

13        Someone may just get drunk and act out some bizarre

14   sexual behavior.  That has nothing to do with a persistent

15   pattern of bizarre fantasies, so the key thing is to always

16   be aware that even though someone has been convicted of a

17   sexual offense and may very well have paraphilia, that for

18   the most part, they don't.

19        There's actually only a small group of people that

20   commit sexual offenses that actually have paraphilias.  Our

21   task is to help identify those people; whereas, Dr. Salter,

22   if I'm understanding her correctly, her assumption is that

23   anyone that commits a sex offense has paraphilia, and her

24   job is just to sort out the details.

25   Q.   Maybe we can give his Honor an example that takes it

1    away from this particular case and crystalizes it a little

2    more.  Take an example of someone who molests a child, okay?

3    Actually, commits the act, gets convicted of that criminal

4    act; but without knowing why they molest that child, can

5    you label that person as a pedophile?

6    A.   Well, a lot of this -- yes and no.  A lot of the

7    argument in this debate comes down to how much inferences

8    can you take merely from behavior ... because, clearly, in

9    forensic assessments people are incentivized not to be

10   telling us whole truth so you have to take the -- be

11   cautious about that on one hand.

12       On the other hand, referring an internal fantasy merely

13   on the basis of behavior is on very precarious ground.

14   It's possible.  It's certainly theoretically possible; but

15   diagnostic methodology teaches that when you go into

16   inferences, the diagnostic standard actually becomes

17   tighter, more rigid.

18       You actually have to be much more careful; in contrast

19   to what I and a lot of other people believe that Dr. Doren,

20   the father of this kind of diagnosis, has done.  His

21   argument is you actually lower your diagnostic standards in

22   situations of ambiguity, when, in fact, the rest of the

23   profession says:  in situations where you're having to make

24   inferences, you actually need to raise your diagnostic

25   standard to a more careful degree.

1    Q.  And following up on that, in my hypothetical, I mean,

2    in the hypothetical the person could have molested a child

3    for deviant sexual arousal purposes or based upon those or

4    he or she could have done it because there's going through a

5    nasty divorce and they're just bitter and angry and they

6    decided that's what they wanted to do, correct?

7    A.  Absolutely.  The vast majority of rapes do not occur as

8    a result of deviant sexual arousal.  They occur out of power,

9    anger, acting-out behaviors as opposed to -- as a part of

10    some conflict.

11        It's only a very small group that paraphilias are

12    the cause of it.  They do exist, but there's been a real

13    controversy in our field because there is a small group of

14    the practitioners on the margins that have adopted these

15    stances that are way outside normal range of practice; that

16    merely on the basis of a behavior, I can tell you what's

17    going on in the fantasy life of a person.

18        Now, there are theoretical possibilities, like scripting

19    is probably one of the best examples.  If someone commits

20    three rapes, and each rape is scripted exactly the same;

21    they're almost following a written script, and they make the

22    person say certain things and do certain things, the person

23    may never tell you anything about their internal fantasies

24    or urges, but then that higher diagnostic standard that we

25    use when we're entering internal mental states from

1   behaviors, you might be able to make that step ... because

2   they're clearly acting out on the basis of their behaviors

3   some kind of internal script; but absent those types of

4   strong inferences, you really can't make this diagnosis.

5   Q.   Now, you've reviewed the entire record in this case,

6   correct?

7   A.   Yes.

8   Q.   What is your conclusion as to whether or not there's

9   any evidence that Mr. Graham suffers from such paraphilia

10   or any evidence that he's acting based upon a script or

11   anything else that shows a deviant sexual arousal pattern?

12   A.   There's none.

13   Q.   Now, in an effort to move this along a little bit, I'm

14   not going to spend too much time on your background, but I am

15   going to spend a little.

16       You filed a report in this case at the direction of the

17   Court, correct?

18   A.   Yes.

19   Q.   And if you look you have two binders over there, if

20   you'd turn to Exhibit 25, which is in Binder 2?

21   A.   Yes.

22   Q.   Is that your report, sir?

23   A.   Yes.

24   Q.   Okay.  And if you go to Exhibit 26, which is already in

25   evidence, is that your most recently updated CV?

1    A.   Yes.

2    Q.   Can you give the Court, again since the Court has your

3    CV in evidence, just a brief summary of your educational

4    background and what your current position is right now?

5    A.   I'm a forensic psychiatrist, board certified.  I

6    practiced in Texas for many years.  My accent is certainly

7    not from Boston.

8         I was President of the American Academy of Psychiatry &

9    the Law, the Texas chapter.  I was the chief psychiatrist at

10   the forensic state hospital of Texas; essentially, the

11   equivalent Bridgewater.

12        Five years ago I received an offer to come and work at

13   Harvard and go more into academics and teaching, which I

14   took.  I had been -- they hired me in one job but very

15   quickly promoted me to Medical Director at Cambridge Health

16   Alliance.

17        I also work at Mass. General Hospital; and at Cambridge

18   Health Alliance, I'm the chief forensic psychiatrist

19   essentially in charge of all the teaching of residents and

20   medical students for forensic issues.

21   Q.   And when you worked down in Texas, did you have

22   experience working with commitment proceedings?

23   A.   Yes.

24   Q.   Okay, and can you briefly explain to the Court what

25   that work experience entailed?

1    A.   Well, all the patients committed to our maximum security

2    forensic hospital were civilly committed.  Texas did not

3    have an SVP, sexually violent predator, statute that

4    committed people to inpatient programs; it was only to

5    out-patient; but, nevertheless, we still received a lot of

6    the people that were felt necessary to be committed that

7    were sex offenders and also had some type of disorder that

8    made them unsafe to the community.

9    Q.   So you were making risk assessments in Texas as part of

10   your job?

11   A.   That's a big part of my job.

12   Q.   And would you do this in the prison setting?

13   A.   Prison or forensic hospital setting.

14   Q.   And did that become your primary area of focus at some

15   point?

16   A.   For about 15 years it's been.

17   Q.   What threw you up to Massachusetts?

18   A.   A job offer that the Chairman of Psychiatry, in fact, at

19   Harvard was from Texas, and he convinced me to come up here.

20   I'm still not used to the winters.

21   Q.   Neither am I ... have you testified at any other Adam

22   Walsh Act proceedings in federal court at trial?

23   A.   Yes.

24   Q.   And did you testify in the case of the United States

25   versus Wilkinson at trial?

```
 1     A.   Yes.
 2     Q.   And were you qualified as an expert by Chief Judge Wolf
 3     in that case?
 4     A.   Yes.
 5     Q.   And, again, your Honor, in an effort to kind of move
 6     this along a little bit, I'll move from his background from
 7     there; you have his CV if you wish to look at it ... going
 8     back to the issue of behaviors versus kind of the internal
 9     workings of a patient's mind, again, is that concept that's
10     explained by Francis controversial at all:  that behaviors
11     alone should not be used?  In your opinion, is that a
12     controversial position?
13     A.   That behaviors should not be used?
14     Q.   Right, should not be used?
15          THE COURT:  Solely?
16     Q.   Solely.
17     A.   Solely?
18          THE COURT:  I take it, behavior is always a factor,
19     a legitimate factor?
20          THE WITNESS:  Behavior is always a factor, yes, sir.
21     I mean, it's impossible to separate out behavior, but it
22     should never be only behavior.
23     Q.   And that's not a controversial position in your
24     position, right, that's the default position?
25     A.   Yes.
```

1    Q.   Now, in this case can you just tell us briefly how you

2    undertook the task that was assigned to you by the Court,

3    what you did in the case?

4    A.   There was a large pile of records that I reviewed.  I

5    went to Devens, set up interviews, interviewed Mr. Graham on

6    one day, administered some tests, came back, reviewed some

7    more records, and prepared a report.

8    Q.   What tests did you administer to Mr. Graham?

9    A.   The only structured test was called the executive

10   interview, but I also did standard mental status testing.

11   Q.   Now, when you interviewed Mr. Graham, did he tell you

12   about his upbringing?

13   A.   Yes.

14   Q.   All right.  Did he tell you that he was born in the

15   District of Massachusetts -- I'm sorry, in South Carolina,

16   and then moved to the District of Columbia at some point?

17   A.   Yes.

18   Q.   And did he mention to you that he had a long time

19   romantic sexual relationship with a woman named Mary

20   Phargood?

21   A.   Yes.

22   Q.   And did you talk to him about that relationship?

23   A.   Yes.

24   Q.   Did you ask him whether or not he still speaks to

25   Miss Phargood?

1    A.   I believe so.

2    Q.   Okay.  If you look at Exhibit 25, which is your report,

3    just to refresh your recollection, Page 4, the first full

4    paragraph on Page 4, the last sentence?

5    A.   Yes.  "The respondent indicates that he is still in

6    communication with his exgirlfriend."

7    Q.   Okay, and did he also talk to you about the fact that

8    his sister had passed away this June?

9    A.   Yes.

10   Q.   Did his emotional state in discussing these issues seem

11   within the bounds of normal to you?

12   A.   Yes.

13   Q.   How would you -- I don't know if I'm asking for a

14   medical opinion or just kind of your general sense, but

15   how would you describe Mr. Graham during the course of the

16   interview you had with him?

17   A.   He was polite, cooperative.  He had no behavioral

18   problems.  He sat in the waiting area around a lot of people

19   with -- very calmly.  His exchange, though, was remarkable

20   for sometimes what we call poverty of spontaneity; he just

21   did not offer spontaneously a lot of information.

22   Q.   Did you form an opinion as to Mr. Graham's intellect?

23   A.   Yes.

24   Q.   What is that?

25   A.   His IQ, while not given formal IQ testing, is below

1   average.

2   Q.   And at a certain point did you -- well, let's back up.

3   You talked about Mr. Graham sitting in a waiting area; was

4   he restrained in any way during that time period?

5   A.   Not at all.

6   Q.   While you were sitting there observing him in the

7   general waiting room at Fort Devens to meet with you, did

8   you notice whether or not he exhibited any inappropriate

9   behavior?

10   A.   He did not.

11   Q.   All right, and this waiting room at Devens is a -- it's

12   not a waiting room actually; it's a visiting area, right?

13   A.   Yes.

14   Q.   It's a very large room that has vending machines on

15   one side; it has separate rooms for attorney and/or doctor

16   meetings that are private, correct?

17   A.   Yes, and a children's playroom.

18   Q.   A children's playroom.  It has a lot of people who are

19   sitting in there, correct?

20   A.   A lot.

21   Q.   And then there are actually only two guards who are up

22   on a podium, kind of like his Honor, sitting behind a desk,

23   correct?

24   A.   That's correct.

25   Q.   All right, and at any point did any of those

1    correctional officers need to control Mr. Graham in any way?

2    A.    No.

3    Q.    And during your interview with him he was never

4    threatening at all?

5    A.    Not at all.

6    Q.    Polite?

7    A.    Yes.

8    Q.    Courteous?

9    A.    Yes.

10   Q.    Now, there are three sexual offenses at issue in this

11   case, correct?

12   A.    Yes.

13   Q.    There's a 1974 rape, correct?

14   A.    Yes.

15   Q.    There's a 1975 assault with intent to commit rape,

16   correct?

17   A.    Yes.

18   Q.    And what we've been referring to in this case as the

19   index offense, the 1987 rape, correct?

20   A.    Correct.

21   Q.    Did you review all the records pertaining to those

22   three cases during the course of your evaluation?

23   A.    Everything I was given, yes.

24   Q.    Okay, and during the course of your evaluation did you

25   question Mr. Graham about those three cases?

1    A.   Yes.

2    Q.   And when Mr. Graham's version of the events differed

3    from the official record when making your analysis and your

4    opinion of this case, which one would you credit?

5    A.   Well, I don't think you can make global statements one

6    way or the other.  In general, if someone's been convicted

7    of a crime, that carries a lot of weight, but I don't

8    automatically assume that's always the case, but it's given

9    large credence.

10   Q.   Okay.  So, for example, taking the '74 rape conviction,

11   Mr. Graham doesn't deny that he was convicted, right?

12   A.   Correct.

13   Q.   He just denies the underlying facts as they're recited

14   in the official record, correct?

15   A.   Correct.

16   Q.   And, similarly, with the 1975 assault with intent to

17   commit rape, he doesn't deny being convicted, correct?

18   A.   Correct.

19   Q.   In fact, he plead guilty to that offense, right?

20        MR. GRADY:  I'd just object to the leading questions,

21   your Honor.

22        MR. SINNIS:  Your Honor, I think under Rule 706A I'm

23   allowed to lead with a court-appointed expert.

24        THE COURT:  Besides that, those aren't leading

25   questions; in that, they don't suggest the answer, each and

1    every one.  A couple of them did, but I don't think there is

2    a pattern here that causes me to be cautionary here.  Go

3    ahead.

4    Q.   Similarly, with the assault with intent to rape, he's

5    admitted that he plead guilty to that, right?

6    A.   Correct.

7    Q.   Denying some of the underlying facts, again, correct?

8    A.   Correct.

9    Q.   If we look at what has been Bates stamped 338 in this

10   record, this is a Psychological Services Intake Screening

11   Summary from June 3 of 2004, some four years before you ever

12   met Mr. Graham, correct?

13   A.   Yes.

14   Q.   And, in fact, I'll submit to you roughly three years

15   before he was even certified under the Adam Walsh Act.  Can

16   you read the highlighted part there?

17   A.   "And denied responsibility for some of his prior

18   convictions; although, he did admit to the most recent rape."

19   Q.   So even back in 2004 before the Adam Walsh Act was even

20   passed, Mr. Graham was taking the same stance he took with

21   you, correct?

22   A.   Yes.

23   Q.   By the way, if you look at the top of that under:

24   Mental Status, can you read that for the Court?

25   A.   "During the screening interview no mental status items

1    were noteworthy.  His psychological stability for custody is

2    judged to be favorable."

3    Q.   So back in 2004 --

4              THE COURT:  What does that mean?

5              THE WITNESS:  It can, it can mean a lot of different

6    things.  Within a prison setting, there's still a hierarchy

7    of different needs for people that have mental problems ...

8    so on one hand, someone could be functioning just as like a

9    typical out-patient; they just happen to be in prison.  They

10   may have some mild symptoms, but there's nothing that really

11   needs to be done about it, or they may have no condition

12   whatsoever.

13       At the other extreme is someone that is severely

14   impaired that almost they need to be either in a prison

15   infirmary or a prison hospital.  Within the Federal

16   Department of Correction, I'm sure you know better than I do,

17   they have those prison hospitals where if someone reaches a

18   certain level of impairment that they can be put in one of

19   those hospitals.

20       These types of assessments help to determine within the

21   prison where he should be, and the fact that he's judged to

22   be favorable would indicate that there's no active mental

23   issue that needs to be addressed.

24   Q.   In fact, on Page 2 of this document that was done by

25   the Bureau of Prisons back in June of '04, can you read the

1    two diagnoses they give?

2    A.   Yes.  "On Axis 1:  Opiate/cannabis dependence with a

3    qualifier:  in remission due to incarceration," and then on

4    Axis 2:  "Antisocial personality disorder."

5    Q.   So back in 2004 before the Adam Walsh Act was passed,

6    was anybody in the Bureau of Prisons, as far as this document

7    indicates, diagnosing Mr. Graham with paraphilia NOS

8    (nonconsent)?

9    A.   It does not appear so.

10   Q.   Anybody diagnosing him with paraphilic coercive

11   disorder?

12   A.   No.

13   Q.   Paraphilic rapism?

14   A.   No.

15   Q.   It's not even asking to be ruled out there, correct?

16   A.   Correct.

17   Q.   We'll come back to this.  When we discuss the Global

18   Assessment of Functioning, the GAF, do you know what the GAF

19   is?

20   A.   Oh, yes.

21   Q.   Dr. Salter testified that, and I think she puts it in

22   her report, that Mr. Graham would have an under 10 on the

23   GAF score; did you see that in her report?

24   A.   Yes.

25   Q.   If someone had an under 10 on the GAF score --

1          THE COURT:  Now, spell that for me:  GAF?

2     Q.   It's GAF, G-A-F.  It stands for Global Assessment

3     Functioning.  Maybe you can just explain to his Honor what

4     it is....

5     A.   Certainly.  On any diagnoses that a psychiatrist gives,

6     one of the required diagnoses is a score from 0 to 100 global

7     assessment of functioning ... so independent of whatever a

8     diagnosis is, each patient gets a GAF score, and they have

9     some significant meanings; but what it is, it's a snapshot

10    usually within the last week of how this person is overall

11    functioning in life ... because different diagnoses may have

12    different levels of functioning.

13         Someone with a relatively minor diagnosis might actually

14    be functionally, in terms of being able to eat by themselves

15    or go to the bathroom by themselves or bathe themselves, is

16    quite impaired; whereas, vice versa, some people may have a

17    very serious diagnosis like schizophrenia, but,

18    paradoxically, be able to function fairly independently.

19         The GAF score is a way to communicate in the last week

20    how much help does this person need overall to do the normal

21    activities of daily living ... it's usually used almost more

22    by nursing to just know how much help is a nurse going to

23    have to provide this person to be able to get up in the

24    morning, to:  can they make their bed on their own; are they

25    so suicidal that we have to have them in a straight jacket

1    24 hours a day ... so it's a very rough estimate for what

2    the person is actually looking like over the last week.

3    Q.   And it's actually contained in the DSM-IV-TR, correct?

4    A.   Oh, absolutely.

5    Q.   And it's on Page 34, I have it up on the screen.   If

6    Mr. Graham were a 10, which is listed on the global

7    assessment of functioning as persistent danger of severely

8    hurting himself or others, e.g., recurrent violence or

9    persistent inability to maintain minimal personal hygiene or

10   serious suicidal act with expectation of death, in your

11   opinion what would he be looking like here and where would

12   these marshals be sitting next to him in reference to him, if

13   he was in under 10?

14   A.   Well, he's definitely not under 10.   He would be on a

15   stretcher, probably in a straight jacket with a catheter,

16   probably smelling pretty bad ... I mean, and these are rough

17   estimates, but, for example, the 10 would include anything

18   worse than it ... so like on a 30, it says inability to

19   function in almost all areas of their life, and so someone

20   at 10 is essentially almost the equivalent of a comatosed

21   person, like a full-duty nursing-care type person that you

22   have to feed them, you have to -- they need to be in a

23   nursing home essentially.

24   Q.   So what would your -- what's your view of Dr. Salter's

25   opinion that he's a 10 or under?

1   A.   I think it's a real mistake.

2   Q.   In fact, if we look at some more of the DOP records,

3   Bates stamped 353, this is a work performance rating for

4   Mr. Graham back in June, covering the period of May 22nd to

5   June 21, '05.

6       Did you review this as part of your assessment?

7   A.   It doesn't -- if it was in one of the Bates stamps

8   documents, I believe so --

9   Q.   Okay.

10  A.   -- but it doesn't immediately jump to my memory.

11  Q.   Well, you reviewed over 900 some other documents, right?

12  A.   Yes.

13  Q.   I will represent to you that Bates stamp 353 was in the

14  materials that you were sent by the government looking at

15  number -- not number -- Item X, need for supervision,

16  dependability, safety, care or equipment or -- care of

17  equipment, what did his supervisor give Mr. Graham?

18  A.   He gave him a Level 5, no supervision required,

19  completely dependable in all things.

20  Q.   Would someone who scores under 10 on the GAF, in your

21  opinion, as a medical professional, ever receive a no

22  supervision required, completely dependable in all things?

23  A.   By definition, no.  Can I add one thing?

24  Q.   Of course.

25  A.   I mean, one of the key aspects of the GAF score, from 0

1    to 100, is above or below 50.  Anyone below 50 is supposed

2    to be in a hospital.  That's the cut-off line.

3        This is the most commonly cited number on GAF scores ...

4    so even within a prison setting, if someone is scoring below

5    50, say a 49, that means they should not be in a normal open

6    population, regular area of the prison; they need to be

7    transferred to a prison hospital.

8    Q.   Can you just read the one under there, too, "response to

9    supervision and instruction"?

10   A.   Yes.  "No. 5:  outstanding, makes a real effort to

11   please the instructor, does exactly as is told."

12   Q.   There are many more of these, but I'm going to skip

13   ahead to August of '07.  On this one, which is Bates stamped

14   361, Mr. Graham receives a good under response to supervision

15   and instruction, correct?

16   A.   Yes.

17   Q.   And what did he receive under initiative, if you could

18   read that?

19   A.   "Good, can plan own work well, acts on own on most

20   things, doesn't wait to be told what to do."

21   Q.   Again, someone with a GAF score that Dr. Salter gives --

22   I'm sorry, your Honor, do you want to see that?

23        THE COURT:  Yes, put it back please ... okay.

24   Thank you.  Go ahead with your question.

25   Q.   Again, Dr. Salter gives him a GAF score of 10; he

```
 1     wouldn't even be able to work if he was a 10, right?
 2     A.   Oh, yes.   I mean, most people admitted to psychiatric
 3     hospitals in Boston don't even score a 10.   I mean, that's
 4     an incredibly low score.
 5     Q.   And I think you characterized it as a real mistake on
 6     Dr. Salter's part, correct?
 7     A.   Well, yes.
 8     Q.   And what do you give him on this score?
 9     A.   I believe I gave him a 65.
10     Q.   And if we look at the DSM, 65, if you could read to his
11     Honor would be covered under the 70 to 61; is that right?
12     A.   Correct.
13     Q.   And can you read to his Honor what that would entail?
14     A.   "Some mild symptoms, examples:  depressed mood and mild
15     insomnia or some difficulty in social, occupational, or
16     school functioning; example:  occasional truancy or theft
17     within the household but generally functioning pretty well,
18     has some meaningful intrapersonal relationships."
19     Q.   Now, again, you indicated that the GAF is a snapshot, a
20     recent snapshot, correct?
21     A.   Correct.
22     Q.   That's what it's intended use under the DSM is, correct?
23     A.   Definitely.
24     Q.   So if Dr. Salter has stated in her opinion that he's a
25     10 or under on a rape that occurred in 1987, 22 years ago,
```

1    did she totally get this assessment wrong?

2    A.   I would strongly disagree with that GAF, and it would

3    appear to go directly against the instructions of the GAF....

4    Q.   Thank you.  Now, going back to the actual three sexual

5    offenses, and I want to walk you through one by one.  I

6    think you said much earlier in your testimony that your

7    ultimate conclusion is you didn't see any evidence here of

8    a deviant sexual arousal pattern as based on these three

9    offenses, which would allow you to make a diagnosis of some

10   sort of paraphilia; is that a fair summary?

11   A.   That's correct.

12   Q.   Okay.  So let's take them one by one ... this is the

13   first -- this is the police report associated with the first

14   rape, and I'm not going to have you read it through.  It's

15   in evidence.  It's Bates No. 409.  It's been read before,

16   but I want to go through it a little bit.

17       The first sentence talks about the victim accepting a

18   ride from Mr. Graham, correct?

19   A.   Yes.

20   Q.   Is there anything in that first sentence that tells us

21   anything about the sexual arousal motivations of Mr. Graham?

22   A.   No.

23   Q.   And, by the way, where does he say it gave her a ride

24   from?

25   A.   The Chun-King restaurant.

1    Q.   It doesn't indicate that he drove her home from a bar,

2    correct?

3    A.   That's correct.

4    Q.   And, again, when you come at this, you take the facts

5    such as in a police report pretty much as a given, right;

6    you don't make assumptions, factual assumptions, about them,

7    right, fair to say?

8    A.   Yes.

9    Q.   So you might make medical conclusions drawn from them,

10   but you're not going to alter the facts or make assumptions

11   of facts that aren't actually in the official record, fair to

12   say?

13   A.   Correct.

14   Q.   Okay.  The next sentence talks about that the man was

15   known to her as Wesley, correct?

16   A.   Yes.

17   Q.   Does that tell you anything as to the sexual motivations

18   of Mr. Graham?

19   A.   No.

20   Q.   Then, she says that he said:  "He wasn't a teenager and

21   he was going to show her that he was not."  Do you see that?

22   A.   Yes.

23   Q.   Now, does that give you some insight as to what is going

24   on in Mr. Graham's mind?

25   A.   It's a little bit of an odd statement certainly of what

1    we know of afterwards, but it doesn't really say much about

2    aberrant sexual arousal.

3    Q.   Does it more seem in keeping what we typically think of

4    in rapes in terms of:  I'm going to show you power,

5    domination, things of that nature?

6    A.   Yes.  I mean, that's the key issue or one of the key

7    issues about rape is that they're almost always motivated by

8    power than sexual arousal.

9    Q.   And, again, just to be clear, that sentence in no way in

10   your opinion gives you any indication of the deviant sexual

11   arousal pattern?

12   A.   That's correct.

13   Q.   And then it goes on to describe -- well, before I do it

14   more generally:  "He told her to remove her clothes," do you

15   see that?

16   A.   Yes.

17   Q.   Now, one of the things that's been talked a lot about

18   here is getting aroused by the nonconsent.  Dr. Salter's

19   talked about it in her report.  Dr. Doren talks about it.

20   He asks her to take her clothes off; does that seem to fit

21   with someone who's sexually aroused by the physical act of

22   nonconsent?

23   A.    Well, he told her to remove it.  He didn't ask but,

24   yeah, there's nothing in here that would indicate that the

25   primary issue is that he's getting aroused at the idea of

1    nonconsent sex.

2    Q.   And then it goes on to talk about how he completed the

3    act of rape; in that, he ejaculated on and in her, correct?

4    A.   Yes.

5    Q.   Does the mere fact that he was able to ejaculate and

6    complete the crime of rape give you any insight as to whether

7    or not he has a deviant sexual interest in the nonconsent?

8    A.   No.

9    Q.   And, in fact, in order to be convicted of rape, you

10   actually have to cause penetration, correct, if you know?

11   If you don't know, that's okay.

12   A.   I don't know.

13   Q.   Okay, fair enough.  But the fact that he was able to

14   penetrate her and the fact he was able to ejaculate doesn't

15   give you as a scientist any motivation as to what's arousing

16   his sexual interest pattern?

17   A.   That's true.

18   Q.   So taking this case on its own, is there anything in

19   there that would lead you towards a diagnosis of paraphilia,

20   paraphilic rapism, paraphilia NOS (nonconsent), paraphilic

21   coercive disorder?

22   A.   Not on its own, no.

23   Q.   Okay.  And, in fact, I think Dr. Salter in her report

24   actually describes this on Page 13, that this is a fairly

25   typical pattern of behavior for a rape; would you agree

1   with that?

2   A.   Yes.

3   Q.   And there's, in fact, some indication even by the

4   victim's own statement that she knew Mr. Graham to some

5   extent, correct; we don't know to what extent?

6   A.   That's correct.

7   Q.   Now, did you learn anything from Mr. Graham about who he

8   says this victim was?

9   A.   Yes.

10   Q.   And who, if you recall, and if you need to refresh your

11   memory from your report, please feel free to do so; who did

12   he tell you this woman was?

13   A.   Essentially, it was an exgirlfriend; that they had had

14   a sexual relationship, who was wanting to rekindle their

15   relationship, and was angry that he did not want to do that.

16   Q.   Now, we move on to the second sexual offense.  Would it

17   be fair to describe what we know about this as a paucity of

18   information?

19   A.   I would be surprised by how little we know about the

20   second event, yes.

21   Q.   In fact, I put up on the screen here the police report

22   associated with that second offense, and I am going to ask

23   you to read to yourself the entire fact pattern so you

24   become more familiar with it, and then we'll talk about it

25   specifically?

1    A.   Okay.

2    Q.   You're a fast reader ... the first sentence that I've

3    highlighted, can you read that to the Court?

4    A.   "I was informed by the dispatcher of an assault that

5    occurred on the C-O canal."

6    Q.   So the dispatcher -- can you glean from this that the

7    dispatcher's putting over the radio that this was an assault?

8    A.   Yes.

9    Q.   Do you see anything in that that indicates this was an

10   assault with intent to rape as initially put out by the

11   police?

12   A.   No.

13   Q.   Then it talks about how the victim gives a description

14   of the person, correct?

15   A.   Correct.

16   Q.   And can you read the next highlighted portion?

17   A.   "I was searching the area of M Street and Gray Street

18   when I observed an individual that appeared to fit the

19   description."

20   Q.   It says "appeared to fit the description," correct?

21   A.   Yes.

22   Q.   Again, would you classify that as, you know, anything

23   that you know or see in that police report that gives you

24   any indication about the sexual motivations or deviant

25   sexual interests of Mr. Graham?

1    A.    No.

2    Q.    In fact, do you learn anything about what Mr. Graham is

3    alleged to have done in this case?

4    A.    Not from this information, no.

5    Q.    Okay.  Is there some other information where you learned

6    what he actually did that day?

7    A.    All I think we know is that a pregnant woman says she

8    was assaulted.

9    Q.    Okay.  But we don't know what shape, size, or form that

10   assault had, right?

11   A.    That's correct.

12   Q.    We don't know whether or not Mr. Graham grabbed her by

13   the arm, right?

14   A.    Correct.

15   Q.    We don't know whether he choked her, right?

16   A.    Correct.

17   Q.    We don't know whether he tore any clothes off her?

18   A.    Correct.

19   Q.    We don't know whether he was erect or aroused, do we?

20   A.    We do not.

21   Q.    The only thing we do know is that there was no actual

22   rape in this event, correct?  There's no indication that he

23   actually completed the act of rape, right?

24   A.    I know of nothing that says that.

25   Q.    Okay.  So, again, when we go back to our original

1    discussion with his Honor about behaviors alone being not

2    enough and needing to get kind of into the mind of the

3    rapist, is there anything here that allows you to get into

4    his mind?

5    A.   Yes.

6    Q.   What?

7    A.   Well, acknowledging there's incredibly limited

8    information:  there's a pregnant woman.

9    Q.   Okay.

10   A.   So if I was trying to think of a man that might have

11   paraphilia, I might start to wonder:  well, does he have

12   paraphilia?  Does he get deviantly sexual aroused to

13   pregnant woman?  So, in fact, this case, acknowledging we

14   have very limited information, if it did involve some type

15   of sexual arousal involving a pregnant woman, it actually

16   militates against the paraphilia because we do not have

17   evidence at any other point of some type of recurrent

18   intense urges about having sex with pregnant women.

19   Q.   And I think that's a good point that you raised, that

20   paraphilias can be attractions to anything, right?

21   A.   Absolutely.

22   Q.   All right.  So you could have a diagnosis of paraphilia

23   NOS/pregnant women, correct?

24   A.   I mean, that's one of the weird things about paraphilic

25   NOS which -- theoretically, it can apply to anything.  I

1   have seen some incredibly bizarre paraphilias, that there's

2   nothing limiting what a person can develop a paraphilia to.

3   Q.   And, again, going back to some of the things that you

4   mentioned very early on is you're looking for patterns,

5   right; you're looking for scripts; you're looking for some

6   consistency through the separate offenses, correct, to give

7   you an idea?

8   A.   Exactly.  For example, if he -- if we had evidence of

9   three distinct rapes of pregnant women, that's a behavior

10  that independent of anymore knowledge about what he says,

11  could infer there's something going on in his mental state

12  that sexually arouses him about having sex with pregnant

13  women, but we don't have anything.

14  Q.   In fact, if you look at the two that we've gone over

15  now, what, if anything, is -- other than perhaps an interest

16  in committing the crime, what is there that is common between

17  the two?

18  A.   Very little.

19  Q.   Well, the first one involves someone he had some

20  acquaintance with, right; the second one didn't, fair to say?

21  A.   Correct.

22  Q.   The first one didn't involve a pregnant woman and the

23  second one did, correct?

24  A.   Correct.

25  Q.   The first one is someone he was giving a ride home to

```
 1    who had agreed to the ride home; the second one appears to
 2    be just someone who's walking down a toe path by a canal,
 3    correct?
 4    A.   Correct.
 5    Q.   So they're actually very different in a way?
 6    A.   Yeah.  There's nothing in here that indicates scripting
 7    or allows us to diagnose paraphilia.  It's one of the things
 8    in Dr. Salter's report that concerned me a little bit is
 9    that she kept saying things suggest a diagnosis ...
10    considering that anything can possibly be a paraphilia,
11    it's almost impossible to rule out the remote theoretical
12    possibility of a paraphilia but suggesting something is not
13    reasonable medical certainty; that's an entirely different
14    standard.
15    Q.   Let's just pick right up on that right now, and then
16    we'll go back to the third one.  You're talking about
17    Dr. Salter's report where her ultimate conclusion -- let me
18    just find it here --
19              MR. SINNIS:  Bear with me, your Honor.
20              THE COURT:  Uh-huh....
21              MR. SINNIS:  Maybe Mr. Graham could find it -- I
22    mean, maybe Mr. Gold could find it for me....
23              MR. GOLD:  Page 37.
24              MR. SINNIS:  Page 37.  Thank you, Mr. Gold.
25              THE COURT:  What is it you're looking for?
```

1          MR. SINNIS:  I'm looking for a specific passage

2     in her report which Dr. Mills touched on with regard to

3     suggestiveness.  Mr. Gold has found it.  I'll come back to

4     it, your Honor.

5     Q.  But you were indicating that she talks about -- she

6     qualifies her ultimate opinion, correct?

7     A.  Well, it kind of depends on what point in the report.

8     On one hand, she makes a conclusion; on the other hand, when

9     she gives the evidence, she says this set of facts suggests a

10    diagnosis ... and it kind of struck me because there are

11    things all the time that suggest diagnoses that we may then

12    pursue further, but you do not then make a final diagnosis

13    without more information.

14         I think it goes straight to the key of this thing in her

15    report that her assumption is, and from this small group of

16    people that follow Dr. Doren, that merely on the basis of a

17    conviction you can diagnose paraphilia and that's the

18    default ... and so if I don't have any other evidence to

19    disprove it, then, they've got paraphilia; whereas, what

20    the profession does is even in forensic situations which

21    are always a little bit more suspicious because you can't

22    entirely take the defendant's or respondent's word as the

23    truth, the default is still that there's no diagnosis until

24    you have evidence to support.

25    Q.  And looking at Page 14 of her report right here,

1    starting -- can you read that sentence starting with "in"?

2    A.   "In Mr. Graham's case an analysis of the evidence

3    suggests that his sexual assaults are suggestive of

4    paraphilia NOS or paraphilic rapism."

5    Q.   So there are two qualifiers in that one sentence in her

6    opinion, correct?

7    A.   Yes, it's not just a suggestion; it suggests that she

8    suggests.

9    Q.   In your opinion is that to a reasonable degree of

10   medical certainty that he suffers from paraphilia NOS or

11   paraphilic rapism?

12   A.   Not at all.

13   Q.   So even in her own report, she seems to qualify whether

14   or not he would even meet the criteria?

15   A.   Yes.

16   Q.   Now, moving onto the third sexual offense, that one we

17   know a fair amount about, correct?

18   A.   Yes.

19   Q.   And you've read the record on that one?

20   A.   Yes.

21   Q.   Okay.  Did you read an appellate brief that was filed --

22   I'm sorry, an appellate opinion from a higher court that was

23   handed down in that case?

24   A.   Yes.

25   Q.   I'm going to show you Bates stamp 512.  Is that the

```
1    opinion that we were just speaking about?
2    A.   Yes.
3    Q.   And there's a fact section, correct, that starts on
4    Page 513?
5    A.   Yes.
6    Q.   And I think it's probably easier if I just come up and
7    give you that fact section, that section that begins on 513
8    and carries over to 515, and I'd ask you to read it to
9    yourself.  We've gone over it many times in open court, and
10   then we'll just go through it piece by piece....
11   A.   Okay.
12   Q.   I'm just going to get it on my screen.  Okay, did you
13   read that?
14   A.   Yes.
15   Q.   Now, let's go through that a little bit ... what we
16   know through this fact pattern is that Mr. Graham approaches
17   someone who's working in their garden, correct?
18   A.   Yes.
19   Q.   And at some point he leaves and comes back and gives her
20   a plant, correct?
21   A.   Yes.
22   Q.   And then at some point he leaves again and then comes
23   back again, correct?
24   A.   I believe so, yes.
25   Q.   "At approximately," and I'm reading from the second
```

```
 1    page that I gave you, "at approximately 11 a.m. the victim
 2    saw the appellate again standing at a screen door with his
 3    right hand gloved and his left hand pressed against the
 4    glass."  Correct?
 5    A.   Yes.
 6    Q.   "She became apprehensive.  Despite her protests,
 7    appellate pushed his way into the condominium," so he
 8    physically gets his way into her apartment, correct?
 9    A.   Correct.
10    Q.   And then there's a struggle, correct?
11    A.   Yes.
12    Q.   And he chokes her to unconsciousness at some point,
13    correct?
14    A.   Yes.
15    Q.   She comes to, correct?
16    A.   Yes.
17    Q.   And according to the record, she twisted her body so
18    that she could kick the door, correct?
19    A.   Yes.
20    Q.   And then at some point he checks her again into
21    unconsciousness, correct?
22    A.   Yes.
23    Q.   So that's fairly violent there, right?
24    A.   Oh, definitely.
25    Q.   Okay.  According to the record that we have -- I want
```

1    to put this the right way:  the rape itself is obviously a

2    crime of violence, and I don't mean to by my questions

3    suggest that it's not; but other than the actual force

4    needed to penetrate her, from that point on after the

5    second choking incident into unconsciousness, is there any

6    indication of physical violence above and beyond by

7    Mr. Graham?

8    A.   No.  If anything, it's to the contrary.

9    Q.   And why do you say:  "If anything, it's to the

10   contrary"?

11   A.   Well, with the qualification that you stated that

12   clearly rape is a violent act, and this is a horrible event,

13   stating things like he wanted to make love to her and

14   reaching out his hand to her, helping her up, tends to

15   militate against someone who is either a sexual sadist,

16   trying to humiliate an individual, or is particularly

17   sexually aroused by the issue of nonconsent.

18       If I'm going to make inferences from behavior, I need to

19   accept both inferences in one direction and inferences in the

20   other, and these point in the direction away from paraphilia.

21   Q.   Now, let's kind of break that down a little bit.  Let's

22   focus on the first part that is rather violent, okay?

23   A.   Yes.

24   Q.   The stuff that comes all before it says:  "before

25   engaging in sexual intercourse, the victim asked him to be

1    gentle," so focusing on the appellate opinion before that

2    point, is there any indication in that opinion from --

3    which is based upon testimony that occurred in court that

4    Mr. Graham ejaculated prior to the actual sexual intercourse,

5    during the time when he was being violent with her?

6    A.   Oh, not ejaculated.

7    Q.   Okay.  Is there even any evidence that he was sexually

8    aroused or erect at that point?

9    A.   No.

10   Q.   Okay.  So if you were dealing with someone who could

11   properly be diagnosed as suffering from paraphilic rapism,

12   one of the things you might be looking for is:  are they

13   aroused at the time of the violence, correct?

14         MR. GRADY:  Objection, your Honor, it's a leading

15   question.

16         THE COURT:  That's not a leading question.  He's not

17   suggesting the answer.  He's focusing the witness' attention.

18   That's the way I'm interpreting it.  He's focusing the

19   witness' attention to the topic.

20   A.   Can you repeat the question?

21   Q.   Probably not, but we'll give it a go ... if you were

22   trying to determine whether or not someone could properly be

23   diagnosed with paraphilic rapism, would you be looking for

24   evidence that during the commission of the actual violence,

25   the chokings into unconsciousness, that there was some

1    evidence of sexual arousal during that specific time frame?

2    A.   Yes.

3    Q.   Okay, and do you see that here?

4    A.   No.

5    Q.   Now, we move on during the course of this rape which

6    lasts approximately 40 minutes or so and the victim says:

7    "requested that he be gentle."  Do you see that?

8    A.   Yes.

9    Q.   Because she had not had intercourse for about four

10   months, is there any evidence in the record again that he

11   did not comply with that request?

12   A.   No.

13   Q.   So she asked him to be gentle; and from what we know --

14   he still committed the rape; but from what we know, he

15   complied with that request?

16   A.   We don't have any indication otherwise.

17   Q.   Okay.  Now, someone who can only get off on the sexual

18   arousal fact that your partner is not consenting, would they

19   be someone who would be gentle in that circumstance?

20   A.   It would certainly seem to be the contrary.

21   Q.   And then she goes on to say that she requested some tea,

22   correct?

23   A.   Yes.

24   Q.   No indication about that not being complied with at all,

25   correct?

1    A.   We have no evidence one way or the other.

2    Q.   That's right.  And then we hear that Mr. Graham out

3    stretches his arm and says, and this is a direct quote:

4    "Wanted to make love to her in her bed."

5        Does the physical act of outstretching your hand to your

6    rape victim, while it might be creepy and beyond what one

7    might do, does it evidence an arousal to the nonconsent of

8    the rape victim?

9    A.   No.

10   Q.   In fact, what does it indicate?  It indicates that

11   consent somehow in his mind is being established perhaps,

12   correct?

13   A.   Yes.

14   Q.   And then he's able, because we know this through the

15   record, to get aroused and complete the act, correct?

16   A.   Correct.

17   Q.   So, if anything, he's getting aroused to the consent as

18   opposed to the nonconsent?

19   A.   Correct, the misunderstood consent.

20   Q.   That's a better way of putting it, correct, the

21   misunderstood consent ... so, again, looking at this case,

22   are you able to base a diagnosis of paraphilic rapism,

23   paraphilic coercive disorder, paraphilia NOS, based upon

24   the fact patterns as you see them in the record?

25   A.   No, and, in fact, it seems to rule it out.

1    Q.   Now, you just testified -- I think we're done with that

2    one for now.  You just testified that it, in fact, rules it

3    out.  I want to talk -- so that's this case, specifically

4    these facts, this case, you say, ruled out, right?

5    A.   Yes.

6    Q.   I want to talk more kind of theoretically and just

7    globally and just briefly.  You talked to his Honor that

8    there is theoretically a condition called paraphilic coercive

9    disorder or paraphilic rapism, correct?

10   A.   Theoretically.

11   Q.   Now, we've also been using the phrase paraphilic NOS

12   (nonconsent), and that has been put forward by Dr. Salter and

13   also by someone named Dennis Doren, correct?

14   A.   Correct.

15   Q.   Are you familiar with Dennis Doren's writings on this?

16   A.   I have his book.

17   Q.   Okay, and have you read his book --

18   A.   Yes.

19   Q.   -- Evaluating Sex Offenders?

20   A.   Yes.

21   Q.   And would it be fair to say that when you say paraphilic

22   coercive disorder, paraphilic rapism is theoretically

23   possible, you're not saying that paraphilia NOS (nonconsent)

24   as defined by Doren and Salter is theoretically possible;

25   would that be a fair statement, if you understand my

1    question?

2            THE COURT:  I know I don't but....

3    Q.   Okay.  Is there a difference between, in your mind, how

4    you view paraphilic rapism and paraphilic coercive disorder

5    as opposed to how Dr. Doren and Dr. Salter do?

6    A.   Oh, absolutely.  In fact, that's an important

7    distinction; that while anything could possibly be

8    paraphilia, what Dr. Doren has done has really violated the

9    core sin qua non of what paraphilias are, what we tell

10   medical students on Day 1 that this is the most important

11   thing to remember; that it's about internal urges and

12   fantasies.  It's not equated with a sexual offense.

13       If you look at his diagnostic criteria, he has

14   deemphasized the internal mental state to -- and emphasized

15   repetitive knowing behavior; and while this is an interesting

16   concept on his part, it's certainly not accepted by the

17   medical professional community.

18       And, in fact, if anything, if it was going to be an

19   accepted diagnosis, it would almost have to not even be a

20   paraphilia; it would have to be a whole classification system

21   within itself ... because if violence is the core issue of

22   what paraphilias are, deviant, persistent arousal patterns

23   from the internal mental state of the person as opposed to

24   just repetitive knowing behavior ... because if you just

25   start emphasizing repetitive, knowing behavior, essentially,

1    all rapists could fall under that ...  because only the

2    people that are so impaired they don't even know that

3    they're raping someone would not meet the criteria.

4    Q.   And I'm going to show you Dr. First's article, and

5    you're familiar with this article, correct?

6    A.   Yes.

7    Q.   And we've been discussing it in this case.  Can you read

8    what Dr. First says in the highlighted area on Page 451 of

9    his article?

10   A.   "It should be noted however that Doren's formulation

11   does not conform to the DSM-IV-TR diagnostic construct of a

12   paraphilia because it focuses on the offender's repetitively

13   and knowingly acting in sexual contact with nonconsenting

14   persons and only obliquely refers to the core paraphilic

15   focus specifically for sexual arousal to nonconsenting

16   interaction."

17           THE COURT:  Where is this, where is this from?

18           MR. SINNIS:  This is in, this is on Page 451 of an

19   article written by Michael First:  "Use of DSM Paraphilia

20   Diagnoses in Sexually Violent Predator Commitment Cases."

21           THE COURT:  Thank you.

22           MR. SINNIS:  It's an article referred to somewhat

23   during the case, your Honor.

24           THE COURT:  Just so I make it clear on the record

25   where it is.

1        MR. SINNIS:  Yes.  Thank you, your Honor; I

2    appreciate that....

3    Q.   Is that what you were opining right before, in the

4    answer to my previous question?

5    A.   Yes.

6    Q.   It isn't a medical term or scientific term, but would

7    it be fair to say that the positions staked out by Dr. Doren

8    or Dr. Salter is an outlier position within the medical

9    community?

10   A.   That's almost giving it too much credibility.

11   Q.   Okay.  So it's on the fringe?

12   A.   Yes.

13   Q.   And it's even on the fringe, Dr. First, Dr. Francis,

14   these people we've been talking about, they actually agree

15   maybe more than you do; you're on a theoretical point, they

16   actually agree that rarely you can have this diagnosis of

17   paraphilic coercive disorder, but way, way less than Doren

18   and Salter say, right?

19   A.   Well, and I don't want to overstate the theoretical.  I

20   mean, it's theoretical.  I would agree that it probably can

21   exist, but that's correct.  The DSM has taken a very strict

22   orthodox position.  Doren has taken a position that's not

23   even -- it's not even in left field; it's outside the

24   ballpark, and then most people are somewhere closer to the

25   APA standard but maybe are willing to open up to theoretical

1    possibilities.

2    Q.   Okay.   And Doren and Salter are even outliers within

3    those people who can think it's somewhat of a possibility,

4    correct?

5         MR. SAVERY:   Your Honor, I just want to object for

6    the record.

7         THE COURT:   That was leading.

8         MR. SAVERY:   Yeah.

9         THE COURT:   You get that objection.

10        MR. SAVERY:   In addition to the leading, though, his

11   characterization of Salter and Doren as being in sync really

12   mischaracterizes Dr. Salter's testimony.   She explained she

13   lies somewhere between Doren and First, and she explained

14   her differences with Doren.

15        THE COURT:   What's wrong with that?   I think that's

16   an important enough observation so that we can break it down

17   ... if he feels that way about it individually, not as a

18   team.

19        MR. SINNIS:   That's fair.

20   Q.   Have you read Dr. Salter's report?

21   A.   Yes.

22   Q.   Do you find her position to be consistent with the

23   positions of Dr. Francis and Dr. First?

24   A.   No.

25   Q.   I'm sorry?

1   A.   No.

2   Q.   Do you find her position to be consistent with the

3   DSM-TR-IV?

4   A.   No.

5   Q.   Do you find it to be more in line with Dennis Doren's

6   position?

7   A.   Well, it depends.  At different points she kind of

8   argues different things that almost contradict themselves,

9   so at times she seems to be taking Doren's position; at

10  other times, she seems to take a more mediated position and

11  emphasizes how we need to infer behavior or infer internal

12  mental states from behavior.  She seems to be kind of having

13  it both ways.

14  Q.   So you sense some kind of internal inconsistency in her

15  report?

16  A.   Correct.

17  Q.   Okay, and let's give the Court an example of that.

18  For example, on Page 12 where we just talked about this at

19  the beginning of this case, where she says:  "It cannot be

20  doubted that the DSM-IV-TR permits diagnosis of paraphilia

21  NOS by behavior alone," that's a Doren-type position,

22  correct?

23  A.   Yes.

24  Q.   Okay, and then later she goes on in her report and

25  tries to strike a more nuanced view by saying:  well, of

1    course, we'd have to also look to what causes the sexual

2    arousal, correct?

3    A.   Correct.

4    Q.   Okay, and somehow from the same documents you're

5    reviewing, from the same police reports, the appellate

6    opinion that we just reviewed, she's able to draw an

7    inference Mr. Graham that he's aroused to the nonconsent,

8    correct?

9            MR. SAVERY:  Objection.

10           THE COURT:  What's the objection?

11           MR. SAVERY:  Again, it's the leading.

12           THE COURT:  No, I don't think that's leading.

13   Go ahead.

14   A.   I would agree.

15   Q.   And you don't agree with that?

16   A.   No.

17   Q.   All right.  Now, Dr. First in his article actually

18   presents -- I'm not using this in the scientific sense, just

19   in the more layman's sense, some criteria to look for if we

20   want to diagnose this theoretical diagnosis of paraphilic

21   coercive disorder, correct, over here on the second

22   highlighted area?

23   A.   Yes.

24   Q.   And he says:  "Accordingly, evidence must be presented

25   to establish the presence of a deviant sexual arousal

1    pattern in which the offender is aroused specifically by

2    the nonconsensual nature of the sexual act," which is what

3    we've been talking about all morning, right?

4    A.   Yes.

5    Q.   And then he says:  "Examples of such evidence include:

6    admission by the offender that he has had fantasies and

7    urges involving nonconsensual sex."  We don't have that,

8    right?

9    A.   Correct.

10   Q.   And to be fair, you probably rarely do have that, right,

11   in the forensic setting, at least?

12   A.   That's correct.

13   Q.   You might get that in the clinical setting more often,

14   right?

15   A.   That's correct.

16   Q.   All right.  So that's not present, and that goes on.

17   "And it is the nonconsenting aspect of the encounter that

18   becomes sexually gratifying to him," we don't know that;

19   "possession and collection of pornography, in which rape or

20   other forms of coercion are an essential sexually satisfying

21   theme," do we have any evidence of that?

22   A.   No.

23   Q.   "Evidence from consensual partners that the rapist's

24   repeatedly requested role playing of rape scenarios with

25   them."  Do we have any evidence of that?

```
 1    A.   No.
 2    Q.   "Any pattern or lack of sexual responsiveness to a
 3    consenting partner," do we have any evidence of that?
 4    A.   No.
 5    Q.   So if we go through the first criteria, we don't have
 6    any evidence of any of those, correct?
 7    A.   That's correct.
 8    Q.   Okay.  Now, I don't know what the government's going to
 9    do, but they may come and say:  You know who Mary Phargood
10    is, right?
11    A.   Yes.
12    Q.   And you know that in your review of the documents that
13    there was an allegation made by Mary Phargood sometime back
14    in 1985 that Wesley forced her to have sex after she had a
15    hysterectomy, correct?
16    A.   Correct.
17    Q.   And that case was eventually was we call nolle prossed,
18    correct?
19    A.   Correct.
20    Q.   Now, based upon that alone, would you say that that's
21    evidence from a consensual partner that the rapist's
22    repeatedly requested role playing of rape scenarios?
23    A.   No.
24    Q.   Okay.  So, again, he doesn't meet any of those criteria,
25    right?
```

1    A.   Correct.

2    Q.   Now, Dr. Francis, the chair person of the DSM Task

3    Force, who wrote the article:  "Defining Mental Disorder When

4    It Really Counts," also lays out some criteria, correct?

5    A.   Correct.

6    Q.   And he does that on Page 383, and he says that what you

7    should be looking for may include identifying the presence --

8         THE COURT:  Where are you, in the underlying --

9         MR. SINNIS:  Yes, your Honor.  Thank you, your Honor.

10        THE COURT:  Thank you.

11   Q.   "Identifying the presence of ritualistic behaviors,"

12   this is kind of what you were talking about earlier:

13   patterns throughout the course of the crimes, correct?

14   A.   Yes.

15   Q.   Okay.  Francis uses the examples of always uses duct

16   tape to blind victims.  It could be any type of pattern,

17   right?

18   A.   That's correct.

19   Q.   Do you see any pattern by Mr. Graham over the course of

20   the three sexual offenses which are at issue in this case?

21   A.   No.

22   Q.   Nothing that indicates to you he's playing out a script

23   over and over and over in his head?

24   A.   That's correct.

25   Q.   It's correct that there's nothing that indicates that,

1    right?

2    A.   Yes.

3    Q.   "Statements or behaviors that demean the victim, (e.g.,

4    forces her to say that she enjoys being raped)."

5         Now, let's be careful here:  "statements or behaviors

6    that demean the victim," obviously, rape in and of itself

7    demeans the victim, right?

8    A.   Correct.

9    Q.   Mr. Graham's choking the third victim demeans the

10   victim, correct?

11   A.   Correct.

12   Q.   Okay.  Is that what he's talking about in that criteria,

13   I'm sorry?

14   A.   No.

15   Q.   What is he talking about?

16   A.   That's a key distinction.  It's difficult in a rape

17   because clearly it's a violent act.  However, the key aspect

18   of paraphilia is that there's sexual arousal to some deviant

19   object, issue, or fantasy, and paraphilia nonconsent is that

20   the person is specifically getting sexually aroused to the

21   issue of nonconsent ... so that the behavior on one hand

22   might be included as part of the rape, but you have to

23   separate that out and say:  what's actually going on in

24   their internal mental state?

25   Q.   So, for example, let's take the third rape.  If we had,

```
1    just to see if we can bring this into focus, if we had some
2    evidence from the victim or testimony from the victim in
3    that case that when she said to Mr. Graham:  please be
4    gentle; Mr. Graham responded:  hell, no, I'm going to rape
5    you and you're going to like it and you're going to tell me
6    that you like it or some fact pattern to that, to that
7    effect, would that be something that -- what Dr. Francis is
8    talking about there?
9    A.   Exactly.
10   Q.   And we don't have that, right?
11   A.   Correct.
12   Q.   In fact, what we have is him, to the extent that he
13   could ever, given what he was doing to her, obliging that
14   request, correct?
15   A.   Correct.
16   Q.   Next, we have behaviors that demonstrate arousal in
17   controlling the victim; he gives an example of sustaining
18   an erection while the victim was crying or making statements
19   that he or she is being hurt.
20       Again, he sustained an erection to complete the act of
21   rape, but we don't have anything that indicates the type of
22   facts that Dr. Francis is asking a clinician to look for when
23   diagnosing this, do we?
24   A.   That's correct.
25   Q.   So fair to say in your opinion that from everything you
```

1    know about what Mr. Graham did, he doesn't meet any of the

2    criteria listed by Dr. Francis or Dr. First, correct?

3    A.   That's correct.

4         MR. SINNIS:  Your Honor, would you mind if we took

5    the morning break right now?

6         THE COURT:  Sure.

7         MR. SINNIS:  Thank you.

8         THE COURT:  Well, we'll see you back here about

9    quarter of, okay?

10        MR. SINNIS:  Thank you.

11        THE CLERK:  All rise.

12        THE COURT:  Maybe you can figure out --

13        MR. GRADY:  We're working on that, your Honor.

14        THE COURT:  -- the schedule....

15        (Whereupon, a brief recess convened.)

16        THE COURT:  Sit down everybody.

17        THE CLERK:  Clerk all rise for the Honorable Court.

18        THE COURT:  Sit down, please.  Were you able to work

19   things out?

20        MR. GRADY:  Yeah.  I think if we finish this witness

21   today, there's no reason to bring back the other one.  We

22   would rest.

23        THE COURT:  Okay, so let's move fast.  Thank you.

24        MR. SINNIS:  I will do that, your Honor....

25   Q.   Okay.  Dr. Mills, you indicated a little bit earlier

1    that the APA takes a strict view of the DSM's position on

2    paraphilic rapism, correct?

3    A.   Yes.

4    Q.   And what is that view as you understand it?

5    A.   Well, they considered it as a separate diagnosis and

6    rejected it.

7    Q.   And that's their view then?

8    A.   Correct.

9    Q.   That it shouldn't have been in the DSM, correct?

10   A.   As a separate diagnosis, correct.

11   Q.   And if I understand your position, you might even take

12   less of a hard line, that there are times where you can

13   actually diagnose this, but you'd need to see a lot?

14   A.   Correct.

15   Q.   And very briefly --

16           THE COURT:  What about the NOS?

17           THE WITNESS:  That's what I would diagnose it under

18   if I saw it but it's -- the evidence that would take to

19   support it would have to be very high, and one of the

20   mistakes I think that is made by some of the folks involved

21   with this is they -- they take the seriousness of the matter

22   as criteria to change the rigor of the diagnostic criteria.

23       And one of the examples that I was taught was that if a

24   person comes in with a cough, it could be let's say a really

25   bad cough, it could be a common cold; it could be lung

1   cancer ... but the mere fact of the seriousness of the one

2   of the possibilities does not make you lower the diagnostic

3   threshold to diagnose lung cancer.

4       It actually makes you be more careful and do -- run more

5   tests to make sure you diagnose lung cancer.  Though, the

6   equivalent that some of these folks like Doren are doing in

7   this matter is they're saying that a patient comes in with a

8   cough, because one of the possibilities here is lung cancer,

9   I should immediately diagnose them with it and put them on

10  toxic chemotherapy.  It's a violation of just fundamental

11  diagnostic procedures that something that's rare and more

12  serious you're actually more careful about.

13  Q.   And is that even more true when you're doing something

14  in the forensic setting as opposed to the clinical setting?

15  A.   On multiple levels, yes.  I mean, in the forensic

16  setting, there's clearly -- I've spent my whole career

17  interviewing people in forensic type of situations;

18  they're not always the most honest people.

19      It's one of the problems with the DSM, in that it was

20  never standardized on forensic populations, and so any time

21  you're using the DSM in a forensic setting there almost

22  should be an asterisk beside it because from a straight

23  scientific perspective it's never been standardized in those

24  populations ... so that in the whole DSM in some ways there's

25  an inference any time it's used in a forensic setting; but

1    if you're gonna diagnose a rare condition with serious

2    possible implications and it's in a legal matter, you've got

3    three reasons already to actually tighten your diagnostic

4    standards as opposed to loosen them, which, for some reason,

5    Doren and his folks go in the other direction.

6    Q.   In fact, the DSM cautions on this at Page Roman Numeral

7    XXXIII 23 -- 33, and can you start reading the sentence that

8    I've underlined there?

9    A.   "In most situations the clinical diagnosis of a DSM-IV

10   mental disorder is not sufficient to establish the existence

11   for legal purposes of a mental disorder, mental disability,

12   mental disease, or mental defect."

13   Q.   Is that what you're speaking of to some extent?

14   A.   One element of it; that the reasoning behind that is

15   because when a student asks me:  well, why is that; shouldn't

16   that just apply?

17       Well, when they did studies on schizophrenia, they did

18   not go into prisons and study people that had been either

19   convicted or study people that were facing charges ... and

20   so any time you're making conclusions about a population that

21   you did not study, it's inferential.  That doesn't mean you

22   can't do it, but it means you have to be a little bit more

23   cautious.

24   Q.   And in your opinion this diagnosis under either the

25   paraphilia NOS or if you want to call it paraphilic coercive

1    disorder or paraphilic rapism, the facts presented in this

2    case, is it even a close call here in your judgment?

3    A.   No.

4    Q.   It's not even a close call?

5    A.   No.

6    Q.   Now, one other basis that Dr. Salter testified to with

7    regard to why she could diagnose this under the paraphilias

8    is that in the introduction to the paraphilias they use the

9    phrase in the introduction:  "of children or other

10   nonconsenting persons."  Do you see that highlighted there?

11   A.   Yes.

12   Q.   Okay.  In your opinion was the use of nonconsenting

13   persons there meant to apply to a group of people such as

14   Mr. Graham?

15   A.   No.  And, in fact, the DSM group has clarified that to

16   say that was not the intent.

17   Q.   Okay.  And, in fact, maybe one of the people you were

18   mentioning when you speak about the group is Dr. Francis,

19   again, in his article?

20   A.   Yes.

21   Q.   Okay.  And on Page 381, sorry -- Page 380 here, could

22   you read that highlighted portion that starts with "the

23   other"?

24   A.   "The other misleading aspect was the narrative in the

25   introduction of the paraphilias that one type was nonconsent.

1   The term nonconsenting person was meant to apply only to

2   exhibitionism, voyeurism, and sadism.  It was not meant to

3   signify rapism specifically.  Rape was not included as a

4   coded diagnosis nor as an example of NOS."

5   Q.   Now, I want to -- he uses the word "misleading," and I

6   just kind of want to explore that a little bit.  I mean, do

7   you think it is somewhat misleading for Dr. Salter to say

8   that "nonconsenting persons" actually applies to someone

9   like Mr. Graham, given the literature that's out there in

10  the scientific community?

11  A.   Well, you know, misleading would presume some intent,

12  and I do not know Dr. Salter.  I would say it's inaccurate;

13  and at a minimum, if you're going to take an extreme outlier

14  position, you should clarify that, in fact, that's what

15  you're doing.

16  Q.   And does she do that here?

17  A.   I did not see that.

18  Q.   And you would characterize her opinion as being an

19  outlier position?

20       MR. SAVERY:  Objection, your Honor, just to the

21  extent it's made clear and he's basing this on --

22       THE COURT:  That's leading; you can have that one.

23  I'll sustain it.

24       MR. SAVERY:  And not only that, but he wasn't here

25  for her testimony; he's basing it solely on her report.

1    Q.   Based on her report, how would you characterize her

2    position?

3            THE COURT:  I think that's a fair observation, but I

4    presume we all understood that.  Go ahead, ask the question.

5    Q.   Based upon her report, how would you characterize her

6    position?

7    A.   Quite inaccurate.

8    Q.   I'm sorry?

9    A.   Quite inaccurate.

10   Q.   Inaccurate?

11           THE COURT:  Quite inaccurate he's saying.

12   Q.   Thank you.  Okay.  I want to move on away from the

13   paraphilia aspect.  You've diagnosed Mr. Graham with

14   antisocial personality disorder, correct?

15   A.   Yes.

16   Q.   Okay.  Now, is it your opinion that antisocial

17   personality disorder standing alone can justify civil

18   commitment?

19   A.   I do not believe so.

20   Q.   Okay.  Why do you not believe so?

21   A.   Well, for a variety of reasons.  The core component is

22   that medical standards say that antisocial personality

23   disorder is not a serious mental disorder, and it's not

24   typically used for those purposes.  In fact, if anything,

25   the diagnosis indicates quite the opposite.

1    Q.   Okay.  And when you say "it's not a serious mental

2    disorder," what do you base that upon?

3    A.   Common practice and the literature.

4    Q.   And did you testify on this concept during the U.S. V

5    Wilkinson case?

6    A.   I believe so.

7    Q.   Now, let's assume that -- well, we don't have to assume;

8    you diagnosed him with antisocial personality disorder,

9    correct?

10   A.   Correct.

11   Q.   What does aging -- what effect, if any, does aging have

12   on antisocial personality disorder?

13   A.   Aging is the most single robust factor that shows a

14   decrease in the behavior, the intensity, the acting out.

15   It's not a perfect factor, but of all of them it's probably

16   the single most important.

17   Q.   And from looking at the DOP records, and I'm just going

18   to show you some.  Here's page Bates stamped 29, which is a

19   U.S. Department of Justice document, Extra Good Time

20   Recommendation is the title here.

21       When Mr. Graham was at FCI McKean back on December 1 of

22   2004, before the Adam Walsh Act, what does it say in the

23   highlighted portion?

24   A.   "I recommend meritorious good time."  Then it goes down

25   to say:  "His performance is consistent with a level that

1    warrants receiving meritorious good time.  He is dedicated

2    and helpful when needed."

3    Q.   Is that a reflection of someone who is currently

4    severely suffering from antisocial personality disorder in

5    your opinion?

6    A.   It could be.  I mean, certainly within a structured

7    institutional setting, people with antisocial personality

8    disorder can behave.  Even in the free world, they can

9    behave but it's -- the fact of the diagnosis now is a

10   lifetime diagnosis for the most part because even if he

11   shows no signs of it for the next four or five years, for

12   the most part, he's still going to have the diagnosis.

13   Q.   Is it kind of like alcoholism in a way:  once an

14   alcoholic, always an alcoholic?

15   A.   That is analogous, yes.

16   Q.   And then again we have another record which indicates,

17   this is Bates Numbered 23:  "Discipline data does not exist

18   for this inmate."

19       Would you anticipate seeing some sort of disciplinary

20   record for someone who is -- you know, I don't want to use

21   acutely, but, you know, really in the throws of antisocial

22   personality disorder; is that one thing you might look to?

23   A.   Yes.

24   Q.   All right.  And we already went through, and I'm not

25   going to do it again for time sake, we went through his

1    work in prison as well; did those documents that I showed

2    you earlier cut against a kind of acute antisocial

3    personality disorder which Mr. Graham has been present upon?

4    A.   Well, either way, I think he has antisocial personality

5    disorder, but he's maturing; he's growing older, which it's

6    not uncommon for people with antisocial personality disorder

7    that their behaviors start to change after about the age of

8    40.

9    Q.   I guess that's what I'm trying to get at ... do these

10   records help you come to that conclusion that his behavior is

11   changing over time?

12   A.   Oh, yes.

13   Q.   Okay.  Now I just want to touch on a couple of things in

14   your report.  You go to some length in your report on the

15   issue of suffering, correct, as used in the statute?

16         THE COURT:  The issue of what, I'm sorry?

17         MR. SINNIS:  Suffering.

18   Q.   The statute uses the word "suffering," correct,

19   Dr. Mills?

20   A.   Yes.

21   Q.   And you go to some length about that in your report,

22   correct?

23   A.   Yes.

24   Q.   Okay.  Now, you -- well, can you tell the Court how you

25   interpreted the word "suffering" when you were first getting

1   into this case?

2   A.   Well, I thought it was a unique choice of words, and I

3   may have over interpreted it, but to me it was different

4   than they -- just as opposed to saying the person has a

5   certain condition or disorder, it says that they suffer

6   from a condition or disorder.

7       There are multiple meanings too about suffering in the

8   medical context.  Frequently people use that in the context

9   of not so much that a person has a condition but that they

10  are experiencing distress, personally, that they express as

11  a result of that, but I'm fully willing to acknowledge that

12  there are multiple meanings to that term.

13          THE COURT:  It could be symptomatic as a result of?

14          THE WITNESS:  Yes.

15          THE COURT:  Is that it?

16  Q.   So I guess what I'd like to know is if we replace the

17  word "suffering," as you analyze it in your report, and as

18  used, as it appears in the statute the word just have, you

19  know, does Mr. Graham have a serious mental illness or

20  disorder, would your opinion as reflected in your report be

21  the same?

22  A.   Except for that section nothing else would be changed.

23  Q.   All right.  Except for the section discussing suffering,

24  correct?

25  A.   Correct.

1   Q.   So you would still conclude that he does not have a

2   serious mental illness or disorder, correct?

3   A.   Correct.

4   Q.   Now, you also go on in some length about the use of the

5   phrase "serious" or the word "serious" in terms of describing

6   mental illnesses, correct?

7   A.   Correct.

8   Q.   Okay.  Can you tell the Court how as a medical

9   professional the term "serious mental illness" or "disorder,"

10  what your interpretation of that means?

11  A.   Well, it's a unique choice of words because not unlike

12  the issue with suffering, "serious" clearly on one hand can

13  mean a condition with serious implications of which

14  antisocial personality disorder or paraphilias would meet

15  that criteria, but I was struggling when I read it that

16  that's not what it says.  It actually says "serious mental

17  disorder," which in the medical field has kind of a special

18  meaning.

19     If you review the literature, there is this kind of

20  construct used frequently of serious mental disorder, major

21  mental disorder, serious mental illness, or major mental

22  illness, that has a fairly clear meaning of certain

23  diagnoses that consistently does not include antisocial

24  personality disorder or paraphilias.  In fact, it frequently

25  says that those don't meet the criteria for that.

1    The reason being that from a medical model, those are not

2    conditions that usually lead to an impairment in a person's

3    ability to control their behavior or doesn't really need

4    hospitalization.  I mean, the literature's fairly clear on

5    this.

6    Q.  I want to show you one article on that.  Are you

7    familiar with this article:  Prevalence and Treatment of

8    Mental Disorders?

9         MR. SAVERY:  Your Honor, we're going to object.

10    There's been no reliance on this authority or any other on

11    this point of seriousness in Dr. Mill's report and having

12    deposed him, we didn't hear any news of this article, and we

13    haven't seen it before coming up on the screen.

14         MR. SINNIS:  They had seven hours and 226 pages of

15    deposition testimony of a court-appointed expert.  He's not

16    our expert where they could have asked him anything under the

17    sun.  They chose not to.  They delved into this issue of

18    what he means by seriousness for probably 50 pages of the

19    deposition.  I think this isn't anything new; this is fair

20    game, I believe.

21         THE COURT:  Well, let's just assume you don't need

22    this; it might be superfluous.

23    Q.  Are you familiar with this article?

24    A.  Yes.

25    Q.  And this appeared in the New England Journal of

```
1     Medicine?
2            THE COURT:  We're not going to have this.
3            MR. SINNIS:  Oh, I'm sorry.  You're telling me -- oh,
4     you're sustained the objection?
5            THE COURT:  I did.
6            MR. SINNIS:  I'm sorry, your Honor.
7            THE COURT:  You're so used to winning....
8            MR. SINNIS:  I did, I thought I won that one.
9     Q.   In any event, your definition of the way you consider
10    "serious" is commonly accepted within the medical profession?
11    A.   Yes.
12    Q.   Would it be fair to say though even for purposes of
13    this legal proceeding paraphilia coercive disorder,
14    paraphilic rapism, paraphilia NOS (nonconsent) was
15    considered by the Court or by the statute to be a serious
16    mental illness, would your opinion still be the same that he
17    does not suffer from that illness?
18    A.   That is correct.
19    Q.   So your conclusion is not based upon what the word
20    "serious" means, it's based upon the fact that he just
21    doesn't have this?
22    A.   Both, but more the latter.
23    Q.   Okay.  And standing alone, though, you say both, but
24    more the latter; if we're just focused on the latter, does he
25    have it?
```

1          THE COURT:  The latter being?

2     Q.   Does he have paraphilia NOS (nonconsent), does he have

3     paraphilic coercive disorder, does have paraphilic rapism?

4     A.   Correct.  Even if it was determined that "suffering"

5     was meant to have, and that antisocial personality disorder

6     and paraphilia were serious mental disorders, I would still

7     have the same opinion because he doesn't have them.

8     Q.   Well, he has ASPD, but he doesn't have the other?

9     A.   Correct.

10         THE COURT:  This is not to prod you, but just to

11    alert you that today I have a physical therapy appointment

12    at 5:30 in Marblehead, which means I have to leave here no

13    later than 4:15.  The doctor doesn't wait for me....

14         MR. SINNIS:  I'm going to check my notes.  I may be

15    done, your Honor, and I may be able to hand it off to

16    Mr. Grady.  Let me just check with Mr. Gold....

17    Q.   Just a couple more questions very briefly.  Is your

18    opinion as to risk of reoffense contained in your report?

19    A.   I believe so, yes.

20    Q.   Okay.  There is actually one brief area I want to hit

21    upon.  In your report while you say he's not sexually

22    dangerous, correct --

23    A.   Correct.

24    Q.   -- as defined by the statute, correct --

25    A.   Correct.

1    Q.  -- you do express some concern about the fact that

2    Mr. Graham doesn't have any parole, probation, supervised

3    release, awaiting him should the Court say he's not a

4    sexually dangerous person, correct?

5    A.  That's correct.

6    Q.  And your concern there is that where is he going to go,

7    where is he going to live, what's he going to do, things

8    like that; he's been in jail for 22 years?

9    A.  Someone that has borderline intellectual functioning and

10   antisocial personality disorder that hasn't been in the free

11   world for a long time, it would be nice if he had some

12   structure and supportive situation as opposed to just

13   saying go to a homeless shelter or something like that.

14   Q.  And since you wrote that report, have you reviewed the

15   deposition transcripts of Ivan and Floyd Young?

16   A.  Yes.

17   Q.  And did they give you more comfort in terms of what's

18   awaiting him on the outside?

19   A.  Yes.

20        MR. SINNIS:  Nothing further.

21        THE COURT:  Just as a matter of curiosity on my

22   part, I probably should know the answer to this:  if he's

23   committed, or if anybody is committed, how long is that

24   commitment:  forever or what triggers a review?

25        MR. SINNIS:  Well, I believe under the statute if

```
1    he's committed or if anybody's committed under the statute,
2    there is a right of renew I believe annually from the date
3    of the decision.
4              THE COURT:  Is it annually; is that what it is?
5              MR. GRADY:  That's correct, your Honor.
6              THE COURT:  I thought there was something, but I
7    couldn't pinpoint it in my mind ... thank you.
8              MR. SAVERY:  I just need one minute, your Honor?
9              THE COURT:  Yes, take your time....
10             CROSS-EXAMINATION BY MR. SAVERY:
11   Q.   Afternoon, Dr. Mills.
12   A.   Greetings.
13   Q.   When you first took the stand, you were asked some
14   questions about a portion of Dr. Salter's report;
15   specifically, this section here and the quotes it contains;
16   do you recall that?
17   A.   Yes.
18   Q.   Okay, and I believe you testified that her report
19   suggests that a person has paraphilia merely because they're
20   charged with a crime.  Do you recall that testimony?
21   A.   Yes.
22   Q.   Okay.  That's not what Dr. Salter says here, right?
23   A.   That's, I mean, not explicitly; that is the implication
24   of what she's saying.
25   Q.   Okay.  Well, let's read what she actually writes?
```

1    A.   Okay.

2    Q.   Okay.  First & Halon, and we spent some time with First

3    & Halon's article, correct?

4    A.   Yes.

5    Q.   First & Halon have written that:  "Paraphilia NOS cannot

6    be diagnosed simply on the basis of multiple rapes," and her

7    next words:  "And this evaluator agrees," right?

8    A.   Yes.

9    Q.   Okay.  So that's what she says there, that she agrees

10   it can't be diagnosed simply on the basis of multiple rapes,

11   correct?

12   A.   Yes.

13   Q.   Okay, next line:  "They have made the claim that sexual

14   urges and fantasies are essential to the diagnosis," see

15   that?

16   A.   Yes.

17   Q.   And this is clearly true, this is Dr. Salter's view,

18   right?

19   A.   Correct.

20   Q.   Okay.  "It's clearly true that paraphilia NOS is

21   distinguished from other forms of rapes specifically by the

22   internal motivation for the rape," right?

23   A.   Correct.

24   Q.   Okay.  She doesn't say there:  you just see if there's a

25   rape; and if there is or if there is a history of rapes, you

1    can diagnose paraphilia, correct?

2    A.   That's correct.

3    Q.   Now, let's go down to the quoted language here, the

4    passage from the draft or the in-press version of First &

5    Halon.  I believe you testified that this suggests that you

6    can rush to the paraphilic diagnosis, or something along

7    those lines, right?

8    A.   It's the default.

9    Q.   You're suggesting that paraphilia is the default

10   according to this quoted passage?

11   A.   That's how I read it.

12   Q.   Well, let's read it.  Let's see what it says.  "The

13   diagnostic task as it pertains to SVP civil commitment cases

14   is for the expert to consider what other conditions besides

15   the paraphilia are possible causal conditions for the sexual

16   offense and to rule them out before concluding that the

17   sexual offense is a direct consequence of the paraphilia."

18       Now, that doesn't say to presume that the paraphilia is

19   the causal factor, correct?

20   A.   Actually, the only thing you're ruling out is things

21   other than paraphilia so I would disagree.

22   Q.   Well, doesn't this, sir, presume that you've got a

23   paraphilia in existence?

24   A.   Exactly.

25   Q.   Yes.  It presumes that you're in a position to make a

1    diagnosis of paraphilia; and once you make that diagnosis,

2    to determine whether the paraphilia is causing the conduct,

3    you look at all other possible causes and then you try to

4    rule them out.  And only after you rule out all the other

5    possible consequence -- causes of that conduct, can you then

6    determine that paraphilia is the cause; isn't that what this

7    is saying?

8    A.   Yes.

9    Q.   Okay.  Thank you.  Now, and you got some more questions

10   regarding whether paraphilia can be diagnosed on the basis

11   of behaviors alone, right?

12   A.   Yes.

13   Q.   And you noted that it's Francis' position that you can't

14   diagnosis a paraphilia on the basis of behavior alone, right?

15   A.   That's correct.

16   Q.   Let's take a look at what Francis says.  We're now at

17   the Francis article entitled:  Defining Mental Disorder

18   When It Really Counts, DSM-IV-TR, and SDP/SVP statutes at

19   Page 380.

20       He says:  "The distinction does not mean that paraphilia

21   NOS cannot or should not be used to describe some individuals

22   who commit coercive sexual acts," so he's saying there that

23   the NOS designation can be an appropriate diagnosis in some

24   cases generally?

25   A.   Yes.

Q.   And a little further down, let's see what the
highlighted words say here:  "One acceptable standard for
using it may be to demonstrate clear substantiation of urges
and fantasies."  Do you see that?

A.   Yes.

Q.   "Either as inferred by the acts perpetrated on the
victim"?

A.   Yes.

Q.   Okay, let's take that in isolation for a second ...
he's saying here that one standard for using NOS may be to
demonstrate clear substantiation of urges and fantasies as
inferred from the acts perpetrated on the victim, right?

A.   Correct.

Q.   So we're going to look at the acts and see if we can
infer from those acts whether there are urges and fantasies,
correct?

A.   Correct.

Q.   All right.  That's something that Francis signs onto in
this article, right?

A.   Absolutely.

Q.   Okay.  And then in the alternative, he says:  "or by
the interview information so as to distinguish it from
criminal behavior that's not rooted in sexual
psychopathology," right?

A.   Correct.

```
 1    Q.   Let's go to the next page; this is now 381:  "Attempts
 2    to describe rape-related paraphilia is a difficult
 3    diagnostic endeavor."  Do you see that?
 4    A.   Yes.
 5    Q.   And that's something you agree with?
 6    A.   Yes.
 7    Q.   Okay.  Down below:  "In some instances the behaviors
 8    demonstrated can be articulated to reflect paraphilic urges
 9    and fantasies," right?
10    A.   Yes.
11    Q.   Again, "the behaviors themselves can display signs that
12    there are paraphilic urges and fantasies at play," right?
13    A.   Well, I wouldn't use the word "display."  That to me is
14    a little bit different than inferred or articulated to
15    reflect.
16    Q.   Okay, that's fine.
17    A.   And it's close.
18    Q.   Okay.  "In other instances it may be more accurate
19    diagnostically to render only the antisocial personality
20    disorder."  That's how that paragraph finishes, correct?
21    A.   Yes.
22    Q.   And I believe Mr. Sinnis spent some time with you on
23    this paragraph, and that's on Page 383 in the same article.
24    It begins:  "For paraphilia NOS, one approach may be to
25    demonstrate that there are sufficient case data regarding
```

1    the individual's underlying deviant fantasies and urges

2    upon which he has acted so as to conclude he is predisposed

3    to commit dangerous sexual offenses."

4         Do you see that?

5    A.   Yes.

6    Q.   Okay.  So here, again, it's an instance where he's

7    suggesting that we can conclude a predisposition to commit

8    dangerous sexual offenses merely from case data in certain

9    circumstances, right?

10   A.   That's what he is saying.

11   Q.   Okay.  I thought you agreed with Francis in this

12   article?

13   A.   Well, I don't agree with everything he says.

14   Q.   Oh, okay.  So that part you don't agree with?

15   A.   I don't like the word "predisposition."

16   Q.   Okay.  You do agree, though, that it's not the absolute

17   rule that -- or I'll withdraw that.

18        You do agree there's no absolute rule that you can't

19   diagnose, cannot diagnose a paraphilia on the basis of

20   behaviors alone, correct?

21   A.   I would disagree with that.

22   Q.   Well, you said in your own testimony that there are

23   instances where inferences can be made of sexual deviant

24   arousal patterns merely from behaviors, right?

25   A.   The emphasis is on the inferences, not on the behaviors.

1    Q.   Okay.  Well, let's say this:  in those instances you

2    don't have necessarily a defendant or a respondent or an

3    individual confessing to you that he has these urges or

4    fantasies, right?

5    A.   Most of the time, correct.

6    Q.   Okay.  And so in those instances, sometimes you can

7    look at the conduct and you can make inferences regarding

8    urges and fantasies, right; you agree with that?

9    A.   Correct.

10   Q.   Okay.  Now, before we jump in deeply here, you also

11   testified on direct concerning a Bureau of Prisons intake

12   screening report; do you recall that?

13   A.   I don't remember that title, but I know there were

14   several reports like that, yes.

15   Q.   Okay.  And there was a favorable finding in the report,

16   do you recall that?

17   A.   Yes.

18   Q.   Okay.  And in your view, that favorable finding

19   suggests there was no mental condition that needs to be

20   addressed with Mr. Graham.  That was -- these are your words;

21   I believe the record will speak for itself, but do you

22   recall that testimony?

23   A.   Yes.

24   Q.   I'm showing you the first page of what's been marked

25   Exhibit 7, and it's titled:  Federal Bureau of Prisons

1    Psychology Data System.  Have you seen this document before?

2    A.   Yeah, I'm not sure.  If it was, if it was one of the

3    Bates-stamped documents, then, yes, I think I have seen it.

4    Q.   What I'll do is I'll move this up --

5    A.   Oh, yeah.

6    Q.   -- to display the Bates No.

7    A.   I've seen that.

8    Q.   You're now able to say you've seen it?

9    A.   Yeah.

10   Q.   Okay.  And it reads, first off, this is authored by a

11   Dr. Rhinehart, right?

12   A.   Correct.

13   Q.   At McKean?

14   A.   Yes.

15   Q.   And it reads:  "I have reviewed this inmate's psychology

16   file and SENTRY files.  He was recommended for both drug

17   treatment and sex offender treatment but has declined

18   participation in both."

19       Do you see that?

20   A.   Yes.

21   Q.   All right.  That's not news to you; you were aware that

22   Mr. Graham had denied both drug treatment and sex offender

23   treatment?

24   A.   Definitely.

25   Q.   Okay.  Well, someone in the Bureau of Prisons felt that

```
1    he should have sex offender treatment, right?
2    A.   Yes.
3    Q.   They recommended it on a number of different occasions,
4    correct?
5    A.   I believe that's true, yes.
6    Q.   And he declined to participate, is that right?
7    A.   That's true.
8    Q.   All right.  So when you say that, Doctor, you had
9    reviewed that favorable finding in the other documents
10   suggested no mental condition that needs to be addressed,
11   again, someone felt at the Bureau of Prisons that
12   Mr. Graham's condition should have been addressed with
13   sex offender treatment, right?
14   A.   That's true.
15   Q.   Okay.  Is it fair to say Dr. Mills that your
16   professional background is not focused on sex offender
17   issues, specifically?
18   A.   That's true.
19   Q.   Okay.  You do have substantial experience regarding
20   dangerousness issues, right?
21   A.   Yes.
22   Q.   Okay.  But those are under a general dangerousness
23   statute and not a sex offender dangerousness statute, right?
24   A.   Well, only my experiences beyond any specific statute,
25   correct.
```

1    Q.   Okay.  But you've testified only once in court on the

2    issue of sex offender dangerousness under a sex offender

3    commitment statute, right?

4    A.   Either once or twice, but, yes.

5    Q.   Okay.  Well, that was in the Wilkinson case that you

6    mentioned in your testimony earlier this morning, right?

7    A.   Yes.

8    Q.   Okay.  It was about a year ago?

9    A.   Correct.

10   Q.   And prior to your involvement in the Wilkinson case,

11   you had never been called on to issue an opinion as to

12   whether someone qualified for civil commitment under a sex

13   offender civil commitment statute --

14   A.   That's correct.

15   Q.   -- right?  Okay.  Now, the term "sex offender" appears

16   nowhere in your CV, right?

17   A.   I don't believe so.

18   Q.   Okay.  You don't belong to any professional

19   associations or committees having to do specifically with

20   sex offenders, right?

21   A.   Specifically, no.

22   Q.   Okay.  Are you familiar with ATSA?

23   A.   Yes.

24   Q.   What do the letters A-T-S-A stand for?

25   A.   I believe it's the association for the treatment of sex

1    offenders or sexual deviants.

2    Q.   Is it the Association for the Treatment of Sexual

3    Abusers?

4    A.   That sounds right.

5    Q.   And you're not a member of that organization, right?

6    A.   That's correct.

7    Q.   Okay.  And that's, in part, because you don't consider

8    yourself to be working full time in the sex offender area,

9    correct?

10   A.   I wouldn't say that's the primary reason, but that would

11   be part of it, yes.

12   Q.   Okay.  It's also partly because you don't want to have

13   to pay dues for another association, is that correct?

14   A.   Partially, yes.

15   Q.   You're familiar with the APA, correct?

16   A.   Yes.

17   Q.   And that's the American Psychological Association?

18   A.   It is.  Well, there's two.  There's the American

19   Psychiatric and the American Psychological Association.

20   Q.   Okay.  You're a member of neither of those, is that

21   right?

22   A.   Correct.

23   Q.   You haven't written any peer-reviewed articles

24   regarding sex offenders, correct?

25   A.   That's correct.

1    Q.   Regarding sex offender treatment, evaluation,

2    recidivism, you haven't written any peer-reviewed articles

3    on those subjects, correct?

4    A.   That's correct.

5    Q.   Your CV lists a number of publications, right?

6    A.   Yes.

7    Q.   And you've written at least one book or edited at least

8    one book, correct?

9    A.   Correct.

10   Q.   Not on sex offender issues?

11   A.   Right.

12   Q.   That was on mythological issues?

13   A.   Cultural Studies.  In fact, could I add something?

14   Q.   Well, on redirect you can if --

15   A.   I'm sorry.

16   Q.   You can explain --

17            THE COURT:  Well, you know, did you misspeak?

18            THE WITNESS:  Yes.  I'm just realizing that when I

19   said my CV was updated that I made a mistake.  I've actually

20   received my Ph.D. since this CV, so I've got a Ph.D. now too.

21            THE COURT:  All right.  Go ahead.

22   Q.   Does your Ph.D. dissertation have anything to do with

23   sex offenses?

24   A.   No.

25   Q.   Okay.  Did it focus on civil commitment issues, right?

```
1    A.   No.
2    Q.   In fact, your Ph.D. is in cultural studies and
3    religions, is that right?
4    A.   That's correct.
5    Q.   And your dissertation concerns post-colonialism and
6    terror in the Hindu Goddess tradition?
7    A.   That's correct.
8    Q.   In your view, Doctor, the concept of a sexually
9    dangerous person, as that term is used under the Adam Walsh
10   Act, is not a scientifically valid entity, right?
11   A.   That's correct.
12   Q.   Okay.  Did you give an opinion this morning that
13   Mr. Graham is a sexually dangerous person under the statute?
14   A.   Yes.
15   Q.   Okay.  But you agree it's not a scientifically valid
16   entity, that's your position, correct?
17   A.   Absolutely.
18   Q.   All right.  And in your view, it's not a scientifically
19   valid entity for medical review because the symptoms of the
20   condition of being a sexually dangerous person in your words
21   here:  "must predictably cluster and remain stable over
22   time"?
23   A.   That's one of the reasons, yes.
24   Q.   And in your view, there is a lack of substantive
25   scientific research on the concept of a sexually dangerous
```

1    person as that term is used again, right?

2    A.   Yes.

3    Q.   All right.  You testified at your deposition that

4    because you're not in a position to offer an opinion to a

5    reasonable degree of medical certainty -- I'm going to

6    withdraw that question.

7         It's also your view, am I right, that because of the fact

8    that this is not a valid scientific entity in your opinion,

9    you're not in a position to offer an opinion to a reasonable

10   degree of medical certainty here as to whether someone meets

11   the statutory definition of a sexually dangerous person,

12   right?

13   A.   That's correct.

14   Q.   Okay.  So you gave us your views that Mr. Graham was a

15   sexually dangerous person, but that's not an opinion that you

16   hold to a reasonable degree of medical certainty, correct?

17   A.   That's incorrect.

18            THE COURT:  That's incorrect?

19            THE WITNESS:  That's incorrect.

20   Q.   Well, in your view, again, to use your words:  "It's

21   very problematic for a psychiatrist to testify to a

22   reasonable degree of medical certainty that an individual

23   is or isn't a sexually dangerous person as that term is

24   used in the statute," right?

25   A.   Yes.

1    Q.   Okay.  Now, it is your opinion, again held to a

2    reasonable degree of medical certainty, that Mr. Graham has

3    antisocial personality disorder, right?

4    A.   Yes.

5    Q.   Now, you reviewed the relevant statutes here for

6    purposes of your evaluation, correct?

7    A.   Yes.

8    Q.   And you examined the phrase "serious mental illness,

9    disorder, or abnormality"?

10   A.   Yes.

11   Q.   And antisocial personality disorder you agree is a type

12   of mental disorder, right?

13   A.   Yes and no.  I mean, unfortunately, it kind of crosses

14   both worlds, but I would agree that it's certainly in the

15   DSM.

16   Q.   It's in the DSM, and the DSM lists mental disorders,

17   right?

18   A.   Yes.

19   Q.   Okay.  The DSM, you'll agree with me, acknowledges that

20   antisocial personality disorder is a mental disorder?

21   A.   Yes.

22   Q.   But you believe that antisocial personality disorder

23   can't satisfy the term "serious mental illness or disorder,"

24   right?

25   A.   That's correct.

1    Q.   All right.  And you go further than that, right; you

2    believe that no personality disorders that are listed in the

3    DSM can constitute a serious mental illness or disorder,

4    right?

5    A.   It's possible that borderline personality disorder

6    could be considered that in certain situations.  In fact,

7    the DSM work group is considering moving borderline

8    personality disorder back to one; but for the most part, yes,

9    the personality disorders, by definition, are not serious

10   mental disorders.

11   Q.   Okay.  And you testified at the trial in the Wilkinson

12   case, right?

13   A.   Yes.

14   Q.   I'm showing you a transcript of that testimony.  At

15   Page 119 you were asked the question:  "Okay.  Well, in fact,

16   you believe that no personality disorders can meet the term

17   "serious mental illness or disorder," isn't that correct?

18   Answer:  Well, the way they're constructed now, I think

19   that's very likely."

20       That was your testimony, right?

21   A.   Correct.

22   Q.   Okay.

23       MR. SINNIS:  Objection, your Honor.  I don't think

24   that's inconsistent with his position here today, which is

25   what he just testified to.

1    THE COURT:  All right.  I'm not going to comment on

2    that, but I think he can make that argument.  Go ahead....

3    Q.   And there are a number of personality disorders in the

4    DSM, right?

5    A.   Yes.

6    Q.   Approximately ten of them?

7    A.   Yes.

8    Q.   And you also believe that no paraphilia could qualify as

9    a serious mental illness or disorder, right?

10   A.   That's correct.

11   Q.   There are quite a number of paraphilias identified in

12   the DSM, right?

13   A.   Yes.

14   Q.   Among them is pedophilia, correct?

15   A.   Yes.

16   Q.   And you believe that none of the paraphilias listed in

17   the DSM meets the term "serious" as it's used in the Adam

18   Walsh Act, right?

19        MR. GOLD:  Well, objection, your Honor.  He's talking

20   about "serious" as it's defined in the medical community, not

21   specifically as he interprets it in the DSM.

22        MR. SAVERY:  I'll withdraw the question, your Honor.

23        THE COURT:  Okay.

24   Q.   You believe that none of the paraphilias listed in the

25   DSM constitutes a serious mental illness or disorder, right?

1    A.   Yes.  As I've explained that I'm using the term serious

2    mental disorder different from a disorder with serious

3    implications.

4    Q.   All right.  And when you apply your definition of

5    serious to antisocial personality disorder, again, you're

6    applying what you understand to be a commonly accepted

7    meaning of the word "serious," right?

8    A.   Correct.

9    Q.   And you agree that a commonly accepted definition or

10   meaning of the term "serious" in the psychiatric community,

11   when that term is used in the context of serious mental

12   illness or disorder, is one that causes significant

13   functional impairment, right?

14   A.   Yes.

15   Q.   And that's a different definition that you've testified

16   to, correct?

17   A.   Yes.

18   Q.   All right.  You recognize the DSM is a publication

19   that's regularly acknowledged in your field, is that right?

20   A.   Yes.

21   Q.   And you apply criteria from the DSM in diagnosing

22   Mr. Graham, correct?

23   A.   Yes.

24   Q.   And you concluded at least with respect to antisocial

25   personality disorder that Mr. Graham satisfied those

1    criteria, right?

2    A.   Yes.

3    Q.   I'm showing you a portion of what's been marked

4    Exhibit 20.  In fact, I'll show you a copy.  Do you

5    recognize that as the cover to the DSM, right?

6    A.   Yes.

7    Q.   I'm now showing you Page 701 from the DSM, which, again,

8    is from Exhibit 20.  Do you recognize that as the section of

9    the DSM dealing with antisocial personality disorder?

10   A.   Yes.

11   Q.   Okay.  And the DSM says, regarding antisocial

12   personality disorder:  "The essential feature of antisocial

13   personality disorder is a pervasive pattern of disregard

14   for, and violation of, the rights of others that begins in

15   childhood or early adolescence and continues into adulthood."

16   Is that right?

17   A.   Yes.

18   Q.   And you'd agree that Mr. Graham satisfies that standard?

19   A.   Yes.

20   Q.   Okay.  And the DSM also says, with respect to persons

21   with antisocial personality disorder, that "they tend to be

22   irritable and aggressive and may repeatedly get into physical

23   fights or commit acts of physical assault (including spouse

24   beating or child beating)."

25        Do you see that?

1    A.   Yes.

2    Q.   All right.  And it further states that "they may engage

3    in sexual behavior or substance abuse that has a high risk

4    for harmful consequences," right?

5    A.   Yes.

6         MR. SINNIS:  Objection.  It says:  "Substance use,"

7    not "abuse."

8    Q.   Sorry, "substance use"?

9    A.   Correct.

10   Q.   Okay.  Now, looking at Page 705, the DSM instructs down

11   the bottom here:  "only when antisocial personality traits

12   are inflexible, maladaptive, and persistent and cause

13   significant functional impairment or subjective distress do

14   they constitute antisocial personality disorder."

15        Do you see that?

16   A.   Yes.

17   Q.   So they're really two sets of requirements here, right?

18   I'm going to put one up, the first is that the traits have to

19   be inflexible, maladaptive, and persistent, right?

20   A.   Correct.

21   Q.   The second set of requirements is that they have to

22   cause significant functional impairment or subjective

23   distress, correct?

24   A.   Right.

25   Q.   So at least according to the DSM some cases of

1    antisocial personality disorder will cause significant

2    functional impairment, right?

3    A.   According to the DSM.

4    Q.   Okay, right.  So according to the DSM, some cases of

5    antisocial personality disorder will meet your definition of

6    "serious," right?

7    A.   I don't think so.

8    Q.   Well, you testified awhile ago that one definition you

9    have of "serious" is that it involves significant functional

10   impairment, right?

11   A.   Correct.

12   Q.   Okay.  That term is used here, right?

13   A.   Correct.

14   Q.   And when we consider this directive in connection

15   with the diagnosis of Mr. Graham, it's your opinion that

16   Mr. Graham hasn't "suffered" as a result of his having

17   antisocial personality disorder, right?

18   A.   Well, it goes back to that issue of how are we defining

19   "suffering".  Most personality disorders only suffer in the

20   context of what society does to them; and if society did not

21   tell them not to do anything, they would just keep doing it.

22   ... so that suffering in terms of having the condition that

23   then causes certain problems in a society that tells them no,

24   yes.

25   Q.   Okay.  So it's your opinion that he has not experienced

1    subjective distress at his having antisocial personality
2    disorder, right?
3    A.   I think that the arguments for that would be less; that
4    he does not see much of that as, as being what he has done is
5    wrong with the exception of how it's gotten him into trouble.
6    Q.   Now, the DSM-IV lists potential consequences for people
7    with antisocial personality disorder, right?
8    A.   I'm not seeing anything, but I wouldn't be surprised if
9    it does.
10   Q.   Okay.  Well, here's one example:  "Individuals with
11   antisocial personality disorder are more likely than people
12   in the general population to die prematurely by violent
13   means; for example, suicide, accidents, and homicides."
14       Do you see that, right?
15   A.   Yes.
16   Q.   All right.  And you agree that those are grave and
17   serious consequences, right?
18   A.   Can you please clarify that?
19   Q.   Sure.  Do you agree that to die prematurely by violent
20   means associated with your having antisocial personality
21   disorder is a serious consequence?
22   A.   In association, yes.  I would not necessarily say it
23   causes it, but there are clear associations, yes.
24   Q.   And you agree that antisocial personality disorder may
25   be serious to society, right?

1    A.   Oh, absolutely.

2    Q.   Okay.  It's serious to the patient if the conduct

3    associated with the antisocial personality disorder results

4    in the patient being incarcerated for 30 years, right?

5    A.   Yes.

6    Q.   Okay.  Now, in your report in support of your position

7    that antisocial personality disorder is not serious, you

8    point out that it's on Axis 2 within the DSM rather than

9    Axis 1, right?

10   A.   Well, I would clarify:  I did not say it wasn't serious.

11   I said, it's not a serious mental disorder.  To me -- I know

12   it seems like an academic point, but it is to me an

13   important issue, but, yes, one of the reasons is that it's

14   on Axis 2.

15   Q.   Okay, and that's a fair point.  Your view is that it's

16   not a serious mental disorder, right?

17   A.   Correct.

18   Q.   And in support of that argument you pointed out that

19   antisocial personality disorder is found in Axis 2 rather

20   than Axis 1 in the DSM, right?

21   A.   Correct.

22   Q.   Okay.  And you consider Axis 1 diagnoses to be the most

23   important diagnoses, right?

24   A.   Well, that depends on the individual person.

25   Qualitatively, there's a difference between Axis 1 and

1    Axis 2.  Sometimes Axis 2 might actually be the more

2    important; but in terms of talking about major mental

3    disorders, serious mental disorders, Axis 1 is more

4    important.

5    Q.   Okay.  You say sometimes Axis 2 may be more important,

6    right?

7    A.   Yes.

8    Q.   All right.  And you're aware that some psychiatrists

9    believe that Axis 2 diagnoses are more appropriate than

10   Axis 1, right?

11   A.   I don't -- I've never heard anyone say that Axis 2 are

12   more important; they might say that they are equal in

13   importance.

14   Q.   Okay.  Again, you testified at trial in the Wilkinson

15   case, I'm showing you Page 135 from the transcript:

16   "Question:  And some psychiatrists believe that an Axis 2

17   diagnosis is more important than Axis 1?  Answer:  Um,

18   there's a small group that believe that, yes."

19        Was that your testimony?

20   A.   That's true.  I would add I would not consider it

21   incredible, but there is a group that says that.

22   Q.   Okay.  Now, paraphilias, they are on Axis 1?

23   A.   Yes.

24   Q.   Okay.  But you're not willing to say that they

25   constitute a serious mental illness or disorder, right?

1   A.   Yes, it's both a similar and a different issue, but, as

2   commonly used, they're not serious mental disorders.

3   Q.   Okay.  And that's in part because in your view

4   paraphilias are controversial, right?

5   A.   Well, I can't -- I can tell you what my view is, the

6   major --

7   Q.   Why don't you answer my question?

8        MR. SINNIS:  I thought he was trying to answer the

9   question.

10       THE COURT:  I think he was trying to.  Go ahead.

11  A.   I mean, I can tell you my view is trying to reflect what

12  the standards of the medical profession are.  My view might

13  emphasize different aspects of that, and I can't say why

14  entirely the medical profession has rejected them as a

15  serious mental disorder, but, yes, in my view, that's one

16  of the issues.

17  Q.   Okay.  And in your view to constitute a serious mental

18  issue or disorder, a condition must be neurobiological in

19  origin, right?

20  A.   Not must be.  That's one of the things about this whole

21  serious mental disorder issue is there's not a clean line.

22  There's clear --

23       THE COURT:  Well, maybe I misunderstood.  I thought

24  your position was:  it's not serious if it's not in the book,

25  if it's not in DSM-IV?

```
1            THE WITNESS:  It's -- I think it's more than that.

2            THE COURT:  Well, is that the fundamental; in other

3    words, you look to the book.  If it's not there, that's the

4    answer:  it's not serious?

5            THE WITNESS:  No, I would say there are things

6    within the DSM, like, for example, there's something called

7    mathematic disorder.  That is not a serious -- it's in the

8    DSM, but it's not a serious mental disorder.

9            THE COURT:  That's not my question.  My question is:

10   if it's not in the DSM, then your position is that it's not

11   serious?

12           THE WITNESS:  Correct.

13           THE COURT:  So the DSM is the, you know, the

14   beginning and end of it all?

15           THE WITNESS:  It's a big portion of it.  I don't

16   know if it's completely the end; but if they have decided

17   explicitly to exclude something, it's hard to get around

18   that.

19           THE COURT:  What?

20           MR. GOLD:  Oh.

21           THE COURT:  You were getting up for something.  What

22   do you want?

23           MR. GOLD:  I was just going to add as a point of

24   clarification, your Honor, but I --

25           THE COURT:  No.  I mean, the witness -- you were
```

1   going to clarify what the witness said?

2        MR. GOLD:  Yes, but I was instructed to sit down,

3   your Honor, and so --

4        THE COURT:  That's twice that's happened in this

5   trial....

6   Q.  Now, Dr. Mills, in your report you used what you call --

7        THE COURT:  May the record show I didn't tell you to

8   sit down.

9        MR. GOLD:  No.  By my colleague, Mr. Sinnis.

10       THE COURT:  I understand.  I just wanted the record

11  to be clear.  I don't want one of these, you know, five years

12  from now, quotes that we all have to wonder what happened.

13  Go ahead.

14  Q.  Dr. Mills, in your report you use what you call a

15  medical definition of the term "serious," right?

16  A.  Yes.

17  Q.  But it's not a definition that you found in a medical

18  dictionary, right?

19  A.  I did not specifically look that up in the dictionary.

20  Q.  Well, you're just going on what's commonly used at

21  work, right?

22  A.  Not necessarily at work, but, I mean, in the literature.

23  Q.  Now, I'd like to focus for a minute on the term

24  "suffers from" as it's used in the statute.

25       Just to remind ourselves, the statute says that a

1   sexually dangerous person is a person who has engaged in

2   sexually violent conduct and who is sexually violent to

3   others, right?

4   A.   Yes.

5   Q.   And then it defines sexually dangerous to others to

6   mean in part that the persons suffers from a serious mental

7   illness, abnormality, or disorder, right?

8   A.   Yes.

9   Q.   And in your opinion, personality disorders and

10  paraphilias do not meet the statutory requirement for the

11  person to suffer from an illness, abnormality, or disorder,

12  right?

13  A.   If suffering is defined as in that one particular

14  definition.

15  Q.   Okay.  That's the definition that you used in your

16  report, right?

17  A.   Yes.

18  Q.   Okay, and you agree that's a narrow definition?

19  A.   I am increasingly starting to think that, but, yes, I

20  mean, I would accept that.

21  Q.   All right.  And you agree in its common usage of the

22  term, "suffer" can simply refer to experience?

23  A.   Yes.

24  Q.   Okay.  And using that definition, you'll agree with me

25  that Mr. Graham suffers from antisocial personality

1    disorder, right?

2    A.   Yes.

3    Q.   And if he were diagnosed with a paraphilia, you'd agree,

4    using that definition, that Mr. Graham would suffer from

5    paraphilia, right?

6    A.   Yes.

7    Q.   Now, when you assessed Mr. Graham, you considered

8    whether he should be diagnosed with sexual sadism, right?

9    A.   Yes.

10   Q.   And you refer to sexual sadism in your report, correct?

11   A.   I believe so.

12   Q.   Now, the number of places in your report where you

13   refer to sexual sadism, you refer to it as a proper noun

14   using capitalization:  Sexual Sadism, capital S's.  Does

15   that sound right?

16   A.   I haven't thought of it consciously like that, but I

17   would not be surprised, yeah.

18   Q.   Okay, and you do the same with a number of other

19   diagnoses, right?  So let's -- for instance, if we look at

20   Page 16 of your report, bear with me for a second please ...

21   if we look at Page 16 of your report, you refer to

22   paraphilia here, right, with a capital P?

23   A.   Yes.

24   Q.   All right.  And you refer to Alzheimer's Dementia with

25   capitalization, right?

1    A.   Yes.

2    Q.   You refer to -- well, there's a number of others here:

3    schizophrenia, right, bipolar disorder?

4    A.   Right.

5    Q.   And you use the capitalization because those terms have

6    meaning in your profession, correct?

7    A.   I'm not sure exactly why I was using capitalization, but

8    that's probably it.

9    Q.   Well, they're all recognized diagnoses, correct?

10   A.   Yes.

11   Q.   And they're all recognized mental disorders, right?

12   A.   Those listed, yes.

13   Q.   Okay.  And you're familiar with the term:  paraphilia

14   NOS, correct?

15   A.   Yes.

16   Q.   That term refers to paraphilias that satisfy the general

17   criteria for paraphilia in the DSM but that don't fit within

18   one of the paraphilias that's given its own separate

19   category, right?

20   A.   That's one of the uses of paraphilia NOS, yes.

21   Q.   And, again, you refer to sexual sadism in your report,

22   right?

23   A.   Yes.

24   Q.   Now, where would we find the disorder sexual sadism in

25   the DSM?

1    A.   I would have to look specifically, but I think that

2    falls under personality disorder.

3    Q.   NOS?

4    A.   It's so rare that you don't really make that diagnosis

5    very much so I would not be surprised.

6    Q.   Well, you were appointed by the Court by this case,

7    correct?

8    A.   Correct.

9    Q.   And you examined Mr. Graham, and you were appointed by

10   the Court to offer your opinions on issues relating to his

11   potential civil commitment, right?

12   A.   Yes.

13   Q.   Okay.  And part of your assignment was to determine if

14   he should be diagnosed with any mental disorders, right?

15   A.   Correct.

16   Q.   Now, you went back and looked at the DSM in connection

17   with your work in this case?

18   A.   Yes.

19   Q.   In fact, your report quotes criteria from the DSM

20   concerning antisocial personality disorder, right?

21   A.   Yes.

22   Q.   So it's fair to say you went back to the DSM and

23   reviewed the section on personality disorders, right?

24   A.   Yes.

25   Q.   Okay, and that's because you wanted your assessment of

```
1    your discussion to be accurate, right?

2    A.   Right, that's true.

3    Q.   Did you likewise go back and review the discussion in

4    the DSM concerning paraphilias?

5    A.   Yes.

6    Q.   And did you read it closely when you went back?

7    A.   It's been a year.  I don't remember exactly, but I can't

8    imagine I didn't.

9    Q.   Okay.

10            THE COURT:  Why don't we break here, okay?

11            MR. SAVERY:  Okay.

12            THE COURT:  2:15.

13            THE CLERK:  All rise....

14            (Whereupon, a lunch recess convened at 1:00 p.m.)

15            THE CLERK:  All rise for the Honorable Court ...

16            THE COURT:  Afternoon everybody.  Sit down, please.

17   Go ahead, Mr. Savery.

18   Q.   Thank you.  Dr. Mills, I'd like to focus for a few

19   minutes on this issue of whether behavior alone is

20   sufficient for a diagnosis of paraphilia; and in the context

21   of the questioning you got this morning, you were referred

22   to this article by Michael First, right?

23   A.   Yes.

24   Q.   Okay.  And this is up on the screen, and the article is:

25   Use of DSM Paraphilia Diagnoses in Sexual Violent Predator
```

```
1    Commitment Cases for purposes of the record?

2    A.   Yes.

3    Q.   And Mr. Sinnis directed your attention to Page 452 of

4    that article, and, in particular, he had you read a portion

5    of this paragraph down here; and just to remind us, the

6    paragraph begins with:  "Accordingly, evidence must be

7    presented to establish the presence of a deviant sexual

8    arousal pattern in which the offender is aroused

9    specifically by the nonconsensual nature of the sexual act."

10        Do you see that?

11   A.   Yes.

12   Q.   Do you recall being questioned on this paragraph?

13   A.   Roughly, yes.

14   Q.   Okay.  Well, it goes through examples of the types of

15   evidence that might be considered as you try to reach a

16   determination, right?

17   A.   Yes.

18   Q.   And Mr. Sinnis led you through this lengthy sentence

19   that addresses the examples of such evidence, and at the

20   conclusion of that sentence Mr. Sinnis stopped and we no

21   longer read from the article.  I'd like to continue with

22   the next sentence.

23        The next sentence reads:  "Given that it is common for

24   offenders not to be forthcoming with such information, a

25   careful analysis of the pattern of rape behavior may also
```

1    provide the basis for inferring the presence of a rape

2    paraphilia," right?

3    A.   Yes.

4    Q.   So this, again, is a reflection of Mr. First's view

5    that one can reach a determination as to paraphilia based on

6    an analysis of the pattern of rape behavior, right?

7    A.   I don't think that's exactly what it's saying.

8    Q.   Okay.  Well, it will speak for itself ... now, before

9    the break we were discussing sexual sadism, right?

10   A.   Yes.

11   Q.   And I think your testimony was that sexual sadism may

12   fall within the category of paraphilia NOS or it might have

13   a separate category, right?

14   A.   Yeah.  Off the top of my head, I'm not -- there's a

15   debate going on with the DSM-V now where they're saying:

16   we can make it independent or an NOS qualifier, and I can't

17   remember honestly, without looking, exactly where we're at

18   right now.

19   Q.   Okay.  Well, you had your deposition taken in this case

20   several months ago, right?

21   A.   Yes.

22   Q.   Okay.  And there wasn't any question in your mind when

23   you testified regarding the location of sexual sadism in the

24   DSM during that testimony, right?

25       I'll show you the testimony.  This is now from Page 132

1    of your transcript:  "Question:  Okay.  What is in particular

2    paraphilia NOS?  Answer:  Well, some of us think it's a kind

3    of a wastebasket term.  It's a way of saying:  well, they

4    don't meet the criteria for any of the kind of known

5    paraphilias, but we need to have something to label them

6    with.

7        Sexual sadism is one of those things that would fall

8    under there because there just isn't enough research yet to

9    meet minimum criteria about sexual sadism.  It's very

10   difficult to study for one thing."

11       That was your testimony there, right?

12   A.   Yes.

13   Q.   Okay.  Now --

14       MR. SINNIS:  Again, your Honor, I'm just going to

15   object because I don't see that as a prior inconsistent

16   statement, so I'm not sure what the purpose of it is.

17       THE COURT:  I'm going to let it stand.

18       MR. SINNIS:  Okay.

19   Q.   Then we continue to the next page -- sorry, yes, the

20   next page, Page 133:  "Question:  Okay.  But in all events,

21   if someone qualifies as having paraphilia NOS as opposed to

22   any other paraphilia, they're still satisfying the diagnostic

23   criteria for paraphilia generally, correct?

24       Answer:  It is, but it's kind of:  any time there's an

25   NOS diagnosis, the way we teach it there's a little asterisk

1     off to the side that either the person just has a very rare,

2     atypical kind of condition or either they're meeting criteria

3     for a condition that, you know, there really hasn't been a

4     lot of research done on.

5         Sexual sadism is one of those.  I believe sexual sadism

6     exists, but it's incredibly difficult to study because

7     people are not really all that willing to submit to

8     volunteer research studies about that type of thing."

9         That was your testimony, right?

10    A.   Yes.

11    Q.   Okay.  Your testimony was that sexual sadism falls

12    within paraphilia NOS ... now, again, you're familiar with

13    the DSM?

14    A.   Yes.

15    Q.   And I'm showing you now a portion of the DSM that's

16    been marked Exhibit 21?

17    A.   Yes.

18    Q.   Okay, and you're free to refer to the binders if you'd

19    like to have the paper copy in front of you.  I'm going to

20    flip forward here to the section addressing paraphilias; do

21    you see that?

22    A.   Yes.

23    Q.   Okay, and do you recognize that as the section of the

24    DSM that addresses paraphilias?

25    A.   Yes.

1    Q.   Okay, and this section goes on and identifies a number

2    of specific categories of paraphilias, right?

3    A.   Yes.

4    Q.   Exhibitionism is one of them, right?

5    A.   Yes.

6    Q.   That's got a separate category; it's not an NOS

7    paraphilia, correct?

8    A.   Yes.

9    Q.   Fetishism, that's another with its own category, not an

10    NOS, right?

11    A.   That's correct.

12    Q.   Frotteurism, another one, right?

13    A.   That's correct.

14    Q.   Pedophilia, correct?

15    A.   That's correct.

16    Q.   Sexual masochism, right?

17    A.   Correct.

18    Q.   And here we have 302.84, Sexual Sadism, right?

19    A.   Correct.

20    Q.   Okay.  So in the DSM sexual sadism indeed has its own

21    category, correct?

22    A.   In the IV, correct.

23    Q.   DSM-IV?

24    A.   Correct.

25    Q.   Right, okay.  And, in fact, it has diagnostic criteria

1    listed for sexual sadism, right?

2    A.   Correct.

3    Q.   Okay.  Now, in your report you list Mr. Graham's

4    diagnoses, right?  You identify what it is you diagnosed him

5    with?

6    A.   Yes.

7    Q.   One of the items there is:  "opiate abuse, in remission

8    due to incarceration"?

9    A.   Yes.

10   Q.   Okay.  And you use the term again in remission with

11   respect to that diagnosis, right?

12   A.   Yes.

13   Q.   And the condition is in remission because it's your

14   understanding he hadn't used opiates while he was in prison,

15   correct?

16   A.   Correct.

17   Q.   You do agree that he's got a substantial history of

18   substance abuse, right?

19   A.   Yes.

20   Q.   And in your view substance abuse is a contaminating

21   variable with respect to Mr. Graham's risk assessment,

22   correct?

23   A.   Yes.

24   Q.   Okay.  In fact, that's what you say in your report,

25   right?

1    A.   Yes, right.

2    Q.   All right.  And you agree that Mr. Graham will have

3    greater difficulty refraining from sexually violent conduct

4    if he engages in substance abuse, right?

5    A.   Definitely.

6    Q.   All right.  And in your exit interview you scored

7    Mr. Graham with a 9, right?

8    A.   Yes.

9    Q.   And the normal range in the exit interview is 0 to 9,

10   correct?

11   A.   0 to 10.

12   Q.   0 to 10 is the normal range?

13   A.   I can't remember if it's 10 -- I believe 10 is -- it's

14   right at the cut-off whether or not that's normal or the

15   beginning of abnormal, but 9 is like a high normal.

16   Q.   Okay.  In any event, you assessed Mr. Graham as being

17   at the cusp of moving from normal into abnormal, right?

18   A.   Yes.

19   Q.   All right.  And you agree that if he has one drink that

20   could kick him up to a 12 or 13, right?

21   A.   For the time he's intoxicated, yes.

22   Q.   All right.  And that would fall in the range of impaired

23   executive control, right; he gets bumped up to 12 or 13?

24   A.   Yes.

25   Q.   And in your view impaired executive control effectively

1    means impaired volitional control?

2    A.   They're strongly related, yes.

3    Q.   Now, he's received some substance abuse treatment in the

4    past, Mr. Graham has, right?

5    A.   Limited.

6    Q.   Okay.  And that was when he was much younger, right?

7    A.   Yes.

8    Q.   Okay.  And he wasn't willing to participate in drug

9    treatment while he's incarcerated, right?

10   A.   That's correct.

11   Q.   And as recently as 2006, drug treatment programs were

12   being recommended for Mr. Graham and he was refusing to

13   participate in them, right?

14   A.   I believe so, yes.

15   Q.   And you're concerned that Mr. Graham may abuse alcohol

16   or drugs if he's released, right?

17   A.   Yes.

18   Q.   In fact, I'll turn to your report ... you note at

19   Page 30 of your report, which for the record is Exhibit 25:

20   "The respondent's ability to refrain from sexually dangerous

21   behavior is likely to be negatively influenced by any future

22   return to substance abuse," is that right?

23   A.   Yes.

24   Q.   And then you state:  "Mandatory participation in

25   substance abuse treatment with intensive supervision of any

1    relapses is likely to be the most important variable in the

2    respondent's prognosis," right?  So, again, you recommend

3    mandatory participation in substance abuse treatment, right?

4    A.   Yes.

5    Q.   With intensive supervision, right?

6    A.   Yes.

7    Q.   Okay.  And you're aware, aren't you, that if he's

8    released these conditions will not be imposed?

9    A.   That's my understanding that --

10        THE COURT:  That if he's not released you said?

11   Q.   That if he is released, none of these conditions would

12   be imposed?

13   A.   Yes.

14   Q.   Okay.  Now, in your opinion, Dr. Mills, Mr. Graham

15   meets the criteria that he has engaged in or attempted to

16   engage in sexually violent conduct in the past, right?

17   A.   Yes.

18   Q.   All right.  And, in fact, he has several convictions for

19   sexual offenses, right?

20   A.   Correct.

21   Q.   And you interviewed Mr. Graham, right?

22   A.   Yes.

23   Q.   And that interview was important to your ultimate

24   opinion in this case?

25   A.   Yes.

1    Q.   You interviewed him once, right?

2    A.   Correct.

3    Q.   That was on June 28, 2009 -- sorry, of 2008?

4    A.   That sounds correct.

5    Q.   Okay.  And you discussed his prior sexual offenses,

6    right?

7    A.   Yes.

8    Q.   You discussed his '74 conviction, the 1974 conviction

9    for rape?

10   A.   Yes.

11   Q.   And according to the records relating to that offense,

12   Mr. Graham tore his victim's pants and he raped her, right?

13   A.   Yes.

14   Q.   Okay.  He was found guilty of that offense at trial,

15   right?

16   A.   Yes.

17   Q.   And when you met with him, he denied that he committed

18   that offense, right?

19   A.   Correct.

20   Q.   And you also discussed with him the second sexual

21   offense, correct?

22   A.   Yes.

23   Q.   That was the 1975 assault with intent to commit rape,

24   right?

25   A.   Correct.

1    Q.   And according to the records of that offense, Mr. Graham

2    assaulted an eight-month pregnant woman, right?

3    A.   Correct.

4    Q.   And that assault was done with the intent to commit

5    rape, correct?

6    A.   Apparently so.

7    Q.   All right.  And he pleaded guilty to that offense,

8    right?

9    A.   Correct.

10   Q.   But when you met with him, he denied that offense,

11   correct?

12   A.   Correct.

13   Q.   And you also discussed with him the third sexual offense

14   for which he's been incarcerated, correct?

15   A.   Correct.

16   Q.   That was a 1987 rape of a woman in her apartment, right?

17   A.   Yes.

18   Q.   That involved Mr. Graham first talking with the woman

19   outside, right?

20   A.   Yes.

21   Q.   Then he forced his way into her apartment, right?

22   A.   Yes.

23   Q.   He threatened to kill her at one point, correct?

24   A.   Yes.

25   Q.   Okay.  And then he strangled her, right --

```
 1   A.   Yes.

 2   Q.   -- into unconsciousness, correct?

 3   A.   Twice.

 4   Q.   At least twice, right?

 5   A.   Correct.

 6   Q.   And then he raped her, correct?

 7   A.   Yes.

 8   Q.   All right.  And he raped her repeatedly, right?

 9   A.   I believe so, yes.

10   Q.   Okay.  Now, he admitted to you that he raped her, right?

11   A.   Yes.

12   Q.   And you agree that the intercourse that he had with his

13   victim constituted a rape?

14   A.   Yes.

15   Q.   It wasn't consensual intercourse, correct?

16   A.   Correct.

17   Q.   In fact, you note in your report that Mr. Graham twice

18   violently raped her, correct?

19   A.   Yes.

20   Q.   All right.  So even though just prior to the intercourse

21   the victim may have told Mr. Graham that or asked Mr. Graham

22   to be gentle with her, that was still a rape, right?

23   A.   Absolutely.

24   Q.   All right.  It's still nonconsenting?

25   A.   Correct.
```

1    Q.   Now, when you met with him, Mr. Graham denied ever

2    threatening the woman, right?

3    A.   I believe so.

4    Q.   Okay.  But you note in your report that the rapes of

5    the woman took place, "after forcing himself into her home

6    and threatening to kill the victim."  Is that right?

7    A.   I believe so, yes.

8    Q.   Now, when you met with him, you approached this

9    interview cautiously, right?

10   A.   Yes.

11   Q.   And that's because forensic psychologists assume going

12   into an interview such as this that the person being

13   interviewed is going to lie, right?

14   A.   Well, they are incentivized for things other than

15   seeking help for treatment, yes.

16   Q.   Okay.  You assume going into an interview such as this

17   that the person you're meeting with is going to lie, right?

18   A.   I don't know if it's said exactly that way.  I would

19   partially agree with what you're saying, that this person

20   isn't -- is probably going to be more dishonest than someone

21   coming for just a regular clinical interview.

22   Q.   Okay.

23   A.   There's a whole theme where in clinical psychiatry you

24   assume a patient's telling you the truth, and in forensic

25   psychiatry you assume they're not telling the truth.

1   Q.   So in forensic psychiatry you assume the person's not

2   going to be truthful with you, right?

3   A.   Well, that's the saying.  I think it's an

4   oversimplification, but the point being:  this is very

5   different, and you have to have additional evidence other

6   than just what you have in clinical psychiatry.

7   Q.   Okay.  You testified at the Wilkinson trial; I'm

8   showing you Page 152 of that transcript?

9   A.   Yes.

10  Q.   "Question:  Now, you approached the interview

11  cautiously, didn't you?  Answer:  Yes.  Question:  Okay,

12  and that's because as you told us before, forensic

13  psychiatrists assume that the person is going to lie; isn't

14  that right?  Answer:  That's correct."

15      That was your testimony right?

16          MR. SINNIS:  Your Honor, that appears to be a

17  consistent statement as opposed to a prior inconsistent

18  statement, so I'm not quite sure of his rationale here.

19          THE COURT:  I'm afraid I missed the question I think.

20          MR. SAVERY:  Okay.  The question from the testimony,

21  your Honor, or the preceding question?

22          THE COURT:  Are you quoting now from a transcript?

23          MR. SAVERY:  I am.  I'm quoting from a transcript,

24  correct.

25          THE COURT:  Okay.

```
1              MR. SAVERY:  Because --

2              THE COURT:  Let me see it.

3              MR. SAVERY:  Yep....

4              THE COURT:  Now, what's your objection?

5              MR. SINNIS:  My objection is that's consistent with

6    what he just testified to, so I'm not sure what the purpose

7    -- what the government's trying to do here.  It's a prior

8    consistent statement, not a prior inconsistent statement.

9              THE COURT:  And a prior motive to lie, that's part of

10   the prior consistent statement; there has to be a motive,

11   prior motive to lie.

12             MR. SAVERY:  Your Honor, we identified in the

13   transcript -- I'm identifying this section solely because

14   it's not entirely consistent with what his current testimony

15   is.  I asked him:  do you assume that the person's going to

16   have a motive, do you assume the person --

17             THE COURT:  Well, I think he said that a couple of

18   times but --

19             MR. SAVERY:  Okay.  Well, if that's what his

20   testimony is, that's fine.

21             THE COURT:  -- there's an old saying that, you know,

22   what they do in forensic, they don't?

23             MR. SAVERY:  Right, and then I asked him after the

24   saying, I said and that's something forensic psychiatrists

25   assume and he said:  well, you know, it's just a saying; it's
```

1    not really what they assume, so this is why I laid this in

2    front of him where he completely signs onto this concept.

3         THE COURT:  Okay, we'll let it stand.

4    Q.  Let's get an answer then.  Dr. Mills, going back to

5    your testimony from Wilkinson:  "Question:  You approached

6    the interview cautiously, didn't you?  Answer:  Yes.

7    Question:  Okay, that's because as you told us before

8    forensic psychiatrists assume that the person is going to

9    lie, isn't that right?  Answer:  That's correct.

10       That was your testimony at Wilkinson, right?

11   A.  Yes.

12   Q.  Now, we spent some time this morning on this article

13   here, right?  This is the First & Halon article, correct?

14   A.  Yes.

15   Q.  Now, I'm bringing this up to Page 447, and the article

16   says:  "Although information gleaned from interviews and

17   questionnaires is potentially very useful, one must always

18   be skeptical about the veracity of methods that rely on

19   self-report because of the legal and social sanctions

20   offenders may face as a result of acknowledging their

21   paraphilic interests in past illegal acts."

22       Do you see that?

23   A.  Yes.

24   Q.  That's something you agree with?

25   A.  Yes.

```
1    Q.   Okay.  And when we say:  "Veracity of methods that rely

2    on self-report, we're talking about reporting by -- being

3    done by the individuals being interviewed, correct?

4    A.   Well, I'm not sure exactly what he's referring to.  I

5    think there's a lot of psychological tests that assume the

6    person is telling you the truth.  That's how they're

7    validated; that's how they're created, and they're

8    inappropriately used in a forensic setting where the

9    assumption is not so that the person is telling you the

10   truth.

11   Q.   Okay.  Now, people with antisocial personality disorder

12   frequently lie, right?

13   A.   Yes.

14   Q.   And they say what they need to for their own personal

15   gains, right?

16   A.   Correct.

17   Q.   Now, Mr. Graham was aware of this case when you met with

18   him, right?

19   A.   Yes.

20   Q.   All right.  And he understood your role in this case

21   when you met with him, correct?

22   A.   Yes.

23   Q.   You explained that to him, right?

24   A.   Yes.

25   Q.   And you confirmed that he understood it, correct?
```

1   A.   Right.

2   Q.   And you agree Mr. Graham wants to get out of prison,

3   right?

4   A.   Yes.

5   Q.   And you agree that he had an incentive during your

6   interview not to be truthful with you concerning facts that

7   might be harmful to his chances of getting out of prison?

8        MR. SINNIS:   Objection to that as to what he knows.

9   Q.   I didn't ask him what he knows.   Do you agree with that?

10       THE COURT:   I'm going to sustain the objection.

11  Q.   Do you understand Mr. Graham had an incentive to lie --

12  A.   Yes.

13  Q.   -- during your interview?

14  A.   Yes.

15  Q.   Okay.   Now, apart from any incentive he may have had to

16  lie, is it your view that Mr. Graham personally has a great

17  capacity to lie?

18  A.   Yes.

19  Q.   All right.   In your view he's not the most honest man

20  around, right?

21  A.   Yes.

22  Q.   And consistent with this view, Mr. Graham repeatedly

23  failed to be truthful with you during your interview,

24  correct?

25  A.   I wouldn't say that.

1    Q.   Okay.  Well, he told you he never injected heroin,

2    right?

3    A.   That's correct.

4    Q.   All right.  And he had previously admitted injecting

5    heroin, correct?

6    A.   That's correct.

7    Q.   That was an instance where you feel he wasn't being

8    truthful with you, right?

9    A.   Yes.

10   Q.   All right.  Also, during your interview he denied ever

11   using PCP, correct?

12   A.   That's correct.

13   Q.   All right.  And there's evidence in the record

14   concerning the parole violation relating to a positive PCP

15   test in 1986, correct?

16   A.   That's correct.

17   Q.   All right.  So in each of these instances there were

18   documents in the record that refuted what he told you during

19   your interview with him, correct?

20   A.   That's correct.

21   Q.   All right.  And in each of those instances is it fair

22   to say that you concluded in the face of those documents

23   that Mr. Graham wasn't being truthful with you?

24   A.   I'm very suspicious about it, yes.

25   Q.   All right.  Now, Mr. Graham mentioned to you that he

1  was remorseful, right?

2  A.   Yes.

3  Q.   And that was something you noted in your report,

4  correct?

5  A.   Yes.

6  Q.   Now, you don't think he was being truthful about that,

7  do you?

8  A.   It's hard to say if he was truthful.  It certainly

9  wasn't very deep.

10  Q.   It wasn't very convincing to you, was it?

11  A.   That's correct.

12  Q.   All right.  And, in fact, it seemed to you that he

13  almost was parroting to some degree when he told you he was

14  remorseful, right, as if it were something he learned to say?

15        MR. SINNIS:  Objection.

16        THE COURT:  No, overruled.  Go ahead.

17  A.   It felt like it, I guess.

18  Q.   Okay.  But you didn't include that in your report, did

19  you, Doctor?

20  A.   The word parroted, no.

21  Q.   So you didn't include in your report that you weren't

22  convinced by it when he told you that he was being remorseful

23  -- that he was remorseful?

24  A.   Well, I don't include all my feelings about the patient

25  in my report, no.

1    Q.   You noted in the report that he told you he was being

2    remorseful, correct?

3    A.   Correct.

4    Q.   All right.  You're not convinced that he was being

5    truthful with you, right?

6    A.   That's correct.

7    Q.   All right.  And you don't say that in your report,

8    right?

9    A.   Actually, I think I mentioned about his, his -- he

10   seemed unconvincing.

11   Q.   You mentioned that in your report?

12   A.   Either that or the deposition.

13   Q.   Okay.  It may be in your deposition, but you're welcome

14   to look through your report and try to find where you

15   mentioned it?

16   A.   I believe once I diagnosed him with antisocial

17   personality disorder, it's a fairly strong statement that

18   the person isn't the most honest person.

19   Q.   Okay.  So it wasn't -- you didn't need to go ahead and

20   reiterate in the report that you didn't feel he was being

21   truthful when he told you he was remorseful, right?

22   A.   Well, when I -- when we talked about the remorse, it was

23   fairly obvious that he wasn't -- I mean just saying:  I'm

24   remorseful is not necessarily remorse.

25   Q.   Now, he denied the first rape, right?

1    A.   Correct.

2    Q.   He wasn't remorseful about that one?

3    A.   That's correct.

4    Q.   Denied the second one, right?

5    A.   That's correct.

6    Q.   Wasn't remorseful about that one, correct?

7    A.   Correct.

8    Q.   All right.  Now, on Page 14 of your report, for the

9    record it's in evidence as Exhibit 25, down at the bottom

10   you begin addressing paraphilias, correct?

11   A.   Yes.

12   Q.   And you give an opinion at the outset of this section

13   that "The respondent does not have a diagnosis of sexual

14   sadism, paraphilic rapism, paraphilia NOS, or other

15   paraphilia," right?

16   A.   Correct.

17   Q.   All right.  And each of these are proper nouns, right?

18   They're all capitalized?

19   A.   Correct.

20   Q.   You considered all of these:  sexual sadism, paraphilic

21   rapism, paraphilia NOS, because they're all potential

22   diagnoses, right?

23   A.   Well, they're certainly potential in the sense that

24   someone may say they have them, yes.

25   Q.   Okay.  Someone may say --

1    A.   It's not necessarily valid.

2    Q.   Okay.  So you're including invalid diagnoses in your

3    report, is that your testimony?

4    A.   Well, if someone is going to label someone with a

5    diagnosis, I think it's important for me to say whether or

6    not I think they have it, even though if I question the

7    validity.

8    Q.   Okay.  So is it your testimony that these diagnoses

9    here in your list are invalid diagnoses?

10   A.   Paraphilic rapism I think is the most problematic.

11   Q.   Okay.  Let's go on and read.  You go on to say that "he

12   has no known history of sexual interest in minors," right?

13   A.   Correct.

14   Q.   That's a reference to pedophilia, correct?

15   A.   Right.

16   Q.   "Of course, due to its violence, his third offense is

17   suggestive of sexual sadism, paraphilic rapism, or paraphilia

18   NOS," right?

19   A.   Yes.

20   Q.   Okay.  You go on and say:  "However, besides this

21   incident we have no history of a persistent pattern of sexual

22   arousal involving violence," correct?

23   A.   Correct.

24   Q.   Now, "sexual arousal involving violence," that's a

25   reference to sexual sadism, correct?

A.   Yes.

Q.   Okay.  And then you mention "forced sex upon a nonconsenting partner," correct?

A.   Correct.

Q.   That's a reference to paraphilic rapism, right, isn't it?

A.   It's not a one-to-one correlation.  We're talking about a broad construct here, but, I understand what you're saying, yes.

Q.   Broadly speaking, that's what you're referring to when you wrote those words:  "forced sex upon a nonconsenting partner"?

A.   Not really, because, I mean paraphilic rapism is more than that.

Q.   Of course it's more than that --

A.   Right.

Q.   -- but when you wrote these words --

MR. SINNIS:  Can he complete his answer?  I'm not sure he had completed his answer.

THE COURT:  Yes.  Did you finish?

THE WITNESS:  No.  I mean I think it's -- you know, these are probably in the concept of necessary but not sufficient, meaning:  if there is no evidence for a persistent pattern of this, then you almost don't kind of need to go into more of the details because you don't have

1    to have that.

2    Q.  All right.  But you agree with me that forced sex upon

3    a nonconsenting partner, that's not a reference to sexual

4    sadism, right?  You weren't intending that to be a reference

5    to sexual sadism, correct?

6    A.  Yeah.  You're making a one-to-one correlation, and I

7    really don't think there was a one-to-one correlation; I

8    think I was trying to capture the broad construct of it.

9         THE COURT:  Are you talking about the case that was

10   nolle prossed?

11        MR. SAVERY:  No, your Honor.  I'm just talking about

12   his analysis of this case, and his reference to this forced

13   sex upon a nonconsenting partner as a general idea.

14        THE COURT:  Well, is that report to refer to the case

15   that was nolle prossed?

16        MR. SAVERY:  No, your Honor.  It's referring

17   generally to his analysis in the case and to the extent that

18   he considers this issue of forced sex upon a nonconsenting

19   partner, he's considering it in relation to this diagnosis.

20        THE COURT:  No, I know, but is it in the case

21   somewhere?  Why would he consider it if it's not in the case?

22        MR. SAVERY:  It is in the case.  Well, your Honor --

23        THE COURT:  How is it in the case?

24        MR. SAVERY:  -- it's in this entire case.  The only

25   reason I'm pointing it out, your Honor, is because --

1          THE COURT:  I just don't understand.  The only

2     nonconsensual partner or sex that I recall is the case that

3     was nolle prossed; maybe I --

4          MR. SAVERY:  No, your Honor.  Each of the rapes here

5     involved a nonconsenting partner, the first rape --

6          THE COURT:  Well, your use of the word partner is

7     different than mine.

8          MR. SAVERY:  I see.

9          THE COURT:  There was no relationship with anybody

10    other than the woman who was his partner, and he allegedly

11    forced himself on her.

12         MR. SAVERY:  I understand.  I perhaps can clarify

13    that he wasn't referring to that instance in this report; he

14    hadn't had those relationships.

15         THE COURT:  And why is somebody considered to be a

16    partner merely because they, you know, hooked up together; is

17    that what it is?

18         MR. SAVERY:  No, I think in this instance "partner"

19    merely means the other person who's involved in the incident.

20         THE COURT:  All right.  I think we can chose a better

21    word, at least I got confused anyway.

22    Q.   Okay.  You know, in any event I'm going to move on, but

23    for purposes of clarity:  when you used the term "partner,"

24    right, you weren't referring to any domestic abuse that

25    Mr. Graham might have been alleged to be involved in, right?

1    A.   I'm confused on this statement, even the way I wrote it

2    now, so I'm not completely sure.  I really could have worded

3    this better.

4    Q.   Okay.  But you agree that forced sex on a nonconsenting

5    individual would be a term that refers to rape generally,

6    right; I mean, that falls within the scope of the context of

7    rape?

8    A.   Yes, but you're splitting that sentence because I think

9    the way it was intended was sexual arousal involving that as

10   opposed to splitting the sentence at a later point, but,

11   yes, I mean, as a general point I would agree.

12   Q.   Okay.  I'm going to turn to Page 22 of your report.

13   I want to read a passage that's at the top of Page 22.  It

14   begins, "for example."

15      "For example, a heterosexual male is aroused by women, a

16   homosexual male is aroused by men, a pedophile is aroused by

17   children, and a paraphilic rapist is aroused by the thought

18   of coerced sex."  Correct?

19   A.   That's correct.

20   Q.   All right.  Now, you agree that there's some set of

21   rapists that is aroused by coerced sex, right?

22   A.   I think theoretically there's nothing preventing that

23   from existing.

24   Q.   All right.  Your profession uses the term paraphilic

25   rapism to refer to that concept, right.

1    A.   I don't think psychiatry refers to it.  I think there

2    are people in psychology that more commonly refer to it, but

3    it's in the literature so it's been talked about, yes.

4    Q.   Okay.  You use the term "paraphilic rapism" throughout

5    your report, right?

6    A.   Yes.

7    Q.   All right.  And the idea of a paraphilic rapist:  "A

8    paraphilic rapist would satisfy the general criteria for

9    paraphilia," right?  Otherwise, they wouldn't be a paraphilic

10   rapist; they'd just be a rapist?

11   A.   Well it's difficult to say.  I would say partially yes

12   on a theoretical level, but, also, no, for the reasons that

13   it's been rejected as a diagnosis.  There's not enough

14   scientific evidence to say this is a valid diagnosis ...

15   just because something is theoretically possible doesn't

16   mean that it's scientifically accepted or valid.

17   Q.   Okay.  So it's an illegitimate diagnosis that you

18   reference in your report by name a number of times, right?

19   A.   Well, I don't know if I would say the word

20   "illegitimate".  I think it can exist.

21   Q.   It can exist; nonetheless, you refer to it a number of

22   times in your report, correct?

23   A.   Yes.

24   Q.   And you consider whether Mr. Graham has it, right?

25   A.   Well, considering he's been accused of having it, I

1    think it's important.

2    Q.   Okay.  Now, in addition to the convictions for rape and

3    assault with intent to commit rape, Mr. Graham was alleged

4    to have committed another sexual offense, right?

5    A.   I believe so, yeah.

6    Q.   Okay, and did you review documents in the record that

7    related to an arrest associated with an alleged battery

8    involving Mr. Graham's live-in girlfriend?

9    A.   Yes.

10   Q.   Now, you hadn't seen that report before you prepared

11   your own report in this case, right?

12   A.   That's correct.

13   Q.   And you hadn't seen that report before you met with

14   Mr. Graham, correct?

15   A.   That's correct.

16   Q.   So am I correct that you didn't raise that incident

17   with Mr. Graham when you met with him?

18   A.   That's correct.

19   Q.   All right.  He didn't raise it with you, right?

20   A.   That's correct.

21   Q.   In fact, on the contrary, he told you his relationship

22   with his girlfriend was a good and stable relationship for

23   him, right?

24   A.   Yes.

25   Q.   All right.  Now, you'd agree that the alleged events

1    in those documents, again relating to that alleged battery

2    involving the live-in girlfriend, they're relevant to the

3    issues that you considered in this case, right?

4    A.   Particularly if they're true, yes.

5    Q.   All right.  And they're relevant to a potential

6    diagnosis of both antisocial personality disorder and

7    paraphilia, correct?

8    A.   I would say yes to the former, but I would be less

9    convinced of the latter.

10   Q.   Okay.  Well, if the alleged events involved an instance

11   of nonconsensual sexual encounter, would that be of interest

12   to you with respect to your consideration of paraphilia?

13   A.   Well, it's a possibility; but just again like all rapes

14   are not paraphilias, we would have to have more inferential

15   evidence, in fact, that he was aroused by that event.  The

16   fact that two of them might have occurred is worrisome, but

17   it's not enough.

18   Q.   Okay.  So the mere fact of the allegation isn't enough

19   for you to make a determination on paraphilia or to what

20   extent it's relevant to a diagnosis of paraphilia; you'd

21   want more information about that event, right?

22   A.   Well, I mean, ideally, there's certainly no

23   black-and-white standards on this.  If ten different people

24   made the allegation of a scripted type of sexual arousal

25   scenario, even if he was not convicted of any of those ten

1    things, it would start to become a bit worrisome.  It

2    becomes an issue of the weight of the evidence.

3    Q.   Okay.  If you had known about those allegations at the

4    time you met with Mr. Graham, you would have asked him about

5    them, right?

6    A.   Sure.

7    Q.   All right.  And that's because it would be important for

8    you to hear what he has to say about those alleged events,

9    right?

10   A.   Yes.

11   Q.   All right.  So once you found out about those

12   allegations, did you go and interview him again?

13   A.   No.

14   Q.   In fact, after your first interview you thought you

15   might need to interview him a second time, right?

16   A.   Yes.

17   Q.   All right, and you told him that when you left the first

18   time?

19   A.   Definitely.

20   Q.   But even after you learned of these allegations by his

21   live-in girlfriend, you didn't go back and meet with him

22   again; is that correct?

23   A.   That's correct.

24   Q.   Now, again, you learned of these allegations after you

25   prepared your report, right?

1   A.   Yes.

2   Q.   And so you learned of them after you opined that

3   Mr. Graham doesn't have paraphilia, correct?

4   A.   Correct.

5   Q.   But that opinion now, now that you're aware of these

6   allegations, is to use yours words:  "a little less strong,"

7   right?

8           MR. SINNIS:  Objection.

9           THE COURT:  What's the objection?

10          MR. SINNIS:  I don't know that he made -- that he

11  used those words in the context that he's being asked.

12          THE COURT:  Well, he's posing the premise to him.

13          MR. SINNIS:  Okay.

14  A.   I would agree, yes.

15  Q.   Okay.  Did you prepare a revised report to disclose that

16  to the Court?

17  A.   No.

18  Q.   Okay.  Now, let's assume that those allegations were

19  true, okay?  For the next few questions let's assume those

20  allegations were true, okay?

21  A.   Okay.

22  Q.   You'd agree with me that Mr. Graham's conduct would

23  constitute sexual intercourse with a nonconsenting partner,

24  right?

25  A.   If that was true.

```
1    Q.   All right.  And let's also assume that Mr. Graham, in
2    fact, committed all of the sexual offenses for which he was
3    convicted, okay?
4    A.   Yes.
5    Q.   All right.  So including Mary Phargood's allegations,
6    that would be a total of three instances of intercourse with
7    a nonconsenting person, right?
8    A.   Correct.
9    Q.   And one additional attempted rape, correct?
10   A.   Correct.
11   Q.   So if you make those assumptions, am I correct that
12   you'd be unable to reach an opinion one way or the other as
13   to whether Mr. Graham has paraphilia?
14   A.   Can you repeat the question?
15   Q.   Sure.  If you assumed that all those events were true,
16   that they all happened, am I correct that you would be
17   unable to reach an opinion one way or another as to whether
18   Mr. Graham should be diagnosed with paraphilia?
19   A.   I would say that's incorrect.
20   Q.   Okay.  And again I took your deposition -- you sat for
21   a deposition in this case several months ago, right?
22   A.   Yes.
23   Q.   All right.  And you reviewed the transcript from that
24   deposition, correct?
25   A.   Yes.
```

1    Q.   All right.  And you signed a signature sheet that

2    represented that the transcript was accurate but for the

3    changes that you made, correct?

4    A.   Correct.

5    Q.   Okay, and we're now on Page 163 of that deposition

6    transcript:  "Question:  We don't have convictions for the

7    other things, and we don't have sworn statements from victims

8    regarding other things.  We have two convictions and a sworn

9    statement regarding three sexual offenses, alleged sexual

10   offenses; two of which he was convicted of, so if you agree,

11   if you, for purposes of discussion here, assume that all of

12   those events occurred as they're alleged to have occurred,

13   in addition to the one conviction that he admits, does that

14   change your opinion?"

15        MR. SINNIS:  What page are you on?

16   Q.   I'm now on Page 164.  "Let me put it this way:  can

17   you conclude to a reasonable degree of scientific or medical

18   certainty that he does not have paraphilia, if you assume

19   that all those events occurred?  Answer:  I don't think I

20   can reach an opinion in one way or the other way because

21   there's just too many hypotheticals in this for the diagnosis

22   of paraphilia," and it goes on; and you may continue reading

23   if you like, Dr. Mills ... to me, and I know other people

24   that feel differently about this, but to understand a

25   person's own internal sexual motivations purely based on

1    conviction is very precarious; and until he acknowledges

2    this to some degree or on some level, he may very well be a

3    sexual predator, but for him to have a medical diagnosis of

4    sexual sadism, it requires a leap that there's not enough to

5    support."

6        That was your testimony, right?

7    A.   Yes.

8    Q.   All right.  Now, the statute requires analysis as to

9    whether a person has serious difficulty -- sorry, would

10   experience serious difficulty from refraining from sexually

11   violent conduct, right?

12   A.   Right.

13   Q.   All right.  And you interpret difficulty refraining to

14   mean a person must have a serious impairment of volitional

15   capacity in regards to controlling sexual behavior, right?

16   A.   Well, it's the closest thing in medical constructs to

17   that.

18   Q.   Okay.  So you need the inability to control behavior in

19   your view, right?

20   A.   Not an inability to control behavior, some degree of

21   impairment.

22   Q.   Okay.  So under your interpretation, if someone plans

23   out sexually violent conduct, then they wouldn't meet your

24   definition of sexually -- sorry, serious difficulty

25   refraining, correct?

1    A.   Well, that would be one element; someone that chooses to

2    do this and can refrain, to me doesn't meet the criteria.

3    Q.   All right.  So in your interpretation if a pedophile

4    says to you:  I intend to go out and reoffend, I'll reoffend,

5    I'm in control of my conduct, I don't have any reservations

6    about it, and I'm going to go out and rape; then, that to you

7    wouldn't satisfy the statute, correct?

8    A.   Not exactly because sometimes people are not the best

9    assessors of their own inability to refrain from the

10   behavior if -- but, certainly, if they said that and then

11   they demonstrated a great ability and detail to avoid being

12   captured for the events, to planning them out, organizing it,

13   all of that would militate against their inability to refrain

14   from it.

15   Q.   Okay.  So if they planned it, if they had the intention

16   of going out, all right, conducting child molestation, they

17   planned it out intricately, take some time to carry it out,

18   they try to hide themselves from getting arrested or getting

19   discovered, that to you would suggest that they don't have

20   serious difficulty refraining, correct?

21   A.   Yes, people can have the ability to control their

22   behavior and yet still choose to do something.

23   Q.   All right.  Now, in your assessment of Mr. Graham, you

24   found it relevant that he hasn't had any major disciplinary

25   issues in prison?

1    A.   Yes.

2    Q.   All right.  And you point out that he's not evidenced

3    hypersexuality in prison, right?

4    A.   Correct.

5    Q.   Now, you agree that this only tells us so much about his

6    future risk, right?

7    A.   Absolutely.

8    Q.   He doesn't have free Axis to women in prison, right?

9    A.   That's correct.

10   Q.   And assuming he had any Axis to women in prison, it's

11   been restricted, is it that fair to say?

12   A.   It wasn't very restricted in the visiting room, but it

13   was certainly supervised.

14   Q.   He had two guards, you said, looking over him?

15   A.   Yes.

16   Q.   And he's sitting in prison now, right?

17   A.   Right.

18   Q.   And if he's released, his Axis to women won't be

19   restricted, right?

20   A.   That's correct.

21   Q.   All right.  He'll have the opportunity to be in the

22   company of women every day if he wants?

23   A.   That's correct.

24   Q.   Now, he was incarcerated after his first rape

25   conviction, right?

1    A.   Yes.

2    Q.   Did he have any disciplinary issues during that

3    incarceration?

4    A.   He had disciplinary problems early on.  I don't

5    remember the exact details, but, yes, he had them early on.

6    Q.   Yes.  For that, during that incarceration?

7    A.   I don't remember.

8    Q.   Okay.  He didn't commit any sexual offenses during that

9    incarceration, is that fair to say?

10   A.   I don't think so.

11   Q.   There's nothing in the record to suggest that he

12   experienced hypersexuality when he was incarcerated then,

13   right?

14   A.   That's correct.

15   Q.   So you would agree with me that there was nothing

16   about his conduct, at least what we know of it, during that

17   incarceration that suggests to you he was going to commit

18   another sexual offense when he got out, right?

19   A.   That's correct.

20   Q.   But he did get out in January of 2005, right?

21   A.   From the first conviction?

22   Q.   From the first conviction.  I'm sorry, January of 1975.

23   A.   Correct.

24   Q.   All right.  And he was arrested for assault with intent

25   to commit rape six months later, correct?

1   A.   That's -- I'm not exactly sure of the details of it, but

2   that sounds right.

3   Q.   Approximately six months, it was in the next year after

4   he was released, fair to say?

5   A.   Yes.

6   Q.   All right.  And he plead guilty to that offense,

7   correct?

8   A.   The second one, yes.

9   Q.   All right.  And he went away to prison again, right?

10   A.   Yes.

11   Q.   And he was incarcerated during this stretch for

12   approximately seven years, correct?

13   A.   Correct.

14   Q.   All right.  Didn't commit any sexual offenses during

15   that incarceration, right?

16   A.   Correct.

17   Q.   Nothing in the record to reflect any hypersexuality

18   while he was incarcerated, right?

19   A.   Right.

20   Q.   And you'd agree with me that if you focus solely on his

21   conduct in prison, what we know of it, that doesn't suggest

22   that he was going to reoffend when he got out, right?

23   A.   Correct.

24   Q.   All right.  He had gone a seven whole years without a

25   problem, right, when he was in prison -- well, without a

1    substantial problem let's say?

2    A.   Well, he declined recommended treatment while in prison,

3    but in terms of active behavioral problems, yeah, he was

4    fairly well-behaved.

5    Q.   And that was frankly unprecedented for Mr. Graham since

6    his childhood to go that long?

7    A.   Sometimes people with antisocial personality, when

8    they're in a structured setting, they seem to calm down more,

9    but, yes, compared to his early life, that is very different.

10   Q.   Okay.  And again his going seven long years without a

11   problem, that type of performance wouldn't have given you

12   reason to suspect he was going to reoffend when he was

13   released, right?

14   A.   Well, but taken in and of itself one variable would just

15   be one issue, but that's correct.

16   Q.   Okay.  But after he was released, he did reoffend,

17   right?

18   A.   Yes.

19   Q.   All right.  And he had a number of other legal issues

20   come up, correct?  Well, let me withdraw the question.  Let

21   me put it this way:  he was arrested for OUI, right?

22   A.   What is OUI?

23   Q.   Sorry.  Operating Under the Influence of alcohol?

24   A.   Oh, yes.

25   Q.   He was convicted for that, correct?

1    A.   I believe so, yes.

2    Q.   All right.  He was convicted of battery against his

3    girlfriend's adult child, right?

4    A.   I believe so, yes.

5    Q.   He was accused of -- essentially, of battery and rape by

6    his girlfriend, correct?

7    A.   Yes.

8    Q.   All right.  He tested positive for marijuana twice,

9    right?

10   A.   Yes.

11   Q.   He tested positive for PCP, correct?

12   A.   Yes.

13   Q.   And he committed his 1987 rape in the apartment, right?

14   A.   Correct.

15   Q.   Okay.  And you'd agree with me that was his most brutal

16   sexual offense?

17   A.   Yes.

18   Q.   And you'd agree with me again that Mr. Graham doesn't

19   want to be in prison, right?  He'd prefer to be out of

20   prison?

21        MR. SINNIS:  Asked and answered, your Honor.

22        THE COURT:  I'll let him answer.  Go ahead.

23   A.   Yes.

24   Q.   You'd agree with me he didn't want to be in prison

25   during any of his prior periods of incarceration, right?

1    A.   I believe so.

2    Q.   And you don't have any reason to believe that he liked

3    being behind bars during the incarceration after his first

4    rape conviction --

5    A.   Right.

6    Q.   -- right?  You don't think he wanted to return to

7    prison after he got out from doing that prison sentence,

8    right?

9    A.   No.

10   Q.   But he committed a sex offense anyway that resulted in

11   him going back to prison?

12   A.   Yes.

13   Q.   Okay.  And after he got out from doing the seven years

14   in prison that followed, you don't have any reason to think

15   he wanted to go back to prison, right?

16   A.   That's correct.

17   Q.   All right.  But, nonetheless, he committed a brutal rape

18   that sent him back to prison, correct?

19   A.   Correct.

20   Q.   Okay.  Now, a few questions regarding age ... in your

21   view age may be -- strike that.

22       In your view age is an important variable to assess

23   future risk, right?

24   A.   Yes.

25   Q.   Okay.  Now, you included the chart of Page 28 of your

1    report, right?

2    A.   Yes.

3    Q.   And this chart came from the Static-99 Scoring Manual,

4    correct?

5    A.   That sounds right.

6    Q.   What did you say?

7    A.   That sounds right.

8    Q.   Oh, okay.  And are you aware that the chart was

9    originally included in an article by Karl Hanson?

10   A.   That's my understanding, yes.

11   Q.   And that article by Karl Hanson was entitled:

12   Recidivism & Age?

13   A.   That I don't know.

14   Q.   Is this the Static-99 Scoring Manual that you had

15   referred to?

16   A.   Yes.

17   Q.   Okay.  For the record, it's entitled:  Static-99 Coding

18   Rules Revised 2003 by Andrew Harris, et al.  If we turn to

19   Page 24, is that a copy of the graph that's in your report?

20   A.   Yes.

21   Q.   And down below is there a reference to Hanson, R.K.?

22   A.   Yes.

23   Q.   Recidivism & Age Follow-up Data on 4,673 Sexual

24   Offenders?

25   A.   Yes.

1    Q.   Now, when you used that graph in your report, have you

2    gone back and looked for that article?

3    A.   I don't remember.

4    Q.   Have you ever heard of the name Karl Hanson when you

5    first used that graph in your report?

6    A.   I believe I had, yes.

7    Q.   And was that in your deposition taken on July 18, 2008?

8    A.   I don't recall.

9    Q.   Now, this graph, we're again looking at Page 28 of your

10   report which is in evidence as Exhibit 25, does this chart

11   take into account only high-risk sex offenders?

12   A.   I don't know.

13   Q.   Okay.  So this chart may be based on data as far as you

14   know that includes moderate risk and low risk sex offenders,

15   is that fair to say?

16   A.   I'm saying I don't know.  I don't remember exactly how

17   the data was gathered.

18   Q.   You don't know one way or the other; in fact, you're

19   not sure if you referred to that Hanson article before you

20   included this in your report, correct?

21   A.   Right.  It's in the scoring manual, and that's, that's

22   why I used it.

23   Q.   Okay, and do you recall any discussion in the scoring

24   manual about the data that was used to prepare this graph?

25   A.   I believe so.

1    Q.   Yeah.   Now, with respect to this chart in determining

2    Mr. Graham's risk of recidivism, we should focus on the 50

3    to 59 category, which is down here, correct?

4    A.   Okay.

5    Q.   And we would focus on the line that's on this chart for

6    rapists, is that right?

7    A.   Yes.

8    Q.   Okay.   And the one for rapists is the solid line with

9    the dots on it, right?

10   A.   Yes.

11   Q.   Then, there's another line for "exact CM," what does

12   that refer to?

13   A.   I can't remember the exact CM -- there's a big

14   difference between incest and kind of nonincest abusers; I

15   can't remember exactly what the CM stands for.

16   Q.   Is it extrafamilial child molestation?

17   A.   That's it.   I believe so.

18   Q.   Okay, and then we've got a line here for incest, right?

19   That's the dotted line down the bottom here?

20   A.   Yes.

21   Q.   Okay.   Now, at the bottom here there are various age

22   categories, correct?

23   A.   Correct.

24   Q.   All right.   Now, Mr. Graham is how old?

25   A.   He would be 58 now, I believe.

1  Q.  58 or 59 perhaps?

2  A.  Yes.

3  Q.  Okay.  In any event, he'd fall within this category

4  here of 50 to 59, right?

5  A.  Correct.

6  Q.  And if we look at the line for rapists, that would be

7  somewhere in this neighborhood here, correct?

8  A.  It looks like it, yes.

9  Q.  All right.  Now, it is your understanding that the risk

10  of recidivism in individuals with antisocial personality

11  disorder tends to ameliorate during their fourth decade of

12  life, right?

13  A.  Well, the risk of recidivism would be one element of

14  it.  There's a change in, change in their life, and there's

15  conflicting evidence on this:  there's some that say their

16  basic core personality stays the same, but that their

17  criminal behavior actually goes down because -- sorry, I'm

18  not saying this very well, but, in general, yes.  There

19  seems to be a change in the 40s with people with antisocial

20  personality -- all of the personality disorders.

21  Q.  Okay.  And I think you referred to the fourth decade in

22  your report, right, the fourth decade of life?

23  A.  Yes.

24  Q.  And you say in your report:  "Antisocial personality

25  disorder begins to ameliorate in the fourth decade of life,"

1    right?

2    A.   Correct.

3    Q.   Now, the fourth decade of life, if we look on this

4    chart, we see a dip here; do you see this dip?

5    A.   Yes.

6    Q.   Okay.  And that is from the age range of 35 to 39,

7    right?

8    A.   Yes.

9    Q.   And that's during the fourth decade of life, right?

10   The first decade would be 0, it's either 9 the second decade,

11   10 to 19?

12   A.   Yeah.  Yeah, I think I probably should clarify:  I

13   think I meant the fourth decade of adult life, so it would

14   be the next one.

15        MR. GOLD:  Your Honor, I'm going to object to this.

16   I mean, I don't think there's anything in evidence that

17   shows that any of these people or most of them have

18   antisocial personality disorder.  It seems like we're mixing

19   two different areas of the research to potentially confuse

20   the facts.

21        MR. SAVERY:  I think they're entitled to a redirect,

22   your Honor; I'm just asking the witness questions.

23        THE COURT:  Yes, I'm going to overrule the objection.

24   Q.   Okay.  But in any event, we do see here for rapists --

25        THE COURT:  I should just remind everybody:  we have

1    no more than one hour left today --

2             MR. SAVERY:  I've got it, your Honor.

3             THE COURT:  -- for everything....

4    Q.   We see a dip here, again, during the 35 to 39 range for

5    rapists, right?

6    A.   Yes.

7    Q.   All right.  Now, for the 50 to 59 range that would be --

8    would you say that's just under 10:  10% is the recidivism

9    rate?

10   A.   Yes.

11   Q.   All right.  For the 35 to 39 range, I'll circle that

12   here, would you say that's a little over 10?

13   A.   Yes.

14   Q.   All right.  So we're talking maybe 11, 12?

15   A.   Yes.

16   Q.   All right.  So according to this chart, Mr. Graham's

17   risk of recidivism, assuming this chart applies to

18   Mr. Graham, when he was in his 35 to 39 range, he was in

19   the range of 11, 12% according to this chart?

20   A.   Correct.

21   Q.   Okay.  And he was 37 years old when he committed the

22   1987 rape in his apartment, right?

23   A.   Yes.

24   Q.   He was 35 years old when he committed the battery on the

25   girlfriend's daughter, right?

1    A.   I believe that's correct.

2    Q.   Okay.  And he was 35 when he allegedly committed the

3    battery on the girlfriend, correct?

4    A.   Yes.

5    Q.   All right.  He was 35 when he was convicted for an OUI,

6    right?

7    A.   I don't have the exact ages, but I'll take your word for

8    it.

9    Q.   He was 36 when he tested positive for marijuana and PCP,

10   right?

11   A.   I think he was in his 30s.

12   Q.   So although the data for the 35 to 39 age group suggests

13   a rate of recidivism of 11 or 12%, Mr. Graham didn't fall in

14   that 11 or 12%, right?

15   A.   I'm not sure what you mean.

16   Q.   Okay.  I'm sorry.  He did fall within that 11 or 12%; in

17   other words, what this is telling us is that 11 to 12% of the

18   folks in the 35 to 39 age group would recidivate?

19   A.   Well, exactly, that's not what it says.  What it says

20   is that that's a risk which is essentially saying the same

21   thing but to technically correct, it's the rate of

22   recidivism so it's slightly different than that ... like

23   each year that goes by where a person isn't recidivating

24   actually decreases their individual risk --

25   Q.   Okay.

1    A.   -- compared to the group; but as a general rule, what

2    you're saying is correct.

3    Q.   Okay.  So, again, as a general rule, 35 to 39, that was

4    the age range where Mr. Graham fell when he committed his

5    third rape, right?

6    A.   Yes.

7    Q.   Okay.  And we're now in the 50 to 59 category, and we're

8    only one or two percentage points below where he was at 35 to

9    39, correct?

10   A.   That's true.

11   Q.   All right.  Now, your opinion is that Mr. Graham's

12   prognosis is poor if he's released into the community with

13   no follow-up treatment, right?

14   A.   Without any support, that's correct.

15   Q.   Okay.  You believe his prognosis is better if he's

16   released into a program with intense supervision and

17   intervention with respect to sex offender treatment, right?

18   A.   Yes.

19   Q.   In fact, you say here on Page 30 of your report:  "I

20   believe his prognosis is poor if he's committed to long-term

21   psychiatric inpatient care, or, alternatively, if is

22   released to the community with no follow-up or treatment.

23   Alternatively, I believe his prognosis is much better if

24   he's released to a community-based mandatory program with

25   intensive supervision and integrated intervention for sex

```
1    offender management," right?

2    A.   Correct.

3    Q.   Okay.  And Mr. Graham has refused sex offender

4    treatment, right?

5    A.   Yes.

6    Q.   He has repeatedly refused to participate in

7    psychotherapy while he's been incarcerated, right?

8    A.   I'm not so sure about the psychotherapy.  I'm not sure

9    if that was even offered to him, but he's definitely not

10   expressed an interest in those kinds of things.

11   Q.   In the course of your review of the documents, did

12   you review Department of Corrections Progress Reports?

13   A.   I remember seeing some, yes.  Is it Bates stamped?

14   Q.   Yes, it is.

15   A.   Okay, yes.

16   Q.   I'm referring now to what's in evidence within

17   Exhibit 17, at Page 765, so this is a document you

18   reviewed, right?

19   A.   Off the top of my head, I don't remember, but it looks

20   like the types of things I reviewed in other documents.

21   Q.   Okay.

22   A.   And that looks like it.

23   Q.   I'm sorry?

24   A.   And what you're showing now looks more familiar.

25   Q.   And if we go down here to the evaluation section in
```

1    this report, it says here:  "Mr. Graham's position is

2    that as long as the parole board insists that he shows

3    significant growth in psychotherapy and he has no desire for

4    such participation, he will continue to be denied parole.

5    He has virtually reached the position of deciding not to

6    apply for parole and requesting that his case be continued

7    until his conditional release date."

8        Do you see that?

9    A.   Yes.

10   Q.   Okay.  And then we have a subsequent Department of

11   Corrections Progress Report; and for the record, this one

12   is Page 760 of Exhibit 17, and this one reads:  "The

13   essential reason for the repeated denials of parole has been

14   Mr. Graham's reluctance to involve himself in psychotherapy

15   to the extent that the parole board felt comfortable in

16   releasing him to the community," do you see that?

17   A.   Yes.

18   Q.   Okay.  Now, his attitude toward psychiatric treatment

19   hasn't changed, right?

20   A.   That appears so.

21   Q.   Okay.  As you note in your report he's told you he

22   doesn't want psychiatric treatment, right?

23   A.   Correct.

24   Q.   And would you say that's one of the things he said

25   during his interview that you found to be truthful?

1    A.    That surely seems consistent with his pattern of

2    behavior and his statements in the past.

3              MR. SAVERY:  Nothing further, your Honor.

4              THE COURT:  Okay.  Anything else.  Redirect?

5              MR. SINNIS:  Briefly.  We'll be done or I'll be done

6    shortly; and then if the government has follow up, we'll

7    definitely get this done by 4:15.

8              THE COURT:  Okay.

9              REDIRECT EXAMINATION BY MR. SINNIS:

10   Q.    There was much talk about what Mr. Graham did or didn't

11   want while he's been in prison --

12   A.    Yes.

13   Q.    -- on questioning from Mr. Savery?  Showing you a

14   document:  Psychological Services Intake Screening Summary,

15   Bates stamped 338; and under drug abuse history, let me just

16   scan this out for you ... can you please read what it says?

17   A.    "Inmate Graham reported an interest in participating in

18   program treatment."

19   Q.    Well, it says --

20   A.    I'm sorry.

21   Q.    Oh, you're down there, fine.  I was going to ask you to

22   start above that --

23   A.    I see it.

24   Q.    -- the drug abuse history sir?

25   A.    "Inmate Graham reports a history of substance abuse.

1    His primary drug of abuse is heroin and marijuana.  He is

2    interested in drug abuse treatment."

3    Q.   Then it goes on later:  Program Treatment

4    Recommendation.  It says:  "Inmate Graham reported an

5    interest in participating in programs and treatment,"

6    correct?

7    A.   Correct.

8    Q.   And that was in 2004?

9    A.   Correct.

10   Q.   I don't want to go document by document here ... is

11   it fair to say that based upon your review in this case that

12   sometimes Mr. Graham says he wants treatment, sometimes he

13   doesn't; sometimes he said he injected heroin through a

14   needle, sometimes he said he didn't.

15       Is there inconsistency within the documents as a whole

16   with regard to this?

17   A.   I mean, is there -- I'm not sure I understand the

18   question.

19   Q.   Well, I mean --

20          THE COURT:  In other words, given the fact that

21   there's conflicting stories, that that is what is throughout

22   the documents; is that what you're saying?

23   Q.   Right.  Sometimes Mr. Graham says:  I want drug

24   treatment, sometimes he doesn't, right?  Clearly, from this

25   he says he wants it here, correct?

```
1    A.   Yes, but I mean I've reviewed documents for other people

2    over 30 years of incarceration, and there's going to be

3    certain times they say different things.

4        I mean, one of the things that worries me about

5    psychotherapy is, is:  psychotherapy for what?  If the

6    prison was saying he has no condition, what would he need

7    psychotherapy for?

8    Q.   I would just also point out that the documents

9    Mr. Savery showed you were from 1981 and 1982 when he was

10   held in a DC facility called York so they're over 27 years

11   old as well, but so you're used to seeing conflicting points

12   in documents like this, correct?

13   A.   Yes, and it's the nature of substance abuse that people

14   have different ideas at different times.

15   Q.   Okay.  Now, I want to go back to something Judge Tauro

16   asked you a question about, which was:  if it's not in the

17   DSM, you take the opinion that it's not a serious mental

18   illness, correct?

19        THE COURT:  It could be a crime, but not a serious

20   mental illness?

21   A.   I think that's a good way to say it.  It's just the

22   evidence to say something is a serious mental illness that's

23   not DSM -- that's not in DSM, I mean, theoretically, is it

24   possible?  Yes, but it would require much more evidence than

25   is usual for a diagnosis.
```

1    Q.   Okay, and now I want to go with the counter to that:
2    just because it's in the DSM in your opinion doesn't
3    necessarily make it a serious mental disorder, correct?
4    A.   Absolutely.
5    Q.   Okay, and can you talk about that?  Are there
6    qualitatively different aspects to things contained within
7    the DSM-IV?
8    A.   Yes, the DSM is just a collection of diagnoses that
9    psychiatrists have recommended be put into this book; in
10   that, there's some consensus on.  There's committees formed,
11   they take votes; some of the diagnoses have a lot of
12   evidence for, some of them don't have as much evidence for
13   ... so there's a lot of different reasons why a diagnosis
14   goes in.
15       A diagnosis may be excluded for a lot of reasons.  The
16   most important being is that there's not enough evidence
17   really to support its existence; but even within DSM, just
18   the mere inclusion says nothing about whether or not it's a
19   serious mental disorder.
20       I think I was mentioning earlier mathematics disorder ...
21   you know, is it important for a child that's having
22   difficulty in math?  Yes.  Is it a serious mental disorder
23   that might require, you know, hospitalization or medications
24   or impairs their ability to function in the world?
25   Absolutely not.

1    Q.   All right.  And so we're clear too, whatever name we

2    want to give this diagnosis that we've been talking about:

3    Paraphilic coercive disorder, paraphilic rapism, paraphilia

4    NOS (nonconsent), that was considered for inclusion in the

5    DSM, correct?

6    A.   It was very carefully considered and rejected.

7    Q.   Okay.  And part of the reason it was rejected, you

8    talked about sometimes things aren't in there because there's

9    not enough scientific validity to them; is that part of the

10   reason why this was rejected?

11          MR. SAVERY:  Objection, your Honor, leading.

12          THE COURT:  That's not leading; it doesn't suggest

13   the answer.  Go ahead.

14   A.   Well, there's many reasons things are rejected, and

15   that was probably one of the most intensely debated issues

16   that came up in the APA in the last 20 years.  And there was

17   a small group of people that advocated very strongly to have

18   it put in; but when they looked at the evidence, there just

19   wasn't enough to support its enclosure, and it's not been

20   reconsidered since that time.

21   Q.   Now, Mr. Savery asked you some questions about what you

22   could and could not reach in terms of your opinions to a

23   reasonable degree of medical certainty, and you opined to

24   him that on the ultimate issue of whether or not someone is

25   a sexually dangerous person as defined by the statute that

1    you could not reach an opinion to a reasonable degree of

2    medical certainty as to that, correct?

3    A.   Yes.

4    Q.   Okay.  But you have reached in this case an opinion on

5    whether or not he suffers from paraphilia to a reasonable

6    degree of medical certainty, correct?

7    A.   That's correct.

8    Q.   And what is your answer to that?

9    A.   That he does not.

10   Q.   Okay, and you have concluded in this case to a

11   reasonable degree of medical certainty that ASPD declines in

12   severity over time and age, correct?

13   A.   Yes.

14   Q.   And the reason, if I'm understanding you correctly, as

15   to why you don't want to opine to the ultimate issue is that

16   similar to -- I mean, in law, we have this concept that

17   experts are not supposed to opine on the expert issue like

18   in insanity cases you present the evidence, but you don't

19   say whether someone's sane or not insane, correct?

20   A.   Correct.

21   Q.   Is that where you're coming from as a medical

22   professional?

23   A.   That's one of the issues.  The other one would be:

24   there are things that I can say with reasonable medical

25   certainty that -- in the negative that would be, but I can't

1    say in the affirmative because there's not enough science to

2    support it.

3         If someone just decides to make up a mental disorder,

4    and it's popular for some reason, people start to talk about

5    it; when I say that I should not comment on it with

6    reasonable medical certainty, it's not that I should not

7    comment on it in the negative; I can say this doesn't reach

8    the scientific level of rigor that needs to be ... what I

9    can't do is go around testifying that it does exist.

10   Q.   So, for example, in this case, you can say that

11   paraphilic coercive disorder does not exist in this case

12   even though you might not accept it as a concept?

13   A.   Yes.

14   Q.   Now, Mr. Savery mentioned some confusion on whether or

15   not sexual sadism is a separate diagnosis or if it's

16   contained under paraphilia NOS.

17        First, as a more broad matter, you did not diagnose

18   Mr. Graham as being a sexual sadist, correct?

19   A.   That's correct.

20   Q.   All right.  And you had mentioned, and I just would

21   like you to elaborate on it, I think I got your words down,

22   that's the current debate within the publication of the DSM-V

23   with regard to sexual sadism.  What did you mean by that?

24   A.   Yes, I apologize for --

25             THE COURT:  You've got to give me that again.

1          MR. SINNIS:  He had mentioned on Mr. Savery's

2     examination --

3          THE COURT:  Direct the question to him.

4     Q.   -- that there was a debate going on within the -- are

5     they about to come with or working towards a DSM-V?

6     A.   Yes.  I mean, Mr. Savery was exactly correct:  in DSM-IV

7     sexual sadism is not under paraphilia NOS.  I made a mistake

8     in stating that; and part of the confusion is it's one of

9     the things that's being considered and probably -- or there

10    is a good chance what will happen in DSM-V is that it will

11    be removed as a separate diagnosis and made as a qualifier

12    under paraphilia NOS ... so a person that has sexual sadism

13    would be given that diagnosis, and that still would be

14    recognized as a valid diagnosis, but it would become a

15    qualifier like paraphilia NOS, sexual-sadism type as opposed

16    to having a complete separate diagnosis on it.  There's just

17    so little --

18          THE COURT:  So paraphilia, is that in the DSM?

19          THE WITNESS:  Paraphilia NOS is.  It is, but it's --

20          THE COURT:  As a separate entity?

21          THE WITNESS:  It is, but it's very rare.  And so

22    they're trying to clean up the DSM, but there's been so much

23    confusion on this that in the past enough people could just

24    vote and almost anything could get labeled a diagnosis, but

25    they're being much more rigorous now about:  well, let's be

1   very careful about this and maybe make it a qualifier, but

2   put it under the NOS diagnosis.

3   Q.   Let's go back to his Honor's question about there is a

4   category under paraphilias that says:  Paraphilia NOS Not

5   Otherwise Specified, correct?

6   A.   Correct.

7   Q.   Okay.  The question presented I think in this case is,

8   and correct me if you see this as inaccurate:  paraphilic

9   coercive disorder, paraphilic rapism, paraphilic NOS

10  (nonconsent) does properly fit under the general rubric of

11  paraphilia NOS, correct?

12  A.   That would be one of the big questions, yes.

13  Q.   Okay, and what you have testified to is those three

14  things that I just mentioned:  Paraphilic coercive disorder,

15  paraphilic rapism, paraphilia NOS (nonconsent) were

16  considered and rejected by the authors of the DSM, correct?

17  A.   Correct.

18  Q.   And so there's a strong argument to be made that they

19  shouldn't then be put back into the DSM through this

20  catch-all paraphilia NOS category?

21  A.   Yeah.  It's kind of disingenuous to say:  well, the

22  diagnosis was rejected so we're just going to do this

23  run-around and sneak it in come the back, which is the way

24  the psychiatric profession looks like -- talks about

25  paraphilic rapism; in that, the diagnosis was rejected.

1  Q.   What is -- now, just removing it from this case, what is

2  a diagnosis of paraphilia NOS?  I mean, what are some of the

3  ones that are listed in that category if you have the book

4  there or if you can remember them off the top of your head?

5  A.   Well, there's telephone scatologia, that's making

6  obscene phone calls and getting sexually aroused at that;

7  it's almost limitless what could possibly be under

8  paraphilia NOS.

9  Q.   Is there some kind of uncertainty?  I mean, what

10  distinguishes something from having a defined separate

11  diagnosis as a paraphilia like pedophilia versus something

12  being placed into the NOS category; what does that say from

13  a scientific standpoint?

14  A.   The amount of evidence and the professional consensus

15  as to whether or not this exists.  I mean, for example,

16  telephone scatologia ... there's very little written in the

17  scientific literature about it, but there's enough case

18  records that this might exist that they allow it to be

19  diagnosed under paraphilia NOS; even though they're saying

20  there's not enough evidence to support this as a separate

21  diagnosis, but telephone scatologia was never explicitly

22  rejected as a diagnosis.  That's the unique thing about

23  paraphilic rapism is it was considered and explicitly

24  rejected.

25  Q.   And these NOS categories, they're throughout the DSM;

1    they're not just unique to the paraphilias, correct?

2    A.   Every category has a NOS diagnosis.

3    Q.   And to some degree, they're to express some degree of

4    uncertainty?

5    A.   That's actually their primary use, is when you have

6    incomplete information.

7         MR. SINNIS:  One moment, your Honor....

8    Q.   You indicated that age is one of the more robust

9    indicators in terms of risk assessment?  I mean, is that

10   your opinion as a medical professional?

11   A.   Yes.

12   Q.   And why is that?

13   A.   Well, that's -- it's one of the most important

14   standards in the medical psychiatric literature that has

15   really stood the test of time is that criminal behavior,

16   antisocial behavior, becomes less as people get older ...

17   there's challenges to it.  There's people that want to

18   commit elderly sex offenders, and so there's a rigorous

19   debate going on in the literature, and people are trying to

20   challenge it, but some attempts to challenge it do not

21   invalidate where we have been at for a long period of time

22   that age is one of the single most factors that lessons risk.

23        MR. SINNIS:  Nothing further, your Honor.

24        THE COURT:  Anything else?

25        MR. SAVERY:  No further questions.

```
 1              THE COURT:  Do both sides rest?

 2              MR. SAVERY:  Yes, your Honor.

 3              MR. SINNIS:  Yes, your Honor.

 4              THE COURT:  Okay, good.  Now, what do you want to do

 5     -- you're excused, Doctor.  Thank you.  Proposed findings of

 6     fact 30 days after you get the transcripts, is that

 7     reasonable?

 8              MR. GRADY:  Yes, your Honor.

 9              MR. SINNIS:  That is, your Honor.

10              THE COURT:  Okay.  Now, how did we do it before ...

11     after we had the initial exchange of facts -- now,

12     understand when I want proposed findings of fact, I don't

13     want editorials; I just want facts.  You can write a

14     memorandum in support of the facts, but the proposed

15     findings of facts are pure, just the facts.

16              MR. SINNIS:  Just for the record cite --

17              THE COURT:  Yes, John Doe lives in Malden, Record 3,

18     Page 3, Line 2, you know, that type of thing.

19              MR. SINNIS:  But we're not precluded obviously from

20     filing a more argumentative brief?

21              THE COURT:  No, if you want to do that, you're

22     certainly welcome to it; it would be very helpful.

23              MR. SINNIS:  You're envisioning simultaneous filings?

24              THE COURT:  I am, and then what I was trying to

25     figure out is how much time you might need for a responsive
```

```
1    memoranda?
2         MR. SINNIS:  Obviously, from our standpoint, the
3    less time the better, given the fact that every day
4    Mr. Graham continues to sit.
5         THE COURT:  Well, you tell me.
6         MR. GRADY:  Well, there hasn't been response to
7    memoranda that I'm aware of to date.  I think that we could
8    just in this case go with findings and initial memoranda
9    and have the Court decide....
10        MR. SINNIS:  I think we would agree with Mr. Grady,
11   but reserve our right and the government can reserve their
12   right that if there are going to be any responsive pleadings
13   that they're filed within two weeks of the filing of the
14   initial briefing, if that makes sense to your Honor?
15        MR. GRADY:  That's fine, your Honor.
16        THE COURT:  I'll give you an open window, two weeks
17   after the initial exchange.
18        MR. GRADY:  Great.
19        THE COURT:  Anything else?
20        MR. SINNIS:  I don't believe so, your Honor.
21        THE COURT:  I want to tell you something ... you
22   know, I was kidding you before about asking so many
23   questions.  This case was very, very well-prepared, very
24   well-tried; a terrific professional job, both sides.  It
25   was a pleasure to preside over it.  I wish that I could
```

1    make both of you win, but I can't; one of you will win, one

2    side will lose, but you're pros, and you understand that's

3    the way it goes, but it was very well-handled by everybody.

4              MR. GOLD:  Thank you, Judge.

5              MR. GRADY:  Thank you.

6              MR. SAVERY:  And of course on behalf of all of us we

7    wish Zita well, your Honor.  Please let Zita know we all

8    wish she and her mother well.

9              THE COURT:  Her mother, thank you, we certainly will.

10             THE CLERK:  All rise....

11             (Whereupon, the proceedings concluded at 3:40 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3          I, Helana E. Kline, a Registered Merit Reporter,

4     Certified Realtime Reporter, and Federal Official Court

5     Reporter of the United States District Court, do hereby

6     certify that the foregoing transcript, from Page 1 to

7     Page 177, constitutes, to the best of my skill and ability,

8     a true and accurate transcription of my stenotype notes

9     taken in the matter of the United States of America v.

10    Wesley Graham.

11

12

13

14

15

16

17

18

19

20

21

22

23          /s/ Helana E. Kline              September 21, 2009

24          Helana E. Kline, RMR, CRR

25          Federal Official Court Reporter